## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT FOR TENNESSEE

| | | |
|---|---|---|
| **TIMOTHY ALLEN ATCHISON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number** _____ |
| | ) | |
| | ) | **Jury Demand** |
| **HUBBELL INDUSTRIAL CONTROLS, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

## I.  INTRODUCTORY/JURISDICTIONAL STATEMENT:

A.  Plaintiff, **Timothy Allen Atchison,** is a resident of Gallatin, Sumner County, Tennessee, residing at 353 Sunset Island Trail (37066).

B.  Defendant, **Hubbell Industrial Controls, Inc**. (hereafter referenced as **"Hubbell"),** is a corporation formed within the State of Delaware, maintaining a principal business office (40 Waterview Drive, Shelton, CT 06484) in the State of Connecticut, and a Registered Agent (Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312) on file with the Office of the Secretary of State for the State of Tennessee.

C.  Venue and jurisdiction of the case are based upon diversity, pursuant to 28 USC § 1332, predicated on the amount in controversy and diversity of citizenship of the parties.

D.  Plaintiff, **Timothy Allen Atchison,** presents alternative, complementing claims against Hubbell, predicated upon the following legal and equitable theories:

(1) joint venture:   profit/proceeds accounting

(2) quantum meruit/unjust enrichment; and

(3) fraud and intentional misrepresentation/concealment of claim.

(4) constructive trust/confidential relationship/fiduciary breach

(5) patent violation

E. Upon the factual premises detailed below, and the related legal claims, as described, Plaintiff seeks an accounting; compensatory and punitive damages; and, declaratory/injunctive relief within the meaning of FRCP Rule 57. Plaintiff requests a jury trial.

## II. <u>MATERIAL FACTS RELEVANT TO THE PLAINTIFF'S CLAIMS:</u>

### A. <u>Plaintiff's training and vocational history with Bonitron and Powerohm Resistors, Inc.:</u>

(1) Plaintiff is trained as an electronics design engineer. Plaintiff's early professional history commenced at a (non-party) company known as "**Bonitron, Inc.,**" which focused its industrial activities on a broad range of commercial and governmental electronic projects. Those projects included production of complex electronic devices that focused on ultrasonic electronic equipment, intended to verify the integrity of the welds and seams in rocket fuel tanks, fluid flow metering, as well as various products designed for the fiber industry with such companies as E.I. Dupont. Plaintiff's work experience, and continuing education in the field of ultra-complex electronics, resulted in an amicable, productive and challenging 30-year career during his tenure with his initial and former employer, **Bonitron, Inc.**

(2) Entirely independent from his routine work activities at **Bonitron,** Plaintiff, at his personal residence, experimented with highly complex technical subjects in his spare time, and as a hobby that complemented his routine work activities for **Bonitron.**

(3)   Plaintiff devoted many hundreds of hours of his spare time to highly-specialized, narrowly-focused research and development.  Consistent with a high level of personal curiosity and interest in a separate, emerging industrial electronics field, (but unrelated to his duties at **Bonitron**) Plaintiff Atchison focused an intense, personal research in conceiving an enhanced, superior **<u>electronic controller device</u>**, generically described as a **"Brake Power Module" (or, "BPM"),** for use primarily in motor control systems, but not limited to that purpose**.**

(4)   Plaintiff's innovative BPM experimentation became known within the narrow, specialized industry.

(5)   As Plaintiff continued in his spare time with his personal, independent work focused on conceiving and developing what Plaintiff describes as a **"<u>Dynamic Brake Module</u>,"** Plaintiff received <u>both</u> a sales and engineering job offer, and a proposal from **"Powerohm Resistors, Inc." ("Powerohm")** representatives for a separate joint venture proposal in 2008.  The proposed focus of Plaintiff's sales and engineering efforts for **Powerohm** was to be similar in nature and scope to the work performed at **Bonitron,** and started with an AC Generator Module Project for Omron Oilfield and Marine.   The basic component of the **Powerohm** work was generic in nature, and involved routine maintenance, repair, sales and marketing of components into heavy industry "motor-control systems."

(6) Plaintiff's proposed specific job title with **Powerohm** was "product design engineer," for which he was to be paid a basic salary of $7,000.00 (seven thousand dollars) per month, plus commission on "new division" sales.  But, that relatively-secondary work was to be collateral to **Powerohm's** unrelated proposed plan for a joint collaboration focused on development and marketing of Plaintiff's novel, ultra-complex **BPM, "<u>Dynamic Brake Module</u>" and/or any**

**other items listed in the "business Plan,"** as well as establishing a new division, **"Power Electronics."**

(7) Plaintiff accepted the job offer by **Powerohm** in 2008, and thereafter experienced an amicable and financially productive tenure of employment. The basic, in-house employment position was a casual, "at will" position, with no formal written employment or operational agreement. Plaintiff consistently received positive performance reviews.

(8) Subsequent to his employment with **Powerohm,** Plaintiff trustingly shared with **Powerohm** management (specifically, **Mike Crowe** and **Vance Hinton**) the general details (but **not** the specific technical plans and specifications) of his personal, narrowly-focused research directed toward the development of a technically unprecedented **"Dynamic Brake Module."** Generically described, Plaintiff labeled his technically-unique and enhanced new device as a **"chopper"** based on the functional intent of the device to divert "regenerated" energy into an extremely high-wattage electronic component known (generically) as a "resistor." The source of that regenerated energy is a motor.

(9) As his personal, proprietary intellectual property, Plaintiff now owns (presently pending, see attached Complaint exhibit #1) a preliminary patent approval for elements of the uniquely conceived, designed, and implemented **"Brake Power Module."** At the time of his commencement of his joint venture discussions and planning with his former employer (non-party) **Powerohm,** no similar project existed.

(10) No related, specific industry plans for the BPM/ DBM projects pre-existed Plaintiff's home-based "hobby" work. Conversely, the broad industrial focus of **Powerohm** included the production and sale of power resistors for industrial motor-control devices, and harmonic filtering, neutral grounding resistors, and ground fault locators. Nothing in existence

at that early stage of the parties' relationship (commencing in about 2008) contained the specific combination of discretely-unique, highly-complex features and power capacities conceived by Plaintiff, and eventually shared with **Powerohm** (and its successor in interest, Defendant Hubbell), as his employers/joint venturers. Plaintiff never executed any agreement with either Powerohm or Hubbell for **"assignment of inventions"** or **"ownership of discoveries."** Conversely, all conduct and communications, as alleged herein, suggested the opposite, including **the Powerohm-prepared** documentation of the plans for the joint venture, see Exhibit 2 (9-2-05, e-mail from Hinton).

(11) The uniquely-conceived features, with elements now patent-pending by Plaintiff, require a detailed, highly-complex description which may not be concisely described in an abbreviated manner **(see par. "II B, Items A-P," as detailed below),** see Complaint exhibit #1.

