# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| TIMOTHY ALLEN ATCHISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-00922** |
| | ) | **Judge Aleta A. Trauger** |
| HUBBELL INDUSTRIAL CONTROLS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM</u>

This case concerns an engineer's claim that his former employer is profiting from his intellectual property without paying him agreed-upon compensation. For the reasons set forth herein, the defendant's Motion to Dismiss (Doc. No. 20) the Amended Complaint ("Complaint") (Doc. No. 37) will be granted in part and denied in part.[1]

## I. FACTS AND PROCEDURAL HISTORY

According to the Complaint, Timothy Allen Atchison is an experienced electronics design engineer who worked for thirty years at Bonitron, Inc. ("Bonitron"), which manages a "broad range of commercial and governmental electronic projects," including "production of complex electronic devices." (Doc. No. 37 ¶ II(A)(1).)[2] In his spare time, and "[e]ntirely independent from his routine

---

[1] The Amended Complaint was filed with permission after motion to dismiss briefing had concluded, so that the plaintiff could file an accidentally omitted email as an exhibit. This filing did not moot the then-existing, now-pending, Motion to Dismiss (Doc. No. 20) and related briefs. (*See* Doc. No. 36 ("The inclusion of this email in the Amended Complaint . . . in no way affects the completed briefing on the defendant's Motion to Dismiss (Doc. No. 20), and no further briefing on that motion will be allowed.").)

[2] The Complaint's idiosyncratic format strains Rule 10's requirement that "[a] party must state its claims . . . in numbered paragraphs." Fed. R. Civ. P. 10(b).

work activities at Bonitron," Atchison engaged in hundreds of hours of highly specialized technical research and conceived a "Brake Power Module" ("BPM") and a "Dynamic Brake Module" ("DBM"), which are "for use primarily in motor control systems." (*Id.* ¶ II(A)(2)–(3), (5).) His research led to industry-specific notoriety. (*Id.* ¶ II(A)(4).)

Starting in late 2005, Atchison began discussing a collaboration with two Powerohm Resistors, Inc. ("Powerohm") employees, Mike Crowe and Vance Hinton. (*Id.* ¶ II(A)(10) (citing Doc. No. 37-2 at 2).)[3] After years of discussion, Atchison alleges, in 2008 Powerohm hired him both as a salaried product design engineer and to develop his BPM and DBM through a new Powerohm division called "Power Electronics." (Doc. No. 37 ¶ II(A)(5)–(6).) The plaintiff alleges that Powerohm agreed to pay him a "3% share in the distribution, marketing, and industry-wide sales of his 'Brake Power Module' and all other items he created within the 'new division.'" (*Id.* ¶ II(B)(7).) Atchison describes his time at Powerohm as "an amicable and financially productive tenure of employment." (*Id.* ¶ II(A)(7).)

In 2014, defendant Hubbell Industrial Controls, Inc. ("Hubbell") acquired Powerohm. (*Id.* ¶ II(C)(1).) While Hubbell initially "voiced support for continuing" Power Electronics, that same year, despite "having [initially] identified the prospect of enormous financial benefit, Hubbell, on non-existent grounds, deceitfully removed Plaintiff, and the Power Electronics venture, from its future business concerns." (*Id.*) Hubbell "impli[ed] . . . that the Power Electronics joint venture [had] not advanced in a positive manner [and] . . . became a matter of minimal interest to the new . . . Hubbell" managers. (*Id.* ¶ II(F).) In fact, however, Atchison alleges, this feigned disinterest

---

[3] The plaintiff has filed with the Complaint what he refers to as a "business plan." (*See* Doc. No. 37 ¶ II(B)(2) (citing Doc. No. 37-2 at 4–39).) The business plan is undated and unsigned. And while the exhibit appears to contain a template confidentiality agreement, it does not contain any names, dates, or signatures. (*See* Doc. No. 37-2 at 5.)

was a ruse Hubbell concocted to "secretly . . . and unlawfully convert Plaintiff's intellectual property to the ultimate and exclusive benefit of Hubbell. Hubbell intended to eliminate Plaintiff from any financial entitlement, and to remove him from its operation." (*Id.* ¶ II(D)(1).) Atchison "was intentionally deceived by . . . representatives of both Powerohm and Hubbell, seduced into believing that the Power Electronics joint venture plan was abandoned, or otherwise so minimized as to amount to nothing of future consequence for Hubbell or [him]." (*Id.* ¶ II(I)(3).) Atchison was terminated in July 2015. (*Id.* ¶ II(F).) With Atchison out of the picture, he alleges, Hubbell could continue to develop and market products using Atchison's designs, but without paying him as agreed. (*Id.* ¶¶ II(G)(1), II(H)(1)–(2).)

Since then, as Atchison only recently learned through related work in the field, "his proprietary . . . ideas and concepts had not been abandoned by Hubbell, and instead, had only quietly and discreetly [been] appropriated and adapted" to products now on the market. (*Id.* ¶¶ II(G)(1), II(I).) Atchison has, in "recent months," "observed internet reports and documentation of Hubbell's industrial activities," which caused him to "progressively investigate the scope and nature of [Hubbell's] industrial 'brake module' innovations." (*Id.* ¶ II(I)(4).) Contrary to Hubbell's earlier expressed disinterest in continuing the BPM projects, Atchison's "investigation confirms Hubbell's adaptation, use, and financial exploitations of" Atchison's designs "which, by [Hubbell's] words and conduct, had been suddenly and dismissively discounted, just prior to when Hubbell terminated [him]." (*Id.*) The Complaint does not identify any specific Hubbell products that illicitly incorporate his designs.

On July 29, 2024, Atchison sued Hubbell for patent infringement under federal law, and "joint venture/accounting," unjust enrichment, fraud, and breach of fiduciary duty under Tennessee law. (Doc. No. 37 ¶ III(A–E).) Atchison seeks injunctive relief, an accounting of profits,

and compensatory, punitive, and exemplary damages. (*Id.* at 30.) Hubbell has filed a Motion to Dismiss (Doc. No. 20), an accompanying Memorandum (Doc. No. 21), and Exhibits (Doc. Nos. 21-1–4), to which Atchison has filed a Response (Doc. No. 25), and Hubbell has filed a Reply (Doc. No. 28). The plaintiff invokes this court's diversity jurisdiction, which the defendant does not dispute.[4]

## II.    LEGAL STANDARD – RULE 12(b)(6)

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Twombly*, 550 U.S. at 555–57. The court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and

---

[4] While the Complaint does not specify an amount in controversy, the court infers from the facts alleged that the jurisdictional amount has been met. *Accord Donaldson v. BAC Home Loans Servicing, L.P.*, 813 F. Supp. 2d 885, 891 (M.D. Tenn. 2011) (Nixon, J.) ("Failure to adequately plead the amount in controversy requirement may be cured by the presence of clear allegations . . . that the case involves a sum well in excess of the $75,000 minimum." (internal quotation marks and alterations omitted) (quoting *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir. 2001)). The plaintiff alleges that he is owed three percent of the "unaccounted millions of dollars annually" generated from Hubbell's products that incorporate his designs and further demands punitive and exemplary damages. (Doc. No. 37 ¶¶ II(C)(2), III(E).)

