# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT FOR TENNESSEE

TIMOTHY ALLEN ATCHISON )
)
        Plaintiff, )    **Civil Action Number 3:24-cv-922**
)
v. ) .   **Jury Demand**
)
)    **Judge Trauger**
HUBBELL INDUSTRIAL CONTROLS, INC., )
)
        Defendant. )

---

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES 1 – 12

---

**Interrogatory No. 1**

Identify and describe all of the accused products which form the basis of Plaintiff's claim of unjust enrichment and how the Atchison IP is used in the accused products, including: the component parts; function and operation if they are physical things; their steps if they are methods; their elements if they are procedures; their code or programming if they are software; their contents if they are information; and identify all documents concerning the technology at issue.

**RESPONSE:** A) Broadly, I would describe the products as the **"BG Series Modules"** and "**LG Series Modules,**" both of which conceptually pre-dated my employment with Powerohm, as well as the creation of **"Power Electronics,"** which came into existence as a "venture" to finalize and market the designs that I had initiated, and to physically bring those modules to the world marketplace. The Power Electronics "venture" (see the emails; the banking applications; and the "Business Plan") existed entirely apart from my Powerohm (and later

DEFENDANT'S
EXHIBIT 2

Hubbell) salaried duties. The "venture" was to provide the marketing expertise, financing, and personnel resources under what I would describe as the "Powerohm umbrella." As a relatively small corporation, Powerohm was very casual, loose, and unstructured with a "family" feeling. I include additional reference to the BM "K" and BM "W" series, which also came into existence as created extensions of my "kitchen table" innovative Brake Power Module creations. That evolved after the commencement of the "venture" referenced in the Power Electronics-related "venture" emails. They are categorically reflected in the business plan (previously provided), under the operational management and control of my personnel in the Covington "Motel Ohm" structure, and the related industrial facility.

B)      How were the devices used? In Brake Module applications, on AC drive/motor systems, with the innovations directed toward smaller size, greater capacity, and increased reliability. The documents concerning the technology are reflected in the voluminous digital materials that have been provided by Dropbox. **Those schematics and part descriptions were transposed and digitally generated after 2008 at my home. That was preceded, initially, in a very rough "legal pad" written format, <u>damaged but still in existence.</u>** Importantly (from a credibility perspective) that otherwise highly-proprietary technical information has been provided to you prior to your receipt of these interrogatories **and prior to my receipt of Hubbell's document production responses.** I must incorporate the voluminous contents herein by reference, as a part of my complete answer to this question. It cannot be easily and concisely answered because of the complexity of the subject.

C)      A common thread that extends through my claims against Hubbell is that I can prove that I assigned **the parts numbers** (2008 and later) to the devices that I had conceived (2008 and later), and Hubbel cannot credibly deny that. Just compare my documented 2008 (forward)

Case 3:24-cv-00922    Document 52-2    Filed 08/01/25    Page 2 of 32 PageID #: 532

personal work (including unique parts and components that I ordered in 2008) to the components in Hubbell's presently-marketed devices. Coincidence is not an explanation. My present (pre-discovery) access to those fine, minutely-precise, proprietary inner-workings is certainly not a possibility. I already have documented my 2008-forward "historical" possession of unique intellectual material that Hubbell will not be able to trace back to any other source than Tim Atchison and the (2015) purportedly abandoned "Power Electronics" venture.

D)     All of those parts-specific devices (with traceable parts numbers) were negotiated for Power Electronics' (separate business) production and marketing in return for my 3% gross sales commissions---initially and briefly paid, until I abruptly learned (post-acquisition) that Hubbell (supposedly) had decided that further production and marketing was not practical. I can prove that the parts numbers mostly originated with my personal assignment Hubbell (inexplicably, in view of the initial concealment), lazily and confidently, simply continued to use my assigned parts numbers for their devices, rather than extending even minimal efforts to hide their theft of my intellectual property in their present worldwide internet marketing efforts. Hubbell assumed, correctly, that I had just gone away.

E)     In parts number presently in use, **"TA" absolutely means "Timothy Atchison."** **"BG" means "Big Guy." "LG" means "Little Guy."** I personally assigned those acronyms and will prove it. "BM" obviously stands for "Brake Module." I emphasize that Hubbell (to the best of my knowledge) was not in the "Brake Module" business at all prior to its acquisition of Powerohm in January 2014. Prior to "Power Electronics," Powerohm's marketing emphasis could be best described as "power resistors," with any involvement in "Brake Power Modules" being a surface-level and minimal involvement. "Powerohm" became interested in the lucrative and complex "Brake Power Module" marketing only through my Power Electronics venture that is

documented in the business plan and, unequivocally, referenced in the few e-mails that I have been able to locate after the passage of so much time following my loss of interest, after dismissive (purported) abandonment by Hubbell—and by people I respected and trusted as my professional family. I believe when the respective banking records, of Powerohm, Power Electronics, and Hubbell, and the stock transfer sales contract involving Powerohm and Hubbell, it will confirm what I am stating on these salient, provable, evidentiary points.

F) **Importantly: When you review my document production responses, you will see that, in addition to the "last date modified" notations, my technical files reflect the date of original file creation. Without restriction or limitation, Hubbell is welcome to procure the forensic services of a computer analyst to confirm that it is not possible for those early (2007, 2008, 2012, etc.) "file creation" dates to have been recently inserted, or otherwise altered or manipulated. When directly compared to the hundreds of parts and circuits duplicated in the presently-marketed Hubbell Brake Power Modules, how will Hubbell explain that totally impossible coincidence?** When I provide my deposition, and can explain in greater detail, I will show you **my** parts (ie, **my** initials) listings **(dating to 2008 or so), with those exact parts numbers** still being used by Hubbell in what they are marketing.

