

# Transcript of Michael Crowe

**Date:** June 18, 2025
**Case:** Atchison -v- Hubbell Industrial Controls, Inc.

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

---

**1**

```
1              UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF TENNESSEE
3               Civil Action No. 3:24-cv-922
4
5
6              TIMOTHY ALLEN ATCHISON,
7                        PLAINTIFF
8
9                          V.
10
11         HUBBELL INDUSTRIAL CONTROLS, INC.,
12                      DEFENDANT
13
14
15
16
17
18
19
20
21
22
23  DEPONENT:  MICHAEL CROWE
24  DATE:      JUNE 18, 2025
25  REPORTER:  ALLISON WOLFF, RPR
```

---

**2**

```
1              APPEARANCES OF COUNSEL
2
3  ON BEHALF OF THE PLAINTIFF, TIMOTHY ALLEN ATCHISON:
4  Ken Burger, Esquire
5  Burger Law Firm
6  12 North Public Square
7  Murfreesboro, Tennessee 37130
8  Telephone No. (615) 893-8933
9  E-mail: KenBurger@comcast.net
10  (Appeared via videoconference.)
11
12  ON BEHALF OF THE DEFENDANT, HUBBELL INDUSTRIAL CONTROLS,
13  INC.:
14  William E. Bradley, Esquire
15  Robinson + Cole, LLP
16  1201 Penn Avenue, NW
17  Suite 820
18  Washington, D.C. 20004
19  Telephone No.: (771) 213-5602
20  E-mail: wbradley@rc.com
21
22  Also Present: Timothy Atchison, Plaintiff; Koren Eve
23  Polywka, Videographer
24
25
```

---

**3**

```
1                        INDEX
2                                              Page
3  PROCEEDINGS                                   5
4  DIRECT EXAMINATION BY MR. BRADLEY             6
5  CROSS-EXAMINATION BY MR. BURGER             120
6
7                    EXHIBIT INDEX
8  Exhibit                                     Page
9  1 - Subpoena to Testify at a Deposition in a Civil
10     Action                                    7
11  2 - September 20, 2005 e-mail, Subject: Re: Business
12     Plan                                      19
13  3 - January 9, 2006 e-mail, Subject: Re: Business
14     Plan                                      22
15  4 - Complaint                                25
16  5 - Stock Purchase Agreement, HCI000001 - 308   35
17  6 - Plaintiff's FRCP Rule 26 Initial Disclosures   70
18  7 - Certified copies of PowerOhm Resistor, Inc.'s
19     filing with Tennessee Secretary of State   79
20  8 - May 31, 2025 letter from Burger Law Firm   87
21  9 - May 3, 2011 e-mail, Subject: FW:         117
22
23
24
25
```

---

**4**

```
1                    STIPULATIONS
2
3  The VIDEO deposition of MICHAEL CROWE was taken at TAFT
4  STETTINIUS & HOLLISTER, LLP, 50 EAST RIVER CENTER
5  BOULEVARD, SUITE 850, COVINGTON, KENTUCKY 41011 on
6  Wednesday the 18th day of JUNE, 2025, at approximately
7  10:01 a.m.; said deposition was taken pursuant to
8  FEDERAL Rules of Civil Procedure.
9
10  It is agreed that ALLISON WOLFF, RPR, being a Notary
11  Public and Court Reporter for the State of KENTUCKY, may
12  swear the witness.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

1              PROCEEDINGS

2

3          VIDEOGRAPHER:  Here begins media number one in

4     the videotape deposition of Michael D. Crowe the

5     matter of Timothy Allen Atchison V.

6          Hubbell Industrial Controls in the United

7     States District Court for the Middle District of

8     Tennessee, Civil Action Number 3:24-cv-922.

9          Today's date is June 18th, 2025.  Time on the

10    video monitor 10:01 a.m. Eastern.  The videographer

11    today is Karin Eve Polywka representing Planet

12    Depos.  This video deposition is taking place at

13    Taft Stettinius & Hollister, LLP, located at 50 East

14    River Center Boulevard, suite 850, Covington,

15    Kentucky 41011.  Will counsel please identify themselves

16    and state whom they represent.

17          MR. BRADLEY:  William Bradley for Hubbell

18    Industrial Controls.

19          MR. BURGER:  Ken Burger for Timothy Atchison.

20          VIDEOGRAPHER:  Thank you.  The court reporter

21    today is Allison Wolff representing Planet

22    Depos as well.  The witness will now be sworn.

23          COURT REPORTER:  Please raise your right hand.

24          Do you solemnly swear or affirm the testimony

25    you're about to give will be the truth, the whole

**6**

1     truth, and nothing but the truth?

2          THE WITNESS:  Yes.

3          COURT REPORTER:  Thank you.

4            DIRECT EXAMINATION

5     BY MR. BRADLEY:

6          Q.  Morning, Mr. Crowe.  Can you state your name

7     and address, for the record.

8          A.  Yes.  It's Michael Darren Crowe.  Crowe is

9     spelled C-R-O-W-E, and Darren has two Rs and an E in it.

10    And my address is 9673 Squire, S-Q-U-I-R-E, Oaks Drive,

11    oaks like the tree, and that's located in Villa Hills,

12    Kentucky, and the zip code is 41017.

13          Q.  Good morning, Mr. Crowe.

14          A.  Good morning.

15          Q.  My name is William Bradley.  I'm representing

16    Hubbell this morning.  On video, you've already met Mr.

17    Burger.  He is representing Timothy Atchison in this

18    matter.

19          Do you understand you're here to provide

20    testimony in a lawsuit filed by Mr. Atchison against

21    Hubbell Industrial Controls?

22          A.  Yes, I am.

23          Q.  And did you receive a subpoena compelling your

24    testimony here today?

25          A.  Yes, I did last week.

**7**

1          Q.  I'm going to have the court reporter mark

2     Exhibit 1.

3          MR. BRADLEY:  And Ken, for you, Exhibit 1 is

4     the subpoena.

5          MR. BURGER:  Did you address me, Mr. Bradley?

6     I didn't understand.

7          MR. BRADLEY:  I wanted to make sure you had the

8     exhibits that --

9          MR. BURGER:  I got them yesterday.  Yes, thank

10    you.

11    BY MR. BRADLEY:

12          Q.  Have you ever been deposed before?

13          A.  I have not.

14          Q.  Okay.  So let me go over a few of the ground

15    rules.

16          A.  Okay.

17          Q.  A deposition is a court proceeding.

18          A.  Okay.

19          Q.  You are here testifying under oath just as you

20    will be in a courtroom.  We're going to need a verbal

21    response.  When I ask you a question, you can't just

22    shake your head or say uh-huh.

23          A.  Okay.

24          Q.  We need a verbal response because the court

25    reporter will be taking a transcription of our

**8**

1     conversation today.

2          A.  I understand.

3          Q.  You need to let me finish my questions for

4     clarity for the court reporter.  If we're both talking

5     at the same time, it causes confusion, makes her job

6     harder.  Do you understand that?

7          A.  Sure.

8          Q.  Okay.  If I ask you a question during your

9     testimony today that you don't understand, let me know.

10    We can rephrase it and try to make sure there's some

11    clarity so you'll be able to answer it truthfully.

12          A.  Okay.

13          Q.  If you need to take a break at any time, let

14    me know.  We can take a break.  If you need to use the

15    restroom or have to make a call, please let us know, and

16    we'll certainly take a break.

17          A.  Okay.

18          Q.  During the course of depositions, Counsel will

19    make objections, and that's evidentiary objections on

20    how testimony can be used in court, but you're still

21    obligated to answer the question unless it's -- involves

22    conversation you had with an attorney.

23          A.  Okay.  Understood.

24          Q.  I need to make sure you're competent to

25    provide testimony that can be used in court, so I need

**9**

1    to ask if you're on any medications or have any medical

2    conditions that would affect your ability to understand

3    my questions and answer them truthfully today.

4         A.   I take two pills every morning, and they're

5    both related to high blood pressure.  So I'm fine,

6    competent.

7         Q.   Okay.  So if you do answer my questions, I'll

8    assume you understood them and were able to answer them

9    truthfully.

10        A.   Okay.

11        Q.   Okay.  During the course of your testimony

12   today, we're taking about events that happen many years

13   ago, so you might have a recollection later in the day

14   and want to go back and correct something or clarify a

15   statement you made earlier.  If so, I ask that you wait

16   'til we're on the record and in the presence of Mr.

17   Burger before you address prior testimony.

18        A.   Okay.

19        Q.   Okay.

20        A.   I understand.

21        Q.   During the breaks today, I will not be able to

22   speak with you or answer any of your questions.  The

23   rules don't allow me to interact with you at all.  It's

24   not that I'm rude.  It's that, out of fairness to Mr.

25   Atchison, I can't be having any conversations with you

**10**

1    off the record.

2         A.   I understand.

3         Q.   Okay.  Thank you.

4              If you turn to Exhibit 1, at the back, there

5    was document requests asking if you had any documents.

6         A.   I don't have any documents left over from

7    PowerOhm.  You know, we moved to a new home last August

8    and we purged everything, but I didn't have any

9    documents.  You know, I left all that with Hubbell.  So I

10   have no documentation on anything, no old e-mails or

11   nothing.  No access to that because it was a PowerOhm e-

12   mail.

13        Q.   Understood.  So when you divested from the

14   company and then separated from the company, you left

15   all PowerOhm materials in the custody of Hubbell?

16        A.   Yeah, no longer needed.  I sold the company.

17        Q.   Okay.  Thank you.

18             I want to get some background information on

19   you, so let me start with your education.

20             After high school, did you continue your

21   formal education?

22        A.   Yeah.  I graduated from high school from the

23   Covington Catholic in Park Hills, Kentucky.  I attended

24   Northern Kentucky University for two years.  I went into

25   a three-two engineering program, which meant I was

**11**

1    supposed to spend three years at Northern.  But I decided

2    to leave a little early for UK, and I spent my last

3    three and a half years at UK getting an electrical

4    engineering degree — a bachelor's degree in electrical

5    engineering.

6         Q.   So you have a BS in electrical engineering

7    from the University of Kentucky?

8         A.   That is correct.

9         Q.   And what year?

10        A.   I graduated from December of 1989.

11        Q.   After you graduated from the University of

12   Kentucky, did you do any other formal education?

13        A.   I went back to Xavier.  I was going to get my

14   MBA, so I took my GMAT.  And I did one semester, and

15   that was kind of the time when I realized I wasn't very

16   happy with the company I was working with, and I decided

17   to start my own company manufacturing power resistors.

18        Q.   Okay.  Thank you.  So let's discuss your

19   employment history.

20        A.   Okay.

21        Q.   When did you -- strike that.

22             So after you graduated from the University of

23   Kentucky in 1989, did you enter the workforce?

24        A.   Yes, I did.

25        Q.   And where were you employed?

**12**

1         A.   In January of 1990, I started working for Post

2    Glover resistors based in Erlanger, Kentucky.  That were

3    on 167 Gap Way.

4         Q.   And how long did you work there?

5         A.   I left there March of 1995.

6         Q.   And what were your job duties there?

7         A.   I was a sale engineer.  We took a lot of phone

8    calls.  In this industry, you do a lot of custom designs

9    with power resistors.  Medium voltage application up to

10   40 — well, 72 KV systems, 72,000-volt systems, and then

11   many other applications just using power resistors.

12        Q.   And when did you leave Post Glover?

13        A.   I left there — I believe it was March of

14   1995, and I went to Houston, Texas, and joined an

15   electrical — basically, a rep for Post Glover at the

16   time.

17        Q.   And how long were you employed there?

18        A.   I worked in his — it was Electrical Sales

19   Associates, ESA, based in Houston, and I worked with

20   reps up until about January of 1996, and that's when we

21   started PowerOhm resistors.  We started manufacturing

22   our own resistors there in Katy, Texas, which is close

23   to Houston.  It's west of Houston.

24        Q.   So you were working for ESA in Houston, and

25   then in January of '96, you started PowerOhm; is that

13

1 correct?

2     A.  That is correct.  It was PowerOhm

3 incorporated.  I believe we set that up in Texas, but

4 I'm not exact -- I'm not completely positive of that.

5     Q.  When you say we, who are you referring to?

6     A.  I had two partners.  One was Vance Hinton and

7 the other was Richard Jochen.  Three partners total.

8     Q.  And how many employees did you start with?

9     A.  I was the first employee on the payroll.

10     Q.  And what was the nature of the business in

11 January of '96?

12     A.  Manufacturing power resistors.

13     Q.  And in -- can you describe how the company

14 evolved from 1996 to 2006.

15     A.  Well, you know, we -- I think it took us maybe

16 over five years to get past about two million dollars in

17 sales, annual sales.  And eventually, we ramped that up

18 very quickly over time, and by the time we sold that in

19 2014, I believe the previous year we had over 150

20 employees on the payroll at one time.

21         We did I think over 30 -- we did over $30

22 million in sales that year.  So we had grown

23 significantly, and that's when, you know,

24 Hubbell -- they're a very large corporation, was

25 interested in purchasing us, along with others.

14

1     Q.  How long -- strike that.

2         At some point, you set up some operations in

3 Florence, Kentucky.  Do you recall when that was?

4     A.  Operations in Florence?  Oh, we had an -- we

5 had a sales office in Florence.  That is correct, yes.

6 Yeah, I moved back from -- what we did was, our

7 competitor was actually Post Glover then, and we ended

8 up hiring two engineers -- Tom Yingling and Rusty O'Hara

9 -- that were both -- they had been let go from the

10 company, so we hired them, and also Joe Eschleman.  He

11 was the vice president of sales at one time throughout a

12 lot of different resistor manufacturers.  We hired him,

13 and we put them all in the same office space in

14 Florence.  So I ended up joining those guys in 2003.  We

15 moved back home from Houston.

16     Q.  And then at some point, you opened -- or

17 purchased a plant in Covington, Kentucky; is that

18 correct?

19     A.  Yeah.  We started doing some light

20 manufacturing off of old 17, near Doe Run Lake.  I can't

21 remember that address.  But we were doing a little bit

22 of manufacturing, and we found an old building that we

23 purchased and renovated, and we started manufacturing on

24 kind of a larger scale there, eventually.

25     Q.  Do you recall what year that was?

15

1     A.  We bought that building in 2007, and there was

2 quite a bit to do.  I can't remember if we moved in this

3 2007 or maybe 2008.  Maybe 2007, I believe, if I'm

4 correct.  I mean, I don't have any records of it, but

5 that's what I recall.

6     Q.  And when you say you started manufacturing

7 there, what were you manufacturing?

8     A.  We built some filters, you know.  We included

9 reactor, capacitors, and then our resistors, fan cool,

10 we did some of those.  We had high-resistance grounding

11 systems, and then eventually, we started manufacturing

12 power electronics there in Latonia -- Covington.  It was

13 annexed by Covington.  That was 125 West 34th Street.

14     Q.  Okay.  Thank you.

15         How was the management of the two locations

16 handled?  You had a Katy part and a Covington.

17     A.  Yeah, the Katy was focused on the -- well,

18 they were fully focused on the manufacturing of power

19 resistors and then to grounding resistors, braking

20 resistors.  The things we manufactured -- because we had

21 -- all the engineers were all based out of Latonia.  So

22 we did the, like, more sophisticated manufacturing, the

23 high-resistance grounding systems there, things that

24 kind of needed engineering input and questions answered.

25 But the power resistors are relatively simple,

16

1 technically.

2     Q.  So you mentioned Latonia.

3     A.  Yeah.  Let's call it Covington.  That's

4 better.  It's Latonia to me because that's where my

5 folks grew up.

6     Q.  So I see.  So it's the same plant?

7     A.  Yes, it is.  Yes.  Latonia -- I say Latonia.

8 It's actually still Latonia.  There's signs there, but

9 the address is Covington because they were annexed by

10 Covington.

11     Q.  I see.  And so Katy was the power resistors

12 manufacturing?

13     A.  Yes.

14     Q.  And Latonia, slash, Covington was the -- I

15 guess strike that.

16         What was it again?  The Covington and Latonia,

17 what did you manufacture there?

18     A.  We did some filters projects, high-resistance

19 grounding systems, power electronics, and we did start

20 manufacturing load banks towards the end.  But we did

21 not sell a load bank portion of that to Hubbell.  We

22 spun that into another company.  That was part of the

23 sale.

24     Q.  So you listed off some nouns.  You did

25 filters, high-voltage resistors, power electronics, and

17

1  load banks?
2      A.  We did -- we did filters.  High-voltage
3  resistors were manufactured in Katy.  High-resistance
4  grounding systems is what we manufactured.
5      Q.  High --
6      A.  Yeah, HRGS.
7      Q.  Thank you.
8      A.  Or -- yeah.
9      Q.  And power electronics.  What does power
10 electronics include?
11     A.  That was the braking modules we were
12 manufacturing.
13     Q.  And so they were called power electronics?
14     A.  Well, that's considered a power electronic
15 because of the high current.
16     Q.  High current?
17     A.  Yeah.
18     Q.  Do you know Tim -- Timothy Allen Atchison?
19     A.  Yes, I do.  Very well.
20     Q.  When did you first meet Mr. Atchison?
21     A.  The first time I met Tim was, I traveled with
22 my partner, Vance Hinton.  We had a potential customer
23 in Nashville, Tennessee, named Bonitron, and we met with
24 Keith Vincent that day and most of his engineers that
25 day.  We spent almost a few day there, and that's when I

18

1  met Timothy Atchison.
2      Q.  Do you recall what year that was?
3      A.  Oh, no.  No, I don't.  This would have been --
4  golly, you know, 2000 -- I don't know if I traveled from
5  here or from Houston at the time.  So I would say around
6  2003, '4, somewhere around there.  It's hard to recall.
7  It's a long time ago.
8      Q.  And then at some point -- strike that.  What
9  was the nature of Bonitron's business --
10     A.  They manufactured braking modules.
11     Q.  And when you say "braking modules," what does
12 that term mean to you?
13     A.  A braking module is basically a high-speed
14 switch.  There's the switch itself is a transistor.  It's
15 called an IGBT, and that stands for insulated gate
16 bipolar transistor.  And you have a -- basically, a
17 motherboard that controls that switch to turn on and off
18 very, very, very quickly.
19         And what it does, you connect that switch
20 between a variable frequency drive and a power resistor.
21 And a variable frequency drive controls the speed and
22 torque characteristics of an AC motor.  And if a AV
23 motor goes into a region mode -- an example of that
24 would be if they the -- are a hoist application, when
25 they lift it, there's no region because they're using

19

1  all this power to pick up the load.  But when they lower
2  it, that load tries to run away.
3         And that braking module will sense the DV
4  voltage that's inside of that drive, and basically, use
5  the resistor to just turn electrical engineering -- or
6  electrical energy into heat, and it just dissipates that
7  heat.  Resistor's very ungrained product, but very
8  necessary.  So it's a -- the braking module's basically
9  a high-speed switch that connects the resistor to a
10 variable frequency drive.
11     Q.  Thank you.  Mark as Exhibit 2 an e-mail dated
12 September 20th, 2005.
13         (Exhibit 2 marked.)
14         MR. BRADLEY:  So Ken, Exhibit 2 is the
15 September 20 e-mail.
16 BY MR. BRADLEY:
17     Q.  Mr. Crowe, have you ever seen this document
18 before?
19     A.  Well, yeah, I read this thing yesterday.
20     Q.  Besides receiving the exhibits yesterday, do
21 you recall ever seeing this e-mail before?
22     A.  No.  I mean, this looks like it was an e-mail
23 between Tim and Vance.
24     Q.  Okay.
25     A.  I haven't seen this one before, like I said,

20

1  yesterday.
2      Q.  Okay.  So did you get a chance to read it
3  yesterday?
4      A.  I -- yeah, I kind of buzzed through it a
5  little bit.  It's basically Vance telling these guys
6  that we're probably not going to, you know -- we're
7  going to put this project on hold.
8      Q.  Okay.  So the first part of this e-mail is
9  coming from Mr. Atchison's e-mail box.  He responded to
10 Mr. Hinton.
11     A.  No -- yeah, he's responded to Vance' e-mail
12 there.
13     Q.  Okay.  I'd like to jump down to Vance's e-
14 mail.
15     A.  Yes.
16     Q.  Okay.  It says "gentlemen," so that's plural.
17         Do you have any idea who the recipients of
18 this e-mail were?
19     A.  I think when he's saying gentlemen, there was
20 three individuals that we were interested in hiring and
21 setting up the manufacture of braking modules in
22 Nashville.  And it was Tim Atchison; it was Mike Roof,
23 and he was kind of sales/over production at Bonitron;
24 and then also Tim Olsen, and he was an engineer that
25 assisted Tim Atchison.

21

1    Q.  Okay.  And in the body of the e-mail, it
2  mentions attempting to set up a new division.
3    **A.  Well, Vance was -- the working capital line.**
4  **We were -- he went to the bank -- our bank**
5  **representatives, and said, hey, we'd like to set up a**
6  **division in Tennessee.  Will you sign this credit line**
7  **we have to, you know, fund this project because it's**
8  **going to be expensive.  And they basically said no.  We**
9  **need a business plan, we need more information, we need**
10  **to develop.**
11    Q.  I see.  Then, in the next paragraph, he does
12  say, "A detailed business plan like what our bank
13  expects will take some time to prepare."
14      So he's referencing that the bank asked for a
15  business plan; is that correct?
16    **A.  That is correct.**
17    Q.  And then, since the next paragraph says,
18  "Since our request may not be granted in automatic
19  acceptance," it continues, "it would be wise for you
20  guys to hold off making any moves until we know for sure
21  the outcome."
22      Do you see that?
23    **A.  Yeah, I did see that.  Yes, I did.**
24    Q.  And do you -- did you and Mr. Hinton discuss
25  this proposed division?

22

1    **A.  Yes, we did.**
2    Q.  Okay.  And what was the sum total of those
3  discussions?
4    **A.  Well, the main idea was to hire those three**
5  **guys and set up a manufacturing facility close to where**
6  **they lived because several of those guys did not want to**
7  **move to either Northern Kentucky or -- or Houston.  So**
8  **we considered hiring those three guys and setting up a**
9  **separate division manufacturing power electronics.**
10    Q.  Okay.  Thank you.  I want to mark as Exhibit 3
11  an e-mail dated January 9th, 2006.
12      (Exhibit 3 marked.)
13  BY MR. BRADLEY:
14    Q.  I'll give you a second to review that.
15    **A.  Well, I guess he -- I don't see who he was e-**
16  **mailing.  I don't see where I was on the e-mail on this.**
17  **I don't know, but, yeah, it's okay.  I do remember going**
18  **to -- I spent a week at Katy.  We were trying to get**
19  **certified -- CSA certification.  That's Canadian**
20  **Standard Association, kind of like a UL.  It's an**
21  **electrical safety company that, you know, basically**
22  **certifies your equipment.  So they were there for**
23  **testing that week.**
24    Q.  Okay.  So the first part of the e-mail is Mr.
25  Atchison responding to Mr. Vance, and he says, "Just

23

1  keep us updated as you can," in his next-to-last
2  sentence.  And this was January 9, 2006.
3      Do you see that?
4    **A.  Yeah.**
5    Q.  Okay.  In the body of the e-mail, it says, "I
6  received your message this morning, Mike," but then it
7  says, "I forgot that Mike Crowe had already scheduled
8  that we have CSA in Katy."  So that's a different Mike.
9    **A.  No, that's me.  That's Mike Crowe.  I don't --**
10    Q.  Is this --
11    **A.  Maybe -- maybe that was from Mike -- maybe**
12  **Mike Roof.  I don't know.**
13    Q.  Okay.
14    **A.  Why is it not on the string here?**
15    Q.  This is how we received the document.  I'm
16  just trying to piece it together.
17    **A.  It must have been Mike Roof because that's the**
18  **only other Mike I can remember.  That would have made**
19  **sense.  Ask him -- received your message -- they were**
20  **communicating a little bit, and I -- "forgot that Mike**
21  **Crowe had already scheduled CSA."  Yeah, okay.**
22    Q.  So --
23    **A.  "As we look forward, definitely interested in**
24  **putting a plan together to examine our future**
25  **possibilities."  Okay.  Yeah.  So we're still**

24

1  **considering that -- starting up another division down**
2  **in...**
3    Q.  And towards the bottom, it says, "The week of
4  January 23rd."  Do you see that?
5    **A.  Yes.**
6    Q.  It says, "The focus for the time being is the
7  framework of a business plan."  Excuse me.  "A completed
8  business plan will determine the profitability of the
9  venture for which we have discussed" --
10    **A.  Okay.**
11    Q.  -- "and give us the required credibility in
12  the eyes of our financial institution."
13      Do you see that?
14    **A.  Yes.**
15    Q.  And do you recall a business plan being
16  prepared?
17    **A.  I remember seeing a business plan.  I think**
18  **what happened was Mike Roof spearheaded the whole thing.**
19  **I think he jumped in there and wrote a business plan**
20  **pretty -- trying to help out, you know, trying to**
21  **expedite starting this -- starting, you know, this**
22  **company.**
23    Q.  And again, when it says, "Hey, guys," you're
24  not sure who that would be?
25    **A.  I don't know.  I assume -- and I don't know if**

25

1 I was on this e-mail. This has been a long time ago,
2 but I would say, hey, guys, was probably Mike Roof and
3 Tim Atchison and Tim Olsen, I would assume.
4    Q.   And when it says that you were going to be in
5 Katy that week and you guys were going to meet about
6 that, do you recall meeting to discuss --
7    A.   Oh, I'm sure. We were talking a lot about
8 this project, and I was all for doing it, so, you know.
9 Yeah, we talked about ate lot. I was very, very busy
10 that week. I do recall that, but I'm sure we had time
11 to talk and go to dinner and everything else.
12    Q.   Okay. Thank you. Exhibit 4 is going to be
13 the complaint.
14        (Exhibit 4 marked.)
15 BY MR. BRADLEY:
16    Q.   Mr. Crowe, what I'm handing you now as Exhibit
17 4 is the copy of the complaint that was filed in this
18 action, and it consists of three parts, and
19        I've collated them for you. The first part is
20 the body of the complaint, and then there's two
21 exhibits: Exhibit 1 --
22    A.   Okay.
23    Q.   -- and Exhibit 2.
24        I'd like to start with Exhibit 2.
25    A.   Okay. Okay. This looks like some kind of a

26

1 patent office.
2    Q.   That's Exhibit 1. Can you go to the next
3 exhibit, Exhibit 2.
4    A.   Sure. Okay. Looks like it's the same e-mail
5 we just checked out.
6    Q.   It is. So --
7    A.   Okay.
8    Q.   -- the first page is that e-mail we just read
9 that references the business plan.
10    A.   Sure.
11    Q.   Okay. Then the next page starts what was
12 represented in the complaint as a business plan.
13        Do you recall ever seeing this document? I'll
14 give you a moment to flip through it.
15    A.   Barely. I do recall seeing a business plan.
16 Yeah. And again, I think Mike — Mike Roof spearheaded
17 this, and I'm not sure how much Tim — Tim and Tim, how
18 much they contributed to this or not, but I'm sure they
19 had input. Yeah, they basically — run through it, it
20 looks like, you know, a basic business plan.
21    Q.   Okay. Go back to page 3 of 38. Down at the
22 bottom, you'll see there's numbers for --
23    A.   Okay. All right. Oh, okay, page 3, my bad.
24    Q.   So where the business plan starts.
25    A.   I'm looking to the other numbers. All right.

27

1    A.   I'm there.
2    Q.   Okay. So under objectives, number 3, says,
3 "Gross sales to 1.5 million in second year, FY 2007."
4        Do you see that?
5    A.   Yes, I do.
6    Q.   So this an indication to you that they were
7 preparing this plan to go into effect in 2006?
8    A.   Well, I think -- I don't know specifically
9 about '6, maybe even '7, but they were, you know, put
10 this together to try to get this started.
11    Q.   If you can flip to page 19 of 38.
12    A.   Okay.
13    Q.   Okay. There's a chart there, and it has a
14 start date of April 1st, 2006.
15        Do you see that?
16    A.   Yeah, that's not -- that wasn't our dates.
17 That's their dates. Right?
18    Q.   Understood. But at the time that they wrote
19 this, it appears that the intention, at least on their
20 part, was to get this started in 2006.
21    A.   Yeah, sure looks that way.
22    Q.   Okay. If you -- okay. Go back to the first
23 page, 3 of 38.
24    A.   Okay.
25    Q.   Okay. Now, if you turn to page -- to page 4

28

1 of 38.
2    A.   Okay.
3    Q.   Do you see it's got a confidentiality
4 agreement for people to sign if they're going to get a
5 copy of this?
6    A.   Okay.
7    Q.   Do you know if this plan was shared with
8 anyone outside of PowerOhm resistors?
9    A.   Not to my knowledge, unless they shared it. We
10 never shared it with anyone outside of PowerOhm that I
11 know of -- I never did.
12    Q.   Do you know if Mr. Hinton shared this plan
13 with any banks or tried to use this to secure financing?
14    A.   I don't think he ever did, but you'd have to
15 ask him.
16    Q.   Understood.
17    A.   He had cold feet at this point.
18    Q.   So can you explain that, please.
19    A.   He had a lot of concerns. I loved the idea of
20 getting started and going all in, but there was going to
21 be money issues. He was quickly growing. He had a lot
22 of concerns about that. He had concerns about whether
23 or not those three gentlemen could actually operate a
24 business. There seemed to be some friction there that
25 we were concerned about.

---

**29**

1       We didn't, you know -- we were considering --
2 we kind of liked Keith Vincent with Bonitron, to take
3 three of his employees, we talked about that. A lot of
4 different things we talked about, and Vance just got
5 cold feet and said, I don't want to do it. Said, I want
6 to cancel this idea, starting something down in
7 Nashville, and starting another division called power
8 electronics. He didn't want to do it.
9     Q. So do you recall when he decided not to do it?
10     A. I would say right about the time this business
11 plan was created, pretty much, you know, right around
12 that framework. I think that's when we probably
13 squashed it was the 2006 or so.
14     Q. At some point -- after it got squashed, what
15 became of those three individuals that you were talking
16 to?
17     A. They continued to work for Bonitron.
18     Q. And in 2008, you hired Tim Atchison at
19 PowerOhm Resistors; is that right?
20     A. That sounds right. I'm not exactly sure the
21 year we hired him, but that sounds about right because
22 we bought that building in '7, so we probably -- yeah.
23 Yeah. We hired him as an employee to -- or to design
24 and manufacture braking resistors there in Latonia.
25     Q. And so there's a gap between 2006, when Mr.

---

**30**

1 Hinton said, I don't want to do this Tennessee thing --
2     A. Right.
3     Q. -- with these individuals and when Mr.
4 Atchison got hired. Say, 18 months?
5     A. Yes.
6     Q. Did anything -- were there any further
7 negotiations on the business plan or looking at property
8 in Tennessee or anything like that, that you recall?
9     A. No, there was not. We went down there one
10 time, checked out one building space, and we had dinner
11 one night at Mike Roof's house. I think I read in there
12 multiple times, but it was one time.
13     Q. Why did -- strike that.
14     In 2008, when you hired Mr. Atchison, why
15 didn't you hire Mr. Olsen and Mr. Roof?
16     A. Well, they -- for one, they didn't want to,
17 you know -- for one, we didn't need three guys to start
18 that. You know, that was part of the expense and part
19 of the problem of forming the other division. It was
20 going to be expensive and did we really need -- if we
21 had that in Latonia with me there, I was over
22 manufacturing all the power resistors. I'm pretty good
23 at manufacturing projects and the manufacturing overall,
24 so I was going to lead that portion of it. We had, you
25 know, a building, and I was there.

---

**31**

1     So Tim came on. We hired Tim because he knew
2 how to design braking modules, and we liked the idea of
3 adding a product that was between our resistors and a
4 variable frequency drive. It made a lot of sense.
5     Q. So in the complaint, Mr. Atchison says he was
6 hired as a design engineer.
7     A. That is correct.
8     Q. And what are the duties of a design engineer?
9     A. Well, his duties were to manufacturer braking
10 modules, to design and manufacturer -- manufacturer.
11 That was his main duties.
12     Q. And how long after he got hired did it take
13 for him to complete a working braking module?
14     A. Oh, see, that -- okay. We already had -- I
15 got -- we had a module that was manufactured by
16 Saftronics that we copied. And our vice president of
17 sales had the opportunity to sell that through -- and I
18 can't remember exactly who, but I believe it was
19 Rockwell.
20     And we actually, before we hired Tim, we gave
21 -- we paid him a little bit to help develop and
22 basically copy a module. You know, just give us a copy
23 of this, and we pretty much just copied the aluminum
24 extrusion. The whole thing was just a direct copy of
25 that Saftronics unit.

---

**32**

1     Q. Understood.
2     A. But we kind of had that flooding, but that was
3 not a big seller, kind of stalled. And what happened
4 was, when we first hired Tim, Tim and I were in Houston,
5 and we went to visit OMRON, and they bought a lot of
6 large amp, high-amp braking modules, and that would be
7 the BG series, you know, 450 amps and up type, you know
8 power, and it was for fracking rigs. We went to meet
9 with him.
10     In that initial meeting, he was very, very
11 interested in braking modules, but we had to design it,
12 first. And he offered something right away. He said,
13 hey, we have a little generator module, and I knew
14 nothing about it. It was basically a control for a
15 generator, and Tim knew about it, and they were having
16 problems, issues, getting parts and boards and stuff.
17 So we started manufacturing those in Latonia, and that
18 really -- that greatly delayed what we were trying to
19 accomplish. It was a mistake to do that, honestly,
20 because it was very low margin after it was all said and
21 done.
22     Q. And then eventually, as part of his duties as
23 a design engineer, he helped design and bring to market
24 these BG/LG brake modules; is that correct?
25     A. Yeah. And a line of other ones that were just

---

33

1 direct copies of -- I think it all came back from
2 Rockwell, those PW series. There's a bunch of part
3 numbers in there. Those were just direct copies of what
4 -- I think they didn't want to continue manufacturing
5 those, and it was like, hey, would you manufacture these
6 for us and sell them to our distributors around the
7 country? And Tim jumped in and copied those designs,
8 and I did the sheet metal, the overlays. I'd help him
9 as much as I could, but he did all the electronics. He
10 was the electronics guy.
11     Q.   So the braking modules, were they built on
12 company time?
13     A.   Oh, absolutely. Designed and built on company
14 time.
15     Q.   Were company resources used?
16     A.   Absolutely. Tim was getting paid every day.
17     Q.   Were the company facilities used?
18     A.   Absolutely. Right there in the -- we were
19 manufacturing and testing those right there in
20 Covington.
21     Q.   Were other company employees used?
22     A.   Other -- well, I mean, he was an employee of
23 PowerOhm, so we had other -- yeah, there were other
24 people helping.
25     Q.   Like someone -- did you have somebody doing

---

34

1 engineering drawings?
2     A.   That was Tim.
3     Q.   That was Tim?
4     A.   For the braking modules, that was Tim. That
5 was -- no one knew anything about braking modules, other
6 than Tim.
7     Q.   What about, like, PCB board -- PCB board
8 layout or something?
9     A.   Yeah, that was his. There's a motherboard in
10 the controls that, you know -- basically that switch
11 turning on and off, and he developed that -- that
12 motherboard.
13     Q.   The motherboard?
14     A.   Yeah.
15     Q.   Thank you.
16         So this -- we're dealing with the time period
17 from when Mr. Atchison was hired in '08 to when you sold
18 the company in 2014.
19     A.   Correct. January of 2014.
20     Q.   Did PowerOhm believe they owned all the
21 products that were designed --
22     A.   Absolutely, we did.
23     Q.   And at any time between 2008 and 2014, did
24 Timothy Atchison express his belief that he owned those
25 products?

---

35

1     A.   Not one time.
2     Q.   And at any time between 2008 and 2014, did
3 PowerOhm ever agree or concede ownership in any of the
4 products?
5     A.   Absolutely not.
6     Q.   Put aside Exhibit 4 for a second. We'll come
7 back to that. Let me just re-collate it for you.
8     A.   Here, I'll do that. I've got it right here.
9 This is...
10     Q.   I'm going to mark as Exhibit 5 a copy of the
11 stock purchase agreement between Hubbell Industrial
12 Controls, PowerOhm Resistors, dated January 16th,
13 2014.
14         (Exhibit 5 marked.)
15     A.   Is this for me here?
16 BY MR. BRADLEY:
17     Q.   Yeah, yes. Mr. Crowe, what I've handed to you
18 is a copy of the stock purchase agreement when
19     Hubbell Industrial Controls bought PowerOhm
20 Resistors on January 16, 2014. It is a -- another
21 exhibit that has three parts: That has a stock purchase
22 agreement itself, then it has the exhibits, and then it
23 has a list of schedules.
24         Can you take one minute and see if you recall
25 this document.

---

36

1     A.   This agreement? Well, this certainly came --
2 this is when we sold the company. That's just the
3 purchase agreement.
4     Q.   Okay. If you turn to the signature page,
5 you'll see the signatures of the owners.
6     A.   Okay.
7     Q.   Do you recognize your signature?
8     A.   Absolutely. That's my signature.
9     Q.   Okay. We're going to take a little bit of
10 time to go through the terms and schedules and the stock
11 purchase agreement, just because this is the only
12 contemporary evidence we had from this time period. I
13 know it might --
14     A.   Okay. Yeah, sure. I haven't read this --
15 they basically -- sign this and we'll send you a lot of
16 money, is what I was...
17     Q.   Okay. So we will -- it might appear a little
18 redundant, but it's important, since you're one of the
19 only first-hand knowledge people that I'm going to have
20 a chance to talk to.
21     A.   Sure.
22     Q.   So we can take some time.
23         Do you need to take a break first?
24     A.   No, I'm fine.
25     Q.   Okay. Thank you.

---

**37**

1        Okay.  If we start, you'll see at the bottom
2  of every page there's a number.
3        A.  Okay.
4        Q.  Those were added by our vendor.  It's called a
5  Bates number.  In litigation, you start numbering
6  documents when you're collecting them.
7        A.  Okay.
8        Q.  And so this was collected.  As you'll see,
9  it's photocopies of exhibits and schedules, so sometimes
10 the text might be a little bit off.  But the -- we
11 couldn't unassemble it.  The rules at Hubbell required
12 this to remain bound at all times.
13       A.  Okay.
14       MR. BRADLEY:  And I will make the original
15       available for inspection, Mr. Burger, if you ever
16       want to see it, but I can't take it apart.  This is
17       as good of a copy as I can get.
18       MR. BURGER:  That's fine.
19       MR. BRADLEY:  Okay.  Thank you.
20 BY MR. BRADLEY:
21       Q.  The stock purchase agreement has a table of
22 contents right after the front page.
23       A.  Okay.
24       Q.  The -- obviously, this covers a lot of
25 disclosures and information for the sale of the company,

---

**38**

1  but we're going to focus on the definitions in Article
2  1, and then the representations of the seller in Article
3  3.  And then we'll touch on a couple post-closing
4  agreements.
5        A.  Okay.
6        Q.  Okay.  So if you turn to the first page that
7  says, Stock Purchase Agreement.  It's HCI0005.
8        Do you see that?
9        A.  Yes.
10       Q.  The second paragraph starts where "whereas
11 PowerOhm is engaged in the business of designing,
12 manufacturing, selling, and servicing electrical --
13 electrical components and systems."
14       Do you see that?
15       A.  Yes, I do.
16       Q.  Okay.  Do you know, at the bottom, it ends
17 with "with products including but not limited to dynamic
18 braking resistors, grounding resistors, control
19 grounding, high-resistance grounding (pulsers), harmonic
20 filters, alternative energy resistors, and electronic
21 braking modules, but shall not include the load bank
22 business"?
23       A.  That is all true.
24       Q.  And then in parenthesis, it says "the
25 business" and "business" is bolded.

---

**39**

1        A.  Okay.
2        Q.  Okay.  So that is giving you the definition of
3  business.  So when the word "business" appears elsewhere
4  in the business, this is what it means.
5        A.  Okay.
6        Q.  Okay.  A couple preliminary questions.  I
7  believe earlier you said, by 2014 you're doing about 30
8  million in revenue?
9        **A.  I don't think -- we didn't do that the last**
10 **year when we sold the Hubbell.  We did it the previous**
11 **year, I believe, in '12.**
12       Q.  Okay.
13       **A.  '13, fracking kind of slowed down a little**
14 **bit, and one of the big pushers -- we had some very**
15 **large solar field projects were -- I believe were over**
16 **ten million dollars.  They kind of disappeared**
17 **overnight.  They figured out a way not to use resistors**
18 **for these solar panel fields.**
19       Q.  And the last product listed is electronic
20 braking modules.  Do you see that?
21       **A.  Yes, I do.**
22       Q.  Is that the BG and the LG, when you say --
23       **A.  Yes, it is.  Absolutely.**
24       Q.  And it is listed last.
25       Do you know why it's listed last?

---

**40**

1        **A.  Maybe because all the -- well, I would say**
2  **you've got, really, kind of two categories of things**
3  **going on here.  All these are resistors, basically, and**
4  **then you have an electronic braking module.  So I guess**
5  **it's at the end because it's a little different from**
6  **everything above, because everything above is basically**
7  **connected power resistor.**
8        Q.  And do you know what the annual sales of the
9  electronic braking modules were?
10       **A.  It was a fraction of the 30 million, but I**
11 **don't know those numbers anymore.**
12       Q.  Was it more or less than a million?
13       **A.  I believe it was less.**
14       Q.  And if you're doing 30 million a year and it's
15 less than a million, it was maybe 3 percent of the
16 business?
17       **A.  Yeah.  And I think actual sales were really --**
18 **without the solar field, it was more like $20 million**
19 **here.  So it was a small portion of our business,**
20 **especially the BG series.  The majority of what we sold**
21 **were those copies to the Rock -- the Rockwell, the one**
22 **that we just copied and started selling, those were the**
23 **big movers.  The -- you know, the BG or I think they**
24 **call them whatever now, but the BG450, 600, 900, 1200,**
25 **we didn't sell a lot of those.  Those kind of got off to**

41

1 a slow start. We did have some issues with some of the
2 larger modules.
3    Q. So would there have been any reason to start a
4 division for --
5    A. No.
6    Q. -- product line --
7    A. Not at that time, no. We had no intentions,
8 never even discussed it again.
9    Q. Okay. Thank you. If you can flip to the next
10 page, HCI0006.
11    A. Okay.
12    Q. Okay. There are three definitions that I want
13 to discuss very quickly.
14        The first one's affiliate. Do you see that?
15    A. Yes.
16    Q. Okay. And I guess, can you read that
17 definition to yourself, and I'll have one question.
18    A. You guys -- you attorneys can write simple,
19 can't you?
20    Q. Understood. But -- so when you see the word
21 "affiliate," you might need a little bit of
22 clarification because of this definition?
23    A. Okay. No, I think I'm okay.
24    Q. You are, okay. But if you get confused later
25 if I use that word, can you just let me know and we can

42

1 parse through it.
2    A. Okay.
3    Q. Okay. Thank you.
4        And then the next definition, affiliate
5 arrangement, and it says has the meaning specified in
6 section 3.20. Do you see that?
7    A. Yes, I do.
8    Q. Can you flip to section 3.20. It starts on
9 page 30 of the agreement, which is HCI00034.
10    A. Okay. I'm there.
11    Q. Okay. So section 3.20 is entitled "Interest,
12 Customers, Suppliers, Et cetera."
13        Do you see that?
14    A. Yes, down at the bottom?
15    Q. Yes. And it says, "Except as set forth on
16 Schedule 3.20 attached hereto, neither the sellers nor
17 any officer, employee, or director of PowerOhm or any
18 affiliate thereof, nor to PowerOhm's sellers
19 knowledge, any member of such person's immediate
20 family."
21        So I want to stop there for a second.
22    A. Okay.
23    Q. Do you see it references employee. So it's
24 neither the seller nor any employee of PowerOhm.
25    A. I don't see the word "employee" in there.

43

1    Q. Second line.
2    A. Oh, okay.
3    Q. Nor any officer, employee, or director.
4    A. Neither the seller, nor any officer, employer,
5 or director. Okay. So everyone within PowerOhm.
6    Q. So everyone with PowerOhm.
7    A. Or affiliated with PowerOhm, even.
8    Q. Okay. Then it continues with letter A.
9    A. Okay.
10    Q. "Possesses, directly or indirectly, any
11 ownership interest in or is a director, officer, or
12 employee of any person which is a supplier, customer,
13 lessor, lessee, licensor, developer, competitor, or
14 potential competitor of PowerOhm."
15        Do you see that?
16    A. Yeah, I do.
17    Q. Okay. And then the next part, "Or is a party
18 to any contract or other business relationship with
19 PowerOhm or owns any interest or properties that are
20 used in the business (any such arrangement set forth in
21 clauses A and B, an affiliate arrangement)."
22        Okay. Do you see that?
23    A. Yes, I do.
24    Q. Okay. Do you understand this paragraph to say
25 if any employee is a licenser or owns any interest in

44

1 any of the assets necessary for the business, it would
2 be disclosed on Schedule 3.20.
3    A. Okay.
4    Q. And the business included dynamic braking
5 resistors. Correct?
6    A. Absolutely.
7    Q. And had Mr. Atchison -- strike that.
8        Had the company believed or Mr. Atchison
9 asserted he had ownership in or licensed the company,
10 the technology, you and your partners/coowners would
11 have listed it in section 3.20 as required. Correct?
12    A. Yeah. There was -- he had no ownership, and
13 he designed these as he was an employee, and that was
14 his job, to design braking modules. So when we sold
15 this, there were three owners of the company; that was
16 myself, Vance, and Richard. No one else.
17    Q. Thank you.
18        If you could turn back to definitions. The
19 next one. Do you see "business"?
20    A. Yes.
21    Q. Has the meaning specified in recitals to this
22 agreement.
23        So that was what we looked at before?
24    A. Right. Everything the business contained or
25 manufactured, sure.

45

1    Q.  Okay.  On page 3, which is HCI00007.
2    A.  I'm there.
3    Q.  About halfway down, you'll see a definition
4  for contract.
5    A.  Okay.
6    Q.  Okay.  Mean -- quoting here, "Contract means
7  any written or oral agreements, arrangements,
8  authorizations, commitments, contracts, indentures,
9  instruments, leases, licenses, obligations, plans,
10  practices, restrictions, understandings, or undertakings
11  of any kind or character or any other agreement to which
12  PowerOhm is a party or that is binding on PowerOhm or
13  its capital stock, assets, or business."
14    Do you see that definition?
15    A.  Yes, I do.
16    Q.  So when we look at this agreement and it says,
17  you need to list any contract that does X, Y, or Z, you
18  understand that that would include any oral agreements,
19  any other understandings, any licenses.  Correct?
20    A.  Sure.
21    Q.  Okay.  Thank you.
22    And the next definition, do you see down
23  towards the bottom, says, "Employee benefit plans"?
24    A.  Yes.
25    Q.  Has the meaning specified in section 3.19(a).

46

1    Do you see that?
2    A.  Yes, I do.
3    Q.  Okay.  We will come back to that.  But when
4  you see that -- when we get to section 3.19(a).
5    A.  Okay.
6    Q.  And then the next definition, "encumbrances."
7  Do you see that definition?
8    A.  Yes.
9    Q.  It says, "Means any adverse claims,
10  encumbrances, liens, charges, security interest,
11  easements, defect in title, encroachments, restrictions
12  on transfer, or any other restriction of any kind or
13  character."
14    Do you see that?
15    A.  Yes, and I understand that.
16    Q.  And you do understand it.  Okay.  Thank you.
17    And two more definitions.  If you could flip
18  to page 8.  It's HCI000012.
19    A.  Okay.
20    Q.  The first one is "Kentucky house."  And it
21  says, "Kentucky house means the residential property
22  owned by PowerOhm Properties, LLC, located 109 Half West
23  34th Street, Covington, Kentucky."
24    Do you see that?
25    A.  Yes.

47

1    Q.  What was the Kentucky house?
2    A.  It was a house behind the building, and we had
3  very limited parking at this site.  We had a very small
4  parking lot in the front.  And we were in the middle of
5  purchasing that building and a little -- had the little
6  house out back came up for sale.  So we jumped in --
7  before we purchased the building, we jumped in and
8  purchased that house because we -- we were thinking that
9  we would probably tear it down and build a parking lot
10  there.
11    Q.  Do you recall when you purchased the house?
12    A.  No, I do not.
13    Q.  Do you know if it was --
14    A.  I would say 2007, right around that area,
15  because we bought it just before we closed on the
16  building.  We locked it down because we didn't want
17  someone else to buy it.
18    Q.  Do you know if --
19    A.  We did not buy it through PowerOhm.  Vance,
20  Richard, and I bought that house on our own.
21    Q.  Was that house bought for --
22    A.  Parking.
23    Q.  Okay.  Strike that.
24    Was that house bought for Tim Atchison?
25    A.  No, absolutely not.

48

1    Q.  At some point, did you Mr. Atchison live in
2  that house?
3    A.  Absolutely.
4    Q.  And can you explain circumstances that led to
5  him residing there.
6    A.  We kind of thought -- we were thinking about
7  tearing the house down initially, and then we thought,
8  well, maybe we -- I had my brother working for the
9  company, and I was trying to keep him busy constantly.
10  And when he wasn't, I said, Hey, let's get over and try
11  to fix this house up a little bit.  It was a small --
12  very small house, two bedrooms, very, very same, kind in
13  poor condition.  So we put new cabinets and flooring in
14  it, made it -- kind of painted it.  Just so basic stuff
15  to make it look nice.
16    And we planned on using that for, like I said,
17  visitors and different guys that came into town and
18  stuff.  And Vance would come into town.  We thought,
19  well, maybe use it, it's nice.  Put a TV there and
20  everything.  If somebody wants to stay there, they can
21  stay there.
22    Q.  So earlier, you mentioned Tim didn't want to
23  move to Kentucky?
24    A.  No.  The plan was he would just -- he had a
25  house in Nashville.  He didn't want to sell and move.  He

49

1  said, I'll just stye here and work out of my house, you
2  know, and I'll come to -- as needed, I'll come to
3  PowerOhm, you know, to start testing some of this stuff
4  and working on the manufacturing things. So he would
5  come in town and stay in that house.
6     Q.  So he was, in some regards, a remote employee?
7     A.  Yeah, he was a remote employee.
8     Q.  And when he came to town, he would stay in
9  that house?
10    A.  Yeah, because it was cheaper to put him up in
11  a hotel for a week or something, you know.
12    Q.  And other individuals were put up in that
13  house as well?
14    A.  Yeah, we had several people who were there. My
15  young co-op work was there a summer or two, him and his
16  brother. They stayed in the house and -- oh, jeez.
17  There was another gentleman from Bonitron that ended up
18  getting fired from Bonitron. We hired him. He would
19  come up and stay in the house also. I can't even recall
20  his name. I didn't know him very well.
21    Q.  Okay. The next definition, "Kentucky house
22  servers," on page 8. Do you see that?
23    A.  Yes.
24    Q.  Has the meaning specified in section 6.2(c).
25    A.  Yes.

50

1     Q.  Do you see that?
2       We'll cover that when we get to that section.
3  But do you recall that there was PowerOhm business being
4  done in the Kentucky house or computers in the Kentucky
5  house?
6    A.  I'm sure, you know -- I'm sure Tim was, you
7  know, working in the house on, you know, designs and
8  different things. I'm sure that happened.
9    Q.  Is it because he was remote employee and
10  didn't have an office in the plant?
11    A.  I really -- we didn't really have an office
12  space for him, but he would work in the conference room
13  sometimes over there. I've always encouraged him to
14  work in the main building so I knew he was actually --
15  what are you doing, you know, type thing. Easier to kind
16  of monitor.
17    Q.  Okay. Thank you.
18      If you could flip to page 16. We're going to
19  get into the -- strike that. Let me lay some
20  foundation. Start on page 15.
21      We're now in Article 3, "representations of
22  PowerOhm and sellers." And it starts off, "PowerOhm and
23  sellers hereby represent warrant to the buyer as
24  follows."
25      Do you see that?

51

1     A.  No, I don't.
2     Q.  Page 15 -- it's HCI000019.
3     A.  Okay. I didn't get your reference. Okay, I'm
4  there now.
5     Q.  Okay. So it's Article 3, "representations of
6  PowerOhm and sellers." Do you see that?
7     A.  Okay. Yes, I do.
8     Q.  It says, "PowerOhm and sellers hereby
9  represent warrant to the buyer as follows," and it
10  starts with section 3.1, "existence in good standing."
11      Do you see that?
12    A.  Yes.
13    Q.  And the first paragraph says, You're -- You
14  have the authority to "own, lease, and operate its
15  properties and assets and to carry on its business as
16  now being conducted."
17      Do you see that?
18    A.  Yes, I do.
19    Q.  And at the time that this agreement was
20  prepared, no one at PowerOhm -- strike that.
21      The -- the sellers were able to warrant this
22  because they believed it true?
23    A.  Absolutely. Yeah, we were selling the company
24  and everything we manufactured there, other than the
25  load banks. We split that out from the document.

52

1     Q.  Understood. If you could turn to page section
2  3.4. It says, "Subsidiaries and investments."
3      And it reads "PowerOhm does not own any
4  capital stock or other equity or ownership or
5  proprietary interest for any of the securities in a
6  corporation, partnership, association, trust, joint
7  venture," or any -- strike that -- "or other entity or
8  person, domestic or foreign."
9      Do you see that?
10    A.  Right. Yeah. Sure. It's asking -- yeah, I
11  understand that.
12    Q.  So there was no power electronics division at
13  the time you sold the company. Correct?
14    A.  No, no, absolutely not. We just sold braking
15  modules as one of our products.
16    Q.  And there were no other subsidiaries. It was
17  a single company called PowerOhm Resistors, Inc.?
18    A.  That was it.
19    Q.  Okay. Thank you.
20    A.  The only thing we spun off of there was the
21  load banks.
22    Q.  Thank you.
23      If you flip to the next page, it's HCI00021,
24  section 3.7, titled "Properties Encumbrances."
25    A.  Okay.

53

1    Q.  Says, "Except as put forth on Schedule 3.7,
2 and except for such properties and assets which have
3 been sold or otherwise disposed of in the ordinary
4 course of business, PowerOhm has good title to its real
5 properties and all other assets, real and personal,
6 tangible and intangible, including the properties and
7 assets reflected in the PowerOhm financial statements."
8 And then it continues.
9        At the time that you signed this agreement and
10 sold the company, other than what's on Schedule 3.7, the
11 sellers did not believe that there are any encumbrances
12 and you had clear title to all assets, tangible,
13 intangible, including intellectual property and
14 ownership of the dynamic brake modules.  Correct?
15    A.  Yes, absolutely.
16    Q.  If you could turn to the next page.  Section
17 3.9, intellectual property, and if you could go to sub
18 paragraph B.  It says, "Except as set forth on Schedule
19 3.9(b), PowerOhm owns all rights to and has a valid
20 right to use all material intellectual property used or
21 held for use in the operation of the business PowerOhm
22 has presently -- has presently conducted, and the
23 consummation of the transactions contemplated by this
24 agreement shall not result in the loss or impairment of
25 any rights of PowerOhm in any intellectual property."

54

1        Do you see that?
2    A.  Yes, I do.
3    Q.  If there was a proprietary ownership interest
4 of Tim Atchison in any of the company's intellectual
5 property, you would have scheduled it in 3.9(b) if you
6 believed that to be true.  Correct?
7    A.  Sure, we would have.
8    Q.  Thank you.  If you could go to the next page,
9 HCI00023, subsection D under "intellectual property."
10    A.  Yes.
11    Q.  Says, "Except as set forth in Schedule 3.9(d),
12 to the knowledge of PowerOhm, PowerOhm is not
13 infringing, diluting, misappropriating, or other
14 violating any intellectual property rights of any
15 person, and PowerOhm has not received any notice during
16 the past two years or earlier if not resolved alleging
17 such infringement, dilution, misappropriation, or
18 violation."
19        Do you see that?
20    A.  Yes, I do.
21    Q.  Had you and the other sellers believed that
22 you were misappropriating or violating intellectual
23 property rights of Mr. Atchison or had been threatened
24 by Mr. Atchison of misappropriating or violating
25 intellectual property rights, you would have indicated

55

1 so in Schedule 3.9(d); is that correct?
2    A.  That is correct.
3    Q.  If we go to Section 3.10, "Material
4 Contracts."  So earlier, we talked about the definition
5 of contract.  Includes oral, written.
6    A.  Yeah, absolutely.
7    Q.  Okay.
8    A.  Handshake's a contract, I mean.
9    Q.  Okay.  So -- so Schedule 3.10, by subclause,
10 is going to list any contracts that fall under the
11 subparagraphs.  If you flip to HCI00025, it's page 21 of
12 the agreement, it's saying that you're going to list any
13 contracts -- any contract relating to an affiliate
14 arrangement.
15        Do you see that?
16    A.  Yes, I do.
17    Q.  So if there was an ownership interest or a
18 license or something from Mr. Atchison regarding the
19 products, it would be listed there.  Correct?
20    A.  Absolutely.
21    Q.  Whether --
22    A.  Tim had no ownership in PowerOhm, period,
23 ever.  Never did we even discuss or he requested it,
24 never.
25    Q.  I understand.  I told you this would be a

56

1 little redundant.
2    A.  That's fine.  Yeah, that's fine.  I'm just
3 trying to clarify, that's all.
4    Q.  It's my only chance to talk to you.
5    A.  Sure.
6    Q.  Thank you, sir.
7        Subparagraph P:  Any contract related to the
8 use, licensing, development, or ownership of
9 intellectual property (or pursuant to which PowerOhm
10 uses any intellectual property), other than shrink-wrap,
11 click-wrap, and off-the-shelf software with annual
12 license, maintenance, support, and other fees of less
13 than $50,000.
14        MR. BRADLEY:  Sorry.  Were you able to catch
15 that?  Thank you.  If I need to slow down, please
16 let me know.
17        COURT REPORTER:  It would be easier, but I got
18 it.
19        MR. BRADLEY:  All right.  Thank you.
20        THE WITNESS:  I don't know how you do it.
21 BY MR. BRADLEY:
22    Q.  If Mr. Atchison believed or indicated he was
23 licensing technology to you or had ownership and there
24 was an oral agreement as such, that would have been
25 listed in that schedule.  Correct?

57

1    A.  Yeah.  All the -- all the designs we've had
2  time that were in -- on our website, that was our
3  intellectual property.  We paid Tim to develop those
4  products, period.  There was never -- we didn't contract
5  Tim or, you know, agree to anything, you know, other
6  than you're an employee and you're going to help us
7  design.  That's all he could do, really.  He didn't know
8  much about resistors, you know.  He was there to design
9  braking modules from the start.
10    Q.  Okay.  Thank you.  If you can flip to
11  HCI00031.  It's page 27 of the agreement.
12    A.  Okay.
13    Q.  Okay.  "Employee benefit plans," section
14  3.19.
15    A.  Yes.
16    Q.  Okay.  Subsection A says, "List of plans.  Set
17  forth in Schedule 3.19(a) is an accurate and complete
18  list of each employee benefit plan (as such term is
19  defined in section 3(3) of ERISA), and each other
20  employment, consulting, retention, change in control,
21  incentive bonus, deferred compensation, vacation,
22  health, welfare, retirement, fringe benefit, collective
23  bargaining, equity or equity-based plan, policy,
24  program, practice, agreement, understanding or
25  arrangement compensation whether or not subject to

58

1  ERISA, whether formal or informal, oral or written,
2  legally binding or not, providing compensation or other
3  benefits to current or" former employee, officer --
4  sorry, "former director, officer, employee, or
5  consultant of PowerOhm."
6        Do you see that?
7    A.  Yes, I do.
8    Q.  Let's go to the schedules.  It's going to be
9  the third attachment, and we'll start with Schedule
10  3.19(a).  It is --
11    A.  Is it in this?  I've got a big stack.
12    Q.  Oh, no, the smaller stack.  Okay.
13    A.  Okay.
14    Q.  It's HCI000291.
15    A.  Okay.
16    Q.  And we just read the section on employee
17  benefit plans, including any sort of compensation or
18  benefit, oral or written, even if it's a custom or a
19  practice, and I want to start on this list and talk
20  about the first ones:  8, 9, 10, 11, and 12.
21        Do you see those?
22    A.  Yeah, sure.
23    Q.  Okay.  So --
24    A.  We had bonus plans for all of our sales guys,
25  basically.

59

1    Q.  And so the -- the record's clear, we'll just
2  go through them real quick and identify these
3  individuals and what they did.
4    A.  Okay.
5    Q.  Okay.  So 8, 9, 10, 11, and 12, say "2013
6  bonus plan for" -- and then lists a specific individual.
7    A.  Okay.
8    Q.  Items 13 through 17 say "2013 sales incentive
9  plan project manager for," and then a number of
10  individuals.
11    A.  Yeah.  All those project managers were
12  electrical engineers, other than Jason Waters was a
13  mechanical engineer.  And Tim never went to college.  He
14  was -- he never -- he was pretty much self-taught.  What
15  he learned was through Bonitron, I believe.
16    Q.  Okay.  Thank you.
17        So number 18 says, "Pursuant to a verbal
18  agreement with PowerOhm, Tim Atchison receives a 500-
19  dollar monthly vehicle allowance that is structured as a
20  reimbursed out-of-pocket expense."
21        Do you see that?
22    A.  Yes, I do.
23    Q.  Do you recall him having that agreement?
24    A.  Yeah, because we wanted him -- we wanted to
25  help him with the cost of, you know, traveling between

60

1  Nashville and, you know, Kentucky.  So we thought it was
2  appropriate to let him have allowance for a car, and he
3  went out and bought a car right away.
4    Q.  And the presence of an oral agreement, that in
5  significance on this schedule, does that indicate how
6  thorough you may have been when you prepared this?
7    A.  Well, I say we put out everything we could.  I
8  mean, there were incentive plans for everyone over here.
9  We put together bonus plans, usually based on sales of
10  their products -- the product managers and the sales
11  guys, either territory related or whatever it was.  And
12  then for Tim, we also had an incentive plan also.
13    Q.  So if there was a -- even a verbal agreement
14  to give Mr. Atchison a percent ownership --
15    A.  No.
16    Q.  -- of power electronics or anything else, it
17  would be reflected here?
18    A.  Absolutely.
19    Q.  So the only agreement and understandings
20  between PowerOhm and Mr. Atchison are reflected in this
21  Schedule 3.19?
22    A.  Yes.
23    Q.  Okay.  Thank you.
24        Let's start with number 8, 2013 bonus plan for
25  Joe Eschleman.

61

1    A.   Okay.
2    Q.   Who is Joe Eschleman?
3    A.   He is our vice president of sales.
4    Q.   And do you recall what the bonus plan was or
5  how it was structured?
6    A.   No, I do not.  No.
7    Q.   Was it a written bonus plan?
8    A.   Yes.
9    Q.   And was there one in 2012?
10   A.   Oh, yeah, I believe every year we had one.
11 Sometimes we just carried the same plan over if they
12 didn't achieve it, because we always wanted these guys
13 to do well and receive large bonuses.
14   Q.   And so it was a written plan, and you got a
15 new one every year?
16   A.   Yes.  Or sometimes you did, sometimes you
17 didn't.  Sometimes we carried it a year -- yeah, carried
18 the same numbers and the same goals.
19   Q.   Okay.  The number 9, 2013 bonus plan for
20 Richard Wu [sic].  Who was Richard Wu?
21   A.   He was a sales guy, and he was kind of charge
22 of trying to get sales out of Asia, specifically China.
23 He was Chinese.
24   Q.   And do you recall the nature of his --
25   A.   No, that wasn't -- I don't know any of these

62

1  guys.  I don't remember any of these guys.  I really
2  don't know -- I don't remember them on these plans,
3  actually.  Based on sales.  Most of these guys were
4  making six figures.
5    Q.   Okay.
6    A.   And seemed really happy.  We always gave very
7  generous bonuses.
8    Q.   Thank you.  Let's look at 13 through 17, then.
9    A.   Okay.
10   Q.   So 13 says, "2013 sales incentive plan,
11 project manager" for Rusty O'Hara.
12        Do you see that?
13   A.   Uh-huh.
14   Q.   Do you recall -- strike that.
15        What's the difference between a bonus plan and
16 a sales inventive plan?
17   A.   Same thing.
18   Q.   Same thing.
19        Do you recall what Mr. O'Hara did?
20   A.   Yeah.  He was over mostly braking -- his
21 product management was braking resistors.  He was
22 definitely involved in that.
23   Q.   So 8 through 12, are those sales people; and
24 13 through 17 are the tech people, is that --
25   A.   Thirteen through 17 are the guys that design

63

1  stuff.  They're engineers.  All these guys designed
2  resistors or braking modules.
3    Q.   Okay.  So --
4    A.   The other guys weren't degreed electrical
5  engineers.  They were just sales guys.  Guys that went
6  out and met with customers and shook hands, and when
7  they had questions, they normally contacted the guys
8  between 13 and 17.
9    Q.   Got it.  So the 8 through 12, the bonus plan,
10 are the sale guy -- guys; and then the incentive plans
11 are for the project managers, the engineers guys?
12   A.   Yes.
13   Q.   Okay.  Who was Mr. O'Hara?
14   A.   He was an electrical engineer.
15   Q.   And do you recall what he was the project
16 manager of?
17   A.   I believe it was braking resistors.  Braking
18 resistors.
19   Q.   Was -- thank you.
20        Did he work in Katy or Covington?
21   A.   Let me see here.  I can't remember Dave let,
22 but Joe Eschleman, Randy Wu, Rob Angel, Pete Ahfeld,
23 Rusty O'Hara, Brent Crawford, Jason Waters, Tom
24 Tingling, and Tim -- so everyone except Dave Mallette
25 and I'm having a hard time remembering this guy.  But

64

1  all these guys worked out of Covington.
2    Q.   And Brent Crawford, do you recall what he was
3  and what he was in charge of?
4    A.   You know what?  I -- I think solar -- I can't
5  remember anymore.  I just don't know.  I think Tim
6  Yingling was over neutral grounding.  Tim Atchison was
7  braking modules.  Brent and Jason, I can't remember how
8  we -- what we were having -- we were trying to get guys
9  that were going to focus on certain product lines.  If
10 we needed an engineer to visit a customer and it was
11 specific to braking resistors, we'd send Rusty O'Hara.
12 I believe it was -- neutral grounding, I believe, was
13 Tom Yingling -- or may have been Jason Waters.  He may
14 have been neutral grounding.
15        By 2013, Tom was over all these plants.  He
16 was -- I put him as the engineering manager because we
17 were in a process of looking for a buyer for load -- for
18 the power -- you know, for PowerOhm, and we put him in,
19 you know -- because I wanted to leave.  I didn't want to
20 have to stay there and manage these guys.  So Tim -- Tom
21 managed these guys for over a year.
22   Q.   So Tom was the manager of those individuals we
23 see in 13 through 17?
24   A.   Yeah, and Joe was over the four guys below
25 him.

**65**

1    Q.  Okay.  Thank you.

2    **A.  Because I focused more -- that last year, year**

3    **and a half, I was focused on load banks and trying to**

4    **get that started and manufacturing and everything.**

5    Q.  So in sales incentive plan, could there be a

6    term, something like we will give you 3 percent of your

7    product line as a bonus?

8    **A.  I saw 3 percent commission in there somewhere.**

9    **Never, ever did we give Tim Atchison 3 percent**

10   **commission, and never did he request it from me, and**

11   **normally those requests went through me.  We never**

12   **discussed commissions.  The only persons we ever sold or**

13   **gave commissions to were outside manufacturer's reps**

14   **that we had employees to support their own business, and**

15   **they were working for a commission.  But Tim was just**

16   **given a bonus.  Never, ever would we have given an**

17   **employee 3 percent commissions on a product line.  Never**

18   **happened.**

19   Q.  Thank you, Mr. Crowe.

20       If he would have asked for 3 percent as a

21   royalty or cut or for --

22   **A.  He would have been told no.**

23   Q.  Okay.  Thank you.  If you could turn to page -

24   - or schedule -- let's take a quick break.

25   **A.  Okay.  I'm fine with that.  I can use the**

**66**

1    bathroom, really.

2        MR. BRADLEY:  Okay, Ken, we're going to take a

3    quick break.  Okay.  Ten minutes?

4        VIDEOGRAPHER:  We are going off the record at

5    11:17 a.m.

6        (Recess.)

7        VIDEOGRAPHER:  We are back on the record.  The

8    time is 11:31 a.m., Eastern.

9    BY MR. BRADLEY:

10   Q.  Welcome back, Mr. Crowe.

11   **A.  Okay.**

12   Q.  Continuing with this stock purchase agreement

13   --

14   **A.  Okay.**

15   Q.  -- if you can put the schedules and the

16   exhibits to the side for now.  I just want to cover one

17   last thing --

18   **A.  Okay.**

19   Q.  -- in the body of the agreement.  So if you --

20   do you have that in front of you?

21   **A.  The large document or the --**

22   Q.  The -- it will say "stock purchase agreement"

23   on the front.

24   **A.  Yeah, okay.  I've got it.**

25   Q.  If you could flip to section 6.2(c).

**67**

1    **A.  What page is that, HCI number?**

2    Q.  Hold on a second.

3        (Reporter requests clarification.)

4    **A.  6.23.  Yeah, I'm there.  6.2.**

5    **BY MR. BRADLEY:**

6    Q.  6.2, yes, post-closing cooperation.  Do you

7    see that?

8    **A.  Yes.**

9    Q.  So if you flip to this next page, page 40 of

10   the agreement, which is HCI000044.  Do you see that?

11   **A.  Yes.**

12   Q.  Subsection C says, "The parties hereto agree

13   that the backup information technology servers and

14   related materials (collectively the 'Kentucky house

15   servers') located at the Kentucky house are owned by

16   PowerOhm and will be removed from the Kentucky house by

17   PowerOhm following the closing.  Each seller agrees that

18   it shall and shall cause its affiliates to cooperate

19   with PowerOhm (upon reasonable advance notice from

20   PowerOhm to seller's representative) to arrange for the

21   removal of the Kentucky house servers by PowerOhm and

22   its representatives from the Kentucky house."

23       Do you see that?

24   **A.  Yeah.**

25   Q.  Do you recall why that was included in the

**68**

1    agreement?

2    **A.  I do not.  No, I do not.  It's the first time**

3    **I've read this.**

4    Q.  Do you recall there being servers and related

5    materials at the Kentucky house?

6    **A.  We had our main server in the main building.**

7    **There was no computer server.  Tim had a laptop and, you**

8    **know, he always -- he had papers he collected,**

9    **documents.**

10   Q.  And does this paragraph indicate to you that

11   the company believed the materials in the Kentucky house

12   were the property of PowerOhm?

13   **A.  If they're related to braking modules, they**

14   **were.**

15   Q.  And do you recall if Hubbell had someone come

16   and collect those documents pursuant to this agreement?

17   **A.  I don't know.  I -- they didn't collect them**

18   **while I was there because they didn't own the business**

19   **and I left, so I was just communicating via e-mail.  So I**

20   **don't know if that ever happened or not.**

21   Q.  Okay.  Thank you.

22   **A.  Tim was there for another year and a half, so**

23   **I'm sure -- I'm sure it did happen, but I don't know.**

24   Q.  Okay.  Thank you.

25       Do you know whatever became of the Kentucky

69

1  house?
2      A.  We recently sold the building and the house
3  together in a deal.  It was two separate purchase
4  agreements because the main building was owned by
5  PowerOhm, and we actually turned that into Resistor
6  Holdings; and then the house was just owned by three
7  individuals.  So it was two purchase contracts, but we
8  sold it for the same buyer for the same reason, the
9  parking.
10     Q.  And Hubbell leased the building from you for a
11  while or --
12     A.  Yeah.  They leased it for -- I believe it was
13  about three years or so, and they moved manufacture --
14  some of the power modules -- or braking modules and
15  everything we were manufacturing, that all went to
16  Archdale, North Carolina.  When Hubbell purchased
17  companies, they took, like, smaller stuff that was real
18  small, and they didn't want to continue manufacturing
19  there, so they just -- they basically just moved it,
20  went to Archdale.
21     Q.  Did the Covington employees go to Archdale as
22  well?
23     A.  One employee I believe went there for a while,
24  Mike Simmons, trying to help with the braking modules.
25  And he -- I don't think he lasted a year there, and I

70

1  actually think he got another job.  But I don't know.  I
2  wasn't there.
3      No, they ended up closing the facility down.
4  They got an office for the engineers, basically, the
5  sales guys they had left, and moved them just to a
6  different office and shut down the manufacturing there,
7  is what they eventually did.
8      Q.  Do you know where the new office was?
9      A.  It was somewhere in Edgewood, Kentucky.
10     Q.  Got it.
11     A.  Right up the hill.
12     Q.  Okay.
13     A.  Close.
14     Q.  Okay.  Thank you.  You can -- we're finished
15  with that exhibit.
16     A.  Okay.
17     Q.  I want to hand you what will be marked as
18  Exhibit 6.
19     (Exhibit 6 marked.)
20  BY MR. BRADLEY:
21     Q.  And it's a copy of the plaintiff's initial
22  disclosures in this matter.  And part of the initial
23  disclosures, the parties are obligated to identify their
24  witnesses in the matter.  And Mr. Atchison has
25  identified you --

71

1      A.  Okay.
2      Q.  -- in a number of places.  And so if you could
3  flip to page 4 of 13.
4      A.  I'm there.
5      Q.  And it says, number 5, "Identification of the
6  case issues and supporting witness and document
7  identification."
8      And then subpart A, the existence of
9  plaintiff's unique kitchen table BPM innovations,
10  created outside his regular duties as an employee of
11  Bonitron and later PowerOhm.
12     Do you see that?
13     A.  Yes.
14     Q.  Let's start with the first witness, Tim Olsen.
15  Do you see that individual?
16     A.  Yes.
17     Q.  And is he the individual you identified
18  earlier as one of those original three employees of
19  Bonitron?
20     A.  Yeah, both Tim Olsen and Mike Roof.  Tim Olsen
21  was an engineer, and Mike Roof was not.  He was more of
22  a management guy, sales, helped with sales a little bit.
23     Q.  Do you know where Tim Olsen is today?
24     A.  I think he still works with Bonitron.  I
25  believe I spoke with him sometime I believe last year.

72

1  We occasionally buy braking modules off of Bonitron and
2  resell it, you know, just mark it up and keep the
3  Bonitron label on it.
4      Q.  How different are the Bonitron braking modules
5  from what you make?
6      A.  They're all about the same.
7      Q.  Okay.
8      A.  There's actually braking modules built into a
9  lot of drives, you know.  So some drives -- the cheaper
10  drives don't usually include a braking module that you
11  connect a resistor directly to the drive.  There are
12  drives where you don't need the switch.  It's the switch
13  is built into the drive itself.  You just connect the
14  resistor to the drive and you're done.
15     Q.  Thank you.
16     Next witness, Mike Roof.  That is the other
17  individual --
18     A.  Yes.
19     Q.  -- of the original --
20     A.  That was going to be three guys we were going
21  to hire.
22     Q.  Okay.  In this description, it says, "Mike
23  Roof, whose address is presently unknown."
24     Do you know where Mr. Roof is?
25     A.  I heard he left Bonitron and moved somewhere

73

1  else.  He's no longer with Bonitron, last I heard.
2      Q.  Do you know when he left Bonitron?
3      A.  No, I have no idea.  I lost communication with
4  him.  We invited him back one time to maybe take over an
5  interview from management, and he was already I think
6  what -- I don't know what the deal was, but it wasn't
7  going to work out.
8      Q.  Okay.  Thank you.
9          Now, it says, "Mr. Roof was a former employee
10 of Bonitron who worked with Mr. Atchison and hosted
11 technical meetings at his house.  Those in attendance at
12 Mike Roof's house on multiple occasions: Tim Atchison,
13 Tim Olsen, Mike Roof, Vance Hinton, Mike Crowe and
14 Richard Jochen."
15         Do you see that sentence?
16     A.  Yes.
17     Q.  Do you recall multiple meetings at Mr. Roof's
18 house?
19     A.  The one -- one time we went to Nashville and
20 we spent one night there, and I believe -- we may have
21 spent two nights there.  We may have got in the
22 afternoon, maybe two nights, but we met at Mike Roof's
23 for dinner one night, and I don't -- I don't think we
24 went back.  Unless we went back for a quick meeting the
25 next day or something.  I just remember being there one

74

1  night, and it was one occasion over all.  It was just
2  one visit total over one or two days.
3      Q.  The next sentence says, "Roof can provide
4  similar supporting testimony for the allegation that Mr.
5  Atchison was identified by PowerOhm personnel,
6  supervisors, and other employees as having developed BPM
7  innovations that PowerOhm was interested in exploiting.
8  That plan culminated in the employer developing with the
9  employee, Atchison, a new, quote-unquote, venture for
10 which PowerOhm employee defendant identified Mike Vance"
11 -- I --
12     A.  I don't know who Mike Vance is.  I don't if
13 that's supposed to be Mike Crowe or Vance Hinton.  Mike
14 and Vance, I don't know.
15     Q.  Understood.
16         "Pursued developmental financing, which was
17 created for no other purpose than to focus on
18 integrating the Atchison-conceived BPM innovations from
19 Plaintiff Atchison's power electronics business plan
20 into PowerOhm's existing product line, beginning in
21 approximately 2008."
22         Do you see that?
23     A.  Yes.
24     Q.  So in 2008, what was the employment
25 arrangement discussions with Mr. Atchison when you hired

75

1  him?
2      A.  Tim was very, very unhappy working at
3  Bonitron.  He had a manager named Charlie who he greatly
4  disliked, and he wanted to leave there, and I believe we
5  -- we had spoke many times after we decided not to start
6  another division, and -- because we had mutual
7  customers, and we would just talk occasionally.  And, you
8  know, I went to Vance and said, Hey, what if we hire Tim
9  Atchison?  He can design braking modules for us, and we
10 can start a new product line, and that's what ended up
11 happening.  Is we hired Tim to design braking modules.
12         He discussed ideas that he had, and he knew
13 braking modules well because he was involved with
14 Bonitron, and that was their main product line.
15     Q.  Okay.
16     A.  Even region he was going to do for us, but we
17 never got past the braking modules.  There were long
18 delays and different things that happened.  You know,
19 Tim was there, and as far as I'm concerned, this kitchen
20 table stuff was when he was working at Nashville for us.
21 A lot of these -- I mean, the final designs -- there
22 wasn't a design ready that he gave us.  He had to
23 develop that.  He knew how to do it.
24     Q.  Thank you.
25         And he was hired as a W-2 employee product

76

1  design engineer?
2      A.  Yeah, absolutely, just a W-2 guy.
3      Q.  Okay.  Then next sentence says, "It is
4  believed that Mr. Vance, along with PowerOhm coowners
5  Mike Crowe and Richard Jochen will be aware of the
6  details that provided the backdrop to PowerOhm's
7  decision to affirming the unique and separate business
8  venture with Atchison, purchase for Atchison's use a
9  residential house adjacent to defendant's Covington
10 Kentucky facility."
11         Do you see that sentence?
12     A.  Yeah, I do.
13     Q.  So the first part is, he's listing you as a
14 witness that's going to affirm the unique and separate
15 business venture with him.  Is --
16     A.  Well, I've got bad news for him.  There was
17 never a separate venture.
18     Q.  Okay.  And then also that -- an individual
19 that will affirm or confirm that the residential house
20 was purchased for him?
21     A.  No, that's incorrect.  We purchased that
22 because we wanted the parking.  Tim ended up coming in
23 there and really overstaying his welcome, but that's a
24 long, long story.
25     Q.  Okay.  Then the next sentence says, "The large

77

1  industrial facility and neighboring house was not owned
2  by PowerOhm, Inc., prior to the business venture labeled
3  power electronics."
4      Do you see that?
5      **A. Yes.**
6      Q. And I believe earlier, you testified that you
7  actually bought that property in 2007, before you hired
8  Mr. Atchison; is that correct?
9      **A. We bought that property before we bought the**
10  **main building, and it was done in -- it was not**
11  **purchased, the house, Tim Atchison, at the time -- we**
12  **were thinking heavily about tearing it down and just**
13  **making it a gravel parking lot.**
14      Q. And the next sentence says, "The residence was
15  purchased by PowerOhm specifically as a separate from
16  the main operation base for the early development of
17  Atchison-conceived BPM innovations and absolutely not
18  otherwise."
19      Do you see that sentence?
20      **A. Yes, I do.**
21      Q. And I believe you just testified that that's
22  incorrect?
23      **A. That's absolutely incorrect. That is fiction.**
24      Q. And the next sentence says, "The residence was
25  used as an initial separate headquarters throughout the

78

1  stages of the power electronics/BPM innovation
2  development."
3      **A. So Tim used it as a lot of space. It was a**
4  **little dumpy, two-bedroom house that was just kind of --**
5  **it wasn't very nice. Okay. We had it fixed up nice on**
6  **the inside, but it wasn't much on the outside. It was**
7  **right up against the train tracks. It wasn't a separate**
8  **headquarters. That's ridiculous.**
9      Q. Okay. Thank you.
10      The next sentence says, "As a purported,
11  quote-quote, routine employee of PowerOhm, PowerOhm
12  arranged for Atchison to be a principle with PowerOhm's
13  financing within power electronics, designating him as
14  the business' registered agent and utilizing Atchison's
15  Gallatin, Tennessee, permanent address as the initial
16  power electronics principle address."
17      Do you see that sentence?
18      **A. Yes, I do.**
19      Q. Do you -- can you provide context for that
20  sentence.
21      **A. Well, for one, PowerOhm didn't purchase the**
22  **house. That was purchased by three individuals, three**
23  **owners of PowerOhm, separately. And we never, ever --**
24  **Tim never asked to be a principle owner. After we hired**
25  **him as an employee -- even when we were just going to**

79

1  **start another division, he never asked to be owners. So**
2  **that's -- that's false.**
3      Q. And to the extent he was named the registered
4  agent in Tennessee, is that because he was a remote
5  employee doing work in Tennessee?
6      **A. I don't know what he's talking about there.**
7  **Well, he worked out of his house, but an agent, I don't**
8  **know what he's talking about. A registered agent, show**
9  **me a document.**
10      Q. Okay. Hold on second. Exhibit 7.
11      (Exhibit 7 marked.)
12      **A. Where is that?**
13  BY MR. BRADLEY:
14      Q. So I'm going to hand Exhibit 7. I don't know
15  if you've ever seen it before. She's got to mark it.
16      COURT REPORTER: Hold on. Let me put a sticker
17      on it before you get too into it.
18  BY MR. BRADLEY:
19      Q. So what I handed you is Exhibit 7, is
20  certified copies of PowerOhm Resistor, Inc.'s filing
21  with the state of Tennessee Secretary of State for the
22  corporations.
23      Do you see that?
24      **A. Yeah, I do.**
25      Q. If you could take a second just to look at it.

80

1      So the first two pages are just my receipt for
2  asking for this, and then -- that's the first page.
3  Second page is Secretary of State saying these are the
4  certified records, and then the next three pages are the
5  actual records.
6      **A. Okay.**
7      Q. And if you flip to the third page, at the top,
8  says, "Application for Certificate Of Authority."
9      **A. Okay.**
10      Q. Do you see that? Do you know what a
11  certificate of authority is?
12      **A. No, not really.**
13      Q. Okay. First sentence says, "Pursuant to the
14  provisions of section 48-25-103 of the Tennessee
15  Business Corporation Act" --
16      **A. Okay.**
17      Q. -- "the undersigned corporation hereby applies
18  for certificate of authority to transact business in the
19  state of Tennessee."
20      **A. Okay.**
21      Q. Do you see that?
22      **A. Yes.**
23      Q. And then the next line, number one says, "The
24  name of the corporation is PowerOhm Resistors, Inc."
25      Do you see that?

---

81

1    A. Okay. Yes, I do.
2    Q. So do you -- does this provide any
3 recollection that --
4    A. I was not part of this.
5    Q. Okay.
6    A. Daryl Keller was our, like, we -- he was a
7 consultant for us. He was a good accountant, so he
8 helped with the taxes and everything. And I guess -- I
9 don't know if we had to set something up to actually --
10 were considering manufacturing in Tennessee, and this
11 had to be set up, but I don't know -- I've never seen
12 this before in my life.
13    Q. Okay. That's fine.
14    A. That -- I just -- I wasn't a part of this. I
15 don't know.
16    Q. Okay.
17    A. I don't even know why you'd have to do that.
18 Maybe you'd have to apply to do business in Tennessee if
19 we were going to manufacturer, possibly, you know, a 20-
20 dollar fee and file a piece of paper. But that fell
21 through. We ended that idea.
22    Q. Okay. Thank you, Mr. Crowe. I realize you're
23 not a lawyer.
24    A. Oh, right.
25    Q. I realize you've never seen this document

---

82

1 before, so I -- I'm not going to ask you to guess.
2    A. Yeah, I'm guessing. Exactly.
3    Q. So thank you.
4    Turning back to the 26(a)(1) disclosure we
5 were looking at. Yeah, we were -- just -- I know this
6 is a little redundant. Bear with me.
7    The final sentence on page 5 says, "The
8 foregoing named individuals are believed to possess
9 knowledge that no other reason existed for the purchase
10 of the industrial facility, the residence, or PowerOhm's
11 enthusiastic financing of power electronics under the
12 direction of the alleged routine employee, Tim Atchison,
13 other than" brake module -- "brake power module
14 innovations and not otherwise."
15    Do you see that?
16    A. Yes.
17    Q. And I know we've discussed this before, but to
18 confirm once again, the facility and residence were part
19 -- an asset of PowerOhm before you hired Tim Atchison?
20    A. Yes.
21    Q. And there was no financing or formation of a
22 division or entity called power electronics. Correct?
23    A. No, we never established anything. We gave up
24 on that idea.
25    Q. Okay. Thank you. All right.

---

83

1    If you turn to page -- do you know who Elva
2 Martinez is?
3    A. Yeah, she was an engineer at OMRON. It was a
4 good customer. OMRON Oilfield & Marine.
5    Q. Do you know where she is today?
6    A. No, I have no idea. She may still be there. I
7 think they're owned by Schlumberger now.
8    Q. Okay. Thank you.
9    The next person down, Dave Huntington, do you
10 know him?
11    A. You know, I -- I don't remember a Dave
12 Huntington. You know, I know a lot of names back in the
13 day, but I can't -- I don't know if this was a customer
14 that Tim -- because Tim would speak directly to
15 customers. So I don't know.
16    Q. Okay.
17    A. I guess.
18    Q. Do you know number 5, Jon Wehman?
19    A. Okay. Jon's the one who was living in the
20 house also for a while. He was livering in the other
21 room up with Tim on one side, him on the other.
22    Q. So why was Mr. Wehman living in the house?
23    A. He was -- he had been -- I think he had been
24 released by Bonitron, and Tim wanted to hire him. Tim
25 was friends with him, and he said he could really help

---

84

1 assist me with different things, so he jumped in to
2 help.
3    Q. Do you know when he was hired?
4    A. No.
5    Q. Okay. And then the next page, number 6, Micah
6 Rentschler.
7    Do you know that name?
8    A. Yeah, yeah. His father was a manufacturer's
9 rep for us in the state of Tennessee, received
10 commissions for sales. And Micah was in engineering
11 school and wanted to intern with us in the summer. He
12 came one summer, and he had a twin brother that came
13 back the following summer, and they stayed over in the
14 house.
15    Q. Do you know where that individual is now?
16    A. No.
17    Q. If you turn the page, and I want to go down to
18 subsection C. It says, "Expected proof that the
19 complaint-itemized Atchison innovations did not predate
20 the power electronics venture with his employer Hubbell
21 predecessor power." And then it says, "Expecting
22 supporting witnesses," and number 2 says Mike Crowe's
23 wife, Terri Crowe.
24    A. I don't know how that --
25    Q. Address unknown.

85

1      A.  I have no idea.  The only thing -- for one,
2  the Ohm motel I think is referencing the house out back,
3  and that's the first time I've heard that term.  My
4  brother Rick Lutes -- and his name is spelled
5  incorrectly.  Instead of a Z, it should be E-S at the
6  end, L-U-T-E-S.  He's my half brother.  He worked for
7  me, and he's the guy that went over and renovated the
8  house; and then my wife just bought furniture for it and
9  few things to hang on the wall and different things and
10 that was it.  That was their -- they knew -- they knew
11 Tim only as a person, not as, you know, anything that he
12 was doing or working on.
13     Q.  Okay.  Towards the bottom of the page, it
14 says, "These individuals, your wife and your brother-in-
15 law" --
16     A.  No, not my brother-in-law.  My step-brother.
17     Q.  Step-brother, sorry.
18         -- "understood by all involved to be limited
19 to the pursuit of Mr. Atchison's BPM innovations and the
20 creation of power electronics for that exclusive
21 purpose."
22     A.  No, that's incorrect.  They didn't know
23 anything about power electronics.
24     Q.  Because it didn't exist or --
25     A.  Didn't exist.

86

1      Q.  Thank you.
2      A.  They wouldn't have been part of that
3  conversation anyhow.
4      Q.  Okay.  If you could turn to page 9 or 13.
5      A.  Okay.
6      Q.  At the bottom, E, Hubbell's abrupt termination
7  of Atchison soon after the Xiang dispatch.  Do you see
8  that?
9      A.  Yes.
10     Q.  It says witnesses Wehman, Korton, Wadl, Crowe,
11 Vance, Lutes, Xiang, and Yingling can also corroborate
12 plaintiff's alleges that the Hubbell BPM staff was
13 generally aware that, for reasons unknown by any
14 presently-identified witness at the time, 2015, Hubbell
15 abruptly fired the exemplary employee and scrapped the
16 power electronics project.
17         Do you see that?
18     A.  Yes.
19     Q.  Do you -- are you a witness that's going to be
20 able to testify about any of that?
21     A.  Well, I can tell you that we never scrapped
22 the modules.  They're still online.  I believe they're
23 still selling them, so I think that's incorrect.  And
24 Tom Yingling was managing Tim, and exemplary employee,
25 absolutely not.  Tim was not a model employee.  He was

87

1  very difficult to manage.
2      Q.  Can you give me an example of what you mean by
3  that.
4      A.  Missed deadlines.  You know, I'm going to be
5  in the office Monday morning and not show up until
6  Thursday because he was down in Tennessee coming up with
7  excuses not to show.  It was very frustrating dealing
8  with Tim, and I was glad when Tom took over his
9  management.  I liked Tim, though.  I liked Tim as an
10 individual.
11     Q.  Thank you.
12     A.  Okay.  Let me mark the next exhibit.
13     MR. BRADLEY:  Is that 7?  Is that right?
14     COURT REPORTER:  Eight.
15         (Exhibit 8 marked.)
16 BY MR. BRADLEY:
17     Q.  So I handed you what has been marked as
18 Exhibit 8, is a letter from Mr. Burger to me dated May
19 31st, 2025, where it clarifies some information I
20 requested regarding witnesses.
21         If you could flip to page 5 of the letter, 5
22 of 10.  So the third witness, Vance Hinton -- and for
23 the record, can you identify who that is again.
24     A.  Yeah.  He was the president of PowerOhm and my
25 friend and business partner.

88

1      Q.  Okay.  Thank you.  Says, "Vance Hinton, an
2  employee of PowerOhm, who possesses knowledge regarding
3  the reasons for commencing and financing the new venture
4  of power electronics for the sole purpose of furthering
5  Mr. Atchison's personal, unique BPM concepts and
6  innovations."
7      A.  I mean, Mr. Atchison, for one, did not invent
8  the BPM, you know, or the concept.  It was already in
9  production and manufactured by major electronics
10 manufacturers.  All the drives guys had braking modules.
11 And then the financing of a venture, power electronics,
12 that went under -- that was gone when we -- when we
13 hired Tim.  That was off the table.  There was never
14 going to be a venture, a separate division created,
15 ever.  It wasn't even discussed.  This is pure fiction.
16     Q.  Understood.  Thank you.
17         Number 4, it identifies you, Mike Crowe.  It
18 says, "Mike Crowe, vice president of PowerOhm, who
19 processes similar knowledge regarding the developmental
20 progress of power electronics and Mr. Atchison's
21 singular, unique contributions based on his personal
22 work rather than being based on his PowerOhm duties."
23     A.  His duties was to create braking modules, so I
24 don't know how they're trying to separate that.  I don't
25 know what else he would have been working on other than

89

1  braking modules. He have never helping the power
2  resistors, and a lot of engineers in there were power
3  resistors guys. He was the braking engineer.
4      Q.  And so you will not be a witness that will be
5  able to testify the way that he indicates that you would
6  be here because your position is, it was not separate
7  from being his PowerOhm duties --
8      A.  No, it was -- never, never. Never discussed
9  it after that. I don't remember ever discussing it.
10      (Reporter requests clarification.)
11  BY MR. BRADLEY:
12      Q.  Number 5, "Richard Jochen, a coowner of
13  PowerOhm who possesses similar knowledge regarding Mr.
14  Atchison's unique BPM concepts that definitely predated
15  his employment at PowerOhm and which proved to be the
16  basis for a separate corporate entity and product line
17  entirely independent of anything being developed or
18  marked by PowerOhm at the time Mr. Atchison commenced
19  his work with PowerOhm 2008."
20      Do you see that?
21      A.  Yes.
22      Q.  And again, for clarity, you dispute the
23  factual contentions in that paragraph. Correct?
24      A.  Pertaining to my name. I can't speak for Mr.
25  Jochen, but -- Jochen was not an engineer. He was an

90

1  accounting guy, a sales guy. He knew we wanted to hire
2  Tim and start manufacturing braking modules. He was
3  aware of that, but there was never going to be a
4  separate entity -- entity. No, never.
5      Q.  Okay.
6      A.  Separate corporate entity, no.
7      Q.  Thank you.
8      A.  I mean, where is that? Where is that
9  document? Where was it created? It's fiction.
10      Q.  Thank you.
11      A.  Okay.
12      Q.  Let's go back through the complaint. Can you
13  go back to the complaint, the body of the complaint.
14      A.  Yes. Which one is it?
15      Q.  So it -- I believe it was Exhibit 4.
16      A.  Yeah, okay. I got it.
17      Q.  If you flip to page 2 of 31, Roman numeral 2
18  says, "Material facts relevant to the plaintiff's
19  claims."
20      A.  Okay.
21      Q.  Can you just read the first two subparagraphs,
22  paragraphs 1 and 2, to yourself.
23      A.  Yes. Okay.
24      Q.  When you met Tim Atchison, he was working at
25  Bonitron with braking modules. Correct?

91

1      A.  Yes.
2      Q.  Okay. Thank you.
3      If you could turn the page, and if you could
4  read paragraphs 3 and 4.
5      A.  Okay. I don't know how he's calling it
6  separate emerging industrial electronics deal because
7  Bonitron was -- they were manufacturing plenty of
8  braking resistors at the time. They were supplying a
9  lot of big guys down at the oilfields that we wanted to
10  get.
11      Q.  Okay.
12      A.  Those were Bonitron modules. They were
13  heavily into braking modules. This wasn't some idea he
14  brought -- he thought of.
15      Q.  Okay. Paragraph 4, it says, "Plaintiff's
16  innovative BPM experimentation became known within the
17  narrow, specialized industry."
18      Do you see that?
19      A.  No.
20      Q.  Do you have any idea what he's talking about
21  there?
22      A.  Which one -- show me that again.
23      Q.  Number 4.
24      A.  Oh, here. Okay. I haven't read that yet.
25  Narrow, specialized...

92

1      I mean, if it's -- you know, when he was
2  hired, I don't know what his spare time. Is this before
3  he joined? Are they saying this is before he joined
4  PowerOhm? I mean, if he was working for PowerOhm, he
5  was supposed to develop braking modules, and I don't
6  know you would call that your spare time.
7      Q.  Okay. Let's -- if you go to paragraph 5,
8  might provide some context, if you could read that, and
9  we'll break it down after that.
10      A.  Okay. Yeah, there's the AC general module.
11  That was the mistake we made.
12      Okay.
13      Q.  Okay. So let's break down the paragraph. So -
14  - the second sentence clause says, "Plaintiff received
15  both a sales and engineering job offer and a proposal
16  from PowerOhm Resistors, Inc., PowerOhm representatives
17  for a separate joint venture proposal in 2008."
18      Do you believe that to be a true statement?
19      A.  Yeah, we hired him in 2008, I'll agree with
20  that.
21      Q.  And then it says, "For both the sales and
22  engineering job and for a separate joint venture
23  proposal."
24      A.  No, there was never a separate joint proposal.
25  And Tim was going to go on sales calls, but he wasn't

93

1 considered a sales guy. He was an engineer, and the
2 sales guys would take him with them to help, you know,
3 sales calls and highly technical subjects.
4     Q.  Thank you.
5         And then the next sentence says, "The proposed
6 focus of plaintiff's sales and engineering efforts for
7 PowerOhm was to be similar in nature and scope to the
8 work performed on Bonitron and started with an AC
9 generator module project for OMRON Oilfield & Marine.
10 The basic component of the PowerOhm work was generic in
11 nature, involved routine maintenance, repairs, sales,
12 and marketing components into heavily industrial motor
13 controlled systems."
14     Do you see that?
15     A.  Yes.
16     Q.  Was that his original duties or was he --
17     A.  Well, we -- the AC generator module was kind
18 of a distraction. That goes back to the same story I
19 told. We went to OMRON, met with Phil Martin, the head
20 of engineering, and he said, Hey, can you build this for
21 us? It's like, well, let's jump and help them. I was
22 told that on the side, Tim could still manage his -- you
23 know, designing these braking modules, which was why we
24 got together. That was the key reason we got together
25 was for braking modules, not to chase this low margin

94

1 AC. That was a favor to Phil Martin, was the only
2 reason we did it.
3     Q.  Okay. Understood.
4         Paragraph 6 says, "Plaintiff's proposed
5 specific job title with PowerOhm was product design
6 engineer." Do you see that?
7     A.  Yeah, and I don't know if we call him an
8 actually product design engineer, but that's what he was
9 doing. He was designing braking modules. That was his
10 job, product design.
11     Q.  And he says, "For which he was to be paid a
12 basic salary of $7,000 a month plus commission on all
13 new division sales."
14     Do you see that?
15     A.  Yes.
16     Q.  Do you have any recollection or any idea of --
17     A.  Yeah, I remember this very -- when I -- when I
18 said, hey, I convinced Vance to hire Tim as just a sole
19 employee, we matched what he was making with Bonitron.
20 And I said, Hey, Tim, we'll give you a bonuses based on
21 how this does. Nothing specific, and certainly not the
22 word "commissions."
23     Q.  And then it says --
24     A.  That's almost a contradiction to the first
25 item. Okay.

95

1     Q.  The next sentence says, "But that relatively
2 secondary work was to be collateral to PowerOhm's
3 unrelated proposed plan for joint collaboration focused
4 on development and marketing of plaintiff's novel ultra
5 complex BPM dynamic break module and/or any other items
6 listed in the business plan, as well as establishing a
7 new division, power electronics."
8         I know we've covered this in length already,
9 but can you address that one last time. Well, let me
10 start.
11     A.  What are they calling relatively secondary
12 work?
13     Q.  Meaning the first paragraph talking about his
14 product design engineer salary plus commission --
15     A.  Right, okay.
16     Q.  -- was secondary to what you were working on
17 in this joint collaboration.
18     Do you see that?
19     A.  Okay.
20     Q.  Did -- were there two separate -- strike that.
21         The first sentence --
22     A.  The word "novel, ultra complex," is -- is a
23 reach. That's real grandiose. It was not a novel idea.
24     Q.  So the first sentence: He's being hired as a
25 product design engineer, he's going to be paid $7,000

96

1 plus a commission. Correct?
2     A.  He was not going paid -- be paid a commission,
3 a sales bonus.
4     Q.  Strike -- okay. Strike that.
5         And he -- in the next sentence says that was
6 secondary work to what he was really hired for, and
7 that's this joint collaboration.
8     Do you see that?
9     A.  Yeah. I see that.
10     Q.  And is it your testimony that that is just
11 untrue?
12     A.  It was untrue. The main goal was to -- for
13 him to design modules. That's why we hired him, braking
14 modules, period. The AC generator module was just a big
15 low margin distraction that was very difficult to
16 manufacture, that we had a lot of issues with.
17     Q.  And the new division, power electronics,
18 discussion was long dead by this point. Correct?
19     A.  Absolutely.
20     Q.  Do you want to take a lunch break?
21     COURT REPORTER:  Sure. We can.
22     MR. BRADLEY:  Ken, I think we're going to take
23 a lunch break. Take a lunch break? Half an hour,
24 is that good? Do you need longer?
25     MR. BURGER:  I'm comfortable either way. It's

97

1  fine. 30 minutes is --
2      MR. BRADLEY: I don't need a break. If you
3  guys want to keep going, I'm fine. I don't -- go
4  ahead. But if you guys want a break, yeah, let's
5  break.
6      COURT REPORTER: Let's go off the record.
7      MR. BRADLEY: Sorry. Can we go off the record
8  for a second?
9      VIDEOGRAPHER: We are going off the record at
10  12:09 p.m., Eastern.
11      (Recess.)
12      VIDEOGRAPHER: We are back on the record. The
13  time is 12:26 p.m., Eastern.
14  BY MR. BRADLEY:
15      Q. Mr. Crowe, before the break, we were
16  discussing the allegations in the plaintiff's complaint,
17  and I'd like to continue going through that. Your name
18  appears in it numerous times, so we will continue
19  through the complaint in order. I believe we're on
20  paragraph 7. If you could read that to yourself, I have
21  only one quick question, maybe two.
22      A. Okay. Okay.
23      Q. Okay. Do you recall if Mr. Atchison actually
24  had a written employment agreement?
25      A. Usually we would send an e-mail saying, you

98

1  know, basically this is your start date, this is your
2  base salary, there's your 401(k), you're eligible, you
3  know, a certain date and health benefits and that type
4  of thing. There would have been maybe a 500-dollar car
5  allowance. I'm sure that was e-mailed, but I could be
6  wrong. It's been a long time, you know.
7      Q. Okay.
8      A. It could have been just a verbal agreement.
9      Q. Understood. And then, earlier we saw the
10  schedules with, like, 2013 bonus program.
11      Were those written or e-mails, do you know?
12      A. Those were written documents that were e-
13  mailed.
14      Q. Okay.
15      A. And to individuals.
16      Q. Thank you.
17      And then this concludes "plaintiff
18  consistently received positive performance reviews."
19      A. I would say that's -- that's, you know -- I
20  would say -- under me, yeah, under me.
21      Q. Okay. Can you read paragraph 8 to yourself.
22      A. Okay. I've read it.
23      Q. Is this a fairly accurate description of what
24  the BG and LG are?
25      A. Well, the word "chopper" wasn't developed by

99

1  the plaintiff. The chopper was a common word in the
2  industry. A chopper was a braking module, and again,
3  there was many, many factors of braking modules.
4  Rockwell, Saftronics, all the drive guys either had
5  internal braking modules or an external device they
6  used, and sometimes they would purchase from Bonitron
7  and eventually us.
8      Q. So the -- the word "chopper" in these products
9  was not coined by plaintiff?
10      A. No.
11      Q. Okay. All right. Thank you.
12      Let's skip to section B on the next page. If
13  you could read paragraph 1, B1.
14      A. Okay.
15      Q. Okay. The last sentence says, "A result in
16  extended discussion between plaintiff and PowerOhm
17  started in about 2008, focusing on what all the parties
18  mutually identified as a potential novel multi-million
19  dollar market."
20      Do you see that?
21      A. Yes.
22      Q. Do you know what he's referring to there?
23      A. Well, I guess with the hope that these braking
24  modules will become a multi-million dollar project, you
25  know, or product line. And that the potential is multi-

100

1  million dollars. Right?
2      Q. Right. And do you know what the best year of
3  sales was for these products?
4      A. I don't have that information. I would say it
5  was certainly probably the last year I was there, we
6  were shipping a lot of braking modules, mostly the
7  modules that were copies of the Rockwell design.
8      Q. And I believe earlier, you said those were
9  probably less than a million still?
10      A. I would guess that, but I'm not positive of
11  that. But yeah, the numbers -- it wasn't a big
12  moneymaker. It wasn't like the resistors. The margins
13  were lower.
14      Q. Okay. If you could read paragraph 2, and I
15  have one question about that as well.
16      A. Okay.
17      Q. So I believe we discussed this earlier, but to
18  your knowledge, the business plan was never submitted to
19  various banks in furthering or financing a joint
20  venture. Correct?
21      A. Well, early on, I don't think that business
22  plan ever went to our bank.
23      Q. Okay. Thank you.
24      A. Yeah. But that would be a question for Vance
25  and -- yeah, I don't think we ever passed that on.

101

1  Vance was beyond — he didn't want to pursue — he was
2  really trying to — he didn't want to do it. He was
3  worried about setting up a cell location down in
4  Nashville and manufacturing and taking on so much
5  employees and the cost between that.
6      Q.  Okay.  Thank you.
7          If-- could you read paragraphs 3 and 4,
8  because your name appears in them, and I'll have --
9      A.  Okay.
10     Q.  -- a couple questions.
11     A.  Okay.
12     Q.  Okay.  So in paragraph 3, he mentions you and
13 Mr. Hinton and says that there are "progressing
14 assurances of PowerOhm and later Hubbell, recently
15 learned to be false and predatory."
16         Do you see that sentence?
17     A.  Yes.
18     Q.  Were you involved in any false or predatory
19 fake assurances?
20     A.  Not at all.
21     Q.  Okay.  Thank you.
22     A.  Tim always seemed very happy working for us,
23 you know.  He always seemed very happy.  He was making a
24 lot more money with us than he was with Bonitron, and he
25 was given a lot of respect, and I don't think he got the

102

1  respect that he got from us that he had — you know,
2  wasn't the same at Bonitron.  He was very unhappy there.
3      Q.  And in paragraph 4, he mentions you and Mr.
4  Hinton again and said "resulted in the parties' definite
5  agreement for a joint venture."
6          Do you see that?
7      A.  Yeah, I see it.
8      Q.  And again, your testimony is that is just not
9  true?
10     A.  That's just absolutely not true.
11     Q.  And if you read paragraph 5.
12     A.  Okay.  I've read it.
13     Q.  And again, it makes reference to financial
14 arrangement where there would be 3 percent to the gross
15 annual global receipts.
16         Do you see that?
17     A.  Yes.
18     Q.  Is -- to your recollection, that is not
19 correct?
20     A.  I completely recall that's a false statement.
21 That's fiction.  Never did the word "commissions" or "3
22 percent" ever arise, and there is no documentation to
23 support that, I guarantee it, because it never happened.
24     Q.  Okay.  Thank you.
25         If you -- if you read paragraph 6, your name

103

1  appears in it again.  And paragraph 7.
2      A.  Okay.  I read 6.  Okay.
3      Q.  And he is making 100 percent -- a claim of 100
4  percent ownership in paragraph 7, and then saying,
5  again, he agreed to a 3 percent share.  And I believe
6  your testimony was that is just not true.
7      A.  That's not true.
8      Q.  Okay.  If you could read paragraph 8, your
9  name appears in it again.
10     A.  Okay.  I've read it.
11     Q.  Okay.  You've already testified that there was
12 no separate power electronics and the 2006 business plan
13 was scrapped --
14     A.  By 2006, that was all scrapped.
15     Q.  Understood.  And the second part where
16 PowerOhm Resistors filed to do business in Tennessee,
17 you I guess testified you were unaware of that and
18 hadn't seen those documents; is that correct?
19     A.  Yeah.  They may have mentioned it to me. David
20 Keller maybe jumped in and said, We need to register
21 with the state of Tennessee if you guys are going to do
22 this.  It's only $20.  Let's go ahead and do it now type
23 of thing, I guess is the reasoning.
24     Q.  Paragraph 9, can you read that.  Your name
25 appears again.

104

1      A.  Okay.
2      Q.  Okay.  In this paragraph, it again makes
3  reference to a joint venture, and it promised 3 percent
4  of annual gross profits.  And --
5      A.  Did it say gross sales before or gross
6  profits?
7      Q.  It said gross sales before, but --
8      A.  Profit and sales are a lot different -- two
9  different things.  But three -- there was never a 3
10 percent or gross profits or gross sales.
11     Q.  And at the bottom of the paragraph, it says
12 that he was advised by you and others that "although
13 threshold steps were progressing slowly and gradually,
14 plaintiff will be kept apprized of the development and
15 the fruition of the joint venture efforts."
16         Do you see that?
17     A.  Yes.
18     Q.  Do you have a response to that statement?
19     A.  I don't know what he's talking about.
20     Q.  Okay.  We move on to section C, the
21 PowerOhm/Hubbell relationship.  Your name appears in
22 paragraph 1, if you could read that.
23     A.  Okay.
24     Q.  Okay.  Starting with the second sentence: "In
25 plaintiff's presence in multiple conferences in 2014 and

105

1  early 2015, Hubbell was fully briefed on the plaintiff's
2  BPM innovations and, therefore, its above-named agents,
3  primarily Dave King and Andrew Thexton, became aware of
4  both the history and the promising status of Hubbell's
5  joint venture with plaintiff and PowerOhm's new
6  division, Gallatin-based power electronics. Defendant
7  Hubbell executives, specifically Andrew Thexton and
8  David King, participated with plaintiff in the ongoing
9  joint venture meetings, and later other unknown Hubbell
10 executives in private with Mike Crowe and Vance Hinton,
11 as the plans were made for Hubbell to assume PowerOhm's
12 joint venture rights and duties in the new power
13 electronics."
14        Do you see that sentence?
15     **A.  Yes.**
16     Q.  Is there any -- well, how do you respond to --
17     **A.  Well, I can't speak for what -- because I**
18 **didn't deal with Andrew Thexton and Dave King. I met**
19 **them very briefly when we sold the company. It says**
20 **here "in ongoing joist venture meetings."**
21     Q.  Yes.
22     **A.  I was never in any meetings with these guys**
23 **discussing power electronics. It never existed, you**
24 **know. That was it.**
25     Q.  Okay. Thank you.

106

1      **A.  We would never, ever consider going back to**
2  **Gallatin, Tennessee. That was only considered in 2005**
3  **and 2006.**
4      Q.  Okay. Hold on one second. If you could flip
5  to page 11 of 31, section D.
6      **A.  I'm there.**
7      Q.  If you read paragraph 1, and you're mentioned
8  in there. And at the bottom, I want you to focus on
9  something, when you get to it, says, "Upon finalizes its
10 purchase of PowerOhm's assets, secretly planned through
11 contrivance with the above-named former PowerOhm
12 officials to unethically and unlawfully convert
13 plaintiff's intellectual property to the ultimate and
14 exclusive benefit of Hubbell."
15        So we'll discuss that --
16     **A.  Okay.**
17     Q.  -- when you read it.
18     **A.  Okay.**
19     Q.  Okay. So the first sentence says, "As the
20 attached incorporated documentation confirms," complaint
21 Exhibit 2, which we looked at was the business plan,
22 "represented as PowerOhm, specifically Mike Crowe
23 offered ongoing representations to the plaintiff (the
24 PowerOhm acquisition by Hubbell), that the new discreet
25 joint venture was perceived as viable, realistic, and

107

1  profitable."
2        Do you see that sentence?
3     **A.  Yes.**
4      Q.  Do you have a response that allegation?
5     **A.  When Hubbell came along, we were never**
6  **discussing a separate division, another joint venture. I**
7  **don't know where that comes from. There was no**
8  **discussions at all. Those products were -- he developed**
9  **all those products for PowerOhm, and we sold them, and**
10 **Hubbell purchased us and that product line, along with**
11 **the resistors; and the intellectual property was there**
12 **in the units, right there for everyone to see.**
13        **Never was there going to be a separate**
14 **division called power electronics, no. I can't imagine**
15 **Hubbell even discussed that. I would have a hard time**
16 **believing that, but they have to speak for themselves.**
17     Q.  In the last sentence, it says, "In educated
18 hindsight, plaintiff now alleges that Hubbell, upon
19 finalizing its purchase of PowerOhm's assets, secretly
20 planned (through contrivance with the above-named former
21 PowerOhm officials) to unethically and unlawfully
22 convert plaintiff's intellectual property to the
23 ultimate and exclusive benefit of Hubbell. Hubbell
24 intended to eliminate plaintiff from the financial
25 entitlement and remove him entirely from its operation."

108

1        Do you see those two sentences?
2     **A.  Yes.**
3      Q.  You part of some conspiracy with Hubbell to
4  secretly, unethically, and unlawfully convert any
5  intellectual property of Mr. Atchison to cut him out of
6  some deal?
7     **A.  Absolutely not. Never happened.**
8      Q.  Okay.
9     **A.  I spoke with very little with Hubbell after I**
10 **left. I had a deal where I would respond and help them**
11 **every time they needed me for twelve months, and I had**
12 **to answer a couple e-mails, and none of them ever**
13 **touched on the subject of braking modules, that I**
14 **remember. Certainly not a separate division power**
15 **electronics. That never happened.**
16        **And I would never let that happen to Tim. I**
17 **wouldn't do anything to, you know, backdoor Tim or cheat**
18 **him out of anything. I liked — I liked Tim as a**
19 **person.**
20     Q.  Thank you. We're almost done. Just a couple
21 of additional sections.
22        Section E, your name appears again, if you
23 could read section E.
24     **A.  Okay. Okay.**
25     Q.  Your name first appears in reference to

109

1 affirming to plaintiff that Hubbell had agreed to not
2 dismantle the new division, meaning the joint venture
3 power electronics.
4     Do you recall having any discussions with Mr.
5 Atchison about Hubbell's plans or any agreements with
6 Hubbell?
7     **A. Nope. I couldn't have spoke for Hubbell.**
8     Q. And then, towards bottom, it says, "Nothing
9 had changed. Plaintiff's inquiries to Crowe, Hinton,
10 and others in management were evaded and never
11 answered."
12     **A. Where are you right now?**
13     Q. Oh, I'm sorry. Down at the bottom here.
14     **A. Okay. Okay.**
15     Q. So did you have any -- strike that.
16     You just said that you -- you did not speak
17 for Hubbell and you wouldn't be affirming anything or
18 have any knowledge of what Hubbell agreed or did not
19 agree to do?
20     **A. Right. And there was no following many months
21 of enthusiastic planning and conversation about starting
22 a new venture; that's fiction. We never talked about
23 that at all.**
24     Q. And your name shows up in section F. It's a
25 long section. I'll give you a second to -- I'll give

110

1 you a minute to read it.
2     **A. Okay. I've read it.**
3     Q. Okay. Again, he says, "Very abruptly in the
4 weeks just preceding the Hubbell transition, Mike Crowe
5 began devoting increasing discussion to the party's
6 comprehensive power electronics joint venture business
7 plan."
8     Were there any conversations about a power
9 electronics joint venture business plan?
10     **A. No.**
11     Q. And --
12     **A. The only conversation Tim Atchison — he's the
13 only guy that came into my employ and said, Why in the
14 world would you sell PowerOhm Resistors? You know, it's
15 doing so well, we're growing every year, blah-blah-blah.
16 That's the only thing we discussed. He was a little
17 disappointed we were selling. Nothing — there was never
18 another division. We never started another division.
19 There's nothing there.**
20     Q. Understood.
21     And then there's a paragraph that says,
22 "Plaintiff was initially assured by Mike Crowe (with
23 accolades) and then by Tom Yingling that his previous
24 basic job with PowerOhm would remain secure under the
25 new Hubbell management, who had been fully apprized of

111

1 the subject status and objectives of the joint venture.
2 However, inexplicably odd controversies were generated
3 by management, who abruptly declined to pay the
4 plaintiff the earned commissions owed to plaintiff from
5 previous, both related and unrelated to the "joy/V --
6 "J/V," joint venture, "corporation work. That collateral
7 dispute was never finalized and remained unresolved."
8     Do you see that sentence -- or sentences?
9     **A. I don't know if I see that or not. Is this
10 under section E still?**
11     Q. Oh, sorry, F.
12     **A. Under F, okay. Second page on F?**
13     Q. Yeah, second page on F.
14     **A. Okay.**
15     Q. And it starts "after Archdale plaintiff" --
16     **A. Okay. "Who was initially assured by Mike
17 Crowe."**
18     **Okay. Yeah, I did tell Tim I thought -- I
19 thought Tim would thrive under Hubbell. I thought Tim
20 would do well. They're a big nine billion dollar
21 company, I believe, at the time. I thought he was in a
22 good position to do well with them, but apparently it
23 didn't work out, and I don't know why he was fired. I
24 wasn't there.**
25     Q. He --

112

1     **A. He was the only one that was fired that I'm
2 aware of.**
3     Q. He was the only one?
4     **A. Out of that list of managers, project —
5 product managers and sales guys, to my knowledge, he was
6 the only one that was fired within the first couple, you
7 know — he — yeah. I don't know why he was fired, but
8 he was the only one fired out of that group, the main
9 group.**
10     Q. Do you know if he actually moved to Archdale
11 or did he continue to live in Tennessee?
12     **A. I can't even tell you if he traveled to
13 Archdale. He may have because I know they needed help
14 out there with manufacturing, but I don't know what
15 happened. I don't know.**
16     Q. Okay. He talks about odd controversies and
17 earned commissions, a dispute over earned commissions in
18 that sentence, both related and unrelated to joint
19 venture.
20     Do you have any idea what that is?
21     **A. I would think he would have came in my office
22 and said, hey, if you're going to sell the Hubbell, I
23 want my earned commissions because — and would have
24 said it then, but there were no commissions. There were
25 no promised commissions, no 3 percent ever.**

**113**

1    Q.   And there was no joint venture.  Correct?

2    A.   No joint venture.

3    Q.   Okay.  Thank you.  Put this aside.  Just a few

4  last follow-up questions.

5        When was the last time you talked to Tim

6  Atchison?

7    A.   2021.

8    Q.   And what were the circumstances of speaking

9  with him?

10   A.   I believe Tim called me, and I answered the

11  phone, and we spoke and just about general things, how's

12  life going type of thing.  And, you know, he asked how -

13  - I told him I had a resistor business -- or what was it

14  at the time?  Yeah, that we -- I was starting another

15  power resistor business.  Hubbell had moved the company

16  to Mexico, and that was -- that was kind of about it.

17  And I did receive a strange voicemail from him, like a

18  week or so later, that I still have, and it was

19  something along the fact, he wanted to continue

20  discussion about -- I assume what he was talking about

21  was coming to work for Crohm Resistors and manufacturing

22  braking modules again, and we never discussed that.  I

23  found it very odd, and that's the reason I kept the

24  voicemail.

25   Q.   Okay.  Thank you.

**114**

1        After you sold PowerOhm Resistors, what did

2  you do professionally?

3    A.   We focused on Load Banks Direct, and we sold

4  that five years ago.  And we started that -- you know,

5  we took that division to Erlanger.  I think we had maybe

6  a half a dozen employees or more that were working,

7  building load banks, and we took them to Erlanger with

8  us.  And that was part of the deal, the agreement we had

9  with Hubbell, that we could go manufacture load banks,

10  that we were not selling them that technology, and

11  that's what I focused on.  And we sold that company very

12  quickly.  It did very, very well.

13   Q.   And then what did you after you sold load

14  banks?

15   A.   What I'm currently doing.  I'm manufacturing

16  resistors with my sons, my two sons, over in Cincinnati,

17  Ohio.

18   Q.   Cincinnati, Ohio?

19   A.   Yes.

20   Q.   Okay.  How many employees do you have?

21   A.   I believe we have 22.

22   Q.   And through your work, have you had occasion

23  to run across the old PowerOhm Resistors products still

24  for sale?

25   A.   Oh, yeah.  They're a competitor of ours.  They

**115**

1  manufacture resistors down in -- it's in Mexico now and

2  ship to the states.

3    Q.   And the dynamic braking modules, are you aware

4  if there was ever a stoppage in sales between 2014 and

5  today?

6    A.   The only thing I heard was -- you know, we

7  were shipping a lot of braking modules, and we had them

8  stacked on the shelf, ready to go.  It was the smaller

9  series that we knew were going to sell, not the large

10  ones.  Those were kind of custom built for orders.  We

11  very rarely built those ahead of time, the BG series.

12  It was all the smaller stuff that we sold on a regular

13  basis.  That was going very well.

14       And I know, when Hubbell purchased it,

15  feedback from guys that I worked with was that Hubbell

16  had implemented a new accounting system, and they were

17  having so many issues trying to ship product because one

18  thing was, they had orders that needed to ship ASAP and

19  the product was siting on the shelf finished, but they

20  couldn't ship it because they couldn't account for the

21  powder coating.  It sounded like a real mess.

22       And I think Tim Atchison, Tom Young showed up

23  in Erlanger one day, and they told me they had only sold

24  maybe eight modules that month, and it was because of

25  this -- what I was told, it was because of the

**116**

1  accounting system.  They wanted to sell them, build

2  them, but they were having all kinds of crazy issues.

3    Q.   And Hubbell's a competitor of yours today?

4    A.   Yeah, we compete against PowerOhm Resistors.

5    Q.   You do?

6    A.   Yes.

7    Q.   Do you have any sense of how large Hubbell's

8  dynamic braking module business is today?

9    A.   I have no idea how many they're selling.

10   Q.   Okay.  Thank you.  If I can, I'm going to ask

11  you a few questions, try to summarize the substance of

12  our conversation today.

13       Any plan to start a new division in Tennessee

14  was scrapped sometime in 2006 and never revisited?

15   A.   That is absolutely correct.

16   Q.   Tim Atchison was hired in 2008 as a design

17  engineer, paid to develop and build dynamic braking

18  module products for PowerOhm Resistors, Inc.?

19   A.   That was sole reason we hired him, just for

20  that:  To design and engineer a product line for us.

21   Q.   Tim Atchison used company resources, collected

22  a paycheck, used your equipment and your plant to build

23  the dynamic braking resistors such as the BG and the LG.

24  Correct?

25   A.   Oh, yeah.  They're a competitor of ours.  They

---

**117**

1    Q.  At no time that you recall was Tim Atchison
2  ever promised a 3 percent royalty on some new division
3  or new corporate entity, power electronics?
4    **A.  That is complete fiction.**
5    Q.  Okay.  One final exhibit -- which exhibit --
6    COURT REPORTER:  Nine.
7  BY MR. BRADLEY:
8    Q.  I'm going to mark as Exhibit 9 an e-mail that
9  you did not draft, but you received.
10    (Exhibit 9 marked.)
11  BY MR. BRADLEY:
12    Q.  And if you could just take a minute to read
13  it, and I'll have a few questions for you on the final
14  paragraph of this e-mail.  And for the record, it's an
15  e-mail dated Tuesday, May 3rd, 2011, from Vance Hinton,
16  VHinton@PowerOhm.com, to a number of individuals, one
17  including MCrowe@PowerOhm.com?
18    **A.  Yes, that's me.**
19    Q.  Okay.  Thank you.
20    **A.  Okay.**
21    Q.  Okay.  Let me start with the -- the sentence
22  at the bottom says, "In Joe's new role, his title will
23  simply change to vice president of strategic
24  partnership."
25    **A.  Yes.**

---

**118**

1    Q.  Okay.  Was there a separate legal entity
2  called strategic partnerships at PowerOhm?
3    **A.  There was not, and there was not a separate**
4  **power line because that was -- those were not divisions.**
5  **Joe was going to take over the strategic -- the**
6  **partnerships was going to be, I think, less than 20**
7  **companies, like our major companies, and then Martin**
8  **Glover really became our vice president of sales.  And I**
9  **think Vance was trying to cushion that a little bit,**
10  **trying to prop Joe up because he had a big ego and there**
11  **was some friction there with the way Martin was coming**
12  **in.  He was doing a great job.**
13    **But Martin was going to, you know, try to get**
14  **more business for us and power electronics and better**
15  **help us market those products because, you know, the new**
16  **stuff, the big stuff, it really wasn't taking off.  We**
17  **weren't getting the big oilfield business like we**
18  **expected, so Martin was going to kind of focus on that**
19  **product line.  That was not a division.**
20    Q.  So you might have a VP of sales.  Correct?
21    **A.  Sure.**
22    Q.  And that's an internal terminology for sales?
23    **A.  Yes.**
24    Q.  When you say VP power electronics, is that
25  referring to Kentucky versus Katy or -- do you have any

---

**119**

1  idea what Mr. Hinton meant by power electronics?
2    **A.  Yeah.  He's just going -- he's calling -- the**
3  **way I read this -- and I can't speak for him, but it**
4  **reads we didn't have a division.  It was just a product**
5  **line.  Martin was going to try to boost our power**
6  **electronic sales, our braking module sales.**
7    Q.  So -- so if I was to talk about Katy, I could
8  just say resistors?
9    **A.  Just resistors.**
10    Q.  And if I'm talking about Covington, that's the
11  power electronics for the resistors?
12    **A.  Power electronics, load banks, high**
13  **resistance, blah-blah-blah, yeah.**
14    Q.  Okay.  All right.  I have no further
15  questions.  Thank you.
16    **A.  Okay.**
17    MR. BRADLEY:  Madame Reporter, thank you as
18  well.
19    Mr. Burger, I am done.  Can he hear us?
20    THE WITNESS:  He's speaking, but I can't hear
21  him.
22    MR. BRADLEY:  You're on mute.  We can't hear
23  you.
24    MR. BURGER:  There we go.  There we go.
25    MR. BRADLEY:  Okay, Ken.  I'm all finished.

---

**120**

1    THE WITNESS:  He's talking again, I think.
2  You're muted.  Maybe he was talking to someone
3  else.
4    MR. BRADLEY:  I can't hear you.
5    MR. BURGER:  Now can you hear me?
6    THE WITNESS:  Yes.
7    MR. BURGER:  Okay.  I don't know why I'm having
8  trouble with this mute button on there.
9    CROSS-EXAMINATION
10  BY MR. BURGER:
11    Q.  Mr. Crowe, good afternoon again.  I'm Ken
12  Burger.  I was introduced to you earlier, and I am
13  assisting Mr. Atchison in this matter.  I have some
14  questions for you over the next several minutes, and as
15  with Mr. Bradley, if I ask you anything that seems
16  unclear or requires clarification, please don't guess at
17  my question.  Please feel comfortable in telling me that
18  you're not understanding it and to make sure that you
19  and I are communicating, if that's okay.
20    **A.  I understand.**
21    Q.  All right.  Did you do anything in particular
22  to prepare for your deposition today?
23    **A.  No.  I read -- I -- honestly, I got these -- I**
24  **was given a copy of the complaint, but I had just**
25  **breezed through it.  But yesterday, I did take the time**

121

1  to read all the documents that Bill's group forwarded to
2  me that we've discussed today. I read those pretty well
3  yesterday, pretty -- pretty in depth.
4      Q.  When did you last speak with Mr. Hinton?
5      A.  I speak -- I spoke to Vance Hinton yesterday.
6  I speak to him on a very regular basis. He's one of my
7  dear friends, and he's one of my favorites. I pull up -
8  - I've got a list of most people, the last name is Crowe
9  on that list, but Vance is on that list. We've been
10 long term -- long-time friends.
11     Q.  I understand. And may I assume, then, you
12 have talked with him about the claims with Mr. Atchison
13 in this lawsuit?
14     A.  We have talked about it.
15     Q.  And did you talk about that with him
16 yesterday, as you mentioned?
17     A.  No. We discussed -- I told him I had a
18 deposition -- I had told him I had to come here today,
19 but we talked about. He's got a movie or something he
20 funded. He went to New York City and was telling me
21 about that, and also California. He's going to
22 California to see that movie premier again. So, yeah,
23 it was not about this.
24     Q.  All right. Did you play any direct role in
25 the decision to hire Mr. Atchison or was he hired by

122

1  someone else with your acquiescence?
2      A.  I was -- I was the main guy pushing to hire
3  Tim.
4      Q.  What -- to make sure I'm clear, what is your
5  description of the payment arrangement? How was he to
6  be paid from PowerOhm?
7      A.  We gave him $84,000 a year and said we would
8  treat him very fairly on bonuses as this product line
9  developed, and we had no written, what that bonus was
10 going to be. We didn't know what this would turn into,
11 you know. We had no idea, but we thought it was a good
12 idea to try to make a run at it, and it wasn't going to
13 be that expensive if Tim was going to work from home and
14 then travel to help us out when we needed it.
15     Q.  For that period of time between roughly 2008
16 and 2000 -- January of 2015, December of '14, in that
17 time frame, what is your best estimate of the total
18 number of employees that PowerOhm maintained?
19     A.  Well, a year before we sold to Hubbell, it was
20 over 150. But it was below that number when we actually
21 sold in '14, and I'm not sure -- because the solar field
22 business had dropped off, and that was the main reason.
23 That was -- that bumped our sales up tremendously, maybe
24 by 30 -- a third of our sales one year.
25     Q.  A broad approximation is about 150, if I

123

1  understood you.
2      A.  Yeah. Most those were based out of Houston --
3  the Houston location at Katy.
4      Q.  And about how many would have been based out
5  of Kentucky?
6      A.  All the guys on the list, the sales guys were
7  there, and we had some folks, maybe five guys out there
8  building modules and another group building the load
9  banks, and occasionally high-resistance grounding
10 systems were built by the guys building the load banks,
11 because they were --
12     Q.  It was -- 2014, how many people did you have
13 working for you who carried the title design engineer?
14     A.  A design engineer? We had engineers. It's
15 that product manager group. Those were all design
16 engineers.
17     Q.  Let me rephrase that question.
18         How many people did you have working for you
19 in 2014 who did work comparable to what Tim Atchison was
20 going the doing for you?
21     A.  Other than John Wehman, Tim was the main guy.
22 He was the product manager. It was his deal. He was the
23 main designer. He designed all those products.
24     Q.  Okay. And at any time while you were there,
25 did anyone do design work comparable to what Tim

124

1  Atchison did for your company?
2      A.  No, Tim -- Tim developed that whole line. I
3  think Wehman was trying to help with certain little
4  things, duties or whatever, but Tim developed that, you
5  know, to be -- the BG series, the LG series.
6      Q.  And I think I understood your clarification to
7  Mr. Bradley a moment ago.
8         You -- I had written down several times that
9  you used the word "fiction" or that it was nonexistent,
10 that there essentially was no discreet business entity
11 known as power electronics after about
12 2006.
13     A.  Yeah, that was -- and that was only a
14 discussion. We never formed that division or filed for
15 that name in Tennessee.
16     Q.  That's what I'm not -- do you have any
17 knowledge of your company, someone on behalf of your
18 company, reviewing your business registration for power
19 electronics from year to year in Tennessee?
20     A.  I would assume that Daryl Keller, but that's
21 an assumption. I didn't even know what was really going
22 on. That's something our accountant would have done,
23 and it wouldn't have meant anything to me, really. I
24 was engineering -- the vice president of engineering.
25     Q.  Do you have any knowledge of how power

125

1 electronics was addressed in your tax returns? Was it
2 addressed separately from PowerOhm?
3     MR. BRADLEY: Objection. Assumes facts not in
4 evidence.
5     A. There was no separation division. We had one
6 tax return for PowerOhm Resistors.
7 BY MR. BRADLEY:
8     Q. Okay. Your explanation for the discussion in
9 2011 about Mr. Glover being the vice president of power
10 electronics, if I followed you correctly, is that you
11 were referring to his management of the department, not
12 as a separate --
13     A. Our product line. We had a line of braking
14 modules that Tim designed, and Martin was going to focus
15 on trying to prop up the sales because we weren't that
16 successful with the higher amp stuff. The big dollar
17 things is what we were chase -- wanting to chase.
18     Q. What knowledge do you have of any of anyone in
19 the -- in PowerOhm structure, you or Mr. Hinton, anyone,
20 pursuing financing at any stage for power electronics?
21     A. That would have been solely Vance, if there
22 was going to be something like that. That would be
23 Vance that usually dealt with the bank. He was the main
24 -- our bank guy.
25     Q. Do you have any knowledge of when his last

126

1 dealings or discussions with the bank for financing for
2 power electronic may have occurred?
3     A. You have to ask him. I don't even know if
4 there was a conversation back in 2005 or '6 that was
5 actually with a bank, other than the fact that we asked
6 that capital line to help fund this, and the answer is
7 no.
8     Q. Of all of the 150 people that you had working
9 for you, employees, to your knowledge, at any time, did
10 PowerOhm designate any one of those individuals as a
11 registered agent for any business entity related to
12 PowerOhm?
13     A. I'm not sure if I understand what you're
14 saying or asking.
15     Q. At any time while you were affiliated with
16 PowerOhm, of the 150 so employees that you described
17 earlier, was anyone, other than Tim Atchison, ever named
18 a registered agent --
19     MR. BRADLEY: Objection. Assumes facts not in
20 evidence.
21 BY MR. BURGER:
22     Q. -- for PowerOhm?
23     A. He wasn't -- what do you mean, a registered
24 agent? I wasn't aware of Tim being a registered agent
25 out of that group. What do you mean, a registered

127

1 agent?
2 BY MR. BURGER:
3     Q. You saw documents earlier that were exhibited
4 to you, didn't you, that demonstrated that he had been
5 named registered agent for power electronics in
6 Tennessee?
7     A. I didn't see that.
8     Q. Have you ever seen any documents -- as you've
9 given your testimony here today, have you relied on any
10 documents that you've seen previously in which employee
11 Tim Atchison was named registered agent for power
12 electronics as a separate legal entity?
13     A. I don't think -- I do not think that document
14 exists.
15     Q. Okay. Have you seen any documents filed on
16 behalf of power electronics that were --
17     A. No.
18     Q. -- placed on file in the office of the
19 business division, the Secretary of State for Tennessee?
20     A. No.
21     Q. In any of your discussions with Vance Hinton,
22 he has never told you anything about filing any discreet
23 legal entity documents with the business division on
24 behalf of power electronics?
25     A. He hasn't mentioned that to me, unless that

128

1 was -- he did something like that in '5 or '6, I don't
2 know. But it wasn't done -- it wouldn't have been done
3 after we decided not to pursue that venture.
4     Q. Have you ever seen a version of a business
5 plan for power electronics -- not PowerOhm -- power
6 electronics prepared by Mr. Hinton?
7     A. No.
8     Q. Has he ever told you that he prepared a
9 version of a business plan for power electronics?
10     A. No. And based on my experience with Mr.
11 Hinton, I highly doubt if he developed a business plan.
12 We didn't develop a business plan when we started
13 resistors, and we were highly successful. We are very
14 smart electronic engineers who always felt like we had
15 to plan and discuss, but never a written business plan.
16     Q. Do you have any insight, Mr. Crowe, into the
17 parts nomenclature for the brake power modules that your
18 company was marketing up until the time of the
19 acquisition?
20     A. Do I have knowledge of what, now?
21     Q. Of the nomenclature, the naming of the parts
22 for the brake power modules?
23     A. You mean the actual part numbers themselves?
24     Q. Yes, sir.
25     A. Like, for instance, give me an example of a

129

1  part number.
2      Q.  Do you know what BG and LG stand for?
3      A.  Yes, big guy and little guy.
4      Q.  And do you know who assigned those names, big
5  guy and little guy, to those parts?
6      A.  Tim always used the term LG and BG, but I used
7  that to say, hey, we're going to call it the BG and the
8  LG because Tim always called it big guy/little guy when
9  he referred to it.  It was just kind of funny.  It was
10 like, let's add that into the part numbering system.
11     Q.  Did Tim Atchison come up with the name -- the
12 word, the letters BG and LG for these parts, as far as
13 you know?
14     A.  No, I did.
15     Q.  Those parts that bear the preface TA, were
16 those parts numbers assigned by Tim Atchison to reflect
17 his initials?
18     A.  I can't remember that.  I do remember I think
19 we had a terminal block we called TA1 or 2 or something
20 like that, that was trying to put a part number on it,
21 trying to keep it separate.  And again, we had a lot of
22 respect for Tim, and, you know, you throw Tim's name in
23 there, the BG, the LG.  We were all supportive of Tim
24 and what have you.
25     Q.  To clarify, if Mr. Atchison affirms under oath

130

1  that the letters TA on the various brake power modules
2  that were marketed by PowerOhm were assigned by him as
3  his initials TA, would you dispute that?
4      A.  It was only an internal part number to
5  identify what part was in that braking module, and it
6  was simply a piece of phenolic board with some half-inch
7  bolts coming out of it.  It wasn't anything, you know.
8      Q.  Have you had occasion for any reason to
9  inspect the parts that are presently being marketed by
10 Hubbell in furtherance of their brake power module
11 product line?
12     A.  I left there in '14.  I have no idea what
13 those folks are doing.
14     Q.  Did Tim Atchison ever show you any diagrams or
15 parts list -- diagrams or parts lists while you were
16 affiliated with him?
17     A.  Absolutely.  We had part lists for all the
18 braking modules.  How else would you build them?
19     Q.  Let me finish my question.
20     A.  I'm sorry.
21     Q.  That's just the first part of it.  Excuse me.
22 Excuse me.
23     A.  Okay.  I thought that was the question.
24     Q.  You're jumping in front of me.
25         My question is, did he ever show you, while

131

1  you were affiliated with him, any diagrams or any parts
2  lists that reflected file creation dates between 2007
3  and 2012?
4      A.  What do you mean, file dates?
5      Q.  On a computer, file creation dates on a
6  computer spreadsheet folder that reflected the date of
7  initial creation as being between 2007 and 2012?
8      A.  There was certainly plenty of documents that,
9  you know, supported the manufacturing of that.  We had
10 detailed drawings of the units and diagrams, yes.  How
11 else would you turn it over to manufacturing?
12     Q.  If it's shown in this matter, Mr. Crowe, in
13 view of your broad overview that you described to Mr.
14 Bradley here of this case and the dispute, if it's shown
15 in this matter that many of the present Hubbell BPM
16 brake power module parts numbers are identical to those
17 2007 through 2012 BPM parts that appear on Mr.-- on Mr.
18 Atchison's file creations between 2007 and 2012, may I
19 ask what conclusion you would draw from that?
20     A.  I don't know what Hubbell's doing.  I don't
21 know if they still -- I see -- I know those products are
22 still online.  I don't know if they're available or
23 what's going on with this now.  I have no idea.
24     Q.  Well, let me restate my question, and I'll
25 move on.  I'm not sure I asked it precisely.

132

1      If the parts presently being used by Hubbell
2  bear the identical parts numbers TA, BG, LG, if they
3  bear presently on the Hubbell market line identically
4  the same parts numbers that existed on the file creation
5  dates in 2007, before he even came to work for you guys,
6  what conclusion would you draw from that?
7      A.  I don't think he started designing any of
8  these braking modules until he started -- was employed
9  by us.  He had ideas.  He knew how, you know, he --
10 according to him, he had designed braking modules for
11 Bonitron and knew them very, very, very well.
12     Q.  My question and then I'll move on from this,
13 and I'm attempting to understand.
14         If he has computer documentation that shows an
15 original file creation date before he went to work for
16 you that reflects the TA and BG parts numbers, before he
17 even went to work for you, that are presently being used
18 and marketed by Hubbell, what conclusion would you draw
19 from?
20         MR. BRADLEY:  Objection.
21 BY MR. BURGER:
22     Q.  If any?
23     A.  Yeah, I don't think he design -- I don't know
24 maybe -- I don't know when he designed those.  He said,
25 hey, I've got -- this is how we're going to terminate

133

1  it. I don't know if he started that before we hired
2  him. I don't know. We didn't -- I know it was quite a
3  bit of time after we started we tapped into TA and T1,
4  and I may -- I probably did the auto CAD drawing itself,
5  because I don't think Tim did a whole lot of auto CAD
6  drawings, a lot of sketches and things.
7      Q.  If power electronics was as you described it
8  earlier, a fiction that never got off the ground -- I
9  think I wrote your words down correctly -- do you have
10  any idea, has anyone told you from any source, direct or
11  hearsay, as to why Tim Atchison would have, in
12  consecutive years, been renewed as the registered agent
13  for the discreet legal entity power electronics?
14      MR. BRADLEY:  Objection.
15  BY MR. BURGER:
16      Q.  Has anyone give you an explanation on that?
17      A.  No.
18      MR. BRADLEY:  Objection. Assumes facts not in
19  evidence.
20  BY MR. BURGER:
21      Q.  Anybody talk to you about that, sir?
22      A.  Not that I recall.
23      Q.  Did power electronics have separate employees?
24      MR. BRADLEY:  Objection. Assumes facts not in
25  evidence.

134

1      A.  They were all under the PowerOhm resistor
2  curtain. I mean, we had specific people there that
3  could manufacture braking resistors, and we had specific
4  people that could wire up load banks and high-resistance
5  grounding systems, so there was a group building braking
6  modules, yes.
7  BY MR. BURGER:
8      Q.  So Mr. Atchison claims that, right before he
9  was fired, right after the acquisition, that right after
10  -- right before he was fired, ten of the employees who
11  were devoted to power electronics brake power module
12  work under his supervision were filed -- fired, do you
13  have any recollection of that?
14      A.  I heard that, but I was gone when that
15  happened so I don't know the details. But I know that
16  they offered certain employees a chance to move to
17  Archdale, and I believe one employee who was kind of key
18  to that, Chris Powell, told me that he traveled to
19  Archdale. And they put him up for a night, and he
20  inspected Archdale, but he didn't -- it turned out he
21  did not want to move. I believe the only guy that went
22  out there was Mike Simmons, and he was coming home on
23  the weekends.
24      Q.  Well, let me rephrase my question. I'm not
25  sure I understood your answer. Forgive me. Let me

135

1  rephrase it.
2      If Mr. Atchison says that immediately after
3  the acquisition date but preceding his termination in
4  June of 2015, the only employees who were singled out
5  for termination at the Covington plant were the power
6  electronics brake power module people who were under his
7  supervision, is he correct or incorrect about that, if
8  you know?
9      MR. BRADLEY:  Objection. Calls for
10  speculation.
11      A.  Well, the --
12  BY MR. BRADLEY:
13      Q.  If you know.
14      A.  Hubbell moved production to Archdale, and they
15  had a lot of different companies they had purchased that
16  had small, little product lines, that they would put
17  them under the same management group to try to save
18  costs. And that's why they moved to Archdale and they
19  released those employees, yes. They maintained all the
20  office personnel, including Tim.
21      Q.  You mentioned load banks earlier, and I need
22  to clarify.
23      From its inception -- from PowerOhm's
24  inception up until the Hubbell acquisition, did PowerOhm
25  develop any other -- any business entities within its

136

1  main operation?
2      A.  We spun off Load Banks Direct and Load Banks
3  Depot when sold to Hubbell.
4      Q.  Did you have any employees of PowerOhm who
5  were in any way affiliated as officers or registered
6  agents or in any capacity for load banks?
7      A.  Ask me that question again.
8      Q.  Yeah. With regard to the development of load
9  banks --
10      A.  Yes.
11      Q.  -- did you have any PowerOhm employees
12  situated, in any context, who were affiliated with load
13  banks as either an officer, joint venture, or a
14  registered agent?
15      A.  No. When we left there, we turned that into a
16  partnership. I had majority ownership, Vance was second
17  in line, and we also hired Martin Glover and Martin Peko
18  were the four main owners of that business.
19      Q.  Yup.
20      A.  And we left that with PowerOhm employees, and
21  that was part of the agreement we had with Hubbell. We
22  were allowed to leave with the group that was wiring the
23  load banks.
24      Q.  And I think I know the answer to these
25  questions, so forgive me. I just need to get them on

137

1  the record here.
2       Did Tim Atchison ever possess any ownership
3  rights in any nature in PowerOhm?
4       **A. No.**
5       Q. Did he ever possess any rights of control in
6  the business decisions of PowerOhm?
7       **A. We listened to input from Tim, but no, he —**
8  **he wasn't — he wasn't directing those.**
9       Q. Who had the primary responsibility for the
10  day-to-day decisions at the PowerOhm facility in
11  Kentucky? I understood Mr. Hinton is in Katy, Texas,
12  and you're in Kentucky. May I assume from that that you
13  were the primary -- you were the boss in Kentucky?
14      **A. Yes, I was the main guy. I was our vice**
15  **president of engineering, and, you know, certainly Joe**
16  **Eschleman was vice the president of sales, but we spoke**
17  **on a daily basis.**
18      Q. And how did the chain of command flow from you
19  down?
20      **A. I was over the product managers, the engineers**
21  **including Tim Atchison, and Joe was over the sales group**
22  **listed on that one line.**
23      Q. Who was responsible for -- let me back up a
24  moment.
25      Did all of your employees receive yearly or

138

1  periodic performance reviews?
2       **A. Yeah, we did reviews. We did reviews with**
3  **employees. Not all of them, but we did reviews.**
4       Q. To your knowledge, did Tim Atchison receive a
5  performance review every year that he worked for
6  PowerOhm?
7       **A. I don't think so. I don't think so, no.**
8       Q. Who prepared the performance reviews when they
9  were done?
10      **A. I was involved with some of that, yes.**
11      Q. Do you have any recollection of there being
12  written performance reviews of Tim Atchison in the last
13  five years that he was there?
14      **A. Boy, I don't think so. I really don't. Unless**
15  **that's something we started at the end when Tom was**
16  **managing, I don't think so.**
17      Q. Is there any other person, other than you, who
18  would have performed a performance evaluation on Tim
19  Atchison?
20      **A. No.**
21      Q. If he claims that he received a performance
22  evaluation in the years preceding his termination with a
23  raise each year, would you agree with that or dispute
24  it?
25      **A. Yeah, we treated Tim very well.**

139

1       Q. But you considered him a poor employee?
2       **A. An employee, yes.**
3       Q. And will you clarify that for me, please. He
4  was getting raises.
5       **A. Tim was an employee of PowerOhm. His job was**
6  **to design braking modules on a new power line for us and**
7  **he did that.**
8       Q. I'm sorry. I didn't understand that answer.
9  Can you --
10      MR. BRADLEY: Can you read the question back?
11  I believe poor employee was...
12      THE WITNESS: Oh.
13      MR. BRADLEY: Hold on.
14      (Record read as follows: Question, but you
15      considered him a poor employee?)
16      **A. Did I consider Tim a poor employee?**
17  BY MR. BURGER:
18      Q. Yes, sir.
19      **A. No.**
20      Q. In the broadest context possible, and I
21  understand you've said you were gone after the
22  acquisition.
23      But in the broadest context possible, from any
24  source, do you have any insight into the reasons for his
25  termination and the team who worked under him in the six

140

1  months preceding June of 20 -- of '15?
2       **A. It would only be rumors, but I heard it was**
3  **lack of performance.**
4       Q. Had you had any issues with him, with lack of
5  performance between 2008 and 2015?
6       **A. Very frustrating times. He, you know — some**
7  **of the projects were always delayed and behind schedule,**
8  **and there — yeah, we were trying to get UL, and that**
9  **went on for more — it just seems like it should have**
10  **taken — it should have gone on a lot faster, and Tim**
11  **should have been working quite a bit harder at it, to**
12  **finish it, because it was key to selling more braking**
13  **modules, to get the UL on it.**
14      Q. As of the time you departed PowerOhm, where
15  were the business records of PowerOhm located? I'm
16  referring to that as broadly as may. Letters, e-mails,
17  texts, memos, technical documents, administrative
18  documents, where were those records located and by whom
19  were they possessed?
20      **A. You know, there were documents at both**
21  **locations, in Katy, Texas, and also in the Latonia**
22  **location. We had documents and e-mails going back and**
23  **forth, but Hubbell retained all those records. I lost**
24  **my e-mail after a certain amount of time, my PowerOhm e-**
25  **mail. So I was —**

141

1    Q.  Do you have any knowledge of whether the
2  department, as you described it, of power electronics,
3  did it maintain its records separately from PowerOhm?
4    **A.  Not to my knowledge.  I don't know.**
5    Q.  Have you given a statement to anyone at any
6  time, by telephone or a written statement, preceding
7  your deposition here today regarding the allegations
8  made by Mr. Atchison?
9    **A.  No.  I -- you mean like an official statement**
10 **or something like that?  I've discussed it with people**
11 **that, hey, Tim's suing Hubbell.  I've mentioned that to**
12 **employees I work with now.**
13   Q.  Who contacted you about giving your testimony
14 in this matter?
15   **A.  Mr. Bradley.**
16   Q.  Personally?
17   **A.  Called me on the phone.**
18   Q.  Okay.  With as much detail as you can offer
19 me, Mr. Crowe, will you describe PowerOhm's business
20 involvement with producing and marketing brake power
21 modules prior to the work that was done with power
22 electronics.  What were they doing and how were they
23 doing it, if you can give me a good overview?
24   **A.  What do you mean, the work done by power**
25 **electronics?  There was no power electronics.**

142

1    Q.  Before Mr. Atchison came to work for you --
2    **A.  Okay.**
3    Q.  Before Mr. Atchison came to work for PowerOhm,
4  what was PowerOhm doing with regard to brake power
5  modules?
6    **A.  Nothing.**
7    Q.  Had any kind of a brake power module line --
8    **A.  Let me back that up.  Before he was on, he did**
9  **a little consulting work.  We were trying to duplicate**
10 **that Saftronics braking module, and we couldn't -- we**
11 **didn't get that project finished in time to really**
12 **capture the business that was available early on.  Tim**
13 **wasn't a direct employee.  He was working a little bit**
14 **on the side for us, trying to develop that, just to**
15 **develop that product.  But it took too long.  He took**
16 **too long to develop it, and we never did get sales.  We**
17 **sold some of those later, but it never generated any**
18 **sales.**
19   Q.  With regard to the stock sales agreement that
20 you ultimately achieved with Hubbell, who in your
21 organization was primarily responsible for negotiating
22 the terms of that -- among the three of you who were the
23 owners, who carried the ball mostly in negotiating those
24 terms?
25   **A.  We hired a consultant, Joe Saloom.  He was**

143

1  kind of an accounting guy.  He put together a lot of the
2  -- you know, all the information you have to create and
3  put together, along with -- there was a company up in
4  Pittsburgh, a merger and acquisition group that we
5  hired, and we were paying them a commission based on the
6  sale price of the company.  And they helped with that
7  also.  Schneider Downs was the name of that company,
8  Schneider Downs in Pittsburgh.
9    Q.  Did you, after the acquisition, perform any
10 type of consulting duties with Hubbell to assist during
11 the transition?
12   **A.  They paid me $10,000 a month for 12 months,**
13 **and I just had to be available to even travel, and I**
14 **agreed to do that.  And literally, I think I answered**
15 **less than five e-mails, and that took me minutes each,**
16 **you know.  So they really didn't come back.  I had**
17 **turned management of PowerOhm Resistors over to Tom**
18 **Yingling, and I was more focused on load banks for the**
19 **last year and a half or more, and, you know, they didn't**
20 **-- I didn't, you know-- I kind of worked myself out of**
21 **that role.  So they didn't need me much.  It was all --**
22   Q.  Anyone -- I'm sorry.
23   **A.  Well, we sold them a company that was pretty**
24 **much managed -- was all managed and run by the people**
25 **they kept.**

144

1    Q.  I just got this stock agreement yesterday, and
2  honestly, I haven't studied it.  But is there anything
3  in that agreement that addresses your being paid a
4  consulting fee?
5    **A.  I guess they called it a consulting fee, but**
6  **it was a -- there was a written document given to me,**
7  **that, hey, we'll pay you this amount of money to -- and**
8  **sign this or whatever, and I did.**
9    Q.  Do you still --
10   **A.  I wanted to help them, you know -- they were**
11 **giving us a fair price for the business, and I wanted to**
12 **help them as much as I could.**
13   Q.  Do you have a copy of that agreement?
14   **A.  No.**
15   Q.  Have you looked to see if you still have a
16 copy of it?
17   **A.  I don't.  I don't even think I kept it.**
18   Q.  Did anyone else in the PowerOhm structure
19 receive -- and I'll use the word "consulting."  You're
20 not bound by that.  I don't mean anything legal by it.
21   Whatever arrangement you had to assist them in
22 the transition period, we won't label it other than
23 consulting, but I understand that you may or may not
24 agree with that.
25   **A.  I believe that all three partners were given**

145

1 the same deal.  The same -- I think Vance and Richard
2 got the same thing, 120,000, I believe, to just provide
3 assistance.
4     Q.  Yeah.  In that context, in that 12-month
5 period that you were talking about, were you consulted
6 at any time regarding Mr. Atchison's termination or the
7 termination of the people working under him in the power
8 electronics department?
9     A.  No, that was all Hubbell.  They didn't bring
10 me into that.
11     Q.  Did they tell you their plans?  Whether they
12 consulted with you or not about it, did they tell you
13 their plans?
14     A.  No, no, absolutely not.
15     Q.  Do you know the name of the individual within
16 Hubbell who was in charge of the facility there in
17 Covington in that 12-month period leading to -- twelve-
18 month period following acquisition?
19     A.  I'm not 100 percent sure, but I think it was
20 Andrew Thexton was over that division.
21     Q.  And who below Andrew Thexton was in the chain
22 of command for Hubbell during that year?
23     A.  It would have been -- Joe was still vice
24 president of sales.  So...
25     Q.  Joe Eschleman?

146

1     A.  Yeah, Joe Eschleman.
2     Q.  Okay.  Anybody else?
3     A.  Not that I know of.  I'm not -- I don't know
4 what happened after I left.
5     Q.  To be sure I'm clear, excuse me for a minute,
6 I'm just -- you really didn't play any active role in
7 discretionary or administerial, you played no active
8 role for Hubbell in that 12-month period in the
9 transition?
10     A.  Never did, never returned to that office, you
11 know, when they had it, never did.
12     Q.  And to your knowledge, did Mr. Hinton or Mr.--
13 is it Jochen?
14     A.  I have no idea.
15     Q.  Do you have any knowledge, industry-type
16 knowledge, as of the date of the acquisition, what
17 Hubbell had done up to that point with regard to
18 manufacturing and marketing brake power modules?
19     A.  They had a lot of divisions.  They were a
20 major company.  I believe nine billion dollars at the
21 time, so they had a lot of different companies, were
22 very technical companies, but I don't know if they had
23 another division that offered braking modules.  I do not
24 know that.
25     Q.  Do you know anything about a company called

147

1 Cableform?
2     A.  I've heard of Cableform, yes.
3     Q.  Do you have any knowledge of Hubbell in the
4 couple of years preceding their negotiations with you,
5 attempting to get into the brake power module business
6 through their acquisition of Cableform?
7     A.  I don't even know what Cableform did, so I
8 have no idea.  I've never heard that.
9     Q.  Do you recall any conversation around the time
10 you were negotiating for the acquisition, of anyone
11 relating to you that Hubbell had failed in its efforts
12 to gain a marketing spot with Cableform?
13     A.  No, we never had that discussion.  They didn't
14 really seem that interested in the braking modules
15 because it's such a small portion of our business.  All
16 the sales and the profits were generated, the majority
17 of it, I mean, by far, was the resistors, and that's
18 what they wanted.
19     Q.  As of the time you departed PowerOhm following
20 the acquisition, what was the physical location and the
21 method of storage of the technical documentation for
22 your brake power module product line?
23     A.  I don't know what they did.  I have no idea.
24     Q.  When you walked out the door for the last
25 time, where was it located and who was in charge of it?

148

1     A.  Our server, I believe we had stopped using the
2 server because we went to the cloud because it was a
3 much better option, more dependable option, I believe.
4 So most of the drawings and all the tech -- all the e-
5 mails and technical information were on the cloud.
6     Q.  What person within your organization was
7 responsible for managing and accessing it?
8     A.  Well, as far as IT and managing the server and
9 everything, that was George Muntz.  He was an IT guy.
10 He set up the cloud --
11     Q.  Spell his last name.  I'm sorry, spell his
12 last name.
13     A.  Yeah, George Muntz; M-U-N-T-Z, Muntz.
14     Q.  M-U-N-T-Z, okay.
15     A.  Yes.  He still helps me with my company with
16 small things.  He's looking for a new laptop for me now,
17 so I'm still in contact with George.  He's living in
18 North Carolina -- or South Carolina.  I think it's North
19 Carolina.
20     Q.  Did he still on with Hubbell after you
21 departed?
22     A.  Yeah, but they had a huge IT department.  So
23 after a time, they didn't need George.  He went on --
24 he's doing really great.  He went on somewhere else.
25     Q.  Is there anyone that -- and I apologize.  You

149

1  may have answered this already. I just need to make
2  sure I'm understanding.
3      In your involvement with the acquisition and
4  the ultimate -- the transition, was there anyone within
5  Hubbell who claimed the primary role in its -- in
6  managing its interest in the brake power module line?
7  Was there any particular person or was it a group of
8  people?
9      A. I don't know. I have no idea.
10     Q. Did Andrew Thexton have technical expertise
11 with the brake power modules or was he an administrative
12 man?
13     A. I don't know. I never worked alongside of
14 him, you know. I met him in some meetings. When you're
15 selling a company, you usually meet with a group, and I
16 met him then. I don't know what he was good at. I have
17 no idea.
18     Q. Mr. Atchison tells me a story about a Mr.
19 Stewart Jang (phonetic) -- Jang coming to him shortly
20 before he was terminated and asking for duplication of
21 and additional technical documents pertaining to brake
22 power modules.
23     Do you have any knowledge of Mr. Jang being
24 dispatched by Andrew Thexton during that time frame?
25     A. I don't know anything about that time period.

150

1  I've said that already. I don't know who that man is.
2      Q. Do you know who Mr. Jang is?
3      A. No, I have no idea.
4      Q. Did PowerOhm, while under your -- under your
5  tutelage, did PowerOhm ever seek any type of patent
6  protection for any of its brake power module products?
7      A. Not to my knowledge. How can you patent
8  something that already exists?
9      Q. And tell me again, what is the factual basis
10 for your conclusion that these brake power module
11 devices -- the high-power standalone brake power module
12 devices were already in existence?
13     A. How do I know that?
14     Q. I'm sorry?
15     A. How do I know that?
16     Q. Yes, sir.
17     A. Well, because Bonitron, I believe they had a
18 2,000 amp module. And we even had an incident where one
19 of Tim's designs blew up a $60,000 AC drive, and we
20 wrote a check for that to avoid being sued, and they put
21 in a Bonitron module that worked right away. So they had
22 good products.
23     Q. So that brings me back to request another
24 clarification on your -- your description of power
25 electronics as being something that was sort of briefly

151

1  discussed in 2005 and 2006 and then -- then abandoned as
2  anything serious.
3      Can you clarify for me, identify any facts
4  that you may recall as to the -- to the reason for power
5  electronics being discussed as a -- even being discussed
6  from a threshold angle as a separate entity? What was
7  the need for it if it wasn't to develop the brake power
8  module separately?
9      A. Well, initially, we thought we would start
10 another division and we entertained that, but that
11 wasn't going to be an absolute. But we entertained
12 breaking into another division, one, so we could just
13 look at the books and how they're doing and keep that
14 separate, you know. But we weren't doing it to include
15 -- we never offered any ownership to any of those three
16 guys if we had started that business.
17     Q. Well, I understand that statement, but what I
18 am attempting to have you clarify, if you can, and that
19 may be your best answer. I'll move on if it is, but let
20 me clarify that I'm understanding you accurately.
21     Can you give me a factual description, if
22 PowerOhm -- let me back up. Strike that question.
23     As of 2006, PowerOhm is rocking along with its
24 -- its hired -- with its standard product line?
25     A. Correct.

152

1      Q. Standard product line. That product line does
2  not include brake power modules. Am I right so far, as
3  of 2006, 2007?
4      A. Before Tim came, we were not manufacturing any
5  braking modules. No, we were not.
6      Q. But there were discussions in 2006 and 2007
7  involving PowerOhm and Timothy Atchison about a new
8  division for some purpose.
9      What was that new division that would involve
10 Tennessee?
11     MR. BRADLEY: Objection. I believe it's 2005
12     and 2006.
13 BY MR. BURGER:
14     Q. With that correction, 2005, 2006, why are you
15 reaching out to a man who's not working to you yet, why
16 are there e-mail communications talking about financing
17 and a business plan on something that is nonexistent?
18     A. Well, because we were considering the idea, so
19 you have to discuss that. You don't start the company
20 and then start the business plan. I mean, you know what
21 I'm saying? We were discussing options. That's all it
22 was, and we were going back and forth and talking about
23 it and sending e-mails and everything else, and you see
24 those. We did discuss starting another -- another
25 location in Nashville and possibly separating as a

153

1  separate division, but we decided not to do that.
2      Q.  But in furtherance of whatever plan you had,
3  you brought Tim Atchison under the PowerOhm umbrella in
4  2008?
5      A.  We hired him as an employee in 2008 to design
6  braking modules.
7      Q.  And in subsequent communications, there
8  continued to be communications about power electronics
9  in as late of 2011?
10     A.  No, that's not true.
11     Q.  Well, how do you distinguish the words in the
12  e-mail that Mr. Bradley offered for you to review of
13  power electronics from the e-mails in 2005 and
14  2006?
15     A.  Are you referring to the one where Martin
16  Glover was over power electronics sales?
17     Q.  The vice president of power electronics.
18     A.  There was no separate division and never was
19  going to be at that time.  That was just, he was going
20  to focus on trying to sell those larger braking modules
21  because we weren't having a lot of success.
22     Q.  The distinction --
23     A.  That was a product line.  It was never a
24  division, never intended to be, neither was strategic
25  accounts.  That was not going to be a separate division.

154

1      Q.  So you were saying power electronics, even as
2  early as 2005 or 2006, it was never being discussed in
3  any possible scenario as a separate, discreet entity --
4  business entity?
5      A.  There was -- we were -- discussed throwing
6  that idea around in '5 -- 2005 and '6, but not after
7  that.
8      Q.  Give me just a minute here, please.
9          Where is Mr. Thexton located now, if you know?
10     A.  I have no idea.  I don't know anything about
11  that man.
12     Q.  Who was in charge of your bookkeeping
13  department at the time you left -- at the end of 2014,
14  who was in charge of the business department at
15  PowerOhm?
16     A.  Mostly Richard Jochen with the help of Daryl
17  Keller, outside consultant.
18     Q.  And what clerks worked under him at his
19  direction in actually computing the -- you don't like
20  the word -- the bonuses, whatever, however they're
21  characterized, and writing the checks, what person
22  physically did that?
23     A.  Well, Richard did payroll, so I assume he
24  wrote all the checks.
25     Q.  You said earlier, I believe, that that last

155

1  year -- excuse me, allergy -- that last year that you
2  were there, that the brake power modules generated about
3  a million dollars in gross sales.
4          Did I recall that correctly?
5      A.  I said it was less than a million.  I don't
6  know if it was 200,000 or 800.  I don't know, but it was
7  a small portion of our business.
8      Q.  You're not sure that it was close to a
9  million, is that what you're saying?
10     A.  Well, certainly not the BG series that Mr.
11  Atchison developed.  Now, the stuff we copied, those
12  were the big sellers, and we just copied -- Rockwell
13  gave us permission to copy those designs.  And Tim
14  altered some things, improved a couple little things,
15  but it was just the same.  It was a quick project.  He
16  got them done very quickly.
17     Q.  Was he working on anything other than brake
18  power modules in that last year of his work under your
19  supervision?
20     A.  Not to my knowledge.
21     Q.  If he claims that he got a 30,000-dollar
22  commission, as he describes it, for that year, for the
23  last year he was there, as 3 percent of a million
24  dollars, you would dispute that was commission, by
25  earlier testimony?

156

1      A.  His bonus -- we never did any kind of
2  commission or .03 calculations at all.  He was just
3  given a bonus.
4      Q.  But in that year preceding his termination, he
5  received both a raise and a bonus?
6          MR. BRADLEY:  Objection.  Assumes facts.
7      A.  I can't remember if he did -- I know he
8  received a bonus.  I'm not sure about a raise.  But I
9  think we gave raises to about every one of our good
10  employees that weren't the main guys, you know, the
11  product managers.  We took well -- good care of those
12  guys.
13  BY MR. BURGER:
14     Q.  Was he involved with something called, in the
15  addition to brake power modules, universal --
16         MR. BURGER:  Tim, what else did you do beside
17     the brake power modules?
18         MR. ATCHISON:  Generator modules.
19  BY MR. BURGER:
20     Q.  Do you remember his involvement with something
21  called generator modules for -- under the power
22  electronics department?
23     A.  Yeah, that's project -- that's the -- we
24  jumped in to help Phil Martin.  He was having issues
25  to acquire generator modules, so they turned over

157

1  all -- turned over all the information we needed for Tim
2  to design them, so Tim jumped in and designed a
3  duplicate. Which what I said was a mistake. It wasn't
4  supposed to be his focus. We just jumped in, okay, we
5  can do that at the same time we're going to develop this
6  braking module. But that slowed down the development of
7  the braking modules greatly.
8      Q. What did -- technically, would you distinguish
9  the generator module and the braking modules, laymen's
10  description, as best you can.
11     A. Well, the -- a braking modules is basically
12  the switch between the VFD and the resistor. It turns
13  the resistor on when a drive needs it to dissipate power
14  on the bust, the DC's bust that's internal to the drive.
15      And the motherboard and the braking module
16  identifies when it's needed and turns it on until it
17  doesn't need it. And the generator -- I didn't know
18  much about the generator modules other than the fact
19  that they controlled some generator they had at these
20  fracking rigs. I knew nothing about those things.
21     Q. Within your organization, within the PowerOhm
22  organization, who would you identify for me as witnesses
23  who would corroborate that power electronics was never
24  pursued as a separate entity?
25     A. Well, Vance Richard for one. They would have

158

1  been involved in that. I can't really think of anyone -
2  - you know, that decision would have been made by us,
3  and actually, I wanted to start a location in Nashville.
4  It didn't have to be a separate division, but that was -
5  - I was voted against. And every time we vote as a
6  three, two to one, it's two to one not to start it.
7      Q. To be sure I'm clear, neither of them or no
8  one on their behalf has ever clarified to you why it was
9  continued to be recorded in the business division at
10  Nashville for the -- for the state of Tennessee as --
11  during the presence here as a separate entity with this
12  man behind me being registered agent?
13     MR. BRADLEY: Objection. Assumes facts not in
14  evidence.
15  BY MR. BURGER:
16     Q. Okay. Go ahead.
17     A. Yeah, I have no idea. I don't -- I didn't
18  even know that was being done, to be honest. I don't
19  know if that's something Keller did and it cost us $20
20  or something. I don't know. But we were never going
21  back to Nashville to manufacturer ever, so I don't know
22  why they would -- that was to register PowerOhm
23  Resistors -- correct? -- in the state of Tennessee.
24  Nothing to do with power electronics. Nothing was ever
25  established in Tennessee or Texas or anywhere, Kentucky,

159

1  for power electronics. We never set up any -- anything.
2      Q. There were never any corporate minutes that
3  you're aware of within your organization that discussed
4  its involvement with Tennessee, PowerOhm's involvement
5  with Tennessee?
6      A. Not after 2006.
7      Q. Where were the corporate minutes for your
8  organization when you last saw them?
9      A. Those were pretty -- we, you know -- corporate
10  minutes, yeah, I don't know. Vance Hinton would be the
11  guy to ask that question. He was responsible for
12  corporate minutes.
13     Q. May I take five minutes, and I'll be right
14  back?
15     A. Sure. I want to take a little break. I got
16  to go to the bathroom.
17     VIDEOGRAPHER: Okay. We are going off the
18  record at 1:56 p.m., Eastern.
19     (Recess.)
20     VIDEOGRAPHER: We are back on the record. The
21  time is 2:06 p.m., Eastern. Go ahead, sir.
22  BY MR. BURGER:
23     Q. With regard to the digital storage of the
24  technical materials and the office documents, do you
25  have any knowledge or recollection of Mr. Atchison and

160

1  Tom Yingling running a cable from your main server in
2  the big building over to the house that you're talking
3  about and utilizing that cable to store the materials
4  from the little building in the main server?
5      A. Yeah, we ran a -- we actually ran a cable over
6  there from -- to see you -- yeah, you could tie it
7  directly to our server.
8      Q. So whatever materials were generated in -- on
9  -- by Mr. Atchison in the Louisville house, the Ohm
10  house as he calls it, that material that was generated
11  on the computer there, was then transferred to the
12  server, and later uploaded to the cloud. Am I following
13  that description correctly?
14     A. That's how it kind of worked, yeah. We
15  initially had a server and transferred everything to the
16  cloud, and he had access to be able to tap in and get
17  drawings or documents off of the server from the house.
18     Q. Okay. And again, who prepared the tax returns
19  for PowerOhm in the last few years that you were there?
20     A. Combination of Richard Jochen and mostly Daryl
21  Keller.
22     Q. Is Daryl Keller an employee or an independent
23  CPA?
24     A. Just an independent CPA. We never employed
25  him directly.

161

1    Q.   In the Cincinnati/Covington area?

2    **A.   No, he's based out of Texas.**

3    Q.   Do you know which city he was in?

4    **A.   Yeah, he's out of Katy, I believe.**

5    Q.   Those are all of my questions.  Thank you.

6    **A.   All right.  Thank you for your time.**

7    Q.   Well, thank you for your time.

8    **A.   All right.**

9        MR. BRADLEY:  I have no redirect.  Thank you,

10   Madame Reporter.  Thank you, Madame Recorder.

11       Thank you for your time today.

12       THE WITNESS:  No problem.

13       VIDEOGRAPHER:  This marks the end of the

14   deposition of Michael D. Crowe.  We are going off

15   the video record at 2:09 p.m. Eastern.

16       (DEPOSITION CONCLUDED AT 2:09 P.M. EASTERN)

17

18

19

20

21

22

23

24

25

162

1        CERTIFICATE OF REPORTER

2        COMMONWEALTH OF KENTUCKY AT LARGE

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof by me after first

7    being duly sworn to testify the truth, the whole truth,

8    and nothing but the truth; and that the said matter was

9    recorded stenographically and mechanically by me and

10   then reduced to typewritten form under my direction, and

11   constitutes a true record of the transcript as taken,

12   all to the best of my skill and ability.  I certify that

13   I am not a relative or employee of either counsel, and

14   that I am in no way interested financially, directly or

15   indirectly, in this action.

16

17

18

19

20

21

22   ALLISON WOLFF, RPR

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES:  06/15/2027

25   SUBMITTED ON:  06/23/2025

## A

a)(1
82:4
**abandoned**
151:1
**ability**
9:2, 162:12
**able**
8:11, 9:8,
9:21, 51:21,
56:14, 86:20,
89:5, 160:16
**about**
5:25, 9:12,
12:20, 13:16,
25:5, 25:7,
25:9, 27:9,
28:22, 28:25,
29:3, 29:4,
29:10, 29:21,
32:14, 32:15,
34:5, 34:7,
39:7, 45:3,
48:6, 55:4,
57:8, 58:20,
69:13, 72:6,
77:12, 79:6,
79:8, 85:23,
86:20, 91:20,
95:13, 99:17,
100:15, 101:3,
104:19, 109:5,
109:21, 109:22,
110:8, 112:16,
113:11, 113:16,
113:20, 119:7,
119:10, 121:12,
121:14, 121:15,
121:19, 121:21,
121:23, 122:25,
123:4, 124:11,
125:9, 127:22,
133:21, 135:7,
141:13, 145:5,
145:12, 146:25,
149:18, 149:25,
152:7, 152:16,

152:22, 153:8,
154:10, 155:2,
156:8, 156:9,
157:18, 157:20,
160:3
**above**
40:6
**above-named**
105:2, 106:11,
107:20
**abrupt**
86:6
**abruptly**
86:15, 110:3,
111:3
**absolute**
151:11
**absolutely**
33:13, 33:16,
33:18, 34:22,
35:5, 36:8,
39:23, 44:6,
47:25, 48:3,
51:23, 52:14,
53:15, 55:6,
55:20, 60:18,
76:2, 77:17,
77:23, 86:25,
96:19, 102:10,
108:7, 116:15,
130:17, 145:14
**ac**
18:22, 92:10,
93:8, 93:17,
94:1, 96:14,
150:19
**acceptance**
21:19
**access**
10:11, 160:16
**accessing**
148:7
**accolades**
110:23
**accomplish**
32:19
**according**
132:10

**account**
115:20
**accountant**
81:7, 124:22
**accounting**
90:1, 115:16,
116:1, 143:1
**accounts**
153:25
**accurate**
57:17, 98:23
**accurately**
151:20
**achieve**
61:12
**achieved**
142:20
**acquiescence**
122:1
**acquire**
156:25
**acquisition**
106:24, 128:19,
134:9, 135:3,
135:24, 139:22,
143:4, 143:9,
145:18, 146:16,
147:6, 147:10,
147:20, 149:3
**across**
114:23
**act**
80:15
**action**
1:3, 3:10, 5:8,
25:18, 162:15
**active**
146:6, 146:7
**actual**
40:17, 80:5,
128:23
**actually**
14:7, 16:8,
28:23, 31:20,
50:14, 62:3,
69:5, 70:1,
72:8, 77:7,
81:9, 94:8,

97:23, 112:10,
122:20, 126:5,
154:19, 158:3,
160:5
**add**
129:10
**added**
37:4
**adding**
31:3
**addition**
156:15
**additional**
108:21, 149:21
**address**
6:7, 6:10, 7:5,
9:17, 14:21,
16:9, 72:23,
78:15, 78:16,
84:25, 95:9
**addressed**
125:1, 125:2
**addresses**
144:3
**adjacent**
76:9
**administerial**
146:7
**administrative**
140:17, 149:11
**advance**
67:19
**adverse**
46:9
**advised**
104:12
**affect**
9:2
**affiliate**
41:14, 41:21,
42:4, 42:18,
43:21, 55:13
**affiliated**
43:7, 126:15,
130:16, 131:1,
136:5, 136:12
**affiliates**
67:18

**affirm**
5:24, 76:14,
76:19
**affirming**
76:7, 109:1,
109:17
**affirms**
129:25
**after**
10:20, 11:11,
11:22, 29:14,
31:12, 32:20,
37:22, 75:5,
78:24, 86:7,
89:9, 92:9,
108:9, 111:15,
114:1, 114:13,
124:11, 128:3,
133:3, 134:9,
135:2, 139:21,
140:24, 143:9,
146:4, 148:20,
148:23, 154:6,
159:6, 162:6
**afternoon**
73:22, 120:11
**again**
16:16, 24:23,
26:16, 41:8,
82:18, 87:23,
89:22, 91:22,
99:2, 102:4,
102:8, 102:13,
103:1, 103:5,
103:9, 103:25,
104:2, 108:22,
110:3, 113:22,
120:1, 120:11,
121:22, 129:21,
136:7, 150:9,
160:18
**against**
6:20, 78:7,
116:4, 158:5
**agent**
78:14, 79:4,
79:7, 79:8,
126:11, 126:18,

126:24, 127:1,
127:5, 127:11,
133:12, 136:14,
158:12
**agents**
105:2, 136:6
**ago**
9:13, 18:7,
25:1, 114:4,
124:7
**agree**
35:3, 57:5,
67:12, 92:19,
109:19, 138:23,
144:24
**agreed**
4:10, 103:5,
109:1, 109:18,
143:14
**agreement**
3:16, 28:4,
35:11, 35:18,
35:22, 36:1,
36:3, 36:11,
37:21, 38:7,
42:9, 44:22,
45:11, 45:16,
51:19, 53:9,
53:24, 55:12,
56:24, 57:11,
57:24, 59:18,
59:23, 60:4,
60:13, 60:19,
66:12, 66:19,
66:22, 67:10,
68:1, 68:16,
97:24, 98:8,
102:5, 114:8,
136:21, 142:19,
144:1, 144:3,
144:13
**agreements**
38:4, 45:7,
45:18, 69:4,
109:5
**agrees**
67:17
**ahead**
97:4, 103:22,

115:11, 158:16,
159:21
**ahfeld**
63:22
**all**
9:23, 10:9,
10:15, 14:13,
15:21, 19:1,
25:8, 26:23,
26:25, 28:20,
30:22, 32:20,
33:1, 33:9,
34:20, 37:12,
38:23, 40:1,
40:3, 53:5,
53:12, 53:19,
53:20, 56:3,
56:19, 57:1,
57:7, 58:24,
59:11, 63:1,
64:1, 64:15,
69:15, 72:6,
74:1, 82:25,
85:18, 88:10,
94:12, 99:4,
99:11, 99:17,
101:20, 103:14,
107:8, 107:9,
109:23, 115:12,
116:2, 119:14,
119:25, 120:21,
121:1, 121:24,
123:6, 123:15,
123:23, 126:8,
129:23, 130:17,
134:1, 135:19,
137:25, 138:3,
140:23, 143:2,
143:21, 143:24,
144:25, 145:9,
147:15, 148:4,
152:21, 154:24,
156:2, 157:1,
161:5, 161:6,
161:8, 162:12
**allegation**
74:4, 107:4
**allegations**
97:16, 141:7

**alleged**
82:12
**alleges**
86:12, 107:18
**alleging**
54:16
**allen**
1:6, 2:3, 5:5,
17:18
**allergy**
155:1
**allison**
1:25, 4:10,
5:21, 162:22
**allow**
9:23
**allowance**
59:19, 60:2,
98:5
**allowed**
136:22
**almost**
17:25, 94:24,
108:20
**along**
13:25, 76:4,
107:5, 107:10,
113:19, 143:3,
151:23
**alongside**
149:13
**already**
6:16, 23:7,
23:21, 31:14,
73:5, 88:8,
95:8, 103:11,
149:1, 150:1,
150:8, 150:12
**also**
2:22, 14:10,
20:24, 49:19,
60:12, 76:18,
83:20, 86:11,
121:21, 136:17,
140:21, 143:7
**altered**
155:14
**alternative**
38:20

**although**
104:12
**aluminum**
31:23
**always**
50:13, 61:12,
62:6, 68:8,
101:22, 101:23,
128:14, 129:6,
129:8, 140:7
**among**
142:22
**amount**
140:24, 144:7
**amp**
32:6, 125:16,
150:18
**amps**
32:7
**andrew**
105:3, 105:7,
105:18, 145:20,
145:21, 149:10,
149:24
**angel**
63:22
**angle**
151:6
**annexed**
15:13, 16:9
**annual**
13:17, 40:8,
56:11, 102:15,
104:4
**another**
16:22, 24:1,
29:7, 35:20,
49:17, 68:22,
70:1, 75:6,
79:1, 107:6,
110:18, 113:14,
123:8, 146:23,
150:23, 151:10,
151:12, 152:24
**answer**
8:11, 8:21,
9:3, 9:7, 9:8,
9:22, 108:12,

126:6, 134:25,
136:24, 139:8,
151:19
**answered**
15:24, 109:11,
113:10, 143:14,
149:1
**anybody**
133:21, 146:2
**anyhow**
86:3
**anymore**
40:11, 64:5
**anyone**
28:8, 28:10,
123:25, 125:18,
125:19, 126:17,
133:10, 133:16,
141:5, 143:22,
144:18, 147:10,
148:25, 149:4,
158:1
**anything**
10:10, 30:6,
30:8, 34:5,
57:5, 60:16,
82:23, 85:11,
85:23, 89:17,
108:17, 108:18,
109:17, 120:15,
120:21, 124:23,
127:22, 130:7,
144:2, 144:20,
146:25, 149:25,
151:2, 154:10,
155:17, 159:1
**anywhere**
158:25
**apart**
37:16
**apologize**
148:25
**apparently**
111:22
**appear**
36:17, 131:17
**appearances**
2:1

**appeared**
2:10
**appears**
27:19, 39:3,
97:18, 101:8,
103:1, 103:9,
103:25, 104:21,
108:22, 108:25
**application**
12:9, 18:24,
80:8
**applications**
12:11
**applies**
80:17
**apply**
81:18
**apprized**
104:14, 110:25
**appropriate**
60:2
**approximately**
4:6, 74:21
**approximation**
122:25
**april**
27:14
**archdale**
69:16, 69:20,
69:21, 111:15,
112:10, 112:13,
134:17, 134:19,
134:20, 135:14,
135:18
**area**
47:14, 161:1
**arise**
102:22
**around**
18:5, 18:6,
29:11, 33:6,
47:14, 147:9,
154:6
**arrange**
67:20
**arranged**
78:12
**arrangement**
42:5, 43:20,

43:21, 55:14,
57:25, 74:25,
102:14, 122:5,
144:21
**arrangements**
45:7
**article**
38:1, 38:2,
50:21, 51:5
**asap**
115:18
**asia**
61:22
**aside**
35:6, 113:3
**asked**
21:14, 65:20,
78:24, 79:1,
113:12, 126:5,
131:25
**asking**
10:5, 52:10,
80:2, 126:14,
149:20
**asserted**
44:9
**asset**
82:19
**assets**
44:1, 45:13,
51:15, 53:2,
53:5, 53:7,
53:12, 106:10,
107:19
**assigned**
129:4, 129:16,
130:2
**assist**
84:1, 143:10,
144:21
**assistance**
145:3
**assisted**
20:25
**assisting**
120:13
**associates**
12:19

association
22:20, 52:6
assume
9:8, 24:25,
25:3, 105:11,
113:20, 121:11,
124:20, 137:12,
154:23
assumes
125:3, 126:19,
133:18, 133:24,
156:6, 158:13
assumption
124:21
assurances
101:14, 101:19
assured
110:22, 111:16
atchison
1:6, 2:3, 2:22,
5:5, 5:19, 6:17,
6:20, 9:25,
17:18, 17:20,
18:1, 20:22,
20:25, 22:25,
25:3, 29:18,
30:4, 30:14,
31:5, 34:17,
34:24, 44:7,
44:8, 47:24,
48:1, 54:4,
54:23, 54:24,
55:18, 56:22,
59:18, 60:14,
60:20, 64:6,
65:9, 70:24,
73:10, 73:12,
74:5, 74:9,
74:25, 75:9,
76:8, 77:8,
77:11, 78:12,
82:12, 82:19,
84:19, 86:7,
88:7, 89:18,
90:24, 97:23,
108:5, 109:5,
110:12, 113:6,
115:22, 116:16,

116:21, 117:1,
120:13, 121:12,
121:25, 123:19,
124:1, 126:17,
127:11, 129:11,
129:16, 129:25,
130:14, 133:11,
134:8, 135:2,
137:2, 137:21,
138:4, 138:12,
138:19, 141:8,
142:1, 142:3,
149:18, 152:7,
153:3, 155:11,
156:18, 159:25,
160:9
atchison's
20:9, 74:19,
76:8, 78:14,
85:19, 88:5,
88:20, 89:14,
131:18, 145:6
atchison-conceiv-
ed
74:18, 77:17
ate
25:9
attached
42:16, 106:20
attachment
58:9
attempting
21:2, 132:13,
147:5, 151:18
attendance
73:11
attended
10:23
attorney
8:22
attorneys
41:18
august
10:7
authority
51:14, 80:8,
80:11, 80:18
authorizations
45:8

auto
133:4, 133:5
automatic
21:18
av
18:22
available
37:15, 131:22,
142:12, 143:13
avenue
2:16
avoid
150:20
aware
76:5, 86:13,
90:3, 105:3,
112:2, 115:3,
126:24, 159:3
away
19:2, 32:12,
60:3, 150:21

**B**

b
53:19, 54:5
b1
99:13
bachelor's
11:4
back
9:14, 10:4,
11:13, 14:6,
14:15, 26:21,
27:22, 33:1,
35:7, 44:18,
46:3, 47:6,
66:7, 66:10,
73:4, 73:24,
82:4, 83:12,
84:13, 85:2,
90:12, 90:13,
93:18, 97:12,
106:1, 126:4,
137:23, 139:10,
140:22, 142:8,
143:16, 150:23,
151:22, 152:22,
158:21, 159:14,

159:20
backdoor
108:17
backdrop
76:6
background
10:18
backup
67:13
bad
26:23, 76:16
ball
142:23
bank
16:21, 21:4,
21:12, 21:14,
38:21, 100:22,
125:23, 125:24,
126:1, 126:5
banks
16:20, 17:1,
28:13, 51:25,
52:21, 65:3,
100:19, 114:3,
114:7, 114:9,
114:14, 119:12,
123:9, 123:10,
134:4, 135:21,
136:2, 136:6,
136:9, 136:13,
136:23, 143:18
barely
26:15
bargaining
57:23
base
77:16, 98:2
based
12:2, 12:19,
15:21, 60:9,
62:3, 88:21,
88:22, 94:20,
123:2, 123:4,
128:10, 143:5,
161:2
basic
26:20, 48:14,
93:10, 94:12,

110:24
**basically**
12:15, 18:13,
18:16, 19:4,
19:8, 20:5,
21:8, 22:21,
26:19, 31:22,
32:14, 34:10,
36:15, 40:3,
40:6, 58:25,
69:19, 70:4,
98:1, 157:11
**basis**
89:16, 115:13,
121:6, 137:17,
150:9
**bates**
37:5
**bathroom**
66:1, 159:16
**bear**
82:6, 129:15,
132:2, 132:3
**became**
29:15, 68:25,
91:16, 105:3,
118:8
**because**
7:24, 10:11,
15:20, 16:4,
16:9, 17:15,
18:25, 21:7,
22:6, 23:17,
29:21, 31:1,
32:20, 36:11,
40:1, 40:5,
40:6, 41:22,
47:8, 47:15,
47:16, 49:10,
50:9, 51:22,
59:24, 61:12,
64:16, 64:19,
65:2, 68:18,
69:4, 75:6,
75:13, 76:22,
79:4, 83:14,
85:24, 87:6,
89:6, 91:6,

101:8, 102:23,
105:17, 112:13,
112:23, 115:17,
115:20, 115:24,
115:25, 118:4,
118:10, 118:15,
122:21, 123:11,
125:15, 129:8,
133:5, 140:12,
147:15, 148:2,
150:17, 152:18,
153:21
**become**
99:24
**bedrooms**
48:12
**been**
7:12, 14:9,
18:3, 23:17,
25:1, 41:3,
53:3, 54:23,
56:24, 60:6,
64:13, 64:14,
65:22, 83:23,
86:2, 87:17,
88:25, 98:4,
98:6, 98:8,
110:25, 121:9,
123:4, 125:21,
127:4, 128:2,
133:12, 140:11,
145:23, 158:1,
158:2
**before**
7:12, 9:17,
19:18, 19:21,
19:25, 31:20,
44:23, 47:7,
47:15, 77:7,
77:9, 79:15,
79:17, 81:12,
82:1, 82:17,
82:19, 92:2,
92:3, 97:15,
104:5, 104:7,
122:19, 132:5,
132:15, 132:16,
133:1, 134:8,

134:10, 142:1,
142:3, 142:8,
149:20, 152:4
**began**
110:5
**beginning**
74:20
**begins**
5:3
**behalf**
2:3, 2:12,
124:17, 127:16,
127:24, 158:8
**behind**
47:2, 140:7,
158:12
**being**
4:10, 24:6,
24:15, 50:3,
51:16, 68:4,
73:25, 88:22,
89:7, 89:17,
95:24, 125:9,
126:24, 130:9,
131:7, 132:1,
132:17, 138:11,
144:3, 149:23,
150:20, 150:25,
151:5, 154:2,
158:12, 158:18,
162:7
**belief**
34:24
**believe**
12:13, 13:3,
13:19, 15:3,
31:18, 34:20,
39:7, 39:11,
39:15, 40:13,
53:11, 59:15,
61:10, 63:17,
64:12, 69:12,
69:23, 71:25,
73:20, 75:4,
77:6, 77:21,
86:22, 90:15,
92:18, 97:19,
100:8, 100:17,

103:5, 111:21,
113:10, 114:21,
134:17, 134:21,
139:11, 144:25,
145:2, 146:20,
148:1, 148:3,
150:17, 152:11,
154:25, 161:4
**believed**
44:8, 51:22,
54:6, 54:21,
56:22, 68:11,
76:4, 82:8
**believing**
107:16
**below**
64:24, 122:20,
145:21
**benefit**
45:23, 57:13,
57:18, 57:22,
58:17, 58:18,
106:14, 107:23
**benefits**
58:3, 98:3
**beside**
156:16
**besides**
19:20
**best**
100:2, 122:17,
151:19, 157:10,
162:12
**better**
16:4, 118:14,
148:3
**between**
18:20, 19:23,
29:25, 31:3,
34:23, 35:2,
35:11, 59:25,
60:20, 62:15,
63:8, 99:16,
101:5, 115:4,
122:15, 131:2,
131:7, 131:18,
140:5, 157:12
**beyond**
101:1

**bg**
32:7, 32:24,
39:22, 40:20,
40:23, 40:24,
98:24, 115:11,
116:23, 124:5,
129:2, 129:6,
129:7, 129:12,
129:23, 132:2,
132:16, 155:10
**big**
32:3, 39:14,
40:23, 58:11,
91:9, 96:14,
100:11, 111:20,
118:10, 118:16,
118:17, 125:16,
129:3, 129:4,
129:8, 155:12,
160:2
**bill's**
121:1
**billion**
111:20, 146:20
**binding**
45:12, 58:2
**bipolar**
18:16
**bit**
14:21, 15:2,
20:5, 23:20,
31:21, 36:9,
37:10, 39:14,
41:21, 48:11,
71:22, 118:9,
133:3, 140:11,
142:13
**blah-blah-blah**
110:15, 119:13
**blew**
150:19
**block**
129:19
**blood**
9:5
**board**
34:7, 130:6
**boards**
32:16

**body**
21:1, 23:5,
25:20, 66:19,
90:13
**bolded**
38:25
**bolts**
130:7
**bonitron**
17:23, 20:23,
29:2, 29:17,
49:17, 49:18,
59:15, 71:11,
71:19, 71:24,
72:1, 72:3,
72:4, 72:25,
73:1, 73:2,
73:10, 75:3,
75:14, 83:24,
90:25, 91:7,
91:12, 93:8,
94:19, 99:6,
101:24, 102:2,
132:11, 150:17,
150:21
**bonitron's**
18:9
**bonus**
57:21, 58:24,
59:6, 60:9,
60:24, 61:4,
61:7, 61:19,
62:15, 63:9,
65:7, 65:16,
96:3, 98:10,
122:9, 156:1,
156:3, 156:5,
156:8
**bonuses**
61:13, 62:7,
94:20, 122:8,
154:20
**bookkeeping**
154:12
**books**
151:13
**boost**
119:5

**boss**
137:13
**both**
8:4, 9:5, 14:9,
71:20, 92:15,
92:21, 105:4,
111:5, 112:18,
140:20, 156:5
**bottom**
24:3, 26:22,
37:1, 38:16,
42:14, 45:23,
85:13, 86:6,
104:11, 106:8,
109:8, 109:13,
117:22
**bought**
15:1, 29:22,
32:5, 35:19,
47:15, 47:20,
47:21, 47:24,
60:3, 77:7,
77:9, 85:8
**boulevard**
4:5, 5:14
**bound**
37:12, 144:20
**box**
20:9
**boy**
138:14
**bpm**
71:9, 74:6,
74:18, 77:17,
78:1, 85:19,
86:12, 88:5,
88:8, 89:14,
91:16, 95:5,
105:2, 131:15,
131:17
**bradley**
2:14, 3:4,
5:17, 6:5, 6:15,
7:3, 7:5, 7:7,
7:11, 19:14,
19:16, 22:13,
25:15, 35:16,
37:14, 37:19,

37:20, 56:14,
56:19, 56:21,
66:2, 66:9,
67:5, 70:20,
79:13, 79:18,
87:13, 87:16,
89:11, 96:22,
97:2, 97:7,
97:14, 117:7,
117:11, 119:17,
119:22, 119:25,
120:4, 120:15,
124:7, 125:3,
125:7, 126:19,
131:14, 132:20,
133:14, 133:18,
133:24, 135:9,
135:12, 139:10,
139:13, 141:15,
152:11, 153:12,
156:6, 158:13,
161:9
**brake**
32:24, 53:14,
82:13, 128:17,
128:22, 130:1,
130:10, 131:16,
134:11, 135:6,
141:20, 142:4,
142:7, 146:18,
147:5, 147:22,
149:6, 149:11,
149:21, 150:6,
150:10, 150:11,
151:7, 152:2,
155:2, 155:17,
156:15, 156:17
**braking**
15:19, 17:11,
18:10, 18:11,
18:13, 19:3,
19:8, 20:21,
29:24, 31:2,
31:9, 31:13,
32:6, 32:11,
33:11, 34:4,
34:5, 38:18,
38:21, 39:20,

40:4, 40:9,
44:4, 44:14,
52:14, 57:9,
62:20, 62:21,
63:2, 63:17,
64:7, 64:11,
68:13, 69:14,
69:24, 72:1,
72:4, 72:8,
72:10, 75:9,
75:11, 75:13,
75:17, 88:10,
88:23, 89:1,
89:3, 90:2,
90:25, 91:8,
91:13, 92:5,
93:23, 93:25,
94:9, 96:13,
99:2, 99:3,
99:5, 99:23,
100:6, 108:13,
113:22, 115:3,
115:7, 116:8,
116:17, 116:23,
119:6, 125:13,
130:5, 130:18,
132:8, 132:10,
134:3, 134:5,
139:6, 140:12,
142:10, 146:23,
147:14, 152:5,
153:6, 153:20,
157:6, 157:7,
157:9, 157:11,
157:15

**break**
8:13, 8:14,
8:16, 36:23,
65:24, 66:3,
92:9, 92:13,
95:5, 96:20,
96:23, 97:2,
97:4, 97:5,
97:15, 159:15

**breaking**
151:12

**breaks**
9:21

**breezed**
120:25

**brent**
63:23, 64:2,
64:7

**briefed**
105:1

**briefly**
105:19, 150:25

**bring**
32:23, 145:9

**brings**
150:23

**broad**
122:25, 131:13

**broadest**
139:20, 139:23

**broadly**
140:16

**brother**
48:8, 49:16,
84:12, 85:4,
85:6

**brother-in**
85:14

**brother-in-law**
85:16

**brought**
91:14, 153:3

**bs**
11:6

**build**
47:9, 93:20,
116:1, 116:17,
116:22, 130:18

**building**
14:22, 15:1,
29:22, 30:10,
30:25, 47:2,
47:5, 47:7,
47:16, 50:14,
68:6, 69:2,
69:4, 69:10,
77:10, 114:7,
123:8, 123:10,
134:5, 160:2,
160:4

**built**
15:8, 33:11,

33:13, 72:8,
72:13, 115:10,
115:11, 123:10

**bumped**
122:23

**bunch**
33:2

**burger**
2:4, 2:5, 3:5,
3:20, 5:19,
6:17, 7:5, 7:9,
9:17, 37:15,
37:18, 87:18,
96:25, 119:19,
119:24, 120:5,
120:7, 120:10,
120:12, 126:21,
127:2, 132:21,
133:15, 133:20,
134:7, 139:17,
152:13, 156:13,
156:16, 156:19,
158:15, 159:22

**business**
3:11, 3:13,
13:10, 18:9,
21:9, 21:12,
21:15, 24:7,
24:8, 24:15,
24:17, 24:19,
26:9, 26:12,
26:15, 26:20,
26:24, 28:24,
29:10, 30:7,
38:11, 38:22,
38:25, 39:3,
39:4, 40:16,
40:19, 43:18,
43:20, 44:1,
44:4, 44:19,
44:24, 45:13,
50:3, 51:15,
53:4, 53:21,
65:14, 68:18,
74:19, 76:7,
76:15, 77:2,
78:14, 80:15,
80:18, 81:18,

87:25, 95:6,
100:18, 100:21,
103:12, 103:16,
106:21, 110:6,
110:9, 113:13,
113:15, 116:8,
118:14, 118:17,
122:22, 124:10,
124:18, 126:11,
127:19, 127:23,
128:4, 128:9,
128:11, 128:12,
128:15, 135:25,
136:18, 137:6,
140:15, 141:19,
142:12, 144:11,
147:5, 147:15,
151:16, 152:17,
152:20, 154:4,
154:14, 155:7,
158:9

**bust**
157:14

**busy**
25:9, 48:9

**button**
120:8

**buy**
47:17, 47:19,
72:1

**buyer**
50:23, 51:9,
64:17, 69:8

**buzzed**
20:4

---
**C**
---

**c**
49:24, 66:25

**c-r-o-w-e**
6:9

**cabinets**
48:13

**cable**
160:1, 160:3,
160:5

**cableform**
147:1, 147:2,

147:6, 147:7,
147:12
**cad**
133:4, 133:5
**calculations**
156:2
**california**
121:21, 121:22
**call**
8:15, 16:3,
40:24, 92:6,
94:7, 129:7
**called**
17:13, 18:15,
29:7, 37:4,
52:17, 82:22,
107:14, 113:10,
118:2, 129:8,
129:19, 141:17,
144:5, 146:25,
156:14, 156:21
**calling**
91:5, 95:11,
119:2
**calls**
12:8, 92:25,
93:3, 135:9,
160:10
**came**
31:1, 33:1,
36:1, 47:6,
48:17, 49:8,
84:12, 107:5,
110:13, 112:21,
132:5, 142:1,
142:3, 152:4
**can't**
7:21, 9:25,
14:20, 15:2,
31:18, 37:16,
41:19, 49:19,
63:21, 64:4,
64:7, 83:13,
89:24, 105:17,
107:14, 112:12,
119:3, 119:20,
119:22, 120:4,
129:18, 156:7,

158:1
**canadian**
22:19
**cancel**
29:6
**capacitors**
15:9
**capacity**
136:6
**capital**
21:3, 45:13,
52:4, 126:6
**capture**
142:12
**car**
60:2, 60:3,
98:4
**care**
156:11
**carolina**
69:16, 148:18,
148:19
**carried**
61:11, 61:17,
123:13, 142:23
**carry**
51:15
**case**
71:6, 131:14
**catch**
56:14
**categories**
40:2
**catholic**
10:23
**cause**
67:18
**causes**
8:5
**cell**
101:3
**center**
4:4, 5:14
**certain**
64:9, 98:3,
124:3, 134:16,
140:24
**certainly**
8:16, 36:1,

94:21, 100:5,
108:14, 131:8,
137:15, 155:10
**certificate**
80:8, 80:11,
80:18, 162:1
**certification**
22:19
**certified**
3:18, 22:19,
79:20, 80:4
**certifies**
22:22
**certify**
162:4, 162:12
**cetera**
42:12
**chain**
137:18, 145:21
**chance**
20:2, 36:20,
56:4, 134:16
**change**
57:20, 117:23
**changed**
109:9
**character**
45:11, 46:13
**characteristics**
18:22
**characterized**
154:21
**charge**
61:21, 64:3,
145:16, 147:25,
154:12, 154:14
**charges**
46:10
**charlie**
75:3
**chart**
27:13
**chase**
93:25, 125:17
**cheaper**
49:10, 72:9
**cheat**
108:17

**check**
150:20
**checked**
26:5, 30:10
**checks**
154:21, 154:24
**china**
61:22
**chinese**
61:23
**chopper**
98:25, 99:1,
99:2, 99:8
**chris**
134:18
**cincinnati**
114:16, 114:18,
161:1
**circumstances**
48:4, 113:8
**city**
121:20, 161:3
**civil**
1:3, 3:9, 4:8,
5:8
**claim**
103:3
**claimed**
149:5
**claims**
46:9, 90:19,
121:12, 134:8,
138:21, 155:21
**clarification**
41:22, 67:3,
89:10, 120:16,
124:6, 150:24
**clarified**
158:8
**clarifies**
87:19
**clarify**
9:14, 56:3,
129:25, 135:22,
139:3, 151:3,
151:18, 151:20
**clarity**
8:4, 8:11,

clause
92:14
clauses
43:21
clear
53:12, 59:1,
122:4, 146:5,
158:7
clerks
154:18
click-wrap
56:11
close
12:22, 22:5,
70:13, 155:8
closed
47:15
closing
67:17, 70:3
cloud
148:2, 148:5,
148:10, 160:12,
160:16
co-op
49:15
coating
115:21
code
6:12
coined
99:9
cold
28:17, 29:5
cole
2:15
collaboration
95:3, 95:17,
96:7
collated
25:19
collateral
95:2, 111:6
collect
68:16, 68:17
collected
37:8, 68:8,
116:21

collecting
37:6
collective
57:22
collectively
67:14
college
59:13
com
2:20, 117:16,
117:17
combination
160:20
come
35:6, 46:3,
48:18, 49:2,
49:5, 49:19,
68:15, 121:18,
129:11, 143:16
comes
107:7
comfortable
96:25, 120:17
coming
20:9, 76:22,
87:6, 113:21,
118:11, 130:7,
134:22, 149:19
command
137:18, 145:22
commenced
89:18
commencing
88:3
commission
65:8, 65:10,
65:15, 94:12,
95:14, 96:1,
96:2, 143:5,
155:22, 155:24,
156:2, 162:24
commissions
65:12, 65:13,
65:17, 84:10,
94:22, 102:21,
111:4, 112:17,
112:23, 112:24,
112:25

commitments
45:8
common
99:1
commonwealth
162:2
communicating
23:20, 68:19,
120:19
communication
73:3
communications
152:16, 153:7,
153:8
companies
69:17, 118:7,
135:15, 146:21,
146:22
company
10:14, 10:16,
11:16, 11:17,
13:13, 14:10,
16:22, 22:21,
24:22, 33:12,
33:13, 33:15,
33:17, 33:21,
34:18, 36:2,
37:25, 44:8,
44:9, 44:15,
48:9, 51:23,
52:13, 52:17,
53:10, 68:11,
105:19, 111:21,
113:15, 114:11,
116:21, 124:1,
124:17, 124:18,
128:18, 143:3,
143:6, 143:7,
143:23, 146:20,
146:25, 148:15,
149:15, 152:19
company's
54:4
comparable
123:19, 123:25
compelling
6:23
compensation
57:21, 57:25,

58:2, 58:17
compete
116:4
competent
8:24, 9:6
competitor
14:7, 43:13,
43:14, 114:25,
116:3
complaint
3:15, 25:13,
25:17, 25:20,
26:12, 31:5,
90:12, 90:13,
97:16, 97:19,
106:20, 120:24
complaint-itemiz-
ed
84:19
complete
31:13, 57:17,
117:4
completed
24:7
completely
13:4, 102:20
complex
95:5, 95:22
component
93:10
components
38:13, 93:12
comprehensive
110:6
computer
68:7, 131:5,
131:6, 132:14,
160:11
computers
50:4
computing
154:19
concede
35:3
concept
88:8
concepts
88:5, 89:14

concerned
28:25, 75:19
concerns
28:19, 28:22
concluded
161:16
concludes
98:17
conclusion
131:19, 132:6,
132:18, 150:10
condition
48:13
conditions
9:2
conducted
51:16, 53:22
conference
50:12
conferences
104:25
confidentiality
28:3
confirm
76:19, 82:18
confirms
106:20
confused
41:24
confusion
8:5
connect
18:19, 72:11,
72:13
connected
40:7
connects
19:9
consecutive
133:12
consider
106:1, 139:16
considered
17:14, 22:8,
93:1, 106:2,
139:1, 139:15
considering
24:1, 29:1,

81:10, 152:18
consistently
98:18
consists
25:18
conspiracy
108:3
constantly
48:9
constitutes
162:11
consultant
58:5, 81:7,
142:25, 154:17
consulted
145:5, 145:12
consulting
57:20, 142:9,
143:10, 144:4,
144:5, 144:19,
144:23
consummation
53:23
contact
148:17
contacted
63:7, 141:13
contained
44:24
contemplated
53:23
contemporary
36:12
contentions
89:23
contents
37:22
context
78:19, 92:8,
136:12, 139:20,
139:23, 145:4
continue
10:20, 33:4,
69:18, 97:17,
97:18, 112:11,
113:19
continued
29:17, 153:8,

158:9
continues
21:19, 43:8,
53:8
continuing
66:12
contract
43:18, 45:4,
45:6, 45:17,
55:5, 55:8,
55:13, 56:7,
57:4
contracts
45:8, 55:4,
55:10, 55:13,
69:7
contradiction
94:24
contributed
26:18
contributions
88:21
contrivance
106:11, 107:20
control
32:14, 38:18,
57:20, 137:5
controlled
93:13, 157:19
controls
1:11, 2:12,
5:6, 5:18, 6:21,
18:17, 18:21,
34:10, 35:12,
35:19
controversies
111:2, 112:16
conversation
8:1, 8:22,
86:3, 109:21,
110:12, 116:12,
126:4, 147:9
conversations
9:25, 110:8
convert
106:12, 107:22,
108:4
convinced
94:18

cool
15:9
cooperate
67:18
cooperation
67:6
coowner
89:12
coowners
44:10, 76:4
copied
31:16, 31:23,
33:7, 40:22,
155:11, 155:12
copies
3:18, 33:1,
33:3, 40:21,
79:20, 100:7
copy
25:17, 28:5,
31:22, 31:24,
35:10, 35:18,
37:17, 70:21,
120:24, 144:13,
144:16, 155:13
corporate
89:16, 90:6,
117:3, 159:2,
159:7, 159:9,
159:12
corporation
13:24, 52:6,
80:15, 80:17,
80:24, 111:6
corporations
79:22
correct
9:14, 11:8,
13:1, 13:2,
14:5, 14:18,
15:4, 21:15,
21:16, 31:7,
32:24, 34:19,
44:5, 44:11,
45:19, 52:13,
53:14, 54:6,
55:1, 55:2,
55:19, 56:25,

77:8, 82:22,
89:23, 90:25,
96:1, 96:18,
100:20, 102:19,
103:18, 113:1,
116:15, 116:24,
118:20, 135:7,
151:25, 158:23
**correction**
152:14
**correctly**
125:10, 133:9,
155:4, 160:13
**corroborate**
86:11, 157:23
**cost**
59:25, 101:5,
158:19
**costs**
135:18
**could**
28:23, 33:9,
44:18, 46:17,
50:18, 52:1,
53:16, 53:17,
54:8, 57:7,
60:7, 65:5,
65:23, 66:25,
71:2, 79:25,
83:25, 86:4,
87:21, 91:3,
92:8, 93:22,
97:20, 98:5,
98:8, 99:13,
100:14, 101:7,
103:8, 104:22,
106:4, 108:23,
114:9, 117:12,
119:7, 134:3,
134:4, 144:12,
151:12, 160:6
**couldn't**
37:11, 109:7,
115:20, 142:10
**counsel**
2:1, 5:15,
8:18, 162:13
**country**
33:7

**couple**
38:3, 39:6,
101:10, 108:12,
108:20, 112:6,
147:4, 155:14
**course**
8:18, 9:11,
53:4
**court**
1:1, 4:11, 5:7,
5:20, 5:23, 6:3,
7:1, 7:17, 7:24,
8:4, 8:20, 8:25,
56:17, 79:16,
87:14, 96:21,
97:6, 117:6,
162:23
**courtroom**
7:20
**cover**
50:2, 66:16
**covered**
95:8
**covers**
37:24
**covington**
4:5, 5:14,
10:23, 14:17,
15:12, 15:13,
15:16, 16:3,
16:9, 16:10,
16:14, 16:16,
33:20, 46:23,
63:20, 64:1,
69:21, 76:9,
119:10, 135:5,
145:17, 161:1
**cpa**
160:23, 160:24
**crawford**
63:23, 64:2
**crazy**
116:2
**create**
88:23, 143:2
**created**
29:11, 71:10,
74:17, 88:14,

90:9
**creation**
85:20, 131:2,
131:5, 131:7,
132:4, 132:15
**creations**
131:18
**credibility**
24:11
**credit**
21:6
**crohm**
113:21
**cross-examination**
3:5, 120:9
**crowe**
1:23, 4:3, 5:4,
6:6, 6:8, 6:13,
19:17, 23:7,
23:9, 23:21,
25:16, 35:17,
65:19, 66:10,
73:13, 74:13,
76:5, 81:22,
84:23, 86:10,
88:17, 88:18,
97:15, 105:10,
106:22, 109:9,
110:4, 110:22,
111:17, 120:11,
121:8, 128:16,
131:12, 141:19,
161:14
**crowe's**
84:22
**csa**
22:19, 23:8,
23:21
**culminated**
74:8
**current**
17:15, 17:16,
58:3
**currently**
114:15
**curtain**
134:2
**cushion**
118:9

**custody**
10:15
**custom**
12:8, 58:18,
115:10
**customer**
17:22, 43:12,
64:10, 83:4,
83:13
**customers**
42:12, 63:6,
75:7, 83:15
**cut**
65:21, 108:5

**D**

**d**
54:11
**d)**
55:1
**daily**
137:17
**darren**
6:8, 6:9
**daryl**
81:6, 124:20,
154:16, 160:20,
160:22
**date**
1:24, 5:9,
27:14, 98:1,
98:3, 131:6,
132:15, 135:3,
146:16, 162:5
**dated**
19:11, 22:11,
35:12, 87:18,
117:15
**dates**
27:16, 27:17,
131:2, 131:4,
131:5, 132:5
**dave**
63:21, 63:24,
83:9, 83:11,
105:3, 105:18
**david**
103:19, 105:8

day
4:6, 9:13,
17:24, 17:25,
33:16, 73:25,
83:13, 115:23
day-to-day
137:10
days
74:2
dc's
157:14
dead
96:18
deadlines
87:4
deal
69:3, 73:6,
91:6, 105:18,
108:6, 108:10,
114:8, 123:22,
145:1
dealing
34:16, 87:7
dealings
126:1
dealt
125:23
dear
121:7
december
11:10, 122:16
decided
11:1, 11:16,
29:9, 75:5,
128:3, 153:1
decision
76:7, 121:25,
158:2
decisions
137:6, 137:10
declined
111:3
defect
46:11
defendant
1:12, 2:12,
74:10, 105:6
defendant's
76:9

deferred
57:21
defined
57:19
definite
102:4
definitely
23:23, 62:22,
89:14
definition
39:2, 41:17,
41:22, 42:4,
45:3, 45:14,
45:22, 46:6,
46:7, 49:21,
55:4
definitions
38:1, 41:12,
44:18, 46:17
degree
11:4
degreed
63:4
delayed
32:18, 140:7
delays
75:18
demonstrated
127:4
departed
140:14, 147:19,
148:21
department
125:11, 141:2,
145:8, 148:22,
154:13, 154:14,
156:22
dependable
148:3
deponent
1:23
depos
5:12, 5:22
deposed
7:12
deposition
3:9, 4:3, 4:7,
5:4, 5:12, 7:17,

120:22, 121:18,
141:7, 161:14,
161:16
depositions
8:18
depot
136:3
depth
121:3
describe
13:13, 141:19
described
126:16, 131:13,
133:7, 141:2
describes
155:22
description
72:22, 98:23,
122:5, 150:24,
151:21, 157:10,
160:13
design
29:23, 31:2,
31:6, 31:8,
31:10, 32:11,
32:23, 44:14,
57:7, 57:8,
62:25, 75:9,
75:11, 75:22,
76:1, 94:5,
94:8, 94:10,
95:14, 95:25,
96:13, 100:7,
116:16, 116:20,
123:13, 123:14,
123:15, 123:25,
132:23, 139:6,
153:5, 157:2
designate
126:10
designating
78:13
designed
33:13, 34:21,
44:13, 63:1,
123:23, 125:14,
132:10, 132:24,
157:2

designer
123:23
designing
38:11, 93:23,
94:9, 132:7
designs
12:8, 33:7,
50:7, 57:1,
75:21, 150:19,
155:13
detail
141:18
detailed
21:12, 131:10
details
76:6, 134:15
determine
24:8
develop
21:10, 31:21,
57:3, 75:23,
92:5, 116:17,
128:12, 135:25,
142:14, 142:15,
142:16, 151:7,
157:5
developed
34:11, 74:6,
89:17, 98:25,
107:8, 122:9,
124:2, 124:4,
128:11, 155:11
developer
43:13
developing
74:8
development
56:8, 77:16,
78:2, 95:4,
104:14, 136:8,
157:6
developmental
74:16, 88:19
device
99:5
devices
150:11, 150:12
devoted
134:11

devoting
110:5

diagrams
130:14, 130:15,
131:1, 131:10

difference
62:15

different
14:12, 23:8,
29:4, 40:5,
48:17, 50:8,
70:6, 72:4,
75:18, 84:1,
85:9, 104:8,
104:9, 135:15,
146:21

difficult
87:1, 96:15

digital
159:23

diluting
54:13

dilution
54:17

dinner
25:11, 30:10,
73:23

direct
3:4, 6:4,
31:24, 33:1,
33:3, 114:3,
121:24, 133:10,
136:2, 142:13

directing
137:8

direction
82:12, 154:19,
162:10

directly
43:10, 72:11,
83:14, 160:7,
160:25, 162:14

director
42:17, 43:3,
43:5, 43:11,
58:4

disappeared
39:16

disappointed
110:17

disclosed
44:2

disclosure
82:4

disclosures
3:17, 37:25,
70:22, 70:23

discreet
106:24, 124:10,
127:22, 133:13,
154:3

discretionary
146:7

discuss
11:18, 21:24,
25:6, 41:13,
55:23, 106:15,
128:15, 152:19,
152:24

discussed
24:9, 41:8,
65:12, 75:12,
82:17, 88:15,
89:8, 100:17,
107:15, 110:16,
113:22, 121:2,
121:17, 141:10,
151:1, 151:5,
154:2, 154:5,
159:3

discussing
89:9, 97:16,
105:23, 107:6,
152:21

discussion
96:18, 99:16,
110:5, 113:20,
124:14, 125:8,
147:13

discussions
22:3, 74:25,
107:8, 109:4,
126:1, 127:21,
152:6

disliked
75:4

dismantle
109:2

dispatch
86:7

dispatched
149:24

disposed
53:3

dispute
89:22, 111:7,
112:17, 130:3,
131:14, 138:23,
155:24

dissipate
157:13

dissipates
19:6

distinction
153:22

distinguish
153:11, 157:8

distraction
93:18, 96:15

distributors
33:6

district
1:1, 1:2, 5:7

divested
10:13

division
21:2, 21:6,
21:25, 22:9,
24:1, 29:7,
30:19, 41:4,
52:12, 75:6,
79:1, 82:22,
88:14, 94:13,
95:7, 96:17,
105:6, 107:6,
107:14, 108:14,
109:2, 110:18,
114:5, 116:13,
117:2, 118:19,
119:4, 124:14,
125:5, 127:19,
127:23, 145:20,
146:23, 151:10,
151:12, 152:8,

152:9, 153:1,
153:18, 153:24,
153:25, 158:4,
158:9

divisions
118:4, 146:19

document
10:5, 19:17,
23:15, 26:13,
35:25, 51:25,
66:21, 71:6,
79:9, 81:25,
90:9, 127:13,
144:6

documentation
10:10, 102:22,
106:20, 132:14,
147:21

documents
10:5, 10:6,
10:9, 37:6,
68:9, 68:16,
98:12, 103:18,
121:1, 127:3,
127:8, 127:10,
127:15, 127:23,
131:8, 140:17,
140:18, 140:20,
140:22, 149:21,
159:24, 160:17

doe
14:20

doing
14:19, 14:21,
25:8, 33:25,
39:7, 40:14,
50:15, 79:5,
85:12, 94:9,
110:15, 114:15,
118:12, 123:20,
130:13, 131:20,
141:22, 141:23,
142:4, 148:24,
151:13, 151:14

dollar
59:19, 81:20,
98:4, 99:19,
99:24, 111:20,

**dollars**
13:16, 39:16,
100:1, 146:20,
155:3, 155:24
**domestic**
52:8
**done**
32:21, 50:4,
72:14, 77:10,
108:20, 119:19,
124:22, 128:2,
138:9, 141:21,
141:24, 146:17,
155:16, 158:18
**door**
147:24
**doubt**
128:11
**down**
20:13, 24:1,
26:21, 29:6,
30:9, 39:13,
42:14, 45:3,
45:22, 47:9,
47:16, 48:7,
56:15, 70:3,
70:6, 77:12,
83:9, 84:17,
87:6, 91:9,
92:9, 92:13,
101:3, 109:13,
115:1, 124:8,
133:9, 137:19,
157:6
**downs**
143:7, 143:8
**dozen**
114:6
**draft**
117:9
**draw**
131:19, 132:6,
132:18
**drawing**
133:4
**drawings**
34:1, 131:10,

125:16, 155:21

133:6, 148:4,
160:17
**drive**
6:10, 18:20,
18:21, 19:4,
19:10, 31:4,
72:11, 72:13,
72:14, 99:4,
150:19, 157:13,
157:14
**drives**
72:9, 72:10,
72:12, 88:10
**dropped**
122:22
**duly**
162:7
**dumpy**
78:4
**duplicate**
142:9, 157:3
**duplication**
149:20
**during**
8:8, 8:18,
9:11, 9:21,
54:15, 143:10,
145:22, 149:24,
158:11
**duties**
12:6, 31:8,
31:9, 31:11,
32:22, 71:10,
88:22, 88:23,
89:7, 93:16,
105:12, 124:4,
143:10
**dv**
19:3
**dynamic**
38:17, 44:4,
53:14, 95:5,
115:3, 116:8,
116:17, 116:23

**— E —**

**e**
10:11, 20:13,

22:15, 98:12,
140:24, 148:4
**e-mail**
2:9, 2:20,
3:11, 3:13,
3:21, 19:11,
19:15, 19:21,
19:22, 20:8,
20:9, 20:11,
20:18, 21:1,
22:11, 22:16,
22:24, 23:5,
25:1, 26:4,
26:8, 68:19,
97:25, 117:8,
117:14, 117:15,
140:24, 152:16,
153:12
**e-mailed**
98:5
**e-mails**
10:10, 98:11,
108:12, 140:16,
140:22, 143:15,
152:23, 153:13
**e-s**
85:5
**each**
57:18, 57:19,
67:17, 138:23,
143:15
**earlier**
9:15, 39:7,
48:22, 54:16,
55:4, 71:18,
77:6, 98:9,
100:8, 100:17,
120:12, 126:17,
127:3, 133:8,
135:21, 154:25,
155:25
**early**
11:2, 77:16,
100:21, 105:1,
142:12, 154:2
**earned**
111:4, 112:17,
112:23

**easements**
46:11
**easier**
50:15, 56:17
**east**
4:4, 5:13
**eastern**
5:10, 66:8,
97:10, 97:13,
159:18, 159:21,
161:15, 161:16
**edgewood**
70:9
**educated**
107:17
**education**
10:19, 10:21,
11:12
**effect**
27:7
**efforts**
93:6, 104:15,
147:11
**ego**
118:10
**eight**
87:14, 115:24
**either**
22:7, 60:11,
96:25, 99:4,
136:13, 162:13
**electrical**
11:3, 11:4,
11:6, 12:15,
12:18, 19:5,
19:6, 22:21,
38:12, 38:13,
59:12, 63:4,
63:14
**electronic**
17:14, 38:20,
39:19, 40:4,
40:9, 119:6,
126:2, 128:14
**electronics**
15:12, 16:19,
16:25, 17:9,
17:10, 17:13,

22:9, 29:8,
33:9, 33:10,
52:12, 60:16,
74:19, 77:3,
78:1, 78:13,
78:16, 82:11,
82:22, 84:20,
85:20, 85:23,
86:16, 88:4,
88:9, 88:11,
88:20, 91:6,
95:7, 96:17,
103:12, 105:6,
105:13, 105:23,
107:14, 108:15,
109:3, 110:6,
110:9, 117:3,
118:14, 118:24,
119:1, 119:11,
119:12, 124:11,
124:19, 125:1,
125:10, 125:20,
127:5, 127:12,
127:16, 127:24,
128:5, 128:6,
128:9, 133:7,
133:13, 133:23,
134:11, 135:6,
141:2, 141:22,
141:25, 145:8,
150:25, 151:5,
153:8, 153:13,
153:16, 153:17,
154:1, 156:22,
157:23, 158:24,
159:1
**eligible**
98:2
**eliminate**
107:24
**else**
25:11, 44:16,
47:17, 60:16,
73:1, 88:25,
120:3, 122:1,
130:18, 131:11,
144:18, 146:2,
148:24, 152:23,

156:16
**elsewhere**
39:3
**elva**
83:1
**emerging**
91:6
**employ**
110:13
**employed**
11:25, 12:17,
132:8, 160:24
**employee**
13:9, 29:23,
33:22, 42:17,
42:23, 42:24,
42:25, 43:3,
43:12, 43:25,
44:13, 45:23,
49:6, 49:7,
50:9, 57:6,
57:13, 57:18,
58:3, 58:4,
58:16, 65:17,
69:23, 71:10,
73:9, 74:9,
74:10, 75:25,
78:11, 78:25,
79:5, 82:12,
86:15, 86:24,
86:25, 88:2,
94:19, 127:10,
134:17, 139:1,
139:2, 139:5,
139:11, 139:15,
139:16, 142:13,
153:5, 160:22,
162:13
**employees**
13:8, 13:20,
29:3, 33:21,
65:14, 69:21,
71:18, 74:6,
101:5, 114:6,
114:20, 122:18,
126:9, 126:16,
133:23, 134:10,
134:16, 135:4,

135:19, 136:4,
136:11, 136:20,
137:25, 138:3,
141:12, 156:10
**employer**
43:4, 74:8,
84:20
**employment**
11:19, 57:20,
74:24, 89:15,
97:24
**encouraged**
50:13
**encroachments**
46:11
**encumbrances**
46:6, 46:10,
52:24, 53:11
**end**
16:20, 40:5,
85:6, 138:15,
154:13, 161:13
**ended**
14:7, 14:14,
49:17, 70:3,
75:10, 76:22,
81:21
**ends**
38:16
**energy**
19:6, 38:20
**engaged**
38:11
**engineer**
12:7, 20:24,
31:6, 31:8,
32:23, 59:13,
63:14, 64:10,
71:21, 76:1,
83:3, 89:3,
89:25, 93:1,
94:6, 94:8,
95:14, 95:25,
116:17, 116:20,
123:13, 123:14
**engineering**
10:25, 11:4,
11:5, 11:6,

15:24, 19:5,
34:1, 64:16,
84:10, 92:15,
92:22, 93:6,
93:20, 124:24,
137:15
**engineers**
14:8, 15:21,
17:24, 59:12,
63:1, 63:5,
63:11, 70:4,
89:2, 123:14,
123:16, 128:14,
137:20
**enter**
11:23
**entertained**
151:10, 151:11
**enthusiastic**
82:11, 109:21
**entirely**
89:17, 107:25
**entities**
135:25
**entitled**
42:11
**entitlement**
107:25
**entity**
52:7, 82:22,
89:16, 90:4,
90:6, 117:3,
118:1, 124:10,
126:11, 127:12,
127:23, 133:13,
151:6, 154:3,
154:4, 157:24,
158:11
**equipment**
22:22, 116:22
**equity**
52:4, 57:23
**equity-based**
57:23
**erisa**
57:19, 58:1
**erlanger**
12:2, 114:5,

114:7, 115:23
**esa**
12:19, 12:24
**eschleman**
14:10, 60:25,
61:2, 63:22,
137:16, 145:25,
146:1
**especially**
40:20
**esquire**
2:4, 2:14
**essentially**
124:10
**established**
82:23, 158:25
**establishing**
95:6
**estimate**
122:17
**et**
42:12
**evaded**
109:10
**evaluation**
138:18, 138:22
**eve**
2:22, 5:11
**even**
27:9, 41:8,
43:7, 49:19,
55:23, 58:18,
60:13, 75:16,
78:25, 81:17,
88:15, 107:15,
112:12, 124:21,
126:3, 132:5,
132:17, 143:13,
144:17, 147:7,
150:18, 151:5,
154:1, 158:18
**events**
9:12
**eventually**
13:17, 14:24,
15:11, 32:22,
70:7, 99:7
**ever**
7:12, 19:17,

19:21, 26:13,
28:14, 35:3,
37:15, 55:23,
65:9, 65:12,
65:16, 68:20,
78:23, 79:15,
88:15, 89:9,
100:22, 100:25,
102:22, 106:1,
108:12, 112:25,
115:4, 117:2,
126:17, 127:8,
128:4, 128:8,
130:14, 130:25,
137:2, 137:5,
150:5, 158:8,
158:21, 158:24
**every**
9:4, 33:16,
37:2, 61:10,
61:15, 108:11,
110:15, 138:5,
156:9, 158:5
**everyone**
43:5, 43:6,
60:8, 63:24,
107:12
**everything**
10:8, 25:11,
40:6, 44:24,
48:20, 51:24,
60:7, 65:4,
69:15, 81:8,
148:9, 152:23,
160:15
**evidence**
36:12, 125:4,
126:20, 133:19,
133:25, 158:14
**evidentiary**
8:19
**evolved**
13:14
**exact**
13:4
**exactly**
29:20, 31:18,
82:2

**examination**
3:4, 6:4
**examine**
23:24
**example**
18:23, 87:2,
128:25
**except**
42:15, 53:1,
53:2, 53:18,
54:11, 63:24
**exclusive**
85:20, 106:14,
107:23
**excuse**
24:7, 130:21,
130:22, 146:5,
155:1
**excuses**
87:7
**executives**
105:7, 105:10
**exemplary**
86:15, 86:24
**exhibit**
3:7, 3:8, 7:2,
7:3, 10:4,
19:11, 19:13,
19:14, 22:10,
22:12, 25:12,
25:14, 25:16,
25:21, 25:23,
25:24, 26:2,
26:3, 35:6,
35:10, 35:14,
35:21, 70:15,
70:18, 70:19,
79:10, 79:11,
79:14, 79:19,
87:12, 87:15,
87:18, 90:15,
106:21, 117:5,
117:8, 117:10
**exhibited**
127:3
**exhibits**
7:8, 19:20,
25:21, 35:22,

37:9, 66:16
**exist**
85:24, 85:25
**existed**
82:9, 105:23,
132:4
**existence**
51:10, 71:8,
150:12
**existing**
74:20
**exists**
127:14, 150:8
**expected**
84:18, 118:18
**expecting**
84:21
**expects**
21:13
**expedite**
24:21
**expense**
30:18, 59:20
**expensive**
21:8, 30:20,
122:13
**experience**
128:10
**experimentation**
91:16
**expertise**
149:10
**expires**
162:24
**explain**
28:18, 48:4
**explanation**
125:8, 133:16
**exploiting**
74:7
**express**
34:24
**extended**
99:16
**extent**
79:3
**external**
99:5

extrusion
31:24
eyes
24:12

**F**

facilities
33:17
facility
22:5, 70:3,
76:10, 77:1,
82:10, 82:18,
137:10, 145:16
fact
113:19, 126:5,
157:18
factors
99:3
facts
90:18, 125:3,
126:19, 133:18,
133:24, 151:3,
156:6, 158:13
factual
89:23, 150:9,
151:21
failed
147:11
fair
144:11
fairly
98:23, 122:8
fairness
9:24
fake
101:19
fall
55:10
false
79:2, 101:15,
101:18, 102:20
family
42:20
fan
15:9
far
75:19, 129:12,
147:17, 148:8,

152:2
faster
140:10
father
84:8
favor
94:1
favorites
121:7
federal
4:8
fee
81:20, 144:4,
144:5
feedback
115:15
feel
120:17
fees
56:12
feet
28:17, 29:5
fell
81:20
felt
128:14
few
7:14, 17:25,
85:9, 113:3,
116:11, 117:13,
160:19
fiction
77:23, 88:15,
90:9, 102:21,
109:22, 117:4,
124:9, 133:8
field
39:15, 40:18,
122:21
fields
39:18
figured
39:17
figures
62:4
file
81:20, 127:18,
131:2, 131:4,

131:5, 131:18,
132:4, 132:15
filed
6:20, 25:17,
103:16, 124:14,
127:15, 134:12
filing
3:19, 79:20,
127:22
filters
15:8, 16:18,
16:25, 17:2,
38:20
final
75:21, 82:7,
117:5, 117:13
finalized
111:7
finalizes
106:9
finalizing
107:19
financial
24:12, 53:7,
102:13, 107:24
financially
162:14
financing
28:13, 74:16,
78:13, 82:11,
82:21, 88:3,
88:11, 100:19,
125:20, 126:1,
152:16
fine
9:5, 36:24,
37:18, 56:2,
65:25, 81:13,
97:1, 97:3
finish
8:3, 130:19,
140:12
finished
70:14, 115:19,
119:25, 142:11
fired
49:18, 86:15,
111:23, 112:1,

112:6, 112:7,
112:8, 134:9,
134:10, 134:12
firm
2:5, 3:20
first
13:9, 17:20,
17:21, 20:8,
22:24, 25:19,
26:8, 27:22,
32:4, 32:12,
36:23, 38:6,
41:14, 46:20,
51:13, 58:20,
68:2, 71:14,
76:13, 80:1,
80:2, 80:13,
85:3, 90:21,
94:24, 95:13,
95:21, 95:24,
106:19, 108:25,
112:6, 130:21,
162:6
first-hand
36:19
five
13:16, 114:4,
123:7, 138:13,
143:15, 159:13
fix
48:11
fixed
78:5
flip
26:14, 27:11,
41:9, 42:8,
46:17, 50:18,
52:23, 55:11,
57:10, 66:25,
67:9, 71:3,
80:7, 87:21,
90:17, 106:4
flooding
32:2
flooring
48:13
florence
14:3, 14:4,

flow
137:18
focus
24:6, 38:1,
64:9, 74:17,
93:6, 106:8,
118:18, 125:14,
153:20, 157:4
focused
15:17, 15:18,
65:2, 65:3,
95:3, 114:3,
114:11, 143:18
focusing
99:17
folder
131:6
folks
16:5, 123:7,
130:13
follow-up
113:4
followed
125:10
following
67:17, 84:13,
109:20, 145:18,
147:19, 160:12
follows
50:24, 51:9,
139:14
foregoing
82:8, 162:4
foreign
52:8
forgive
134:25, 136:25
forgot
23:7, 23:20
form
162:10
formal
10:21, 11:12,
58:1
formation
82:21
formed
124:14

former
58:3, 58:4,
73:9, 106:11,
107:20
forming
30:19
forth
42:15, 43:20,
53:1, 53:18,
54:11, 57:17,
140:23, 152:22
forward
23:23
forwarded
121:1
found
14:22, 113:23
foundation
50:20
four
64:24, 136:18
fracking
32:8, 39:13,
157:20
fraction
40:10
frame
122:17, 149:24
framework
24:7, 29:12
frcp
3:17
frequency
18:20, 18:21,
19:10, 31:4
friction
28:24, 118:11
friend
87:25
friends
83:25, 121:7,
121:10
fringe
57:22
front
37:22, 47:4,
66:20, 66:23,
130:24

fruition
104:15
frustrating
87:7, 140:6
fully
15:18, 105:1,
110:25
fund
21:7, 126:6
funded
121:20
funny
129:9
furniture
85:8
further
30:6, 119:14
furtherance
130:10, 153:2
furthering
88:4, 100:19
future
23:24
fw
3:21
fy
27:3

G

gain
147:12
gallatin
78:15, 106:2
gallatin-based
105:6
gap
12:3, 29:25
gate
18:15
gave
31:20, 62:6,
65:13, 75:22,
82:23, 122:7,
155:13, 156:9
general
92:10, 113:11
generally
86:13

generated
111:2, 142:17,
147:16, 155:2,
160:8, 160:10
generator
32:13, 32:15,
93:9, 93:17,
96:14, 156:18,
156:21, 156:25,
157:9, 157:17,
157:18, 157:19
generic
93:10
generous
62:7
gentleman
49:17
gentlemen
20:16, 20:19,
28:23
george
148:9, 148:13,
148:17, 148:23
getting
11:3, 28:20,
32:16, 33:16,
49:18, 118:17,
139:4
give
5:25, 22:14,
24:11, 26:14,
31:22, 60:14,
65:6, 65:9,
87:2, 94:20,
109:25, 128:25,
133:16, 141:23,
151:21, 154:8
given
65:16, 101:25,
120:24, 127:9,
141:5, 144:6,
144:25, 156:3
giving
39:2, 141:13,
144:11
glad
87:8
global
102:15

**glover**
12:2, 12:12,
12:15, 14:7,
118:8, 125:9,
136:17, 153:16
**gmat**
11:14
**go**
7:14, 9:14,
14:9, 25:11,
26:2, 26:21,
27:7, 27:22,
36:10, 53:17,
54:8, 55:3,
58:8, 59:2,
69:21, 84:17,
90:12, 90:13,
92:7, 92:25,
97:3, 97:6,
97:7, 103:22,
114:9, 115:8,
119:24, 158:16,
159:16, 159:21
**goal**
96:12
**goals**
61:18
**goes**
18:23, 93:18
**going**
7:1, 7:20,
11:13, 20:6,
20:7, 21:8,
22:17, 25:4,
25:5, 25:12,
28:4, 28:20,
30:20, 30:24,
35:10, 36:9,
36:19, 38:1,
40:3, 50:18,
55:10, 55:12,
57:6, 58:8,
64:9, 66:2,
66:4, 72:20,
73:7, 75:16,
76:14, 78:25,
79:14, 81:19,
82:1, 86:19,

87:4, 88:14,
90:3, 92:25,
95:25, 96:2,
96:22, 97:3,
97:9, 97:17,
103:21, 106:1,
107:13, 112:22,
113:12, 115:9,
115:13, 116:10,
117:8, 118:5,
118:6, 118:13,
118:18, 119:2,
119:5, 121:21,
122:10, 122:12,
122:13, 123:20,
124:21, 125:14,
125:22, 129:7,
131:23, 132:25,
140:22, 151:11,
152:22, 153:19,
153:25, 157:5,
158:20, 159:17,
161:14
**golly**
18:4
**gone**
88:12, 134:14,
139:21, 140:10
**good**
6:13, 6:14,
30:22, 37:17,
51:10, 53:4,
81:7, 83:4,
96:24, 111:22,
120:11, 122:11,
141:23, 149:16,
150:22, 156:9,
156:11
**gradually**
104:13
**graduated**
10:22, 11:10,
11:11, 11:22
**grandiose**
95:23
**granted**
21:18
**gravel**
77:13

**great**
118:12, 148:24
**greatly**
32:18, 75:3,
157:7
**grew**
16:5
**gross**
27:3, 102:14,
104:4, 104:5,
104:7, 104:10,
155:3
**ground**
7:14, 133:8
**grounding**
15:10, 15:19,
15:23, 16:19,
17:4, 38:18,
38:19, 64:6,
64:12, 64:14,
123:9, 134:5
**group**
112:8, 112:9,
121:1, 123:8,
123:15, 126:25,
134:5, 135:17,
136:22, 137:21,
143:4, 149:7,
149:15
**growing**
28:21, 110:15
**grown**
13:22
**guarantee**
102:23
**guess**
16:15, 22:15,
40:4, 41:16,
81:8, 82:1,
83:17, 99:23,
100:10, 103:17,
103:23, 120:16,
144:5
**guessing**
82:2
**guy**
33:10, 61:21,
63:10, 63:25,

**great**
71:22, 76:2,
85:7, 90:1,
93:1, 110:13,
122:2, 123:21,
125:24, 129:3,
129:5, 129:8,
134:21, 137:14,
143:1, 148:9,
159:11
**guys**
14:14, 20:5,
21:20, 22:5,
22:6, 22:8,
24:23, 25:2,
25:5, 30:17,
41:18, 48:17,
58:24, 60:11,
61:12, 62:1,
62:3, 62:25,
63:1, 63:4,
63:5, 63:7,
63:10, 63:11,
64:1, 64:8,
64:20, 64:21,
64:24, 70:5,
72:20, 88:10,
89:3, 91:9,
93:2, 97:3,
97:4, 99:4,
103:21, 105:22,
112:5, 115:15,
123:6, 123:7,
123:10, 132:5,
151:16, 156:10,
156:12

**H**

**half**
11:3, 46:22,
65:3, 68:22,
85:6, 96:23,
114:6, 143:19
**half-inch**
130:6
**halfway**
45:3
**hand**
5:23, 70:17,

**handed**
35:17, 79:19, 87:17

**handing**
25:16

**handled**
15:16

**hands**
63:6

**handshake's**
55:8

**hang**
85:9

**happen**
9:12, 68:23, 108:16

**happened**
24:18, 32:3, 50:8, 65:18, 68:20, 75:18, 102:23, 108:7, 108:15, 112:15, 134:15, 146:4

**happening**
75:11

**happy**
11:16, 62:6, 101:22, 101:23

**hard**
18:6, 63:25, 107:15

**harder**
8:6, 140:11

**harmonic**
38:19

**hci**
3:16, 38:7, 41:10, 42:9, 45:1, 46:18, 51:2, 52:23, 54:9, 55:11, 57:11, 58:14, 67:1, 67:10

**head**
7:22, 93:19

**headquarters**
77:25, 78:8

**health**
57:22, 98:3

**hear**
119:19, 119:20, 119:22, 120:4, 120:5

**heard**
72:25, 73:1, 85:3, 115:6, 134:14, 140:2, 147:2, 147:8

**hearsay**
133:11

**heat**
19:6, 19:7

**heavily**
77:12, 91:13, 93:12

**held**
53:21

**help**
24:20, 31:21, 33:8, 57:6, 59:25, 69:24, 83:25, 84:2, 93:2, 93:21, 108:10, 112:13, 118:15, 122:14, 124:3, 126:6, 144:10, 144:12, 154:16, 156:24

**helped**
32:23, 71:22, 81:8, 143:6

**helping**
33:24, 89:1

**helps**
148:15

**here**
5:3, 6:19, 6:24, 7:19, 18:5, 23:14, 35:8, 35:15, 40:3, 40:19, 45:6, 49:1, 60:8, 60:17, 63:21, 89:6, 91:24, 105:20,

**health** [continued list]
109:13, 121:18, 127:9, 131:14, 137:1, 141:7, 154:8, 158:11

**hereby**
50:23, 51:8, 80:17, 162:4

**hereof**
162:6

**hereto**
42:16, 67:12

**hey**
21:5, 24:23, 25:2, 32:13, 33:5, 48:10, 75:8, 93:20, 94:18, 94:20, 112:22, 129:7, 132:25, 141:11, 144:7

**high**
9:5, 10:20, 10:22, 17:5, 17:15, 17:16, 119:12

**high-amp**
32:6

**high-power**
150:11

**high-resistance**
15:10, 15:23, 16:18, 17:3, 38:19, 123:9, 134:4

**high-speed**
18:13, 19:9

**high-voltage**
16:25, 17:2

**higher**
125:16

**highly**
93:3, 128:11, 128:13

**hill**
70:11

**hills**
6:11, 10:23

**hindsight**
107:18

**hinton**
13:6, 17:22, 20:10, 21:24, 28:12, 30:1, 73:13, 74:13, 87:22, 88:1, 101:13, 102:4, 105:10, 109:9, 117:15, 119:1, 121:4, 121:5, 125:19, 127:21, 128:6, 128:11, 137:11, 146:12, 159:10

**hire**
22:4, 30:15, 72:21, 75:8, 83:24, 90:1, 94:18, 121:25, 122:2

**hired**
14:10, 14:12, 29:18, 29:21, 29:23, 30:4, 30:14, 31:1, 31:6, 31:12, 31:20, 32:4, 34:17, 49:18, 74:25, 75:11, 75:25, 77:7, 78:24, 82:19, 84:3, 88:13, 92:2, 92:19, 95:24, 96:6, 96:13, 116:16, 116:19, 121:25, 133:1, 136:17, 142:25, 143:5, 151:24, 153:5

**hiring**
14:8, 20:20, 22:8

**history**
11:19, 105:4

**hoist**
18:24

**hold**
20:7, 21:20,

67:2, 79:10,
79:16, 106:4,
139:13
**holdings**
69:6
**hollister**
4:4, 5:13
**home**
10:7, 14:15,
122:13, 134:22
**honest**
158:18
**honestly**
32:19, 120:23,
144:2
**hope**
99:23
**hosted**
73:10
**hotel**
49:11
**hour**
96:23
**house**
30:11, 46:20,
46:21, 47:1,
47:2, 47:6,
47:8, 47:11,
47:20, 47:21,
47:24, 48:2,
48:7, 48:11,
48:12, 48:25,
49:1, 49:5,
49:9, 49:13,
49:16, 49:19,
49:21, 50:4,
50:5, 50:7,
67:14, 67:15,
67:16, 67:21,
67:22, 68:5,
68:11, 69:1,
69:2, 69:6,
73:11, 73:12,
73:18, 76:9,
76:19, 77:1,
77:11, 78:4,
78:22, 79:7,
83:20, 83:22,

84:14, 85:2,
85:8, 160:2,
160:9, 160:10,
160:17
**houston**
12:14, 12:19,
12:23, 12:24,
14:15, 18:5,
22:7, 32:4,
123:2, 123:3
**how's**
113:11
**however**
111:2, 154:20
**hrgs**
17:6
**hubbell**
1:11, 2:12,
5:6, 5:17, 6:16,
6:21, 10:9,
10:15, 13:24,
16:21, 35:11,
35:19, 37:11,
39:10, 68:15,
69:10, 69:16,
84:20, 86:12,
86:14, 101:14,
104:21, 105:1,
105:7, 105:9,
105:11, 106:14,
106:24, 107:5,
107:10, 107:15,
107:18, 107:23,
108:3, 108:9,
109:1, 109:6,
109:7, 109:17,
109:18, 110:4,
110:25, 111:19,
112:22, 113:15,
114:9, 115:14,
115:15, 122:19,
130:10, 131:15,
132:1, 132:3,
132:18, 135:14,
135:24, 136:3,
136:21, 140:23,
141:11, 142:20,
143:10, 145:9,

145:16, 145:22,
146:8, 146:17,
147:3, 147:11,
148:20, 149:5
**hubbell's**
86:6, 105:4,
109:5, 116:3,
116:7, 131:20
**huge**
148:22
**huntington**
83:9, 83:12

---

**I**

**idea**
20:17, 22:4,
28:19, 29:6,
31:2, 73:3,
81:21, 82:24,
83:6, 85:1,
91:13, 91:20,
94:16, 95:23,
112:20, 116:9,
119:1, 122:11,
122:12, 130:12,
131:23, 133:10,
146:14, 147:8,
147:23, 149:9,
149:17, 150:3,
152:18, 154:6,
154:10, 158:17
**ideas**
75:12, 132:9
**identical**
131:16, 132:2
**identically**
132:3
**identification**
71:5, 71:7
**identified**
70:25, 71:17,
74:5, 74:10,
99:18
**identifies**
88:17, 157:16
**identify**
5:15, 59:2,
70:23, 87:23,

130:5, 151:3,
157:22
**igbt**
18:15
**imagine**
107:14
**immediate**
42:19
**immediately**
135:2
**impairment**
53:24
**implemented**
115:16
**important**
36:18
**improved**
155:14
**inc**
1:11, 2:13,
3:18, 52:17,
77:2, 79:20,
80:24, 92:16,
116:18
**incentive**
57:21, 59:8,
60:8, 60:12,
62:10, 63:10,
65:5
**inception**
135:23, 135:24
**incident**
150:18
**include**
17:10, 38:21,
45:18, 72:10,
151:14, 152:2
**included**
15:8, 44:4,
67:25
**includes**
55:5
**including**
38:17, 53:6,
53:13, 58:17,
117:17, 135:20,
137:21
**incorporated**
13:3, 106:20

incorrect
76:21, 77:22,
77:23, 85:22,
86:23, 135:7
incorrectly
85:5
increasing
110:5
indentures
45:8
independent
89:17, 160:22,
160:24
index
3:1, 3:7
indicate
60:5, 68:10
indicated
54:25, 56:22
indicates
89:5
indication
27:6
indirectly
43:10, 162:15
individual
59:6, 71:15,
71:17, 72:17,
76:18, 84:15,
87:10, 145:15
individuals
20:20, 29:15,
30:3, 49:12,
59:3, 59:10,
64:22, 69:7,
78:22, 82:8,
85:14, 98:15,
117:16, 126:10
industrial
1:11, 2:12,
5:6, 5:18, 6:21,
35:11, 35:19,
77:1, 82:10,
91:6, 93:12
industry
12:8, 91:17,
99:2
industry-type
146:15

inexplicably
111:2
informal
58:1
information
10:18, 21:9,
37:25, 67:13,
87:19, 100:4,
143:2, 148:5,
157:1
infringement
54:17
infringing
54:13
initial
3:17, 32:10,
70:21, 70:22,
77:25, 78:15,
131:7
initially
48:7, 110:22,
111:16, 151:9,
160:15
initials
129:17, 130:3
innovation
78:1
innovations
71:9, 74:7,
74:18, 77:17,
82:14, 84:19,
85:19, 88:6,
105:2
innovative
91:16
input
15:24, 26:19,
137:7
inquiries
109:9
inside
19:4, 78:6
insight
128:16, 139:24
inspect
130:9
inspected
134:20

inspection
37:15
instance
128:25
instead
85:5
institution
24:12
instruments
45:9
insulated
18:15
intangible
53:6, 53:13
integrating
74:18
intellectual
53:13, 53:17,
53:20, 53:25,
54:4, 54:9,
54:14, 54:22,
54:25, 56:9,
56:10, 57:3,
106:13, 107:11,
107:22, 108:5
intended
107:24, 153:24
intention
27:19
intentions
41:7
interact
9:23
interest
42:11, 43:11,
43:19, 43:25,
46:10, 52:5,
54:3, 55:17,
149:6
interested
13:25, 20:20,
23:23, 32:11,
74:7, 147:14,
162:14
intern
84:11
internal
99:5, 118:22,

130:4, 157:14
interview
73:5
introduced
120:12
invent
88:7
inventive
62:16
investments
52:2
invited
73:4
involve
152:9
involved
62:22, 75:13,
85:18, 93:11,
101:18, 138:10,
156:14, 158:1
involvement
141:20, 149:3,
156:20, 159:4
involves
8:21
involving
152:7
issues
28:21, 32:16,
41:1, 71:6,
96:16, 115:17,
116:2, 140:4,
156:24
item
94:25
items
59:8, 95:5
itself
18:14, 35:22,
72:13, 133:4

---

**J**

j
111:6
jang
149:19, 149:23,
150:2
january
3:13, 12:1,

12:20, 12:25,
13:11, 22:11,
23:2, 24:4,
34:19, 35:12,
35:20, 122:16
**jason**
59:12, 63:23,
64:7, 64:13
**jeez**
49:16
**job**
8:5, 12:6,
44:14, 70:1,
92:15, 92:22,
94:5, 94:10,
110:24, 118:12,
139:5
**jochen**
13:7, 73:14,
76:5, 89:12,
89:25, 146:13,
154:16, 160:20
**joe**
14:10, 60:25,
61:2, 63:22,
64:24, 118:5,
118:10, 137:15,
137:21, 142:25,
145:23, 145:25,
146:1
**joe's**
117:22
**john**
123:21
**joined**
12:14, 92:3
**joining**
14:14
**joint**
52:6, 92:17,
92:22, 92:24,
95:3, 95:17,
96:7, 100:19,
102:5, 104:3,
104:15, 105:5,
105:9, 105:12,
106:25, 107:6,
109:2, 110:6,

110:9, 111:1,
111:6, 112:18,
113:1, 113:2,
136:13
**joist**
105:20
**jon**
83:18
**jon's**
83:19
**joy**
111:5
**jump**
20:13, 93:21
**jumped**
24:19, 33:7,
47:6, 47:7,
84:1, 103:20,
156:24, 157:2,
157:4
**jumping**
130:24
**june**
1:24, 4:6, 5:9,
135:4, 140:1

---
**K**
---

**k**
98:2
**karin**
5:11
**katy**
12:22, 15:16,
15:17, 16:11,
17:3, 22:18,
23:8, 25:5,
63:20, 118:25,
119:7, 123:3,
137:11, 140:21,
161:4
**keep**
23:1, 48:9,
72:2, 97:3,
129:21, 151:13
**keith**
17:24, 29:2
**keller**
81:6, 103:20,

124:20, 154:17,
158:19, 160:21,
160:22
**ken**
2:4, 5:19, 7:3,
19:14, 66:2,
96:22, 119:25,
120:11
**kenburger@comcast**
2:9
**kentucky**
4:5, 4:11,
5:15, 6:12,
10:23, 10:24,
11:7, 11:12,
11:23, 12:2,
14:3, 14:17,
22:7, 46:20,
46:21, 46:23,
47:1, 48:23,
49:21, 50:4,
60:1, 67:14,
67:15, 67:16,
67:21, 67:22,
68:5, 68:11,
68:25, 70:9,
76:10, 118:25,
123:5, 137:11,
137:12, 137:13,
158:25, 162:2
**kept**
104:14, 113:23,
143:25, 144:17
**key**
93:24, 134:17,
140:12
**kind**
11:15, 14:24,
15:24, 20:4,
20:23, 22:20,
25:25, 29:2,
32:2, 32:3,
39:13, 39:16,
40:2, 40:25,
45:11, 46:12,
48:6, 48:12,
48:14, 50:15,
61:21, 78:4,

93:17, 113:16,
115:10, 118:18,
129:9, 134:17,
142:7, 143:1,
143:20, 156:1,
160:14
**kinds**
116:2
**king**
105:3, 105:8,
105:18
**kitchen**
71:9, 75:19
**knew**
31:1, 32:13,
32:15, 34:5,
50:14, 75:12,
75:23, 85:10,
90:1, 115:9,
132:9, 132:11,
157:20
**knowledge**
28:9, 36:19,
42:19, 54:12,
82:9, 88:2,
88:19, 89:13,
100:18, 109:18,
112:5, 124:17,
124:25, 125:18,
125:25, 126:9,
128:20, 138:4,
141:1, 141:4,
146:12, 146:15,
146:16, 147:3,
149:23, 150:7,
155:20, 159:25
**known**
91:16, 124:11
**koren**
2:22
**korton**
86:10
**kv**
12:10

---
**L**
---

**l-u-t-e-s**
85:6

**label**
72:3, 144:22
**labeled**
77:2
**lack**
140:3, 140:4
**lake**
14:20
**laptop**
68:7, 148:16
**large**
13:24, 32:6,
39:15, 61:13,
66:21, 76:25,
115:9, 116:7,
162:2
**larger**
14:24, 41:2,
153:20
**last**
6:25, 10:7,
11:2, 39:9,
39:19, 39:24,
39:25, 65:2,
66:17, 71:25,
73:1, 95:9,
99:15, 100:5,
107:17, 113:4,
113:5, 121:4,
121:8, 125:25,
138:12, 143:19,
147:24, 148:11,
148:12, 154:25,
155:1, 155:18,
155:23, 159:8,
160:19
**lasted**
69:25
**late**
153:9
**later**
9:13, 41:24,
71:11, 101:14,
105:9, 113:18,
142:17, 160:12
**latonia**
15:12, 15:21,
16:2, 16:4,

16:7, 16:8,
16:14, 16:16,
29:24, 30:21,
32:17, 140:21
**law**
2:5, 3:20,
85:15
**lawsuit**
6:20, 121:13
**lawyer**
81:23
**lay**
50:19
**laymen's**
157:9
**layout**
34:8
**lead**
30:24
**leading**
145:17
**learned**
59:15, 101:15
**lease**
51:14
**leased**
69:10, 69:12
**leases**
45:9
**least**
27:19
**leave**
11:2, 12:12,
64:19, 75:4,
136:22
**led**
48:4
**left**
10:6, 10:9,
10:14, 12:5,
12:13, 68:19,
70:5, 72:25,
73:2, 108:10,
130:12, 136:15,
136:20, 146:4,
154:13
**legal**
118:1, 127:12,

127:23, 133:13,
144:20
**legally**
58:2
**length**
95:8
**less**
40:12, 40:13,
40:15, 56:12,
100:9, 118:6,
143:15, 155:5
**lessee**
43:13
**lessor**
43:13
**let's**
11:18, 16:3,
48:10, 58:8,
60:24, 62:8,
65:24, 71:14,
90:12, 92:7,
92:13, 93:21,
97:4, 97:6,
99:12, 103:22,
129:10
**letter**
3:20, 43:8,
87:18, 87:21
**letters**
129:12, 130:1,
140:16
**lg**
32:24, 39:22,
98:24, 116:23,
124:5, 129:2,
129:6, 129:8,
129:12, 129:23,
132:2
**license**
55:18, 56:12
**licensed**
44:9
**licenser**
43:25
**licenses**
45:9, 45:19
**licensing**
56:8, 56:23

**licensor**
43:13
**liens**
46:10
**life**
81:12, 113:12
**lift**
18:25
**light**
14:19
**liked**
29:2, 31:2,
87:9, 108:18
**limited**
38:17, 47:3,
85:18
**line**
21:3, 21:6,
32:25, 41:6,
43:1, 65:7,
65:17, 74:20,
75:10, 75:14,
80:23, 89:16,
99:25, 107:10,
116:20, 118:4,
118:19, 119:5,
122:8, 124:2,
125:13, 126:6,
130:11, 132:3,
136:17, 137:22,
139:6, 142:7,
147:22, 149:6,
151:24, 152:1,
153:23
**lines**
64:9, 135:16
**list**
35:23, 45:17,
55:10, 55:12,
57:16, 57:18,
58:19, 112:4,
121:8, 121:9,
123:6, 130:15
**listed**
16:24, 39:19,
39:24, 39:25,
44:11, 55:19,
56:25, 95:6,

137:22
**listened**
137:7
**listing**
76:13
**lists**
59:6, 130:15,
130:17, 131:2
**literally**
143:14
**litigation**
37:5
**little**
11:2, 14:21,
20:5, 23:20,
31:21, 32:13,
36:9, 36:17,
37:10, 39:13,
40:5, 41:21,
47:5, 48:11,
56:1, 71:22,
78:4, 82:6,
108:9, 110:16,
118:9, 124:3,
129:3, 129:5,
129:8, 135:16,
142:9, 142:13,
155:14, 159:15,
160:4
**live**
48:1, 112:11
**lived**
22:6
**livering**
83:20
**living**
83:19, 83:22,
148:17
**llc**
46:22
**llp**
2:15, 4:4, 5:13
**load**
16:20, 16:21,
17:1, 19:1,
19:2, 38:21,
51:25, 52:21,
64:17, 65:3,

114:3, 114:7,
114:9, 114:13,
119:12, 123:8,
123:10, 134:4,
135:21, 136:2,
136:6, 136:8,
136:12, 136:23,
143:18
**located**
5:13, 6:11,
46:22, 67:15,
140:15, 140:18,
147:25, 154:9
**location**
101:3, 123:3,
140:22, 147:20,
152:25, 158:3
**locations**
15:15, 140:21
**locked**
47:16
**long**
12:4, 12:17,
14:1, 18:7,
25:1, 31:12,
75:17, 76:24,
96:18, 98:6,
109:25, 121:10,
142:15, 142:16
**long-time**
121:10
**longer**
10:16, 73:1,
96:24
**look**
23:23, 45:16,
48:15, 62:8,
79:25, 151:13
**looked**
44:23, 106:21,
144:15
**looking**
26:25, 30:7,
64:17, 82:5,
148:16
**looks**
19:22, 25:25,
26:4, 26:20,

27:21
**loss**
53:24
**lost**
73:3, 140:23
**lot**
12:7, 12:8,
14:12, 25:7,
25:9, 28:19,
28:21, 29:3,
31:4, 32:5,
36:15, 37:24,
40:25, 47:4,
47:9, 72:9,
75:21, 77:13,
78:3, 83:12,
89:2, 91:9,
96:16, 100:6,
101:24, 101:25,
104:8, 115:7,
129:21, 133:5,
133:6, 135:15,
140:10, 143:1,
146:19, 146:21,
153:21
**louisville**
160:9
**loved**
28:19
**low**
32:20, 93:25,
96:15
**lower**
19:1, 100:13
**lunch**
96:20, 96:23
**lutes**
85:4, 86:11

## M

**m-u-n-t-z**
148:13, 148:14
**madame**
119:17, 161:10
**made**
9:15, 23:18,
31:4, 48:14,
92:11, 105:11,

141:8, 158:2
**mail**
10:12, 20:14,
140:25
**mailed**
98:13
**mailing**
22:16
**mails**
148:5
**main**
22:4, 31:11,
50:14, 68:6,
69:4, 75:14,
77:10, 77:16,
96:12, 112:8,
122:2, 122:22,
123:21, 123:23,
125:23, 136:1,
136:18, 137:14,
156:10, 160:1,
160:4
**maintain**
141:3
**maintained**
122:18, 135:19
**maintenance**
56:12, 93:11
**major**
88:9, 118:7,
146:20
**majority**
40:20, 136:16,
147:16
**make**
7:7, 8:10,
8:15, 8:19,
8:24, 37:14,
48:15, 72:5,
120:18, 122:4,
122:12, 149:1
**makes**
8:5, 102:13,
104:2
**making**
21:20, 62:4,
77:13, 94:19,
101:23, 103:3

mallette
63:24
man
149:12, 150:1,
152:15, 154:11,
158:12
manage
64:20, 87:1,
93:22
managed
64:21, 143:24
management
15:15, 62:21,
71:22, 73:5,
87:9, 109:10,
110:25, 111:3,
125:11, 135:17,
143:17
manager
59:9, 62:11,
63:16, 64:16,
64:22, 75:3,
123:15, 123:22
managers
59:11, 60:10,
63:11, 112:4,
112:5, 137:20,
156:11
managing
86:24, 138:16,
148:7, 148:8,
149:6
manufacture
16:17, 20:21,
29:24, 33:5,
69:13, 96:16,
114:9, 115:1,
134:3
manufactured
15:20, 17:3,
17:4, 18:10,
31:15, 44:25,
51:24, 88:9
manufacturer
31:9, 31:10,
81:19, 158:21
manufacturer's
65:13, 84:8

manufacturers
14:12, 88:10
manufacturing
11:17, 12:21,
13:12, 14:20,
14:22, 14:23,
15:6, 15:7,
15:11, 15:18,
15:22, 16:12,
16:20, 17:12,
22:5, 22:9,
30:22, 30:23,
32:17, 33:4,
33:19, 38:12,
49:4, 65:4,
69:15, 69:18,
70:6, 81:10,
90:2, 91:7,
101:4, 112:14,
113:21, 114:15,
131:9, 131:11,
146:18, 152:4
many
9:12, 12:11,
13:8, 75:5,
99:3, 109:20,
114:20, 115:17,
116:9, 123:4,
123:12, 123:18,
131:15
march
12:5, 12:13
margin
32:20, 93:25,
96:15
margins
100:12
marine
83:4, 93:9
mark
7:1, 19:11,
22:10, 35:10,
72:2, 79:15,
87:12, 117:8
marked
19:13, 22:12,
25:14, 35:14,
70:17, 70:19,

79:11, 87:15,
87:17, 89:18,
117:10
market
32:23, 99:19,
118:15, 132:3
marketed
130:2, 130:9,
132:18
marketing
93:12, 95:4,
128:18, 141:20,
146:18, 147:12
marks
161:13
martin
93:19, 94:1,
118:7, 118:11,
118:13, 118:18,
119:5, 125:14,
136:17, 153:15,
156:24
martinez
83:2
matched
94:19
material
53:20, 55:3,
90:18, 160:10
materials
10:15, 67:14,
68:5, 68:11,
159:24, 160:3,
160:8
matter
5:5, 6:18,
70:22, 70:24,
120:13, 131:12,
131:15, 141:14,
162:8
maybe
13:15, 15:3,
23:11, 27:9,
40:1, 40:15,
48:8, 48:19,
73:4, 73:22,
81:18, 97:21,
98:4, 103:20,

114:5, 115:24,
120:2, 122:23,
123:7, 132:24
mba
11:14
mcrowe@powerohm
117:17
mean
15:4, 18:12,
19:22, 33:22,
45:6, 55:8,
60:8, 75:21,
87:2, 88:7,
90:8, 92:1,
92:4, 126:23,
126:25, 128:23,
131:4, 134:2,
141:9, 141:24,
144:20, 147:17,
152:20
meaning
42:5, 44:21,
45:25, 49:24,
95:13, 109:2
means
39:4, 45:6,
46:9, 46:21
meant
10:25, 119:1,
124:23
mechanical
59:13
mechanically
162:9
media
5:3
medical
9:1
medications
9:1
medium
12:9
meet
17:20, 25:5,
32:8, 149:15
meeting
25:6, 32:10,
73:24

meetings
73:11, 73:17,
105:9, 105:20,
105:22, 149:14
member
42:19
memos
140:17
mentioned
16:2, 48:22,
103:19, 106:7,
121:16, 127:25,
135:21, 141:11
mentions
21:2, 101:12,
102:3
merger
143:4
mess
115:21
message
23:6, 23:19
met
6:16, 17:21,
17:23, 18:1,
63:6, 73:22,
90:24, 93:19,
105:18, 149:14,
149:16
metal
33:8
method
147:21
mexico
113:16, 115:1
micah
84:5, 84:10
michael
1:23, 4:3, 5:4,
6:8, 161:14
middle
1:2, 5:7, 47:4
might
9:13, 36:13,
36:17, 37:10,
41:21, 92:8,
118:20
mike
20:22, 23:6,

23:7, 23:8,
23:9, 23:11,
23:12, 23:17,
23:18, 23:20,
24:18, 25:2,
26:16, 30:11,
69:24, 71:20,
71:21, 72:16,
72:22, 73:12,
73:13, 73:22,
74:10, 74:12,
74:13, 76:5,
84:22, 88:17,
88:18, 105:10,
106:22, 110:4,
110:22, 111:16,
134:22
million
13:16, 13:22,
27:3, 39:8,
39:16, 40:10,
40:12, 40:14,
40:15, 40:18,
100:1, 100:9,
155:3, 155:5,
155:9, 155:23
minute
35:24, 110:1,
117:12, 146:5,
154:8
minutes
66:3, 97:1,
120:14, 143:15,
159:2, 159:7,
159:10, 159:12,
159:13
misappropriating
54:13, 54:22,
54:24
misappropriation
54:17
missed
87:4
mistake
32:19, 92:11,
157:3
mode
18:23

model
86:25
module
18:13, 19:3,
31:13, 31:15,
31:22, 32:13,
40:4, 72:10,
82:13, 92:10,
93:9, 93:17,
95:5, 96:14,
99:2, 116:8,
116:18, 119:6,
130:5, 130:10,
131:16, 134:11,
135:6, 142:7,
142:10, 147:5,
147:22, 149:6,
150:6, 150:10,
150:11, 150:18,
150:21, 151:8,
157:6, 157:9,
157:15
module's
19:8
modules
17:11, 18:10,
18:11, 20:21,
31:2, 31:10,
32:6, 32:11,
32:24, 33:11,
34:4, 34:5,
38:21, 39:20,
40:9, 41:2,
44:14, 52:15,
53:14, 57:9,
63:2, 64:7,
68:13, 69:14,
69:24, 72:1,
72:4, 72:8,
75:9, 75:11,
75:13, 75:17,
86:22, 88:10,
88:23, 89:1,
90:2, 90:25,
91:12, 91:13,
92:5, 93:23,
93:25, 94:9,
96:13, 96:14,

99:3, 99:5,
99:24, 100:6,
100:7, 108:13,
113:22, 115:3,
115:7, 115:24,
123:8, 125:14,
128:17, 128:22,
130:1, 130:18,
132:8, 132:10,
134:6, 139:6,
140:13, 141:21,
142:5, 146:18,
146:23, 147:14,
149:11, 149:22,
152:2, 152:5,
153:6, 153:20,
155:2, 155:18,
156:15, 156:17,
156:18, 156:21,
156:25, 157:7,
157:9, 157:11,
157:18
moment
26:14, 124:7,
137:24
monday
87:5
money
28:21, 36:16,
101:24, 144:7
moneymaker
100:12
monitor
5:10, 50:16
month
94:12, 115:24,
143:12, 145:4,
145:17, 145:18,
146:8
monthly
59:19
months
30:4, 108:11,
109:20, 140:1,
143:12
more
15:22, 21:9,
40:12, 40:18,

46:17, 65:2,
71:21, 101:24,
114:6, 118:14,
140:9, 140:12,
143:18, 143:19,
148:3
**morning**
6:6, 6:13,
6:14, 6:16, 9:4,
23:6, 87:5
**most**
17:24, 62:3,
121:8, 123:2,
148:4
**mostly**
62:20, 100:6,
142:23, 154:16,
160:20
**motel**
85:2
**motherboard**
18:17, 34:9,
34:12, 34:13,
157:15
**motor**
18:22, 18:23,
93:12
**move**
22:7, 48:23,
48:25, 104:20,
131:25, 132:12,
134:16, 134:21,
151:19
**moved**
10:7, 14:6,
14:15, 15:2,
69:13, 69:19,
70:5, 72:25,
112:10, 113:15,
135:14, 135:18
**movers**
40:23
**moves**
21:20
**movie**
121:19, 121:22
**much**
26:17, 26:18,

29:11, 31:23,
33:9, 57:8,
59:14, 78:6,
101:4, 141:18,
143:21, 143:24,
144:12, 148:3,
157:18
**multi**
99:25
**multi-million**
99:18, 99:24
**multiple**
30:12, 73:12,
73:17, 104:25
**muntz**
148:9, 148:13
**murfreesboro**
2:7
**must**
23:17
**mute**
119:22, 120:8
**muted**
120:2
**mutual**
75:6
**mutually**
99:18
**myself**
44:16, 143:20

**N**

**name**
6:6, 6:15,
49:20, 80:24,
84:7, 85:4,
89:24, 97:17,
101:8, 102:25,
103:9, 103:24,
104:21, 108:22,
108:25, 109:24,
121:8, 124:15,
129:11, 129:22,
143:7, 145:15,
148:11, 148:12
**named**
17:23, 75:3,
79:3, 82:8,

126:17, 127:5,
127:11
**names**
83:12, 129:4
**naming**
128:21
**narrow**
91:17, 91:25
**nashville**
17:23, 20:22,
29:7, 48:25,
60:1, 73:19,
75:20, 101:4,
152:25, 158:3,
158:10, 158:21
**nature**
13:10, 18:9,
61:24, 93:7,
93:11, 137:3
**near**
14:20
**necessary**
19:8, 44:1
**need**
7:20, 7:24,
8:3, 8:13, 8:14,
8:24, 8:25,
21:9, 30:17,
30:20, 36:23,
41:21, 45:17,
56:15, 72:12,
96:24, 97:2,
103:20, 135:21,
136:25, 143:21,
148:23, 149:1,
151:7, 157:17
**needed**
10:16, 15:24,
49:2, 64:10,
108:11, 112:13,
115:18, 122:14,
157:1, 157:16
**needs**
157:13
**negotiating**
142:21, 142:23,
147:10
**negotiations**
30:7, 147:4

**neighboring**
77:1
**neither**
42:16, 42:24,
43:4, 153:24,
158:7
**net**
2:9
**neutral**
64:6, 64:12,
64:14
**never**
28:10, 28:11,
41:8, 55:23,
55:24, 57:4,
59:13, 59:14,
65:9, 65:10,
65:11, 65:16,
65:17, 75:17,
76:17, 78:23,
78:24, 79:1,
81:11, 81:25,
82:23, 86:21,
88:13, 89:1,
89:8, 90:3,
90:4, 92:24,
100:18, 102:21,
102:23, 104:9,
105:22, 105:23,
106:1, 107:5,
107:13, 108:7,
108:15, 108:16,
109:10, 109:22,
110:17, 110:18,
111:7, 113:22,
116:14, 124:14,
127:22, 128:15,
133:8, 142:16,
142:17, 146:10,
146:11, 147:8,
147:13, 149:13,
151:15, 153:18,
153:23, 153:24,
154:2, 156:1,
157:23, 158:20,
159:1, 159:2,
160:24
**new**
10:7, 21:2,

48:13, 61:15,
70:8, 74:9,
75:10, 88:3,
94:13, 95:7,
96:17, 105:5,
105:12, 106:24,
109:2, 109:22,
110:25, 115:16,
116:13, 117:2,
117:3, 117:22,
118:15, 121:20,
139:6, 148:16,
152:7, 152:9
**news**
76:16
**next**
21:11, 21:17,
26:2, 26:11,
41:9, 42:4,
43:17, 44:19,
45:22, 46:6,
49:21, 52:23,
53:16, 54:8,
67:9, 72:16,
73:25, 74:3,
76:3, 76:25,
77:14, 77:24,
78:10, 80:4,
80:23, 83:9,
84:5, 87:12,
93:5, 95:1,
96:5, 99:12,
120:14
**next-to-last**
23:1
**nice**
48:15, 48:19,
78:5
**night**
30:11, 73:20,
73:23, 74:1,
134:19
**nights**
73:21, 73:22
**nine**
111:20, 117:6,
146:20
**nomenclature**
128:17, 128:21

**none**
108:12
**nonexistent**
124:9, 152:17
**nope**
109:7
**normally**
63:7, 65:11
**north**
2:6, 69:16,
148:18
**northern**
10:24, 11:1,
22:7
**notary**
4:10, 162:23
**nothing**
6:1, 10:11,
32:14, 94:21,
109:8, 110:17,
110:19, 142:6,
157:20, 158:24,
162:8
**notice**
54:15, 67:19
**nouns**
16:24
**novel**
95:4, 95:22,
95:23, 99:18
**number**
5:3, 5:8, 27:2,
37:2, 37:5,
59:9, 59:17,
60:24, 61:19,
67:1, 71:2,
71:5, 80:23,
83:18, 84:5,
84:22, 88:17,
89:12, 91:23,
117:16, 122:18,
122:20, 129:1,
129:20, 130:4
**numbering**
37:5, 129:10
**numbers**
26:22, 26:25,
33:3, 40:11,

61:18, 100:11,
128:23, 129:16,
131:16, 132:2,
132:4, 132:16
**numeral**
90:17
**numerous**
97:18
**nw**
2:16

---

### O

**o'hara**
14:8, 62:11,
62:19, 63:13,
63:23, 64:11
**oaks**
6:10, 6:11
**oath**
7:19, 129:25
**objection**
125:3, 126:19,
132:20, 133:14,
133:18, 133:24,
135:9, 152:11,
156:6, 158:13
**objections**
8:19
**objectives**
27:2, 111:1
**obligated**
8:21, 70:23
**obligations**
45:9
**obviously**
37:24
**occasion**
74:1, 114:22,
130:8
**occasionally**
72:1, 75:7,
123:9
**occasions**
73:12
**occurred**
126:2
**odd**
111:2, 112:16,

113:23
**off-the-shelf**
56:11
**offer**
92:15, 141:18
**offered**
32:12, 106:23,
134:16, 146:23,
151:15, 153:12
**office**
14:5, 14:13,
26:1, 50:10,
50:11, 70:4,
70:6, 70:8,
87:5, 112:21,
127:18, 135:20,
146:10, 159:24
**officer**
42:17, 43:3,
43:4, 43:11,
58:3, 58:4,
136:13
**officers**
136:5
**official**
141:9
**officials**
106:12, 107:21
**oh**
14:4, 18:3,
25:7, 26:23,
31:14, 33:13,
43:2, 49:16,
58:12, 61:10,
81:24, 91:24,
109:13, 111:11,
114:25, 139:12
**ohio**
114:17, 114:18
**ohm**
85:2, 160:9
**oilfield**
83:4, 93:9,
118:17
**oilfields**
91:9
**old**
10:10, 14:20,

14:22, 114:23
**olsen**
20:24, 25:3,
30:15, 71:14,
71:20, 71:23,
73:13
**omron**
32:5, 83:3,
83:4, 93:9,
93:19
**once**
82:18
**one**
5:3, 11:14,
13:6, 13:20,
14:11, 19:25,
30:9, 30:10,
30:11, 30:12,
30:16, 30:17,
34:5, 35:1,
35:24, 36:18,
39:14, 40:21,
41:17, 44:16,
44:19, 46:20,
51:20, 52:15,
61:9, 61:10,
61:15, 66:16,
69:23, 71:18,
73:4, 73:19,
73:20, 73:23,
73:25, 74:1,
74:2, 78:21,
80:23, 83:19,
83:21, 84:12,
85:1, 88:7,
90:14, 91:22,
95:9, 97:21,
100:15, 106:4,
112:1, 112:3,
112:6, 112:8,
115:17, 115:23,
117:5, 117:16,
121:6, 121:7,
122:24, 125:5,
126:10, 134:17,
137:22, 150:18,
151:12, 153:15,
156:9, 157:25,

158:6, 158:8
**one's**
41:14
**ones**
32:25, 58:20,
115:10
**ongoing**
105:8, 105:20,
106:23
**online**
86:22, 131:22
**only**
23:18, 36:11,
36:19, 52:20,
56:4, 60:19,
65:12, 85:1,
85:11, 94:1,
97:21, 103:22,
106:2, 110:12,
110:13, 110:16,
112:1, 112:3,
112:6, 112:8,
115:6, 115:23,
124:13, 130:4,
134:21, 135:4,
140:2
**opened**
14:16
**operate**
28:23, 51:14
**operation**
53:21, 77:16,
107:25, 136:1
**operations**
14:2, 14:4
**opportunity**
31:17
**option**
148:3
**options**
152:21
**oral**
45:7, 45:18,
55:5, 56:24,
58:1, 58:18,
60:4
**order**
97:19

**orders**
115:10, 115:18
**ordinary**
53:3
**organization**
142:21, 148:6,
157:21, 157:22,
159:3, 159:8
**original**
37:14, 71:18,
72:19, 93:16,
132:15
**other**
11:12, 12:11,
13:7, 23:18,
26:25, 30:19,
32:25, 33:21,
33:22, 33:23,
34:5, 43:18,
45:11, 45:19,
46:12, 49:12,
51:24, 52:4,
52:7, 52:16,
53:5, 53:10,
54:13, 54:21,
56:10, 56:12,
57:5, 57:19,
58:2, 59:12,
63:4, 72:16,
74:6, 74:17,
82:9, 82:13,
83:20, 83:21,
88:25, 95:5,
105:9, 123:21,
126:5, 126:17,
135:25, 138:17,
144:22, 155:17,
157:18
**others**
13:25, 104:12,
109:10
**otherwise**
53:3, 77:18,
82:14
**out**
9:24, 15:21,
24:20, 26:5,
30:10, 39:17,

47:6, 49:1,
51:25, 60:3,
60:7, 61:22,
63:6, 64:1,
73:7, 79:7,
85:2, 108:5,
108:18, 111:23,
112:4, 112:8,
112:14, 122:14,
123:2, 123:4,
123:7, 126:25,
130:7, 134:20,
134:22, 135:4,
143:20, 147:24,
152:15, 161:2,
161:4, 162:6
**out-of-pocket**
59:20
**outcome**
21:21
**outside**
28:8, 28:10,
65:13, 71:10,
78:6, 154:17
**over**
7:14, 10:6,
13:16, 13:18,
13:19, 13:21,
20:23, 30:21,
39:15, 48:10,
50:13, 60:8,
61:11, 62:20,
64:6, 64:15,
64:21, 64:24,
73:4, 74:1,
74:2, 84:13,
85:7, 87:8,
112:17, 114:16,
118:5, 120:14,
122:20, 131:11,
137:20, 137:21,
143:17, 145:20,
153:16, 156:25,
157:1, 160:2,
160:5
**overall**
30:23
**overlays**
33:8

overnight
39:17
overstaying
76:23
overview
131:13, 141:23
owed
111:4
own
11:17, 12:22,
47:20, 51:14,
52:3, 65:14,
68:18
owned
34:20, 34:24,
46:22, 67:15,
69:4, 69:6,
77:1, 83:7
owner
78:24
owners
36:5, 44:15,
78:23, 79:1,
136:18, 142:23
ownership
35:3, 43:11,
44:9, 44:12,
52:4, 53:14,
54:3, 55:17,
55:22, 56:8,
56:23, 60:14,
103:4, 136:16,
137:2, 151:15
owns
43:19, 43:25,
53:19

**P**

P
56:7
page
3:2, 3:8, 26:8,
26:11, 26:21,
26:23, 27:11,
27:23, 27:25,
36:4, 37:2,
37:22, 38:6,
41:10, 42:9,

45:1, 46:18,
49:22, 50:18,
50:20, 51:2,
52:1, 52:23,
53:16, 54:8,
55:11, 57:11,
65:23, 67:1,
67:9, 71:3,
80:2, 80:3,
80:7, 82:7,
83:1, 84:5,
84:17, 85:13,
86:4, 87:21,
90:17, 91:3,
99:12, 106:5,
111:12, 111:13,
162:6
pages
80:1, 80:4
paid
31:21, 33:16,
57:3, 94:11,
95:25, 96:2,
116:17, 122:6,
143:12, 144:3
painted
48:14
panel
39:18
paper
81:20
papers
68:8
paragraph
21:11, 21:17,
38:10, 43:24,
51:13, 53:18,
68:10, 89:23,
91:15, 92:7,
92:13, 94:4,
95:13, 97:20,
98:21, 99:13,
100:14, 101:12,
102:3, 102:11,
102:25, 103:1,
103:4, 103:8,
103:24, 104:2,
104:11, 104:22,

106:7, 110:21,
117:14
paragraphs
90:22, 91:4,
101:7
parenthesis
38:24
park
10:23
parking
47:3, 47:4,
47:9, 47:22,
69:9, 76:22,
77:13
parse
42:1
part
15:16, 16:22,
20:8, 22:24,
25:19, 27:20,
30:18, 32:22,
33:2, 43:17,
70:22, 76:13,
81:4, 81:14,
82:18, 86:2,
103:15, 108:3,
114:8, 128:23,
129:1, 129:10,
129:20, 130:4,
130:5, 130:17,
130:21, 136:21
participated
105:8
particular
120:21, 149:7
parties
67:12, 70:23,
99:17, 102:4
partner
17:22, 87:25
partners
13:6, 13:7,
44:10, 144:25
partnership
52:6, 117:24,
136:16
partnerships
118:2, 118:6

parts
25:18, 32:16,
35:21, 128:17,
128:21, 129:5,
129:12, 129:15,
129:16, 130:9,
130:15, 131:1,
131:16, 131:17,
132:1, 132:2,
132:4, 132:16
party
43:17, 45:12
party's
110:5
passed
100:25
past
13:16, 54:16,
75:17
patent
26:1, 150:5,
150:7
pay
111:3, 144:7
paycheck
116:22
paying
143:5
payment
122:5
payroll
13:9, 13:20,
154:23
pcb
34:7
peko
136:17
penn
2:16
people
28:4, 33:24,
36:19, 49:14,
62:23, 62:24,
121:8, 123:12,
123:18, 126:8,
134:2, 134:4,
135:6, 141:10,
143:24, 145:7,

149:8

**perceived**
106:25

**percent**
40:15, 60:14,
65:6, 65:8,
65:9, 65:17,
65:20, 102:14,
102:22, 103:3,
103:4, 103:5,
104:3, 104:10,
112:25, 117:2,
145:19, 155:23

**perform**
143:9

**performance**
98:18, 138:1,
138:5, 138:8,
138:12, 138:18,
138:21, 140:3,
140:5

**performed**
93:8, 138:18

**period**
34:16, 36:12,
55:22, 57:4,
96:14, 122:15,
144:22, 145:5,
145:17, 145:18,
146:8, 149:25

**periodic**
138:1

**permanent**
78:15

**permission**
155:13

**person**
43:12, 52:8,
54:15, 83:9,
85:11, 108:19,
138:17, 148:6,
149:7, 154:21

**person's**
42:19

**personal**
53:5, 88:5,
88:21

**personally**
141:16

**personnel**
74:5, 135:20

**persons**
65:12

**pertaining**
89:24, 149:21

**pete**
63:22

**phenolic**
130:6

**phil**
93:19, 94:1,
156:24

**phone**
12:7, 113:11,
141:17

**phonetic**
149:19

**photocopies**
37:9

**physical**
147:20

**physically**
154:22

**pick**
19:1

**piece**
23:16, 81:20,
130:6

**pills**
9:4

**pittsburgh**
143:4, 143:8

**place**
5:12, 162:6

**placed**
127:18

**places**
71:2

**plaintiff**
1:7, 2:3, 2:22,
74:19, 92:14,
98:17, 99:1,
99:9, 99:16,
104:14, 105:5,
105:8, 106:23,
107:18, 107:24,
109:1, 110:22,

111:4, 111:15

**plaintiff's**
3:17, 70:21,
71:9, 86:12,
90:18, 91:15,
93:6, 94:4,
95:4, 97:16,
104:25, 105:1,
106:13, 107:22,
109:9

**plan**
3:12, 3:14,
21:9, 21:12,
21:15, 23:24,
24:7, 24:8,
24:15, 24:17,
24:19, 26:9,
26:12, 26:15,
26:20, 26:24,
27:7, 28:7,
28:12, 29:11,
30:7, 48:24,
57:18, 57:23,
59:6, 59:9,
60:12, 60:24,
61:4, 61:7,
61:11, 61:14,
61:19, 62:10,
62:15, 62:16,
63:9, 65:5,
74:8, 74:19,
95:3, 95:6,
100:18, 100:22,
103:12, 106:21,
110:7, 110:9,
116:13, 128:5,
128:9, 128:11,
128:12, 128:15,
152:17, 152:20,
153:2

**planet**
5:11, 5:21

**planned**
48:16, 106:10,
107:20

**planning**
109:21

**plans**
45:9, 45:23,

57:13, 57:16,
58:17, 58:24,
60:8, 60:9,
62:2, 63:10,
105:11, 109:5,
145:11, 145:13

**plant**
14:17, 16:6,
50:10, 116:22,
135:5

**plants**
64:15

**play**
121:24, 146:6

**played**
146:7

**please**
5:15, 5:23,
8:15, 28:18,
56:15, 120:16,
120:17, 139:3,
154:8

**plenty**
91:7, 131:8

**plural**
20:16

**plus**
94:12, 95:14,
96:1

**point**
14:2, 14:16,
18:8, 28:17,
29:14, 48:1,
96:18, 146:17

**policy**
57:23

**polywka**
2:23, 5:11

**poor**
48:13, 139:1,
139:11, 139:15,
139:16

**portion**
16:21, 30:24,
40:19, 147:15,
155:7

**position**
89:6, 111:22

positive
13:4, 98:18,
100:10
possess
82:8, 137:2,
137:5
possessed
140:19
possesses
43:10, 88:2,
89:13
possibilities
23:25
possible
139:20, 139:23,
154:3
possibly
81:19, 152:25
post
12:1, 12:12,
12:15, 14:7
post-closing
38:3, 67:6
potential
17:22, 43:14,
99:18, 99:25
powder
115:21
powell
134:18
powerohm's
42:18, 74:20,
76:6, 78:12,
82:10, 95:2,
105:5, 105:11,
106:10, 107:19,
135:23, 141:19,
159:4
practice
57:24, 58:19
practices
45:10
preceding
110:4, 135:3,
138:22, 140:1,
141:6, 147:4,
156:4
precisely
131:25

predate
84:19
predated
89:14
predatory
101:15, 101:18
predecessor
84:21
preface
129:15
preliminary
39:6
premier
121:22
prepare
21:13, 120:22
prepared
24:16, 51:20,
60:6, 128:6,
128:8, 138:8,
160:18
preparing
27:7
presence
9:16, 60:4,
104:25, 158:11
present
2:22, 131:15
presently
53:22, 72:23,
130:9, 132:1,
132:3, 132:17
presently-identi-
fied
86:14
president
14:11, 31:16,
61:3, 87:24,
88:18, 117:23,
118:8, 124:24,
125:9, 137:15,
137:16, 145:24,
153:17
pressure
9:5
pretty
24:20, 29:11,
30:22, 31:23,

59:14, 121:2,
121:3, 143:23,
159:9
previous
13:19, 39:10,
110:23, 111:5
previously
127:10
price
143:6, 144:11
primarily
105:3, 142:21
primary
137:9, 137:13,
149:5
principle
78:12, 78:16,
78:24
prior
9:17, 77:2,
141:21
private
105:10
probably
20:6, 25:2,
29:12, 29:22,
47:9, 100:5,
100:9, 133:4
problem
30:19, 161:12
problems
32:16
procedure
4:8
proceeding
7:17
proceedings
3:3, 5:1
process
64:17
processes
88:19
producing
141:20
product
19:7, 31:3,
39:19, 41:6,
60:10, 62:21,

64:9, 65:7,
65:17, 74:20,
75:10, 75:14,
75:25, 89:16,
94:5, 94:8,
94:10, 95:14,
95:25, 99:25,
107:10, 112:5,
115:17, 115:19,
116:20, 118:19,
119:4, 122:8,
123:15, 123:22,
125:13, 130:11,
135:16, 137:20,
142:15, 147:22,
151:24, 152:1,
153:23, 156:11
production
20:23, 88:9,
135:14
products
34:21, 34:25,
35:4, 38:17,
52:15, 55:19,
57:4, 60:10,
99:8, 100:3,
107:8, 107:9,
114:23, 116:18,
118:15, 123:23,
131:21, 150:6,
150:22
professionally
114:2
profit
104:8
profitability
24:8
profitable
107:1
profits
104:4, 104:6,
104:10, 147:16
program
10:25, 57:24,
98:10
progress
88:20
progressing
101:13, 104:13

project
20:7, 21:7,
25:8, 59:9,
59:11, 62:11,
63:11, 63:15,
86:16, 93:9,
99:24, 112:4,
142:11, 155:15,
156:23
projects
16:18, 30:23,
39:15, 140:7
promised
104:3, 112:25,
117:2
promising
105:4
proof
84:18
prop
118:10, 125:15
properties
43:19, 46:22,
51:15, 52:24,
53:2, 53:5, 53:6
property
30:7, 46:21,
53:13, 53:17,
53:20, 53:25,
54:5, 54:9,
54:14, 54:23,
54:25, 56:9,
56:10, 57:3,
68:12, 77:7,
77:9, 106:13,
107:11, 107:22,
108:5
proposal
92:15, 92:17,
92:23, 92:24
proposed
21:25, 93:5,
94:4, 95:3
proprietary
52:5, 54:3
protection
150:6
proved
89:15

provide
6:19, 8:25,
74:3, 78:19,
81:2, 92:8,
145:2
provided
76:6
providing
58:2
provisions
80:14
public
2:6, 4:11
pull
121:7
pulsers
38:19
purchase
3:16, 35:11,
35:18, 35:21,
36:3, 36:11,
37:21, 38:7,
66:12, 66:22,
69:3, 69:7,
76:8, 78:21,
82:9, 99:6,
106:10, 107:19
purchased
14:17, 14:23,
47:7, 47:8,
47:11, 69:16,
76:20, 76:21,
77:11, 77:15,
78:22, 107:10,
115:14, 135:15
purchasing
13:25, 47:5
pure
88:15
purged
10:8
purported
78:10
purpose
74:17, 85:21,
88:4, 152:8
pursuant
4:7, 56:9,

59:17, 68:16,
80:13
pursue
101:1, 128:3
pursued
74:16, 157:24
pursuing
125:20
pursuit
85:19
pushers
39:14
pushing
122:2
put
14:13, 20:7,
27:9, 35:6,
48:13, 48:19,
49:10, 49:12,
53:1, 60:7,
60:9, 64:16,
64:18, 66:15,
79:16, 113:3,
129:20, 134:19,
135:16, 143:1,
143:3, 150:20
putting
23:24
pw
33:2

Q

question
7:21, 8:8,
8:21, 41:17,
97:21, 100:15,
100:24, 120:17,
123:17, 130:19,
130:23, 130:25,
131:24, 132:12,
134:24, 136:7,
139:10, 139:14,
151:22, 159:11
questions
8:3, 9:3, 9:7,
9:22, 15:24,
39:6, 63:7,
101:10, 113:4,

116:11, 117:13,
119:15, 120:14,
136:25, 161:5
quick
59:2, 65:24,
66:3, 73:24,
97:21, 155:15
quickly
13:18, 18:18,
28:21, 41:13,
114:12, 155:16
quite
15:2, 133:2,
140:11
quote-quote
78:11
quote-unquote
74:9
quoting
45:6

R

raise
5:23, 138:23,
156:5, 156:8
raises
139:4, 156:9
ramped
13:17
ran
160:5
randy
63:22
rarely
115:11
rather
88:22
rd
24:4
re-collate
35:7
reach
95:23
reaching
152:15
reactor
15:9
read
19:19, 20:2,

26:8, 30:11,
36:14, 41:16,
58:16, 68:3,
90:21, 91:4,
91:24, 92:8,
97:20, 98:21,
98:22, 99:13,
100:14, 101:7,
102:11, 102:12,
102:25, 103:2,
103:8, 103:10,
103:24, 104:22,
106:7, 106:17,
108:23, 110:1,
110:2, 117:12,
119:3, 120:23,
121:1, 121:2,
139:10, 139:14
**reads**
52:3, 119:4
**ready**
75:22, 115:8
**real**
53:4, 53:5,
59:2, 69:17,
95:23, 115:21
**realistic**
106:25
**realize**
81:22, 81:25
**realized**
11:15
**really**
30:20, 32:18,
40:2, 40:17,
50:11, 57:7,
62:1, 62:6,
66:1, 76:23,
80:12, 83:25,
96:6, 101:2,
118:8, 118:16,
124:21, 124:23,
138:14, 142:11,
143:16, 146:6,
147:14, 148:24,
158:1
**reason**
41:3, 69:8,

82:9, 93:24,
94:2, 113:23,
116:19, 122:22,
130:8, 151:4
**reasonable**
67:19
**reasoning**
103:23
**reasons**
86:13, 88:3,
139:24
**recall**
14:3, 14:25,
15:5, 18:2,
18:6, 19:21,
24:15, 25:6,
25:10, 26:13,
26:15, 29:9,
30:8, 35:24,
47:11, 49:19,
50:3, 59:23,
61:4, 61:24,
62:14, 62:19,
63:15, 64:2,
67:25, 68:4,
68:15, 73:17,
97:23, 102:20,
109:4, 117:1,
133:22, 147:9,
151:4, 155:4
**receipt**
80:1
**receipts**
102:15
**receive**
6:23, 61:13,
113:17, 137:25,
138:4, 144:19
**received**
23:6, 23:15,
23:19, 54:15,
84:9, 92:14,
98:18, 117:9,
138:21, 156:5,
156:8
**receives**
59:18
**receiving**
19:20

**recently**
69:2, 101:14
**recess**
66:6, 97:11,
159:19
**recipients**
20:17
**recitals**
44:21
**recognize**
36:7
**recollection**
9:13, 81:3,
94:16, 102:18,
134:13, 138:11,
159:25
**record**
6:7, 9:16,
10:1, 66:4,
66:7, 87:23,
97:6, 97:7,
97:9, 97:12,
117:14, 137:1,
139:14, 159:18,
159:20, 161:15,
162:11
**record's**
59:1
**recorded**
158:9, 162:9
**recorder**
161:10
**records**
15:4, 80:4,
80:5, 140:15,
140:18, 140:23,
141:3
**redirect**
161:9
**reduced**
162:10
**redundant**
36:18, 56:1,
82:6
**reference**
51:3, 102:13,
104:3, 108:25
**references**
26:9, 42:23

**referencing**
21:14, 85:2
**referred**
129:9
**referring**
13:5, 99:22,
118:25, 125:11,
140:16, 153:15
**reflect**
129:16
**reflected**
53:7, 60:17,
60:20, 131:2,
131:6
**reflects**
132:16
**regard**
136:8, 142:4,
142:19, 146:17,
159:23
**regarding**
55:18, 87:20,
88:2, 88:19,
89:13, 141:7,
145:6
**regards**
49:6
**region**
18:23, 18:25,
75:16
**register**
103:20, 158:22
**registered**
78:14, 79:3,
79:8, 126:11,
126:18, 126:23,
126:24, 126:25,
127:5, 127:11,
133:12, 136:5,
136:14, 158:12
**registration**
124:18
**regular**
71:10, 115:12,
121:6
**reimbursed**
59:20
**related**
9:5, 56:7,

60:11, 67:14,
68:4, 68:13,
111:5, 112:18,
126:11
**relating**
55:13, 147:11
**relationship**
43:18, 104:21
**relative**
162:13
**relatively**
15:25, 95:1,
95:11
**released**
83:24, 135:19
**relevant**
90:18
**relied**
127:9
**remain**
37:12, 110:24
**remained**
111:7
**remember**
14:21, 15:2,
22:17, 23:18,
24:17, 31:18,
62:1, 62:2,
63:21, 64:5,
64:7, 73:25,
83:11, 89:9,
94:17, 108:14,
129:18, 156:7,
156:20
**remembering**
63:25
**remote**
49:6, 49:7,
50:9, 79:4
**removal**
67:21
**remove**
107:25
**removed**
67:16
**renewed**
133:12
**renovated**
14:23, 85:7

**rentschler**
84:6
**rep**
12:15, 84:9
**repairs**
93:11
**rephrase**
8:10, 123:17,
134:24, 135:1
**reporter**
1:25, 4:11,
5:20, 5:23, 6:3,
7:1, 7:25, 8:4,
56:17, 67:3,
79:16, 87:14,
89:10, 96:21,
97:6, 117:6,
119:17, 161:10,
162:1, 162:23
**represent**
5:16, 50:23,
51:9
**representations**
38:2, 50:21,
51:5, 106:23
**representative**
67:20
**representatives**
21:5, 67:22,
92:16
**represented**
26:12, 106:22
**representing**
5:11, 5:21,
6:15, 6:17
**reps**
12:20, 65:13
**request**
21:18, 65:10,
150:23
**requested**
55:23, 87:20
**requests**
10:5, 65:11,
67:3, 89:10
**required**
24:11, 37:11,
44:11

**requires**
120:16
**resell**
72:2
**residence**
77:14, 77:24,
82:10, 82:18
**residential**
46:6, 76:9,
76:19
**residing**
48:5
**resistance**
119:13
**resistor**
3:18, 14:12,
18:20, 19:5,
19:9, 40:7,
69:5, 72:11,
72:14, 79:20,
113:13, 113:15,
134:1, 157:12,
157:13
**resistor's**
19:7
**resistors**
11:17, 12:2,
12:9, 12:11,
12:21, 12:22,
13:12, 15:9,
15:19, 15:20,
15:25, 16:11,
16:25, 17:3,
28:8, 29:19,
29:24, 30:22,
31:3, 35:12,
35:20, 38:18,
38:20, 39:17,
40:3, 44:5,
52:17, 57:8,
62:21, 63:2,
63:17, 63:18,
64:11, 80:24,
89:2, 89:3,
91:8, 92:16,
100:12, 103:16,
107:11, 110:14,
113:21, 114:1,

114:16, 114:23,
115:1, 116:4,
116:18, 116:23,
119:8, 119:9,
119:11, 125:6,
128:13, 134:3,
143:17, 147:17,
158:23
**resolved**
54:16
**resources**
33:15, 116:21
**respect**
101:25, 102:1,
129:22
**respond**
105:16, 108:10
**responded**
20:9, 20:11
**responding**
22:25
**response**
7:21, 7:24,
104:18, 107:4
**responsibility**
137:9
**responsible**
137:23, 142:21,
148:7, 159:11
**restate**
131:24
**restriction**
46:12
**restrictions**
45:10, 46:11
**restroom**
8:15
**result**
53:24, 99:15
**resulted**
102:4
**retained**
140:23
**retention**
57:20
**retirement**
57:22
**return**
125:6

returned
146:10
returns
125:1, 160:18
revenue
39:8
review
22:14, 138:5,
153:12
reviewing
124:18
reviews
98:18, 138:1,
138:2, 138:3,
138:8, 138:12
revisited
116:14
richard
13:7, 44:16,
47:20, 61:20,
73:14, 76:5,
89:12, 145:1,
154:16, 154:23,
157:25, 160:20
rick
85:4
ridiculous
78:8
right
5:23, 26:23,
26:25, 27:17,
29:10, 29:11,
29:19, 29:20,
29:21, 30:2,
32:12, 33:18,
33:19, 35:8,
37:22, 44:24,
47:14, 52:10,
53:20, 56:19,
60:3, 70:11,
78:7, 81:24,
82:25, 87:13,
95:15, 99:11,
100:1, 100:2,
107:12, 109:12,
109:20, 119:14,
120:21, 121:24,
134:8, 134:9,

134:10, 150:21,
152:2, 159:13,
161:6, 161:8
rights
53:19, 53:25,
54:14, 54:23,
54:25, 105:12,
137:3, 137:5
rigs
32:8, 157:20
river
4:4, 5:14
rob
63:22
robinson
2:15
rock
40:21
rocking
151:23
rockwell
31:19, 33:2,
40:21, 99:4,
100:7, 155:12
role
117:22, 121:24,
143:21, 146:6,
146:8, 149:5
roman
90:17
roof
20:22, 23:12,
23:17, 24:18,
25:2, 26:16,
30:15, 71:20,
71:21, 72:16,
72:23, 72:24,
73:9, 73:13,
74:3
roof's
30:11, 73:12,
73:17, 73:22
room
50:12, 83:21
roughly
122:15
routine
78:11, 82:12,

93:11
royalty
65:21, 117:2
rpr
1:25, 4:10,
162:22
rs
6:9
rude
9:24
rule
3:17
rules
4:8, 7:15,
9:23, 37:11
rumors
140:2
run
14:20, 19:2,
26:19, 114:23,
122:12, 143:24
running
160:1
rusty
14:8, 62:11,
63:23, 64:11

## S

s
3:18, 79:20
s-q-u-i-r-e
6:10
safety
22:21
saftronics
31:16, 31:25,
99:4, 142:10
said
4:7, 19:25,
21:5, 21:8,
29:5, 30:1,
32:12, 32:20,
39:7, 48:10,
48:16, 49:1,
75:8, 83:25,
93:20, 94:18,
94:20, 100:8,
102:4, 103:20,

104:7, 109:16,
110:13, 112:22,
112:24, 122:7,
132:24, 139:21,
150:1, 154:25,
155:5, 157:3,
162:8
salary
94:12, 95:14,
98:2
sale
12:7, 16:23,
37:25, 47:6,
63:10, 114:24,
143:6
sales
12:18, 13:17,
13:22, 14:5,
14:11, 20:23,
27:3, 31:17,
40:8, 40:17,
58:24, 59:8,
60:9, 60:10,
61:3, 61:21,
61:22, 62:3,
62:10, 62:16,
62:23, 63:5,
65:5, 70:5,
71:22, 84:10,
90:1, 92:15,
92:21, 92:25,
93:1, 93:2,
93:3, 93:6,
93:11, 94:13,
96:3, 100:3,
104:5, 104:7,
104:8, 104:10,
112:5, 115:4,
118:8, 118:20,
118:22, 119:6,
122:23, 122:24,
123:6, 125:15,
137:16, 137:21,
142:16, 142:18,
142:19, 145:24,
147:16, 153:16,
155:3
saloom
142:25

**same**
8:5, 14:13,
16:6, 26:4,
48:12, 61:11,
61:18, 62:17,
62:18, 69:8,
72:6, 93:18,
102:2, 132:4,
135:17, 145:1,
145:2, 155:15,
157:5
**save**
135:17
**saw**
65:8, 98:9,
127:3, 159:8
**say**
7:22, 13:5,
15:6, 16:7,
18:5, 18:11,
21:12, 25:2,
29:10, 30:4,
39:22, 40:1,
43:24, 47:14,
59:5, 59:8,
60:7, 66:22,
98:19, 98:20,
100:4, 104:5,
118:24, 119:8,
129:7
**saying**
20:19, 55:12,
80:3, 92:3,
97:25, 103:4,
126:14, 152:21,
154:1, 155:9
**says**
20:16, 21:17,
22:25, 23:5,
23:7, 24:3,
24:6, 24:23,
25:4, 27:2,
31:5, 38:7,
38:24, 42:5,
42:15, 45:16,
45:23, 46:9,
46:21, 51:8,
51:13, 52:2,

53:1, 53:18,
54:11, 57:16,
59:17, 62:10,
67:12, 71:5,
72:22, 73:9,
74:3, 76:3,
76:25, 77:14,
77:24, 78:10,
80:8, 80:13,
80:23, 82:7,
84:18, 84:21,
84:22, 85:14,
86:10, 88:1,
88:18, 90:18,
91:15, 92:14,
92:21, 93:5,
94:4, 94:11,
94:23, 95:1,
96:5, 99:15,
101:13, 104:11,
105:19, 106:9,
106:19, 107:17,
109:8, 110:3,
110:21, 117:22,
135:2
**scale**
14:24
**scenario**
154:3
**schedule**
42:16, 44:2,
53:1, 53:10,
53:18, 54:11,
55:1, 55:9,
56:25, 57:17,
58:9, 60:5,
60:21, 65:24,
140:7
**scheduled**
23:7, 23:21,
54:5
**schedules**
35:23, 36:10,
37:9, 58:8,
66:15, 98:10
**schlumberger**
83:7
**schneider**
143:7, 143:8

**school**
10:20, 10:22,
84:11
**scope**
93:7
**scrapped**
86:15, 86:21,
103:13, 103:14,
116:14
**second**
22:14, 27:3,
35:6, 38:10,
42:21, 43:1,
67:2, 79:10,
79:25, 80:3,
92:14, 97:8,
103:15, 104:24,
106:4, 109:25,
111:12, 111:13,
136:16
**secondary**
95:2, 95:11,
95:16, 96:6
**secretary**
3:19, 79:21,
80:3, 127:19
**secretly**
106:10, 107:19,
108:4
**section**
42:6, 42:8,
42:11, 44:11,
45:25, 46:4,
49:24, 50:2,
51:10, 52:1,
52:24, 53:16,
55:3, 57:13,
57:19, 58:16,
66:25, 80:14,
99:12, 104:20,
106:5, 108:22,
108:23, 109:24,
109:25, 111:10
**sections**
108:21
**secure**
28:13, 110:24
**securities**
52:5

**security**
46:10
**see**
16:6, 16:11,
21:11, 21:22,
21:23, 22:15,
22:16, 23:3,
24:4, 24:13,
26:22, 27:4,
27:15, 28:3,
31:14, 35:24,
36:5, 37:1,
37:8, 37:16,
38:8, 38:14,
39:20, 41:14,
41:20, 42:6,
42:13, 42:23,
42:25, 43:15,
43:22, 44:19,
45:3, 45:14,
45:22, 46:1,
46:4, 46:7,
46:14, 46:24,
49:22, 50:1,
50:25, 51:6,
51:11, 51:17,
52:9, 54:1,
54:19, 55:15,
58:6, 58:21,
59:21, 62:12,
63:21, 64:23,
67:7, 67:10,
67:23, 71:12,
71:15, 73:15,
74:22, 76:11,
77:4, 77:19,
78:17, 79:23,
80:10, 80:21,
80:25, 82:15,
86:7, 86:17,
89:20, 91:18,
93:14, 94:6,
94:14, 95:18,
96:8, 96:9,
99:20, 101:16,
102:6, 102:7,
102:16, 104:16,
105:14, 107:2,

107:12, 108:1,
111:8, 111:9,
121:22, 127:7,
131:21, 144:15,
152:23, 160:6
**seeing**
19:21, 24:17,
26:13, 26:15
**seek**
150:5
**seem**
147:14
**seemed**
28:24, 62:6,
101:22, 101:23
**seems**
120:15, 140:9
**seen**
19:17, 19:25,
79:15, 81:11,
81:25, 103:18,
127:8, 127:10,
127:15, 128:4
**self-taught**
59:14
**sell**
16:21, 31:17,
33:6, 40:25,
48:25, 110:14,
112:22, 115:9,
116:1, 153:20
**seller**
32:3, 38:2,
42:24, 43:4,
67:17
**seller's**
67:20
**sellers**
42:16, 42:18,
50:22, 50:23,
51:6, 51:8,
51:21, 53:11,
54:21, 155:12
**selling**
38:12, 40:22,
51:23, 86:23,
110:17, 114:10,
116:9, 140:12,

149:15
**semester**
11:14
**send**
36:15, 64:11,
97:25
**sending**
152:23
**sense**
19:3, 23:19,
31:4, 116:7
**sentence**
23:2, 73:15,
74:3, 76:3,
76:11, 76:25,
77:14, 77:19,
77:24, 78:10,
78:17, 78:20,
80:13, 82:7,
92:14, 93:5,
95:1, 95:21,
95:24, 96:5,
99:15, 101:16,
104:24, 105:14,
106:19, 107:2,
107:17, 111:8,
112:18, 117:21
**sentences**
108:1, 111:8
**separate**
22:9, 69:3,
76:7, 76:14,
76:17, 77:15,
77:25, 78:7,
88:14, 88:24,
89:6, 89:16,
90:4, 90:6,
91:6, 92:17,
92:22, 92:24,
95:20, 103:12,
107:6, 107:13,
108:14, 118:1,
118:3, 125:12,
127:12, 129:21,
133:23, 151:6,
151:14, 153:1,
153:18, 153:25,
154:3, 157:24,

158:4, 158:11
**separated**
10:14
**separately**
78:23, 125:2,
141:3, 151:8
**separating**
152:25
**separation**
125:5
**september**
3:11, 19:12,
19:15
**series**
32:7, 33:2,
40:20, 115:9,
115:11, 124:5,
155:10
**serious**
151:2
**server**
68:6, 68:7,
148:1, 148:2,
148:8, 160:1,
160:4, 160:7,
160:12, 160:15,
160:17
**servers**
49:22, 67:13,
67:21, 68:4
**servers'**
67:15
**servicing**
38:12
**set**
13:3, 14:2,
21:2, 21:5,
22:5, 42:15,
43:20, 53:18,
54:11, 57:16,
81:9, 81:11,
148:10, 159:1,
162:6
**setting**
20:21, 22:8,
101:3
**several**
22:6, 49:14,

120:14, 124:8
**shake**
7:22
**shall**
38:21, 53:24,
67:18
**share**
103:5
**shared**
28:7, 28:9,
28:10, 28:12
**sheet**
33:8
**shelf**
115:8, 115:19
**ship**
115:2, 115:17,
115:18, 115:20
**shipping**
100:6, 115:7
**shook**
63:6
**shortly**
149:19
**should**
85:5, 140:9,
140:10, 140:11
**show**
79:8, 87:5,
87:7, 91:22,
130:14, 130:25
**showed**
115:22
**shown**
131:12, 131:14
**shows**
109:24, 132:14
**shrink-wrap**
56:10
**shut**
70:6
**sic**
61:20
**side**
66:16, 83:21,
93:22, 142:14
**sign**
21:6, 28:4,

**skill**
162:12
**skip**
99:12
**slash**
16:14
**slow**
41:1, 56:15
**slowed**
39:13, 157:6
**slowly**
104:13
**small**
40:19, 47:3,
48:11, 48:12,
69:18, 135:16,
147:15, 148:16,
155:7
**smaller**
58:12, 69:17,
115:8, 115:12
**smart**
128:14
**software**
56:11
**solar**
39:15, 39:18,
40:18, 64:4,
122:21
**sold**
10:16, 13:18,
34:17, 36:2,
39:10, 40:20,
44:14, 52:13,
52:14, 53:3,
53:10, 65:12,
69:2, 69:8,
105:19, 107:9,
114:1, 114:3,
114:11, 114:13,
115:12, 115:23,
122:19, 122:21,
136:3, 142:17,
143:23
**sole**
88:4, 94:18,
116:19
**solely**
125:21

**signature**
36:15, 144:8
**signature**
36:4, 36:7,
36:8
**signature-p1kal**
162:20
**signatures**
36:5
**signed**
53:9
**significance**
60:5
**significantly**
13:23
**signs**
16:8
**similar**
74:4, 88:19,
89:13, 93:7
**simmons**
69:24, 134:22
**simple**
15:25, 41:18
**simply**
117:23, 130:6
**since**
21:17, 21:18,
36:18
**single**
52:17
**singled**
135:4
**singular**
88:21
**sir**
56:6, 128:24,
133:21, 139:18,
150:16, 159:21
**site**
47:3
**siting**
115:19
**situated**
136:12
**six**
62:4, 139:25
**sketches**
133:6

**solemnly**
5:24
**some**
8:10, 10:18,
14:2, 14:16,
14:19, 15:8,
15:10, 16:18,
16:24, 18:8,
21:13, 25:25,
28:24, 29:14,
36:22, 39:14,
41:1, 48:1,
49:3, 49:6,
50:19, 69:14,
72:9, 87:19,
91:13, 92:8,
108:3, 108:6,
117:2, 118:11,
120:13, 123:7,
130:6, 138:10,
140:6, 142:17,
149:14, 152:8,
155:14, 157:19
**somebody**
33:25, 48:20
**someone**
33:25, 47:17,
68:15, 120:2,
122:1, 124:17
**something**
9:14, 29:6,
32:12, 34:8,
49:11, 55:18,
65:6, 73:25,
81:9, 106:9,
113:19, 121:19,
124:22, 125:22,
128:1, 129:19,
138:15, 141:10,
150:8, 150:25,
152:17, 156:14,
156:20, 158:19,
158:20
**sometime**
71:25, 116:14
**sometimes**
37:9, 50:13,
61:11, 61:16,

**61:17, 99:6**
**somewhere**
18:6, 65:8,
70:9, 72:25,
148:24
**sons**
114:16
**soon**
86:7
**sophisticated**
15:22
**sorry**
56:14, 58:4,
85:17, 97:7,
109:13, 111:11,
130:20, 139:8,
143:22, 148:11,
150:14
**sort**
58:17, 150:25
**sounded**
115:21
**sounds**
29:20, 29:21
**source**
133:10, 139:24
**south**
148:18
**space**
14:13, 30:10,
50:12, 78:3
**spare**
92:2, 92:6
**speak**
9:22, 83:14,
89:24, 105:17,
107:16, 109:16,
119:3, 121:4,
121:5, 121:6
**speaking**
113:8, 119:20
**spearheaded**
24:18, 26:16
**specialized**
91:17, 91:25
**specific**
59:6, 64:11,
94:5, 94:21,

134:2, 134:3
**specifically**
27:8, 61:22,
77:15, 105:7,
106:22
**specified**
42:5, 44:21,
45:25, 49:24
**speculation**
135:10
**speed**
18:21
**spell**
148:11
**spelled**
6:9, 85:4
**spend**
11:1
**spent**
11:2, 17:25,
22:18, 73:20,
73:21
**split**
51:25
**spoke**
71:25, 75:5,
108:9, 109:7,
113:11, 121:5,
137:16
**spot**
147:12
**spreadsheet**
131:6
**spun**
16:22, 52:20,
136:2
**square**
2:6
**squashed**
29:13, 29:14
**squire**
6:10
**st**
87:19
**stack**
58:11, 58:12
**stacked**
115:8

**staff**
86:12
**stage**
125:20
**stages**
78:1
**stalled**
32:3
**stand**
129:2
**standalone**
150:11
**standard**
22:20, 151:24,
152:1
**standing**
51:10
**stands**
18:15
**start**
10:19, 11:17,
13:8, 16:19,
25:24, 27:14,
30:17, 37:1,
37:5, 41:1,
41:3, 49:3,
50:20, 57:9,
58:9, 58:19,
60:24, 71:14,
75:5, 75:10,
79:1, 90:2,
95:10, 98:1,
116:13, 117:21,
151:9, 152:19,
152:20, 158:3,
158:6
**started**
12:1, 12:21,
12:25, 14:19,
14:23, 15:6,
15:11, 27:10,
27:20, 28:20,
32:17, 40:22,
65:4, 93:8,
99:17, 110:18,
114:4, 128:12,
132:7, 132:8,
133:1, 133:3,

138:15, 151:16
**starting**
24:1, 24:21,
29:6, 29:7,
104:24, 109:21,
113:14, 152:24
**starts**
26:11, 26:24,
38:10, 42:8,
50:22, 51:10,
111:15
**state**
3:19, 4:11,
5:16, 6:6,
79:21, 80:3,
80:19, 84:9,
103:21, 127:19,
158:10, 158:23
**statement**
9:15, 92:18,
102:20, 104:18,
141:5, 141:6,
141:9, 151:17
**statements**
53:7
**states**
1:1, 5:7, 115:2
**status**
105:4, 111:1
**stay**
48:20, 48:21,
49:5, 49:8,
49:19, 64:20
**stayed**
49:16, 84:13
**stenographically**
162:9
**step-brother**
85:16, 85:17
**steps**
104:13
**stettinius**
4:4, 5:13
**stewart**
149:19
**sticker**
79:16
**still**
8:20, 16:8,

23:25, 71:24,
83:6, 86:22,
86:23, 93:22,
100:9, 111:10,
113:18, 114:23,
131:21, 131:22,
144:9, 144:15,
145:23, 148:15,
148:17, 148:20
**stipulations**
4:1
**stock**
3:16, 35:11,
35:18, 35:21,
36:10, 37:21,
38:7, 45:13,
52:4, 66:12,
66:22, 142:19,
144:1
**stop**
42:21
**stoppage**
115:4
**stopped**
148:1
**storage**
147:21, 159:23
**store**
160:3
**story**
76:24, 93:18,
149:18
**strange**
113:17
**strategic**
117:23, 118:2,
118:5, 153:24
**street**
15:13, 46:23
**strike**
11:21, 14:1,
16:15, 18:8,
30:13, 44:7,
47:23, 50:19,
51:20, 52:7,
62:14, 95:20,
96:4, 109:15,
151:22

string
23:14
structure
125:19, 144:18
structured
59:19, 61:5
studied
144:2
stuff
32:16, 48:14,
48:18, 49:3,
63:1, 69:17,
75:20, 115:12,
118:16, 125:16,
155:11
stye
49:1
sub
53:17
subclause
55:9
subject
3:11, 3:13,
3:21, 57:25,
108:13, 111:1
subjects
93:3
submitted
100:18, 162:25
subparagraph
56:7
subparagraphs
55:11, 90:21
subpart
71:8
subpoena
3:9, 6:23, 7:4
subsection
54:9, 57:16,
67:12, 84:18
subsequent
153:7
subsidiaries
52:2, 52:16
substance
116:11
success
153:21

successful
125:16, 128:13
sued
150:20
suing
141:11
suite
2:17, 4:5, 5:14
sum
22:2
summarize
116:11
summer
49:15, 84:11,
84:12, 84:13
supervision
134:12, 135:7,
155:19
supervisors
74:6
supplier
43:12
suppliers
42:12
supplying
91:8
support
56:12, 65:14,
102:23
supported
131:9
supporting
71:6, 74:4,
84:22
supportive
129:23
supposed
11:1, 74:13,
92:5, 157:4
sure
7:7, 8:7, 8:10,
8:24, 21:20,
24:24, 25:7,
25:10, 26:4,
26:10, 26:17,
26:18, 27:21,
29:20, 36:14,
36:21, 44:25,

45:20, 50:6,
50:8, 52:10,
54:7, 56:5,
58:22, 68:23,
96:21, 98:5,
118:21, 120:18,
122:4, 122:21,
126:13, 131:25,
134:25, 145:19,
146:5, 149:2,
155:8, 156:8,
158:7, 159:15
swear
4:12, 5:24
switch
18:14, 18:17,
18:19, 19:9,
34:10, 72:12,
157:12
sworn
5:22, 162:7
system
115:16, 116:1,
129:10
systems
12:10, 15:11,
15:23, 16:19,
17:4, 38:13,
93:13, 123:10,
134:5

T

t1
133:3
ta
129:15, 130:1,
130:3, 132:2,
132:16, 133:3
ta1
129:19
table
37:21, 71:9,
75:20, 88:13
taft
4:3, 5:13
take
8:13, 8:14,
8:16, 9:4,

21:13, 29:2,
31:12, 35:24,
36:9, 36:22,
36:23, 37:16,
65:24, 66:2,
73:4, 79:25,
93:2, 96:20,
96:22, 96:23,
117:12, 118:5,
120:25, 159:13,
159:15
taken
4:3, 4:7,
140:10, 162:5,
162:11
taking
5:12, 7:25,
9:12, 101:4,
118:16
talk
25:11, 36:20,
56:4, 58:19,
75:7, 119:7,
121:15, 133:21
talked
25:9, 29:3,
29:4, 55:4,
109:22, 113:5,
121:12, 121:14,
121:19
talking
8:4, 25:7,
29:15, 79:6,
79:8, 91:20,
95:13, 104:19,
113:20, 119:10,
120:1, 120:2,
145:5, 152:16,
152:22, 160:2
talks
112:16
tangible
53:6, 53:12
tap
160:16
tapped
133:3
tax
125:1, 125:6,

160:18
**taxes**
81:8
**team**
139:25
**tear**
47:9
**tearing**
48:7, 77:12
**tech**
62:24, 148:4
**technical**
73:11, 93:3,
140:17, 146:22,
147:21, 148:5,
149:10, 149:21,
159:24
**technically**
16:1, 157:8
**technology**
44:10, 56:23,
67:13, 114:10
**telephone**
2:8, 2:19,
141:6
**tell**
86:21, 111:18,
112:12, 145:11,
145:12, 150:9
**telling**
20:5, 120:17,
121:20
**tells**
149:18
**ten**
39:16, 66:3,
134:10
**tennessee**
1:2, 2:7, 3:19,
5:8, 17:23,
21:6, 30:1,
30:8, 78:15,
79:4, 79:5,
79:21, 80:14,
80:19, 81:10,
81:18, 84:9,
87:6, 103:16,
103:21, 106:2,

112:11, 116:13,
124:15, 124:19,
127:6, 127:19,
152:10, 158:10,
158:23, 158:25,
159:4, 159:5
**term**
18:12, 57:18,
65:6, 85:3,
121:10, 129:6
**terminal**
129:19
**terminate**
132:25
**terminated**
149:20
**termination**
86:6, 135:3,
135:5, 138:22,
139:25, 145:6,
145:7, 156:4
**terminology**
118:22
**terms**
36:10, 142:22,
142:24
**terri**
84:23
**territory**
60:11
**testified**
77:6, 77:21,
103:11, 103:17
**testify**
3:9, 86:20,
89:5, 162:7
**testifying**
7:19
**testimony**
5:24, 6:20,
6:24, 8:9, 8:20,
8:25, 9:11,
9:17, 74:4,
96:10, 102:8,
103:6, 127:9,
141:13, 155:25
**testing**
22:23, 33:19,

49:3
**texas**
12:14, 12:22,
13:3, 137:11,
140:21, 158:25,
161:2
**text**
37:10
**texts**
140:17
**th**
4:6, 5:9,
15:13, 19:12,
35:12, 46:23
**thank**
5:20, 6:3, 7:9,
10:3, 10:17,
11:18, 15:14,
17:7, 19:11,
22:10, 25:12,
34:15, 36:25,
37:19, 41:9,
42:3, 44:17,
45:21, 46:16,
50:17, 52:19,
52:22, 54:8,
56:6, 56:15,
56:19, 57:10,
59:16, 60:23,
62:8, 63:19,
65:1, 65:19,
65:23, 68:21,
68:24, 70:14,
72:15, 73:8,
75:24, 78:9,
81:22, 82:3,
82:25, 83:8,
86:1, 87:11,
88:1, 88:16,
90:7, 90:10,
91:2, 93:4,
98:16, 99:11,
100:23, 101:6,
101:21, 102:24,
105:25, 108:20,
113:3, 113:25,
116:10, 117:19,
119:15, 119:17,

161:5, 161:6,
161:7, 161:9,
161:10, 161:11
**themselves**
5:15, 107:16,
128:23
**therefore**
105:2
**thereof**
42:18
**thexton**
105:3, 105:7,
105:18, 145:20,
145:21, 149:10,
149:24, 154:9
**thing**
19:19, 24:18,
30:1, 31:24,
50:15, 52:20,
62:17, 62:18,
66:17, 85:1,
98:4, 103:23,
110:16, 113:12,
115:6, 115:18,
145:2
**things**
15:20, 15:23,
29:4, 40:2,
49:4, 50:8,
75:18, 84:1,
85:9, 104:9,
113:11, 124:4,
125:17, 133:6,
148:16, 155:14,
157:20
**think**
13:15, 13:21,
20:19, 24:17,
24:19, 26:16,
27:8, 28:14,
29:12, 30:11,
33:1, 33:4,
39:9, 40:17,
40:23, 41:23,
64:4, 64:5,
69:25, 70:1,
71:24, 73:5,
73:23, 83:7,

83:23, 85:2,
86:23, 96:22,
100:21, 100:25,
101:25, 112:21,
114:5, 115:22,
118:6, 118:9,
120:1, 124:3,
124:6, 127:13,
129:18, 132:7,
132:23, 133:5,
133:9, 136:24,
138:7, 138:14,
138:16, 143:14,
144:17, 145:1,
145:19, 148:18,
156:9, 158:1

**thinking**
47:8, 48:6,
77:12

**third**
58:9, 80:7,
87:22, 122:24

**thirteen**
62:25

**thorough**
60:6

**thought**
48:6, 48:7,
48:18, 60:1,
91:14, 111:18,
111:19, 111:21,
122:11, 130:23,
151:9

**threatened**
54:23

**three**
11:1, 11:3,
13:7, 20:20,
22:4, 22:8,
25:18, 28:23,
29:3, 29:15,
30:17, 35:21,
41:12, 44:15,
69:6, 69:13,
71:18, 72:20,
78:22, 80:4,
104:9, 142:22,
144:25, 151:15,

158:6
**three-two**
10:25
**threshold**
104:13, 151:6
**thrive**
111:19
**through**
20:4, 26:14,
26:19, 31:17,
36:10, 42:1,
47:19, 59:2,
59:8, 59:15,
62:8, 62:23,
62:24, 62:25,
63:9, 64:23,
65:11, 81:21,
90:12, 97:17,
97:19, 106:10,
107:20, 114:22,
120:25, 131:17,
147:6
**throughout**
14:11, 77:25
**throw**
129:22
**throwing**
154:5
**thursday**
87:6
**tie**
160:6
**tim's**
129:22, 141:11,
150:19
**time**
5:9, 8:5, 8:13,
11:15, 12:16,
13:18, 13:20,
14:11, 17:21,
18:5, 18:7,
21:13, 24:6,
25:1, 25:10,
27:18, 29:10,
30:10, 30:12,
33:12, 33:14,
34:16, 34:23,
35:1, 35:2,

36:10, 36:12,
36:22, 41:7,
51:19, 52:13,
53:9, 57:2,
63:25, 66:8,
68:2, 73:4,
73:19, 77:11,
85:3, 86:14,
89:18, 91:8,
92:2, 92:6,
95:9, 97:13,
98:6, 107:15,
108:11, 111:21,
113:5, 113:14,
115:11, 117:1,
120:25, 122:15,
122:17, 123:24,
126:9, 126:15,
128:18, 133:3,
140:14, 140:24,
141:6, 142:11,
145:6, 146:21,
147:9, 147:19,
147:25, 148:23,
149:24, 149:25,
153:19, 154:13,
157:5, 158:5,
159:21, 161:6,
161:7, 161:11,
162:5
**times**
30:12, 37:12,
75:5, 97:18,
124:8, 140:6
**timothy**
1:6, 2:3, 2:22,
5:5, 5:19, 6:17,
17:18, 18:1,
34:24, 152:7
**tingling**
63:24
**title**
46:11, 53:4,
53:12, 94:5,
117:22, 123:13,
162:6
**titled**
52:24

**today**
5:11, 5:21,
6:24, 8:1, 8:9,
9:3, 9:12, 9:21,
71:23, 83:5,
115:5, 116:3,
116:8, 116:12,
120:22, 121:2,
121:18, 127:9,
141:7, 161:11
**today's**
5:9
**together**
23:16, 23:24,
27:10, 60:9,
69:3, 93:24,
143:1, 143:3
**told**
55:25, 65:22,
93:19, 93:22,
113:13, 115:23,
115:25, 121:17,
121:18, 127:22,
128:8, 133:10,
134:18
**tom**
14:8, 63:23,
64:13, 64:15,
64:20, 64:22,
86:24, 87:8,
110:23, 115:22,
138:15, 143:17,
160:1
**took**
11:14, 12:7,
13:15, 69:17,
87:8, 114:5,
114:7, 142:15,
143:15, 156:11
**top**
80:7
**torque**
18:22
**total**
13:7, 22:2,
74:2, 122:17
**touch**
38:3

touched
108:13
towards
16:20, 24:3,
45:23, 85:13,
109:8
town
48:17, 48:18,
49:5, 49:8
tracks
78:7
train
78:7
transact
80:18
transactions
53:23
transcript
162:5, 162:11
transcription
7:25
transfer
46:12
transferred
160:11, 160:15
transistor
18:14, 18:16
transition
110:4, 143:11,
144:22, 146:9,
149:4
travel
122:14, 143:13
traveled
17:21, 18:4,
112:12, 134:18
traveling
59:25
treat
122:8
treated
138:25
tree
6:11
tremendously
122:23
tried
28:13

tries
19:2
trouble
120:8
true
38:23, 51:22,
54:6, 92:18,
102:9, 102:10,
103:6, 103:7,
153:10, 162:11
trust
52:6
truth
5:25, 6:1,
162:7, 162:8
truthfully
8:11, 9:3, 9:9
try
8:10, 27:10,
48:10, 116:11,
118:13, 119:5,
122:12, 135:17
trying
22:18, 23:16,
24:20, 32:18,
48:9, 56:3,
61:22, 64:8,
65:3, 69:24,
88:24, 101:2,
115:17, 118:9,
118:10, 124:3,
125:15, 129:20,
129:21, 140:8,
142:9, 142:14,
153:20, 156:25
tuesday
117:15
turn
10:4, 18:17,
19:5, 27:25,
36:4, 38:6,
44:18, 52:1,
53:16, 65:23,
83:1, 84:17,
86:4, 91:3,
122:10, 131:11
turned
69:5, 134:20,

136:15, 143:17,
156:25, 157:1
turning
34:11, 82:4
turns
157:12, 157:16
tutelage
150:5
tv
48:19
twelve
108:11, 145:17
twin
84:12
two
6:9, 9:4,
10:24, 13:6,
13:16, 14:8,
15:15, 25:20,
40:2, 46:17,
48:12, 49:15,
54:16, 69:3,
69:7, 73:21,
73:22, 74:2,
80:1, 90:21,
95:20, 97:21,
104:8, 108:1,
114:16, 158:6
two-bedroom
78:4
type
32:7, 50:15,
98:3, 103:22,
113:12, 143:10,
150:5
typewritten
162:10

U

uh-huh
7:22, 62:13
uk
11:2, 11:3
ul
22:20, 140:8,
140:13
ultimate
106:13, 107:23,

149:4
ultimately
142:20
ultra
95:4, 95:22
umbrella
153:3
unassemble
37:11
unaware
103:17
unclear
120:16
under
7:19, 27:2,
54:9, 55:10,
82:11, 88:12,
98:20, 110:24,
111:10, 111:12,
111:19, 129:25,
134:1, 134:12,
135:6, 135:17,
139:25, 145:7,
150:4, 153:3,
154:18, 155:18,
156:21, 162:10
undersigned
80:17
understand
6:19, 7:6, 8:2,
8:6, 8:9, 9:2,
9:20, 10:2,
43:24, 45:18,
46:15, 46:16,
52:11, 55:25,
120:20, 121:11,
126:13, 132:13,
139:8, 139:21,
144:23, 151:17
understanding
57:24, 120:18,
149:2, 151:20
understandings
45:10, 45:19,
60:19
understood
8:23, 9:8,
10:13, 27:18,

28:16, 32:1,
41:20, 52:1,
74:15, 85:18,
88:16, 94:3,
98:9, 103:15,
110:20, 123:1,
124:6, 134:25,
137:11
**undertakings**
45:10
**unethically**
106:12, 107:21,
108:4
**ungrained**
19:7
**unhappy**
75:2, 102:2
**unique**
71:9, 76:7,
76:14, 88:5,
88:21, 89:14
**unit**
31:25
**united**
1:1, 5:6
**units**
107:12, 131:10
**universal**
156:15
**university**
10:24, 11:7,
11:11, 11:22
**unknown**
72:23, 84:25,
86:13, 105:9
**unlawfully**
106:12, 107:21,
108:4
**unless**
8:21, 28:9,
73:24, 127:25,
138:14
**unrelated**
95:3, 111:5,
112:18
**unresolved**
111:7
**until**
12:20, 21:20,

87:5, 128:18,
132:8, 135:24,
157:16
**untrue**
96:11, 96:12
**updated**
23:1
**uploaded**
160:12
**use**
8:14, 19:4,
28:13, 39:17,
41:25, 48:19,
53:20, 53:21,
56:8, 65:25,
76:8, 144:19
**uses**
56:10
**using**
12:11, 18:25,
48:16, 148:1
**usually**
60:9, 72:10,
97:25, 125:23,
149:15
**utilizing**
78:14, 160:3

**V**

**vacation**
57:21
**valid**
53:19
**vance**
13:6, 17:22,
19:23, 20:5,
20:11, 21:3,
22:25, 29:4,
44:16, 47:19,
48:18, 73:13,
74:10, 74:12,
74:13, 74:14,
75:8, 76:4,
86:11, 87:22,
88:1, 94:18,
100:24, 101:1,
105:10, 117:15,
118:9, 121:5,

121:9, 125:21,
125:23, 127:21,
136:16, 145:1,
157:25, 159:10
**vance's**
20:13
**variable**
18:20, 18:21,
19:10, 31:4
**various**
100:19, 130:1
**vehicle**
59:19
**vendor**
37:4
**venture**
24:9, 52:7,
74:9, 76:8,
76:15, 76:17,
77:2, 84:20,
88:3, 88:11,
88:14, 92:17,
92:22, 100:20,
102:5, 104:3,
104:15, 105:5,
105:9, 105:12,
105:20, 106:25,
107:6, 109:2,
109:22, 110:6,
110:9, 111:1,
111:6, 112:19,
113:1, 113:2,
128:3, 136:13
**verbal**
7:20, 7:24,
59:17, 60:13,
98:8
**version**
128:4, 128:9
**versus**
118:25
**vfd**
157:12
**vhinton@powerohm**
117:16
**via**
2:10, 68:19
**viable**
106:25

**vice**
14:11, 31:16,
61:3, 88:18,
117:23, 118:8,
124:24, 125:9,
137:14, 137:16,
145:23, 153:17
**video**
4:3, 5:10,
5:12, 6:16,
161:15
**videoconference**
2:10
**videographer**
2:23, 5:3,
5:10, 5:20,
66:4, 66:7,
97:9, 97:12,
159:17, 159:20,
161:13
**videotape**
5:4
**view**
131:13
**villa**
6:11
**vincent**
17:24, 29:2
**violating**
54:14, 54:22,
54:24
**violation**
54:18
**visit**
32:5, 64:10,
74:2
**visitors**
48:17
**voicemail**
113:17, 113:24
**voltage**
12:9, 19:4
**vote**
158:5
**voted**
158:5
**vp**
118:20, 118:24

## W

**w-2**
75:25, 76:2

**wadl**
86:10

**wait**
9:15

**walked**
147:24

**wall**
85:9

**want**
9:14, 10:18,
22:6, 22:10,
29:5, 29:8,
30:1, 30:16,
33:4, 37:16,
41:12, 42:21,
47:16, 48:22,
48:25, 58:19,
64:19, 66:16,
69:18, 70:17,
84:17, 96:20,
97:3, 97:4,
101:1, 101:2,
106:8, 112:23,
134:21, 159:15

**wanted**
7:7, 59:24,
61:12, 64:19,
75:4, 76:22,
83:24, 84:11,
90:1, 91:9,
113:19, 116:1,
144:10, 144:11,
147:18, 158:3

**wanting**
125:17

**wants**
48:20

**warrant**
50:23, 51:9,
51:21

**washington**
2:18

**waters**
59:12, 63:23,

**64:13**

**way**
12:3, 27:21,
39:17, 89:5,
96:25, 118:11,
119:3, 136:5,
162:14

**wbradley@rc**
2:20

**we'll**
8:16, 35:6,
36:15, 38:3,
50:2, 58:9,
59:1, 92:9,
94:20, 106:15,
144:7

**we're**
7:20, 8:4,
9:12, 9:16,
20:6, 23:25,
34:16, 36:9,
38:1, 50:18,
50:21, 66:2,
70:14, 96:22,
97:19, 108:20,
110:15, 129:7,
132:25, 157:5

**we've**
57:1, 82:17,
95:8, 121:2,
121:9

**website**
57:2

**wednesday**
4:6

**week**
6:25, 22:18,
22:23, 24:3,
25:5, 25:10,
49:11, 113:18

**weekends**
134:23

**weeks**
110:4

**wehman**
83:18, 83:22,
86:10, 123:21,
124:3

**welcome**
66:10, 76:23

**welfare**
57:22

**went**
10:24, 11:13,
12:14, 21:4,
30:9, 32:5,
32:8, 59:13,
60:3, 63:5,
65:11, 69:15,
69:20, 69:23,
73:19, 73:24,
75:8, 85:7,
88:12, 93:19,
100:22, 121:20,
132:15, 132:17,
134:21, 140:9,
148:2, 148:23,
148:24

**weren't**
63:4, 118:17,
125:15, 151:14,
153:21, 156:10

**west**
12:23, 15:13,
46:22

**whatever**
40:24, 60:11,
68:25, 124:4,
144:8, 144:21,
153:2, 154:20,
160:8

**whereas**
38:10

**whether**
28:22, 55:21,
57:25, 58:1,
141:1, 145:11

**whole**
5:25, 24:18,
31:24, 124:2,
133:5, 162:7

**wife**
84:23, 85:8,
85:14

**william**
2:14, 5:17,

**6:15**

**wire**
134:4

**wiring**
136:22

**wise**
21:19

**within**
43:5, 78:13,
91:16, 112:6,
135:25, 145:15,
148:6, 149:4,
157:21, 159:3

**without**
40:18

**witness**
4:12, 5:22,
6:2, 56:20,
71:6, 71:14,
72:16, 76:14,
86:14, 86:19,
87:22, 89:4,
119:20, 120:1,
120:6, 139:12,
161:12, 162:4

**witnesses**
70:24, 84:22,
86:10, 87:20,
157:22

**wolff**
1:25, 4:10,
5:21, 162:22

**word**
39:3, 41:20,
41:25, 42:25,
94:22, 95:22,
98:25, 99:1,
99:8, 102:21,
124:9, 129:12,
144:19, 154:20

**words**
133:9, 153:11

**work**
12:4, 29:17,
49:1, 49:15,
50:12, 50:14,
63:20, 73:7,
79:5, 88:22,

89:19, 93:8,
93:10, 95:2,
95:12, 96:6,
111:6, 111:23,
113:21, 114:22,
122:13, 123:19,
123:25, 132:5,
132:15, 132:17,
134:12, 141:12,
141:21, 141:24,
142:1, 142:3,
142:9, 155:18
**worked**
12:18, 12:19,
64:1, 73:10,
79:7, 85:6,
115:15, 138:5,
139:25, 143:20,
149:13, 150:21,
154:18, 160:14
**workforce**
11:23
**working**
11:16, 12:1,
12:24, 21:3,
31:13, 48:8,
49:4, 50:7,
65:15, 75:2,
75:20, 85:12,
88:25, 90:24,
92:4, 95:16,
101:22, 114:6,
123:13, 123:18,
126:8, 140:11,
142:13, 145:7,
152:15, 155:17
**works**
71:24
**world**
110:14
**worried**
101:3
**wouldn't**
86:2, 108:17,
109:17, 124:23,
128:2
**write**
41:18

**writing**
154:21
**written**
45:7, 55:5,
58:1, 58:18,
61:7, 61:14,
97:24, 98:11,
98:12, 122:9,
124:8, 128:15,
138:12, 141:6,
144:6
**wrong**
98:6
**wrote**
24:19, 27:18,
133:9, 150:20,
154:24
**wu**
61:20, 63:22

---
**X**
---

**xavier**
11:13
**xiang**
86:7, 86:11

---
**Y**
---

**year**
11:9, 13:19,
13:22, 14:25,
18:2, 27:3,
29:21, 39:10,
39:11, 40:14,
61:10, 61:15,
61:17, 64:21,
65:2, 68:22,
69:25, 71:25,
100:2, 100:5,
110:15, 122:7,
122:19, 122:24,
124:19, 138:5,
138:23, 143:19,
145:22, 155:1,
155:18, 155:22,
155:23, 156:4
**yearly**
137:25
**years**
9:12, 10:24,

11:1, 11:3,
13:16, 54:16,
69:13, 114:4,
133:12, 138:13,
138:22, 147:4,
160:19
**yesterday**
7:9, 19:19,
19:20, 20:1,
20:3, 120:25,
121:3, 121:5,
121:16, 144:1
**yingling**
14:8, 64:6,
64:13, 86:11,
86:24, 110:23,
143:18, 160:1
**york**
121:20
**young**
49:15, 115:22
**yourself**
41:17, 90:22,
97:20, 98:21
**yup**
136:19

---
**Z**
---

**zip**
6:12

---
**$**
---

**$10,000**
143:12
**$20**
40:18, 103:22,
158:19
**$30**
13:21
**$50,000**
56:13
**$60,000**
150:19
**$7,000**
94:12, 95:25
**$84,000**
122:7

---
**.**
---

**.03**
156:2

---
**0**
---

**000-volt**
12:10
**000001**
3:16
**000012**
46:18
**000019**
51:2
**000044**
67:10
**00007**
45:1
**00021**
52:23
**00023**
54:9
**00025**
55:11
**000291**
58:14
**00031**
57:11
**00034**
42:9
**0005**
38:7
**0006**
41:10
**01**
4:7, 5:10
**05**
3:11, 19:12
**06**
159:21, 162:24,
162:25
**08**
34:17
**09**
97:10, 161:15,
161:16

---
**1**
---

**1**
159:18
**1.5**
27:3

**10**
4:7, 5:10,
58:20, 59:5,
87:22
**100**
103:3, 145:19
**103**
80:14
**109**
46:22
**11**
58:20, 59:5,
66:5, 66:8,
106:5
**117**
3:21
**12**
2:6, 39:11,
58:20, 59:5,
62:23, 63:9,
97:10, 97:13,
143:12, 145:4,
145:17, 146:8
**120**
3:5
**120,000**
145:2
**1200**
40:24
**1201**
2:16
**125**
15:13
**13**
39:13, 59:8,
62:8, 62:10,
62:24, 63:8,
64:23, 71:3,
86:4
**14**
122:16, 122:21,
130:12
**15**
50:20, 51:2,
140:1, 162:24
**150**
13:19, 122:20,
122:25, 126:8,

126:16
**16**
35:12, 35:20,
50:18
**167**
12:3
**17**
14:20, 59:8,
62:8, 62:24,
62:25, 63:8,
64:23, 66:5
**18**
1:24, 4:6, 5:9,
30:4, 59:17
**19**
3:12, 27:11
**1989**
11:10, 11:23
**1990**
12:1
**1995**
12:5, 12:14
**1996**
12:20, 13:14
**1st**
27:14

---
**2**
---

**2**
159:21, 161:15,
161:16
**2,000**
150:18
**20**
3:11, 19:12,
19:15, 59:8,
62:10, 81:19,
118:6, 140:1
**200,000**
155:6
**2000**
18:4, 122:16
**20004**
2:18
**2003**
14:14, 18:6
**2005**
3:11, 19:12,

106:2, 126:4,
151:1, 152:11,
152:14, 153:13,
154:2, 154:6
**2006**
3:13, 13:14,
22:11, 23:2,
27:7, 27:14,
27:20, 29:13,
29:25, 103:12,
103:14, 106:3,
116:14, 124:12,
151:1, 151:23,
152:3, 152:6,
152:12, 152:14,
153:14, 154:2,
159:6
**2007**
15:1, 15:3,
27:3, 47:14,
77:7, 131:2,
131:7, 131:17,
131:18, 132:5,
152:3, 152:6
**2008**
15:3, 29:18,
30:14, 34:23,
35:2, 74:21,
74:24, 89:19,
92:17, 92:19,
99:17, 116:16,
122:15, 140:5,
153:4, 153:5
**2011**
3:21, 117:15,
125:9, 153:9
**2012**
61:9, 131:3,
131:7, 131:17,
131:18
**2013**
59:5, 59:8,
60:24, 61:19,
62:10, 64:15,
98:10
**2014**
13:19, 34:18,
34:19, 34:23,

35:2, 35:13,
35:20, 39:7,
104:25, 115:4,
123:12, 123:19,
154:13
**2015**
86:14, 105:1,
122:16, 135:4,
140:5
**2021**
113:7
**2025**
1:24, 3:20,
4:6, 5:9, 87:19,
162:25
**2027**
162:24
**21**
55:11
**213**
2:19
**22**
3:14, 114:21
**23**
24:4, 162:25
**24**
1:3, 5:8
**25**
3:15, 80:14
**26**
3:17, 82:4,
97:13
**27**
57:11

---
**3**
---

**3**
2:8, 102:21
**3(3**
57:19
**3.1**
51:10
**3.10**
55:3, 55:9
**3.19**
45:25, 46:4,
57:14, 57:17,
58:10, 60:21

**3.20**
42:6, 42:8,
42:11, 42:16,
44:2, 44:11
**3.4**
52:2
**3.7**
52:24, 53:1,
53:10
**3.9**
53:17, 53:19,
54:5, 54:11,
55:1
**30**
13:21, 39:7,
40:10, 40:14,
42:9, 97:1,
122:24
**30,000**
155:21
**308**
3:16
**31**
3:20, 66:8,
87:19, 90:17,
106:5
**34**
15:13, 46:23
**35**
3:16
**37130**
2:7
**38**
26:21, 27:11,
27:23, 28:1
**3:-cv**
1:3, 5:8
**3rd**
117:15

**4**

**4**
18:6
**40**
12:10, 67:9
**401**
98:2
**41011**
4:5, 5:15

**41017**
6:12
**450**
32:7, 40:24
**48**
80:14

**5**

**5**
128:1, 154:6
**50**
4:4, 5:13
**500**
59:18, 98:4
**56**
159:18
**5602**
2:19

**6**

**6**
27:9, 126:4,
128:1, 154:6
**6.2**
49:24, 66:25,
67:4, 67:6
**6.23**
67:4
**600**
40:24
**615**
2:8

**7**

**7**
27:9, 29:22
**70**
3:17
**72**
12:10
**72,000**
12:10
**771**
2:19
**79**
3:19

**8**

**800**
155:6

**820**
2:17
**850**
4:5, 5:14
**87**
3:20
**893**
2:8
**8933**
2:8

**9**

**900**
40:24
**922**
1:3, 5:8
**96**
12:25, 13:11
**9673**
6:10
**9th**
22:11