B. **Plaintiff's confidential relationship with Powerohm's Mike Crowe, Vance Hinton; the resulting joint venture; and, subsequently, Hubbell:**

(1) Upon innocently and trustingly sharing Plaintiff's uniquely-conceived narrowly-specialized Brake Power Module to the above-named **Powerohm** officials (and as later employees of Hubbell), the **Powerohm** management team was complimentary, acknowledging to Plaintiff the absence of any similar, competitive device. A resulting extended discussion between Plaintiff and **Powerohm** started in about 2008 focusing on what all parties mutually identified as potential, novel multi-million-dollar market.

(2) Plaintiff possesses no business acumen. An ensuing naïve and casual arrangement was based upon friendship, trust, oral promises, and Plaintiff's reliance upon the contents of the attached and incorporated "business plan" **submitted by Powerohm** to various banks in

furtherance of the financing for the joint venture—the "new division," named **"Power Electronics"** by Plaintiff.  Those confidential, sensitive, financial corporate documents would <u>not </u>have been shared with "just" an employee (see Complaint exhibit #2).

(3)   Plaintiff asserts the existence of a **<u>confidential relationship</u>**, initially through Mike Crowe and Vance Hinton, as **Powerohm** agents.  Subsequently, Plaintiff interacted in that ongoing confidential relationship with Hubbell agents Andrew Thexton and Lucien Rainville.  Agents Crowe and Hinton were the **dominant** parties, and Plaintiff was the **servient** (subordinate and dependent) party.  Plaintiff understood very little about how the financing and marketing could be accomplished, and relied upon progressing assurances of **<u>Powerohm</u>** (and later **<u>Hubbell,</u>** recently learned to be false and predatory).  Certainly, acting on his own, Plaintiff recognized that he lacked the financial resources and the business acumen to bring the novel project from the planning stage to the world industry markets.

(4)   The ensuing discussions, innocently and naively-entered by Plaintiff with **Powerohm** agents Crowe and Hinton, resulted in the parties' definite agreement for a **<u>joint venture</u>**.  That plan was independent, and only tangentially-related to his basic **Powerohm** job duties, for which Plaintiff would continue to be paid a base salary of $7,000.00 (seven thousand dollars) per month, plus commissions on all item "new division" sales.

(5)   Because of his unique understanding of the device and its practical applications, Plaintiff was promised by Crowe and Hinton a new and much-expanded role in the newly-conceived joint business venture, **<u>"Power Electronics,"</u>** to be headquartered in Gallatin, Tennessee.  **Powerohm** was to provide the financing, business and legal oversight for the expensive manufacturing and distribution of the new devices.  Plaintiff was designated as the formal "Registered Agent." He was only generically and vaguely described in the planning

discussions as "their" (**Powerohm's**) "partner" and "manager" for the new joint venture project. In return for his overseeing and managing the entirety of the technical aspects of the BPM projects, as well as hiring, training, supervising, managing personnel, parts purchasing, tech support, sales etc., Plaintiff's simple financial arrangement was to be three (3%) percent of the gross, annual global receipts.

(6) Predicated solely upon Plaintiff's personal, unique BPM technical concepts, the separate, "new division" (the joint venture labeled **"Power Electronics"** by Plaintiff) was to include manufacturing the new BPM devices and the global marketing of those components to prospective customers. That would include the necessary field monitoring and maintenance of the devices once the devices were installed. Plaintiff was assured (by word and conduct by Crowe and Vance) the discretion and right to control the future "tweaking" involved in anticipated adjustments of the complex, novel device.

(7) Despite Plaintiff's 100% proprietary ownership of the subject matter of the new **"Power Electronics"** joint venture project (as Plaintiff's intellectual property), Plaintiff did not possess the business acumen or financial resources that could permit the manufacturing, sales, and marketing of the technically-complex **"Brake Power Modules."** Based on Plaintiff's enthusiasm for the immediate marketing of the innovative, industry-changing device that he had proudly conceived in his home-based, "dinner table," evening hobby efforts, Plaintiff readily agreed to a seemingly-modest (but overall equitable) 3% share in the distribution, marketing, and industry-wide sales of his **"Brake Power Module"** and all other items he created within the "new division".

(8) The joint venture, labeled and distributed in documents prepared by Crowe and Vance," as **"Power Electronics,"** would be a separate division of **"Powerohm."** E-mails and

the business plan reference its location as "Nashville, Tennessee." The minimal, written business plan, prepared by Plaintiff on behalf of **Powerohm**, is **attached as Complaint Exhibit #2.** **The joint venture's operational location (cited by Powerohm in its records) was the private residence of the Plaintiff in Gallatin, Tennessee.** Based upon those minimal documents prepared by **Plaintiff**, Plaintiff was consequently assigned (solely <u>by **Powerohm**)</u> the **Power Electronics** "Registered Agent" status with the Secretary of State Business Division. With principal **Powerohm** offices in Texas, no other Tennessee address existed. Although business activity at that time was regularly conducted by **Powerohm** within the State of Tennessee.

(9) The **"Power Electronics"** joint venture legal separateness is confirmed by documents which recite that Plaintiff's innovative work for the joint venture was to be accomplished at Plaintiff's Gallatin private residence, complementing, but supplemental to, his basic job for **Powerohm**, then **Hubbell**. Initially, agents for **Powerohm** (**Mike Crowe** and **Vance Hinton**) (later followed by Defendant **Hubbell** agents Thexton and Rainville) encouraged a disarming, casual informality that engendered trust by the Plaintiff that he would be treated fairly and honestly by both **Powerohm** and **Hubbell**. In the joint venture, Plaintiff was promised that he would be paid three-percent of the annual **gross** profits generated by Plaintiff's new designs, and specifically by the new joint venture entity, **"Power Electronics."** In the very early initial stages of the parties' discussions, Plaintiff was advised by **Mike Crowe**; **Vance Hinton; Joe Eschleman; and Rob Angel** that: (a) although the threshold steps were progressing slowly and gradually, Plaintiff would be kept apprised of the development and fruition of the joint venture efforts; and that, (b) both Plaintiff and **Powerohm** **"should eventually reap**

**enormous financial benefits"** from the newly-developed concepts described in the subparagraphs of "B" above.

C. **The Powerohm/Hubbell relationship:**

(1) **Powerohm** negotiated the sale of its tangible and intangible assets in 2014 to Defendant **Hubbell**. In Plaintiff's presence, in multiple conferences in 2014 and early 2015, **Hubbell** was fully briefed on the Plaintiff's BPM innovations, and therefore its above-named agents (primarily Dave King and Andrew Thexton) became aware of both the history and the promising status of **Hubbell's** joint venture with Plaintiff, and **Powerohm's** "new division," Gallatin-based **"Power Electronics."** Defendant **Hubbell** executives, specifically **Andrew Thexton** and **Dave King,** participated (with Plaintiff) in the ongoing joint venture meetings (and later, other unknown **Hubble** Executives, in private) with **Mike Crowe,** and **Vance Hinton,** as the plans were made for **Hubbell** to assume **Powerohm's** joint venture rights and duties in the new **"Power Electronics."** Plaintiff's early innovative history, and the technical, material details (summarized in the above factual statement) were discussed. **Hubbell** voiced support for continuing the Gallatin-based **"Power Electronics"** joint venture project. As detailed in paragraphs below, detailing what has been learned about **Hubbell's** fraud, **Hubbell** falsely represented it intentions, initially expressing a firm intent to perpetuate the joint venture, and to continue Plaintiff's leadership role in the joint venture. But, **Hubbell** had contrived a plan to ease Plaintiff out of the project, following the sale of the **Powerohm** entity to **Hubbell.** Over the course of the first year of ownership transition, having identified the prospect of enormous financial benefit, **Hubbell,** on non-existent grounds, deceitfully removed Plaintiff, and the **"Power Electronics"** joint venture, from its future business concerns, intending to adopt and convert Plaintiffs' intellectual

property for its own financial benefit. As presently understood by Plaintiff, Plaintiff can identify no further role by **Powerohm,** financial or technical, in the BPM venture project after 2014.