4

draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6 Cir. 2016).

A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557). This standard does not require *detailed* factual allegations, but it does require "more than labels[,] conclusions, [or] a formulaic recitation" of the elements of a cause of action. *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Twombly*, 550 U.S. at 555). "Specific facts are not necessary," as the statement need only provide the defendant fair notice of the nature of the claim and upon what grounds it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly,* 550 U.S. at 555). And, while Rule 8 does not require details, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "[T]he complaint must 'contain either direct or inferential allegations respecting all the material elements [of a claim] to sustain a recovery under some viable legal theory.'" *Hollowell v. Cincinnati Ventilating Co.*, 711 F. Supp. 2d 751, 758 (E.D. Ky. 2010) (quoting *Hunter v. Sec'y of U.S. Army,* 565 F.3d 986, 992 (6th Cir. 2009)).

## III. DISCUSSION

### A. Conversion to Motion for Summary Judgment

The plaintiff argues that, because "both parties offer[] facts and documents beyond the pleadings, Defendant's motion should be converted" under Rule 12(d) to a Rule 56 motion for summary judgment. (Doc. No. 25 at 2.) The defendant opposes such treatment. (Doc. No. 28 at 2–3.)

5

Generally, courts cannot consider "matters outside the pleadings" in deciding a Rule 12(b)(6) motion without treating the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, courts may, "in undertaking a 12(b)(6) analysis, take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) (quoting *Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 617 (6th Cir. 2021)). Because this court has not considered the defendant's exhibits appended to its Motion to Dismiss, the court need not evaluate whether they are "referred to in the Complaint and . . . central to the claims contained therein." (Doc. No. 28 at 2–3 (quoting *Pictsweet Co. v. R.D. Offutt Farms Co.*, No. 3:19-cv-00722, 2021 WL 4034222, at *8 (M.D. Tenn. Sep. 3, 2021)).) The plaintiff has filed no exhibits in addition to those filed with the Complaint. The court declines to treat the defendant's Motion as one for summary judgment.

### B.      Patent Claim

Because Atchison does not hold a patent, this court lacks jurisdiction over his patent infringement claim, and it will be dismissed.

Atchison alleges "patent infringement . . . based upon" provisional patent applications he filed in late 2023 and early 2024. (*See* Doc. No. 37 ¶ III(E) (citing Doc. No. 37-1); *see also id.* ¶ I(D)(5) (alleging "patent violation").) Atchison brings his claim for patent infringement under 35 U.S.C. § 271 (Doc. No. 27 ¶ III(E)), which, he states, without offering any support, "permits the filer of a provisional patent to pursue a federal court claim for infringement." (Doc. 37 ¶ III(F)(2).) The defendant argues that only patent holders can sue for patent infringement. (Doc. No. 21 at 25 (citing 35 U.S.C. § 281).) The defendant moves for dismissal of the claim under Rule 12(b)(6), and argues, first, that Atchison has failed to state a claim for patent infringement (Doc. No. 21 at 6–7), and second, in reply, that this "court lacks subject matter jurisdiction over a claim based on

6

a provisional patent, and such a claim must be dismissed under Rule 12(b)(1)." (Doc. No. 28 at 6 (citations omitted).)

Atchison has not alleged that he holds a patent. Instead, he rests his patent infringement claim on provisional patent applications he filed a little over one year before he filed the Amended Complaint. (*See* Doc. No. 37-1 at 2 (Dec. 20, 2023 application); *id.* at 13 (Jan. 2, 2024 application).) A provisional patent application is a "quick and inexpensive filing that serves as a placeholder with the [U.S. Patent and Trademark Office] and that grants the applicant the benefit of priority for an invention." *United States v. Camick*, 796 F.3d 1206, 1218 (10th Cir. 2015) (citation and internal quotation marks omitted). The provisional application "was designed to provide a lower-cost first patent filing in the United States and to give U.S. applicants parity with foreign applicants." USPTO, *Provisional Application for Patent*, https://www.uspto.gov/patents/basics/apply/provisional-application [https://perma.cc/G54Z-HYL8] (last visited Mar. 24, 2025).

After filing a provisional patent application, as the Tenth Circuit explained,

> [i]f the applicant takes no action within one year of filing the provisional application, the application will be deemed abandoned and "shall not be subject to revival." 35 U.S.C. § 111(b)(5). The applicant may, however, take additional action during that one-year period to either convert a provisional patent application into a nonprovisional application, 37 C.F.R. § 1.53(c)(3), or to incorporate a provisional application into a subsequently filed nonprovisional application by reference, 35 U.S.C. § 119(e)(1).

*Camick*, 796 F.3d at 1218–19. "If a patent is ultimately awarded, the 'priority date' for the patent will date back to the date of the provisional patent." *Davis v. Brouse McDowell*, No. 5:08-cv-1356, 2009 WL 10703128, at *2 n.3 (N.D. Ohio May 22, 2009) (citing 35 U.S.C. § 119(e)); *see also Lemkin v. Hahn, Loeser & Parks*, No. 2:10-CV-665, 2012 WL 1058951, at *1 n.3 (S.D. Ohio Mar. 28, 2012) (citation omitted) ("A provisional patent application . . . will not mature into an issued

utility patent unless further steps are taken. It serves to establish an early effective filing date for priority in connection with a later filed non-provisional patent application.").