G) I will note and concede, as a possible exception to what is stated above, the following: when Hubbell bought a small company known as **"Cable Form"** a year before they acquired Powerohm, Cable Form was producing a very rudimentary form of "DC motor control" using relays and resistors, which, by today's standards, would be considered technically backward. I was generally aware of a **problematic**, technically-crude form of braking circuitry "within" the rudimentary system of "DC Motor Control," which was not sold "outside" this system as a "stand-alone" product. That purchase is a reasonable indication that Hubbell was only **beginning** to

"dabble" or develop an initial interest in the concept of "Brake Power Modules" confirm that Hubbell did not have access through their own channels, or even through Cable Form, to the concepts that were uniquely held by "Power Electronics," predicated entirely on my drawings, parts lists, and concepts. Hubbell, by its "Cable Form" curiosity and acquisition, is among the best evidence that I can suggest to confirm that previously they had nothing reasonably workable until they acquired my materials by acquiring "Power Electronics." They had **no** effective, reliable, **high-power, "stand-alone"** Brake Power Module materials until they acquired my personal 2008-originated "kitchen table" materials. Please compare my old parts lists and drawings—that are stamped and dated in 2008 and thereafter----to what Hubbell is now openly marketing, and then, trace Hubbell's present BPM ideations to whatever they may now try to claim was their original access to that highly-unique technical data. Neither Cableform nor Powerohm (or anyone else) possessed it prior to my involvement.

### Interrogatory No. 2

**Identify and describe all of the Atchison IP which forms the basis of Plaintiff's claim of unjust enrichment that was not being used by Powerohm Resistors, Inc. in its products offerings at the time of its acquisition by Hubbell including the component parts, function and operation if they are physical things, their steps if they are methods, their elements if they are procedures, their code or programming if they are software, their contents if they are information.**

**RESPONSE:** A)  I incorporate the above response. Importantly, I reaffirm the often-repeated statements in the materials that I have submitted so far that confirm that I have possession (as you will now have) of all of the drawings, diagrams, and parts lists that commenced at my Gallatin residence "kitchen table" in 2008, and progressed until it became the **(negotiated**

**venture)** technical premise for the existence of "**Power Electronics.**" Otherwise, the BPM material would have no connection to Powerohm Resistors or Hubbell. In my opinion, neither Powerohm nor Hubbell can answer these questions, which confirm the truth of my sworn testimony: 1) The early Vance Hinton e-mails (2005 and 2006) confirm the business plan for a "new division" (for Brake Power Modules) as a separate division of Powerohm; 2) Why was I included in that discussion—or the related new "business plan--" when I was not even yet an employee? Just a "regular employee?" 3) if "Power Electronics" was no longer an active, ongoing business plan for Mr. Crowe and Powerohm (when I was hired by Powerohm **in 2008**) why was I the only employee (of 150 or so) to be designated as "**the**" company "Registered Agent" in the Business Division for the Secretary of State of Tennessee, in furtherance of an "abandoned" Power Electronics venture? 4) The answer to all of the above is that (as the May 2011 e-mail confirms) the ongoing and pending joint business plan **directly involved me,** through and including Hubbell's abrupt firing of me on June 30, 2015, following the peculiar, "mass-firing" of all ten my Power Electronics team in the preceding three to four months. **But, Hubbell's Brake Power Module work continued** without me or my demonstrably successful team! Through whom I do not know. With a proven performance record, why were we suddenly gone.?

    B)    Why did Powerohm, in furtherance of its established and routine "power resistor" market desire to create a new venture? For what purpose, if not the new, separate business "venture" detailed in the e-mails and the bank financing records. Why not just use its established, existing, well-functioning business structure? The answer is that my BPM's were entirely apart from anything Powerohm had been doing. Admittedly, we all perceived "Power Electronics" as a new, possible business risk. Risk, especially financial, was a highly important consideration undertaken by Vance Hinton before approaching the bank. Reflected in the bank's initial rejection

(refer to emails), clearly, they too needed additional information to assess the loan risk. If the BPM concepts (when later matured into actual products) suffered high failure rates, it would translate to a bad financial risk for the bank.

C)  With no real business training or expertise, I certainly did not know whether the BPM's that I designed were susceptible to financially successful production marketing. I absolutely knew my intentions were for the BPM products to they were more reliable, and more broadly applicable in high-power applications, but I was totally dependent on more business-savvy people (that I fully trusted), in relation to deciding mass manufacturing costs, market demand, and the usual "benefit v. risk" business plan evaluations. I knew Powerohm Resistors was doing nothing of any real significance in the field of Brake Power Modules when it was acquired by Hubbell, **except** through its newly-created/funded "venture" that is described in the emails to me, and in the business plan that Mr. Hinton **procured from me**, and which he successfully used to obtain the financing for the Brake Power Modules that are now being sold by Hubbell.

### Interrogatory No. 3

**Describe all facts and circumstances surrounding Plaintiff's alleged enlightenment and investigation as to Hubbell's use of the technology at issue as alleged in the Complaint.**

**RESPONSE:** A)  As repeated from my previous filings, and in the Complaint, on a date that I do not specifically recall at this time, I received a telephone call from a longtime friend, **David Huntington**, whom I had not heard from in a long while. David described a new "power control" project that he was pursuing and requested my advice and assistance. David's project involved using an array of high-power resistors (he already had) for applying "variable load testing" to some new natural gas-powered generators. His ideas and designs (and mine on this same subject) should be considered proprietary. Given the power levels involved, the thought

returned to my mind of using the BG series modules that I had conceived, which had become a serious basis for the creation of Power Electronics, entirely independent of my routine design engineer work for Powerohm Resistors. The objective was that we would be using them in a **"no motor-no regen present,"** was set forth in my Complaint in painfully minute and voluminous detail. I know of no abbreviated or simple way to address the subject.

B)     My follow-up work and internet research after talking to David Huntington was based on the sparking of my curiosity to see "what," if anything, might be on the market now at this time that would fall within the broad category of our discussion. My recent and present work had not caused me to return to the subject, after my trusted "professional family" friends had indicated that Hubbell had abruptly decided against the Power Electronics venture, based presumably on that "cost v. benefit" evaluation. I concluded that was the end of it, and that my often-referenced "brilliant" ideas apparently were not so brilliant, after all!

C)     After Hubbell unequivocally and clearly conveyed to me that they had abandoned the "Power Electronics" venture (in which I was demonstrably a prominent participant—not a routine employee), I did not initially focus my thoughts or suspicions on Hubbell. After all of the expressed, initial excitement surrounding my business plan (prepared personally by me, and used by Mr. Hinton and the others to finance my ideas through "Power Electronics") it was shocking and disheartening to me when I learned that "Power Electronics" was (supposedly) being shut down. Employees (of which there were approximately ten) were quickly, without explanation to me or them, terminated. There were no further meetings that were similar to the meetings that we had had at Powerohm, and initially at Hubbell. What other reasonable conclusion should I draw from the effective shutdown of the new "venture" that was created and existed for one purpose only, as reflected in the business plan that I prepared at Mr. Hinton's request and direction, and

which he used to obtain the initial funding from the bank? I simply cannot understand anyone denying that my innovations were the sole reason for the existence of Power Electronics, as documented concisely in the few emails that remain in my possession.