(2)   Plaintiff now knows, and herewith alleges, that Hubbell (by word and conduct implying that the project was of no further interest to them) later surreptitiously re-visited the implementation of the Plaintiff's work. **Hubbell** has produced and marketed the Brake Power Modules, generating many unaccounted millions of dollars annually.   **Hubbell**, discretely and privately, replicated Plaintiff's innovative intellectual property without ever seeking patent protection for the concepts and components detailed above in par. II B, items a-p. Conversely, Plaintiff's presently-filed patents on concepts enumerated in par. II B,
 a-p, remain pending, and protected, see Complaint Exhibit 2, and below.

(3)   At the formation of the joint venture, **Power Electronics,** Plaintiff alone possessed the proprietary, ownership rights in the above-itemized (Complaint, par II B, items a-p) technically-complex industrial innovations, now being exploited for its financial benefit by Defendant Hubbell.

(4)   To date, **Hubbell** has offered no compensation, no accounting of profits, and no professional credit to Plaintiff, despite **Hubbell's** initial, vocal enthusiasm for the adoption and implementation of Powerohm/Plaintiff's innovative **"Power Electronics"** joint venture. Defendant Hubbell, based on direct conversations in **2014** with Plaintiff, was aware of Plaintiff's retention of the original technical drawings, data, and component specifications from the early work that he alone commenced in approximately **2006,** and which continued to evolve, with improvements and modifications, through the time of the Defendants **Hubbell's** acquisition of **"Power Electronics."**  Inconsistent with its voiced, waning enthusiasm for the joint venture, **Hubbell**, as detailed below, soon demanded copies of Plaintiff's precise technical data.

**D. Defendant Hubbell's false promises in initially adopting, and then implying/pretending rejection, of the marketing of Plaintiff's BPM "Power Electronics" joint venture:**

(1)   As the attached, incorporated documentation confirms (Complaint Exhibit 2) representatives of **"Powerohm"** (specifically, Mike Crowe) offered ongoing representations to the Plaintiff (in **the Powerohm** acquisition by **Hubble**) that the new, discrete "joint venture" was perceived as viable, realistic, and profitable. Initially, the production and marketing would be developed at the full expense of **Powerohm** (later adopted and ratified by Hubbell), with three percent (3%) of the quarterly gross sales to be paid to Plaintiff quarterly after production and marketing had commenced.  Initially, it was assured to Plaintiff that his innovations would be nurtured and expanded by **Powerohm** (and later, **Hubbell),** through the new division formed for that singular purpose, **"Power Electronics**."  It is believed by Plaintiff that those first assurances were initially sincere, reflecting a genuine, threshold intent by **Powerohm** to further the BPM joint venture plan and purposes.  Both immediately prior to, and subsequent to, the **Powerohm** acquisition, **Hubbell's** representatives disingenuously repeated and conveyed those assurances, and positive assessments, directly to Plaintiff.  In educated hindsight, Plaintiff now alleges that **Hubbell,** upon finalizing its purchase of **Powerohm's** assets, secretly planned (through contrivance with the above-named former Powerohm officials) to unethically and unlawfully **convert** Plaintiff's intellectual property to the ultimate and exclusive benefit of Hubbell. Hubbel intended to eliminate Plaintiff from any financial entitlement, and to remove him entirely from its operation.

E.   **Hubbell's abrupt repudiation and contrived lack of interest:**   Plaintiff acknowledges that Hubbell had no contractual (or other legal) duty to proceed with the **Power**

**Electronics** joint venture. But, Hubbell did have a duty to not misrepresent (by silence or affirmative word or conduct) its plans for the profitable BPM project.  Mike Crowe  affirmed to Plaintiff that Hubbell had agreed to not dismantle the new division, meaning the joint venture, **Power Electronics.**  No patent protection was initially sought by Plaintiff, due to his being misled (by initially Powerohm's and, later, Hubbell's words and conduct), and his assumption, at the time, that his innovative ideas behind the joint venture may have been over-rated by him and his Powerohm mentors, and were not immediately, or in the foreseeable future, feasible to develop and market. Plaintiff was led to reasonably believe, in July, 2015, to his financial detriment, that the **"Power Electronics"** joint venture was dead, and no longer economically feasible. With no rational explanation offered, **Powerohm** abruptly demonstrated (at least, to Plaintiff's face) a diminished enthusiasm for the project.  Technically, nothing had changed. Plaintiff's inquiries to Crowe, Hinton, and others in  management, were evaded and never answered.  Following many previous months of enthusiastic planning and conversation, the sudden lack of interest by **Powerohm**, and subsequently, **Hubbell**, was reflected in ambiguous, vague expressions of uncertainty about the future of the joint venture. Still, Plaintiff completely trusted his joint venturers/collaborators.

       F.   **<u>Plaintiff's Contrived, Abrupt Termination:</u>**  In the same year, and just prior to his "termination," from Hubbell, by and through a comprehensive evaluation process, Plaintiff had received superior performance ratings, and was given a raise for his basic job functions.  One month before his termination, Plaintiff's approximate twenty-page performance review by **Lucien Rainville** echoed the previous yearly accolades. Very abruptly, in the weeks just preceding the Hubbell transition, Mike Crowe began to devote decreasing discussion to the parties' comprehensive **Power Electronics** joint venture business plan.  That sudden, diminished