District courts lack jurisdiction over patent claims before a patent is issued, including over provisional applications. As our sister court recently put it:

> A "patentee" may bring a civil action for infringement of her patent. 35 U.S.C. § 281. . . . It cannot be brought prior to a patent being issued. *Amgen, Inc. v. Genetics Inst., Inc.*, 98 F.3d 1328, 1332 (Fed. Cir. 1996). Claims arising at the provisional patent application stage must be brought before the United States Patent and Trademark Office (USPTO), and so federal courts routinely dismiss such claims. *See Simic-Glavaski v. Lifeware Techs., Inc.*, 2008 WL 423414, at *1–2 (N.D. Ohio Feb. 14, 2008) (dismissing the plaintiff's claim for lack of subject matter jurisdiction because disputes concerning provisional patents are within the purview of the USPTO); *Zuravsky* [*v. Smith*, No. 2:15-cv-3091], 2016 WL 4179454, at *3 [(S.D. Ohio Aug. 8, 2016)] (same). As the Sixth Circuit has recognized, the law makes a clear distinction between patent applications and issued patents; disputes arising under the former are "solely within the authority" of the USPTO. *E.I. Du Pont de Nemours & Co. v. Okuley*, 344 F.3d 578, 584 (6th Cir. 2003).

*Crosby v. Bazos*, No. 2:22-cv-716, 2022 WL 2713899, at *2 (S.D. Ohio July 13, 2022). This court lacks jurisdiction over the plaintiff's patent infringement claim because he does not have a patent.[5]

---

[5] The court will make two additional comments regarding the plaintiff's patent infringement claim. Filing a provisional patent application "allows the term 'Patent Pending' to be applied in connection with the description of the invention." USPTO, *Provisional Application for Patent*. But it is a stretch for the plaintiff to allege that he has "sought[] and conditionally received patent pending protection" (Doc. No. 37 ¶ II(J)(1) (citing Doc. No. 37-1)) or that he has "preliminary patent approval" (Doc. No. 37 ¶ II(A)(9) (citing Doc. No. 37-1)), since he has "filed only . . . provisional application[s], which the PTO does not review for patentability." *United States v. Tao*, 107 F.4th 1179, 1187 (10th Cir. 2024); *see also Plate, LLC v. Elite Tactical Sys., LLC*, No. 3:18-cv-265-CLC-HBG, 2020 WL 5209303, at *14 (E.D. Tenn. Sept. 1, 2020) ("[P]rovisional applications are not examined on their merits.") (citation omitted). Also, Atchison refers to his provisional applications as "'patent pending' applications" (Doc. No. 37 ¶ (II)(I)(1)) and "pending patent application[s]" (Doc. No. 25 at 25–26) and states that his technology is "*now* patent-pending." (*Id.* ¶ II(A)(11) (emphasis added).) But the plaintiff submitted his provisional patent applications more than twelve months before filing the Amended Complaint, and he has not alleged that he has converted the provisional applications into non-provisional applications or separately applied for patent protection. Thus, the court can only infer that the plaintiff's provisional applications were abandoned by the time the plaintiff filed his Amended Complaint, and any claim therein that his designs *are* patent-pending would have been outdated. *See* 35 U.S.C. § 111(b)(5) ("[I]f no . . . request [to have a provisional application treated as a non-provisional

8

### C. Statutes of Limitations

Hubbell argues that it is apparent from the face of the Complaint that Atchison's four state-law claims are barred by the applicable statutes of limitations (alternately three and six years) because Atchison knew or should have known of his claims no later than his termination in July 2015. (Doc. No. 21 at 6, 13–15.)

Statute of limitations noncompliance is an affirmative defense, *see* Fed. R. Civ. P. 8(c), "and generally, a plaintiff 'need not plead the lack of affirmative defenses to state a valid claim' under Rule 12(b)(6).'" *Whitehead v. Sterling Jewelers, Inc.*, 648 F. Supp. 3d 951, 957 (W.D. Tenn. 2023) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)). So, usually "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions" for summary judgment. *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). But if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then, if the plaintiff wishes to avoid dismissal, he has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting in the first instance *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). The court's role, "at this stage, is to determine whether the applicability of such a defense is so clearly established by the pleadings that there is no need to allow the parties to explore the surrounding facts any further." *Unipres U.S.A., Inc. v. Neyenhaus*, No. 3:23-cv-00862, 2024 WL 2060149, at *2–3 (M.D. Tenn. May 6, 2024).

---

application] is made, the provisional application shall be regarded as abandoned 12 months after the filing date of such application and shall not be subject to revival after such 12-month period.").

First, the defendant argues that Hubbell acquired Powerohm (and, therefore, the Power Electronics division) "without Plaintiff transferring any personal interest in the Collaboration." (Doc. No. 21 at 15.) This purportedly shows that Atchison was "on notice that neither Powerohm nor Hubbell believed he was a participant in a partnership or joint venture known as Power Electronics." (*Id.*) But the Complaint does not state, and the plaintiff does not concede, that his personal interest in the alleged joint venture did not transfer with new ownership. And, at least for the beginning of his tenure at Hubbell, Atchison alleges that he was assured that the venture would continue, presumably with his interest intact. Perhaps Hubbell's acquisition of Powerohm without Atchison's consent or input should have put him on notice about the joint venture's nonexistence, but if it did, that is not clear from the face of the Complaint and not a basis for dismissal under Rule 12.

Second, the defendant argues that the plaintiff alleges that, while he held a sales position at Powerohm, the company was selling products that incorporated his technology. (*Id.* (citing Doc. No. 21-3, Powerohm Instruction Manual for BM 'BG' Series Braking Modules).) Thus, Hubbell argues, Atchison "was on notice that Powerohm and Hubbell believed that they had the right to sell these products." (*Id.*) However, while it is a reasonable inference that someone in a sales position would know about the company's sale of a certain product, that is a question of fact not resolvable at the motion to dismiss stage. Moreover, the thrust of the plaintiff's claim is that he recently discovered Hubbell's use of his intellectual property in products—years after Hubbell had informed him it was discontinuing the collaboration.

Third, the defendant argues that, because the plaintiff alleges that, just before his termination, Hubbell "declined to pay Plaintiff the earned commissions owed to Plaintiff on previous (both related and unrelated to the [joint venture]) corporation work," this put the plaintiff

10

on notice of his breach of fiduciary duty claim. (*Id.* (quoting Doc. No. 37 ¶ II(F)).) The at-issue commissions appear to be distinct from the alleged agreement related to the joint venture. As the plaintiff alleges, in his "product design engineer" role at Powerohm, he was to receive a salary "plus commission on 'new division' sales. But, that relatively-secondary work was to be *collateral to* Powerohm's *unrelated* proposed plan for a *joint collaboration* focused on development and marketing of Plaintiff's novel, ultra-complex BPM, Dynamic Brake Module." (Doc. No. 37 ¶ II(A)(6) (emphasis added).) The joint venture, as alleged, "was independent, and only tangentially-related to his basic Powerohm job duties, for which Plaintiff would . . . be paid a . . . salary, plus commissions." (*Id.* ¶ II(B)(4).) Thus, from the face of the Complaint, that the plaintiff was on notice about unpaid commissions does not mean he was on notice about other facts alleged in the Complaint related to the breach of fiduciary duty claim.