D)      I know that Hubbell's present files contain all of the documentation pertaining to the sale, as well as the Powerohm internal memoranda and other communication detailing Powerohm's (and eventually, Hubbell's) interest in, and plan for, my "Power Electronics" business plan and BPM innovations. Power Electronics, and my proven-successful devices, were the answer to Hubbell's ill-advised and clumsy efforts to expand its "power control" interest through the prior year's purchase of Cableform. That effort went nowhere, and offered nothing in terms of discrete AC BPM's, and it's a reasonable conclusion that Hubbell knew that when it re-routed its plans toward my BPM innovations.

E)      I welcome the opportunity to provide my deposition testimony, through which I can present more elaborate and detailed descriptions on the matters addressed above. Simply explained, the Huntington call sparked my dormant curiosity—with that dormancy caused by naïve and mis-guided trust. Progressively, over a period of weeks (as I have had to deal with both family and other work commitments), I researched YouTube and other internet sources. A YouTube search for "Hubbell + Brake Module" revealed a video by my old friend, **Rob Angel.** In the video, Rob describes Hubbell's present and recent sales and marketing efforts for what is being touted as a "reliable" "quality product" in the "Brake Module" category. Then, I visited Hubbell's main internet website and entered "Brake Module" in the search box, thereafter following links to the Powerohm website.

F)      I found a surprising number of brochures, manuals, product listings, and parts lists. I returned to the Hubbell website and discovered that substantial marketing material on the subject

had been created. In an attempt to bring these matters into a tighter focus, I took my old parts numbers (see the previously-provided material data submitted by Dropbox) that is literally dated, in its early origins, to my "kitchen table" in 2008. I was very surprised by what I saw. Module pictures were everywhere. I discovered manuals available through manual companies. I observed Chinese and other international companies (Germany) offering brake power modules of the type that I had developed. I requested a quote from a couple of national and international suppliers **and then cross-referenced those part numbers on the quotes to my old, personal documentation** that I presently have in my possession (reference the Dropbox contents) that I would have no way of possessing. since Hubbell has not yet answered my interrogatories and document production requests as of this date. **Certainly, now, Hubbell should consider it their "proprietary" secret information, <u>so I would have no other way of possessing it.</u>** Isn't that why Hubbell wants the protective order? Otherwise, how will Hubbell explain my provable possession of the minute technical data that should be reproduced and contained in the technical materials that I have asked Hubbell to provide to me, and that I would have no other way of possessing at this stage, pending Hubbell's proper answering of the discovery requests that I have submitted. If Hubbell will be honest and complete in their document production responses, I will be able to lay on the table (figuratively, side-by-side) my parts numbers and material data and compare it to Hubbell's (supposedly, now proprietary/confidential) sketches, parts descriptions, and concept drawings. I have long possessed them, because they are mine.

### Interrogatory No. 4

**Describe the basis for Plaintiff's contention that the right to use any of the technology at issue was not transferred to Hubbell by the acquisition of Powerohm Resistors, Inc.**

      **RESPONSE:** A)    My layman's contention is that Powerohm cannot sell something

that it does not own. When it began observing my openly-disclosed and shared intellectual property, Powerohm knew that what I was doing "at the kitchen table" was very different from my day-to-day work as a design engineer. Obliquely, there may have been some minimal technical overlap. But, all involved should agree that the substance of my unique work was the singular-one and only-reason **that I prepared** the "bank-submitted" business plan that proved to be the technical foundation for the creation of "Power Electronics."

B)  Due to the informal casual approach typical of a small, close corporation, there was some personnel and operational overlap with Powerohm. But, overall, it was entirely discrete (legally, technically, and operationally) from Powerohm Resistors. Otherwise, why not just do it all as the existing "Powerohm?" It is because Mike and Vance had a special plan for the venture— apart from the Powerohm's existing mission. When Hubbell acquired Powerohm Resistors (and its subsidiary, Power Electronics), Powerohm (through its subsidiary, Power Electronics) was unequivocally obligated to pay me 3% of its gross sales on the "Power Electronics" Brake Power Module work. That obligation was fully known to Hubbell's management (Tom Yingling and Andrew Thexton and perhaps others that I do not presently recall). **It was briefly paid (pre-Hubbell), totalling about $30,00.00** (as I now recall) before the brief market introduction was abruptly halted by Hubbell,without explanation.  Without any slight doubt (as I expect the identified witnesses to corroborate), Power Electronics was the "**Brake Power Module**" arm of Powerohm Resistors. It existed for no other reason, as the email references to the new "venture" and my prepared business plan, confirm. Without doubt, Hubbell factored into its purchase price of Powerohm, its newly-focused intention on getting into the "Brake Power Module" business, at my expense.  I again reference Hubbell's Cableform preliminary attempt that absolutely did not result in discrete BPM devices. I believe they acquired the business (including my innovations

through Power Electronics) with the consideration (if not definite plan) to be rid of me within the next year or so, after having shut down the "Golden Boy" Brake Power Module aspiration. That unfulfilled aspiration is documented in its assumedly wasted "Cable Form" acquisition the previous year—which didn't work out in any hopes for BPMs and went nowhere.

C)     I believe that Tom Yingling will be a truthful source (along with the document evidencing my brief, initial payments) for corroborating that the "3%" arrangement was unique among all employees of Powerohm, or, subsequently, Power Electronics. That is an important point that I believe directly corroborates my allegations in this matter. The abrupt and inexplicable "shutdown" of Power Electronics made absolutely no sense, in overall context. In hindsight, it makes perfect sense.

D)     I cite, and incorporate herein by reference, the voluminous statements set forth in the Complaint on Page 5, Section II, ¶ A (10), emphasizing that I never executed any agreement with Powerohm or Hubbell for "**assignment of inventions**" or "**ownership of discoveries**." My concepts pre-existed joining Powerohm. Its new "Power Electronics" venture came into existence (I must reiterate as often as possible) solely for the purpose of bringing to life the enormous expected profits for "Power Electronics" **and me**.