interest was in sharp contrast to the excited **Powerohm** discussions in the parties' preceding meetings about the future of **"Power Electronics."** In approximately January 2014, with no consultation or advanced notice that involved Plaintiff, or the **"Power Electronics"** joint venture entity, Plaintiff was advised in a last-minute phone call from Tom Yingling that **Powerohm** had been sold to Defendant **Hubbell Industrial Controls, Inc.**, and that **"substantial"** (but unspecified) **"changes could be expected"** after the acquisition. Thereafter, over a short period, the strong implication in Plaintiff's discussions with **Hubbell** representatives, was that the **"Power Electronics"** joint venture was perceived as an idea that had not advanced in a positive manner. Impliedly, by conduct and demeanor, the joint venture became a matter of minimal interest to the new superiors of Plaintiff, at Hubbell. Plaintiff was advised by **Tom Yingling** that Plaintiff's subordinates were likely to lose their jobs, as the company's basic functions would be moved by **Hubbell** to "Archdale." Plaintiff was initially assured by Mike Crowe (with accolades), and then by Tom Yingling that his previous, basic job with **Powerohm** would remain secure under the new Hubbell management, **who had been fully apprised of the subject, status, and objectives of the joint venture.** However, and inexplicably, odd controversies were generated by management, who abruptly declined to pay to Plaintiff the earned commissions owed to Plaintiff on previous (both related and unrelated to the j/v) corporation work. **That collateral dispute was never finalized, and remained unresolved.** A period of inactivity and inattention to the "brake power module" innovations followed, suggestive to Plaintiff that the new management officials for **Hubbell** had lost interest in advancing the "brake power module" innovations (described in "II B, items a-p") above, and that the **"Power Electronics"** joint venture project was effectively dead. In ensuing months, the joint venture known as **"Power Electronics"** was no longer actively discussed. Then, with no legitimate explanation, Plaintiff

was **terminated in July 2015,** despite the fact that he was performing his basic job function in an exemplary manner, and was positively producing, technically and financially, for **Hubbell,** just as he had done with **Powerohm.**

G. **Defendant Hubbell's concealment of the conversion of Plaintiff's intellectual property:**

(1)    In hindsight, based upon information recently learned by the Plaintiff's investigation, it is reasonably asserted by Plaintiff that **Hubbell** purchased the **Powerohm** entity, fully aware of **Powerohm's** ethical and legal duties in the joint venture and **Hubbell's** newly-acquired, "new division" **(Power Electronics)**.  At an unknown point in the **Hubbell** privity acquisition of **Powerohm** and "**Power Electronics,**" **Hubbell** conspired to appropriate the intellectual property that was personally conceived by, and belonged to, the Plaintiff, without compensation.  Following a presently-unknown period of dormancy of the joint venture "**Power Electronics**" BPM project, **Hubbell**, discretely and quietly began to implement and merge Plaintiff's intellectual property into their industrial production and marketing. Using copies of the Plaintiff's 2006 technical specifications (demanded in 2014 by **Hubbell**, in odd contrast to its feigned, diminishing overall joint venture interest), **Hubbell** was able to replicate and master the functional basics of the technical innovations detailed above in Paragraph II B, items a-p., and as depicted in the patent documents (Complaint Exhibit #1).   Defendant **Hubbell** determined that it would evade **its assumed (by privity)** financial obligation to Plaintiff, and deviously eased Plaintiff out of the relationship. **Hubbell** management personnel had participated in the initial meetings in which Plaintiff's personal, separate role in the **Power Electronics** joint venture was discussed in detail, all in the context of the lucrative innovations enumerated in Paragraph II B, items a-o, detailed above, and in Exhibit #1.  Those agents/representatives of **Powerohm** and

**Hubbell** (specifically, **Mike Crowe, Vance Hinton, Andrew Thexton, and Dave King**) were fully aware of Plaintiff's intellectual proprietary stake in the technically-unprecedented innovations, and the duty to pay the promised three (3%) percent of gross annual sales.

     H.    **Plaintiff's Delayed Awareness of the Conversion of his intellectual property:**

     (1)    In the context of firing Plaintiff, Hubbell, by the conduct of its representatives (specifically, Andrew Thexton) began to voice diminished enthusiasm for Plaintiff's **"Power Electronics"** joint venture work, abruptly implying, in the post-sale 2014 and further meetings, an irrelevance and unimportance to the BPM project. That view was in contrast to the initial enthusiasm demonstrated by **Powerohm** officials (specifically, Mike Crowe). Inconsistently, Mr. Thexton, in that same pre-termination time-frame, dispatched Hubbell employee, Stuart Xiang, to the Defendants' Kentucky facility to retrieve and secure a duplicate copy of Plaintiff's original rough drawings; sketches, parts lists; and active vendor information. "Memory sticks" and or other data storage/transfer devices were used to reproduce Plaintiff's personal notes and drafts.

     (2)    While not fully yet understanding, <u>even presently, at this late date,</u> the full dynamics of that creatively-deceitful appropriation of his proprietary innovations, Plaintiff alleges a fraudulent subterfuge, **concealment**, and purposeful collusion to exclude Plaintiff from the financial promises which Plaintiff had relied upon, in the confidential relationship with his former joint venturer, **Hubbell,** under circumstances where he had no initial reason to suspect betrayal, subterfuge, deceit or conversion of his proprietary intellectual property.

     I.    **Plaintiff's enlightenment:**

     (1) Identification and recognition of the adoption and integration of Plaintiff's highly-complex technical concepts (enumerated in II B above, and see "patent pending" applications,

Complaint Exhibit #1) is not easily accomplished, since those innovative improvements involve only partial **<u>components</u>**, adapted to much larger, comprehensive industrial systems. The components are not separately marketed or advertised.

(2)   Plaintiff's recent professional work on a broad range of current projects that touch upon innovations in industrial power controls,  has resulted in the Plaintiff's awareness that his proprietary (joint venture) ideas and concepts had not been abandoned by **Hubbell**, and instead, had been only quietly and discreetly appropriated and adapted to **Hubbell's** profit-driven purposes, greedily facilitated by Plaintiff's (never-explained) abrupt removal from his consistently well-rated **Hubbell** employment.

(3)   Through an atmosphere of friendship, casualness, and solicited trust, Plaintiff, as a vulnerable business novice, initially had no reason to suspect that mega-corporation **Hubbell** had misrepresented to Plaintiff its implied abandonment of the **"Power Electronics"** joint venture objective (with **Powerohm**) to develop, manufacture and market the Plaintiff's uniquely-conceived, proprietary "power brake modules." Plaintiff was intentionally deceived by the above-named representatives of both **Powerohm** and **Hubbell**, seduced into believing that the **"Power Electronics"** joint venture plan was abandoned, or otherwise so minimized as to amount to nothing of future consequence for **Hubbell** or Plaintiff.

(4)   In recent months, in working on subject-related projects, Plaintiff has observed internet reports and documentation of Hubbell's industrial activities, causing the Plaintiff to progressively investigate the scope and nature of those industrial "brake module" innovations. That investigation confirms Hubbell's adaptation, use, and financial exploitation of the design concepts depicted in the original 2006 BPM specifications (see II B above, items a-p) which, by their words and conduct, had been suddenly and dismissively discounted, just prior to when

**Hubbell** terminated Plaintiff. The abrupt termination (with no prior reprimands or progressive discipline) was a ruse intended to quietly rid **Hubbell** of Plaintiff's immediate presence, and thereby, his financial entitlements to the fruits of Plaintiff's intellectual property. **Hubbell** adapted and exploited (without patent protection) the devices and concepts for which Plaintiff (**demonstrably, based on Plaintiff's original 2006 specifications**) has now procured pending patent protection (see Exhibit 1, attached) for the significantly innovative features. **Defendant's current BPM manufacturing data will objectively prove the conversion.**

    J. **Description of the technically unique product design:**

    (1) No other person or business entity possesses a patent or other marketing protection for the technical innovations described below. Plaintiff has sought, and conditionally received, pending patent protection for unique features outlined in the below description of the product which is the subject of the parties' joint venture, (see Complaint Exhibit #1).