Fourth, the defendant argues that its "seizure" of what the plaintiff alleges to be his intellectual property should have alerted him to its alleged conversion: "Hubbell's alleged conversion of Plaintiff's intellectual property . . . can provide no clearer a signal than anything else that Hubbell[] [has] asserted rights over Plaintiff's intellectual property." (Doc. No. 21 at 15.) The crux of the plaintiff's claim is that, after Hubbell fraudulently concealed its intentions with respect to his designs, having described them as not valuable, Hubbell is now unjustly profiting from those designs. The plaintiff does not bring a conversion claim, and, at the motion to dismiss stage, the court does not find that this fact put the plaintiff on sufficient notice of the claims he now brings.

The plaintiff alleges that he has, "in recent months," discovered Hubbell's actions that support his claims. (Doc. No. 37 ¶ II(I)(4).) Because it is not apparent from the face of the Complaint that the time limit for bringing the state law claims has passed, the court will not dismiss those claims for lack of timeliness.

11

### D. Joint Venture/Accounting

Atchison "alleges . . . the existence of a joint venture" between himself and Hubbell. (Doc. No. 37 ¶ III(A).) The facts alleged, the plaintiff states, "demonstrate an intent, by way of contract, both express and implied, to engage in and carry out a business venture for joint profit," namely "'Power Electronics,' . . . for the single purpose of bringing to development and marketing for profit[] Plaintiff's 'Brake Power Module' designs." (Doc. No. 37 ¶ III(A).)[6] Atchison requests an accounting of joint venture property and profit and a judgment for his share. (Doc. No. 37 ¶ III(A).) Because there is no "joint venture" cause of action, the court construes the claim as a request for an accounting of the joint venture's property and profits, and a judgment granting the plaintiff his equitable share. *Cf. Koshani v. Barton*, No. 3:17-CV-265, 2018 WL 3150345, at *7 (E.D. Tenn. June 27, 2018) (declining to dismiss a claim for equitable accounting based on a breach of fiduciary duty arising from a joint venture agreement).

The defendant construes the Complaint as "assert[ing] a partnership or joint venture." (Doc. No. 21 at 6.) The Complaint clearly alleges the existence of a joint venture: it is the first claim listed in its introductory paragraph (Doc. No. 37 ¶ I(D(1)), it is the first cause of action (*id.* ¶ III(A)), and "joint venture" is repeated throughout. "Partnership," by contrast, appears only once, where the plaintiff notes that joint ventures are governed by the same laws governing partnerships.[7]

---

[6] The court notes that the Complaint does not elsewhere reference any contract, express or implied. And there is no contract in the record. It is possible that the plaintiff means to refer to the parties' alleged agreement that he would receive three percent of sales related to his designs, but the plaintiff has not brought a breach of contract claim, and he does not allege that the joint venture was governed by a contract, express or implied.

[7] "The existence of an enforceable 'joint venture,' governed, in its establishment and legal relationships, as a Tennessee partnership, within the meaning of T.C.A. § 61-1-101(6)." (Doc. No. 37 ¶ III(A).) Tenn. Code Ann. § 61-1-101(6) is a provision within the definition subsection of Tennessee's Revised Uniform Partnership Act, Tenn. Code Ann. § 61-1-101, *et seq.* Subsection 6 defines foreign limited liability partnerships and similarly named entities. None of the plaintiff's

12

(Doc. No. 37 ¶ III(A).)  The court does not construe the Complaint as asserting a claim based on the existence of a partnership. Nor does the plaintiff argue to the contrary.

"A joint venture is similar, but not identical, to a partnership, and has been described by [the Tennessee] Supreme Court as 'something like a partnership, for a more limited period of time, and a more limited purpose.'" *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605–06 (Tenn. Ct. App. 2001) (quoting *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995)). "Unlike a partnership, a joint venture 'is something more or less temporary[.]'" *Weeks v. Sands*, No. 20-2709-TMP, 2021 WL 5828043, at *7 (W.D. Tenn. Dec. 8, 2021) (quoting *Fain*, 909 S.W.2d at 793). A joint venture usually requires: (1) a common purpose; (2) agreement among the parties; and (3) the equal right of each to control the venture. *See, e.g.*, *Quality Mfg. Sys., Inc. v. R/X Automation Sols., Inc.*, No. 3:13-cv-00260, 2016 WL 2770634, at *3 (M.D. Tenn. May 13, 2016) (Bryant, M.J.) (citing *King v. Flowmaster, Inc.*, No. W2010–00526–COA–R3cv, 2011 WL 4446992, at *2 (Tenn. Ct. App. Sept. 27, 2011)).

The Complaint does not allege joint control over the alleged joint venture. Atchison alleges that he was a salaried employee brought in to run a new division of the company to develop his designs for commercial brakes. (Doc. No. 37 ¶ II(A)(6).) In that role, Atchison was to "oversee[] and manag[e] the entirety of the technical aspects of the BPM projects, as well as hiring, training, supervising, managing personnel, parts purchasing, tech support, [and] sales." (*Id.* ¶ II(B)(5).) Other than managing the new division, Atchison does not allege that he had joint control over the venture. Thus, the court finds that Atchison has not pled joint control. But this court has observed that, even without joint control, a joint venture can arise where there is profit-sharing. *Accord Cool*

---

filings references foreign partnerships, so the court will construe the citation as referring, generally, to the Revised Uniform Partnership Act.

13

*Springs Fin. Grp., LLC v. Albright*, No. 3:19-cv-0964, 2020 WL 2062115, at *9 (M.D. Tenn. Apr. 29, 2020) (citing *Messer Gresheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 471 (Tenn. Ct. App. 2003)).

The plaintiff makes seemingly inconsistent claims about his financial arrangement with the defendant. Atchison alternately states that, according to the unwritten terms of the joint venture, he was to receive three percent of "gross, annual global receipts" (Doc. No. 37 ¶ II(B)(5)), "gross annual sales" (*Id.* ¶ II(G)(1)), "quarterly gross sales" (*Id.* ¶ II(D)(1)), and "annual gross profits generated by Plaintiff's new designs, and specifically by the new joint venture entity, 'Power Electronics'" (*Id.* ¶ II(B)(9)). Putting aside any possible differences between quarterly and annual accounting and "receipts" and "sales," the relevant inconsistency is that between a percent of sales and a percent of profits. This is relevant, as the defendant argues, because "commission-based compensation" does not constitute "profit-sharing" (*see* Doc. No. 21 at 16–17), which is necessary for the existence of a joint venture without equal control.