**Interrogatory No. 5**

**Identify and describe every meeting, conversation, document, or other situation Plaintiff alleges supports Plaintiff's claim that royalties, commissions, or other compensation outside of Plaintiff's employment agreement was agreed to or intended to be conferred based on exploitation of the technology at issue and all witnesses or any other individual Plaintiff believes has firsthand information of the same.**

**RESPONSE:** A)     There was never any formal written employment agreement or

operational agreement with Powerohm. That fact is specifically addressed in the Complaint on Page 4 in Section II, ¶ A (7). Even before I joined Powerohm, there had been discussions about my "Power Electronics" idea and my personally-prepared "business plan."

B)    The persons who are knowledgeable of that 3% plan:  Fundamentally, the office person who computed the math and cut the check to me: **Brandy McManus**, as authorized by my business mentors and "venture" participants: **Mike Crowe; Vance Hinton; Tom Yingling (non-venture participant).**  Please note (this is important) the 3% figure does not appear specifically in the version of the "business plan" that I attached to the Complaint and my earlier affidavit. I know with certainty that it appeared in a later ideation of that "business plan" that (to my knowledge) was last in the possession of Vance Hinton and Mike Crowe. Tom Yingling, at times, was the "middle man" between me and Vance Hinton. That should not be interpreted as implying that I did not interact literally on a daily basis with Vance Hinton and Mike Crowe on the issues we were discussing.

C)    There was no rigid chain of command or hierarchy. Distance (with Vance, but not Mike) was a factor in structuring how we communicated on a daily basis regarding the present issues. I believe **Richard Jochen,** being a financial partner, in accounting, would also have knowledge of that 3% arrangement. The financial assistant/office manager, **Brandy McManus** would possess that information because of her daily role, which involved writing checks and making deposits. She had the responsibility of sending to me written confirmation of every purchase order completed on various projects, including the Brake Power Modules, so that I would have documentation and proof of the entitlement. She assembled a paper file and entered the information digitally into the computers. I have a document among my records that confirms at least one of the 3% payments. **It is important to understand that the "3%" compensation was**

**referable solely to my unique work under the "Power Electronics" developing business plan.**]

D)    I had an entirely separate pay structure for Powerohm, and the work that I generated in the course of sales and otherwise. For Powerohm, my payment arrangement was strictly a salary of \$7,000.00 per month. There was no commission arrangement for any work that I did for Powerohm, regardless of my level of activity or production in the area of power resistor sales. Clarified, no "Brake Power Module" component was ever sold by me, **in the context of my straight salary for Powerohm**. The "Power Electronics" 3% arrangement for me is documented in Exhibit A to my interrogatory responses. It is also included in the responses to the document production requests. Since we were in the early developmental/transitional stage, some of those 3% payments may have originated in the "Powerohm" bank account. However, the relevant supporting paperwork will confirm that it was for work discretely performed for "Power Electronics," and not otherwise. To the best of my knowledge, Powerohm's **(now Hubbell's)** records must confirm that I was never paid a commission on anything outside of "Power Electronics" (under the business model "venture" that references my Brake Power Modules) came into existence.

E)    It is important to emphasize (as Hubbell's documentation will confirm) that "Power Electronics," to the best of my knowledge, never advertised, marketed, or sold **a single product** that was not my creative product, and subject to the 3% commission obligation. Simply put, they paid me a small amount for a brief period, until the ruse of disinterest and venture abandonment came about, shortly before I was terminated, post-acquisition, for no stated reason. I did not complain. I had other options. I am a non-confrontational person. I went on my way, "chalking it up" as a bad experience that I had excitedly and embarrassingly misjudged. I was not bitter, but I declined their initial "severance package" in hopes of negotiating a better package, since I was

about be unemployed for the first time in my life, and was about to be subject to a very broad non-compete lasting a full year, encompassing all of North America. By no preference or choice, I got very busy, trying to avoid losing my home. I got busy, moved on, dropped it, and forgot about it, preoccupied with financial survival, an finding a new job.

### Interrogatory No. 6

**Identify and describe any effort or attempt to make, use, sell, license, or otherwise monetize the technology at issue.**

**RESPONSE:** A) The short answer is, "absolutely none." When it was communicated to me, by conduct and words from people I absolutely trusted, that my Brake Power Module innovations, and the "Power Electronics" structure apparently had been re-evaluated and determined by Hubbell to not be worth the effort and expense to manufacture and market for a relatively-narrow industrial field, I accepted that clear and direct communication. I am a design engineer, not a businessman. I acknowledge that I am naïve and inexperienced in business matters and perhaps concluded too quickly that I was being told the truth in the indication to me that my Brake Power Module innovations had been abandoned as a source of future, reasonably-productive development by persons much smarter and more business-savvy than me. For that reason, I painfully considered the matter a closed chapter in my life and moved on to deal with other challenging professional work and family problems during that phase of my life (*i.e.*, 2015 – 2022).

B) An additional odd, but relevant note: When Hubbell purchased Powerohm's stock, there was an abrupt change in the "tone" of our Power Electronics management by Hubbell. I was told by Tom Yingling that I should not continue to communicate directly or indirectly with Vance Hinton and Mike Crowe. I do not believe that I did so to Crowe or Hinton after the sale on January 16, 2014 (please note that this date is improperly referenced in the opening comments to the

Hubbell interrogatories as "2024") for Vance— due to physical distance from Kentucky, but mainly because I was instructed not to. Mr. Hinton was in Texas, and Mr. Crowe was in the Cincinnati area. While, as I have emphasized, the high level of interest appeared to remain, as the conversations shifted from (primarily) Crowe and Hinton to the new Hubbell management, Andrew Thexton, Lucien Rainville, and Tom Yingling. During the six-month period preceding my termination in June 2015, as I observed the abrupt and unexplained disassembly of Power Electronics (termination of the employees, etc.), my inquiries to those individuals were simply unanswered. My work focused my thoughts in other directions, and, as noted above, I did not carefully weigh the business considerations involved, assuming that my "bosses" at Hubbell had good reasons for doing what they were doing, and that they had perhaps shifted their focus to other more important projects. I hope not to further complicate an already complex story by mentioning "Load Banks Direct." It is only indirectly relevant.