    (a) The primary component of the "BG series module circuit" appears in no comparably-designed, patented "Brake Power Module."

    (b) There are existing design circuits with similar objectives and purposes, **but none which duplicate the unique and discrete operational aspects of the below-described BPM device,** conceived and produced solely by the Plaintiff, comprising specific subject matter of the joint venture terms outline above. Plaintiff possesses the original schematics and draft technical notes for the complex device described below.

    (c) Plaintiff had utilized his own personal materials and home-based test equipment in effecting the initial technical -work-up for the design. Neither **Powerohm** nor **Hubbell** could possess those initial, "home-generated" roughly-drafted, technically-intricate drafts. **Hubbell** can possess only the objective data improperly taken by Hubbell.

(2) There are various, complex functional subdivisions of the unique **"Brake Power Module"** concept conceived by the Plaintiff in furtherance of the parties' joint venture, now apparently marketed in recent years for the exclusive financial benefit of Defendants. The following described components of the general "Brake Power Module" concept are proprietary and exclusive to the Plaintiff's intellectual property, as documented by his (2006 and later) personal, initial component diagrams, with greatly-improved efficiency and features unlike any other "Brake Power Module" device on the market at that time, or at present. Plaintiff's attached diagrams and technical notes (included in Complaint collective Exhibit #1), are incorporated herein by reference, in supplementing the below technical factual allegations which comprise the subject matter of the joint venture:

### (a) THE BG SERIES MOTHERBOARD:

(1) AC variable frequency drives are commonly used with general purpose AC induction motors to form reliable variable speed drive systems, utilized throughout the world in heavy industrial settings. Problems with such drive systems may occur when an application requires a deceleration rate faster than what can be managed by the drive alone, or when motor speeds exceed the synchronous speed set by the output frequency of the drive (which is called an overhauling load condition). Both of the conditions described create regenerated power, which flows from the motor back to the drive, causing what is described as its "DC Bus" to rise. To manage the regenerated power and avoid shutting the drive down due to an over-voltage trip, that excess power must be dissipated by an external braking resistor.

(2) BG Series Braking Modules may be used in conjunction with any AC drive to monitor the "DC Bus" of the drive and activate external braking resistors as needed, not only to avoid over-voltage trips, but to greatly improve the performance of the drive system. The use of "Braking Modules and Resistors" increase the braking torque capability of a variable frequency drive, increasing efficiency by allowing faster and more controlled deceleration times.

(3) To accommodate system horsepower requirements beyond the capability of a single module, the modules are all "master/slave" programmable. That

arrangement allows multiple modules to effectively function as a single higher-rated module.

(4)  In practical, daily-application terms, heavy industrial oil rig systems, and other very high horsepower motor-control systems, are highly specialized, requiring for such power levels, extremely high-power AC voltage to DC voltage "rectifier systems."  On a high-powered DC supply, many AC motor drives are connected, making what is called the "common DC Bus." They may all be utilized contemporaneously or, when issues arise, problematic drives are disconnected. The "BG Series Motherboard" conceived and placed into productivity by Plaintiff, in furtherance of the parties' joint venture arrangement, is uniquely and specifically characterized for use in these demanding, high-risk, high-power motor systems.

(5)  In reliance upon, and in furtherance of, the parties' agreement (as detailed above) Plaintiff essentially "cloistered" himself soon after Defendants recognized the enormous value and practical benefit of the system that had been conceived by the Plaintiff in his spare time, as his intense interest in his day-to-day work challenges, caused him to work "off time" in the evenings to conceive and test the theories which he alone had conceived, without contribution or input from any other employ of the Defendants.

(6)  Prior to the Defendant's acceptance of the practical benefit and financial value of Plaintiff's concept, Powerohm's traditional position was that their industrial goals were limited to what is described above.

(7)  Summarized, Plaintiff individually conceived the concept of having one "solitary" motherboard (with no part changes or multiple versions) service, usable in eight different AC supply power "operating voltage systems."  Six of the voltages were common in normal industrial applications. The remaining two highest dangerous voltages are found in various applications including off-shore oil rig applications, utilizing extreme power levels that require multiple diesel combustion engine/generators with "synchronized equally power-contributing generators" rated 4 megawatts each (four million watts).  Those systems could require up to four of that **particular size of generator power supply.**  Plaintiff's unique motherboard was designed to accommodate "standard electrical grid industrial system supply voltages," as well as oil and gas industry systems, all in one circuit board that required no part changes at all across all voltage systems. In furtherance of such unique design by plaintiff is the second topic of ampere ratings. Plaintiff's unique design "all in one motherboard" also operates, services, and very importantly PROTECTS the ampere rated modules of 450, 600, 900, and 1200 amps, respectively, also with no part changes. These unique features are of enormous benefit for stocking purposes, only requiring the manufacturing purchasing department to purchase/stock one physical board (raw: no parts

installed), and or consequently one (populated: parts installed board) to **accommodate** all requirements of the entire 32-part number BG Series product matrix. The universality of the design was, and remains, a unique design, proprietary to the Plaintiff.

(8) In "Common DC Bus Systems," the initial attempt to "power up" the devices in a new system are sometimes problematic, both from the standpoint of product failure and safety. Traditionally, to minimize that risk (possibly referable to improper wiring or component failure) the initial step is completed without any of the many drives connected to it. Strictly unfiltered DC voltage (omitting all filtering capacitors) is utilized. For many reasons, the "Brake Module" or the network of many "Brake Modules" functioning as one large Module, must be connected to the unfiltered point of access. That is a problematic connection point for the standard, typical "Brake Module" that omits the features possessed in Plaintiff's unique design. The supply source impedance, at the point of introduction, is predominantly "inductive" in nature, and represents an elevated level of risk. Very long DC power cables between the drives and the "Brake Modules" can create a similar risk, due to their inherent inductive component. Conducting cables store energy that is proportionate to its length, creating this risk, while resulting in an efficiency-inhibiting factor. Plaintiff can elaborate on such risks.

(b) **PLAINTIFF'S IMPEDANCE DETECTOR DESIGN:**

(1) A component of Plaintiff's unique "Brake Power Module" design, included an "Impedance Detector," incorporated into the "BG Series Motherboard." If a firing pulse is produced for any reason in the initial operation Phase described above, it would instantly shut-down (fault) the motherboard control, and actuate what is described as a "fault contact." No other device on the market, (except the one presently exploited by Hubbell, designed by the Plaintiff) employs an "Impedance Detector" for that protective purpose. All fault contacts are solid state, as opposed to traditional, outdated relays. Plaintiff's design employed the solid state arrangement because the contacts do not "bounce". Traditional relay contacts "bounce" necessitating transient suppression to protect the contacts or load. Plaintiffs use of solid-state devices thereby saves on protection parts the customer would otherwise need to buy. They also provide longevity, as opposed to a short-lived conventional relay. Plaintiff conceived that approach to capitalize on both aspects of economy, quality, and longevity.