As the defendant argues (*see* Doc. No. 21 at 16–17), for purposes of establishing the existence of a joint venture in the absence of joint control, profit-sharing is not the same thing as entitlement to a percent of sales. *Compare* Tenn. Code Ann. § 61-1-202(c)(3) ("A person who receives a share of the profits of a business is presumed to be a partner in the business."), *with id.* § 61-1-202(c)(2) ("The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived."). *Accord Messer Griesheim*, 131 S.W.3d at 472 ("We are further compelled to point out the distinction between profits and gross revenues. . . . . [U]nlike the sharing of profits, the sharing of gross returns does not itself establish a partnership." (citing Tenn. Code Ann. § 61-1-202(b)(2))); *Webster v. Est. of Dorris*, No. M2014-02230-COA-R3-cv, 2016 WL 502009, at *6

14

(Tenn. Ct. App. Feb. 4, 2016) (contrasting profits with commissions); *see also Quality Mfg. Sys.*, 2016 WL 2770634, at *4 (describing the commission at issue in *Webster* as "not the type of profit sharing which would give rise to a[] . . . joint venture); *Woods v. Wolosko*, No. 3:09-cv-0839, 2012 WL 398307, at *3 (M.D. Tenn. Feb. 7, 2012) (Campbell, J.) (partnerships require an "understanding that profits will be shared between them"). In addition, the plaintiff does not allege that, as part of the joint venture, he did share or would have shared in any losses. *Cf. Wantiez v. Carlson*, No. C.A. 637, 1986 WL 1151, at *2 (Tenn. Ct. App. Jan. 28, 1986) ("Perhaps the most significant fact is that Mr. Wantiez actually shares in and suffered the consequences of the business having losses.").

The plaintiff attempted to respond to the defendant's argument about the distinction between sharing profits and receiving a percentage of sales by arguing that "[t]hat opinion is refuted by" the parties' agreement that the plaintiff would receive "three (3%) percent of the <u>gross, annual</u> receipts." (Doc. No. 25 at 10 (emphasis in original) (citing Doc. No. 1 ¶ II(B)(5)).) In other words, in direct response to the argument that the parties' arrangement did not involve *profit*-sharing because the Complaint alleged an agreement to split *gross receipts*, the plaintiff insists that he was entitled to a share of total sales. Hubbell says as much: "Plaintiff concedes . . . that he lacked profit-sharing rights in the Collaboration by noting his entitlement only to a percentage of gross receipts." (Doc. No. 28 at 4 (citing Doc. No. 25 at 10; Doc. No. 1 ¶¶ II(B)(5), II(D)(1), II(G)(1).)

Because the plaintiff alleges neither an equal right of control nor profit-sharing, he has not established the existence of a joint venture, and the court will dismiss his claim for an accounting of the joint venture's property and profits and a judgment for his share.

### E.     Unjust Enrichment

The Supreme Court of Tennessee has recently described unjust enrichment:

15

Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. Under an unjust enrichment theory, courts impose a contractual obligation where there is no contract between the parties or the contract has become unenforceable or invalid, and the defendant will be unjustly enriched unless the court imposes a quasi-contractual obligation. We stated that the elements of an unjust enrichment claim are (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust.

*Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 304–05 (Tenn. 2024) (citations, alterations, and quotation marks omitted). The Complaint's discussion of unjust enrichment is contained within one sentence, which recites its elements and "asserts that the [Complaint's] facts establish" them. (Doc. No. 37 ¶ III(B).) The court finds that the Complaint states a claim for unjust enrichment.

The first factor of an unjust enrichment claim in Tennessee is that the plaintiff conferred a benefit on the plaintiff. Benefit is a "broad concept." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) ("A benefit is any form of advantage that has a measurable value . . . ."). The plaintiff alleges that he gave Hubbell intellectual property regarding his Brake Power Module. (Doc. No. 37 ¶ II(B)(1).) The plaintiff has pled the first factor.

For the second factor, a defendant must have appreciated the benefit. The defendant does not contest this factor. Atchison alleges that his intellectual property has been "quietly and discreetly appropriated and adapted to Hubbell's profit-driven purposes," (*Id.* ¶ II(I)(2)), to wit, "Hubbell's adaptation, use, and financial exploitation of the design concepts depicted in the original 2006 BPM specifications." (*Id.* ¶ II(I)(4).) The court finds the second factor satisfied.

The third factor is that the defendant accepted the benefit under circumstances in which it would be inequitable to retain them without compensation. The plaintiff alleges that the parties agreed that he would receive three percent of sales related to his innovations, but to avoid that

16

obligation, Hubbell misrepresented the venture's profitability and fired him before "generating untold millions of dollars annually" from the Brake Power Module. (Doc. No. 37 ¶¶ II(C)(2), II(F), II(I)(4), II(G)(1).) The court finds that Atchison has pled the third fact of unjust enrichment.

The court is not persuaded by Hubbell's arguments to the contrary. In particular, Hubbell refers to Atchison's January 5, 2017 Chapter 13 bankruptcy petition, which the defendant has filed as Doc. 21-4,[8] to argue that the plaintiff cannot show that he conferred a benefit on Hubbell. Hubbell argues that Atchison "declared under penalty of perjury that any IP rights that he might have had were worthless and that he had no claims for damages against Hubbell." (Doc. No. 21 at 20 (citing Doc. No. 21-4 at 12–15).) Hubbell explains that, on Atchison's bankruptcy petition, he had checked "no," indicating that he did not have interests in partnerships or joint ventures, intellectual property, claims against third parties, or interests in partnerships or joint ventures. (*Id.* at 6.)

While courts "may take judicial notice of public records" and "are not required to accept as true factual allegations that are contradicted by those records," *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021) (citing *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017)), Atchison's allegations are not contradicted by his bankruptcy petition. Even if the *statements* in the Complaint and bankruptcy petition are contradictory, the mere existence of contradictory statements does not render the allegations here implausible. Furthermore, Atchison alleges that Hubbell falsely claimed that it was abandoning the joint venture. As Atchison puts it, in response, "[c]ertainly, Atchison would not have listed as a bankruptcy 'asset' an 'interest' that he, for good

---

[8] The court refers to the Bankruptcy Petition because it is a public record, not because it is attached to the defendant's Response to the Motion to Dismiss.