C) During the time frame referenced above, not long before the "acquisition" (under the "Power Electronics" umbrella) Mike Crowe asked me what I wanted to do next. I thought about it and proposed what I felt would be another innovative project idea, for "Load Banks," in which I envisioned and intended to create "all new" motherboards and Power Electronics "power modules" to do a new method of applying, controlling and varying 3-phase AC power (on which I have written technical papers), which rapidly (without my initial knowledge) resulted in the formation (by Mike and Vance) of "Load Banks Direct," which is a resistor variation concept. By their actions, with serious interest, Mike and Vance liked my idea/ proposal and privately pursued it---**except** they used standard relay "contactors" to vary the power levels because they knew how to use relays, but they had no idea how to create power electronics modules or controlling motherboards.

Case 3:24-cv-00922   Document 52-2   Filed 08/01/25   Page 16 of 32 PageID #: 546

D) Those facts are not directly relevant to my claims involving my Brake Power Module components, but it is interesting to note that (just before its sale to Hubbell) Powerohm executives (Mike and Vance, as my associates in "Power Electronics") had taken this step (initially not known to me) to establish a separate, parallel **"power resistor"** company operating under the same roof as Power Electronics, using what I would label as "old fashioned" fundamental, "low tech" technology. I do not know of the present management or ownership structure, but, after some investigation, I know "Load Banks Direct" is still presently being operated out of the same building in which "Power Electronics" had previously operated. Otherwise, I know nothing about "Load Banks Direct," as they had to move out post-acquisition (then apparently later moved back in). I do not include it in any of my claims involving the Brake Power Modules, because **the documentation** of my idea and proposal to do "Load Banks Direct" product line is admittedly weak, in contrast to the theft of the Brake Power Modules concepts, well-documented to the pre-Powerohm days. I know now that Load Banks was included in the sale to Hubbell. I emphasize that it is not involved in my claims. Essentially, what I had communicated **directly** to Vance Hinton and Mike Crowe was an idea and proposal, in contrast to the "Brake Power Module" innovations that I absolutely and demonstrably created, from the grassroots concepts level to the actual, physical construction, and the initial brief marketing, all of which paved the way toward the present worldwide Hubbell marketing.

E) **I personally created the concept, the practical design, the parts requirements, parts sources, and every operational aspect necessary to put the devices on the market for profit.**

**Interrogatory No. 7**

**Identify and describe the method, means, or calculation that Plaintiff is using to compute any alleged damages in this Action or the value of any alleged intellectual property rights in the technology at issue.**

**RESPONSE:** A)   I intend no disrespect, but the question, in context, is not understood. I am complaining about the concealment and theft of something that belonged to me. I only recently learned that my work was being marketed and sold by Hubbell. Certainly, I have no access to their records that document their worldwide sales of all of the product numbers that I have enumerated in my discovery responses. I know what I had. I know what proof I have of my connection to the products, but only Hubbell possesses the documentation upon which "3%" may be easily computed with a calculator. I respectfully request, and expect to receive, that documentation in the Hubbell discovery responses.

B)   It is central to my claim. It is not a complicated "expert "analysis. With the gross sales provided, it is a brief math calculation. I will supplement my response upon my receipt of full and complete sales documentation for every Brake Power Module component that is described in the parts listings, and other documentation contained in the voluminous Dropbox presentation.

**Interrogatory No. 8**

**Describe all facts and circumstances relating to Plaintiff's job at Bonitron, Powerohm, Hubbell, including all job duties, what products Plaintiff worked on, and who the Plaintiff reported to.**

**RESPONSE:** A)   Because of the casual informality that I have described, there was no typical "job description." We all worked well together as collaborators and confidants, rather than a rigidly controlled chain of command. We openly exchanged ideas about how to improve

the 'power resistor" devices.    Maintaining those discrete industrial products (assisting in applications, specific projects involving UL etc, and in sales) is how I earned my salary **at Powerohm.** At Bonitron, I was in the engineering department, where I assisted in sales. I answered directly to the president, Keith Benson. I worked for a straight salary of about $5,000.00 per month. I received no commissions on the sales assistance. The technical scope of my work at Bonitron may be concisely described as follows: I had a lifelong interest in various forms of power modules and their control boards. There are many descriptions and variations of these products. I was particularly interested in **"power regeneration"** and **"power storage and retrieval"** systems that utilized **"Ultracapacitors."** My work at Bonitron generally included generic brake modules, but did not specifically include what we are presently discussing as (the high power, stand-alone **"Brake Power Module."** I was extremely successful in my Bonitron design and maintenance work. My unquenched interest led me to my home-based "kitchen table" work that I often pursued at night and on the weekends, with the intention of bringing to life very highly reliable, stronger, yet smaller, devices, which I absolutely accomplished after I left Bonitron. I can specifically affirm that none of my "Brake Power Module" innovative concepts were directly involved in my day-to-day activity at Bonitron. There may be some broad conceptual overlap, and broad device purpose (ie, control). But, the BPM "Power Electronics" innovations were specific and unique to the personal work that I was doing, in contrast to the general work I did at Bonitron.

    B)    I conceived the early ideas for the later-implemented Power Electronics and Control concepts while at Bonitron, in part stimulated by the known failure rates for this type device sold into complex systems. So, it may be correctly stated that there was some broad element of "overlap" as it related to Power Control techniques and industrial **reliability** demands.  So, I incidentally dealt with the "Brake Module" concept, but in terms of providing higher and higher power levels

being requested **into an evolving market**, composed of complex electrical system structures, it was an early level, "greatly in need of a complete overhaul" of control circuitry for reliability and enhanced safety purposes. **There is a huge technical difference in "low power" (shutoff) Brake Modules, and the "high power" Brake Power Module mechanisms.** Concisely stated, especially with regard to the **higher-level** Brake Power Module innovations that are presently being sold by Hubbell, I (nor anyone else at Bonitron) had ever developed or perfected what I was privately conceiving to go beyond the evolutionary lower-power concepts and designs.

     C)    With regard to my work at Powerohm, I started work in 2008. In terms of providing project technical support (like UL etc), application/sizing/specification/engineering assistance, failure analysis/recommendations/design solutions, and sales assistance: for **"pre-existing resistors within powerohm's resistor product lines"** and **"pre-existing resistor products"** that were under a degree of evolution. My job for Powerohm and their products was similar in scope and nature to what I did at Bonitron. I was paid, as a design engineer at Powerohm, on solely a salary basis ($7,000.00 per month). I answered directly to Mike and Vance. I performed inside/outside technical support, working with Mike Crowe, initially. Summarily, as referenced above in detail, the scope of my work at Powerohm was very similar to the scope of my work at Bonitron, I was often asked to assist in **Resistor** sales, and at times participated in Resistor sales. independently v. assistive, **although I did not earn a commission at Powerohm on any of the sales.** Developing more reliable and larger capacity "Brake Power Modules" was absolutely not within my direct job assignment at Powerohm. When I started work for Powerohm, they had absolutely no brake power module products, or any other similar devices, within their inventory. They supplied **"power resistors"** which involve an entirely separate technical concept that is too elaborate to describe in this short response.