(2) In furtherance of the Plaintiff's "Impedance Detecting" design, Plaintiff conceived, designed, and implemented the following:

(c) **INSTANTANEOUS UNDER-VOLTAGE" MONITOR CIRCUIT:**

If the "Brake Module" were to activate in either of the above-referenced

situations, a threatening "fault" would be detected, followed by an instantaneous shut-down of the controlling motherboard with fault contact activation (so as to inform the overall rig or other industrial system).

**(d) INSTANTANEOUS OVER-VOLTAGE" MONITOR CIRCUIT:**

"Inductors" are common between rectifiers and filter capacitors within motor controllers to enhance DC voltage filtration. It may occur that the "Brake Module" winds up improperly connected on the wrong side of it (the connection must be on the capacitor side). This inadvertent occurrence is much more prevalent in complex multi-drive systems, such as is found on offshore or onshore oil rigs. Rapid interruption of current flow in inductors generates high voltage spikes, which can easily cause transistor/Brake Module failure, therefore a means of detecting such misconnection is paramount, as Plaintiff conceived. It should be noted that the above "IUV" and "IOV" are an "either/or" function. If either fault occurs, then a solitary contact changes state.

**(e) IGBT (POWER TRANSISTOR) SHORTED:**

If a power transistor fails, and a damaging "shorted transistor" results, this will inadvertently cause the energy-absorbing load (the high power resistor) to be connected directly across the DC supply. The resistor is normally not meant for that purpose, when properly specified for the system. Consequently, it would then overheat itself and nearby surroundings causing severe damage and failure. It can also overload the system power source (blow breakers/fuses), which would shut down the entire operation. If power is reapplied after correcting the overload (which frequently occurs) this will absolutely damage the expensive drive (if it was not damaged already) and it will have to be replaced. Costly down time would also occur. Trying to "reliably" fuse a light duty resistor to protect it from such event is not a choice for complex reasons beyond scope. Plaintiff can explain.
Plaintiff identified the need for pre-event detection in such a case, in an effort to generate some type of "alert fault contact" and therefore conceived a "shorted transistor detector circuit." Plaintiff conceived the above-referenced circuit, that provides that invaluable protection, resulting in less down time for heavy industrial operations, with millions of dollars at stake for customers, including offshore or onshore oil rigs.

**(f) IOC:**

(1) Since industrial settings, operating at very high-power levels, often involve environmentally-stressful and challenging conditions (sea water, extremely dirty work areas, and other challenges, particularly related to the load resistor in use), Brake Module overloads may result from everything ranging from insect or rodent invasion to corrosion and environmental filth. Also, system

operating overloads "passed on" to the resistor may result in overheating in the resistor element (temperature stress), causing unexpected warping, fractures, or shorting of internal elements. A damaged resistor under such conditions can abruptly produce extreme module stress and overload.

(2) For superior Brake Module protection amidst such adverse conditions, Plaintiff conceived of an unprecedented, unique technical design for "over-current detection and shutdown" consequently producing fragile device (internal transistors) protection in the most extreme situation that no fuse could ever achieve. As part of Plaintiff's design cycle, to demonstrate its unprecedented protective superiority and robust performance involved the following extremely dangerous test performed by Plaintiff on each ampere rating BG Series Module serviced by this motherboard (450, 600, 900 and 1200 amps respectively). This test was conducted "multiple times in succession" on each, without incident:

       -- a "thick plate of copper, involving super-low impedance dead short approach," was bolted directly across the module "external resistor" terminals, (substituting for the high-power load resistor); and,

       --a high value capacitor bank (located directly adjacent to and connected to module under test DC Inputs) was charged to, and maintained at, 1120VDC, extremely dangerous high energy; and,

       --utilizing the module "Discharge Input" feature, the "Brake Module" was then issued a "turn on" command. The module was thereby forced to actuate its power transistors (even at 1,120 volts DC) --thus connecting the "dead" short directly across the system filter capacitors, charged to enormous, stored energy levels;

       --there were no failures. Relevant oscillographs were captured.

The resulting protection time is orders of magnitude faster that any high speed "fuse" known to the industry. The unique design conceived and implemented by Plaintiff is an extraordinary safety net for the industrial employees who maintain the high-voltage, mega-horsepower electrical engines and drive system. Plaintiff's detection/shut-down circuit essentially operates instantaneously, so as to avert any possibility of catastrophic explosion. It does so by safely aborting/shutting the transistors off in .000006 seconds. The ensuing voltage spike is then suppressed and managed by an also unique super "special snubber circuit" (patent pending) conceived by Plaintiff and installed in all of the joint venture "BG Series Units." A significant, unique feature of the circuit is that it is not temperature sensitive— unique in the entire industrial market. Plaintiff's circuit uniquely utilizes "heat sink temperature feedback" to accomplish.

(g) **DUAL PURPOSE IOC:**

(1)  In addition to the above-described "Utmost Transistor Protector," with enhanced safety protection in short-circuit, shorted load circumstance, Plaintiff conceived that circuit to have a "Dual Purpose" function, allowing it to also function as a "connected ohms out of spec and too low" detector.  Plaintiff conceived a "current sensor circuit" without the use of traditional current sensors of any type (patent pending). In many of the described industrial-designed systems, a problematic low ohm value may be ordered or simply pulled from existing stock accidentally by a maintenance worker and installed in error. (As an example: if the absolute minimum, ohm value per module happens to be one ohm, and accidentally a worker connects a .8 ohm or .5 ohm component, the unit will fault on "overcurrent" the very first operating pulse because connected ohms are out of specifications on the "low side" prompting investigation. Summarizing, the unique circuit will fault at a prescribed adjustable "overcurrent" setpoint (specified in module test procedure written by Plaintiff) to accomplish the stated.

(h) **IOC LOCKOUT:**

An "IOC" represents stress for the power transistors.  In the event an "IOC" occurs for any reason, there is a one-second lockout (rest period) before the transistors may be reintroduced to active work. That problem is not advertised by either Hubbell or Powerohm, but it is an integrated, protective technical design feature. Plaintiff's unique design minimizes such "stress risk of damage" to a highly critical and costly design component.