17

reason, trustingly and pragmatically believed had been appropriately abandoned, and was worthless to him." (Doc. No. 25 at 3.)

Second, Hubbell argues that, around the time of his 2015 termination, Atchison was "aware that Hubbell was selling products with this IP and was declining to make incentive/commission payments to him under any agreement." (Doc. No. 21 at 20.) Because, Hubbell continues, "the natural expectation is that a party who had rights would pursue those rights," and Atchison did not, "the only reasonable inference is that he knew at the time that he had no such rights." (*Id.*) As the court explained above, it appears that the "commissions" Atchison refers to are distinct from the entitlement to a share of gross sales of products containing his designs.

Hubbell also argues that the plaintiff's unjust enrichment claim is time-barred. (Doc No. 21 at 13–15.) Tennessee law does not prescribe a specific statute of limitations for unjust enrichment claims; instead, courts look to the "gravamen" of the complaint to determine the appropriate limitations period. *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F. Supp. 3d 805, 827 (W.D. Tenn. 2020) (quoting *Middle Tenn. Occupational & Env't Med., Inc. v. First Health Corp.*, No. 3-05-0218, 2005 WL 3216282, at *4 (M.D. Tenn. Nov. 28, 2005) (Echols, J.). The plaintiff's unjust enrichment claim sounds in tort. *Accord Precision Tracking Sols., Inc. v. Spireon, Inc.*, No. 3:12-CV-00626-PLR, 2014 WL 3058396, at *4 (E.D. Tenn. July 7, 2014) ("economic loss caused by fraud or misrepresentation is a tortious injury to personal property"). So, the three-year statute of limitations for property torts set out in Tenn. Code Ann. § 28-3-105 would apply.

But Tennessee follows the "discovery rule," according to which a statute of limitations is tolled until a plaintiff discovers or should have discovered his injury. *See Moore v. Westgate Resorts Ltd., L.P.*, No. 3:18-CV-00410-DCLC, 2020 WL 6814666, at *14 (E.D. Tenn. Nov. 18, 2020) (citations omitted). As discussed above, it is premature for the court to dismiss the unjust

18

enrichment claim at the motion to dismiss stage where, as here, it not apparent from the face of the Complaint that the time limit for bringing the claim has passed. Here, the plaintiff alleges that he only "in recent months" discovered Hubbell's alleged continued use of his intellectual property. (Doc. No. 37 ¶ II(I)(4).)

The court will deny the Motion to Dismiss the unjust enrichment claim.

### F.  Fraudulent Concealment

Atchison alleges "[f]raud and [i]ntentional [m]isrepresentation." (Doc. No. 37 ¶ III(C); *see also id.* ¶ I(D)(3) listing, among other legal and equitable theories, "fraud and intentional misrepresentation/concealment of claim").) In the alternative, Atchison alleges "fraud in the inducement," which the court construes to mean fraud in the inducement to join the alleged joint venture. In any event, even though the defendant moves to dismiss the fraud in the inducement claim (Doc. No. 21 at 21–22), the plaintiff does not respond. "[W]here a party fails to respond to an argument in a motion to dismiss, 'the [c]ourt assumes he concedes this point and abandons the claim.'" *Thomas v. Tenn. Dep't of Hum. Servs.*, No. 3:21-cv-00426, 2022 WL 2286780, at *6 (M.D. Tenn. June 23, 2022) (Richardson, J.) (quoting *PNC Bank, Nat. Ass'n v. Goyette Mech. Co., Inc.*, 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015)); *see also Brooks v. Laughlin Mem'l Hosp., Inc.*, No. 2:18-cv-146, 2019 WL 13216633, at *7 (E.D. Tenn. June 26, 2019) ("A plaintiff who fails to raise her claims in response to a motion to dismiss abandons those claims." (quoting *Doe v. Bredesen*, 507 F.3d 998, 1007-8 (6th Cir. 2007))). Thus, the court deems the plaintiff's fraud in the inducement claim, if he intended to state such a claim in the first place, abandoned.

The court construes the plaintiff's "fraud and fraudulent misrepresentation" claim to be the same as its fraudulent concealment claim. In his Response, the plaintiff addresses only "fraudulent concealment," so the court deems any other fraud claims abandoned. (*See* Doc. No. 25 at 14–21.) The court agrees with the defendant's description of the plaintiff's claim: "The core of Plaintiff's

19

fraud claim is that, after Hubbell's acquisition of Powerohm, Hubbell personnel misled him about their [dis]interest in developing the BPM. However, Plaintiff never alleges he took or refrained from any act because of Hubbell's allegedly false statements." (Doc. No. 21 at 22.)

Putting aside whether the Complaint meets Rule 9's particularity requirement for pleading fraud, *see* Fed. R. Civ. P. 9(b), the Complaint simply does not allege justifiable reliance, a requirement to plead fraudulent concealment. *See Boynton v. Headwaters, Inc.*, 564 F. App'x 803, 818 (6th Cir. 2014) ("One necessary element of the Tennessee torts of fraudulent misrepresentation and fraudulent omission/concealment is the plaintiff's reasonable reliance on the defendant's misrepresentation." (citing *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006))).

The plaintiff alleges that Hubbell concealed from him its "conversion of Plaintiff's intellectual property." (Doc. No. 37 ¶ II(G).) That is, "Hubbell conspired to appropriate the intellectual property that was personally conceived by, and belonged to, the Plaintiff, without compensation." (*Id.* ¶ II(G)(1).) As alleged, Hubbell falsely told Atchison that his ideas were not valuable, then "[u]sing copies of the Plaintiff's 2006 technical specifications (demanded in 2014 by Hubbell . . . ), Hubbell was able to replicate and master the . . . technical innovations." (*Id.*) Hubbell then "quietly began to implement and merge Plaintiff's intellectual property into their industrial production and marketing" and "deviously eased Plaintiff out of the relationship" to evade its "duty to pay the promised three . . . percent of gross annual sales." (*Id.*) Put another way, Atchison alleges that Hubbell concealed from him its assessment that their collaboration was valuable and that it would continue to develop and market the Brake Power Modules after Atchison's termination. Atchison *states* that he "was justified in relying upon the truth of the

representation" and that he "justifiably [relied] upon the information provided by Defendant Hubbell" (*id.* ¶ III(C)), but those are recitations of elements, not allegations of facts.