D) Again, incidental to the broad field of "power control," I continued (after 2008) my "kitchen table" home-based design and experimentation, directed toward creating a "Brake Power Module" **that would solve the failure rate in the old (geared for low power) "power control" devices. <u>At no point in my employment for Powerohm was I ever given an assignment to develop a "Brake Power Module" that would address the issues that were eventually developed in my personal innovations</u>**. Those are the innovations that appear in my responses to the document production requests (referencing the provided Dropbox materials).

E) While at Powerohm, my daily duties, between 2008 and 2014 (when it was sold), involved maintenance of existing Powerohm products, and assistance in sales. I can affirm absolutely that there are no Powerohm documents or records (now in the possession of Hubbell, as its successor) that would describe what Powerohm might possess would be the documents that I naively and trustingly shared in my open, friendly, and casual discussions with Mike Crowe and Vance Hinton (and my fellow employees and customers, as described in my earlier responses). Some of the records that I generated at home would have been trustingly talked about, detailing what I thought I had accomplished, and how I thought it could be applied.

F) Eventually, the BPM ideas were gradually and progressively shared with my friends, Vance Hinton and Mike Crowe (and certainly with other fellow employees). I was not "jealous" or "proprietary" in wanting to hide that information from my Powerohm supervisors.

G) In 2005 and 2006, I had preliminary conversations with Mr. Hinton (see the emails and the business plan), upon which **"Power Electronics"** was exclusively based, both in the business and technical concept. Power Electronics had one purpose: the taking of my **pre-existing BPM** intellectual property referenced in the business plan, and bringing it to market, with the understanding that I would be paid 3% of the gross proceeds, whenever and however **Power**

Case 3:24-cv-00922   Document 52-2   Filed 08/01/25   Page 21 of 32 PageID #: 551

**Electronics** sold it. I did not have to be personally involved in a sale at all—if someone or anyone sold it—I was to receive the 3 percent commission. **That exclusive Power Electronics arrangement (just like my Secretary of State "Registered Agent" designation for the business) was for me alone, and applied to no other "employee," out of many.** All of that was the predicate (as I later learned) to Hubbell's attempt to get more heavily into the "Brake Power Module" business, as word spread (within the relatively small industry) of my **slowly developing** "Power Electronics" venture with my employer, Powerohm. Clearly, Hubbell had an interest in the potential value of what I had developed, and what the "venture" referenced by Mr. Hinton was intended to accomplish. With their business acumen and financial resources, my new innovations for "Brake Power Modules" (reflected in **my** personally-prepared "Business Plan" for Power Electronics) was to become a key ingredient in Hubbell's future business plans, as I have only belatedly learned. My almost obsessive focus--to make the previously-unreliable power module devices more reliable and with greater power capacity-- was well-known to Vance and Crowe. I must assume that, in their discussions of their sale to Hubbell, that was a central topic of conversation. Again, please note that assumption seems reasonable, based upon the general knowledge within our industrial field that Hubbell was beginning to explore a potential "power module" market, as Hubbell inexplicably (someone really didn't know what they were doing) acquired the Cable Form assets a year before they bought Powerohm. As described elsewhere, Cable Form had a very rudimentary and unsuccessful "power control" program device for DC Motors, which had an internal (not discretely available) "brake control circuit" that experienced high failure rates. Hubbell did not develop the "failure prone" controller, and apparently soon determined it was ineffective. It appeared to me that it was abandoned, in terms of being a means and stepping stone for getting into a discrete stand-alone device in BPM business. I, with Joe

Eschlemen, told Andrew that I would fix those problems, but the offer was declined.

H) Upon Hubbell's "acquisition date" (January, 2014, not 2024), I continued with the same type of basic, daily work that I had done for Powerohm, and Power Electronics, as my duties had (rather ambiguously) evolved to the point where most of the daily work I was doing was for the new Power Electronics "venture," such as finishing the UL project I had started pre-acquisition. My initial post-acquisition directions were to focus on the venture objectives. Pre-acquisition, Mike Crowe, on a daily activity basis, pushed and pressed me increasingly toward expending time for the "Power Electronics" venture that is described in the business plan and Mr. Hinton's emails. I assumed at the time, and still believe, that the continued "Powerohm" salary (while I was doing very little for Powerohm) was a reflection of Powerohm's (later Hubbell's) recognition of the long-range potential for the devices, some of which had no market competition. Very little of what I did in the 18-month period after the 2014 acquisition had to do with strictly-limited, comparatively mundane Powerohm duties, as they had existed initially.

I) As an example, about halfway through that timeframe (late-2014), the excitement by my Hubbell superiors (Andrew Thexton and Lucien Rainville) seemed to me to be confirmed by the request that I travel to Virginia to meet with them at the Cable Form facility. While there was some ambiguity about the purpose for that visit, the conversation there quickly turned to the "Power Electronics" Brake Power Modules, and the ongoing optimism by my mentors/venture principals for the BPM/ Power Electroics "Business Plan." There was some incidental discussion about Cable Form's problems, and my ideas for correcting them. After three-to-four days in Virginia, I left on a long road trip with **Lucien Rainville** to the Hubbell Archdale, North Carolina, facility. The discussion always returned to Hubbell's optimism for my Brake Power Module "Power Electronics" work. I can firmly state that nothing about our discussions or practical work

dealt with the "basic" Powerohm (later Hubbell) design engineer work that I had previously focused my efforts and time on. The Hubbell focus of discussion and interest, openly emphasized to me and my fellow Power Electronics employees, was my "Brake Power Module" products that "Powerohm" had just begun to exploit at the time of the acquisition, apparently being gradually introduced into Hubbell's product line. I was not privy to those business and marketing details, and frankly did not inquire.