(i) **OVER TEMPERATURE DETECTION:**

In most industrial settings, over temperature detection has been traditionally accomplished by the use of a bi-metallic "snap disk." In the Plaintiff's uniquely-designed BG Series Units, if the "heat sink" cooling fan were to fail or become dysfunctional, the "heat sink" temperature quickly sky-rockets under load.  Should a traditional bi-metallic sensor be used, the "heat sink" temperature is far past the "slow-moving temperature trip point" of the bi-metallic (by the time it reacted) and so would be the internal junctions of the power transistors, which is destructive.  Conventional junction temperature maximum is 150 degrees centigrade.  A bi-metallic device trips at a variety of temperatures beyond its rating, merely because it is "slope dependent." That notation is important.  Use of conventional temperature sensors would require the modules to be much physically larger, as they would have required massive "heat sinks," to result in a more gradual increasing

temperature slope. Plaintiff's unique design conceived of the employment of an extremely low mass RTD (non-slope dependent) to accomplish the same function. Its output is electronically monitored, and has a precise, solitary temperature trip point, at which time activation will shut down the control function and generate a contact output. A further unique observation is that it is dual purpose: it not only is innovative in monitoring the "heat sink," (thus protecting the transistor junction) but it also contributes in a unique way to the "IOC function."

(j) **CONTROL LOOP:**

Plaintiff conceived and developed a unique "Control Loop" circuit for the controller. It benefits any system that must employ more than one Brake Module to manage the very high system regenerated power levels. Oil rigs, by the nature of their mission and the economic "down time costs," must remain operational. Plaintiff's unique design involves a "master" application, as is commonly seen in industrial settings. Plaintiff's design ensures that, unless it loses complete power, the "master" will still control any and all other "follower modules." Whether the anomaly occurs "mid-pulse" or just before or after a pulse, the "pulse train," as designed and implemented by Plaintiff, provides instant compensation.

(k) **BUS FEEDBACK/REGULATOR CIRCUIT:**

(1) In heavy industrial settings (such as oil rigs) such applications require several motor functions to operate at very high-power levels, generating staggering amounts of complex electrical noise, both differential and common mode. Fundamentally, all Regulating Controllers, such as the Brake Power Module require "BUS Feedback AND very importantly its' sufficient Filtration" to control reliably. Consequentially as characterized, the presence of this extreme level of complex system noise generates the need for heavier than otherwise feedback filtration. But heavier filtration reduces controller response time. The response time (needing to be fast) of such controller is an even more critical requirement in this day and age. This is due to drive manufactures reducing the amount of filter capacitance on their drive DC structure. Plaintiff can explain why this was done in full technical detail, but this is beyond present scope.

(2) Plaintiff conceived a highly-unique solution to an industry-wide problem. It shields the Brake Module controller against the extreme system noise and the switching noise created by the module itself (totally normal), yielding very fast controller response time. Plaintiff's filtering feedback capacitor (RC Network) is composed of two capacitors in parallel (one much larger than the other). At the very instant a firing pulse is generated by the BUS Feedback Comparator; Plaintiff's design will momentarily disconnect (then re-connect thereafter) the DC BUS Feedback from the second capacitor. The second capacitor incorporates an

op-amp "buffer" connected to it. This buffer cannot discharge the capacitor at all. It effectively "holds" where it was only a "thousandth of a second" earlier.

(3) Consequently, all switching transients created by firing the extreme power module transistors and load will not be "seen" by the motherboard BUS Regulator Circuit. The regulator "sees" only what the "holding capacitor" has, which is what was there prior to the transients appearing. The "transient laden" feedback is kept disconnected from the holding capacitor, which feed the regulator (decision circuit) for a precise amount of time (designed by Plaintiff) via what Plaintiff will describe as a "mono-stable circuit." A mono-stable circuit puts out a pulse far narrower than the pulse triggering it, although it is synchronized with the triggering pulse. The "holding capacitor" function/concept also facilitates the IUV Circuit.

(l) **UNIQUE FRONT PANEL LED CONCEPTION:**

(1) Status indicators ("faulty, healthy, or mode of control") are of significant importance in an industrial power module setting. Normally, such indicators (lights) mounted on the front panel, utilize wires or similar "flat ribbon cables" that emanate from the motherboard to operate the lights.

(2) Uniquely, Plaintiff conceived and implemented, in the general context of the Brake Power Module, the idea of using LED lights strategically located on the Motherboard to accomplish that function. Plaintiff chose what is described as "narrow dispersion angle" LEDs of high efficiency and intensity.

(3) Plaintiff's unique concept involved the mounting of the lights on the motherboard in a row, permitting the shining of their "beams" through colored "lenses only" mounted on the metal front panel. The lighting/control concept effectively minimizes wiring errors, vibration anomalies, and reduces assembly time.

(m) **COMMUNICATIONS MONITORING AND CONTROL:**

Related to the features of "simplicity and ease of use," and to be a superior product, Plaintiff conceived of a unique design to "optionally" allow the BG Series Units to be controlled, monitored, and communicated with (either close by or from around the world) from a host of common computer communication protocols found in industry. At the time of conception, this feature was new to this type of power module.

(n) **ISOLATION BARRIER:**

(1) From a safety perspective, the "DC BUS" of drive systems is extremely dangerous, involving high levels of "Filter Capacitor" stored energy. Conceptually, the BUS is "hot" and cannot be grounded for safety purposes. That

is because it is derived from a three-phase AC power grid, which may involve up to 720 volts AC on an off-shore oil rig. When converted to DC (rectified power) that equates to 1,018 volts DC nominal.

(2) The "hot" DC BUS voltage must be connected to and monitored by the BG Series motherboard for control and fault-detecting purposes. However, this poses a problem when customers connect with the motherboard/module to control it or monitor it with computers, or other logic devices known as PLCs (Programmable Logic Controllers).

(3) These devices <u>must</u> always be safety grounded, and therefore <u>cannot</u> connect to "hot" circuitry. Since "hot" circuitry (ungroundable) and safe circuitry (groundable) are both important parts of the motherboard operation, Plaintiff conceived a means of allowing both to co-exist and interact all on one motherboard, which is ideal vs multiple boards. Plaintiff designed what is called an "electrical isolation barrier" creating 2 circuit halves, with necessary signals going from one half to another via light beams (electrically safe).

(4) **Discharge Input:** In the event a drive problem occurs, requiring it to be turned off and removed from service, Plaintiff's unique design provides the customer a means of utilizing the Brake Module to "rapidly drain" the dangerous stored energy in less than a few seconds, integrating this input into the design for that purpose. Without this feature, on its own, it could take up to 20 minutes to drain for safe removal, keeping the system "costly down" far too long unnecessarily. The added input provides enhanced and important "safety" versatility and down time minimization in its application.

(o)     <u>**FIBER OPTIC SLAVE MODULE (FOLLOWER) CONTROL:**</u>

Addressing the extreme amounts of what is described as "electrical noise" (both conducted, and radio wave transmitted) which may result in interference with Brake Module or other electronic equipment in the industrial premises, Plaintiff uniquely conceived and implemented an optional "fiber optic" transmitter and receiver system to accomplish reliable "noise free" master/follower control. This option was recommended by Plaintiff for systems involving 2-9 follower modules. Noise conditions very often worsen over time, due to a variety of reasons, such as an expansion in plant growth and projects, which are all "noise additive". Therefore, Plaintiff conceived this feature to be easily "field addable" at low cost should conditions ever worsen, needing this feature. That innovation was entirely new to the industry for this type of product, with no competitor offering any similar product to the market.