In his Response, Atchison appears to allege an alternate theory of fraudulent concealment. He states that, "[i]n multiple contexts, the Complaint repeats that Plaintiff surrendered [a] zip drive [containing his proprietary designs] to Hubbell's dispatched envoy, Stuart Xiang, in reliance upon Hubbell's positive words and conduct indicating that . . . the plan was for the venture efforts to be continued." (Doc. No. 25 at 16; *see also id.* ("In reliance upon Hubbell's expression of the 'venture's' intended continuity, Plaintiff surrendered the zip drive . . . .").)

The Complaint alleges that, during the "pre-termination time-frame," Hubbell employe Stuart Xiang was "dispatched . . . to the Defendant['s] Kentucky facility to retrieve and secure a duplicate copy of Plaintiff's original rough drawings; sketches, parts lists; and active vendor information" (Doc. No. 37 ¶ II(H)(1).) And, in the plaintiff's description of his "patent violation" cause of action, he states that a "zip drive" containing his original drawings was "provided, at the demand of Hubbell officials in 2014." (*Id.* ¶ III(E).)

In his Response, therefore, the plaintiff's argument is that he relied on the defendant's fraudulent statement that his designs *were* valuable and that the project *would* continue. This is not alleged in the Complaint. Further, the plaintiff does not make clear how he relied on any statement or concealed fact in handing over the designs. As he puts it, Hubbell demanded the designs. (Doc. No. 37 ¶ II(C)(4).) The plaintiff does not allege how he relied on Hubbell's alleged misrepresentations, and the fraud/misrepresentation claim will be dismissed.

### G.     Breach of Fiduciary Duty

Atchison alleges that Hubbell breached its fiduciary duty to him, "in the context of a legal confidential relationship, [which] imposes a constructive trust upon the profits realized by Hubbell from the Plaintiff's . . . intellectual properties." (*Id.* ¶ III(D).) Atchison describes his fourth cause

21

of action as "Constructive Trust/Confidential Relationship." (*Id.*; *see also id.* ¶ I(D(4) (listing "constructive trust/confidential relationship/fiduciary breach" as one of several "legal and equitable theories" on which his claims are based).)

"Under Tennessee law, '"constructive trust" is not a cause of action, but rather a remedy used by courts to enforce substantive rights.'" *Nolt v. Knowles*, No. 3:20-cv-00962, 2021 WL 2316799, at *7 (M.D. Tenn. June 7, 2021) (Newbern, M.J.) (quoting *Thompson v. Am. Gen. Life & Accident Ins. Co.*, 404 F. Supp. 2d 1023, 1029 n.2 (M.D. Tenn. 2005) (Campbell, J.), and collecting cases), *R. & R. adopted*, No. 3:20-cv-00962, 2021 WL 3661243 (M.D. Tenn. Aug. 18, 2021) (Campbell, J.). Thus, the court construes the Complaint as alleging that Hubbell breached the fiduciary duty it owed to Atchison because of their confidential relationship.[9]

"In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *In re Estate of Potter*, No. W2016-01809-COA-R3-CV, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017) (quoting *Ann Taylor Realtors, Inc. v. Sporu*, No. W2010-00188-COA-R3-CV, 2010 WL 4939967 at *3 (Tenn. Ct. App. Dec. 3, 2010)). "Tennessee law recognizes two types of fiduciary relationships: relationships that are fiduciary *per*

---

[9] The plaintiff argues that the fiduciary duty arose not only from the confidential relationship, but also from the joint venture. (Doc. No. 25 at 17 ("[T]he joint venture relationship creates a fiduciary duty in Tennessee law[.]" (emphasis omitted).) Indeed, "just as partners have fiduciary duties to one another, joint venturers—within the limited scope of their venture—have fiduciary duties as well." *Cool Springs*, 2020 WL 2062115, at *9 (citing *Walsh v. BA, Inc.*, 37 S.W.3d 911, 917 (Tenn. Ct. App. 2000)). But because the plaintiff has not established the existence of a joint venture, he has not stated a claim for the breach of a fiduciary duty arising therefrom. Moreover, the timeline is unclear. The plaintiff seems to imply both that the confidential relationship arose from the joint venture, on the one hand, and predated it, on the other hand. (*Compare* Doc. No. 25 at 20 ("where, as here, in the joint venture, a confidential relationship is shown"), *with* Doc. No. 37 ¶ II(B) ("Plaintiff's confidential relationship . . . [and] the resulting joint venture.").)

se (*e.g.*, attorney/client, guardian/ward) and relationships that are 'confidential' due to one party's ability to exercise 'dominion and control' over another party." *Henrick* v. *Mealor*, No. 3:18-cv-00621, 2020 WL 1676913, at *3 (M.D. Tenn. Apr. 6, 2020) (Campbell, J.) (quoting *Innerimages, Inc. v. Newman,* 579 S.W. 3d 29, 49 (Tenn. Ct. App. 2019)). The plaintiff alleges only that the parties had a confidential relationship.

"Tennessee courts have recognized that 'confidential relationships can assume a variety of forms,' as a result of which 'the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party.'" *Triumph Hosp., LLC v. Constr. Mgmt., Inc.*, No. 3:19-cv-00353, 2019 WL 3841942, at *8 (M.D. Tenn. Aug. 15, 2019) (quoting *Foster Bus. Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009)). "Fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence." *Advantage Ins. Servs., Inc. v. Roule*, No. 3:23-cv-00821, 2025 WL 479392, at *4 (M.D. Tenn. Feb. 12, 2025) (Campbell, C.J.) (quoting Orlowski v. Bates, 146 F. Supp. 3d 908, 927 (W.D. Tenn. 2015)).

As the Tennessee courts have emphasized for at least half a century, though, a confidential relationship is "not merely a relationship of mutual trust and confidence, but rather it is one 'where . . . the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'" *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989) quoting *Iacometti v. Frasinelli,* 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)); *see also Pagliara v. Johnston Barton Proctor & Rose, LLP*, No. 3:10-cv-00679, 2012 WL 913256, at *5 (M.D. Tenn. Mar. 16, 2012) (Sharp, J.)