J) I trusted that my friends/mentors would treat me fairly. I considered these men (primarily, Mike Crowe and Vance Hinton, and later, Lucien Rainville and Andrew Thexton) as my business-smart mentors. I trusted them completely, and accepted their words and conduct as being "good faith" and genuine in all respects. You may mock me for doing so, but I totally trusted and completely accepted every reassurance about my "brilliance" and my "importance." Embarrassingly, in more mature hindsight, I was flattered and totally reassured of my personal and financial safety in their hands. While it might not seem reasonable to outside observers, it never occurred to me to question what was going on. I believed that all of my "Power Electronics" employees (about 10) shared that "specialness." They were not routine Powerohm employees, and would not have had anything to do with Powerohm's production of resistors. The "Brake Power Module" concept was a well-known "hit." In retrospect, I feel foolish in having to admit that I should have demanded more answers and insisted on a more precise clarification of what was going to happen, and when. Instead, based on my naivete, I just "went along," and would not have thought about the present outrageous situation, even when the abrupt change occurred in the spring of 2015. When my good, dependable P.E. employees were abruptly terminated early that Spring, I maintained the accepting attitude that I felt was expected of me. I continued to not ask questions, and exhibited a "good solider" demeanor. I had just received, for the previous year, another (as

with all previous years), good performance rating, evaluation and raise.

K)     Accordingly, in April 2015, when I received a telephone call from Andrew Thexton, that call came in the surprising context of the indications to me that, as an unfortunate business-analysis decision, Hubbell had abandoned its plans to put money, resources, and employee energy into bringing my Brake Power Modules to the profitable market that all of us had envisioned when we put all of the time, effort, and money into "Power Electronics." I will accept responsibility for my naïve personal trusting nature, as I have been taught to trust my superiors and mentors. I was absolutely confused when Mr. Thexton then advised me that my position, also, was to be eliminated. I acknowledge that I did not challenge him, or respond in any negative manner.

L)     With my unique skills in high demand, I knew I could find another job quickly. I meekly accepted what he told me, and trustingly, without doubt or cynicism, assumed the truth of the abandonment of my "Brake Power Module" innovations—a financial "dream" that I must accept was going nowhere. I considered it a closed subject—not for technical reasons (I knew better), but for the apparent Hubbell business "risk vs. benefit" reasons that were "over my head."

### Interrogatory No. 9

**Describe all facts and circumstances relating to Plaintiff's knowledge of the BG Brake Module being sold by Powerohm prior to Hubbell's acquisition of Powerohm.**

**RESPONSE:** A)     I believe I have thoroughly answered that question. I will provide further context and clarification in my deposition. My specific knowledge in response to the question is limited in the above responses, and will not repeat them further. "Power Electronics" venture came to life to manufacture, and to bring my Brake Power Modules to the industrial

place. Because of the brevity of time between the Power Electronics initial (gradual and progressive) productive work, ant the acquistion, there is minimal documentation about what was being done by Powerohm, with regard to Power Electronics. The business plan contemplated, under the auspices of "Power Electronics," and for which I was paid the 3% commission. Other new, anticipated products to be designed by me and my team, anticipating broad future possibilities for Power Electronics. In practical terms, the Brake Power Modules were the central focal point. I was aware **(I was partly paid my commission)** that **Power Electronics** had started selling my designed/constructed BPM products. As the informal, evolutionary and ambiguous nature of our friendly, collaborative arrangement progressed, my focus was on technical, not business, considerations. The records of "Power Electronics" venture will demonstrate that, as I was getting my salary from Powerohm, I remained trusting, non-assertive, and passive as I became aware that Powerohm was indeed shipping to customers, aligning with the purpose of the venture, **my designed devices with my parts numbers,** in the later timeframe, just before the Hubbell acquisition. I received, at the 3% agreed commission rate, only portions of the amounts to which I was entitled. I never received, or demanded, and accounting. As previously noted, to the best of my recollection, the first year 3% commission that was accounted to me was based upon $1.2 million in sales, and I received a total of about $30,000.00. I received more, but I do not recall the details. As a salaried employee, to what does Hubbell claim those large lump sum payments may relate?

B) As the word got around that these devices manifested a reliability rate that was superior in the industry, and, as industrial setups were created and restructured for various corporations, the gradual market demand improved. Because I understood that it was a slow process, I did not demand the accountings, and merely accepted what I was told as I received my

3% commission from Power Electronics Division. I did not know how the internal accounting was handled for Powerohm vs. Power Electronics. —I do not believe (I'm not sure—it was casually and informally handled) that I ever received a commission from the Powerohm account, for anything. It was certainly only the Power Elecronics "venture" that paid me 3%.

    C)    During the early stages of my time where I was asked to focus on "Power Electronics," I literally worked a year of "overtime," often working 100 hours per week, to the point of extreme exhaustion, bringing to life the Brake Power Modules as set forth in the "Business Plan" that I personally prepared for the financing efforts. I continued to receive my "Powerohm salary," but my work centered on the new "venture." Powerohm (through the Power Electronics venture) did not place a large number of devices on the market immediately, but only as they were slowly perfected. Because of our focus on product reliability, we were hyper-cautious and conservative to back up our promises of enhanced reliability, in an industrial field where down-time was frequent and costly. As new items were produced, and I was satisfied with their quality, they were gradually introduced.

### Interrogatory No. 10

**Describe all facts and circumstances relating to your statement on page 9 of the complaint that "Hubbell was fully briefed on the Plaintiff's BPM innovations, and therefore its above-named agents (primarily Dave King and Andrew Thexton) became aware of both the history and the promising status of Hubbell's joint venture with Plaintiff, and Powerohm's "new division," Gallatin-based "Power Electronics."'**

    **RESPONSE: A)**    Following the acquisition, Andrew Thexton was positive, cheerful,

and effusively complimentarily. Dave King and Andrew Thexton became aware in our man personal discussions. In my first meeting with Andrew Thexton, he literally stated to me (I recall specifically) **"We (Hubbell) know that you are some sort of one-man band, and created all of these modules and the division, we don't know how, but we know you did."** I interpreted "we" to include Dave King, Andrew Thexton, and other Hubbell superiors.

B) In subsequent conversations with Hubbell (as I refer to "the Virginia meeting" about nine months into the acquisition), the shift of the plan discussion for Hubbell's solution of the Cable Form business, always seemed to shift back to the Power Electronics "venture " and my team—working from the specifically-provided "Ohm Motel" and the adjoining productions facility. Specifically, in various conversations focusing on the future of "Power Electronics," and my personally-designed and implemented "Brake Power Modules," I was asked by Andrew Thexton if I had any thoughts about how our present ideation of the Power Electronics "Brake Power Modules" could be improved, with the emphasis on the BG series. I emphasized to him that the slow progression to market of those devices is necessary, whatever time it took to guarantee the customer the reliability that was (then) lacking in the market, and that I felt like I had them in pretty good shape in that regard.

### Interrogatory No. 11

Describe all facts and circumstances relating to your statement on page 10 of the complaint that: "Plaintiff now knows, and herewith alleges, that Hubbell (by word and conduct implying that the project was of no further interest to them) later surreptitiously re-visited the implementation of the Plaintiff's work. Hubbell has produced and marketed the Brake Power Modules, generating many unaccounted millions of dollars annually."

**Including when and how you first became aware that Hubbell was producing and marketing**

**such a product.**

    **RESPONSE:** I incorporate the following description from my supplemental disclosure

(paragraphs 12 and 13, page 6 of 9):

> **Dave Huntington**: In the year preceding the filing of the suit, I received a call from an old friend (Dave Huntington) who requested advice from Mr. Atchison pertaining to a pending project in which Mr. Huntington needed to do "variable load testing" of a "natural gas-powered" heavy industrial power generator. Upon commencing my evaluation of the inquiry, it prompted my recollection of the possible application of my earlier-conceived (but thought to be abandoned) BPM innovations that I had commenced in my spare time in 2008 and thereafter, eventually the technical foundation for Power Electronics;
>
> **Rob Angel:** In following up on Mr. Huntington's comments and inquiry, I discovered on the internet a video presented by my former friend and colleague, Rob Angel, discussing specifically, and in a very telling manner, Hubbell's boasting of its present leadership in Brake Power Module applications, all suggestive of, and reminiscent of, Mr. Atchison's personal Brake Power Module "Power Electronics" work, that he can prove dates to 2008, and his "kitchen table" drawings and diagrams. On the basis of Mr. Angel's very specific technical descriptions, I proceeded to Hubbell's website, which produced further links to their purported "leadership" in Brake Power Module applications. There, I laboriously studied (progressively, in my available time over a period of many weeks) the Hubbell marketing and advertising materials, linked to other affiliated companies. I entered some of my assigned parts numbers, and discovered that Hubbell had revealed my personal parts numbers in their national and international internet marketing. I gradually, and progressively, affirmed my conclusions regarding the theft of my intellectual property by placing potential order inquiries, utilizing my own personally-assigned parts numbers, which Hubbell had apparently lazily continued to utilize, with no effort to conceal their use of my personally-generated parts numbers, containing my initials ("TA") and my quirky "Big Guy" ("BG") comparison of the larger capacity/capability devices, in contrast to the "Little Guy" ("LG") reference denominated by me. Again, I believe that assignment by me will be confirmed by Joe Eschleman.

**Interrogatory No. 12**

**Describe the facts and circumstances relating to your statement on page 14 of the**

complaint that: "based upon information recently learned by the Plaintiff's investigation, it is reasonably asserted by Plaintiff that Hubbell purchased the Powerohm entity, fully aware of Powerohm's ethical and legal duties in the joint venture and Hubbell's newly-acquired, "new division" (Power Electronics)."

**RESPONSE:** A) As described elsewhere in my interrogatories, Hubbell was known to have an early interest in an introductory step into the power module arena, when it acquired "Cable Form" the year earlier. For the reasons I have described above, and elsewhere, that did not work out for Hubbell in terms of obtaining access to stand alone reliable Brake Power Module Circuitry.

B) It was well-known within the industry that Powerohm (**only** through my "venture" with Vance and Mike) that "Power Electronics" was doing unique things in the field of Brake Power Modules. It logically follows that their acquisition discussions with Powerohm would include that important topic, as a reasonable extension of its Cable Form interest and acquisition. A casual internet search will confirm that, at the present time (only a short period of years later) "Brake Power Modules" (bearing my personally-assigned part numbers) are a major component of Hubbell's product line. My question to Hubbell is this: "If you did not get your presently-designed 'Brake Power Modules' from my "proprietary" materials--that I have supplied to you in my Dropbox discovery responses—how can you identify your explosion from practically no BPM significance--"pre-Power Electronics" acquisition--to your present dominant status? What are the explanation options? Certainly not Cableform. How may you explain the parts number matches to materials that I retained in my personal files after I assigned them? Exactly where did you procure that unique, highly-specialized and technical data for Brake Power Modules? Powerohm only possessed it through Power Electronics. The Thexton-ordered Stuart Xiang dispatch, just before

the termination, was intended to insure that Hubbell, before they pulled the trigger, wasn't missing

anything from the Atchison-created, "Power Electronics' technical files.

Respectfully submitted,

**BURGER LAW FIRM**

*/s/Wm Kennerly (Ken) Burger*
Wm Kennerly (Ken) Burger, BPR #3731
*Attorney for Plaintiff*
12 North Public Square
Murfreesboro, TN 37130
T: 615-893-8933; F: 615-893-5333
kenburger@comcast.net

## CERTIFICATE OF SERVICE

I do hereby certify that a true and exact copy of the foregoing has been served upon the

following on this the **18th** day of June, 2025.

**McINTEER & O'REAR PLC**
Howell O'Rear, BPR # 26509
Seth M. McInteer, BPR # 26471
*Attorneys for Defendant*
2209 Crestmoor Road, Suite 310
Nashville, TN 37215
T: 615-724-6207; F: 615-523-1311
howell@mcolawfirm.com
seth@mcolawfirm.com

**ROBINSON & COLE LLP**
William E. Bradley *(pro hac vice)*
Kyle G. Hepner *(pro hac vice)*
1201 Pennsylvania Ave NW, Suite 820
Washington, DC 20004
T: 771-213-5602
wbradley@rc.com

*/s/Wm Kennerly (Ken) Burger*

## VERIFICATION

STATE OF TENNESSEE      )
COUNTY OF RUTHERFORD    )

I, Timothy Allen Atchison, after being first duly sworn do hereby depose and state that I
have read the foregoing interrogatory responses, and I affirm that the statements are true and
complete.

*Timothy Allen Atchison*

Timothy Allen Atchison

Sworn to and subscribed before me, this ⟨8⟩ day of June, 2025.

Notary Public