(p) **CONTROL PULSE (TO SLAVE MODULES) ISOLATION:**

The pre-existing typical industry standard for such controller was implemented through an output pulse (intended to be connected to the followers) that typically shared a connection to the described "hot" DC BUS. To be superior, Plaintiff implemented a system to electrically "isolate" the pulse wired to the follower modules, enhancing both the safety and effectiveness of the system.

## III. PLAINTIFF'S CAUSES OF ACTION:

A. **Joint Venture/accounting:** Plaintiff alleges, upon the facts detailed above, the existence of a joint venture in which the participants were the Plaintiff, Timothy Allen Atchison, and the Defendant, Hubbell Industrial Controls, Inc. The existence of an enforceable "joint venture," governed, in its establishment and legal relationships, as a Tennessee partnership, within the meaning of T.C.A. § 61-1-101(6). Plaintiff asserts that the above-described facts, detailing the relationship between Plaintiff Atchison and Defendant Hubbell, demonstrate an intent, by way of contract, both express and implied, to engage in and carry out a business venture for joint profit. Plaintiff and Defendant, upon the facts detailed above, agreed to combine their efforts, property, money, skill and knowledge, for the purpose of carrying out that single, narrow business operation which was labeled "Power Electronics," and for the single purpose of bringing to development, and marketing for profit, Plaintiff's "Brake Power Module" designs. Plaintiff alleges the specific intent of the parties, based upon the words, documents and conduct described above, to effect the mutual joint venture goal of developing and marketing Plaintiff's intellectual property, specifically in reference to Dynamic Brake Modules. Upon a finding that a joint venture exists between Timothy Allen Atchison and Hubbell Industrial Controls, Inc., Plaintiff Atchison is entitled to an accounting of all joint venture property; an accounting of all

profits received with reference to the subject of the joint venture; and a judgment for owed amounts that are unpaid.

**B.** **Unjust Enrichment:** Plaintiff asserts that the above-described facts establish: (1) a benefit conferred upon the Defendant by the Plaintiff; (2) an appreciation by the Defendant of Plaintiff's benefit; and (3) Hubbell's acceptance of that benefit provided by Atchison under circumstances that render it inequitable for Hubbell to retain the benefit without paying the value thereof.

**C.** **Fraud and Intentional Misrepresentation by Defendant Hubbell:** The above-recited details of the conduct of the agents and representatives of Defendant Hubbell support the Plaintiff's cause of action against Hubbell based on fraud or intentional misrepresentation as supported by the above-detailed recitation describing Defendant's subterfuge and contrivance in misleading the Plaintiff regarding Hubbell's intention to abandon the development and marketing of the Plaintiff's Brake Power Module intellectual properties. Specifically, Plaintiff alleges: (1) that Defendant Hubbell made representations of both present and past facts; (2) the representation was false when it was made; (3) the representation involved a material fact, in relation to the subject matter of the parties' relationship; (4) Defendant Hubbell either knew that the representation was false, or did not believe it to be true, or the Defendant made the representation recklessly without knowing whether it was true or false; (5) Plaintiff Atchison did not know that Hubbell's representations, by conduct and word, were false when made, and was justified in relying upon the truth of the representation; and, finally, (6) Plaintiff sustained damages as a result of the intentional and fraudulent representations by Hubbell. Alternatively, Plaintiff pleads fraud in the inducement, asserting that the facts above support a claim of false misrepresentation in a commercial transaction, based upon the Defendant's supplying of false

information for the misguidance and misleading of the Plaintiff in their business transaction, with Plaintiff justifiably relying upon the information provided by Defendant Hubbell in words and conduct that reasonably supported Hubbell's abandonment of its interest in the Brake Power Module project, contemporaneous with the firing of Plaintiff by Hubbell.

      **D. <u>Constructive Trust/Confidential Relationship</u>:** The facts detailed above support the Plaintiff's claim that a confidential relationship existed between Plaintiff Atchison and Defendant Hubbell. Hubbell exploited the confidential relationship, reaping unconscionably huge benefits, and resulting in detriment and great harm to the Plaintiff. The confidential relationship arose between the parties as the dominant party (Hubbell) recognized the enormous value of Plaintiff's intellectual property, and, possessing substantial business acumen and expertise as the dominant party (in context, as Plaintiff's employer), Hubbell breached the resulting fiduciary duty to Plaintiff (as the servient party), taking gross advantage of the Plaintiff's lack of business acumen. The above-recited facts establish the elements of domination and control, as well as Plaintiff's deference to the superiority of his employer, Hubbell. Hubbell, as the dominant party, positioned itself to take financial advantage of its servient party in their relationship with Plaintiff Atchison, exploiting Plaintiff's intellectual property for the financial benefit of Hubbell, through half-truths, omissions by silence, and outright false statements, as detailed above. Plaintiff asserts that the breach of the fiduciary relationship, in the context of a legal confidential relationship, imposes a constructive trust upon the profits realized by Hubbell from Plaintiff's above-detailed intellectual properties.

      **E. <u>Patent Violation</u>:** Plaintiff asserts a timely claim of patent infringement against Defendant Hubbell, based upon the documents attached as Exhibit 1 to the Complaint. As detailed above, Plaintiff's initial drawings and technical specifications dating to 2006 have been

retained and preserved by the Plaintiff, and will closely match (as detailed in the content of Exhibit 1) the objectively demonstrable technical specifications of the "zip drive" contents provided, at the demand of Hubbell officials in 2014 (Andrew Thexton), while, in hindsight, it is known that Hubbell had already made plans to misappropriate Plaintiff's intellectual property, and rid Hubbell of Plaintiff's presence. Plaintiff incorporates the relief and remedy provisions of 35 U.S.C.A. § 271 (Infringement of Patent) in seeking damages for the patent infringement perpetrated by Hubbell Industrial Controls, Inc., through the above-described details.

Based upon the above premises, Plaintiff seeks the relief specified above, including injunctive relief; damages; and an accounting. Plaintiff seeks punitive and exemplary damages in support of the claims of fraud; intentional misrepresentation; and breach of fiduciary relationship. Punitive/exemplary damages in the claim are appropriate in order to deter the Defendant, and others similarly situated and inclined, from engaging in conduct that is fundamentally dishonest, and egregious in its basic nature. Further, Plaintiff will request assessment of all FRCP Rule 54 discretionary costs related to the presentation of the claims. Plaintiff seeks such further and general relief to which he may be entitled.

Respectfully submitted,

**BURGER LAW FIRM**

/s/ Wm Kennerly (Ken) Burger
Wm Kennerly (Ken) Burger, BPR #3731
12 North Public Square
Murfreesboro, TN 37130
T: 615-893-8933; F: 615-893-5333
kenburger@comcast.net

Approved:

Timothy A. Atchison

Case 3:24-cv-00922    Document 1    Filed 07/29/24    Page 31 of 31 PageID #: 31