(collecting cases), *aff'd*, 708 F.3d 813 (6th Cir. 2013). "The critical feature of a confidential relationship or one of trust and confidence is a 'dominion or influence' of one party over the other as a result of their special relationship." *Klein v. May*, No. 86-184-II, 1986 WL 12177, at *3 (Tenn. Ct. App. Oct. 31, 1986) (citing *Turner v. Leathers,* 191 Tenn. 292, 232 S.W.2d 269 (1950)). "Relationships that are not fiduciary *per se* 'require proof of the elements of dominion and control in order to establish the existence of a confidential relationship.'" *Cahill v. Mem'l Heart Inst., LLC*, No. 1:23-cv-168, 2024 WL 4311648, at *14 (E.D. Tenn. Sept. 26, 2024) (quoting *Foster Bus. Park*, 2009 WL 113242, at *12). In addition, "a confidential relationship cannot be unilateral, rather both parties must understand that a special trust or confidence has been reposed." *Camps v. Gore Cap., LLC*, No. 3:17-cv-01039, 2021 WL 2827094, at *10 (M.D. Tenn. July 6, 2021) (Richardson, J.) (citing *Foster Bus. Park*, 2009 WL 113242, at *12).

Atchison alleges that he had a confidential relationship with two Powerohm employees and agents, Mike Crowe and Vance Hinton, and later with two Hubbell employees and agents, Andrew Thexton and Lucien Rainville. (Doc. No. 37 ¶ II(B)(3).) According to the Complaint, after joining Powerohm,[10] he shared "general details" of his research with Crowe and Hinton. (*Id.* ¶ II(A)(8).) The Complaint describes Atchison as "possess[ing] no business acumen." (*Id.* ¶ II(B)(2).) Atchison states that he "understood very little about how the financing and marketing could be

_____

[10] The Complaint's timeline on this point is unclear. The Complaint alleges that Atchison was hired both as a product design engineer and to lead a new division to develop and market his BPM and DBM. (Doc. No. 37 ¶ II(A)(6).) Emails from late 2005 and early 2006, which the plaintiff attached to the Complaint, show that Atchison, Hinton, and Crowe had at least preliminary discussions about financing the venture. (*See* Doc. No. 37-2 at 2–3.) But the Complaint alleges that, "[s]ubsequent to his employment with Powerohm, Plaintiff trustingly shared with . . . Mike Crowe and Vance Hinton the <u>general details</u> (but **not** the specific technical plans and specifications) of [the BPM]." (Doc. No. 37 ¶ II(A)(8) (emphasis in original).) This timeline implausibly suggests that Atchison was hired to lead a new division to develop plans about which the company did not yet know even the "general details."

24

accomplished, and relied upon the progressing assurances of Powerohm []and later Hubbell." (*Id.* ¶ II(B)(3) (emphasis omitted).)

The plaintiff states that, "acting on his own, Plaintiff recognized that he lacked the financial resources and the business acumen to bring the novel project from the planning stage to world industry markets." (*Id.*) He alleges that "the confidential relationship ar[ose] from the superior knowledge and reposed confidence" Atchison placed in Crowe and Hinton. (Doc. No. 25 at 14–15.) In this relationship, "Crowe and Hinton were the dominant parties, and Plaintiff was the servient (subordinate and dependent) party." (Doc. No. 37 ¶ II(B)(3) (emphasis omitted).) As the plaintiff describes it, the "confidential relationship arose between the parties as the dominant party (Hubbell) recognized the enormous value of Plaintiff's intellectual property, and, possessing substantial business acumen and expertise as the dominant party (in context, as Plaintiff's employer), Hubbell breached the resulting fiduciary duty to Plaintiff (as the servient party), taking gross advantage of the Plaintiff's lack of business acumen. The . . . facts [alleged] establish the elements of domination and control, as well as Plaintiff's deference to the superiority of his employer, Hubbell." (*Id.* ¶ III(D).)

Atchison has not alleged sufficient facts to establish the existence of a confidential relation for purposes of a claim for breach of fiduciary duty. Atchison's allegations that "Crowe and Hinton were the dominant parties[] and Plaintiff was the servient (subordinate and dependent) party" (*id.* ¶ II(B)(3)); that Hubbell "breached [its] fiduciary duty to Plaintiff (as the servient party), taking gross advantage of the Plaintiff's lack of business acumen" (*id.* ¶ III(D)); and that the plaintiff has "establish[ed] the elements of dominion and control, as well as Plaintiff's deference to the superiority of his employer, Hubbell" (*id.*) are conclusory.

Moreover, as discussed above, it is not clear when the plaintiff alleges the confidential relationship began. If the confidential relationship is alleged to have begun before Atchison joined Powerohm, no facts alleged indicate domination or control. In general, when parties deal at arm's length, they "lack the sort of relationship of trust and confidence that gives rise to a fiduciary relationship." *Hall v. Liberty Ins. Corp.,* No. 3:13–cv–206–TAV–HBG, 2013 WL 6571928, at *6 (E.D. Tenn. Dec. 13, 2013) (citing *Dick Broadcasting Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 674 (Tenn. 2013)). In this case, the plaintiff has not alleged any facts suggesting that, before he joined Powerohm, any of the people he talked with were "in a position to influence him, actually dominated him[,] or controlled his actions." *Camps*, 2021 WL 2827094, at *10. Atchison was an experienced engineer, not a weak party, and the plaintiff has alleged no facts suggesting that any person forced him to do anything.

If the confidential relationship is alleged to have begun during Atchison's tenure at Powerohm, again he has not alleged any facts that even hint at domination or control. The closest allegation is that his managers possessed superior knowledge over marketing commercial brake technology. But even accepting this as true, it is not sufficient to allege the existence of a confidential relationship. "[T]he mere fact that one of two contracting business entities professed to possess greater expertise in the pertinent business arena does not suffice to establish that the party with greater expertise dominates or controls the other." *Triumph Hosp.*, 2019 WL 3841942, at *8 (citing *Faber v. Ciox Health, LLC*, 331 F. Supp. 3d 767, 781 (W.D. Tenn. 2018)). Moreover, Atchison's job "was a casual, 'at will' position, with no formal written employment or operational agreement." (Doc. No. 37 ¶ II(A)(7).) *Accord Mason v. USEC, Inc.*, No. 3:07-cv-10, 2008 WL 4057799, at *5 (E.D. Tenn. Aug. 26, 2008) ("Clearly an employment-at-will is not comparable to

any . . . relationship[]" that "'giv[es] rise to a finding of a confidential relationship or one of trust and confidence.'" (quoting, in the second instance *Klein*, 1986 WL 12177, at *3)).

This claim, too, will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the defendant's Motion will be granted in part and denied in part. Except for the plaintiff's unjust enrichment claim, all claims will be dismissed without prejudice. The unjust enrichment claim will not be dismissed.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge