

# Transcript of Vance Hinton

**Date:** June 24, 2025
**Case:** Atchison -v- Hubbell Industrial Controls, Inc.

**Planet Depos**

**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

## Page 1

```
 1         UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF TENNESSEE
 3   ---------------------------------x
 4   TIMOTHY ALLEN ATCHISON,        :
 5        Plaintiff,                 :
 6     v.                :  Civil Action No.:
 7   HUBBELL INDUSTRIAL CONTROLS, INC., : 3:24-cv-922
 8        Defendant.                 :
 9   ---------------------------------x
10
11
12
13
14          DEPOSITION OF VANCE HINTON
15             New Braunfels, Texas
16            Tuesday, June 24, 2025
17               10:08 a.m. CST
18
19
20
21
22
23   Job No.: 587559
24   Pages: 1 - 139
25   Recorded By: Leyhbert Sharp
```

## Page 2

```
 1      Deposition of VANCE HINTON, held at the
 2   offices of:
 3
 4
 5
 6
 7       HOMEWOOD SUITES BY HILTON NEW BRAUNFELS
 8          620 Oxford Drive
 9          New Braunfels, TX 78130
10
11
12
13      Pursuant to Notice, before Leyhbert Sharp,
14   Notary Public in and for the State of Texas.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        KEN BURGER, ESQUIRE
 5        BURGER SCOTT & MCFARLIN
 6        12 North Public Square
 7        Murfreesboro, TN 37130
 8        (615) 893-8933
 9
10   ON BEHALF OF THE DEFENDANT:
11        WILLIAM BRADLEY, ESQUIRE
12        ROBINSON & COLE LLP
13        1201 Pennsylvania Avenue Northwest
14        Washington, DC 20004
15        (771) 213-5650
16
17
18   ALSO PRESENT:
19        Timothy Allen Atchison, Plaintiff
20
21
22
23
24
25
```

## Page 4

```
 1              C O N T E N T S
 2   EXAMINATION OF VANCE HINTON          PAGE
 3       By Mr. Bradley                     6
 4       By Mr. Burger                     85
 5
 6
 7              E X H I B I T S
 8          (Attached to transcript.)
 9   DEPOSITION EXHIBIT                   PAGE
10   Exhibit 1   Subpoena                   7
11   Exhibit 2   Email                     25
12   Exhibit 3   Complaint                 30
13   Exhibit 4   Stock Purchase Agreement  40
14   Exhibit 5   Letter                    66
15   Exhibit 6   Certified Copies of Filings 69
16   Exhibit 7   Email Chain               74
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Here begins Media

3    number 1 in the videotaped deposition of Vance

4    Hinton in the matter of Atchison v. Hubbell

5    Industrial Controls, Inc. in the United States

6    District Court for the Middle District of

7    Tennessee, Case number 3:24-CV-922.  Today's date

8    is June 24th, 2025.  The time on the video monitor

9    is 10:08 a.m.  Videographer today is Rosie Jones

10   representing Planet Depos.  This video deposition

11   is taking place at 620 Oxford Drive in New

12   Braunfels, Texas, 78130.  Would Counsel please

13   voice identify themselves and state whom they

14   represent?

15          MR. BRADLEY:  William Bradley for

16   Hubbell Industrial Controls.

17          MR. BURGER:  And this is Ken Burger for

18   Plaintiff Timothy Atchison.

19          THE VIDEOGRAPHER:  The court reporter

20   today is Leyhbert Sharp representing Planet Depos.

21   The reporter, please swear in the witness.

22          THE REPORTER:  Thank you.  Good

23   morning.  I am a notary authorized to administer

24   oaths and this deposition will be recorded by

25   electronic means.  All parties understand and

---

**Page 6**

1    agree that any certified transcript produced for

2    the recording of this proceeding is intended for

3    all uses permitted under applicable procedural and

4    evidentiary rules and rules -- and laws, and

5    should constitute reading a stipulation.  The

6    parties stipulate to the use and certification of

7    the -- of this testimony consistent with

8    applicable law of such.  Sir, can you please raise

9    your right hand for me?

10   Whereupon,

11          VANCE HINTON,

12   being first duly sworn or affirmed to testify to

13   the truth, the whole truth, and nothing but the

14   truth, was examined and testified as follows:

15   EXAMINATION BY COUNSEL FOR THE DEFENDANT

16   BY MR. BRADLEY:

17      Q   Please state your name and address for

18   the record?

19      **A   Vance Hinton.  I live at 4 Vantage**

20   **Point in New Braunfels, Texas.**

21      Q   Good morning, Mr. Hinton.  I am William

22   Bradley.  I represent Hubbell Industrial Controls

23   in connection with a lawsuit filed by Mr.

24   Atchison.  On Zoom today, you'll see Mr. Atchison

25   and his attorney, Mr. Burger.

---

**Page 7**

1          Do you understand that you are here

2    today to provide testimony in connection with that

3    lawsuit pursuant to a subpoena that I --

4      **A   I do.**

5          MR. BRADLEY:  I'm going to mark as

6    Exhibit 1 a copy of the subpoena.

7          (EXHIBIT 1 MARKED)

8    BY MR. BRADLEY:

9      Q   Mr. Hinton, have you ever been deposed

10   before?

11     **A   Yes.**

12     Q   How many times?

13     **A   Once.**

14     Q   And what was the nature of that

15   proceeding?

16     **A   We -- there was a company that wanted**

17   **to buy our business, Powerohm Resistors, and we --**

18   **we weren't interested in selling at that**

19   **particular time.  And they were very persistent**

20   **and I tried to be as flattering as I could by**

21   **saying, thank you, but we're really not**

22   **interested.  And the next thing I know, I'm being**

23   **sued for some sort of corporate espionage that was**

24   **dismissed abruptly in a Texas court once both**

25   **sides were heard.**

---

**Page 8**

1      Q   Thank you.  I'm going to remind you of

2    some of the rules of depositions, so things will

3    go smoothly today.  I want to remind you you are

4    under oath.

5      **A   Yes.**

6      Q   Under penalty of perjury, as if you're

7    testifying in Court.  For our conversation today,

8    we will need a verbal response as we have a court

9    reporter taking a transcription of our

10   conversation.

11     **A   I understand.**

12     Q   Okay.  As we're having an examination

13   today, please wait until I finish my questions

14   before you answer them.  That way the court

15   reporter can keep an accurate reflection of the

16   conversation.

17     **A   Okay.**

18     Q   If at any point you do not understand

19   one of my questions, please let me know so I can

20   rephrase it and provide some clarity so you can

21   answer it.  At any time, we can take a break.  So

22   if you need to use the restroom, or need glass of

23   water, or something like that, we can certainly

24   take a break.  I cannot speak with you during the

25   break.  It's not that I'm rude, it's just out of

---

**9**

1 respect to -- to the process and Mr. Burger that
2 we will --
3 **A Understand.**
4 Q -- not be communicating today.
5 **A Yep.**
6 Q Okay. Thank you.
7 **A Understand.**
8 Q There may be objections made during
9 this proceeding. You still answer the questions,
10 that is for evidentiary reasons, and unless it
11 reflects advice that you got from a lawyer in
12 connection with your -- your testimony. If you do
13 remember something, I -- I -- I realize the events
14 that we're talking about today took place ten to
15 20 years ago. If later today, you remember
16 something or you need to clarify a response, and the
17 please wait until we're on the record and in the
18 presence of Mr. Burger before clarifying any prior
19 testimony. Pursuant to the federal rules, I need
20 to establish that you're competent to provide
21 testimony today.
22 So I need to ask if you're on any
23 medication or have any medical conditions that
24 would inhibit your ability to understand and
25 answer my questions truthfully today?

**10**

1 **A Actually, I'm on several medications.**
2 **I've had an organ transplant, so I have to take**
3 **anti-rejection medications as well as a few other**
4 **things. But no, I'm very competent. I -- I don't**
5 **have any mental issues as a result of them that**
6 **I'm aware of.**
7 Q Okay. Thank you, Mr. Hinton. So if
8 you do answer a question, I'll assume you
9 understood it and was able to answer it
10 truthfully. Okay, thank you.
11 **A Yes.**
12 Q If you can turn to Exhibit 1, the
13 subpoena. At the back, there are some document
14 requests seeing if you still have any -- any
15 documentation from the Powerohm days. If you --
16 **A Where would that be?**
17 Q Oh, I'm sorry. In the back of the
18 subpoena where it has requests. They're the
19 numbered paragraphs. There's 20 of them.
20 **A I don't have any paperwork from those**
21 **days.**
22 Q Okay. Understood. I -- I -- it's one
23 of those things we need to ask to make sure that
24 we're gathering all the information that's
25 available to us --

**11**

1 **A Per the instructions of our**
2 **transaction, I was to leave all documents behind**
3 **when I left Powerohm for the last time, and we did**
4 **that. The closing information was sent to me on a**
5 **memory stick, which I have now misplaced and**
6 **couldn't find, so I -- I don't have any documents.**
7 Q Okay. Thank you, Mr. Hinton. You can
8 put this to the side. I would like to get some
9 background information today. We'll start with
10 your -- your education.
11 **A Okay.**
12 Q When and where did you go to high
13 school?
14 **A I went to Frankfurt Senior High School**
15 **in Frankfurt, Indiana. Actually in the hall of**
16 **fame for that high school.**
17 Q Congratulations.
18 **A Yeah. Thank you.**
19 Q After you graduated from high school,
20 did you continue your formal education?
21 **A I did.**
22 Q And where did that take place?
23 **A I went one year at the IUPUI campus in**
24 **Kokomo, Indiana, and then I transferred to the**
25 **main campus of Purdue University in West**

**12**

1 **Lafayette, Indiana.**
2 Q And did you receive a degree from
3 Purdue?
4 **A I did.**
5 Q And what did you --
6 **A I have a bachelor's degree. A bachelor**
7 **of Science, but it focused on electrical**
8 **engineering.**
9 Q After you received your degree from
10 Purdue, did you continue on with your formal
11 education?
12 **A No.**
13 Q Did you enter the workforce at that
14 time?
15 **A I did.**
16 Q And starting with your first job out of
17 college, where did you work?
18 **A I worked for a company called Square D**
19 **located in Peru, Indiana.**
20 Q Thank you. Do you recall the years
21 that you worked there?
22 **A Yes. 1980 and 1981.**
23 Q And then what was the next step in your
24 employment history?
25 **A It was then I determined that I'd made**

13

1 a big mistake. I was -- I was given offers in the
2 Houston area, but I elected to stay in Indiana
3 because of my familiarity with everything, and --
4 and it -- all it took was a bad winter and I just
5 decided that's it. I'm done. And so I left my
6 job at Square D and took a big risk moving to
7 Houston without a job, and landed a job within a
8 week at Toshiba. And my role at Toshiba was same
9 as with Square D. And they -- they put me in what
10 they referred to as application engineering.
11     Q    And what were the nature of the
12 products you worked on as an application
13 engineering?
14     A    Basically, my job was to -- to develop
15 quotes, be a liaison between customers and the
16 engineering department on various different
17 projects and products. Toshiba also made variable
18 speed drives at the time and so that was my first
19 exposure to electronic controls for -- for
20 electric motors. The big product that they made
21 at the facility I was at was electric motors.
22 That was the -- the very big manufacturing plant
23 there was based on motor manufacturing, but I was
24 in a very small group. I think there were three
25 or four of us total in that group.

14

1     Q    Okay, thank you. How long were you
2 with Toshiba, if you recall?
3     A    Three years.
4     Q    And --
5     A    From '81 to '84.
6     Q    And after you left Toshiba, where did
7 you go?
8     A    I started working in outside sales for
9 a company called Westmoreland, not the general,
10 but Westmoreland Engineering sales. And I was a
11 sales person calling on engineers to sell them
12 engineered products. That was my first exposure
13 as a -- to becoming a manufacturer's rep. That
14 was from '84 to '87.
15     Q    And then in 1987, what did you do?
16     A    '87 is when I created my own
17 manufacturer's rep firm called Electrical Sales
18 Associates.
19     Q    And what was the nature of the
20 electrical sales associates business?
21     A    It was a manufacturer's rep company
22 that basically would seek out small manufacturers
23 of electrical equipment that were so small they
24 couldn't afford their own sales team. So they
25 would employ a company like mine that had capital

15

1 intellect and knowledge of a territory to be their
2 sole representative in a given territory, say for
3 example, the State of Texas. And then your job
4 would be to represent that company in -- in every
5 aspect. So to the customer, you're a -- even
6 though you have a different company moniker on
7 your business card, you're the guy that represents
8 that specific company. And most of the time we
9 had somewhere in the range of ten to 12 companies
10 that we represented of -- of different types, but
11 all in the electrical industry.
12     Q    Thank you. How long were you running
13 electrical sales associates?
14     A    Let's see. That was from '87 until --
15 gosh. I can't remember when we actually shut it
16 down, to be honest.
17     Q    Okay. That's fine.
18     A    It probably would've been 1999 --
19     Q    Okay. Thank you.
20     A    -- when I -- I transitioned out of that
21 to -- I was an executive vice president for a
22 cable tray manufacturer in 1999 until 2003.
23     Q    Okay. And then in 2003, what was the
24 next step?
25     A    In -- we started Powerohm Resistors in

16

1 1996. And -- and in the early stages, Mike was
2 the only employee because the company, I -- I put
3 my life savings into starting that business and it
4 took a -- a lot effort. And we realized pretty
5 quickly that it -- it wasn't generating the kind
6 of income that Richard and myself, we couldn't all
7 be on the payroll. So Mike was the only one on
8 the payroll at that time, and Richard and myself
9 were involved with the electrical sales. But in
10 1999, when I transitioned out of the
11 manufacturer's rep business, that's when Richard
12 joined the Powerohm payroll. He was a partner
13 from the beginning, but he wasn't payrolled until
14 1999.
15          And then I did the executive vice
16 president role for PW Industries from '99 to 2003,
17 so I traveled extensively for that company. I was
18 gone weekly for the most part.
19     Q    And at some point, did you join
20 Powerohm?
21     A    I did.
22     Q    (Inaudible) --
23     A    My joining of the company coincided
24 with Mike moving back to Kentucky. I -- I took a
25 tremendous pay cut to do so, but it was long

17

1 overdue to take -- to be in charge of the company
2 that -- you know, that we founded together. And
3 it was agreed all along from the inception that
4 when Mike's children were old enough to start
5 school, he wanted them in the school system that
6 he grew up in and he wanted his kids going to the
7 same elementary school, the same middle school,
8 and the same Catholic high school that he went to.
9      So 2003 was when Mike moved back. And
10 coincidentally at -- around that same time, we
11 hired a couple of engineers, Rusty O'Hara and Tom
12 Yingling, who had recently been let go from our
13 competitor, Post Glover. Post Glover was going
14 through cost-cutting measures, and they let go two
15 of their very best engineers. I'd have to say
16 that was our gain to see the value in those two
17 guys and bring them on board.
18     Q   To take a quick step back. So Powerohm
19 was formed in 1996?
20     A   Yes.
21     Q   And when you referred to Mike and
22 Richard, that's Michael Crowe and Richard Jochen?
23     A   That's correct.
24     Q   And in 2003, you opened a second
25 location in Kentucky?

18

1     A   That's correct.
2     Q   And was that Florence, Kentucky? Or --
3 or -- sorry, strike that.
4     A   Well, we first rented a place. It
5 could have been Florence. I don't know. Mike --
6 and Mike pretty much handled everything in
7 Kentucky. So the first place we had, I believe I
8 only -- I recall visiting there one time. It was
9 a small place in a little strip center. I don't
10 even -- I -- I can't remember the square footage,
11 maybe 1,000 or 1,500, something like that. It was
12 very small, but that was the initial. We really
13 needed the office space, and so that's what it was
14 for.
15     And then a few years in we managed to
16 get a deal on a building. Actually it was a
17 warehouse for toys. A company called Johnny's
18 Toys was in that building and Mike went and viewed
19 it. It was purchased sight unseen by me. I took
20 Mike's word for it that it was going to work out.
21 And so we bought it and I think Mike was hoping
22 that they would miss some of the inventory and --
23 and leave some of the toys behind, but that didn't
24 happen. They -- they were pretty thorough in
25 their move.

19

1     But we had to do extensive work to make
2 that building work for our uses, and it still
3 wasn't perfect but it was -- I mean, we got the
4 right price. It was a good deal for us at the
5 time, but it had very limited parking, and that
6 was the downside.
7     Q   Where was this building located?
8     A   Well, unfortunately, it was in a
9 neighborhood. It was surrounded by homes. And,
10 in fact, we had real concerns about parking. And
11 before we even closed on the building, we were
12 already in the processes of trying to buy it, and
13 a little house, just a adjacent to it, right next
14 to it, came on the market. And so we decided to
15 buy that house so that we could extend the
16 parking. And we did immediately. As soon as the
17 whole deal's all closed, we took most of the yard
18 and turned it into a gravel parking lot.
19     Q   And --
20     A   We held off. We were thinking about
21 just demoing the whole house and making the whole
22 thing a parking lot, but we looked at the cost
23 involved doing it at the time and we decided,
24 let's just see how it goes with what we have now.
25 And if we have to do it later, we'll do it.

20

1     Q   And this warehouse in -- residential
2 house, these were in Covington, Kentucky, correct?
3     A   Yeah. Well, it was really Latonia, but
4 I think Latonia was part of Covington. I mean, if
5 you -- down the street from our building there's
6 still signs that say you are entering Latonia, so
7 however you want to state it. The locals call it
8 Latonia. I think on a map it's called Covington.
9     Q   Okay. Thank you.
10     A   Yeah.
11     Q   So Powerohm started in 1996 in Katy,
12 Texas, correct?
13     A   That's correct.
14     Q   And in 2003, Mike Crowe went to
15 Kentucky and started -- or -- an office there?
16     A   Yeah, I believe that's the timeline.
17     Q   What were the products being made by
18 Powerohm in this time period?
19     A   We basically made all kinds of
20 different styles of power resistors. In fact,
21 this catalog that I happened to have here, it show
22 -- each Tab -- this is an old catalog, by the way.
23 This -- this predates Tim joining the company.
24 But if you'll look at this, you'll see a tab for
25 every product type. And then what superseded this

21

1 catalog was we just had a digital version that was
2 online.
3        And this catalog doesn't show anything
4 to do with products that we got into in the
5 Kentucky area, except for there are -- there's
6 some sine wave filters in here, which we built in
7 Kentucky. And due to the nature, they're --
8 they're more engineering-oriented, and also the
9 high-resistance grounding products, both of those
10 products required engineering and wiring and so
11 forth, whereas the typical power resistor that we
12 produced was really more mechanical knowledge or
13 mechanical fabrication than anything really
14 electrical.
15        You know, those different types of
16 resistors were -- you'd almost -- if you toured
17 the facility, you -- you didn't see much of
18 anything that looked electrical. It was mostly
19 metal fabrication, but that's the nature of a
20 power resistor versus a small carbon resistor that
21 would be electronic in nature.
22    Q   Thank you, Mr. Hinton.
23    A   We focused on power resistor products
24 only.
25    Q   Thank you. I'll let the written record

22

1 reflect that the witness brought with him a
2 catalog today that he was -- shared with us.
3 Thank you. Do you recall when you first heard the
4 name Tim Atchison?
5    A   I do.
6    Q   And do you recall -- can you provide us
7 with what your recollection is?
8    A   I believe the first time that I met Tim
9 must have been at a trade show. There were
10 numerous trade shows annually that a lot of the
11 small companies, and -- and a lot of the big
12 companies would attend as a way to preview the
13 products that they made. And it was pretty common
14 to attend these trade shows.
15        And the thing about what led us, I
16 guess, to finally meet was we existed in the same
17 customer area with respect to a certain product
18 line. We manufactured dynamic braking resistors
19 that were utilized with variables -- variable
20 frequency drives. And the resistor, unless of --
21 unless the -- a lot of the drive manufacturers
22 will put the braking circuit or the chopper inside
23 their drives, but there were some drive
24 manufacturers that did not.
25        And those that did not had to get an

23

1 external module, or we called it a braking module,
2 to be able to help in the braking of the
3 application or the load. And we made the resistor
4 part. And other companies, such as the one Tim
5 worked for, called Bonitron, they made the brake
6 modules.
7        Now -- in -- to try to put it in a
8 terminology. In a typical room, you have lights
9 and then there's a switch on the wall. And you
10 flip the switch and the lights come on, and you
11 unflip the switch or flip it again and the lights
12 go off. So the switch controls the light. Well,
13 in a dynamic braking resistor circuit, the braking
14 module controls whether the resistor comes on or
15 off. The resistor by itself doesn't do anything.
16 It has no intelligence. It -- it's just a means
17 of converting electrical energy into heat in order
18 to dissipate the energy.
19        So the company that Tim worked for,
20 they made products -- I think they made a whole
21 host of other products as well, but that was one
22 of the products that we knew them for was the fact
23 that they made braking modules to go with braking
24 resistors. I remember the guy's name was Keith
25 something or other. I don't remember his last

24

1 name.
2    Q   Was Mr. Atchison a friend of Mike
3 Crowe's at the time that you met him?
4    A   I think we probably all met around the
5 same time at -- at a show or something like that.
6 And I -- it probably was through that or through
7 some sort of application scenario where Mike had
8 to call Bonitron for something or Bonitron called
9 us for resistors. I'm not sure how it -- how they
10 would've gotten together, but --
11    Q   At -- at -- at this trade show --
12 strike that.
13        Do you know what products or class of
14 products Mr. Atchison worked on at Bonitron?
15    A   Not specifically, no.
16    Q   Do you know if he was working on
17 braking modules or switches?
18    A   I just assumed that was one of the
19 products that he made, based on what information I
20 would get from Mike --
21    Q   And -- and --
22    A   -- Mike Crowe.
23    Q   Okay. Thank you. Do you recall when
24 that trade show was, what year?
25    A   I have no idea. I -- I don't really --

25

1  I mean, we went to shows every year.
2      Q   Okay.  Thank you.
3      A   In fact, I mean, just to give you an
4  idea.  I -- I became friends with the president of
5  our number one competitor.  So we would talk
6  openly and I -- I would pick him up at the airport
7  for the show or drop him off.  I mean, we -- we
8  really had a -- it -- it wasn't as adversarial as
9  a lot of industries might be.  I mean, the -- it
10  was a small community of -- of people.  I mean,
11  the electrical industry itself is -- it's an
12  honest living and you meet a lot of good people,
13  but, you know, most of the time it's -- it's
14  pretty civil.  I mean, everyone gets along.
15      MR. BRADLEY:  Okay.  Thank you.  Mr.
16  Hinton.  I'm going to mark as Exhibit 2 and --
17  with the court reporter and hand it to you.
18      (EXHIBIT 2 MARKED)
19  BY MR. BRADLEY:
20      Q   Mr. Hinton, I handed you what has been
21  marked as Exhibit 2, is an email that -- dated
22  September 20th, 2005.  And it was attached to one
23  of the exhibits in the complaint and then later
24  communication.
25      Can you take a moment to read this

26

1  email?
2      THE WITNESS:  I'm familiar with it.
3  I've seen it.
4  BY MR. BRADLEY:
5      Q   Okay.  Thank you.  Do you recall the
6  events 2005 where you were considering starting a
7  new division of Powerohm?
8      A   I do.
9      Q   Okay.  Can you briefly explain your
10  recollection of that?
11      A   Well, as I mentioned, we had met
12  different personalities, Tim being one through the
13  trade show circuit and Mike was very warm to the
14  idea of us adding a brake module to our line of
15  products, because we would be the only resistor
16  company to have such a marriage of the light and
17  the switch if you will.  Having a brake module as
18  well as manufacturing the resistor would've been a
19  big deal.
20      It -- it -- it makes it easier for a
21  customer because he can get both products at the
22  same place instead of having to source them from
23  different places.  That's really the -- the
24  benefit of the whole thing.  And so we -- Mike, I
25  should say, had communicated, and there were three

27

1  guys that expressed an interest in wanting to team
2  up with us to manufacture break modules for the
3  industry.  And it was Mike Roof and Tim Olson and
4  Tim Atchison, the two Tims and a Mike.  And -- but
5  there were several communiques back and forth over
6  a period of time, probably at least a year or so.
7      And it culminated in Mike, Richard, and
8  I, all three going to Nashville and we wanted to
9  discuss it more in detail.  And I remember we had
10  dinner at Mike Roof's house, I believe.  He cooked
11  out.  He grilled some steaks and I think, you
12  know, we all had a good time.  But at that
13  meeting, I -- I said to the group of them.
14      So if we had an operation in Nashville,
15  which one of you, three, would be the one in
16  charge?  And they all three looked at each other
17  and basically said, well, we'd all be in charge,
18  and that pretty much stuck a fork in it for me.  I
19  decided that none of them were qualified, nor did
20  they have what it took to -- to be on their own
21  and unsupervised.  And -- and that's when I said,
22  okay.  That's it for me.
23      And Richard felt the same.  Richard
24  said, well, yeah, I'm not -- you know, I'm not
25  putting any money into something that we have no

28

1  guarantees what's going to happen.  And none of
2  these guys have a track record of having a
3  business or being responsible enough to have a
4  business and so long as somebody else is paying
5  for it, it'd be great.  But starting a company is
6  a huge responsibility and it's a lot of sacrifices
7  and we didn't we -- didn't feel that they were
8  willing to make the sacrifices necessary for it to
9  be successful.
10      Q   Thank you.
11      A   So we pulled the plug on it right then
12  and there, and we didn't -- it was -- it was a
13  disappointment for Mike because he had high hopes,
14  but he accepted that it was the right thing to do.
15      Q   And do you recall how that -- how your
16  decision not to go forward was communicated to
17  them?
18      A   It really wasn't.  I think we just -- I
19  mean, there were a couple other attempts.  I tried
20  to do some stalls here and there, but it -- I
21  think it -- it eventually just lost traction.  We
22  didn't really communicate more after -- after we
23  went there in person and I kind of got the feel
24  for how things were going to be.  I was soured on
25  the idea.

---

**29**

1    Q   At some point after -- at some point,
2 Powerohm did hire Tim Atchison.
3    A   I believe it was a few after that. He
4 kept complaining to Mike how miserable he was and,
5 you know, please get me out of here and that sort
6 of thing. And Mike came to me and said, look,
7 what if we hire this guy and I'll be responsible
8 for him and we'll have him design a break module
9 for us, and we can add that into the product mix.
10      And I said, I agreed to go along with
11 it. First of all, because I highly respect Mike
12 and I felt like if it was something Mike felt
13 strongly about enough that he would, you know, go
14 to bat for Tim in this case, then I was going to
15 go along with it. So yeah, I -- I think sometime
16 in 2008, I believe it was that we finally hired
17 Tim as an employee.
18    Q   Okay. Thank you. Was Tim hired as a
19 W-2 salaried employee?
20    A   He was.
21    Q   Was there any other side deal to do a
22 joint venture with him or give him an ownership
23 interest in the company?
24    A   No.
25    Q   He was a straight employee. And that

---

**30**

1 was understood by everyone in the company?
2    A   Yes.
3      MR. BRADLEY: I am going to hand you
4 will be marked as Exhibit 3, copy of the complaint
5 filed in this matter. And it consists of three
6 documents -- oh, sorry. Court reporter needs to
7 mark it.
8      (EXHIBIT 3 MARKED)
9 BY MR. BRADLEY:
10    Q   It's the text of the complaint and then
11 two exhibits. And I'll ask you to flip to the
12 second exhibit.
13    A   This one?
14    Q   I'm sorry. Exhibit 3. There's the
15 complaint. I'll take this off for you. So you
16 have a complaint, Exhibit 1, Exhibit 2. Can you
17 start with Exhibit 2?
18    A   I haven't looked at these by the way.
19      So if you open it up, you'll see the
20 email that we just talked about. And then as you
21 flip through it, it's a at least a draft of a
22 business plan for Power Electronics.
23    A   I think that was done by Mike Roof.
24    Q   Mike Roof. Okay. If the fourth page
25 of this -- there's a confidentiality agreement

---

**31**

1 page. Do you see that?
2    A   Okay.
3    Q   Did you or anyone else ever submit this
4 to any banks to try to get lending?
5    A   I did not.
6    Q   Do you know if anyone got a copy of
7 this plan outside of --
8    A   I don't believe so.
9    Q   Do you know if there were any
10 conversations from -- strike that. Do -- do you
11 recall getting this plan back in 2006?
12    A   It -- I don't recall it to be honest,
13 but it -- it wouldn't have gone anywhere because
14 like I said, after we had our little dinner and I
15 posed them to question, who was going to be in
16 charge. And they all three dumbly looked at each
17 other. And I -- to me, that's just a signal
18 saying they haven't even discussed it. No one's
19 willing to step up and be a leader. And without
20 leadership, you -- you can't serve -- you -- you
21 can't be successful. And I wasn't going to move
22 there and neither was Mike and -- and neither was
23 Richard. And without leadership, it -- it
24 wouldn't have worked.
25    Q   Good. Thank you. If you could flip to

---

**32**

1 Section 1.2, where it says Mission, it's Page 7 to
2 38.
3    A   Page 7 and 38. Okay. All right.
4    Q   You know what? I'll read it. It says,
5 Our Mission: Combining a well established
6 electronic engineering team with great sales
7 experience accompanied by a highly respected and
8 well-known resistor manufacturing group into a one
9 stop source for a comprehensive reliable line of
10 power electronics. Do you see that?
11    A   Sure.
12    Q   As a someone involved in the industry
13 is power electronics, a noun that can be used for
14 these sorts of device?
15    A   It's kind of category-ish, if you will.
16 I mean, just like we make power resistors, power
17 electronics would be kind of like a category.
18 It's not necessarily a -- a product per se.
19    Q   So it's a noun to describe a category
20 of switches or -- or the -- the electronics?
21    A   I would say. Yeah.
22    Q   Thank you.
23    A   I mean, it's electronic in nature, but
24 handles higher levels of power, I would say.
25    Q   Okay. So in -- is it -- is it fair to

33

1   say in Katy, Texas you did power resistors and
2   cabinets?
3      A   Yes.  Correct.
4      Q   And in Covington, Kentucky, you did
5   power electronics, the transistors and the
6   switches?
7      A   Well, after Tim came aboard, we did.
8   Yes.  Prior to Tim's arrival, we did not do
9   anything electronic.
10     Q   But when I see the word power
11  electronic or power electronics or if Mike Crowe
12  is using the word power electronics, he's not
13  referring to a separate legal entity that you
14  formed called Power Electronics?
15     A   That's correct.  We did not have any
16  legal entity called that.
17     Q   Okay.  Thank you.
18     A   From my limited experience at the time
19  starting companies, I knew that when I looked at
20  this, if this went to any lending institution,
21  they were going to shoot holes in it immediately.
22  And I didn't want to be embarrassed with something
23  like this, but I'd already made the decision that
24  we weren't doing this and they continued to work
25  as if we were going to.

34

1      Q   Okay.  Thank you.
2      A   And I don't know at some point whether
3   Mike had said, sorry, guys, we're -- we're not
4   doing this or how the message got conveyed, but it
5   got conveyed.  And there -- there was nothing
6   after any of this.  I mean, it was --
7      Q   I'll collate this back together for you.
8      A   Yeah.  I mean, it's nice that there was
9   a business plan created, but business plans are
10  basically all theory and fantasy and -- and
11  usually none of them ever come to fruition the way
12  they were hoped.  I never had a business plan for
13  our company.
14     Q   Sure.
15     A   I never believed in actually having to
16  have one.
17     Q   So it's fair to say that you did not
18  prepare any business plan for a new legal entity
19  to be called Power Electronics?
20     A   I did not.
21     Q   You did not submit any business plan to
22  any financial institution or lenders to get
23  funding for a new legal entity or a division
24  called Power Electronics?
25     A   I did not.  I did ask the bank if -- if

35

1   we got involved with another entity, could I
2   extend our blanket of our line of credit into
3   that?  And they definitely said not a chance.  So
4   I already knew that we weren't going to have any
5   financial support or help.  And at that point in
6   time, we still relied heavily on our operating
7   capital line of credit.  And so -- and it --
8   we exercised it quite a bit because hiring the two
9   guys that we hired as engineers, we had to delve
10  into our line of credit for their payroll and so
11  forth.  Because at that point in time, we didn't
12  -- we weren't strong enough financially to be able
13  to -- we didn't have the operating capital that
14  was surplus, I should say.
15     Q   Thank you.  So in 2008, Tim Atchison
16  was hired as a design engineer; is that correct?
17     A   Yes.
18     Q   Do you recall what his job duties were
19  as a design engineer?
20     A   Yeah, he was supposed to design brake
21  modules for us to offer to the -- the drive market
22  that was buying brake modules and braking
23  resistors.
24     Q   Was Mr. Atchison successful in building
25  brake modules?

36

1      A   To some degree, yes.  The -- while we
2   owned the company, the brake modules were to me a
3   -- a disappointment because we had put a lot of
4   money into the formation of that.  We hired Tim.
5   Tim was one of the highest paid people that we
6   had.  According to Mike, he matched the wage that
7   Tim claimed to be making from Bonitron.  So he was
8   making a considerable amount of money.  I -- I
9   want to say he was getting a salary of 84,000.
10  And back then, that was a -- that was quite a bit
11  of money, and that's -- it's more money than I --
12  I started as president of the company in 2003.
13     Q   Do you recall how many years after he
14  started it took to get a brake module on the
15  market?
16     A   I don't.  I -- I -- I really can't
17  remember.  I do know that both Richard and myself
18  constantly gave Mike grief about how much money
19  was going towards brake modules versus the -- you
20  know, it -- it was -- oh gosh, we were still in
21  the red on brake modules probably up until the
22  time we sold the company.  We had finally got --
23  there were some other products that weren't really
24  cataloged because they were just for specific
25  customers.  I remember we were given some sort of

37

1  -- I don't know whether to call it a brake module
2  or what. I don't know what to title it, but it
3  was a product that Rockwell wanted us to copy and
4  make for them and their distributors. And -- and
5  Tim did a -- a nice job of making a -- a copy of
6  that product. And when I say Tim did a nice job,
7  what I mean by that is, even though you can see
8  something and you see the circuit board and you
9  see all of that, you still have to make all of
10 that yourself.
11        You -- if -- even if you've got the
12 copy or you have something that you want to copy,
13 you still have to go through the motions of making
14 that circuit board the way that's made and getting
15 all the components that are there to be able to
16 assemble it and so on and so forth. And so Tim
17 alone was the one that was involved in doing that
18 stuff. And I believe we sold quite a bit of those
19 -- those products versus we had several problems
20 with the brake modules, as I recollect.
21        I remember -- I remember some
22 customer's drive blew up and they threatened to
23 sue us unless we bought them a new drive, which
24 cost us $60,000 or thereabouts. And that was
25 another issue that Mike had to take a lot of grief

38

1  over because the whole project of making brake
2  modules kind of fell under Mike's realm of
3  responsibility as did Tim. I never had a direct
4  report such as -- you know, Tim wasn't -- he
5  didn't report to me. He reported to Mike. And,
6  you know, I dealt with only the VPs. Mike Crowe
7  was VP of Engineering. Richard Jochen was VP of
8  operations. Joe Eschleman at the time was VP of
9  sales for the majority of the time up until Martin
10 Glover was hired.
11    Q   With the development of the Rockwell
12 modules and then also the BG and LG products.
13    A   Yeah.
14    Q   Was Tim Atchison a salaried employee
15 during the development of those products?
16    A   Yes.
17    Q   Did Tim Atchison build those products
18 on company time?
19    A   As far as -- well, what else would he
20 be doing?
21    Q   Understood.
22    A   He didn't build resistors.
23    Q   Did --
24    A   That was his job. That's why we hired
25 him.

39

1     Q   Did the company pay for the materials --
2     A   Yes.
3     Q   -- in which he worked with?
4         Did he have to report his progress to
5  anybody in management?
6     A   Only to Mike.
7     Q   Mike. Thank you. Does -- strike that.
8         At the time that you were president of
9  Powerohm, was it the company's position and
10 understanding that products designed by their
11 design engineers and other employees were the
12 property of Powerohm?
13    A   Yes.
14    Q   Did Tim Atchison ever express an
15 ownership interest in the BG or LG modules?
16    A   Not to my knowledge.
17    Q   Did Powerohm ever agree to sharing
18 ownership of the braking module products with Tim
19 Atchison?
20    A   No.
21    Q   Did Powerohm ever agree to a royalty or
22 commission to be paid for sales of any products
23 Tim Atchison worked on?
24    A   No.
25        MR. BRADLEY: Thank you. I'm going to

40

1  mark the next exhibit as Exhibit 4; is that
2  correct?
3         THE REPORTER: Yes, sir.
4         (EXHIBIT 4 MARKED)
5  BY MR. BRADLEY:
6     Q   What I've handed to you that has been
7  marked as Exhibit 4 is a copy of the Stock
8  Purchase Agreement dated January 16th, 2014.
9     A   Is this the 300-page document deal?
10    Q   Yeah, it is, sir.
11    A   Yeah.
12    Q   We're not going to look at all of it
13 obviously, but I do have a few questions. Do you
14 recall the last time you saw this document?
15    A   Well, it was when we were closing on
16 the company.
17    Q   So -- so January 16th, 2014 or
18 thereabouts?
19    A   Yep.
20    Q   Okay. Thank you.
21    A   Yep. Yep. That's the date of my
22 resignation.
23    Q   If you take this binder clip off,
24 you'll see this document also is three documents.
25 Where you have the agreement itself. Then you

41

1  have the exhibits to the agreement.  And then you
2  have the schedules to the agreement.
3      A   Okay.
4      Q   Okay.  Let's put the exhibits aside for
5  now and we're going to focus on just the agreement
6  itself and the schedules for now.
7          So -- so starting on the first page,
8  you'll see down at the bottom a number HCI 00001.
9  Do you see that?
10     A   Yep.
11     Q   Okay.  Those were numbers added by our
12 vendor as part of litigation to keep track of
13 documents.  We numbered them.
14     A   I understand.
15     Q   Okay.
16     A   Yep.
17     Q   So starting at HCI 0001, that's just
18 the title page.
19     A   Yeah.
20     Q   Correct?  Okay.  If you flip to the
21 next three pages.
22     A   Yeah.
23     Q   That's the table of contents.
24     A   Yeah, I see.
25     Q   So what I want to look at today is

42

1  going to be Article 1, the definitions.
2      A   Okay.
3      Q   And then Article 3, the Representations
4  of Powerohm and Sellers.  Do you see that?
5      A   Uh-huh.
6      Q   Okay?
7      A   Yes.
8      Q   Okay.  If you flip to HCI 0005.
9      A   Okay.
10     Q   The Stock Purchase Agreement.  In that
11 opening paragraph, it says, Vance J. Hinton in
12 the capacity of seller's representative.  Do you
13 recall being the individual in charge of the sale
14 of the company?
15     A   Yes.
16     Q   And if you could flip to the signature
17 page, HCI 00061 and 00063.
18     A   Okay.
19     Q   Do you recognize that to be your
20 signature?
21     A   Yes.
22     Q   Okay.  Thank you.  If you turn back to
23 that first page again, the Stock Purchase
24 Agreement.
25     A   Yeah, that's my signature.

43

1      Q   The next paragraph that starts with,
2  Witness this.
3      A   Okay.
4      Q   Okay.  It says, Whereas Powerohm is
5  engaged in the business of designing,
6  manufacturing, selling and servicing electrical
7  components and systems used for implementing
8  electrical resistance into a circuit for
9  industrial controls, transit, off-road vehicles,
10 oil and gas infrastructure, alternative energy,
11 power quality, and protection applications with
12 products including but not limited to dynamic
13 braking resistors, grounding resistors, neutral
14 grounding, high resistance grounding (pulsors),
15 harmonic filters, alternative energy resistors and
16 electronic braking modules, but shall not include
17 the load bank business.
18     A   Correct.
19     Q   And then (BUSINESS), meaning that
20 paragraph is going to be the definition of
21 business for this agreement, okay?
22     A   All right.  I'm with you.
23     Q   Okay.  Looking starting with where it
24 says, With products, including, which one of those
25 products were products made in Katy and which were

44

1  made in Covington, if you recall?
2      A   Everything was made in Katy except high
3  resistance grounding, the pulsors and the
4  electronic braking modules.
5      Q   Okay.  Thank you.
6      A   Those were made in Kentucky.
7      Q   Do you recall the gross sales of
8  Powerohm in 2013?
9      A   2013 would've been probably just on the
10 short side of 30 million because I believe the
11 year before that we eclipsed 30 million and -- and
12 we started to see a -- a slight decline.  And --
13 and then later in 2013, we -- we got some bad news
14 that we were going to lose our biggest customer.
15 So we -- they were in the solar related industry,
16 but yeah, it was around 30 million that year would
17 be my best guess since I don't have the sales
18 reports in front of me.
19     Q   Understood.  Do you recall what the
20 sales were for the products coming out of
21 Covington, Kentucky?  Or strike that.
22         For the electronic braking modules?
23     A   Oh, for braking modules only?
24     Q   Yeah.  Let's start there.
25     A   Oh, it -- under a half million probably.

45

1    Q   Okay.  Thank you.
2    A   Yeah, like I said, we felt like we were
3  still in the red.  If it hadn't been for the
4  products that we were copying, those had a decent
5  market and I think those were going out pretty
6  often.  And we even -- we had a pretty good
7  inventory of those.  And we -- we did inventory
8  the brake modules themselves, the BGS and the LGS,
9  but the BGS, from my recollection of that time, I
10  don't know if we really stocked very many of the
11  big ones, if at all.  Those we may have made when
12  they were ordered.  The LGS, the -- the ones that
13  were the smaller of the frame sizes, I do think
14  that we had some of those in stock.
15    Q   Do you recall -- strike that.
16        Do you recall when you made the
17  decision that -- or you and the owners made the
18  decision that you would sell the company?  Do you
19  recall that?
20    A   Yep.  That was made before we hired
21  Martin Glover.  That would've been probably around
22  2011.
23    Q   And --
24    A   Somewhere in that range.
25    Q   And it took a while to find a buyer; is

46

1  that --
2    A   No, we -- we felt like there was a lot
3  of work that had to be done if we wanted to
4  achieve the best results from putting our company
5  on the market.  We started -- how far -- how deep
6  do you want me to go into this thing?
7    Q   I -- I --
8    A   Because it -- it -- it might take a
9  little bit here.
10    Q   It -- we -- we can just jump to.  When
11  did you start talking to Hubbell?
12    A   That wouldn't have been until 2013.
13    Q   And during those discussions with
14  Hubbell, do you recall anyone from Hubbell saying
15  that one of the most important things or one of
16  deciding factors is they're trying to buy this
17  braking module business?
18    A   No, it was inconsequential to the -- to
19  the bigger picture.
20    Q   So from your recollection, Hubbell was
21  interested in really what you were doing in Katy,
22  Texas --
23    A   Yes.
24    Q   Okay.
25    A   Exactly.  I mean, that was well over 90

47

1  percent of everything we were doing was the
2  Resistor products.
3    Q   And at no time during your discussions
4  with Hubbell was there ever a discussion of a
5  potential joint venture with Mr. Atchison or any
6  business arrangement with him?
7    A   Well, I resigned on January 16th, 2014,
8  so I wouldn't have any knowledge of anything after
9  that.  But prior to that, no, there was nothing.
10    Q   That's -- okay.  Thank you.
11    A   In fact, most of the employees,
12  including Tim, had no idea, and the only time they
13  finally figured out what was happening is when
14  they were asked to sign a document, and they were
15  given a bonus for agreeing to stay on and to have
16  a no computer arrangement.  And just about all of
17  the key employees were offered that scenario.
18  Somewhere, I'm thinking in this bigger document,
19  that -- it must detail that there were bonuses
20  paid.  And I don't know whether it reveals it or
21  not, but the owners of Powerohm paid 50 percent of
22  those bonuses and Hubbell paid the other 50
23  percent.
24    Q   Thank you, Mr. Hinton.
25    A   That was a retention deal that we felt

48

1  strongly that we wanted every key employee to
2  receive something and Hubbell agreed.  So that's
3  why we came up with the 50/50 bonus to make sure
4  that we -- that, you know, none of the key
5  employees were going to leave.
6    Q   Okay.  Thank you.  If you can return to
7  the agreement and go to HCI0006.
8    A   Yep.  Okay.
9    Q   We're looking at some definitions.  If
10  you could read the definition of affiliate to
11  yourself.  Let me know when you're finished.
12    A   Okay.
13    Q   Okay.  And then the next definition,
14  affiliate arrangement, it says, Affiliate
15  arrangement has the meaning specified in section
16  3.20.  Do you see that?
17    A   Yep.
18    Q   So when we get to that section, I just
19  want you to keep in mind that it's going to have a
20  slightly different customized definition than what
21  you see in affiliate; is that -- is that clear?
22    A   I don't know where you're going with it
23  but --
24    Q   Well -- well --
25    A   I guess I'll find out when we get there.

49

1    Q   I -- I just wanted to make sure that
2 you realize there's a definition for affiliate and
3 a separate definition for affiliate agreement; do
4 you see that?
5    **A   I see it. I don't know how it's**
6 **applying to whatever question that's coming.**
7    Q   It -- it'll be in section 320 when we
8 get there.
9    A   Okay.
10    Q   And then the definition of business,
11 you'll see, says -- has the meaning specified in
12 the recitals to this agreement.  We already looked
13 at that definition in the second paragraph of the
14 agreement, the definition of business; do you
15 recall that?
16    A   Okay.
17    Q   And then the next definition I want you
18 to look at, it's on HCI0007.
19    A   Okay.
20    Q   Okay.  The definition of contract, and
21 it recites, Contract means any written or oral
22 agreements, arrangements, authorizations,
23 commitments, contracts indentures, instruments,
24 leases, licenses, obligations, plans, practices,
25 restrictions, understandings, or undertaking of

50

1 any kind or character or other agreement to which
2 Powerohm is a party, or that is binding on
3 Powerohm or its capital stock, assets, or
4 business.  Do you see that?
5    A   Uh-huh.
6    Q   And of particular interest will be that
7 the definition includes oral agreements and
8 understandings or anything binding on the assets
9 or the business; do you see that?
10    A   Uh-huh.
11    Q   Okay.  Just keep that in mind for when
12 we look at some of the schedules.
13       THE REPORTER:  Sorry, excuse me.  Just
14 please be verbal when you answer yes or no.
15       THE WITNESS:  Yes.
16       THE REPORTER:  Thank you.
17       THE WITNESS:  I understand.
18 BY MR. BRADLEY:
19    Q   Okay.  Then the next definition says --
20 or I would like you to look at employee --
21 employee benefit plans.
22    A   Okay.
23    Q   It says, Employee benefit plans has the
24 meaning specified in section 3.19A.  So we will
25 look at that definition when we get to that

51

1 section.
2    A   Okay.
3    Q   Okay.  And then the last definition on
4 this page, encumbrances says, Encumbrances means
5 any adverse claims, encumbrances, liens, charges,
6 security interest, easements, defect in title,
7 encroachment, restrictions on transfer, or other
8 restrictions of any kind of character.  Do you see
9 that?
10    A   I do.
11    Q   Okay.  Final two definitions.  If you
12 flip to HCI00012.
13    A   Okay.
14    Q   And the -- the first one where it says
15 Kentucky House.
16    A   Yes.
17    Q   It says, Kentucky House means the
18 residential property owned by Powerohm Properties
19 LLC, located at 109 Half West 34th Street,
20 Covington, Kentucky.  Do you see that?
21    A   I do.
22    Q   Okay.  And then right below that, it
23 says, Kentucky House servers has the meaning
24 specified in section 6.2C.  Do you see that?
25    A   I do.

52

1       MR. BRADLEY:  Okay.  And so when we get
2 to that section, I'll have a few questions about
3 the Kentucky House servers, okay?  I think this is
4 a good place to take a break before we get into
5 some of the specifics of the agreement.
6       THE WITNESS:  I don't need a break if
7 you want to keep going.
8       MR. BRADLEY:  Oh, okay.  Yeah.  We --
9 you guys okay?
10       THE REPORTER:  We're fine.
11       MR. BRADLEY:  All right.  We'll keep
12 going.
13       THE WITNESS:  Yeah.  I've got a house
14 without AC right now, so.
15       MR. BRADLEY:  Okay.  We'll get moving.
16       THE WITNESS:  I've got to deal with
17 some mechanical issues later this afternoon.
18 BY MR. BRADLEY:
19    Q   Okay.  Flip to HCI00020.
20    A   Okay.
21    Q   Where it says, Section 3.4:
22 Subsidiaries and Investments.
23    A   Okay.
24    Q   And it says, Powerohm does not own any
25 capital stock, other equity, or ownership or

53

1  proprietary interest or any securities in any
2  corporation, partnership, association, trust,
3  joint venture, or other entity or person, domestic
4  or foreign. Do you see that?
5      A  Yes, I do.
6      Q  If Powerohm had some joint venture with
7  Tim Atchison or some division or subsidiary called
8  Power Electronics, you would've listed it there,
9  correct?
10     A  We would have but -- yeah. That --
11 there wasn't anything like that.
12     Q  Understood. Thank you. I -- I know
13 this sounds or this is repetitive to you, sir, but
14 it's part of what I have to do --
15     A  I understand.
16     Q  Okay. Thank you. Section 3.7: Title
17 to Properties and Encumbrances. Do you see that
18 it says, Except as set forth on Schedule 3.7, and
19 except for such properties and assets, which have
20 been sold or otherwise disposed of in the ordinary
21 course of business, Powerohm has good title to its
22 real properties and all other assets, real or
23 personal, tangible and intangible, including the
24 properties and assets reflected on Powerohm's
25 financial statement, free and clear of any

54

1  encumbrances, except for encumbrances reflected in
2  the Powerohm financial statements. And it
3  continues. If you could grab the schedules and
4  flip to section 3.7.
5      A  Is that this?
6      Q  This one.
7      A  Oh.
8      Q  And --
9      A  3.7. Which -- what page is that on?
10     Q  3.7 is HCI000273.
11     A  Okay. It doesn't have much there on
12 that page.
13     Q  It -- it -- correct. So it says none.
14 So had there been any encumbrance on any
15 intangible property, any IP, any assets, anything
16 that Mr. Atchison was claiming an ownership
17 interest to, you would've put it on the schedule,
18 correct?
19     A  I would assume so, yes.
20     Q  Correct. Okay. If you could go back
21 to the agreement and -- hold on to the schedules,
22 because we'll -- we're going to flip back and
23 forth.
24     A  All right.
25     Q  Section 3.9: Intellectual Property.

55

1  Subsection B says, Except as set forth on Schedule
2  3.9B, Powerohm owns all right to and has all valid
3  right to use all material intellectual property,
4  used or held, for use in the operation of the
5  business of Powerohm as presently conducted. And
6  two, the consummation of the transactions
7  contemplated by this agreement shall not result in
8  the loss or any impairment of rights of Powerohm
9  and any intellectual property. Do you see that?
10     A  I do.
11     Q  Okay. If you could flip to Schedule
12 3.9 B, which is -- in the schedules, it's the
13 HCI000275. And if you go down to --
14     A  3.9B.
15     Q  If you go down to B --
16     A  It says none.
17     Q  It says none. Correct. So if there
18 had been a license with Mr. Atchison or if he
19 owned any intellectual property used in these BGLG
20 assets, you would've listed it on section 3.9B,
21 correct?
22     A  We would have, yes. Correct.
23     Q  Thank you.
24     A  Tim was an employee of ours.
25     Q  Yep. Understood, sir.

56

1      A  Okay.
2      Q  It's -- I have to -- you have firsthand
3  knowledge of this and that's why we have to go
4  through it and I have to ask you. And I know --
5      A  I understand.
6      Q  Okay. Thank you, sir. If you go to
7  3.9D, the next page, HCI23 3.9D.
8      A  Yeah.
9      Q  It says, Except as set forth in
10 schedule 3.9D, to the knowledge of Powerohm,
11 Powerohm is not infringing, diluting,
12 misappropriating, or otherwise violating any
13 intellectual property rights of any persons. And
14 two, Powerohm has not received any notice during
15 the past two years or earlier, if not resolved,
16 alleging any such infringement, dilution,
17 misappropriation, or violation. Do you see that?
18     A  Yes.
19     Q  If we flip to Schedule 3.9D on HCI002 --
20     A  It says none.
21     Q  It says none. Had Mr. Atchison accused
22 the company of misappropriating or infringing any
23 rights that he had in any of the products, you
24 would have listed it in this schedule, correct?
25     A  Yes.

---

57

1    Q   Thank you.  Section 3.10: Material
2    Contracts.
3    A   Okay.
4    Q   It says, Schedule 3.10 sets forth,
5    organized by clause and sub-clause of this
6    section, 3.10, a true and complete and correct
7    list of the following contracts that are in effect
8    and to which Powerohm is a party or by which
9    Powerohm or its assets are bound.  Do you see that?
10   A   I do.
11   Q   If you flip to N and P.  N says, Any
12   contract relating to any affiliate arrangements.
13   And if you recall, that's going to have a special
14   definition.  So we'll look at that now and then
15   we'll look at the definition in a minute.  And P
16   says, Any contract related to the use, licensing,
17   development, or ownership of intellectual
18   property, or pursuant to which Powerohm uses any
19   intellectual property, other than (inaudible) --
20   and then it continues.  So if we go to 3.10 in the
21   schedules.
22   A   Yeah.
23   Q   And if we go to 3.10 N for affiliate
24   arrangements, it's HCI000280.
25   A   Yeah, I see.

---

58

1    Q   Okay.  So under N, can you confirm that
2    it says none?
3    A   Yeah, there are none.
4    Q   And then under P, it also says none.
5    A   Correct, there are none.
6    Q   Had -- had there been any contracts or
7    licenses relating to any intellectual property or
8    affiliate arrangements, you would've listed them
9    there, correct?
10   A   That would be correct, yeah.
11   Q   Thank you.  If you flip to section 3.19
12   on HCI0031, Employee Benefit Plans.
13   A   Okay.
14   Q   Okay.  And sub-clause A, it starts,
15   List of plans set forth in Schedule 3.19A is an
16   accurate and complete list of each employee
17   benefit plan.
18       Do you see that, sir?
19   A   Yes.
20   Q   And down about the middle of the
21   paragraph, it says, Whether formal or informal,
22   oral or written, legally binding or not.  Do -- do
23   you see that language?
24   A   I do.
25   Q   Okay.

---

59

1    A   Yeah.
2    Q   So if you could go to Section 3.19 in
3    the schedules.
4    A   Okay.
5    Q   And I want to focus your attention on
6    the employee benefit plans from 8 to 18, numbers 8
7    through 18.
8    A   I got you.
9    Q   Let's start with number 18.  It says,
10   Pursuant to a verbal agreement with Powerohm,
11   Timothy Atchison receives a $500 monthly vehicle
12   allowance that is structured as a reimbursed
13   out-of-pocket expense.  Do you see that?
14   A   I do.
15   Q   Do you recall him having that
16   arrangement?  Not --
17   A   That would've been between Mike and
18   Richard.
19   Q   Okay.
20   A   I -- I didn't delve into details that
21   minute, to be honest.
22   Q   Okay.  But --
23   A   But it was -- I mean, $500 was a number
24   typically given to people that -- for -- for
25   travel expenses.

---

60

1    Q   So what we see in -- in number 18 is
2    that, in fact, even verbal agreements as minuscule
3    as $500 a month were listed when you were required
4    to provide lists of encumbrances and agreements
5    and plans to Hubbell?
6    A   That -- I would've guessed that
7    would've been Mike that said that to Tim.
8    Q   Got it.  So if there had been any
9    verbal agreement with Tim Atchison to pay him 3
10   percent of future sales on any products, that
11   would've been listed in the list of plans, correct?
12   A   Yes --
13   Q   Understood.
14   A   -- it would've been.
15   Q   If -- you can see -- let's do now
16   numbers 8 through 12, where it says 2013 bonus
17   plan and then lists some individuals.
18   A   Okay.
19   Q   So do you recall if those were written
20   plans or oral plans?  If it was oral -- strike
21   that.
22       Do -- do you recall those bonus plans?
23   A   I do not.
24   Q   Okay.  That would've been something
25   Mike Crowe would be in charge of, probably?

61

1    A   Not necessarily.  Richard Jochen dealt
2  with all of the administrative and check writing
3  and all of that.  But he would've gotten input
4  from Mike on all the Kentucky personnel.  And as
5  you look at this list, all of these people listed
6  from 8 to 18 were Kentucky employees.
7    Q   Okay.
8    A   They were not located in Katy.
9    Q   Okay.  Thank you.
10    A   Just for the record, I want to state
11  that my role with the company was I -- even though
12  I was president, I also served as general manager
13  of the Katy plant up until 2009.  So I was
14  involved with the day-to-day stuff up until 2009
15  involving the plant and its operations.  In 2009
16  we hired a gentleman by the name of Tim Trott.
17  Tim took over the Katy location as general
18  manager.  I then moved from Katy to the city we're
19  in right now.  And I've lived here since 2009.  So
20  after 2009, I solely and remotely dealt with items
21  relating to the vice presidents and -- and then
22  the main focus became dealing with the sale of the
23  company after 2011.
24    Q   Thank you.  So these various sales
25  incentive and bonus plans were something that

62

1  probably Mike and Richard would've taken care of?
2    A   I would've thought, yeah.
3    Q   Okay.
4    A   I --
5    Q   So that's --
6    A   I don't recall them specifically, no.
7    Q   Okay.  Thank you.
8    A   Okay.
9    Q   The -- if you could flip to Section 320
10  in the main document.  So HCI 0034.
11    A   Okay.  Yep.
12    Q   Where it says, Interest in customers,
13  suppliers, et cetera.  It says, Except as set
14  forth on Schedule 320, attached Tier 2, neither
15  the sellers nor any officer, employee, or director
16  of Powerohm, or any affiliate thereof to Powerohm
17  or sellers knowledge or any member of such
18  person's immediate family, A, possesses, directly
19  or indirectly, any ownership interest or is a
20  director, officer, or employee of any person which
21  is a supplier, customer, lessor, licensee,
22  licensor, developer, competitor, or potential
23  competitor of Powerohm.  Or, B, is a party to a
24  contract or other business relationship with
25  Powerohm or owns any assets or properties that are

63

1  used in the business (any such arrangement set
2  forth in Clauses A and B, an affiliate
3  arrangement).
4       So my first question is: Do you see
5  it's defining what an affiliate arrangement is?
6    A   Yes.
7    Q   And it is --
8    A   There are only three owners of
9  Powerohm, myself, Mike Crowe, and Richard Jochen.
10    Q   And --
11    A   At no time did anyone else own or have
12  any claim to any other ownership.
13    Q   Understood.  But so the -- the record
14  is clear and the transcript is clear, if you could
15  just flip to section -- schedule 320.
16    A   Okay.
17    Q   And you'll see there's two things
18  listed there.  So the real property that you guys
19  are the lessors or -- so that's the Powerohm
20  Properties, LLC.  So you see that if there was a
21  separate legal entity or an interest or -- or
22  something, you guys would've listed it in Section
23  320?
24    A   Yes.
25    Q   And so if Tim Atchison was a licensor

64

1  or had a relationship with Powerohm or any other
2  affiliate arrangement, it would've been listed
3  here, correct?
4    A   It would've been.  But Tim was just an
5  employee.
6    Q   Okay.  Thank you.  I have one last part
7  of this agreement I'd like to look at.  If you
8  could flip to Section 6.2C on page HCI 00044.
9    A   Okay.
10    Q   6.2C says, The parties hereto agree
11  that the backup information, technology servers,
12  and related materials, collectively the Kentucky
13  House Servers.  So It's defining Kentucky House
14  Servers.  Do you see that?
15    A   Yes.
16    Q   Okay.  Located in the Kentucky House
17  are owned by Powerohm and will be removed from the
18  Kentucky House by Powerohm following the closing.
19  Each seller agrees that it shall and shall cause
20  its affiliates to cooperate with Powerohm, upon a
21  reasonable advance notice from Powerohm to
22  seller's representative, to arrange for the
23  removal of such Kentucky House Servers by Powerohm
24  and its representatives from the Kentucky House.
25       Do you see that?

65

1    A   I do.
2    Q   Do you recall why that was included in
3  this agreement?
4    A   I wasn't even aware there were any
5  Kentucky House Servers.  We had an IT guy that was
6  on our payroll.  It was my understanding that all
7  of the server -- we had a -- a network in Katy and
8  we had a network in Kentucky that was set up by
9  our own IT person that was on our payroll.  I
10  wouldn't understand why there would be a server in
11  the Kentucky House.
12       My understanding was that -- that Tim
13  stayed in the house whenever he came up to Latonia
14  and he had a laptop.  At least that was my
15  understanding.  To me, server indicates that it's
16  a desktop unit, potential racking, and all kinds
17  of other equipment involved.  I don't think that
18  -- I'm just not aware of any of that being in that
19  particular place.
20    Q   Okay.  So that's more of a question for
21  Mike Crowe or someone else that --
22    A   Yeah.  Mike Would've had knowledge
23  what's going on there.  You know, I -- I think I
24  saw that property when we first bought it.  And I
25  -- I -- I told Mike, man, this thing's a dump.

66

1  You should -- and then once we decide -- it was
2  really more Mike that took it on himself to fix it
3  up, thinking that one of us might want to stay
4  there at some point in time.  I mean, I always
5  stayed in a hotel whenever I went up there because
6  I -- I didn't want to stay in that thing.  It was
7  not the best of neighborhoods and I really didn't
8  want to stay there.
9    Q   Understood.  I'm done with that
10  exhibit.  I have a few more things to go over
11  today, but I'd like to take a ten-minute break,
12  get organized.
13    A   All right.  It's up to you.  I -- I
14  don't need it.
15    Q   I know.  Thank you, sir.
16       THE VIDEOGRAPHER:  Time is 11:34 a.m.
17  We're off record.
18       (OFF THE RECORD)
19       THE VIDEOGRAPHER:  Time is 11:46 a.m.
20  We're on the record.
21       MR. BRADLEY:  I would like to mark as
22  the next exhibit, Exhibit 5, a letter to me from
23  Mr. Burger clarifying the 26(a)(1) witness
24  disclosures.
25       (EXHIBIT 5 MARKED)

67

1  BY MR. BRADLEY:
2    Q   And if you could flip to Page 5 of 10
3  of this document.
4    A   Okay.
5    Q   It says in the Paragraph -- oops.  I
6  handed you the wrong copy, I think.
7       MR. BRADLEY:  That -- yeah, I handed
8  him the wrong copy. 5.  Okay.  Thank you.
9  BY MR. BRADLEY:
10    Q   Okay.  And on Page 5 of ten --
11    A   Yep.  I'm here.
12    Q   -- you'll see your name?
13    A   I do.
14    Q   It's number 3 on that list.  Before
15  that it says, To be sure there is no
16  misunderstanding regarding who we think may
17  possess relevant information, I will repeat each
18  witness that Mr. Atchison has been able to
19  identify at this stage with a short and general
20  statement as to what knowledge that witness may
21  possess regarding the case issues.
22       And down where your name is, it says,
23  Vance Hinton, an employee of Powerohm, who
24  possesses knowledge regarding the reasons for
25  commencing and financing the new venture of Power

68

1  Electronics for the sole purpose of furthering Mr.
2  Atchison's personal, unique BPM concepts and
3  innovations.
4       Do you see that?
5    A   I do.
6    Q   Are you -- strike that.
7       Would you like to respond to his
8  including you as a witness that apparently he
9  believes is going to confirm this information?
10    A   Well, I don't know where to begin.
11  There's a lot of, I guess I would have to say
12  incorrect information contained in that sentence.
13    Q   Okay.
14    A   I was an employee of Powerohm.  You --
15  because we were a C corp.  So I was an employee,
16  president, and also shareholder.  But there was no
17  Power Electronics, as referenced.  And let's see --
18    Q   That -- maybe I can help you.  So at no
19  time did you commence and finance a new venture
20  called Power Electronics; is that correct?
21    A   That's correct.
22    Q   And there was certainly nothing done
23  for the sole purpose of furthering Mr. Atchison's
24  personal, unique BPM concepts and innovations,
25  correct?

69

1    A   I don't know if I'd call them unique.
2    Q   Go ahead.
3    A   There -- the marketplace already had
4 these products. We wanted to be an additional
5 entrant into the marketplace.
6    Q   Good. Thank you.
7    A   Okay.
8        MR. BRADLEY: I want to mark as the
9 next Exhibit -- it's Exhibit 6, correct?
10       THE REPORTER: Yes, sir.
11       (EXHIBIT 6 MARKED)
12 BY MR. BRADLEY:
13   Q   What you have been handed as Exhibit 6
14 is certified copies of filings with the division
15 of business from the State of Tennessee that I
16 requested.
17   A   Okay.
18   Q   So the first page is the receipt, I
19 think, or the cover letter. The second page is
20 the certification from the Secretary of State of
21 Tennessee, and it identifies what's in the file.
22   A   Okay.
23   Q   And for 1-22-2008, it says, Initial
24 filing for Powerohm Resistors, Inc. And then the
25 next entry, 6-3-2009 says, Notice of Determination

70

1 for Powerohm Resistors, Inc. And then finally on
2 8-17-2009 says, Dissolution
3 revocation/administrative for Powerohm Resistors,
4 Inc.
5        Do you see that?
6    A   I do.
7    Q   Okay. So if we turn to the first page.
8 Have you ever seen this document before?
9    A   No.
10   Q   Okay. If you look down at the bottom
11 where it says it was signed by Darrell M. Keller,
12 do you know who that is?
13   A   Yes.
14   Q   All right. Who is Darrell Keller?
15   A   Darrell has been and still is my
16 personal and business CPA. I've had a
17 relationship with Darrell for over 30 years. And
18 he's involved in all of my -- any accounting or
19 any kind of IRS or tax matters. So yeah, that's
20 -- I know who Darrell is.
21   Q   Okay. Thank you. The --
22   A   Oh, I might add, at one point in time
23 we contracted with Darrell to be our company CFO.
24 But it wasn't a payroll scenario, it was billing
25 him for his time whenever he had something come

71

1 up. So he -- he did work in that regard for our
2 company.
3    Q   Thank you. The document is entitled
4 Application for Certificate of Authority.
5        Do you see that?
6    A   I do.
7    Q   Do you know what a certificate of
8 authority is?
9    A   I don't know the definition. But I
10 believe the intent of this was to let the State of
11 Tennessee be aware that our company was -- or we
12 had a remote office there, and Darrell with his
13 thoroughness wanted to make sure that all bases
14 were covered. So he would have filed this just
15 because he doesn't -- he always would anticipate
16 any potential issues. Sometimes he was over
17 reactive, and I see this as probably one of those
18 situations. Because it looks like he filed it and
19 then it doesn't appear that it was renewed the
20 next year.
21   Q   Thank you. So you'll see in Item 1 on
22 that page, where it says, The name of the
23 corporation is Powerohm Resistors, Inc.
24       Do you see that?
25   A   Yes, I do.

72

1    Q   So this was Powerohm Resistors, Inc.,
2 filing to do business in Tennessee, correct?
3    A   Correct. Yeah.
4    Q   And -- and this is not articles
5 incorporation or anything else regarding a new
6 legal entity called Power Electronics, correct?
7    A   No, that's correct.
8    Q   And then in Item 2, it lists the state
9 of incorporation is Texas?
10   A   Yes.
11   Q   Is that where Powerohm Resistors Inc.
12 was incorporated?
13   A   That is correct, yes.
14   Q   And Item 3, it says the date of
15 incorporation is 1-22-96. Do you see that?
16   A   Yeah.
17   Q   Is that the date that Powerohm
18 Resistors, Inc. --
19   A   Yes.
20   Q   Thank you.
21   A   Darrell would know because he was the
22 one that incorporated us.
23   Q   Okay. Thank you. Item 4 has the
24 street address of the principal office. And it
25 lists the Katy Texas address. Is that your

73

1 principal office?
2 **A  That's correct.**
3 Q  Okay.  Item 5 is where you had to
4 identify a registered office in Tennessee and a
5 registered agent; do you see that?
6 **A  I do.**
7 Q  And you'll see the registered agent is
8 Tim Atchison?
9 **A  Correct.**
10 Q  And you'll see that the address appears
11 to be his home address; is that correct?
12 **A  I would guess that to be, yes.**
13 Q  So was Mr. Atchison hired as a remote
14 employee?
15 **A  Well, he was hired to be an employee.**
16 **He happened to live remotely.  And to my**
17 **knowledge, registered agent, whenever you're**
18 **filing any kind of paperwork to let a state know**
19 **that you're doing business there, you have to have**
20 **someone local in the state listed as a registered**
21 **agent.  It couldn't have been any of us because we**
22 **didn't live there.  So --**
23 Q  And as far as you know, Tim Atchison
24 was the only Tennessee employee?
25 **A  Yes.**

74

1 Q  Okay.  Thank you.  And to your
2 knowledge there has never been any paperwork filed
3 with the State of Tennessee regarding a legal
4 entity called Power Electronics, correct?
5 **A  No, it wouldn't have my name on it.**
6 Q  Okay.
7 **A  I mean I -- I couldn't attest to**
8 **whether someone else may have done that, but**
9 **nothing affiliated with me.**
10 Q  Yeah.  Okay.  Just to clarify, there
11 may be a Power Electronics out there, but has --
12 **A  There could be.**
13 Q  But it has no affiliation whatsoever,
14 you or any of the owners of Powerohm or Powerohm
15 Resistors, Incorporated?
16 **A  Not during the time of our ownership,**
17 **no.**
18 MR. BRADLEY:  Okay.  Thank you.  I'm
19 going to hand you the next exhibit.  Exhibit 7.
20 (EXHIBIT 7 MARKED)
21 BY MR. BRADLEY:
22 Q  Exhibit 7 is an email from you to a
23 number of individuals, dated May 3rd, 2011.
24 **A  Okay.**
25 Q  If you could take a minute to read this

75

1 email to yourself.
2 **A  Okay.**
3 Q  I have a few questions.
4 **A  Yeah, this was after we had already**
5 **made the decision that we were going to sell the**
6 **business.  This is some of my best work actually.**
7 **This is -- this whole email is just a facade, is**
8 **all this is.  It was -- it was a means of stroking**
9 **the ego of one individual.  And that individual is**
10 **Joe Eschleman.**
11 Q  I see.  Okay.
12 **A  I don't need to read the whole thing, I**
13 **can work out --**
14 Q  Okay.
15 **A  -- what it is.**
16 Q  In the last paragraph, let me read it
17 to you.  It says, In Joe's new role, his title
18 will simply change to Vice President Strategic
19 Partnerships.
20 **A  Yeah.**
21 Q  And for the time being Martin will be
22 titled as Vice President, Power Electronics, but
23 -- this eventually will this will eventually
24 change as he transitions into the daily sales
25 management role.

76

1 **A  Right.**
2 Q  Do you see that?
3 **A  I do.**
4 Q  Was there a separate legal entity
5 called Strategic Partnerships?
6 **A  No.**
7 Q  Was there a separate legal entity
8 called Power Electronics?
9 **A  No.**
10 Q  Is there a reason that those two terms
11 are used in connection with the titles of these
12 individuals?
13 **A  Well, Martin never actually did have**
14 **that title, regardless of what this says, because**
15 **I underestimated Joe's reaction.  Joe was quite**
16 **relieved to no longer have the sales**
17 **responsibilities of the -- the day-to-day.  Once I**
18 **explained to him that he's no longer responsible**
19 **for all of our sales reps, he's only responsible**
20 **for a handful of companies.  I don't know, ten or**
21 **15, something like that, that we deemed as**
22 **strategic to our growth.  And I wanted Joe to**
23 **focus just on that.**
24 **It was kind of a way of getting, to be**
25 **forthwith with you -- okay, the cat will be out of**

77

1  the bag. We hired Martin Glover because Martin
2  not only was an electrical engineer, but he also
3  had a master's degree in business, we wanted
4  Martin to get our company prepared for the sale.
5  And Martin was extremely polished. He -- he could
6  do sales reports. He could do presentations in
7  front of a group. Joe could not do those things.
8  And so this particular email was created to be a
9  transitionary thing between relieving Joe of being
10  Vice President of Sales, and installing Martin.
11      And the only reason we came up with
12  this electronic deal was because Martin lived in
13  Columbus and he was going to be going in --
14  whenever he came to -- to the work, he would come
15  to the Kentucky office. And because all we did
16  there was produce electronic products, I just
17  borrowed that term. At first -- but you see,
18  eventually we will, as he transitions into daily
19  sales management, that took one day. Because once
20  Joe realized, you mean I don't have to do all this
21  other stuff? Fine. I'm good with that. And so
22  Martin immediately became Vice President of Sales,
23  and Joe was then Vice President of Strategic
24  Partnerships. Joe did not report to Martin. Joe
25  reported to me, Martin reported to me. Okay.

78

1  That was the relationship between the two.
2      But as -- as planned, Martin took over
3  the day-to-day operations of sales. And one of
4  the things that Mike wanted him to know is he
5  wanted him to get more -- in addition to polishing
6  up everything and making it more legitimate on
7  paper. Because Joe Eschleman was -- until
8  Powerohm, Joe hadn't worked at a company whose
9  sales were greater than $4 million. And when we
10  hired Joe, our sales were under $4 million. But
11  we were very fortunate, part of it due to Joe and
12  -- and a bigger part of it due to other
13  relationships that we had in the industry, we grew
14  this business way beyond what we ever dreamed.
15  Powerohm became the largest independent
16  manufacturer of power resistors in the world.
17    Q  Thank you.
18    A  So the only other company bigger than
19  us was a consortium of companies that was
20  spearheaded by the English. The English, they had
21  two companies. They owned a company in Canada, a
22  company in the U.S., a company in Germany, and --
23  and a -- not the French. I don't think they owned
24  the French at that point in time. Anyway, they're
25  -- with all of their divisions, their combined

79

1  sales were still double what we were doing. But
2  no single entity approached what we were doing in
3  sales as an independent company. Not part of a
4  group.
5    Q  Thank you.
6    A  So this email was basically sent to
7  everyone in the organization as a way to explain a
8  transition for Joe out of day-to-day sales, and
9  for Martin to be put into the role. But Martin's
10  real role was much greater than that. He was
11  pivotal in preparing our company for the sale of
12  -- and it took us a couple of years to prepare.
13    Q  Okay. Thank you. Do you remember
14  earlier we saw Power Electronics used to describe
15  a class of products?
16    A  Uh-huh.
17    Q  So when I'm looking at looking at Vice
18  President Strategic Partnerships and Vice
19  President Power Electronics, are those just made
20  up titles?
21    A  Yes.
22    Q  And it's to describe generically,
23  either the product lines or the particular group
24  of individuals that they will be dealing with,
25  like -- strike that.

80

1    Vice President Strategic Partnerships
2  was focusing on a number of large important
3  clients; is that correct?
4    A  Yes.
5    Q  And Vice President Power Electronics
6  was focusing on the power electronics category
7  products coming out of Kentucky, correct?
8    A  Well, it -- it never --
9    Q  It didn't happen.
10    A  It never really happened.
11    Q  Got it. Thank you.
12    A  The day after this, after an open
13  meeting with Mr. Eschleman, he was quite all right
14  relinquishing his day-to-day role. And so -- much
15  to my surprise. And I thought there was going to
16  be massive pushback and -- Joe wasn't known as
17  being an -- an easy personality so I was surprised
18  that -- that he was willing to allow Martin to
19  step in and -- and take over the day-to-day stuff.
20  So Martin not only dealt with the sales management
21  of all the reps, but he -- I guess -- I hate to
22  use the term covert, but his real mission was to
23  prepare our company for sale, and that's the
24  primary reason he was brought on board.
25    Q  Okay. Thank you. What happened after

---

**81**

1  you sold Powerohm to Hubbell?  Strike that.
2      Do you know what happened to the
3  employees after they became Hubbell employees?
4  Did you keep in touch with anyone?
5      A   Not particular -- I mean, Mike.  Mike
6  and I have always been friends even before.  I
7  mean, Mike was a friend even before he became a --
8  a partner in Powerohm Resistors.  I attended
9  Mike's wedding.
10     Q   Did -- did you ever hear that Hubbell
11 had transferred the manufacturing of the products
12 from Covington to Archdale, North Carolina?
13     A   Somebody mentioned to me in passing,
14 but I -- I didn't really stay much involved with
15 any of it, to be honest.  In fact, just to give
16 you some rough idea, I envisioned that I was going
17 to be able to have a little Kumbaya moment where I
18 gathered all the employees at the Katy location,
19 which at that time were, I think maybe a little
20 over 100, and announce to them that there was a
21 new ownership of the company, and I was going to
22 introduce whoever that was there.  But that was
23 deemed to be not necessary.
24     And during the closing procedures, it
25 was made clear to me that I'm done.  Even though I

---

**82**

1  owned the premises, the building that the company
2  was in, my duties as president were over and that
3  I am not to be a distraction and go to the
4  business, which I fully understood.  And Hubbell
5  had their own way of doing things and I certainly
6  understood that.  And -- and we weren't the first
7  acquisition that they'd made of many.  So I
8  chalked it up as, well, they've done it many
9  times.  They probably know best here.
10     Q   Do you know --
11     A   So I didn't go into the building after
12 that, so --
13     Q   Do you know if Hubbell closed the Katy
14 plant and moved those operations out of Katy as
15 well?
16     A   Of course I know.  I own the building.
17     Q   Yes.
18     A   Yeah.
19     Q   So -- so there were, as far as you
20 know, a number of changes in locations and
21 personnel that took place after the acquisition?
22     A   For the record, both buildings, the --
23 the Kentucky buildings -- building and the two
24 buildings in Katy, were involved as part of the
25 sale of the company.  And as a last minute

---

**83**

1  arrangement, we were approached and Hubbell -- the
2  -- the attorneys involved said, we don't want the
3  properties.  And it was late in the game, and --
4  and I said, well, hold on a minute.  A deal's a
5  deal.  You're not reneging on the price that we've
6  already hammered out.
7      And their attorneys came back and said,
8  well, no, we're not reneging on the deal.  We just
9  don't want the real estate.  We propose that you
10 keep the real estate and give us two years of free
11 rent.  And what idiot would turn that down?  So of
12 course we agreed and we still managed to get the
13 same financial deal, but it included us keeping
14 the real estate.  And that was -- made it a -- a
15 little bit more sweetened deal than what it
16 would've been before, in my -- in my opinion.
17     Q   Okay.  I just have a few final
18 questions and I'll be finished with my part --
19     A   Okay.
20     Q   -- of the examination.  At any time
21 during your ownership and employment with Powerohm
22 Resistors, to your knowledge, was there ever a
23 separate legal entity called Power Electronics
24 formed by Powerohm Resistors or any of its owners?
25     A   No.

---

**84**

1      Q   To the best of your knowledge, was any
2  paperwork filed with the Secretary of State of
3  Tennessee for a separate legal entity called Power
4  Electronics?
5      A   No.
6      Q   Was Tim Atchison ever promised any
7  equity, ownership, royalties or commissions for
8  his braking module products separate from his
9  employment?
10     A   Not that I'm aware, no.
11     Q   Was Tim Atchison hired as a design
12 engineer to build braking modules?
13     A   Yes.
14     Q   And did Tim Atchison build braking
15 modules pursuant to his job duties on company time?
16     A   Yes.
17     Q   Did Tim Atchison build breaking modules
18 pursuant to his job duties while collecting a
19 paycheck?
20     A   He did, yes.
21     Q   Did Tim Atchison build breaking modules
22 pursuant to his job duties using company equipment?
23     A   Yes.
24     Q   Did Tim Atchison build breaking modules
25 pursuant to his job duties using company finances

---

85

1  for parts and UL?
2  **A  Yes.**
3      Q    Did Tim Atchison ever claim ownership
4  of the ideas, designs or end products of the BG or
5  LG series braking modules?
6  **A  He did develop the products that we**
7  **sold, but it was understood by us that there was**
8  **no patents or anything of that nature, or he never**
9  **let on like, these are mine, because we were**
10 **paying him to do that job specifically.**
11     Q    Were you or are you a co-conspirator
12 with anyone from Hubbell to cut Tim Atchison out
13 of a joint venture agreement or other arrangement
14 formed for him to receive 3 percent commissions on
15 products like the LG and the BG?
16 **A  That's poppycock.  That's ridiculous.**
17 **No.**
18     Q    No.  Okay.
19         MR. BRADLEY:  I have no further
20 questions.  Pass the witness.
21     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
22 BY MR. BURGER:
23     Q    Mr. Hutton, good afternoon.  This is
24 Ken Burger in Tennessee.
25 **A  Good afternoon.**

86

1      Q    I'm going to do this as quickly as I
2  can and respect your time constraints that you
3  described earlier, but I have some questions I
4  need to cover with you.  And I'll -- I'll try to
5  move through them as quickly as possible.
6         Did you do anything in particular to
7  prepare for your deposition today?
8  **A  Not necessarily, no.  I mean, I looked**
9  **at the documents that were provided me and that's**
10 **about it.**
11     Q    Have you talked with Mr. Crowe since he
12 presented for his deposition?
13 **A  I'd have to think about that, because**
14 **we talk quite often.  I don't think I've talked to**
15 **him since his deposition.  I think the last**
16 **conversation that we had, he was talking about**
17 **going to his house in Belize for, I think maybe**
18 **ten days or something.  And I was telling him**
19 **about going to New York and Los Angeles for movie**
20 **premieres that I was involved in.  And I think**
21 **that's about it.**
22     Q    Specifically, have you talked to him
23 since last week?  He gave his deposition last
24 week.  Have you -- do you have recent memory of
25 having talked with him since the middle of last

87

1  week?
2  **A  Yes, I think I did talk to him and -- I**
3  **--**
4      Q    Did -- did -- did he describe --
5  **A  We didn't talk --**
6      Q    -- his deposition testimony?
7         MR. BRADLEY:  I'm -- I'm sorry.  Say
8  that again?
9         MR. BURGER:  Sorry.
10 BY MR. BURGER:
11     Q    Did he describe his deposition
12 testimony in your conversation with him since last
13 week?
14 **A  He did not describe anything.  He just**
15 **said, be prepared.  It's going to take quite a**
16 **while.**
17     Q    So he did talk with you about the
18 deposition then since last week?
19 **A  Not in detail, no.  He basically just**
20 **said it -- it took longer than he was expecting.**
21     Q    Give me, if you will, some
22 understanding of the number of employees during
23 the time frame from '08 to '14 at your Katy, Texas
24 facility.  What's the total number of employees
25 you had, the range, during that time frame?

88

1  **A  Well, that would've changed annually as**
2  **the sales grew.  So that's a difficult question to**
3  **answer.  But at the time we were selling the**
4  **company, I'll just use that frame of reference, we**
5  **had roughly 100 in Katy or maybe 110, and**
6  **somewhere around 40 or so in Kentucky.**
7      Q    Okay.  Your references earlier to Mr.
8  -- and you and Mr. Bradley each, I think used the
9  phrasing straight employee, W-2 employee for Mr.
10 Atchison?
11 **A  Correct.**
12     Q    My question about that is, of those
13 approximate 150 employees and any of those who --
14 who -- who you had at either Texas or Kentucky in
15 the '08 to '14 time frame, did you ever name any
16 one of those employees in any state in any context
17 as a registered agent for your business entity?
18 **A  We wouldn't have needed to.  The answer**
19 **is no, because they either lived in Kentucky where**
20 **they were employed, or they lived in Texas where**
21 **they were employed.  Tim was the only one that we**
22 **had that was out of those two state jurisdictions.**
23     Q    Is it your belief as you offer that
24 answer -- is it your belief that because you have
25 an employee working from his home in Tennessee,

89

1 that you need to name him as a registered agent?
2   A   It was my accountant's belief. It
3 wasn't my belief, no. I've never questioned my
4 accountant on anything because in the 30 plus
5 years he's represented me, I've never been audited
6 by the Internal Revenue Service because of his
7 thoroughness.
8   Q   With regard to Powerohm, the -- your
9 corporate entity, Powerohm Resistors, Inc., how
10 many states have -- has that entity filed a
11 business presence notice with the division -- the
12 business division of the respective secretaries of
13 states? Other than --
14   A   To my knowledge, only that one in
15 Nashville -- or Tennessee, where Tim lived.
16   Q   Okay. So you -- you have a physical
17 presence in Texas. You have a physical presence
18 in Kentucky.
19   A   Correct.
20   Q   And you have -- and -- and you have
21 filed in the office of the secretary of states for
22 those respective states for Powerohm Resistors,
23 Inc. Am I correct about that?
24   A   I wouldn't -- I wouldn't know that
25 particularly. You would have to ask Darrell

90

1 Keller, my accountant. But I would assume, yes.
2   Q   But of all the employees who have
3 worked for Powerohm Resistors during your tenure
4 there, wherever they live, whatever work they did
5 for you, there had been no other filings with the
6 office of the secretary of state other than the
7 state of Tennessee with naming Tim Atchison as the
8 registered agent as far as you know?
9         MR. BRADLEY: Object -- objection.
10 Calls for speculation. I believe the witness
11 testified he doesn't know, and he didn't handle it.
12        MR. BURGER: No, please -- please don't
13 characterize his testimony.
14 BY MR. BURGER:
15   Q   Just answer it as best you can, sir,
16 and I'll move on. Do -- do you know the answer to
17 that? It's not speculation. Do you know the
18 answer or do you not know the answer?
19   A   Would you ask the question again,
20 please?
21   Q   What I'm attempting to understand,
22 before we were interrupted -- what I'm attempting
23 to understand is, of all of the places where your
24 company does business in the United States, is
25 there any other state other than the state of

91

1 Tennessee, outside of Texas and Kentucky, where an
2 employee is named as a registered agent?
3   A   There weren't any other employees in
4 any of the other states.
5   Q   What is there -- aside from the
6 question of where you have employees and what
7 they're doing and whether they're working remotely
8 or not, aside from that question, broadly, does
9 Powerohm Resistors, Inc. maintain a presence, a
10 notification of doing business in any other state
11 other than the states of Tennessee, Kentucky, and
12 Texas?
13   A   No.
14   Q   To your knowledge?
15   A   No.
16   Q   When you came to Nashville in, I
17 believe you said 2006, you correct me if I'm
18 wrong, you described the barbecue?
19   A   That sounds about right, yeah.
20   Q   All right. In that time frame, 2006
21 and 2007, did you look at any properties in
22 Tennessee?
23   A   Not to purchase. We could have looked
24 at a -- a small rental unit.
25   Q   Well, why would you be looking at it if

92

1 not for the prospect of purchasing it?
2   A   We wouldn't have had the money to
3 purchase anything at that point. It was something
4 for rent.
5   Q   Okay.
6   A   You have to understand, at one time we
7 were looking at bringing three particular guys on
8 board, until it was determined that it -- it was
9 not going to work out. So up until that time, we
10 investigated all avenues. That's part of the
11 diligence of looking at what's available, how much
12 does it cost, and so forth. You can't build a
13 business plan without knowing that. And at the
14 time, we thought we were going to proceed with
15 something, but we abruptly decided not to.
16   Q   Okay. And was that something power
17 electronics?
18   A   It wasn't going to -- it was just going
19 to be Powerohm Resistors, and we were going to
20 manufacture products that were of electronic
21 nature.
22   Q   Well, when that wording was used,
23 venture, that new venture wording, what were you
24 talking about? In the 2006 email.
25   A   2006 email.

93

1    Q   That you referenced earlier in
2  responding to Mr. Bradley's questions.
3    **A   Okay.  Okay.**
4    Q   Yes, sir.  What -- what new venture
5  were you referring to?
6    **A   We were going to make braking modules**
7  **and other electronic products down in the**
8  **Nashville area, to be a competitor to Bonitron.**
9    Q   Okay.  And what I'm attempting to
10  understand about that -- and I apologize if you've
11  answered it, I'm -- I'm -- it's flying over my
12  head.  Let me - let me make sure I'm
13  understanding.  At the time we're talking about,
14  2006, 2007, you're down here in Tennessee, looking
15  at property, you're -- you've drafted that email
16  that we're -- I won't characterize it, but it says
17  what it says.  You've drafted that email
18  referencing a new venture, but Tim Atchison is
19  still working for Bonitron.  He's not an employee
20  of Powerohm; is that correct?
21    **A   That's correct.**
22    Q   But you're talking with Tim Atchison
23  about -- and communicating with him and including
24  him in the email chain, about a new venture in
25  2006.

94

1    **A   No.  I think -- I think most of that**
2  **communication was either through Mike Roof or --**
3  **or Tim Olson.  Tim wasn't --**
4    Q   But --
5    **A   -- spearheading any of that.**
6    Q   But -- but he was being -- as an
7  employee of Bonitron, who at Bonitron, I think you
8  conceded earlier, his primary function there and
9  role was brake power modules.  So in context -- in
10  the context of your visiting Tennessee and looking
11  at rental properties, purchase, whatever, and
12  looking at properties and drafting this email that
13  says what it says on its face, I won't
14  characterize it, you were doing so with the idea
15  of a new venture that involved brake power modules
16  and Tim Atchison then an employee of Bonitron.  Am
17  I correct about that?
18    **A   Yes, we were at that point in time**
19  **interested in investigating that as a possibility.**
20  **I did not select the property that we looked at.**
21  **That was done by one of those three.**
22    Q   Well, what happened with the concept
23  between -- if -- if the brake power module
24  concept, new venture died a natural death, then
25  why was Tim Atchison hired in 2008 to come under

95

1  the umbrella of Powerohm Resistors and do exactly
2  that?
3    **A   That was Mike Crowe's doing.  I didn't**
4  **have anything to do with bringing Tim on.  That**
5  **was -- chm was Mike's --**
6    Q   But --
7    **A   -- deal.**
8    Q   But didn't I understand you earlier in
9  your testimony, Mr. Hinton, in responding Mr.
10  Bradley's questions to say he was -- CHM Atchison
11  was brought into the fold, into the Powerohm
12  family for one reason and one reason only, and
13  that was brake power modules.  No other reason.
14  Not power resistors, brake power modules?
15    **A   That's correct.**
16    Q   Right.
17    **A   That's the sole purpose that Tim was**
18  **hired at our company, was to develop a Powerohm**
19  **braking module for the variable speed drive**
20  **community.  We would just be a me, too.  There --**
21  **there were other manufacturers already providing**
22  **these products, and --**
23    Q   I'm going to ask you about that.
24    **A   Go ahead.**
25    Q   But -- but by your own statement here,

96

1  your own emphasis, he was brought in as the brake
2  power module guy --
3    **A   Of course he was.**
4    Q   -- for the power electronics discussion
5  that had died completely in 2006, correct?
6    **A   There was no power electronics ever.**
7  **This was a product line of our many --**
8    Q   Let -- let me --
9    **A   -- which turned out to be very**
10  **inconsequential, to be honest.**
11    Q   Well, my -- what I'm attempting to
12  understand, if -- if I'm misunderstanding it, if
13  you will help straighten me out on that and
14  clarify, the very project that led to you coming
15  to Nashville and looking around as you say, and
16  generating the email that references the new
17  venture, that very project narrowly defined was
18  brake power modules, correct?  Am I correct about
19  that?
20    **A   That would've been a particular project**
21  **or a product that could have been made there.**
22    Q   Fast forward 18 months later,
23  approximately 18 months later, Tim Atchison has
24  been hired away from Bonitron and he's now an
25  employee of Powerohm Resistors, Inc, and has been

97

1  named the registered agent in Tennessee by your
2  trusted CPA. Am I correct about all of that
3  sequence of events?
4      A  Yes.
5      Q  Right. But you pronounced, as did Mr.
6  Crowe did, you pronounced the bright power module
7  new venture dead as of the time you hired him,
8  correct?
9      A  The -- the venture involving the all
10 three of those guys was dead, absolutely dead.
11     Q  Is it -- was it dead because you
12 decided that the way to deal with that expansion
13 of Powerohm's business is to just hire Tim
14 Atchison and pursue the joint venture with him?
15     A  There was never a joint venture. That
16 was -- hiring Tim was all Mike's idea.
17     Q  I -- I -- I understood you to say a
18 minute ago that you personally never put together
19 a business plan for the bank, that had anything to
20 do with the venture of the bank -- of the, I'm
21 sorry, brake power modules. You never put any
22 such business plan together?
23     A  I did not.
24     Q  And you're sure that you never took it
25 to any lending institution for financing

98

1  discussion?
2      A  I did not take it to -- to the bank, no.
3      Q  When did the facility in Kentucky get
4  bought? When did you get -- buy it?
5      A  I don't recall. I'd have to look at
6  closing documents.
7      Q  Could you give me an approximation?
8  Was it before 2006 or after 2006?
9      A  I don't recall. I really don't know.
10 I know we --
11     Q  Did --
12     A  We leased a building up there --
13 actually, I think we may have leased a couple
14 before we ended up buying that building.
15     Q  Did -- at the time Tim Atchison was
16 hired in 2008, did Powerohm Resistors Inc. own the
17 Kentucky facility?
18     A  Yes. So --
19     Q  Was it in -- I'm sorry. Was it in
20 active operation at that facility in 2008 when he
21 was hired?
22     A  Yes.
23     Q  And it's -- what -- what was it making
24 at that time, beyond power -- if -- if anything,
25 it was -- what was the facility in Kentucky

99

1  manufacturing in 2008 when Tim Atchison was hired?
2      A  Mostly the high resistance grounding
3  units, but it was also the basis for all of our
4  electrical engineers because -- and sales
5  personnel. The reason --
6      Q  Do you deny -- I'm sorry. Go ahead.
7      A  The reason for that is the number one
8  competitor in power resistors is based in
9  Erlanger, Kentucky, and power resistors is a craft
10 that if you hire someone out of college, they're
11 virtually going to know nothing about. It's --
12 it's stuff that you have to learn by working at
13 one of these companies. And since the nucleus of
14 that industry is located with Post Glover
15 Resistors there, and when they kicked loose two of
16 their engineers, we hired them. And we needed a
17 place for them to be at, so that's what propagated
18 the rental of the first office. And Mike went up
19 to be in charge of the -- the engineering function.
20        So the Kentucky facility was mostly
21 based for engineering and sales, and it did very
22 little manufacturing until the -- the brake
23 modules and the other products, like the unit that
24 we copied, that Tim was given a copy of -- or
25 given a product and said, we have the ability --

100

1  we have the permission to copy this. I think it
2  was Rockwell Automation that did that. And that
3  product sold very well.
4      Q  Broadly --
5      A  I don't recall what it is.
6      Q  Broadly and generally, the Katy, Texas
7  facility was devoted to the manufacturing of power
8  -- generic power resistors. Am I correct about
9  that?
10     A  All forms of resistors.
11     Q  All forms of resistors.
12     A  All of the resistors were manufactured
13 there.
14     Q  Broadly and generally, the Kentucky
15 facility was limited to the manufacturing of brake
16 power modules?
17     A  And high resistance grounding units and
18 also some filtering products, the sine wave filter.
19     Q  But would you -- would you agree that
20 90 percent of the manufacturing in the Kentucky
21 facility was for brake power modules?
22     A  No.
23     Q  How would you characterize it? What
24 percentage for brake power modules?
25     A  I would say it was a heavier

---

101

1 percentage. It was more than 50 percent.
2    Q   Mostly brake power modules?
3    A   Well, that and the other product that
4 Tim copied.
5    Q   When you obtained the financing for the
6 Kentucky facility, its acquisition, through what
7 bank -- what lending institution did you finance
8 it?
9    A   I don't recall.
10    Q   Who handled that? Who personally
11 physically handled the financing?
12    A   That would've been me.
13    Q   But you don't remember what bank you
14 dealt with?
15    A   No. The bank I dealt with changed
16 hands every couple of years. They were purchased
17 and then they got repurchased and so on and so
18 forth. It was always the same people, different
19 bank name, so I don't recall
20    Q   If -- if -- if -- if I needed to locate
21 the documents that you used in furtherance of that
22 institution -- of -- of -- of -- of -- of that
23 financing for that institution, where would those
24 documents presently be located?
25    A   Probably in my file for the real estate.

---

102

1    Q   Okay.
2    A   But I -- I'm not sure where -- since we
3 sold that property, I don't know where those
4 documents are. I -- they're in my possession
5 someplace, but they're stored somewhere.
6    Q   Why would they not be in the business
7 files that were left with Hubbell? When you -- I
8 understood you to say the other day -- I mean, a
9 few minutes ago, that you left every scrap of
10 paper pertaining to the business records of -- of
11 Powerohm with Hubbell. Did I misunderstand that?
12    A   I did, with the exception. Those
13 belong to Powerohm properties. Those -- those
14 properties were spun off and not part of the
15 company. Those belong to Powerohm properties.
16    Q   Can -- can you tell me who -- who do
17 you presently do your banking with on a personal
18 level?
19    A   Several banks.
20    Q   Can you list those for me, please?
21    A   Prosperity Bank, Farmers Bank, Wells
22 Fargo, Wells Fargo Bank, Bank of America.
23    Q   When was the last time you completed a
24 financial statement, one of those financial
25 statements that they require every time you're

---

103

1 doing business with a federally-insured facility?
2 When did you last complete one of those?
3    A   Probably 15 years ago, maybe.
4    Q   Would that have been incidental to this
5 venture you're talking about or an unrelated topic?
6    A   You'll have to repeat the question. I
7 don't understand.
8    Q   The -- the last time you completed a
9 financial statement in furtherance of obtaining
10 credit from a federally-insured facility, that had
11 been in relation to these events that are
12 referenced in the 2006 email that you were
13 questioned about earlier and this new venture?
14    A   I never had to get credit for the last
15 15 years, so I -- that's why I don't have to fill
16 out financial statements. I mean, you only fill
17 those out when you're trying to borrow money.
18    Q   Well -- going back a bit further to
19 2006 or so, I'm -- I'm -- do -- do you have any
20 recollection at all of the state that the bank was
21 located in --
22    A   Well, yeah, Texas.
23    Q   Okay. So the Texas bank would've
24 procured whatever -- financing you procured to get
25 the Kentucky facility, not a -- not a Kentucky

---

104

1 bank?
2    A   Oh, yeah, absolutely.
3    Q   And it would've been in the Katy area?
4    A   Yes.
5    Q   Have you changed banks in the last 20
6 years?
7    A   Yes.
8    Q   Can you tell me every bank -- and I --
9 I know that's a tough maybe assignment as -- as --
10 as busy as you are in your -- your -- many
11 interests, but tell me all the banks you've dealt
12 with in the past 20 years?
13    A   I -- I don't -- I couldn't remember all
14 that. There's too many.
15    Q   Okay. But you believe you never showed
16 a business plan to any one of those banks?
17    A   That's correct.
18    Q   No business plan involved at all?
19    A   Not even for Powerohm Resistors.
20    Q   Did your CPA, Mr. Keller, did he play
21 any role in the procurement of the financing --
22    A   No.
23    Q   -- for that building in Kentucky?
24    A   No, he did not.
25    Q   I'm sorry?

---

105

1    A   No.
2    Q   Did he play any role in the use of that
3    business plan that was exhibited to you earlier
4    for any purpose at any time --
5    A   No.
6    Q   -- as far as you know?
7    A   He's probably never seen it.
8    Q   When I -- I -- I -- I -- I -- because I
9    listened to your story a few minutes ago about Mr.
10   Eschleman, Joe Eschleman, and his personality,
11   maybe his eccentricities. And -- and I'm trying
12   to understand the reason you would describe him in
13   2011, it's five years after the 2006 paperwork,
14   2011, you're describing him as the vice president
15   of Power Electronics.
16       My question about that is why did you --
17   A   I -- I never said that.
18   Q   All right. Well --
19   A   Joe Eschleman was never a -- he was
20   never a vice president of Powerohm --
21   Q   I'm sorry, Martin Glover. Martin
22   Glover. I'm sorry. Martin Glover. Why -- why
23   would not -- my question about that is why not
24   just name him vice president of Powerohm Resistors
25   as opposed to an entity that doesn't exist?

106

1    A   Vice president of what? Everyone had a
2    -- a role in the company. Mike was vice president
3    of engineering. Richard was vice president of,
4    like, operations. And at the time, when we
5    brought Martin on, Joe Eschleman was vice
6    president of sales. As I mentioned --
7    Q   Why --
8    A   -- before, Joe Eschleman was -- did not
9    have the capabilities to represent our sales
10   department in a polished and legitimate manner.
11   And Martin was brought in for the purposes of
12   getting our company ready for sale. And so --
13   Q   My question -- but -- I'm sorry, go
14   ahead. I interrupted you. Go ahead. I'm sorry.
15   A   That's pretty much it in a nutshell.
16   Q   My question about that is, as I've
17   understood your -- your answer, why would Martin
18   Glover not be referenced in that email as vice
19   president of Powerohm Resistors, Inc.? I mean,
20   why the words Power Electronics as opposed to
21   Powerohm Resistors, which is a legitimate --
22   A   Well, as I told you before, this whole
23   email is a facade because it was to try to softly
24   pull the VP sales title away from Joe Eschleman
25   and give it to Martin Glover. And --

107

1    Q   Let me concede, it's -- let's say it's
2    a -- facade, but in furtherance of the facade,
3    what I'm not understanding, and I'm not
4    challenging you, I'm just trying to get some
5    understanding. Why, in furtherance of the facade,
6    not name him, if it's a fairly meaningless,
7    ministerial thing, vice president of Powerohm
8    Resistors, Inc., instead of using the words Power
9    Electronics?
10   A   He was vice president of sales. That
11   was Joe's former title. This was -- this email
12   was intended to soften the -- the transition and
13   to massage Joe Eschleman's ego so that it was
14   clear to everyone that Joe Eschleman didn't report
15   to Martin and Martin immediately resumed the role
16   of vice president of sales and -- going forward
17   from this -- the time of this email.
18   Q   Would you agree with me that during
19   that entire tenure, from 2008 to 2014 when Tim
20   Atchison was with your group, that no design
21   engineer had equivalent knowledge and expertise in
22   the subject of brake power modules other than Tim
23   -- to compare with Tim Atchison?
24   A   I would agree with that, yes.
25   Q   Did Tim Atchison, as he was invited

108

1    over from Bonitron as the discussions were in
2    whatever status they were in about the -- the new
3    venture in 2006, 2007, and you invited him to come
4    to work for your company in 2008, in that time
5    frame, against the backdrop of those events, did
6    he sign any type of waiver of his personal
7    intellectual property rights?
8    A   Well, first of all, Mike invited him.
9    So don't say me. It was Mike Crowe's decision to
10   hire Tim. And Tim was very disgruntled at his
11   employment so it wasn't like we stole him away.
12   He left willingly and was anxious to join
13   Powerohm. And there was never any intellectual
14   proprietary information or any of that nature that
15   we stole from Tim or -- or anyone else for that
16   matter.
17   Q   Have you ever seen the contents of Mr.
18   Atchison's personal digital storage, his personal
19   computers, where he created files as far back as
20   2006, 2007, 2008 that contained brake power module
21   descriptions, schematics, and the part listings.
22       Have you ever seen those before?
23   MR. BRADLEY: Objection.
24   THE WITNESS: No.
25   MR. BRADLEY: Lack of foundation.

109

1 Objection. Calls for speculation.
2      MR. BURGER: Just asked, have you --
3 the question, have you ever seen it, does not call
4 for speculation.
5 BY MR. BURGER:
6     Q   Have you ever seen his computer
7 contents?
8      MR. BRADLEY: Okay. Objection -- lack
9 of foundation.
10 BY MR. BURGER:
11    Q   Have you ever seen the contents of his
12 computer?
13    A   The answer will be no, okay?
14    Q   And, you know, I -- I asked that in the
15 context of when you hired him, when Mike hired
16 him, and I -- I understand you were in Texas and
17 Mike was in Kentucky, but to the extent you
18 participated, I'm just trying to understand the
19 boundaries of what you know and what you don't
20 know. I don't want you to guess at anything, but
21 when you -- when you brought him on board to
22 further this brake power module prospect in
23 Kentucky, did you sit down with him or were you
24 present when someone else sat down with him and
25 looked at the contents of his pad drawings, like

110

1 this, or what he had transferred to the computer,
2 did that ever occur?
3    A   Not with me. None of that's got
4 anything to do with me. I'm not engineering.
5    Q   Do you have any knowledge, as the work
6 began there in Kentucky on the brake power
7 modules, when the nomenclature for the parts began
8 to occur, do you -- do you know where the words BG
9 and Little G originated, what person assigned
10 those phrases?
11    A   Not 100 percent. I thought it was Mike.
12    Q   Okay. Do you have any recollection of
13 it -- of -- of Tim Atchison suggesting Big Guy,
14 Little Guy for the parts nomenclature?
15    A   I -- I don't recollect. I mean, that
16 sounds like it could be Tim.
17    Q   If -- if I were able to show you file
18 creation dates for parts that contain TA, Timothy
19 Atchison's alleged initials on these parts, dating
20 to 2006 and 2007, and compare those to the parts
21 listings of what Hubbell is presently -- presently
22 selling on its markets, what conclusion would you
23 draw from that, if any?
24    A   Well, 2005 and 2006 has nothing to do
25 with Powerohm. We didn't have an affiliation with

111

1 Tim until 2008.
2    Q   I -- I agree -- I think Mr. Atchison
3 would agree with you on that conclusion, but
4 that's not really my question. I think you would
5 agree with --
6    A   Well, what is it then? What -- what's
7 the question?
8    Q   The question is -- my question is, if
9 he has file creation dates for the parts bearing
10 his initials, TA 5439 for example, on brake power
11 module parts that he had depicted in schematics in
12 2006, 2007, 2008, and those same parts numbers
13 appear in the present marketing if you went online
14 right now for Hubbell, what conclusion would you
15 draw from that, if any?
16      Maybe you don't have any conclusion,
17 I'm just asking if you do?
18    A   Well, I don't know about TA. I know
19 that's Tim's initials. I know TB is used a whole
20 lot on all drawings. TB -- indicates terminal
21 block. If there was something specific that Tim
22 developed that carried the nomenclature TA, I
23 would think he would have record of that. And if
24 there were any parts being purchased some -- I
25 mean, I -- I don't really totally understand the

112

1 question. I -- I think you're inferring that
2 there are products in the industry out there with
3 TA designations on them and tracing that to Tim.
4 I -- I don't -- I'm not aware of anything like
5 that.
6    Q   Did -- did you do any follow up work
7 for Hubbell after the transition -- after the
8 acquisition for which you were paid a monthly
9 salary?
10    A   No, I didn't. I was never called upon
11 to do anything.
12    Q   I -- I may have misunderstood, but I --
13 I thought I heard Mr. Crowe say the other day that
14 he was paid $10,000 a month for maybe a year after
15 the acquisition for availability for -- for advice
16 or whatever. Do you --
17    A   All three of us were paid that.
18 Myself, Richard --
19    Q   Sorry?
20    A   Myself, Richard Jochen, and Mike Crowe
21 were all three paid that sum.
22    Q   That -- that's right. Did you do
23 anything -- in practical terms, did you do
24 anything for that or was that just --
25    A   I --

---

113

1   Q   -- something that was written on a
2   paper?
3   A   -- I was never called upon to do
4   anything.
5   Q   Okay.  You -- what I'm trying --
6   stumbling around -- you -- did -- were you -- was
7   your advice sought from Hubbell on, as broadly as
8   I can make it, any topic?  Did anyone from Hubbell
9   contact you in that year --
10  A   No.
11  Q   -- the acquisition and say, what do we
12  do about this?  What do we do about that, Vance?
13  Anything of that nature?
14  A   No.  The only correspondence I had
15  involved the properties and dealing with, I
16  believe, they were attorneys that represented
17  Hubbell.  And they were issues that Hubbell wanted
18  dealt with such as, oh, I don't know, a safety
19  push bar put on a door or something of that
20  nature.  It -- it was -- I never was contacted by
21  any of the Hubbell management personnel to do
22  anything.
23  Q   In the context -- I'm -- I'm sorry.  I
24  keep interrupting you.  I apologize.  I'm trying
25  to rush.  Pardon me, I'll slow down.

---

114

1   A   That's all right.
2   Q   In the context of that $500,000 figure
3   that you quoted earlier in -- in your testimony,
4   if -- if I needed to locate the Powerohm yearly
5   annual financial statements for the period from
6   2008 to 2014, according to your knowledge, where
7   would those -- where would those presently be
8   located?
9   A   Probably on a server that's been thrown
10  away.  I mean, I don't have any record of that.
11  Q   Did -- did you turn them over to
12  Hubbell when you turned over all of the
13  acquisition records you described earlier?
14  A   We did.  Those were all on the -- on
15  the computer servers and on the individual
16  computers.
17  Q   So Hubbell should have those figures in
18  their possession, according to --
19  A   Those go back a ways.  I -- I doubt if
20  they still have them.
21  Q   Well, has anyone told you whether they
22  have them or don't have them?
23  A   No.
24  Q   Are you working anywhere at the present
25  time for any company?

---

115

1   A   I am technically retired, but I have
2   numerous business interests that I monitor and
3   have an interest in.
4   Q   I understood earlier from your answers
5   to Mr. Bradley that it was your perception that as
6   of -- as of 2008, when Mr. Atchison was brought on
7   to the Kentucky operation, that as of that date,
8   your company Powerohm Resistors, Inc., didn't have
9   a major setup to make brake power modules.  All of
10  that came about after 2008.  Am I right about that
11  answer?
12  A   You are correct.  Yes.  That's why Tim
13  was hired.
14  Q   Who else -- in your opinion, as -- in
15  the time frame from 2008 to 2014, who else in the
16  marketplace -- in the industrial marketplace was a
17  major manufacturer of brake power modules?
18  A   There were a lot of people, a lot of
19  the drive manufacturers put that circuitry inside
20  the drive at that particular time.  And there were
21  some that did not -- the ones that did not usually
22  did so -- so that their drive could be either
23  smaller or cost less, but the variable speed drive
24  industry was quite aware of the necessity for a --
25  a brake module, or, an industry term was called a

---

116

1   -- a chopper -- chopper module.  Chopper, meaning
2   a circuit that -- it's -- it's that's the slang
3   term that's used.  I worked at Toshiba.  Toshiba
4   had a variable speed drive department within the
5   company.  And I was familiar with terms that those
6   -- those guys used, and I remember hearing about
7   that sort of stuff at those times.
8   Q   As of 2014 -- as of 2014 and -- and
9   respecting your earlier answers that this was
10  primarily Mr. Crowe's zone and not yours, but as
11  of 2014 in the industry, to your knowledge, were
12  there any other brake power module manufacturers
13  dealing with the large, high-power standalone
14  units?
15  A   Yes.
16  Q   And who were they?
17  A   Bonitron was the one that come to name,
18  or comes to mind.  I think Saftronics may have
19  been doing that as well, but there were a lot of
20  foreign manufacturers that also recognized that
21  brake modules were needed, and they had developed
22  them on their own.
23  Q   But there -- there are lower-power,
24  generically brake power modules.  And then there
25  are the unique high-power modules, aren't there?

117

1    A   That's more detail than I would've
2  gotten involved in.
3    Q   Let -- let me specify the question
4  better and try to narrow it.  To your knowledge,
5  as of 2014, when Hubbell expressed its interest in
6  acquiring your company.  As of 2014, isn't it
7  correct that there was one manufacturer -- one
8  manufacturer alone, who was using in the brake
9  power module, power circuits, the four transistors
10  in parallel design?
11    A   I don't have any idea.
12    Q   Do you have any idea at all about
13  Hubbell's attempt the year before it approached
14  you about -- about buying your company, about them
15  buying a company that -- that dabbled in brake
16  power modules called Cableform.  Do you have any
17  knowledge of that at all?
18    A   No.
19    Q   Is that --
20    A   No, I don't.
21    Q   To your knowledge, did -- before
22  Hubbell acquired your company, did it have any
23  brake power module presence in the market?
24    A   Not to my knowledge.
25    Q   But you would disagree with the idea

118

1  that the reason Hubbell acquired your company was
2  to get the brake power module market?
3    A   No, they wanted our resistor market.  I
4  mean, we were -- we were doing the majority of our
5  sales with power resistors.
6    Q   But they were already manufacturing
7  power resistors, weren't they?  Unlike the brake
8  power modules.
9    A   It was the -- their -- their product
10  was laughable, to be honest.
11    Q   Well, is -- overall -- and then I'm
12  going to move on.  The big picture overall is that
13  -- as of the time Hubbell made its acquisition in
14  2014, they were already in the previous years
15  manufacturing the same product that you were
16  manufacturing in Texas Power, is it?
17    A   No, it wasn't -- it wasn't the same
18  product.  They -- they were, I believe, only
19  making edge-wound products and then maybe some of
20  the smaller wire-wound ones, but they didn't have
21  the full complement of every type of power
22  resistor that was in our portfolio of products.
23    Q   Well, with those distinctions
24  acknowledged, they had no involvement in brake
25  power modules, did they?

119

1    A   Not to my knowledge, no.
2    Q   Okay.  Do you have any knowledge of
3  what portion of their gross profits Hubbell's
4  gross profits at present are from brake power
5  modules as opposed to power resistors?
6    A   I wouldn't think it's very much.
7    Q   Okay.
8    A   Based on the sales that we had, it --
9  it -- I -- I mean, maybe they've grown it.  I -- I
10  don't have any idea.
11    Q   And -- and I understood you to say a
12  minute ago, just to make sure I'm clear about it.
13  Do you -- you believe that you were selling about
14  you -- you had been the year before the
15  acquisition about $500,000 in brake power modules.
16  Did I follow that correctly?
17    A   That would probably be a generous
18  amount because the total sales out of Kentucky
19  were under a million, and there were other
20  products besides brake modules that came out of
21  there, such as that Rockwell product that was
22  copied.  So we --
23    Q   On that --
24    A   -- we sold a significant amount of
25  those products.  Brake modules may have reached a

120

1  half a million, but I would be generous if I -- if
2  I thought a -- any more than that.
3    Q   Would you defer to Mr. Crowe's
4  recollection on that, if -- if he has a different
5  view?
6    A   Mike didn't concern himself much with
7  sales numbers and things of that nature.  I -- I
8  did.  I generated, and/or I shouldn't say
9  generated.  I digested a lot of the sales
10  information, and we had a rather interesting yet
11  volatile customer base.  Usually, most industries
12  can relate to an 80/20 rule, where 80 percent of
13  their business is coming from 20 percent of their
14  customers.  Unfortunately, for us, ours was more
15  90/10, 90 percent of our business was coming from
16  the top 10 percent of our customer arrangement.
17      So -- and the majority of all of that
18  was resistor-based, only the drive people.  So
19  Powerohm was set up.  If you look at it, about 25
20  percent of the sales were due to some sort of
21  dynamic breaking or resistive braking scenario.
22  About 25 percent was neutral grounding.  Another
23  25 percent was general motor control and
24  miscellaneous.  And then there was another 25
25  percent that -- that dealt with the oil and gas

121

1　industry.  So if you just boil it down, it made a
2　pie out of it.  That's about how it boiled down.
3　So of that 25 percent of our market that was brake
4　resistors, a very small segment of that was brake
5　modules.
6　　Q   Okay.  I -- I --
7　　A   Like I said earlier, it was very
8　inconsequential to the big picture.
9　　Q   I want to jump back briefly to our --
10　our earlier discussion about what was going on
11　around 2006 or 2007 when you came down and looked
12　at the properties.  And -- and there was the
13　discussion of the new venture, I won't
14　characterize it.  In that broad time frame, and in
15　that broad context, was there ever a discussion of
16　you using for that new venture, the name Power
17　Electronics?
18　　A   No.  Not to my recollection, no.
19　　Q   Was there ever any letterhead procured
20　by anyone, to your knowledge, by Mr. Crowe, Mr.
21　Atchison, Mr. Roof, anybody -- anybody procure
22　letterhead that referenced Power Electronics?
23　　A   Not to my knowledge, no.
24　　Q   Was there ever a separate financial --
25　a separate bank account for Power Electronics?

122

1　　A   No.  There would have to be an entity
2　to have a bank account.  You can't get a bank
3　account without the legal documents that show you
4　have a company.
5　　Q   Was there any type of internet listing,
6　phone book listing, anything that referenced the
7　name Power Electronics, to your knowledge?
8　　A   No.
9　　Q   No marketing advertisements of any type
10　-- magazines, brochures, anything like that --
11　that ever referenced the name Power Electronics.
12　　A   If someone else in some other company
13　could have had a name like that, but it didn't
14　relate to us.
15　　Q   No.  Under the Powerohm Resistors Inc.
16　umbrella, none?
17　　A   None.
18　　Q   So the -- the -- as far as you know, in
19　this broad discussion that we're having about this
20　-- this -- the -- the ambiguities and the -- the
21　different recollections of things, the only time
22　that Power Electronics is mentioned in any
23　document is the document that you say you drafted
24　in 2011, the email, where you refer to Martin
25　Glover as vice president of Power Electronics,

123

1　that's the only time that you know anything about
2　it, correct?
3　　A   Yes.
4　　Q   And you definitely, positively did not
5　go to any lending institution and talk to them
6　about a new venture called Power Electronics?
7　　A   I did not.
8　　Q   And you don't know anyone who did on
9　your behalf, including your accountant, any of
10　your subordinates?
11　　A   Even if we were going to open a
12　business in Tennessee, it would've still been
13　Powerohm Resistors, and it would've been making a
14　product.  It would've been another tab in our
15　catalog.  It was simply a product, not -- it -- it
16　was not going to be -- it never was envisioned to
17　be something grand, not with those three guys.
18　　Q   Okay.  When -- when you last saw them,
19　I want to be sure.  I'm -- I'm correct about that.
20　The records showing the brake power module gross
21　sales as of 2013.  Those were in the possession of
22　Hubbell.  If I remember your answer correctly
23　earlier.
24　　A   Yeah.  That -- I mean, I don't have
25　them.  And since all these computers and

124

1　everything else were surrendered at the time of
2　the sale, I can only assume that they are in
3　Hubbell's possession.  But like I said, a lot of
4　data is lost over the years because, you know,
5　when they change to new hardware, a lot of the
6　files sometimes don't get moved.  I -- I don't
7　know.
8　　Q   Were your employees in Texas given an
9　annual performance rating by any -- any of the
10　supervisors?
11　　A   All the hourly workers did receive
12　regular and routine performance reviews, but not
13　so much the salaried people.
14　　Q   Did that apply to Kentucky as well as
15　Texas?
16　　A   I don't know because Mike was the
17　impetus around what was going on in Kentucky, and
18　to Mike's credit, he hired a guy named -- I think
19　it was Mike Simmons.  It's coming to mind, Mike
20　Simmons, I think role was to run the production
21　side of things in Kentucky.  I -- I -- I hope I'm
22　correct with that name.  I -- I wasn't in Kentucky
23　very often, so I -- I didn't --
24　　Q   I understand.  I understand.  If -- if
25　-- if Mr. Atchison claims that he got, every

125

1  single year, high performance ratings that he got
2  a raise every single year, would you have any
3  information to dispute that?
4      **A  I would -- I would find that to be**
5  **unusual because in the beginning we weren't -- we**
6  **were operating in the red for several years with**
7  **that product line.  And since Tim was the only one**
8  **involved with it -- it's hard to give people**
9  **raises when there's no income coming in from that**
10  **product.  I don't know personally if he got raises**
11  **every year, but I -- I don't -- I wouldn't see why**
12  **that would be necessary.**
13      Q   Let -- let me narrow that and -- and
14  try to make it a little more sensible in view of
15  that answer.  As of 2013 -- as of 2013, if he
16  claims the year before the Hubbell's acquisition,
17  he got a very high performance rating and a raise.
18  Do you have any information to dispute that?
19      **A  I don't.**
20      Q   Is it your understanding that he was in
21  charge of a group of people, about ten, had varied
22  some -- that he was in charge of a team, a team is
23  the word he uses, of about ten that did absolutely
24  nothing but brake power module work.
25      **A  I was never under the impression that**

126

1  **Tim was managing anybody.  Tim's role was -- he**
2  **was a design engineer and his role was to develop**
3  **breaking modules and anything else that required**
4  **electronic components.**
5      Q   Who was your contact person with
6  Hubbell in that -- leading up to the negotiation,
7  who -- who was the man at Hubbell, man or woman at
8  Hubbell, with whom you negotiated in -- in your
9  role in -- in selling Powerohm to -- to Hubbell?
10      **A  There was no one that I talked to.  It**
11  **would've been the attorneys that represented us,**
12  **as well as the merger and acquisition company,**
13  **Schneider Downs.  I didn't talk directly to**
14  **anybody at Hubbell.**
15      Q   Did anyone in that time frame, and I --
16  anyone as broadly as I can make that, attorneys or
17  Hubbell in your presence, anyone ever indicate to
18  you that they were going to, in contrast to their
19  brake power module aspirations, they were going to
20  clean the house, they were going to fire Tim and
21  his entire brake power module team within a year
22  and a half.  Did anyone share that projection with
23  you?
24      **A  No.  I -- as I said, I didn't speak to**
25  **anybody directly at Hubbell.  It -- it all went**

127

1  **through attorneys.  And during the process, I met**
2  **an individual by the name of Dave King.  To my**
3  **knowledge, Dave was the key person at Hubbell.  I**
4  **think Dave was a vice president level individual**
5  **within the Hubbell framework.**
6      Q   I -- I'm looking for insight into
7  something that may deal with more of your -- your
8  role, and -- and -- and I think I know the answer
9  to it.  I apologize for asking that.  I just want
10  to make sure I've got it on the record here.
11      In that advisory period, in that year
12  after that you were paid the $10,000 and you were
13  there available for Hubbell, did anybody from
14  Hubbell come to you?  Again, in the broadest sense
15  -- I want to make sure I don't leave any vagueness
16  to it.  In the broadest sense, did anybody come to
17  you and say, from Hubbell, yes, we were interested
18  in this -- this great brake power module product
19  that you guys included in your package here, but
20  we've decided to get rid of the only man you have
21  in the umbrella -- under the umbrella here, who's
22  the head guy for the brake power modules, and fire
23  his entire team.  Did they seek your advice on
24  that in any way? (Inaudible).
25      **A  I told you before that I had no contact**

128

1  **with anybody at Hubbell during that year that I**
2  **was paid a consulting fee.**
3      Q   Okay.
4      **A  This is the easiest 120 grand I've ever**
5  **made.**
6      Q   Why did Powerohm Resistors, Inc. not
7  pursue patent protection for these brake power
8  module designs that blossomed between 2008 and
9  2014?
10      **A  They were already on the market.  It --**
11  **it was something that everybody else had.  I mean,**
12  **you can't -- just like we never patented**
13  **resistors, you -- you can't patent something**
14  **that's already there.  I mean, whoever originated**
15  **it should have patented it.**
16      Q   Okay.  You believe that the concept,
17  the -- the -- the four transistors in parallel
18  concept for an exponentially higher power
19  management was not patentable?
20      **A  You're getting down into the minutiae**
21  **of a design, and I don't have any idea about any**
22  **of that.**
23      Q  Okay.
24      **A  I was never an electronic engineer.  My**
25  **degree was in power and I pretty much stayed in**

129

1  the power area of -- and -- and even to this day,
2  everything I'm involved in has to do with power,
3  and never anything that's electronic.
4     Q  Okay.  While Mr. Atchison was an
5  employee in, again, the 2008 to 2014 time -- broad
6  time frame, did you participate in any meetings at
7  the Kentucky facility with Mr. Atchison and his
8  team to talk about brake power modules and -- and
9  what the company was doing with him?
10    A  Well, first of all, when you say his
11  team, I -- I think you're talking about people
12  that were in manufacturing.  There was no team of
13  electronic engineers.  There was Tim who designed
14  everything, and then -- then there were the people
15  that built everything.  And I wasn't aware that he
16  had a team, to be honest.  So I never sat down
17  with Tim and a team of people, no.
18    Q  That -- that's -- it sounds like it's
19  your perception that he didn't supervise anybody.
20  That he -- he was an employee and he -- these were
21  coworkers and not subordinates to him.
22    A  That was my understanding.  I believed
23  that all of the people in the production area were
24  under a guy by the name of Mike Simmons.
25    Q  Yeah.  Did you interact to any extent

130

1  with the, I may broadly describe them as the --
2  the -- the payroll people, the office people who
3  wrote the checks to Tim Atchison and the other
4  Kentucky employees.  Did you interact with them on
5  a regular basis?
6     A  That would be Richard Jochen, yes.
7     Q  And -- and who actually physically
8  wrote the checks to the employees?
9     A  Richard Jochen.
10    Q  Richard D-I-L-K-I-N?
11    A  J-O-C-H-E-N.
12    Q  J-O-C-H-E-N.
13    A  J-O-C-H-E-N.
14    Q  Was there a young lady who worked with
15  him?
16    A  Not all the way back to 2008.
17    Q  If -- if Mr. Atchison affirms that he
18  received a $30,000 bonus near the end of his
19  tenure, therefore his sales on brake power modules
20  as 3 percent, your statement about that, I take it
21  from your multiple comments earlier is, you don't
22  know what he's talking about?
23       MR. BRADLEY:  Objection.
24       THE WITNESS:  There was never any 3
25  percent of anything.  Bonuses were -- were never

131

1  really based on percentage.  It was usually a -- a
2  rounded figure such as $5,000, $10,000 and so on.
3  We -- we never calculated you would get X
4  percentage, and then it goes out to the dollars
5  and cents part.  It wasn't done that way.  Richard
6  Jochen insisted on round numbers, and -- because
7  it made his job and life easier.
8  BY MR. BURGER:
9     Q  Do -- do you have -- I know it's been a
10  while, forgive me for asking, but do you have any
11  memory of what the employees in Kentucky were paid
12  as commissions that last year of operation before
13  the the acquisition?
14    A  I don't.  No.
15    Q  Did -- did anybody else get a
16  commission anywhere in -- or -- or a bonus, I'll
17  use your word, a bonus in the range of $30,000
18  other than Mr. Atchison for that 2013?
19       MR. BRADLEY:  Objection.
20       THE WITNESS:  Could -- well, it could
21  have been Joe Eschleman.  He received usually
22  pretty good bonuses, depending on how we did in
23  sales.
24  BY MR. BURGER:
25    Q  But you don't have any independent

132

1  memory?
2     A  I do not.  No.
3     Q  And the person who could tell us that
4  best is Mr. Richard Jochen?
5     A  He probably won't remember either.
6     Q  Those records would be in the
7  possession of Hubbell, according to your last
8  memory?
9     A  Yes.
10    Q  Okay.  Do you have any knowledge of
11  this accusation made by Mr. Atchison that right
12  before he was terminated, an individual named
13  Stuart -- do -- do you know Stuart Xiang?
14    A  Let me just stop you right there,
15  because anything happening after January the 16th
16  of 2014, I have no knowledge.  I was not in
17  contact with anybody at Hubbell after January the
18  16th.
19    Q  Do you know Stuart Xiang?  Do you know
20  the name?
21    A  No, I do not know that name.
22    Q  Do you know Andrew Sexton?
23    A  I do not.
24    Q  Let met take the --
25       THE REPORTER:  Councilor, I'm sorry.

133

1 Councilor, I'm sorry. What was the name before?
2      MR. BURGER: I'm sorry.
3      THE REPORTER: What was the first name
4 that you mentioned? Sorry.
5      MR. BURGER: Andrew Sexton.
6      THE REPORTER: The one before?
7      MR. BURGER: Stuart, S-T-U-A-R-T
8 X-I-A-N-G, I think it is.
9      THE REPORTER: Thank you.
10      MR. BURGER: I want to take a
11 five-minute break and I'll wrap up here shortly,
12 Mister --
13      THE VIDEOGRAPHER: Okay.
14      MR. BURGER: -- Mr. Hinton.
15      THE VIDEOGRAPHER: Time is 1:16 p.m.
16 We're off the record.
17      (OFF THE RECORD)
18      THE VIDEOGRAPHER: Time is 1:24 p.m.
19 We're on the record.
20      MR. BURGER: You ready to resume?
21      THE WITNESS: Yes.
22 BY MR. BURGER:
23   Q   Okay. I -- I -- I'm going to wrap up
24 here shortly.
25      Mr. Hinton, if Mr. Atchison vehemently

134

1 affirms to me that in 2010 it was a discussion of
2 the commencement of -- of the commission
3 arrangement, that he alleges to be a commission
4 arrangement, and that you literally, you
5 personally flew to Kentucky and sat at a table
6 with Mike Crowe and him, and you slid across the
7 table to him a commission schedule that described
8 what he was to be paid for commissions.
9      You would dispute that, that event
10 occurred?
11   A   I don't recall that event, no.
12   Q   Do you remember there being some point
13 subsequent to that time, after he had been paid
14 documented commission -- or documented payments
15 beyond his salary where there had been a mistake
16 made, and he approached you and you helped him
17 straighten that out?
18   A   I don't recall that, no.
19   Q   Okay. But you're affirmed testimony
20 here under oath today is that you know nothing of
21 there being any commission arrangement with
22 Timothy Atchison?
23   A   It wouldn't have been worded that way.
24 It would've been a bonus of some kind.
25   Q   Three -- 3 percent commission is -- are

135

1 the words I'm using, 3 percent commission.
2   A   No, there was never any 3 percent
3 commission, to my knowledge.
4   Q   And the -- do you remember how on the
5 corporate tax returns when the -- the payroll
6 records, et cetera, were reflected and delineated
7 on the corporate tax returns, was there any
8 reference to employee commissions for Powerohm
9 Resistor, Inc. employees?
10   A   I don't recall. I never looked at the
11 individual tax returns to that minutia of a point.
12 That would've been Darrell Keller.
13   Q   Okay. And would those records be in
14 Mr. Keller's possession or Hubbell's or both?
15   A   I would think Darrell might still have
16 them. I know that he recently lost a bunch of
17 data, but --
18   Q   What did --
19   A   -- we don't have it. I don't have it.
20   Q   What did -- what -- well, I -- I took
21 literally what you said earlier, that all of the
22 records of the corporation were left with Hubbell
23 when you walked out?
24   A   That's correct.
25   Q   You stand by that, and that includes

136

1 the financial records, correct?
2   A   Well, the accountant that did our taxes
3 probably had a copy.
4   Q   Well, in the course of -- of dealing
5 with Hubbell for the purchase, you provided them
6 your financial records, showing your income and
7 what you're paid?
8   A   Absolutely.
9   Q   And so Hubbell would have those,
10 correct?
11   A   Yes.
12      MR. BURGER: Those are all my
13 questions. Thank you. Sorry we kept you so long.
14      THE WITNESS: Okay.
15      MR. BURGER: I have no further
16 questions. Thank you.
17      THE VIDEOGRAPHER: The time is 1:28
18 p.m. We're off the record.
19      THE REPORTER: May I -- before closing
20 the record, may I ask for your transcript orders?
21      MR. BRADLEY: Regular delivery is fine.
22 Thank you.
23      THE REPORTER: And for you, Mr. Burger?
24      MR. BURGER: Yeah. Regular delivery is
25 fine. And I -- I do need -- I -- I -- I -- let me

137

1  let you know about the video, okay?
2          THE VIDEOGRAPHER:  Okay.
3          THE REPORTER:  All right.  And we're --
4          MR. BURGER:  Thank you.
5          THE REPORTER:  -- off the record.
6          (Off the record at 1:28 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

139

1          CERTIFICATE OF TRANSCRIBER
2          I, Carly Hurst, do hereby certify
3   that this transcript was prepared from the digital
4   audio recording of the foregoing proceeding; that
5   said proceedings were reduced to typewriting under
6   my supervision; that said transcript is a true and
7   accurate record of the proceedings to the best of
8   my knowledge, skills, and ability; and that I am
9   neither counsel for, related to, nor employed by any
10  of the parties to the case and have no interest,
11  financial or otherwise, in its outcome.
12
13
14  *Carly Hurst*
15
16  _____
17  CARLY HURST
18  PLANET DEPOS, LLC
19  JULY 9, 2025
20
21
22
23
24
25

138

1     CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2          I, Leyhbert Sharp, the officer
3   before whom the foregoing proceedings were
4   taken, do hereby certify that any witness(es) in
5   the foregoing proceedings were fully sworn;
6   that the proceedings were recorded by me and
7   thereafter reduced to typewriting by a
8   qualified transcriptionist; that said digital
9   audio recording of said proceedings are a
10  true and accurate record to the best of my
11  knowledge, skills, and ability; and that I am
12  neither counsel for, related to, nor employed
13  by any of the parties to this case and have
14  no interest, financial or otherwise, in its
15  outcome.
16
17
18
19
20  _____
21  LEYHBERT SHARP, NOTARY PUBLIC,
22  FOR THE STATE OF TEXAS
23  JULY 9, 2025
24
25

**A**

**a) (1**
66:23
**ability**
9:24, 99:25,
138:11, 139:8
**able**
10:9, 23:2,
35:12, 37:15,
67:18, 81:17,
110:17
**aboard**
33:7
**about**
9:14, 19:10,
19:20, 22:15,
29:13, 30:20,
36:18, 47:16,
52:2, 58:20,
86:10, 86:13,
86:16, 86:19,
86:21, 87:17,
88:12, 89:23,
91:19, 92:24,
93:10, 93:13,
93:23, 93:24,
94:17, 95:23,
96:18, 97:2,
99:11, 100:8,
103:5, 103:13,
105:9, 105:16,
105:23, 106:16,
108:2, 111:18,
113:12, 115:10,
116:6, 117:12,
117:14, 119:12,
119:13, 119:15,
120:19, 120:22,
121:2, 121:10,
122:19, 123:1,
123:6, 123:19,
125:21, 125:23,
128:21, 129:8,
129:11, 130:20,
130:22, 137:1
**abruptly**
7:24, 92:15

**absolutely**
97:10, 104:2,
125:23, 136:8
**ac**
52:14
**accepted**
28:14
**accompanied**
32:7
**according**
36:6, 114:6,
114:18, 132:7
**account**
121:25, 122:2,
122:3
**accountant**
89:4, 90:1,
123:9, 136:2
**accountant's**
89:2
**accounting**
70:18
**accurate**
8:15, 58:16,
138:10, 139:7
**accusation**
132:11
**accused**
56:21
**achieve**
46:4
**acknowledged**
118:24
**acquired**
117:22, 118:1
**acquiring**
117:6
**acquisition**
82:7, 82:21,
101:6, 112:8,
112:15, 113:11,
114:13, 118:13,
119:15, 125:16,
126:12, 131:13
**across**
134:6
**action**
1:6

**active**
98:20
**actually**
10:1, 11:15,
15:15, 18:16,
34:15, 75:6,
76:13, 98:13,
130:7
**add**
29:9, 70:22
**added**
41:11
**adding**
26:14
**addition**
78:5
**additional**
69:4
**address**
6:17, 72:24,
72:25, 73:10,
73:11
**adjacent**
19:13
**administer**
5:23
**administrative**
61:2, 70:3
**advance**
64:21
**adversarial**
25:8
**adverse**
51:5
**advertisements**
122:9
**advice**
9:11, 112:15,
113:7, 127:23
**advisory**
127:11
**affiliate**
48:10, 48:14,
48:21, 49:2,
49:3, 57:12,
57:23, 58:8,
62:16, 63:2,
63:5, 64:2

**affiliated**
74:9
**affiliates**
64:20
**affiliation**
74:13, 110:25
**affirmed**
6:12, 134:19
**affirms**
130:17, 134:1
**afford**
14:24
**after**
11:19, 12:9,
14:6, 28:22,
29:1, 29:3,
31:14, 33:7,
34:6, 36:13,
47:8, 61:20,
61:23, 75:4,
80:12, 80:25,
81:3, 82:11,
82:21, 98:8,
105:13, 112:7,
112:14, 115:10,
127:12, 132:15,
132:17, 134:13
**afternoon**
52:17, 85:23,
85:25
**again**
23:11, 42:23,
87:8, 90:19,
127:14, 129:5
**against**
108:5
**agent**
73:5, 73:7,
73:17, 73:21,
88:17, 89:1,
90:8, 91:2, 97:1
**ago**
9:15, 97:18,
102:9, 103:3,
105:9, 119:12
**agree**
6:1, 39:17,
39:21, 64:10,

100:19, 107:18,
107:24, 111:2,
111:3, 111:5
**agreed**
17:3, 29:10,
48:2, 83:12
**agreeing**
47:15
**agreement**
4:13, 30:25,
40:8, 40:25,
41:1, 41:2,
41:5, 42:10,
42:24, 43:21,
48:7, 49:3,
49:12, 49:14,
50:1, 52:5,
54:21, 55:7,
59:10, 60:9,
64:7, 65:3,
85:13
**agreements**
49:22, 50:7,
60:2, 60:4
**agrees**
64:19
**ahead**
69:2, 95:24,
99:6, 106:14
**airport**
25:6
**all**
5:25, 6:3,
10:24, 11:2,
13:4, 15:11,
16:6, 17:3,
19:17, 20:19,
24:4, 27:8,
27:12, 27:16,
27:17, 29:11,
31:16, 32:3,
34:10, 37:9,
37:15, 40:12,
43:22, 45:11,
47:16, 52:11,
53:22, 54:24,
55:2, 55:3,
61:2, 61:3,

61:4, 61:5,
65:6, 65:16,
66:13, 70:14,
70:18, 71:13,
75:8, 76:19,
77:15, 77:20,
78:25, 80:13,
80:21, 81:18,
90:2, 90:23,
91:20, 92:10,
97:2, 97:9,
97:16, 99:3,
100:10, 100:11,
100:12, 103:20,
104:11, 104:13,
104:18, 105:18,
108:8, 111:20,
112:17, 112:21,
114:1, 114:12,
114:14, 115:9,
117:12, 117:17,
120:17, 123:25,
124:11, 126:25,
129:10, 129:23,
130:16, 135:21,
136:12, 137:3
**alleged**
110:19
**alleges**
134:3
**alleging**
56:16
**allen**
1:4, 3:19
**allow**
80:18
**allowance**
59:12
**almost**
21:16
**alone**
37:17, 117:8
**along**
17:3, 25:14,
29:10, 29:15
**already**
19:12, 33:23,
35:4, 49:12,

69:3, 75:4,
83:6, 95:21,
118:6, 118:14,
128:10, 128:14
**also**
3:18, 13:17,
21:8, 38:12,
40:24, 58:4,
61:12, 68:16,
77:2, 99:3,
100:18, 116:20
**alternative**
43:10, 43:15
**always**
66:4, 71:15,
81:6, 101:18
**ambiguities**
122:20
**america**
102:22
**amount**
36:8, 119:18,
119:24
**andrew**
132:22, 133:5
**angeles**
86:19
**announce**
81:20
**annual**
114:5, 124:9
**annually**
22:10, 88:1
**another**
35:1, 37:25,
120:22, 120:24,
123:14
**answer**
8:14, 8:21,
9:9, 9:25, 10:8,
10:9, 50:14,
88:3, 88:18,
88:24, 90:15,
90:16, 90:18,
106:17, 109:13,
115:11, 123:22,
125:15, 127:8
**answered**
93:11

**answers**
115:4, 116:9
**anti-rejection**
10:3
**anticipate**
71:15
**anxious**
108:12
**anybody**
39:5, 121:21,
126:1, 126:14,
126:25, 127:13,
127:16, 128:1,
129:19, 131:15,
132:17
**anyone**
31:3, 31:6,
46:14, 63:11,
81:4, 85:12,
108:15, 113:8,
114:21, 121:20,
123:8, 126:15,
126:16, 126:17,
126:22
**anything**
21:3, 21:13,
21:18, 23:15,
33:9, 47:8,
50:8, 53:11,
54:15, 72:5,
85:8, 86:6,
87:14, 89:4,
92:3, 95:4,
97:19, 98:24,
109:20, 110:4,
112:4, 112:11,
112:23, 112:24,
113:4, 113:13,
113:22, 122:6,
122:10, 123:1,
126:3, 129:3,
130:25, 132:15
**anyway**
78:24
**anywhere**
31:13, 114:24,
131:16
**apologize**
93:10, 113:24,

127:9
**apparently**
68:8
**appear**
71:19, 111:13
**appears**
73:10
**applicable**
6:3, 6:8
**application**
13:10, 13:12,
23:3, 24:7, 71:4
**applications**
43:11
**apply**
124:14
**applying**
49:6
**approached**
79:2, 83:1,
117:13, 134:16
**approximate**
88:13
**approximately**
96:23
**approximation**
98:7
**archdale**
81:12
**area**
13:2, 21:5,
22:17, 93:8,
104:3, 129:1,
129:23
**aren't**
116:25
**around**
17:10, 24:4,
44:16, 45:21,
88:6, 96:15,
113:6, 121:11,
124:17
**arrange**
64:22
**arrangement**
47:6, 47:16,
48:14, 48:15,
59:16, 63:1,

63:3, 63:5,
64:2, 83:1,
85:13, 120:16,
134:3, 134:4,
134:21
**arrangements**
49:22, 57:12,
57:24, 58:8
**arrival**
33:8
**article**
42:1, 42:3
**articles**
72:4
**aside**
41:4, 91:5,
91:8
**asked**
47:14, 109:2,
109:14
**asking**
111:17, 127:9,
131:10
**aspect**
15:5
**aspirations**
126:19
**assemble**
37:16
**assets**
50:3, 50:8,
53:19, 53:22,
53:24, 54:15,
55:20, 57:9,
62:25
**assigned**
110:9
**assignment**
104:9
**associates**
14:18, 14:20,
15:13
**association**
53:2
**assume**
10:8, 54:19,
90:1, 124:2
**assumed**
24:18

**atchison**
1:4, 3:19, 5:4,
5:18, 6:24,
22:4, 24:2,
24:14, 27:4,
29:2, 35:15,
35:24, 38:14,
38:17, 39:14,
39:19, 39:23,
47:5, 53:7,
54:16, 55:18,
56:21, 59:11,
60:9, 63:25,
67:18, 73:8,
73:13, 73:23,
84:6, 84:11,
84:14, 84:17,
84:21, 84:24,
85:3, 85:12,
88:10, 90:7,
93:18, 93:22,
94:16, 94:25,
95:10, 96:23,
97:14, 98:15,
99:1, 107:20,
107:23, 107:25,
110:13, 111:2,
115:6, 121:21,
124:25, 129:4,
129:7, 130:3,
130:17, 131:18,
132:11, 133:25,
134:22
**atchison's**
68:2, 68:23,
108:18, 110:19
**attached**
4:8, 25:22,
62:14
**attempt**
117:13
**attempting**
90:21, 90:22,
93:9, 96:11
**attempts**
28:19
**attend**
22:12, 22:14

**attended**
81:8
**attention**
59:5
**attest**
74:7
**attorney**
6:25
**attorneys**
83:2, 83:7,
113:16, 126:11,
126:16, 127:1
**audio**
138:9, 139:4
**audited**
89:5
**authority**
71:4, 71:8
**authorizations**
49:22
**authorized**
5:23
**automation**
100:2
**availability**
112:15
**available**
10:25, 92:11,
127:13
**avenue**
3:13
**avenues**
92:10
**aware**
10:6, 65:4,
65:18, 71:11,
84:10, 112:4,
115:24, 129:15
**away**
96:24, 106:24,
108:11, 114:10
**B**
**bachelor**
12:6
**bachelor's**
12:6
**back**
10:13, 10:17,

16:24, 17:9,
17:18, 27:5,
31:11, 34:7,
36:10, 42:22,
54:20, 54:22,
83:7, 103:18,
108:19, 114:19,
121:9, 130:16
**backdrop**
108:5
**background**
11:9
**backup**
64:11
**bad**
13:4, 44:13
**bag**
77:1
**bank**
34:25, 43:17,
97:19, 97:20,
98:2, 101:7,
101:13, 101:15,
101:19, 102:21,
102:22, 103:20,
103:23, 104:1,
104:8, 121:25,
122:2
**banking**
102:17
**banks**
31:4, 102:19,
104:5, 104:11,
104:16
**bar**
113:19
**barbecue**
91:18
**base**
120:11
**based**
13:23, 24:19,
99:8, 99:21,
119:8, 131:1
**bases**
71:13
**basically**
13:14, 14:22,

20:19, 27:17,
34:10, 79:6,
87:19
**basis**
99:3, 130:5
**bat**
29:14
**bearing**
111:9
**became**
25:4, 61:22,
77:22, 78:15,
81:3, 81:7
**because**
13:3, 16:2,
26:15, 26:21,
28:13, 29:11,
31:13, 35:8,
35:11, 36:3,
36:24, 38:1,
44:10, 46:8,
54:22, 66:5,
68:15, 71:15,
71:18, 72:21,
73:21, 76:14,
77:1, 77:12,
77:15, 77:19,
78:7, 85:9,
86:13, 88:19,
88:24, 89:4,
89:6, 97:11,
99:4, 105:8,
106:23, 119:18,
124:4, 124:16,
125:5, 131:6,
132:15
**becoming**
14:13
**been**
7:9, 15:18,
17:12, 18:5,
22:9, 25:20,
26:18, 40:6,
44:9, 45:3,
45:21, 46:12,
53:20, 54:14,
55:18, 58:6,
59:17, 60:7,

60:8, 60:11,
60:14, 60:24,
64:2, 64:4,
67:18, 69:13,
70:15, 73:21,
74:2, 81:6,
83:16, 89:5,
90:5, 96:20,
96:21, 96:24,
96:25, 101:12,
103:4, 103:11,
104:3, 114:9,
116:19, 119:14,
123:12, 123:13,
123:14, 126:11,
131:9, 131:21,
134:13, 134:15,
134:23, 134:24,
135:12
**before**
2:13, 7:10,
8:14, 9:18,
19:11, 44:11,
45:20, 52:4,
67:14, 70:8,
81:6, 81:7,
83:16, 90:22,
98:8, 98:14,
106:8, 106:22,
108:22, 117:13,
117:21, 119:14,
125:16, 127:25,
131:12, 132:12,
133:1, 133:6,
136:19, 138:3
**began**
110:6, 110:7
**begin**
68:10
**beginning**
16:13, 125:5
**begins**
5:2
**behalf**
3:3, 3:10,
123:9
**behind**
11:2, 18:23

**being**
6:12, 7:22,
20:17, 26:12,
28:3, 42:13,
65:18, 75:21,
77:9, 80:17,
94:6, 111:24,
134:12, 134:21
**belief**
88:23, 88:24,
89:2, 89:3
**believe**
18:7, 20:16,
22:8, 27:10,
29:3, 29:16,
31:8, 37:18,
44:10, 71:10,
90:10, 91:17,
104:15, 113:16,
118:18, 119:13,
128:16
**believed**
34:15, 129:22
**believes**
68:9
**belize**
86:17
**belong**
102:13, 102:15
**below**
51:22
**benefit**
26:24, 50:21,
50:23, 58:12,
58:17, 59:6
**besides**
119:20
**best**
17:15, 44:17,
46:4, 66:7,
75:6, 82:9,
84:1, 90:15,
132:4, 138:10,
139:7
**better**
117:4
**between**
13:15, 59:17,

77:9, 78:1,
94:23, 128:8
**beyond**
78:14, 98:24,
134:15
**bg**
38:12, 39:15,
85:4, 85:15,
110:8
**bglg**
55:19
**bgs**
45:8, 45:9
**big**
13:1, 13:6,
13:20, 13:22,
22:11, 26:19,
45:11, 110:13,
118:12, 121:8
**bigger**
46:19, 47:18,
78:12, 78:18
**biggest**
44:14
**billing**
70:24
**binder**
40:23
**binding**
50:2, 50:8,
58:22
**bit**
35:8, 36:10,
37:18, 46:9,
83:15, 103:18
**blanket**
35:2
**blew**
37:22
**block**
111:21
**blossomed**
128:8
**board**
17:17, 37:8,
37:14, 80:24,
92:8, 109:21
**boil**
121:1

**boiled**
121:2
**bonitron**
23:5, 24:8,
24:14, 36:7,
93:8, 93:19,
94:7, 94:16,
96:24, 108:1,
116:17
**bonus**
47:15, 48:3,
60:16, 60:22,
61:25, 130:18,
131:16, 131:17,
134:24
**bonuses**
47:19, 47:22,
130:25, 131:22
**book**
122:6
**borrow**
103:17
**borrowed**
77:17
**both**
7:24, 21:9,
26:21, 36:17,
82:22, 135:14
**bottom**
41:8, 70:10
**bought**
18:21, 37:23,
65:24, 98:4
**bound**
57:9
**boundaries**
109:19
**bpm**
68:2, 68:24
**bradley**
3:11, 4:3,
5:15, 6:16,
6:22, 7:5, 7:8,
25:15, 25:19,
26:4, 30:3,
30:9, 39:25,
40:5, 50:18,
52:1, 52:8,

52:11, 52:15,
52:18, 66:21,
67:1, 67:7,
67:9, 69:8,
69:12, 74:18,
74:21, 85:19,
87:7, 88:8,
90:9, 108:23,
108:25, 109:8,
115:5, 130:23,
131:19, 136:21
**bradley's**
93:2, 95:10
**brake**
23:5, 26:14,
26:17, 35:20,
35:22, 35:25,
36:2, 36:14,
36:19, 36:21,
37:1, 37:20,
38:1, 45:8,
94:9, 94:15,
94:23, 95:13,
95:14, 96:1,
96:18, 97:21,
99:22, 100:15,
100:21, 100:24,
101:2, 107:22,
108:20, 109:22,
110:6, 111:10,
115:9, 115:17,
115:25, 116:12,
116:21, 116:24,
117:8, 117:15,
117:23, 118:2,
118:7, 118:24,
119:4, 119:15,
119:20, 119:25,
121:3, 121:4,
123:20, 125:24,
126:19, 126:21,
127:18, 127:22,
128:7, 129:8,
130:19
**braking**
22:18, 22:22,
23:1, 23:2,
23:13, 23:23,

24:17, 35:22,
39:18, 43:13,
43:16, 44:4,
44:22, 44:23,
46:17, 84:8,
84:12, 84:14,
85:5, 93:6,
95:19, 120:21
**braunfels**
1:15, 2:7, 2:9,
5:12, 6:20
**break**
8:21, 8:24,
8:25, 27:2,
29:8, 52:4,
52:6, 66:11,
133:11
**breaking**
84:17, 84:21,
84:24, 120:21,
126:3
**briefly**
26:9, 121:9
**bright**
97:6
**bring**
17:17
**bringing**
92:7, 95:4
**broad**
121:14, 121:15,
122:19, 129:5
**broadest**
127:14, 127:16
**broadly**
91:8, 100:4,
100:6, 100:14,
113:7, 126:16,
130:1
**brochures**
122:10
**brought**
22:1, 80:24,
95:11, 96:1,
106:5, 106:11,
109:21, 115:6
**build**
38:17, 38:22,

84:12, 84:14,
84:17, 84:21,
84:24, 92:12
**building**
18:16, 18:18,
19:2, 19:7,
19:11, 20:5,
35:24, 82:1,
82:11, 82:16,
82:23, 98:12,
98:14, 104:23
**buildings**
82:22, 82:23,
82:24
**built**
21:6, 129:15
**bunch**
135:16
**burger**
3:4, 3:5, 4:4,
5:17, 6:25, 9:1,
9:18, 66:23,
85:22, 85:24,
87:9, 87:10,
90:12, 90:14,
109:2, 109:5,
109:10, 131:8,
131:24, 133:2,
133:5, 133:7,
133:10, 133:14,
133:20, 133:22,
136:12, 136:15,
136:23, 136:24,
137:4
**business**
7:17, 14:20,
15:7, 16:3,
16:11, 28:3,
28:4, 30:22,
34:9, 34:12,
34:18, 34:21,
43:5, 43:17,
43:19, 43:21,
46:17, 47:6,
49:10, 49:14,
50:4, 50:9,
53:21, 55:5,
62:24, 63:1,

69:15, 70:16,
72:2, 73:19,
75:6, 77:3,
78:14, 82:4,
88:17, 89:11,
89:12, 90:24,
91:10, 92:13,
97:13, 97:19,
97:22, 102:6,
102:10, 103:1,
104:16, 104:18,
105:3, 115:2,
120:13, 120:15,
123:12
**busy**
104:10
**buy**
7:17, 19:12,
19:15, 46:16,
98:4
**buyer**
45:25
**buying**
35:22, 98:14,
117:14, 117:15

**C**

**cabinets**
33:2
**cable**
15:22
**cableform**
117:16
**calculated**
131:3
**call**
20:7, 24:8,
37:1, 69:1,
109:3
**called**
12:18, 14:9,
14:17, 18:17,
20:8, 23:1,
23:5, 24:8,
33:14, 33:16,
34:19, 34:24,
53:7, 68:20,
72:6, 74:4,

76:5, 76:8,
83:23, 84:3,
112:10, 113:3,
115:25, 117:16,
123:6
**calling**
14:11
**calls**
90:10, 109:1
**came**
19:14, 29:6,
33:7, 48:3,
65:13, 77:11,
77:14, 83:7,
91:16, 115:10,
119:20, 121:11
**campus**
11:23, 11:25
**can't**
15:15, 18:10,
31:20, 31:21,
36:16, 92:12,
122:2, 128:12,
128:13
**canada**
78:21
**cannot**
8:24
**capabilities**
106:9
**capacity**
42:12
**capital**
14:25, 35:7,
35:13, 50:3,
52:25
**carbon**
21:20
**card**
15:7
**care**
62:1
**carly**
139:2, 139:17
**carolina**
81:12
**carried**
111:22

**case**
5:7, 29:14,
67:21, 138:13,
139:10
**cat**
76:25
**catalog**
20:21, 20:22,
21:1, 21:3,
22:2, 123:15
**cataloged**
36:24
**category**
32:17, 32:19,
80:6
**category-ish**
32:15
**catholic**
17:8
**cause**
64:19
**center**
18:9
**cents**
131:5
**certain**
22:17
**certainly**
8:23, 68:22,
82:5
**certificate**
71:4, 71:7,
138:1, 139:1
**certification**
6:6, 69:20
**certified**
4:15, 6:1,
69:14
**certify**
138:4, 139:2
**cetera**
62:13, 135:6
**cfo**
70:23
**chain**
4:16, 93:24
**chalked**
82:8

challenging
107:4
chance
35:3
change
75:18, 75:24,
124:5
changed
88:1, 101:15,
104:5
changes
82:20
character
50:1, 51:8
characterize
90:13, 93:16,
94:14, 100:23,
121:14
charge
17:1, 27:16,
27:17, 31:16,
42:13, 60:25,
99:19, 125:21,
125:22
charges
51:5
check
61:2
checks
130:3, 130:8
children
17:4
chm
95:5, 95:10
chopper
22:22, 116:1
circuit
22:22, 23:13,
26:13, 37:8,
37:14, 43:8,
116:2
circuitry
115:19
circuits
117:9
city
61:18
civil
1:6, 25:14

claim
63:12, 85:3
claimed
36:7
claiming
54:16
claims
51:5, 124:25,
125:16
clarify
9:16, 74:10,
96:14
clarifying
9:18, 66:23
clarity
8:20
class
24:13, 79:15
clause
57:5
clauses
63:2
clean
126:20
clear
48:21, 53:25,
63:14, 81:25,
107:14, 119:12
clients
80:3
clip
40:23
closed
19:11, 19:17,
82:13
closing
11:4, 40:15,
64:18, 81:24,
98:6, 136:19
co-conspirator
85:11
coincided
16:23
coincidentally
17:10
cole
3:12
collate
34:7

collecting
84:18
collectively
64:12
college
12:17, 99:10
columbus
77:13
combined
78:25
combining
32:5
come
23:10, 34:11,
70:25, 77:14,
94:25, 108:3,
116:17, 127:14,
127:16
comes
23:14, 116:18
coming
44:20, 49:6,
80:7, 96:14,
120:13, 120:15,
124:19, 125:9
commence
68:19
commencement
134:2
commencing
67:25
comments
130:21
commission
39:22, 131:16,
134:2, 134:3,
134:7, 134:14,
134:21, 134:25,
135:1, 135:3
commissions
84:7, 85:14,
131:12, 134:8,
135:8
commitments
49:23
common
22:13
communicate
28:22

communicated
26:25, 28:16
communicating
9:4, 93:23
communication
25:24, 94:2
communiques
27:5
community
25:10, 95:20
companies
15:9, 22:11,
22:12, 23:4,
33:19, 76:20,
78:19, 78:21,
99:13
company
7:16, 12:18,
14:9, 14:21,
14:25, 15:4,
15:6, 15:8,
16:2, 16:17,
16:23, 17:1,
18:17, 20:23,
23:19, 26:16,
28:5, 29:23,
30:1, 34:13,
36:2, 36:12,
36:22, 38:18,
39:1, 40:16,
42:14, 45:18,
46:4, 56:22,
61:11, 61:23,
70:23, 71:2,
71:11, 77:4,
78:8, 78:18,
78:21, 78:22,
79:3, 79:11,
80:23, 81:21,
82:1, 82:25,
84:15, 84:22,
84:25, 88:4,
90:24, 95:18,
102:15, 106:2,
106:12, 108:4,
114:25, 115:8,
116:5, 117:6,
117:14, 117:15,

117:22, 118:1,
122:4, 122:12,
126:12, 129:9
**company's**
39:9
**compare**
107:23, 110:20
**competent**
9:20, 10:4
**competitor**
17:13, 25:5,
62:22, 62:23,
93:8, 99:8
**complaining**
29:4
**complaint**
4:12, 25:23,
30:4, 30:10,
30:15, 30:16
**complement**
118:21
**complete**
57:6, 58:16,
103:2
**completed**
102:23, 103:8
**completely**
96:5
**components**
37:15, 43:7,
126:4
**comprehensive**
32:9
**computer**
47:16, 109:6,
109:12, 110:1,
114:15
**computers**
108:19, 114:16,
123:25
**concede**
107:1
**conceded**
94:8
**concept**
94:22, 94:24,
128:16, 128:18
**concepts**
68:2, 68:24

**concern**
120:6
**concerns**
19:10
**conclusion**
110:22, 111:3,
111:14, 111:16
**conditions**
9:23
**conducted**
55:5
**confidentiality**
30:25
**confirm**
58:1, 68:9
**congratulations**
11:17
**connection**
6:23, 7:2,
9:12, 76:11
**considerable**
36:8
**considering**
26:6
**consistent**
6:7
**consists**
30:5
**consortium**
78:19
**constantly**
36:18
**constitute**
6:5
**constraints**
86:2
**consulting**
128:2
**consummation**
55:6
**contact**
113:9, 126:5,
127:25, 132:17
**contacted**
113:20
**contain**
110:18
**contained**
68:12, 108:20

**contemplated**
55:7
**contents**
41:23, 108:17,
109:7, 109:11,
109:25
**context**
88:16, 94:9,
94:10, 109:15,
113:23, 114:2,
121:15
**continue**
11:20, 12:10
**continued**
33:24
**continues**
54:3, 57:20
**contract**
49:20, 49:21,
57:12, 57:16,
62:24
**contracted**
70:23
**contracts**
49:23, 57:2,
57:7, 58:6
**contrast**
126:18
**control**
120:23
**controls**
1:7, 5:5, 5:16,
6:22, 13:19,
23:12, 23:14,
43:9
**conversation**
8:7, 8:10,
8:16, 86:16,
87:12
**conversations**
31:10
**converting**
23:17
**conveyed**
34:4, 34:5
**cooked**
27:10
**cooperate**
64:20

**copied**
99:24, 101:4,
119:22
**copies**
4:15, 69:14
**copy**
7:6, 30:4,
31:6, 37:3,
37:5, 37:12,
40:7, 67:6,
67:8, 99:24,
100:1, 136:3
**copying**
45:4
**corp**
68:15
**corporate**
7:23, 89:9,
135:5, 135:7
**corporation**
53:2, 71:23,
135:22
**correct**
17:23, 18:1,
20:2, 20:12,
20:13, 33:3,
33:15, 35:16,
40:2, 41:20,
43:18, 53:9,
54:13, 54:18,
54:20, 55:17,
55:21, 55:22,
56:24, 57:6,
58:5, 58:9,
58:10, 60:11,
64:3, 68:20,
68:21, 68:25,
69:9, 72:2,
72:3, 72:6,
72:7, 72:13,
73:2, 73:9,
73:11, 74:4,
80:3, 80:7,
88:11, 89:19,
89:23, 91:17,
93:20, 93:21,
94:17, 95:15,
96:5, 96:18,

97:2, 97:8,
100:8, 104:17,
115:12, 117:7,
123:2, 123:19,
124:22, 135:24,
136:1, 136:10
**correctly**
119:16, 123:22
**correspondence**
113:14
**cost**
19:22, 37:24,
92:12, 115:23
**cost-cutting**
17:14
**could**
7:20, 18:5,
19:15, 31:25,
35:1, 42:16,
48:10, 54:3,
54:20, 55:11,
59:2, 62:9,
63:14, 64:8,
67:2, 74:12,
74:25, 77:5,
77:6, 77:7,
91:23, 96:21,
98:7, 110:16,
115:22, 122:13,
131:20, 132:3
**couldn't**
11:6, 14:24,
16:6, 73:21,
74:7, 104:13
**councilor**
132:25, 133:1
**counsel**
5:12, 6:15,
85:21, 138:12,
139:9
**couple**
17:11, 28:19,
79:12, 98:13,
101:16
**course**
53:21, 82:16,
83:12, 96:3,
136:4

**court**
1:1, 5:6, 5:19,
7:24, 8:7, 8:8,
8:14, 25:17,
30:6, 138:1
**cover**
69:19, 86:4
**covered**
71:14
**covert**
80:22
**covington**
20:2, 20:4,
20:8, 33:4,
44:1, 44:21,
51:20, 81:12
**coworkers**
129:21
**cpa**
70:16, 97:2,
104:20
**craft**
99:9
**created**
14:16, 34:9,
77:8, 108:19
**creation**
110:18, 111:9
**credit**
35:2, 35:7,
35:10, 103:10,
103:14, 124:18
**crowe**
17:22, 20:14,
24:22, 33:11,
38:6, 60:25,
63:9, 65:21,
86:11, 97:6,
112:13, 112:20,
121:20, 134:6
**crowe's**
24:3, 95:3,
108:9, 116:10,
120:3
**cst**
1:17
**culminated**
27:7

**customer**
15:5, 22:17,
26:21, 44:14,
62:21, 120:11,
120:16
**customer's**
37:22
**customers**
13:15, 36:25,
62:12, 120:14
**customized**
48:20
**cut**
16:25, 85:12

**D**

**d-i-l-k-i-n**
130:10
**dabbled**
117:15
**daily**
75:24, 77:18
**darrell**
70:11, 70:14,
70:15, 70:17,
70:20, 70:23,
71:12, 72:21,
89:25, 135:12,
135:15
**data**
124:4, 135:17
**date**
5:7, 40:21,
72:14, 72:17,
115:7
**dated**
25:21, 40:8,
74:23
**dates**
110:18, 111:9
**dating**
110:19
**dave**
127:2, 127:3,
127:4
**day**
77:19, 80:12,
102:8, 112:13,

129:1
**day-to-day**
61:14, 76:17,
78:3, 79:8,
80:14, 80:19
**days**
10:15, 10:21,
86:18
**dc**
3:14
**dead**
97:7, 97:10,
97:11
**deal**
18:16, 19:4,
26:19, 29:21,
40:9, 47:25,
52:16, 77:12,
83:5, 83:8,
83:13, 83:15,
95:7, 97:12,
127:7
**deal's**
19:17, 83:4
**dealing**
61:22, 79:24,
113:15, 116:13,
136:4
**dealt**
38:6, 61:1,
61:20, 80:20,
101:14, 101:15,
104:11, 113:18,
120:25
**death**
94:24
**decent**
45:4
**decide**
66:1
**decided**
13:5, 19:14,
19:23, 27:19,
92:15, 97:12,
127:20
**deciding**
46:16
**decision**
28:16, 33:23,

45:17, 45:18,
75:5, 108:9
**decline**
44:12
**deemed**
76:21, 81:23
**deep**
46:5
**defect**
51:6
**defendant**
1:8, 3:10, 6:15
**defer**
120:3
**defined**
96:17
**defining**
63:5, 64:13
**definitely**
35:3, 123:4
**definition**
43:20, 48:10,
48:13, 48:20,
49:2, 49:3,
49:10, 49:13,
49:14, 49:17,
49:20, 50:7,
50:19, 50:25,
51:3, 57:14,
57:15, 71:9
**definitions**
42:1, 48:9,
51:11
**degree**
12:2, 12:6,
12:9, 36:1,
77:3, 128:25
**delineated**
135:6
**delivery**
136:21, 136:24
**delve**
35:9, 59:20
**demoing**
19:21
**deny**
99:6
**department**
13:16, 106:10,

116:4
**depending**
131:22
**depicted**
111:11
**depos**
5:10, 5:20,
139:18
**deposed**
7:9
**deposition**
1:14, 2:1, 4:9,
5:3, 5:10, 5:24,
86:7, 86:12,
86:15, 86:23,
87:6, 87:11,
87:18
**depositions**
8:2
**describe**
32:19, 79:14,
79:22, 87:4,
87:11, 87:14,
105:12, 130:1
**described**
86:3, 91:18,
114:13, 134:7
**describing**
105:14
**descriptions**
108:21
**design**
29:8, 35:16,
35:19, 35:20,
39:11, 84:11,
107:20, 117:10,
126:2, 128:21
**designations**
112:3
**designed**
39:10, 129:13
**designing**
43:5
**designs**
85:4, 128:8
**desktop**
65:16
**detail**
27:9, 47:19,

87:19, 117:1
**details**
59:20
**determination**
69:25
**determined**
12:25, 92:8
**develop**
13:14, 85:6,
95:18, 126:2
**developed**
111:22, 116:21
**developer**
62:22
**development**
38:11, 38:15,
57:17
**device**
32:14
**devoted**
100:7
**died**
94:24, 96:5
**different**
13:16, 15:6,
15:10, 20:20,
21:15, 26:12,
26:23, 48:20,
101:18, 120:4,
122:21
**difficult**
88:2
**digested**
120:9
**digital**
21:1, 108:18,
138:8, 139:3
**diligence**
92:11
**diluting**
56:11
**dilution**
56:16
**dinner**
27:10, 31:14
**direct**
38:3
**directly**
62:18, 126:13,

126:25
**director**
62:15, 62:20
**disagree**
117:25
**disappointment**
28:13, 36:3
**disclosures**
66:24
**discuss**
27:9
**discussed**
31:18
**discussion**
47:4, 96:4,
98:1, 121:10,
121:13, 121:15,
122:19, 134:1
**discussions**
46:13, 47:3,
108:1
**disgruntled**
108:10
**dismissed**
7:24
**disposed**
53:20
**dispute**
125:3, 125:18,
134:9
**dissipate**
23:18
**dissolution**
70:2
**distinctions**
118:23
**distraction**
82:3
**distributors**
37:4
**district**
1:1, 1:2, 5:6
**division**
26:7, 34:23,
53:7, 69:14,
89:11, 89:12
**divisions**
78:25

document
10:13, 40:9,
40:14, 40:24,
47:14, 47:18,
62:10, 67:3,
70:8, 71:3,
122:23
documentation
10:15
documented
134:14
documents
11:2, 11:6,
30:6, 40:24,
41:13, 86:9,
98:6, 101:21,
101:24, 102:4,
122:3
doing
19:23, 33:24,
34:4, 37:17,
38:20, 46:21,
47:1, 73:19,
79:1, 79:2,
82:5, 91:7,
91:10, 94:14,
95:3, 103:1,
116:19, 118:4,
129:9
dollars
131:4
domestic
53:3
done
13:5, 30:23,
46:3, 66:9,
68:22, 74:8,
81:25, 82:8,
94:21, 131:5
door
113:19
double
79:1
doubt
114:19
down
15:16, 20:5,
41:8, 55:13,

55:15, 58:20,
67:22, 70:10,
83:11, 93:7,
93:14, 109:23,
109:24, 113:25,
121:1, 121:2,
121:11, 128:20,
129:16
downs
126:13
downside
19:6
draft
30:21
drafted
93:15, 93:17,
122:23
drafting
94:12
draw
110:23, 111:15
drawings
109:25, 111:20
dreamed
78:14
drive
2:8, 5:11,
22:21, 22:23,
35:21, 37:22,
37:23, 95:19,
115:19, 115:20,
115:22, 115:23,
116:4, 120:18
drives
13:18, 22:20,
22:23
drop
25:7
due
21:7, 78:11,
78:12, 120:20
duly
6:12
dumbly
31:16
dump
65:25
during
8:24, 9:8,

38:15, 46:13,
47:3, 56:14,
74:16, 81:24,
83:21, 87:22,
87:25, 90:3,
107:18, 127:1,
128:1
duties
35:18, 82:2,
84:15, 84:18,
84:22, 84:25
dynamic
22:18, 23:13,
43:12, 120:21

**E**

each
20:22, 27:16,
31:16, 58:16,
64:19, 67:17,
88:8
earlier
56:15, 79:14,
86:3, 88:7,
93:1, 94:8,
95:8, 103:13,
105:3, 114:3,
114:13, 115:4,
116:9, 121:7,
121:10, 123:23,
130:21, 135:21
early
16:1
easements
51:6
easier
26:20, 131:7
easiest
128:4
easy
80:17
eccentricities
105:11
eclipsed
44:11
edge-wound
118:19
education
11:10, 11:20,

12:11
effect
57:7
effort
16:4
ego
75:9, 107:13
either
79:23, 88:14,
88:19, 94:2,
115:22, 132:5
elected
13:2
electric
13:20, 13:21
electrical
12:7, 14:17,
14:20, 14:23,
15:11, 15:13,
16:9, 21:14,
21:18, 23:17,
25:11, 43:6,
43:8, 77:2, 99:4
electronic
5:25, 13:19,
21:21, 32:6,
32:23, 33:9,
33:11, 43:16,
44:4, 44:22,
77:12, 77:16,
92:20, 93:7,
126:4, 128:24,
129:3, 129:13
electronics
30:22, 32:10,
32:13, 32:17,
32:20, 33:5,
33:11, 33:12,
33:14, 34:19,
34:24, 53:8,
68:1, 68:17,
68:20, 72:6,
74:4, 74:11,
75:22, 76:8,
79:14, 79:19,
80:5, 80:6,
83:23, 84:4,
92:17, 96:4,

96:6, 105:15,
106:20, 107:9,
121:17, 121:22,
121:25, 122:7,
122:11, 122:22,
122:25, 123:6
**elementary**
17:7
**else**
28:4, 31:3,
38:19, 63:11,
65:21, 72:5,
74:8, 108:15,
109:24, 115:14,
115:15, 122:12,
124:1, 126:3,
128:11, 131:15
**email**
4:11, 4:16,
25:21, 26:1,
30:20, 74:22,
75:1, 75:7,
77:8, 79:6,
92:24, 92:25,
93:15, 93:17,
93:24, 94:12,
96:16, 103:12,
106:18, 106:23,
107:11, 107:17,
122:24
**embarrassed**
33:22
**emphasis**
96:1
**employ**
14:25
**employed**
88:20, 88:21,
138:12, 139:9
**employee**
16:2, 29:17,
29:19, 29:25,
38:14, 48:1,
50:20, 50:21,
50:23, 55:24,
58:12, 58:16,
59:6, 62:15,
62:20, 64:5,

67:23, 68:14,
68:15, 73:14,
73:15, 73:24,
88:9, 88:25,
91:2, 93:19,
94:7, 94:16,
96:25, 129:5,
129:20, 135:8
**employees**
39:11, 47:11,
47:17, 48:5,
61:6, 81:3,
81:18, 87:22,
87:24, 88:13,
88:16, 90:2,
91:3, 91:6,
124:8, 130:4,
130:8, 131:11,
135:9
**employment**
12:24, 83:21,
84:9, 108:11
**encroachment**
51:7
**encumbrance**
54:14
**encumbrances**
51:4, 51:5,
53:17, 54:1,
60:4
**end**
85:4, 130:18
**ended**
98:14
**energy**
23:17, 23:18,
43:10, 43:15
**engaged**
43:5
**engineer**
35:16, 35:19,
77:2, 84:12,
107:21, 126:2,
128:24
**engineered**
14:12
**engineering**
12:8, 13:10,

13:13, 13:16,
14:10, 21:10,
32:6, 38:7,
99:19, 99:21,
106:3, 110:4
**engineering-orie-
nted**
21:8
**engineers**
14:11, 17:11,
17:15, 35:9,
39:11, 99:4,
99:16, 129:13
**english**
78:20
**enough**
17:4, 28:3,
29:13, 35:12
**enter**
12:13
**entering**
20:6
**entire**
107:19, 126:21,
127:23
**entitled**
71:3
**entity**
33:13, 33:16,
34:18, 34:23,
35:1, 53:3,
63:21, 72:6,
74:4, 76:4,
76:7, 79:2,
83:23, 84:3,
88:17, 89:9,
89:10, 105:25,
122:1
**entrant**
69:5
**entry**
69:25
**envisioned**
81:16, 123:16
**equipment**
14:23, 65:17,
84:22
**equity**
52:25, 84:7

**equivalent**
107:21
**erlanger**
99:9
**eschleman**
38:8, 75:10,
78:7, 80:13,
105:10, 105:19,
106:5, 106:8,
106:24, 107:14,
131:21
**eschleman's**
107:13
**espionage**
7:23
**esquire**
3:4, 3:11
**establish**
9:20
**established**
32:5
**estate**
83:9, 83:10,
83:14, 101:25
**et**
62:13, 135:6
**even**
15:5, 18:10,
19:11, 31:18,
37:7, 37:11,
45:6, 60:2,
61:11, 65:4,
81:6, 81:7,
81:25, 104:19,
123:11, 129:1
**event**
134:9, 134:11
**events**
9:13, 26:6,
97:3, 103:11,
108:5
**eventually**
28:21, 75:23,
77:18
**ever**
7:9, 31:3,
34:11, 39:14,
39:17, 39:21,

47:4, 70:8,
78:14, 81:10,
83:22, 84:6,
85:3, 88:15,
96:6, 108:17,
108:22, 109:3,
109:6, 109:11,
110:2, 121:15,
121:19, 121:24,
122:11, 126:17,
128:4
**every**
15:4, 20:25,
25:1, 48:1,
101:16, 102:9,
102:25, 104:8,
118:21, 124:25,
125:2, 125:11
**everybody**
128:11
**everyone**
25:14, 30:1,
79:7, 106:1,
107:14
**everything**
13:3, 18:6,
44:2, 47:1,
78:6, 124:1,
129:2, 129:14,
129:15
**evidentiary**
6:4, 9:10
**exactly**
46:25, 95:1
**examination**
4:2, 6:15,
8:12, 83:20,
85:21
**examined**
6:14
**example**
15:3, 111:10
**except**
21:5, 44:2,
53:18, 53:19,
54:1, 55:1,
56:9, 62:13
**exception**
102:12

**excuse**
50:13
**executive**
15:21, 16:15
**exercised**
35:8
**exhibit**
4:9, 4:10,
4:11, 4:12,
4:13, 4:14,
4:15, 4:16, 7:6,
7:7, 10:12,
25:16, 25:18,
25:21, 30:4,
30:8, 30:12,
30:14, 30:16,
30:17, 40:1,
40:4, 40:7,
66:10, 66:22,
66:25, 69:9,
69:11, 69:13,
74:19, 74:20,
74:22
**exhibited**
105:3
**exhibits**
25:23, 30:11,
41:1, 41:4
**exist**
105:25
**existed**
22:16
**expansion**
97:12
**expecting**
87:20
**expense**
59:13
**expenses**
59:25
**experience**
32:7, 33:18
**expertise**
107:21
**explain**
26:9, 79:7
**explained**
76:18

**exponentially**
128:18
**exposure**
13:19, 14:12
**express**
39:14
**expressed**
27:1, 117:5
**extend**
19:15, 35:2
**extensive**
19:1
**extensively**
16:17
**extent**
109:17, 129:25
**external**
23:1
**extremely**
77:5

**F**

**fabrication**
21:13, 21:19
**facade**
75:7, 106:23,
107:2, 107:5
**face**
94:13
**facility**
13:21, 21:17,
87:24, 98:3,
98:17, 98:20,
98:25, 99:20,
100:7, 100:15,
100:21, 101:6,
103:1, 103:10,
103:25, 129:7
**fact**
19:10, 20:20,
23:22, 25:3,
47:11, 60:2,
81:15
**factors**
46:16
**fair**
32:25, 34:17
**fairly**
107:6

**fame**
11:16
**familiar**
26:2, 116:5
**familiarity**
13:3
**family**
62:18, 95:12
**fantasy**
34:10
**far**
38:19, 46:5,
73:23, 82:19,
90:8, 105:6,
108:19, 122:18
**fargo**
102:22
**farmers**
102:21
**fast**
96:22
**federal**
9:19
**federally-insured**
103:1, 103:10
**fee**
128:2
**feel**
28:7, 28:23
**fell**
38:2
**felt**
27:23, 29:12,
45:2, 46:2,
47:25
**few**
10:3, 18:15,
29:3, 40:13,
52:2, 66:10,
75:3, 83:17,
102:9, 105:9
**figure**
114:2, 131:2
**figured**
47:13
**figures**
114:17
**file**
69:21, 101:25,

110:17, 111:9
**filed**
6:23, 30:5,
71:14, 71:18,
74:2, 84:2,
89:10, 89:21
**files**
102:7, 108:19,
124:6
**filing**
69:24, 72:2,
73:18
**filings**
4:15, 69:14,
90:5
**fill**
103:15, 103:16
**filter**
100:18
**filtering**
100:18
**filters**
21:6, 43:15
**final**
51:11, 83:17
**finally**
22:16, 29:16,
36:22, 47:13,
70:1
**finance**
68:19, 101:7
**finances**
84:25
**financial**
34:22, 35:5,
53:25, 54:2,
83:13, 102:24,
103:9, 103:16,
114:5, 121:24,
136:1, 136:6,
138:14, 139:11
**financially**
35:12
**financing**
67:25, 97:25,
101:5, 101:11,
101:23, 103:24,
104:21

**find**
11:6, 45:25,
48:25, 125:4
**fine**
15:17, 52:10,
77:21, 136:21,
136:25
**finish**
8:13
**finished**
48:11, 83:18
**fire**
126:20, 127:22
**firm**
14:17
**first**
6:12, 12:16,
13:18, 14:12,
18:4, 18:7,
22:3, 22:8,
29:11, 41:7,
42:23, 51:14,
63:4, 65:24,
69:18, 70:7,
77:17, 82:6,
99:18, 108:8,
129:10, 133:3
**firsthand**
56:2
**five**
105:13
**five-minute**
133:11
**fix**
66:2
**flattering**
7:20
**flew**
134:5
**flip**
23:10, 23:11,
30:11, 30:21,
31:25, 41:20,
42:8, 42:16,
51:12, 52:19,
54:4, 54:22,
55:11, 56:19,
57:11, 58:11,

62:9, 63:15,
64:8, 67:2
**florence**
18:2, 18:5
**flying**
93:11
**focus**
41:5, 59:5,
61:22, 76:23,
78:4
**focused**
12:7, 21:23
**focusing**
80:2, 80:6
**fold**
95:11
**follow**
112:6, 119:16
**following**
57:7, 64:18
**follows**
6:14
**footage**
18:10
**foregoing**
138:3, 138:5,
139:4
**foreign**
53:4, 116:20
**forgive**
131:10
**fork**
27:18
**formal**
11:20, 12:10,
58:21
**formation**
36:4
**formed**
17:19, 33:14,
83:24, 85:14
**former**
107:11
**forms**
100:10, 100:11
**forth**
21:11, 27:5,
35:11, 37:16,

53:18, 54:23,
55:1, 56:9,
57:4, 58:15,
62:14, 63:2,
92:12, 101:18
**fortunate**
78:11
**forward**
28:16, 96:22,
107:16
**foundation**
108:25, 109:9
**founded**
17:2
**four**
13:25, 117:9,
128:17
**fourth**
30:24
**frame**
45:13, 87:23,
87:25, 88:4,
88:15, 91:20,
108:5, 115:15,
121:14, 126:15,
129:6
**framework**
127:5
**frankfurt**
11:14, 11:15
**free**
53:25, 83:10
**french**
78:23, 78:24
**frequency**
22:20
**friend**
24:2, 81:7
**friends**
25:4, 81:6
**front**
44:18, 77:7
**fruition**
34:11
**full**
118:21
**fully**
82:4, 138:5

**function**
94:8, 99:19
**funding**
34:23
**further**
85:19, 103:18,
109:22, 136:15
**furtherance**
101:21, 103:9,
107:2, 107:5
**furthering**
68:1, 68:23
**future**
60:10

**G**

**gain**
17:16
**game**
83:3
**gas**
43:10, 120:25
**gathered**
81:18
**gathering**
10:24
**gave**
36:18, 86:23
**general**
14:9, 61:12,
61:17, 67:19,
120:23
**generally**
100:6, 100:14
**generated**
120:8, 120:9
**generating**
16:5, 96:16
**generic**
100:8
**generically**
79:22, 116:24
**generous**
119:17, 120:1
**gentleman**
61:16
**germany**
78:22

**getting**
31:11, 36:9,
37:14, 76:24,
106:12, 128:20
**give**
25:3, 29:22,
81:15, 83:10,
87:21, 98:7,
106:25, 125:8
**given**
13:1, 15:2,
36:25, 47:15,
59:24, 99:24,
99:25, 124:8
**glass**
8:22
**glover**
17:13, 38:10,
45:21, 77:1,
99:14, 105:21,
105:22, 106:18,
106:25, 122:25
**go**
8:3, 11:12,
14:7, 17:12,
17:14, 23:12,
23:23, 28:16,
29:10, 29:13,
29:15, 37:13,
46:6, 48:7,
54:20, 55:13,
55:15, 56:3,
56:6, 57:20,
57:23, 59:2,
66:10, 69:2,
82:3, 82:11,
95:24, 99:6,
106:13, 106:14,
114:19, 123:5
**goes**
19:24, 131:4
**going**
7:5, 8:1, 17:6,
17:13, 18:20,
25:16, 27:8,
28:1, 28:24,
29:14, 30:3,
31:15, 31:21,

33:21, 33:25,
35:4, 36:19,
39:25, 40:12,
41:5, 42:1,
43:20, 44:14,
45:5, 48:5,
48:19, 48:22,
52:7, 52:12,
54:22, 57:13,
65:23, 68:9,
74:19, 75:5,
77:13, 80:15,
81:16, 81:21,
86:1, 86:17,
86:19, 87:15,
92:9, 92:14,
92:18, 92:19,
93:6, 95:23,
99:11, 103:18,
107:16, 118:12,
121:10, 123:11,
123:16, 124:17,
126:18, 126:19,
126:20, 133:23
**gone**
16:18, 31:13
**good**
5:22, 6:21,
19:4, 25:12,
27:12, 31:25,
45:6, 52:4,
53:21, 69:6,
77:21, 85:23,
85:25, 131:22
**gosh**
15:15, 36:20
**gotten**
24:10, 61:3,
117:2
**grab**
54:3
**graduated**
11:19
**grand**
123:17, 128:4
**gravel**
19:18
**great**
28:5, 32:6,

127:18
**greater**
78:9, 79:10
**grew**
17:6, 78:13,
88:2
**grief**
36:18, 37:25
**grilled**
27:11
**gross**
44:7, 119:3,
119:4, 123:20
**grounding**
21:9, 43:13,
43:14, 44:3,
99:2, 100:17,
120:22
**group**
13:24, 13:25,
27:13, 32:8,
77:7, 79:4,
79:23, 107:20,
125:21
**grown**
119:9
**growth**
76:22
**guarantees**
28:1
**guess**
22:16, 44:17,
48:25, 68:11,
73:12, 80:21,
109:20
**guessed**
60:6
**guy**
15:7, 29:7,
65:5, 96:2,
110:13, 110:14,
124:18, 127:22,
129:24
**guy's**
23:24
**guys**
17:17, 27:1,
28:2, 34:3,

35:9, 52:9,
63:18, 63:22,
92:7, 97:10,
116:6, 123:17,
127:19

**H**

**half**
44:25, 51:19,
120:1, 126:22
**hall**
11:15
**hammered**
83:6
**hand**
6:9, 25:17,
30:3, 74:19
**handed**
25:20, 40:6,
67:6, 67:7,
69:13
**handful**
76:20
**handle**
90:11
**handled**
18:6, 101:10,
101:11
**handles**
32:24
**hands**
101:16
**happen**
18:24, 28:1,
80:9
**happened**
20:21, 73:16,
80:10, 80:25,
81:2, 94:22
**happening**
47:13, 132:15
**hard**
125:8
**hardware**
124:5
**harmonic**
43:15
**hate**
80:21

**hci**
41:8, 41:17,
42:8, 42:17,
48:7, 49:18,
51:12, 52:19,
54:10, 55:13,
56:7, 56:19,
57:24, 58:12,
62:10, 64:8
**head**
93:12, 127:22
**hear**
81:10
**heard**
7:25, 22:3,
112:13
**hearing**
116:6
**heat**
23:17
**heavier**
100:25
**heavily**
35:6
**held**
2:1, 19:20,
55:4
**help**
23:2, 35:5,
68:18, 96:13
**helped**
134:16
**here**
5:2, 7:1,
20:21, 21:6,
28:20, 29:5,
46:9, 61:19,
64:3, 67:11,
82:9, 93:14,
95:25, 127:10,
127:19, 127:21,
133:11, 133:24,
134:20
**hereby**
138:4, 139:2
**hereto**
64:10
**high**
11:12, 11:14,

11:16, 11:19,
17:8, 28:13,
43:14, 44:2,
99:2, 100:17,
125:1, 125:17
**high-power**
116:13, 116:25
**high-resistance**
21:9
**higher**
32:24, 128:18
**highest**
36:5
**highly**
29:11, 32:7
**hilton**
2:7
**himself**
66:2, 120:6
**hinton**
1:14, 2:1, 4:2,
5:4, 6:11, 6:19,
6:21, 7:9, 10:7,
11:7, 21:22,
25:16, 25:20,
42:11, 47:24,
67:23, 95:9,
133:14, 133:25
**hire**
29:2, 29:7,
97:13, 99:10,
108:10
**hired**
17:11, 29:16,
29:18, 35:9,
35:16, 36:4,
38:10, 38:24,
45:20, 61:16,
73:13, 73:15,
77:1, 78:10,
84:11, 94:25,
95:18, 96:24,
97:7, 98:16,
98:21, 99:1,
99:16, 109:15,
115:13, 124:18
**hiring**
35:8, 97:16

**history**
12:24
**hold**
54:21, 83:4
**holes**
33:21
**home**
73:11, 88:25
**homes**
19:9
**homewood**
2:7
**honest**
15:16, 25:12,
31:12, 59:21,
76:25, 81:15,
96:10, 118:10,
129:16
**hope**
124:21
**hoped**
34:12
**hopes**
28:13
**hoping**
18:21
**host**
23:21
**hotel**
66:5
**hourly**
124:11
**house**
19:13, 19:15,
19:21, 20:2,
27:10, 51:15,
51:17, 51:23,
52:3, 52:13,
64:13, 64:16,
64:18, 64:23,
64:24, 65:5,
65:11, 65:13,
86:17, 126:20
**houston**
13:2, 13:7
**however**
20:7
**hubbell**
1:7, 5:4, 5:16,

6:22, 46:11,
46:14, 46:20,
47:4, 47:22,
48:2, 60:5,
81:1, 81:3,
81:10, 82:4,
82:13, 83:1,
85:12, 102:7,
102:11, 110:21,
111:14, 112:7,
113:7, 113:8,
113:17, 113:21,
114:12, 114:17,
117:5, 117:22,
118:1, 118:13,
123:22, 126:6,
126:7, 126:8,
126:9, 126:14,
126:17, 126:25,
127:3, 127:5,
127:13, 127:14,
127:17, 128:1,
132:7, 132:17,
135:22, 136:5,
136:9
**hubbell's**
117:13, 119:3,
124:3, 125:16,
135:14
**huge**
28:6
**hurst**
139:2, 139:17
**hutton**
85:23

**I**

**idea**
24:25, 25:4,
26:14, 28:25,
47:12, 81:16,
94:14, 97:16,
117:11, 117:12,
117:25, 119:10,
128:21
**ideas**
85:4
**identifies**
69:21

**identify**
5:13, 67:19,
73:4
**idiot**
83:11
**immediate**
62:18
**immediately**
19:16, 33:21,
77:22, 107:15
**impairment**
55:8
**impetus**
124:17
**implementing**
43:7
**important**
46:15, 80:2
**impression**
125:25
**inc**
1:7, 5:5,
69:24, 70:1,
70:4, 71:23,
72:1, 72:11,
72:18, 89:9,
89:23, 91:9,
96:25, 98:16,
106:19, 107:8,
115:8, 122:15,
128:6, 135:9
**incentive**
61:25
**inception**
17:3
**incidental**
103:4
**include**
43:16
**included**
65:2, 83:13,
127:19
**includes**
50:7, 135:25
**including**
43:12, 43:24,
47:12, 53:23,
68:8, 93:23,

123:9
**income**
16:6, 125:9,
136:6
**inconsequential**
46:18, 96:10,
121:8
**incorporated**
72:12, 72:22,
74:15
**incorporation**
72:5, 72:9,
72:15
**incorrect**
68:12
**indentures**
49:23
**independent**
78:15, 79:3,
131:25
**indiana**
11:15, 11:24,
12:1, 12:19,
13:2
**indicate**
126:17
**indicates**
65:15, 111:20
**indirectly**
62:19
**individual**
42:13, 75:9,
114:15, 127:2,
127:4, 132:12,
135:11
**individuals**
60:17, 74:23,
76:12, 79:24
**industrial**
1:7, 5:5, 5:16,
6:22, 43:9,
115:16
**industries**
16:16, 25:9,
120:11
**industry**
15:11, 25:11,
27:3, 32:12,

44:15, 78:13,
99:14, 112:2,
115:24, 115:25,
116:11, 121:1
**inferring**
112:1
**informal**
58:21
**information**
10:24, 11:4,
11:9, 24:19,
64:11, 67:17,
68:9, 68:12,
108:14, 120:10,
125:3, 125:18
**infrastructure**
43:10
**infringement**
56:16
**infringing**
56:11, 56:22
**inhibit**
9:24
**initial**
18:12, 69:23
**initials**
110:19, 111:10,
111:19
**innovations**
68:3, 68:24
**input**
61:3
**inside**
22:22, 115:19
**insight**
127:6
**insisted**
131:6
**installing**
77:10
**instead**
26:22, 107:8
**institution**
33:20, 34:22,
97:25, 101:7,
101:22, 101:23,
123:5
**instructions**
11:1

**instruments**
49:23
**intangible**
53:23, 54:15
**intellect**
15:1
**intellectual**
54:25, 55:3,
55:9, 55:19,
56:13, 57:17,
57:19, 58:7,
108:7, 108:13
**intelligence**
23:16
**intended**
6:2, 107:12
**intent**
71:10
**interact**
129:25, 130:4
**interest**
27:1, 29:23,
39:15, 50:6,
51:6, 53:1,
54:17, 62:12,
62:19, 63:21,
115:3, 117:5,
138:14, 139:10
**interested**
7:18, 7:22,
46:21, 94:19,
127:17
**interesting**
120:10
**interests**
104:11, 115:2
**internal**
89:6
**internet**
122:5
**interrupted**
90:22, 106:14
**interrupting**
113:24
**introduce**
81:22
**inventory**
18:22, 45:7

**investigated**
92:10
**investigating**
94:19
**investments**
52:22
**invited**
107:25, 108:3,
108:8
**involved**
16:9, 19:23,
32:12, 35:1,
37:17, 61:14,
65:17, 70:18,
81:14, 82:24,
83:2, 86:20,
94:15, 104:18,
113:15, 117:2,
125:8, 129:2
**involvement**
118:24
**involving**
61:15, 97:9
**ip**
54:15
**irs**
70:19
**issue**
37:25
**issues**
10:5, 52:17,
67:21, 71:16,
113:17
**it'd**
28:5
**it'll**
49:7
**item**
71:21, 72:8,
72:14, 72:23,
73:3
**items**
61:20
**itself**
23:15, 25:11,
40:25, 41:6
**iupui**
11:23

**J**

**j-o-c-h-e-n**
130:11, 130:12,
130:13
**january**
40:8, 40:17,
47:7, 132:15,
132:17
**job**
1:23, 12:16,
13:6, 13:7,
13:14, 15:3,
35:18, 37:5,
37:6, 38:24,
84:15, 84:18,
84:22, 84:25,
85:10, 131:7
**jochen**
17:22, 38:7,
61:1, 63:9,
112:20, 130:6,
130:9, 131:6,
132:4
**joe**
38:8, 75:10,
76:15, 76:22,
77:7, 77:9,
77:20, 77:23,
77:24, 78:7,
78:8, 78:10,
78:11, 79:8,
80:16, 105:10,
105:19, 106:5,
106:8, 106:24,
107:13, 107:14,
131:21
**joe's**
75:17, 76:15,
107:11
**johnny's**
18:17
**join**
16:19, 108:12
**joined**
16:12
**joining**
16:23, 20:23

**joint**
29:22, 47:5,
53:3, 53:6,
85:13, 97:14,
97:15
**jones**
5:9
**july**
138:23, 139:19
**jump**
46:10, 121:9
**june**
1:16, 5:8
**jurisdictions**
88:22

**K**

**katy**
20:11, 33:1,
43:25, 44:2,
46:21, 61:8,
61:13, 61:17,
61:18, 65:7,
72:25, 81:18,
82:13, 82:14,
82:24, 87:23,
88:5, 100:6,
104:3
**keep**
8:15, 41:12,
48:19, 50:11,
52:7, 52:11,
81:4, 83:10,
113:24
**keeping**
83:13
**keith**
23:24
**keller**
70:11, 70:14,
90:1, 104:20,
135:12
**keller's**
135:14
**ken**
3:4, 5:17,
85:24
**kentucky**
16:24, 17:25,

18:2, 18:7,
20:2, 20:15,
21:5, 21:7,
33:4, 44:6,
44:21, 51:15,
51:17, 51:20,
51:23, 52:3,
61:4, 61:6,
64:12, 64:13,
64:16, 64:18,
64:23, 64:24,
65:5, 65:8,
65:11, 77:15,
80:7, 82:23,
88:6, 88:14,
88:19, 89:18,
91:1, 91:11,
98:3, 98:17,
98:25, 99:9,
99:20, 100:14,
100:20, 101:6,
103:25, 104:23,
109:17, 109:23,
110:6, 115:7,
119:18, 124:14,
124:17, 124:21,
124:22, 129:7,
130:4, 131:11,
134:5
**kept**
29:4, 136:13
**key**
47:17, 48:1,
48:4, 127:3
**kicked**
99:15
**kids**
17:6
**kind**
16:5, 28:23,
32:15, 32:17,
38:2, 50:1,
51:8, 70:19,
73:18, 76:24,
134:24
**kinds**
20:19, 65:16
**king**
127:2

**knew**
23:22, 33:19,
35:4
**know**
7:22, 8:19,
17:2, 18:5,
21:15, 24:13,
24:16, 25:13,
27:12, 27:24,
29:5, 29:13,
31:6, 31:9,
32:4, 34:2,
36:17, 36:20,
37:1, 37:2,
38:4, 38:6,
45:10, 47:20,
48:4, 48:11,
48:22, 49:5,
53:12, 56:4,
65:23, 66:15,
68:10, 69:1,
70:12, 70:20,
71:7, 71:9,
72:21, 73:18,
73:23, 76:20,
81:2, 82:9,
82:10, 82:13,
82:16, 82:20,
89:24, 90:8,
90:11, 90:16,
90:17, 90:18,
98:9, 98:10,
99:11, 102:3,
104:9, 105:6,
109:14, 109:19,
109:20, 110:8,
111:18, 111:19,
113:18, 122:18,
123:1, 123:8,
124:4, 124:7,
124:16, 125:10,
127:8, 130:22,
131:9, 132:13,
132:19, 132:21,
132:22, 134:20,
135:16, 137:1
**knowing**
92:13

**knowledge**
15:1, 21:12,
39:16, 47:8,
56:3, 56:10,
62:17, 65:22,
67:20, 67:24,
73:17, 74:2,
83:22, 84:1,
89:14, 91:14,
107:21, 110:5,
114:6, 116:11,
117:4, 117:17,
117:21, 117:24,
119:1, 119:2,
121:20, 121:23,
122:7, 127:3,
132:10, 132:16,
135:3, 138:11,
139:8
**known**
80:16
**kokomo**
11:24
**kumbaya**
81:17

---

**L**

**lack**
108:25, 109:8
**lady**
130:14
**lafayette**
12:1
**landed**
13:7
**language**
58:23
**laptop**
65:14
**large**
80:2, 116:13
**largest**
78:15
**last**
11:3, 23:25,
40:14, 51:3,
64:6, 75:16,
82:25, 86:15,

86:23, 86:25,
87:12, 87:18,
102:23, 103:2,
103:8, 103:14,
104:5, 123:18,
131:12, 132:7
**late**
83:3
**later**
9:15, 19:25,
25:23, 44:13,
52:17, 96:22,
96:23
**latonia**
20:3, 20:4,
20:6, 20:8,
65:13
**laughable**
118:10
**law**
6:8
**laws**
6:4
**lawsuit**
6:23, 7:3
**lawyer**
9:11
**leader**
31:19
**leadership**
31:20, 31:23
**leading**
126:6
**learn**
99:12
**leased**
98:12, 98:13
**leases**
49:24
**least**
27:6, 30:21,
65:14
**leave**
11:2, 18:23,
48:5, 127:15
**led**
22:15, 96:14
**left**
11:3, 13:5,

14:6, 102:7,
102:9, 108:12,
135:22
**legal**
33:13, 33:16,
34:18, 34:23,
63:21, 72:6,
74:3, 76:4,
76:7, 83:23,
84:3, 122:3
**legally**
58:22
**legitimate**
78:6, 106:10,
106:21
**lenders**
34:22
**lending**
31:4, 33:20,
97:25, 101:7,
123:5
**less**
115:23
**lessor**
62:21
**lessors**
63:19
**let's**
15:14, 19:24,
41:4, 44:24,
59:9, 60:15,
68:17, 107:1
**letter**
4:14, 66:22,
69:19
**letterhead**
121:19, 121:22
**level**
102:18, 127:4
**levels**
32:24
**leyhbert**
1:25, 2:13,
5:20, 138:2,
138:21
**lg**
38:12, 39:15,
85:5, 85:15

**lgs**
45:8, 45:12
**liaison**
13:15
**license**
55:18
**licensee**
62:21
**licenses**
49:24, 58:7
**licensing**
57:16
**licensor**
62:22, 63:25
**liens**
51:5
**life**
16:3, 131:7
**light**
23:12, 26:16
**lights**
23:8, 23:10,
23:11
**limited**
19:5, 33:18,
43:12, 100:15
**line**
22:18, 26:14,
32:9, 35:2,
35:7, 35:10,
96:7, 125:7
**lines**
79:23
**list**
57:7, 58:15,
58:16, 60:11,
61:5, 67:14,
102:20
**listed**
53:8, 55:20,
56:24, 58:8,
60:3, 60:11,
61:5, 63:18,
63:22, 64:2,
73:20
**listened**
105:9
**listing**
122:5, 122:6

**listings**
108:21, 110:21
**lists**
60:4, 60:17,
72:8, 72:25
**literally**
134:4, 135:21
**litigation**
41:12
**little**
18:9, 19:13,
31:14, 46:9,
81:17, 81:19,
83:15, 99:22,
110:9, 110:14,
125:14
**live**
6:19, 73:16,
73:22, 90:4
**lived**
61:19, 77:12,
88:19, 88:20,
89:15
**living**
25:12
**llc**
51:19, 63:20,
139:18
**llp**
3:12
**load**
23:3, 43:17
**local**
73:20
**locals**
20:7
**locate**
101:20, 114:4
**located**
12:19, 19:7,
51:19, 61:8,
64:16, 99:14,
101:24, 103:21,
114:8
**location**
17:25, 61:17,
81:18
**locations**
82:20

**long**
14:1, 15:12,
16:25, 28:4,
136:13
**longer**
76:16, 76:18,
87:20
**look**
20:14, 29:6,
40:12, 41:25,
49:18, 50:12,
50:20, 50:25,
57:14, 57:15,
61:5, 64:7,
70:10, 91:21,
98:5, 120:19
**looked**
19:22, 21:18,
27:16, 30:18,
31:16, 33:19,
49:12, 86:8,
91:23, 94:20,
109:25, 121:11,
135:10
**looking**
43:23, 48:9,
79:17, 91:25,
92:7, 92:11,
93:14, 94:10,
94:12, 96:15,
127:6
**looks**
71:18
**loose**
99:15
**los**
86:19
**lose**
44:14
**loss**
55:8
**lost**
28:21, 124:4,
135:16
**lot**
16:4, 19:18,
19:22, 22:10,
22:11, 22:21,

25:9, 25:12,
28:6, 36:3,
37:25, 46:2,
68:11, 111:20,
115:18, 116:19,
120:9, 124:3,
124:5
**lower-power**
116:23

### M

**made**
9:8, 12:25,
13:17, 13:20,
20:17, 20:19,
22:13, 23:3,
23:5, 23:20,
23:23, 24:19,
33:23, 37:14,
43:25, 44:1,
44:2, 44:6,
45:11, 45:16,
45:17, 45:20,
75:5, 79:19,
81:25, 82:7,
83:14, 96:21,
118:13, 121:1,
128:5, 131:7,
132:11, 134:16
**magazines**
122:10
**main**
11:25, 61:22,
62:10
**maintain**
91:9
**major**
115:9, 115:17
**majority**
38:9, 118:4,
120:17
**make**
10:23, 19:1,
28:8, 32:16,
37:4, 37:9,
48:3, 49:1,
71:13, 93:6,
93:12, 113:8,

115:9, 119:12,
125:14, 126:16,
127:10, 127:15
**makes**
26:20
**making**
19:21, 36:7,
36:8, 37:5,
37:13, 38:1,
78:6, 98:23,
118:19, 123:13
**man**
65:25, 126:7,
127:20
**managed**
18:15, 83:12
**management**
39:5, 75:25,
77:19, 80:20,
113:21, 128:19
**manager**
61:12, 61:18
**managing**
126:1
**manner**
106:10
**manufacture**
27:2, 92:20
**manufactured**
22:18, 100:12
**manufacturer**
15:22, 78:16,
115:17, 117:7,
117:8
**manufacturer's**
14:13, 14:17,
14:21, 16:11
**manufacturers**
14:22, 22:21,
22:24, 95:21,
115:19, 116:12,
116:20
**manufacturing**
13:22, 13:23,
26:18, 32:8,
43:6, 81:11,
99:1, 99:22,
100:7, 100:15,

100:20, 118:6,
118:15, 118:16,
129:12
**many**
7:12, 36:13,
45:10, 82:7,
82:8, 89:10,
96:7, 104:10,
104:14
**map**
20:8
**mark**
7:5, 25:16,
30:7, 40:1,
66:21, 69:8
**marked**
7:7, 25:18,
25:21, 30:4,
30:8, 40:4,
40:7, 66:25,
69:11, 74:20
**market**
19:14, 35:21,
36:15, 45:5,
46:5, 117:23,
118:2, 118:3,
121:3, 128:10
**marketing**
111:13, 122:9
**marketplace**
69:3, 69:5,
115:16
**markets**
110:22
**marriage**
26:16
**martin**
38:9, 45:21,
75:21, 76:13,
77:1, 77:4,
77:5, 77:10,
77:12, 77:22,
77:24, 77:25,
78:2, 79:9,
80:18, 80:20,
105:21, 105:22,
106:5, 106:11,
106:17, 106:25,

107:15, 122:24
**martin's**
79:9
**massage**
107:13
**massive**
80:16
**master's**
77:3
**matched**
36:6
**material**
55:3, 57:1
**materials**
39:1, 64:12
**matter**
5:4, 30:5,
108:16
**matters**
70:19
**maybe**
18:11, 68:18,
81:19, 86:17,
88:5, 103:3,
104:9, 105:11,
111:16, 112:14,
118:19, 119:9
**mcfarlin**
3:5
**mean**
19:3, 20:4,
25:1, 25:3,
25:7, 25:9,
25:10, 25:14,
28:19, 32:16,
32:23, 34:6,
34:8, 37:7,
46:25, 59:23,
66:4, 74:7,
77:20, 81:5,
81:7, 86:8,
102:8, 103:16,
106:19, 110:15,
111:25, 114:10,
118:4, 119:9,
123:24, 128:11,
128:14
**meaning**
43:19, 48:15,

49:11, 50:24,
51:23, 116:1
**meaningless**
107:6
**means**
5:25, 23:16,
49:21, 51:4,
51:17, 75:8
**measures**
17:14
**mechanical**
21:12, 21:13,
52:17
**media**
5:2
**medical**
9:23
**medication**
9:23
**medications**
10:1, 10:3
**meet**
22:16, 25:12
**meeting**
27:13, 80:13
**meetings**
129:6
**member**
62:17
**memory**
11:5, 86:24,
131:11, 132:1,
132:8
**mental**
10:5
**mentioned**
26:11, 81:13,
106:6, 122:22,
133:4
**merger**
126:12
**message**
34:4
**met**
22:8, 24:3,
24:4, 26:11,
127:1, 132:24
**metal**
21:19

**michael**
17:22
**middle**
1:2, 5:6, 17:7,
58:20, 86:25
**might**
25:9, 46:8,
66:3, 70:22,
135:15
**mike**
16:1, 16:7,
16:24, 17:9,
17:21, 18:5,
18:6, 18:18,
18:21, 20:14,
24:2, 24:7,
24:20, 24:22,
26:13, 26:24,
27:3, 27:4,
27:7, 27:10,
28:13, 29:4,
29:6, 29:11,
29:12, 30:23,
30:24, 31:22,
33:11, 34:3,
36:6, 36:18,
37:25, 38:5,
38:6, 39:6,
39:7, 59:17,
60:7, 60:25,
61:4, 62:1,
63:9, 65:21,
65:22, 65:25,
66:2, 78:4,
81:5, 81:7,
94:2, 95:3,
99:18, 106:2,
108:8, 108:9,
109:15, 109:17,
110:11, 112:20,
120:6, 124:16,
124:19, 129:24,
134:6
**mike's**
17:4, 18:20,
38:2, 81:9,
95:5, 97:16,
124:18

**million**
44:10, 44:11,
44:16, 44:25,
78:9, 78:10,
119:19, 120:1
**mind**
48:19, 50:11,
116:18, 124:19
**mine**
14:25, 85:9
**ministerial**
107:7
**minuscule**
60:2
**minute**
57:15, 59:21,
74:25, 82:25,
83:4, 97:18,
119:12
**minutes**
102:9, 105:9
**minutia**
135:11
**minutiae**
128:20
**misappropriating**
56:12, 56:22
**misappropriation**
56:17
**miscellaneous**
120:24
**miserable**
29:4
**misplaced**
11:5
**miss**
18:22
**mission**
32:1, 32:5,
80:22
**mistake**
13:1, 134:15
**mister**
133:12
**misunderstand**
102:11
**misunderstanding**
67:16, 96:12

**misunderstood**
112:12
**mix**
29:9
**module**
23:1, 23:14,
26:14, 26:17,
29:8, 36:14,
37:1, 39:18,
46:17, 84:8,
94:23, 95:19,
96:2, 97:6,
108:20, 109:22,
111:11, 115:25,
116:1, 116:12,
117:9, 117:23,
118:2, 123:20,
125:24, 126:19,
126:21, 127:18,
128:8
**modules**
23:6, 23:23,
24:17, 27:2,
35:21, 35:22,
35:25, 36:2,
36:19, 36:21,
37:20, 38:2,
38:12, 39:15,
43:16, 44:4,
44:22, 44:23,
45:8, 84:12,
84:15, 84:17,
84:21, 84:24,
85:5, 93:6,
94:9, 94:15,
95:13, 95:14,
96:18, 97:21,
99:23, 100:16,
100:21, 100:24,
101:2, 107:22,
110:7, 115:9,
115:17, 116:21,
116:24, 116:25,
117:16, 118:8,
118:25, 119:5,
119:15, 119:20,
119:25, 121:5,
126:3, 127:22,

moved
17:9, 61:18,
82:14, 124:6
movie
86:19
moving
13:6, 16:24,
52:15
much
18:6, 21:17,
27:18, 36:18,
54:11, 79:10,
80:14, 81:14,
92:11, 106:15,
119:6, 120:6,
124:13, 128:25
multiple
130:21
murfreesboro
3:7
must
22:9, 47:19
myself
16:6, 16:8,
36:17, 63:9,
112:18, 112:20

**N**

name
6:17, 22:4,
23:24, 24:1,
61:16, 67:12,
67:22, 71:22,
74:5, 88:15,
89:1, 101:19,
105:24, 107:6,
116:17, 121:16,
122:7, 122:11,
122:13, 124:22,
127:2, 129:24,
132:20, 132:21,
133:1, 133:3
named
91:2, 97:1,
124:18, 132:12
naming
90:7
narrow
117:4, 125:13

moment
25:25, 81:17
money
27:25, 36:4,
36:8, 36:11,
36:18, 92:2,
103:17
moniker
15:6
monitor
5:8, 115:2
month
60:3, 112:14
monthly
59:11, 112:8
months
96:22, 96:23
more
21:8, 21:12,
27:9, 28:22,
36:11, 65:20,
66:2, 66:10,
78:5, 78:6,
83:15, 101:1,
117:1, 120:2,
120:14, 125:14,
127:7
morning
5:23, 6:21
most
15:8, 16:18,
19:17, 25:13,
46:15, 47:11,
94:1, 120:11
mostly
21:18, 99:2,
99:20, 101:2
motions
37:13
motor
13:23, 120:23
motors
13:20, 13:21
move
18:25, 31:21,
86:5, 90:16,
118:12

narrowly
96:17
nashville
27:8, 27:14,
89:15, 91:16,
93:8, 96:15
natural
94:24
nature
7:14, 13:11,
14:19, 21:7,
21:19, 21:21,
32:23, 85:8,
92:21, 108:14,
113:13, 113:20,
120:7
near
130:18
necessarily
32:18, 61:1,
86:8
necessary
28:8, 81:23,
125:12
necessity
115:24
need
8:8, 8:22,
9:16, 9:19,
9:22, 10:23,
52:6, 66:14,
75:12, 86:4,
89:1, 136:25
needed
18:13, 88:18,
99:16, 101:20,
114:4, 116:21
needs
30:6
negotiated
126:8
negotiation
126:6
neighborhood
19:9
neighborhoods
66:7
neither
31:22, 62:14,

138:12, 139:9
network
65:7, 65:8
neutral
43:13, 120:22
never
34:12, 34:15,
38:3, 74:2,
76:13, 80:8,
80:10, 85:8,
89:3, 89:5,
97:15, 97:18,
97:21, 97:24,
103:14, 104:15,
105:7, 105:17,
105:19, 105:20,
108:13, 112:10,
113:3, 113:20,
123:16, 125:25,
128:12, 128:24,
129:3, 129:16,
130:24, 130:25,
131:3, 135:2,
135:10
new
1:15, 2:7, 2:9,
5:11, 6:20,
26:7, 34:18,
34:23, 37:23,
67:25, 68:19,
72:5, 75:17,
81:21, 86:19,
92:23, 93:4,
93:18, 93:24,
94:15, 94:24,
96:16, 97:7,
103:13, 108:2,
121:13, 121:16,
123:6, 124:5
news
44:13
next
7:22, 12:23,
15:24, 19:13,
40:1, 41:21,
43:1, 48:13,
49:17, 50:19,
56:7, 66:22,

69:9, 69:25,
71:20, 74:19
**nice**
34:8, 37:5,
37:6
**nomenclature**
110:7, 110:14,
111:22
**none**
27:19, 28:1,
34:11, 48:4,
54:13, 55:16,
55:17, 56:20,
56:21, 58:2,
58:3, 58:4,
58:5, 110:3,
122:16, 122:17
**north**
3:6, 81:12
**northwest**
3:13
**notary**
2:14, 5:23,
138:1, 138:21
**nothing**
6:13, 34:5,
47:9, 68:22,
74:9, 99:11,
110:24, 125:24,
134:20
**notice**
2:13, 56:14,
64:21, 69:25,
89:11
**notification**
91:10
**noun**
32:13, 32:19
**nucleus**
99:13
**number**
5:3, 5:7, 25:5,
41:8, 59:9,
59:23, 60:1,
67:14, 74:23,
80:2, 82:20,
87:22, 87:24,
99:7

**numbered**
10:19, 41:13
**numbers**
41:11, 59:6,
60:16, 111:12,
120:7, 131:6
**numerous**
22:10, 115:2
**nutshell**
106:15

## O

**o'hara**
17:11
**oath**
8:4, 134:20
**oaths**
5:24
**object**
90:9
**objection**
90:9, 108:23,
109:1, 109:8,
130:23, 131:19
**objections**
9:8
**obligations**
49:24
**obtained**
101:5
**obtaining**
103:9
**obviously**
40:13
**occur**
110:2, 110:8
**occurred**
134:10
**off-road**
43:9
**offer**
35:21, 88:23
**offered**
47:17
**offers**
13:1
**office**
18:13, 20:15,

71:12, 72:24,
73:1, 73:4,
77:15, 89:21,
90:6, 99:18,
130:2
**officer**
62:15, 62:20,
138:2
**offices**
2:2
**often**
45:6, 86:14,
124:23
**oh**
10:17, 30:6,
36:20, 44:23,
44:25, 52:8,
54:7, 70:22,
104:2, 113:18
**oil**
43:10, 120:25
**old**
17:4, 20:22
**olson**
27:3, 94:3
**once**
7:13, 7:24,
66:1, 76:17,
77:19
**one**
8:19, 10:22,
11:23, 16:7,
18:8, 23:4,
23:21, 24:18,
25:5, 25:22,
26:12, 27:15,
30:13, 32:8,
34:16, 36:5,
37:17, 43:24,
46:15, 51:14,
54:6, 64:6,
66:3, 70:22,
71:17, 72:22,
75:9, 77:19,
78:3, 88:16,
88:21, 89:14,
92:6, 94:21,
95:12, 99:7,

99:13, 102:24,
103:2, 104:16,
116:17, 117:7,
125:7, 126:10,
133:6
**one's**
31:18
**ones**
45:11, 45:12,
115:21, 118:20
**online**
21:2, 111:13
**only**
16:2, 16:7,
18:8, 21:24,
26:15, 38:6,
39:6, 44:23,
47:12, 63:8,
73:24, 76:19,
77:2, 77:11,
78:18, 80:20,
88:21, 89:14,
95:12, 103:16,
113:14, 118:18,
120:18, 122:21,
123:1, 124:2,
125:7, 127:20
**oops**
67:5
**open**
30:19, 80:12,
123:11
**opened**
17:24
**opening**
42:11
**openly**
25:6
**operating**
35:6, 35:13,
125:6
**operation**
27:14, 55:4,
98:20, 115:7,
131:12
**operations**
38:8, 61:15,
78:3, 82:14,

106:4
**opinion**
83:16, 115:14
**opposed**
105:25, 106:20,
119:5
**oral**
49:21, 50:7,
58:22, 60:20
**order**
23:17
**ordered**
45:12
**orders**
136:20
**ordinary**
53:20
**organ**
10:2
**organization**
79:7
**organized**
57:5, 66:12
**originated**
110:9, 128:14
**other**
10:3, 23:4,
23:21, 23:25,
27:16, 28:19,
29:21, 31:17,
36:23, 39:11,
47:22, 50:1,
51:7, 52:25,
53:3, 53:22,
57:19, 62:24,
63:12, 64:1,
65:17, 77:21,
78:12, 78:18,
85:13, 89:13,
90:5, 90:6,
90:25, 91:3,
91:4, 91:10,
91:11, 93:7,
95:13, 95:21,
99:23, 101:3,
102:8, 107:22,
112:13, 116:12,
119:19, 122:12,

130:3, 131:18
**otherwise**
53:20, 56:12,
138:14, 139:11
**out**
8:25, 12:16,
14:22, 15:20,
16:10, 18:20,
27:11, 29:5,
44:20, 45:5,
47:13, 48:25,
74:11, 75:13,
76:25, 79:8,
80:7, 82:14,
83:6, 85:12,
88:22, 92:9,
96:9, 96:13,
99:10, 103:16,
103:17, 112:2,
119:18, 119:20,
121:2, 131:4,
134:17, 135:23
**out-of-pocket**
59:13
**outcome**
138:15, 139:11
**outside**
14:8, 31:7,
91:1
**over**
27:5, 38:1,
46:25, 61:17,
66:10, 70:17,
71:16, 78:2,
80:19, 81:20,
82:2, 93:11,
108:1, 114:11,
114:12, 124:4
**overall**
118:11, 118:12
**overdue**
17:1
**own**
14:16, 14:24,
27:20, 52:24,
63:11, 65:9,
82:5, 82:16,
95:25, 96:1,

98:16, 116:22
**owned**
36:2, 51:18,
55:19, 64:17,
78:21, 78:23,
82:1
**owners**
45:17, 47:21,
63:8, 74:14,
83:24
**ownership**
29:22, 39:15,
39:18, 52:25,
54:16, 57:17,
62:19, 63:12,
74:16, 81:21,
83:21, 84:7,
85:3
**owns**
55:2, 62:25
**oxford**
2:8, 5:11

**P**

**package**
127:19
**pad**
109:25
**page**
4:2, 4:9,
30:24, 31:1,
32:1, 32:3,
40:9, 41:7,
41:18, 42:17,
42:23, 51:4,
54:9, 54:12,
56:7, 64:8,
67:2, 67:10,
69:18, 69:19,
70:7, 71:22
**pages**
1:24, 41:21
**paid**
36:5, 39:22,
47:20, 47:21,
47:22, 112:8,
112:14, 112:17,
112:21, 127:12,

128:2, 131:11,
134:8, 134:13,
136:7
**paper**
78:7, 102:10,
113:2
**paperwork**
10:20, 73:18,
74:2, 84:2,
105:13
**paragraph**
42:11, 43:1,
43:20, 49:13,
58:21, 67:5,
75:16
**paragraphs**
10:19
**parallel**
117:10, 128:17
**pardon**
113:25
**parking**
19:5, 19:10,
19:16, 19:18,
19:22
**part**
16:18, 20:4,
23:4, 41:12,
53:14, 64:6,
78:11, 78:12,
79:3, 82:24,
83:18, 92:10,
102:14, 108:21,
131:5
**participate**
129:6
**participated**
109:18
**particular**
7:19, 50:6,
65:19, 77:8,
79:23, 81:5,
86:6, 92:7,
96:20, 115:20
**particularly**
89:25
**parties**
5:25, 6:6,

64:10, 138:13, 139:10

**partner**
16:12, 81:8

**partnership**
53:2

**partnerships**
75:19, 76:5, 77:24, 79:18, 80:1

**parts**
85:1, 110:7, 110:14, 110:18, 110:19, 110:20, 111:9, 111:11, 111:12, 111:24

**party**
50:2, 57:8, 62:23

**pass**
85:20

**passing**
81:13

**past**
56:15, 104:12

**patent**
128:7, 128:13

**patentable**
128:19

**patented**
128:12, 128:15

**patents**
85:8

**pay**
16:25, 39:1, 60:9

**paycheck**
84:19

**paying**
28:4, 85:10

**payments**
134:14

**payroll**
16:7, 16:8, 16:12, 35:10, 65:6, 65:9, 70:24, 130:2, 135:5

**payrolled**
16:13

**penalty**
8:6

**pennsylvania**
3:13

**people**
25:10, 25:12, 36:5, 59:24, 61:5, 101:18, 115:18, 120:18, 124:13, 125:8, 125:21, 129:11, 129:14, 129:17, 129:23, 130:2

**percent**
47:1, 47:21, 47:23, 60:10, 85:14, 100:20, 101:1, 110:11, 120:12, 120:13, 120:15, 120:16, 120:20, 120:22, 120:23, 120:25, 121:3, 130:20, 130:25, 134:25, 135:1, 135:2

**percentage**
100:24, 101:1, 131:1, 131:4

**perception**
115:5, 129:19

**perfect**
19:3

**performance**
124:9, 124:12, 125:1, 125:17

**period**
20:18, 27:6, 114:5, 127:11

**perjury**
8:6

**permission**
100:1

**permitted**
6:3

**persistent**
7:19

**person**
14:11, 28:23, 53:3, 62:20, 65:9, 110:9, 126:5, 127:3, 132:3

**person's**
62:18

**personal**
53:23, 68:2, 68:24, 70:16, 102:17, 108:6, 108:18

**personalities**
26:12

**personality**
80:17, 105:10

**personally**
97:18, 101:10, 125:10, 134:5

**personnel**
61:4, 82:21, 99:5, 113:21

**persons**
56:13

**pertaining**
102:10

**peru**
12:19

**phone**
122:6

**phrases**
110:10

**phrasing**
88:9

**physical**
89:16, 89:17

**physically**
101:11, 130:7

**pick**
25:6

**picture**
46:19, 118:12, 121:8

**pie**
121:2

**pivotal**
79:11

**place**
5:11, 9:14, 11:22, 18:4, 18:7, 18:9, 26:22, 52:4, 65:19, 82:21, 99:17

**places**
26:23, 90:23

**plaintiff**
1:5, 3:3, 3:19, 5:18, 85:21

**plan**
30:22, 31:7, 31:11, 34:9, 34:12, 34:18, 34:21, 58:17, 60:17, 92:13, 97:19, 97:22, 104:16, 104:18, 105:3

**planet**
5:10, 5:20, 139:18

**planned**
78:2

**plans**
34:9, 49:24, 50:21, 50:23, 58:12, 58:15, 59:6, 60:5, 60:11, 60:20, 60:22, 61:25

**plant**
13:22, 61:13, 61:15, 82:14

**play**
104:20, 105:2

**please**
5:12, 5:21, 6:8, 6:17, 8:13, 8:19, 9:17, 29:5, 50:14, 90:12, 90:20, 102:20

**plug**
28:11

**plus**
89:4

point
6:20, 8:18,
16:19, 29:1,
34:2, 35:5,
35:11, 66:4,
70:22, 78:24,
92:3, 94:18,
134:12, 135:11
polished
77:5, 106:10
polishing
78:5
poppycock
85:16
portfolio
118:22
portion
119:3
posed
31:15
position
39:9
positively
123:4
possess
67:17, 67:21
possesses
62:18, 67:24
possession
102:4, 114:18,
123:21, 124:3,
132:7, 135:14
possibility
94:19
possible
86:5
post
17:13, 99:14
potential
47:5, 62:22,
65:16, 71:16
powerohm
7:17, 10:15,
11:3, 15:25,
16:12, 16:20,
17:18, 20:11,
20:18, 26:7,
29:2, 39:9,

39:12, 39:17,
39:21, 42:4,
43:4, 44:8,
47:21, 50:2,
50:3, 51:18,
52:24, 53:6,
53:21, 54:2,
55:2, 55:5,
55:8, 56:10,
56:11, 56:14,
57:8, 57:9,
57:18, 59:10,
62:16, 62:23,
62:25, 63:9,
63:19, 64:1,
64:17, 64:18,
64:20, 64:21,
64:23, 67:23,
68:14, 69:24,
70:1, 70:3,
71:23, 72:1,
72:11, 72:17,
74:14, 78:8,
78:15, 81:1,
81:8, 83:21,
83:24, 89:8,
89:9, 89:22,
90:3, 91:9,
92:19, 93:20,
95:1, 95:11,
95:18, 96:25,
98:16, 102:11,
102:13, 102:15,
104:19, 105:20,
105:24, 106:19,
106:21, 107:7,
108:13, 110:25,
114:4, 115:8,
120:19, 122:15,
123:13, 126:9,
128:6, 135:8
powerohm's
53:24, 97:13
practical
112:23
practices
49:24
predates
20:23

premieres
86:20
premises
82:1
prepare
34:18, 79:12,
80:23, 86:7
prepared
77:4, 87:15,
139:3
preparing
79:11
presence
9:18, 89:11,
89:17, 91:9,
117:23, 126:17
present
3:18, 109:24,
111:13, 114:24,
119:4
presentations
77:6
presented
86:12
presently
55:5, 101:24,
102:17, 110:21,
114:7
president
15:21, 16:16,
25:4, 36:12,
39:8, 61:12,
68:16, 75:18,
75:22, 77:10,
77:22, 77:23,
79:18, 79:19,
80:1, 80:5,
82:2, 105:14,
105:20, 105:24,
106:1, 106:2,
106:3, 106:6,
106:19, 107:7,
107:10, 107:16,
122:25, 127:4
presidents
61:21
pretty
16:4, 18:6,

18:24, 22:13,
25:14, 27:18,
45:5, 45:6,
106:15, 128:25,
131:22
preview
22:12
previous
118:14
price
19:4, 83:5
primarily
116:10
primary
80:24, 94:8
principal
72:24, 73:1
prior
9:18, 33:8,
47:9
probably
15:18, 24:4,
24:6, 27:6,
36:21, 44:9,
44:25, 45:21,
60:25, 62:1,
71:17, 82:9,
101:25, 103:3,
105:7, 114:9,
119:17, 132:5,
136:3
problems
37:19
procedural
6:3
procedures
81:24
proceed
92:14
proceeding
6:2, 7:15, 9:9,
139:4
proceedings
138:3, 138:5,
138:6, 138:9,
139:5, 139:7
process
9:1, 127:1

processes
19:12
procure
121:21
procured
103:24, 121:19
procurement
104:21
produce
77:16
produced
6:1, 21:12
product
13:20, 20:25,
22:17, 29:9,
32:18, 37:3,
37:6, 79:23,
96:7, 96:21,
99:25, 100:3,
101:3, 118:9,
118:15, 118:18,
119:21, 123:14,
123:15, 125:7,
125:10, 127:18
production
124:20, 129:23
products
13:12, 13:17,
14:12, 20:17,
21:4, 21:9,
21:10, 21:23,
22:13, 23:20,
23:21, 23:22,
24:13, 24:14,
24:19, 26:15,
26:21, 36:23,
37:19, 38:12,
38:15, 38:17,
39:10, 39:18,
39:22, 43:12,
43:24, 43:25,
44:20, 45:4,
47:2, 56:23,
60:10, 69:4,
77:16, 79:15,
80:7, 81:11,
84:8, 85:4,
85:6, 85:15,

92:20, 93:7,
95:22, 99:23,
100:18, 112:2,
118:19, 118:22,
119:20, 119:25
profits
119:3, 119:4
progress
39:4
project
38:1, 96:14,
96:17, 96:20
projection
126:22
projects
13:17
promised
84:6
pronounced
97:5, 97:6
propagated
99:17
properties
51:18, 53:17,
53:19, 53:22,
53:24, 62:25,
63:20, 83:3,
91:21, 94:11,
94:12, 102:13,
102:14, 102:15,
113:15, 121:12
property
39:12, 51:18,
54:15, 54:25,
55:3, 55:9,
55:19, 56:13,
57:18, 57:19,
58:7, 63:18,
65:24, 93:15,
94:20, 102:3,
108:7
propose
83:9
proprietary
53:1, 108:14
prospect
92:1, 109:22
prosperity
102:21

protection
43:11, 128:7
provide
7:2, 8:20,
9:20, 22:6, 60:4
provided
86:9, 136:5
providing
95:21
public
2:14, 3:6,
138:1, 138:21
pull
106:24
pulled
28:11
pulsors
43:14, 44:3
purchase
4:13, 40:8,
42:10, 42:23,
91:23, 92:3,
94:11, 136:5
purchased
18:19, 101:16,
111:24
purchasing
92:1
purdue
11:25, 12:3,
12:10
purpose
68:1, 68:23,
95:17, 105:4
purposes
106:11
pursuant
2:13, 7:3,
9:19, 57:18,
59:10, 84:15,
84:18, 84:22,
84:25
pursue
97:14, 128:7
push
113:19
pushback
80:16

put
11:8, 13:9,
16:2, 22:22,
23:7, 36:3,
41:4, 54:17,
79:9, 97:18,
97:21, 113:19,
115:19
putting
27:25, 46:4
pw
16:16

### Q

qualified
27:19, 138:8
quality
43:11
question
10:8, 31:15,
49:6, 63:4,
65:20, 88:2,
88:12, 90:19,
91:6, 91:8,
103:6, 105:16,
105:23, 106:13,
106:16, 109:3,
111:4, 111:7,
111:8, 112:1,
117:3
questioned
89:3, 103:13
questions
8:13, 8:19,
9:9, 9:25,
40:13, 52:2,
75:3, 83:18,
85:20, 86:3,
93:2, 95:10,
136:13, 136:16
quick
17:18
quickly
16:5, 86:1,
86:5
quite
35:8, 36:10,
37:18, 76:15,

**quoted**
80:13, 86:14,
87:15, 115:24

**quoted**
114:3

**quotes**
13:15

**R**

**racking**
65:16

**raise**
6:8, 125:2,
125:17

**raises**
125:9, 125:10

**range**
15:9, 45:24,
87:25, 131:17

**rather**
120:10

**rating**
124:9, 125:17

**ratings**
125:1

**reached**
119:25

**reaction**
76:15

**reactive**
71:17

**read**
25:25, 32:4,
48:10, 74:25,
75:12, 75:16

**reading**
6:5

**ready**
106:12, 133:20

**real**
19:10, 53:22,
63:18, 79:10,
80:22, 83:9,
83:10, 83:14,
101:25

**realize**
9:13, 49:2

**realized**
16:4, 77:20

**really**
7:21, 18:12,
20:3, 21:12,
21:13, 24:25,
25:8, 26:23,
28:18, 28:22,
36:16, 36:23,
45:10, 46:21,
66:2, 66:7,
80:10, 81:14,
98:9, 111:4,
111:25, 131:1

**realm**
38:2

**reason**
76:10, 77:11,
80:24, 95:12,
95:13, 99:5,
99:7, 105:12,
118:1

**reasonable**
64:21

**reasons**
9:10, 67:24

**recall**
12:20, 14:2,
18:8, 22:3,
22:6, 24:23,
26:5, 28:15,
31:11, 31:12,
35:18, 36:13,
40:14, 42:13,
44:1, 44:7,
44:19, 45:15,
45:16, 45:19,
46:14, 49:15,
57:13, 59:15,
60:19, 60:22,
62:6, 65:2,
98:5, 98:9,
100:5, 101:9,
101:19, 134:11,
134:18, 135:10

**receipt**
69:18

**receive**
12:2, 48:2,
85:14, 124:11

**received**
12:9, 56:14,
130:18, 131:21

**receives**
59:11

**recent**
86:24

**recently**
17:12, 135:16

**recitals**
49:12

**recites**
49:21

**recognize**
42:19

**recognized**
116:20

**recollect**
37:20, 110:15

**recollection**
22:7, 26:10,
45:9, 46:20,
103:20, 110:12,
120:4, 121:18

**recollections**
122:21

**record**
6:18, 9:17,
21:25, 28:2,
61:10, 63:13,
66:17, 66:18,
66:20, 82:22,
111:23, 114:10,
127:10, 133:16,
133:17, 133:19,
136:18, 136:20,
137:5, 137:6,
138:10, 139:7

**recorded**
1:25, 5:24,
138:6

**recording**
6:2, 138:9,
139:4

**records**
102:10, 114:13,
123:20, 132:6,
135:6, 135:13,

**received**
135:22, 136:1,
136:6

**red**
36:21, 45:3,
125:6

**reduced**
138:7, 139:5

**refer**
122:24

**reference**
88:4, 135:8

**referenced**
68:17, 93:1,
103:12, 106:18,
121:22, 122:6,
122:11

**references**
88:7, 96:16

**referencing**
93:18

**referred**
13:10, 17:21

**referring**
33:13, 93:5

**reflect**
22:1

**reflected**
53:24, 54:1,
135:6

**reflection**
8:15

**reflects**
9:11

**regard**
71:1, 89:8

**regarding**
67:16, 67:21,
67:24, 72:5,
74:3

**regardless**
76:14

**registered**
73:4, 73:5,
73:7, 73:17,
73:20, 88:17,
89:1, 90:8,
91:2, 97:1

**regular**
124:12, 130:5,

136:21, 136:24
**reimbursed**
59:12
**relate**
120:12, 122:14
**related**
44:15, 57:16,
64:12, 138:12,
139:9
**relating**
57:12, 58:7,
61:21
**relation**
103:11
**relationship**
62:24, 64:1,
70:17, 78:1
**relationships**
78:13
**relevant**
67:17
**reliable**
32:9
**relied**
35:6
**relieved**
76:16
**relieving**
77:9
**relinquishing**
80:14
**remember**
9:13, 9:15,
15:15, 18:10,
23:24, 23:25,
27:9, 36:17,
36:25, 37:21,
79:13, 101:13,
104:13, 116:6,
123:22, 132:5,
134:12, 135:4
**remind**
8:1, 8:3
**remote**
71:12, 73:13
**remotely**
61:20, 73:16,
91:7

**removal**
64:23
**removed**
64:17
**reneging**
83:5, 83:8
**renewed**
71:19
**rent**
83:11, 92:4
**rental**
91:24, 94:11,
99:18
**rented**
18:4
**rep**
14:13, 14:17,
14:21, 16:11
**repeat**
67:17, 103:6
**repetitive**
53:13
**rephrase**
8:20
**report**
38:4, 38:5,
39:4, 77:24,
107:14
**reported**
38:5, 77:25
**reporter**
5:19, 5:21,
5:22, 8:9, 8:15,
25:17, 30:6,
40:3, 50:13,
50:16, 52:10,
69:10, 132:25,
133:3, 133:6,
133:9, 136:19,
136:23, 137:3,
137:5, 138:1
**reports**
44:18, 77:6
**represent**
5:14, 6:22,
15:4, 106:9
**representations**
42:3

**representative**
15:2, 42:12,
64:22
**representatives**
64:24
**represented**
15:10, 89:5,
113:16, 126:11
**representing**
5:10, 5:20
**represents**
15:7
**reps**
76:19, 80:21
**repurchased**
101:17
**requested**
69:16
**requests**
10:14, 10:18
**require**
102:25
**required**
21:10, 60:3,
126:3
**residential**
20:1, 51:18
**resignation**
40:22
**resigned**
47:7
**resistance**
43:8, 43:14,
44:3, 99:2,
100:17
**resistive**
120:21
**resistor**
21:11, 21:20,
21:23, 22:20,
23:3, 23:13,
23:14, 23:15,
26:15, 26:18,
32:8, 47:2,
118:3, 118:22,
135:9
**resistor-based**
120:18

**resistors**
7:17, 15:25,
20:20, 21:16,
22:18, 23:24,
24:9, 32:16,
33:1, 35:23,
38:22, 43:13,
43:15, 69:24,
70:1, 70:3,
71:23, 72:1,
72:11, 72:18,
74:15, 78:16,
81:8, 83:22,
83:24, 89:9,
89:22, 90:3,
91:9, 92:19,
95:1, 95:14,
96:25, 98:16,
99:8, 99:9,
99:15, 100:8,
100:10, 100:11,
100:12, 104:19,
105:24, 106:19,
106:21, 107:8,
115:8, 118:5,
118:7, 119:5,
121:4, 122:15,
123:13, 128:6,
128:13
**resolved**
56:15
**respect**
9:1, 22:17,
29:11, 86:2
**respected**
32:7
**respecting**
116:9
**respective**
89:12, 89:22
**respond**
68:7
**responding**
93:2, 95:9
**response**
8:8, 9:16
**responsibilities**
76:17

**responsibility**
28:6, 38:3
**responsible**
28:3, 29:7,
76:18, 76:19
**restrictions**
49:25, 51:7,
51:8
**restroom**
8:22
**result**
10:5, 55:7
**results**
46:4
**resume**
133:20
**resumed**
107:15
**retention**
47:25
**retired**
115:1
**return**
48:6
**returns**
135:5, 135:7,
135:11
**reveals**
47:20
**revenue**
89:6
**reviews**
124:12
**revocation**
70:3
**richard**
16:6, 16:8,
16:11, 17:22,
27:7, 27:23,
31:23, 36:17,
38:7, 59:18,
61:1, 62:1,
63:9, 106:3,
112:18, 112:20,
130:6, 130:9,
130:10, 131:5,
132:4
**rid**
127:20

**ridiculous**
85:16
**right**
6:9, 19:4,
19:13, 28:11,
28:14, 32:3,
43:22, 51:22,
52:11, 52:14,
54:24, 55:2,
55:3, 61:19,
66:13, 70:14,
76:1, 80:13,
91:19, 91:20,
95:16, 97:5,
105:18, 111:14,
112:22, 114:1,
115:10, 132:11,
132:14, 137:3
**rights**
55:8, 56:13,
56:23, 108:7
**risk**
13:6
**robinson**
3:12
**rockwell**
37:3, 38:11,
100:2, 119:21
**role**
13:8, 16:16,
61:11, 75:17,
75:25, 79:9,
79:10, 80:14,
94:9, 104:21,
105:2, 106:2,
107:15, 124:20,
126:1, 126:2,
126:9, 127:8
**roof**
27:3, 30:23,
30:24, 94:2,
121:21
**roof's**
27:10
**room**
23:8
**rosie**
5:9

**rough**
81:16
**roughly**
88:5
**round**
131:6
**rounded**
131:2
**routine**
124:12
**royalties**
84:7
**royalty**
39:21
**rude**
8:25
**rule**
120:12
**rules**
6:4, 8:2, 9:19
**run**
124:20
**running**
15:12
**rush**
113:25
**rusty**
17:11

| S |
| --- |

**s-t-u-a-r-t**
133:7
**sacrifices**
28:6, 28:8
**safety**
113:18
**saftronics**
116:18
**said**
27:13, 27:17,
27:21, 27:24,
29:6, 29:10,
31:14, 34:3,
35:3, 45:2,
60:7, 83:2,
83:4, 83:7,
87:15, 87:20,
91:17, 99:25,

105:17, 121:7,
124:3, 126:24,
135:21, 138:8,
138:9, 139:5,
139:6
**salaried**
29:19, 38:14,
124:13
**salary**
36:9, 112:9,
134:15
**sale**
42:13, 61:22,
77:4, 79:11,
80:23, 82:25,
106:12, 124:2
**sales**
14:8, 14:10,
14:11, 14:17,
14:20, 14:24,
15:13, 16:9,
32:6, 38:9,
39:22, 44:7,
44:17, 44:20,
60:10, 61:24,
75:24, 76:16,
76:19, 77:6,
77:10, 77:19,
77:22, 78:3,
78:9, 78:10,
79:1, 79:3,
79:8, 80:20,
88:2, 99:4,
99:21, 106:6,
106:9, 106:24,
107:10, 107:16,
118:5, 119:8,
119:18, 120:7,
120:9, 120:20,
123:21, 130:19,
131:23
**same**
13:8, 17:7,
17:8, 17:10,
22:16, 24:5,
26:22, 27:23,
83:13, 101:18,
111:12, 118:15,

118:17
**sat**
109:24, 129:16, 134:5
**savings**
16:3
**saw**
40:14, 65:24, 79:14, 123:18
**say**
15:2, 17:15, 20:6, 26:25, 32:21, 32:24, 33:1, 34:17, 35:14, 36:9, 37:6, 68:11, 87:7, 95:10, 96:15, 97:17, 100:25, 102:8, 107:1, 108:9, 112:13, 113:11, 119:11, 120:8, 122:23, 127:17, 129:10
**saying**
7:21, 31:18, 46:14
**says**
32:1, 32:4, 42:11, 43:4, 43:24, 48:14, 49:11, 50:19, 50:23, 51:4, 51:14, 51:17, 51:23, 52:21, 52:24, 53:18, 54:13, 55:1, 55:16, 55:17, 56:9, 56:20, 56:21, 57:4, 57:11, 57:16, 58:2, 58:4, 58:21, 59:9, 60:16, 62:12, 62:13, 64:10, 67:5, 67:15, 67:22, 69:23, 69:25, 70:2,

70:11, 71:22, 72:14, 75:17, 76:14, 93:16, 93:17, 94:13
**scenario**
24:7, 47:17, 70:24, 120:21
**schedule**
53:18, 54:17, 55:1, 55:11, 56:10, 56:19, 56:24, 57:4, 58:15, 62:14, 63:15, 134:7
**schedules**
41:2, 41:6, 50:12, 54:3, 54:21, 55:12, 57:21, 59:3
**schematics**
108:21, 111:11
**schneider**
126:13
**school**
11:13, 11:14, 11:16, 11:19, 17:5, 17:7, 17:8
**science**
12:7
**scott**
3:5
**scrap**
102:9
**se**
32:18
**second**
17:24, 30:12, 49:13, 69:19
**secretaries**
89:12
**secretary**
69:20, 84:2, 89:21, 90:6
**section**
32:1, 48:15, 48:18, 49:7, 50:24, 51:1, 51:24, 52:2,

52:21, 53:16, 54:4, 54:25, 55:20, 57:1, 57:6, 58:11, 59:2, 62:9, 63:15, 63:22, 64:8
**securities**
53:1
**security**
51:6
**see**
6:24, 15:14, 17:16, 19:24, 20:24, 21:17, 30:19, 31:1, 32:10, 33:10, 37:7, 37:8, 37:9, 40:24, 41:8, 41:9, 41:24, 42:4, 44:12, 48:16, 48:21, 49:4, 49:5, 49:11, 50:4, 50:9, 51:8, 51:20, 51:24, 53:4, 53:17, 55:9, 56:17, 57:9, 57:25, 58:18, 58:23, 59:13, 60:1, 60:15, 63:4, 63:17, 63:20, 64:14, 64:25, 67:12, 68:4, 68:17, 70:5, 71:5, 71:17, 71:21, 71:24, 72:15, 73:5, 73:7, 73:10, 75:11, 76:2, 77:17, 125:11
**seeing**
10:14
**seek**
14:22, 127:23
**seen**
26:3, 70:8,

105:7, 108:17, 108:22, 109:3, 109:6, 109:11
**segment**
121:4
**select**
94:20
**sell**
14:11, 45:18, 75:5
**seller**
64:19
**seller's**
42:12, 64:22
**sellers**
42:4, 62:15, 62:17
**selling**
7:18, 43:6, 88:3, 110:22, 119:13, 126:9
**senior**
11:14
**sense**
127:14, 127:16
**sensible**
125:14
**sent**
11:4, 79:6
**sentence**
68:12
**separate**
33:13, 49:3, 63:21, 76:4, 76:7, 83:23, 84:3, 84:8, 121:24, 121:25
**september**
25:22
**sequence**
97:3
**series**
85:5
**serve**
31:20
**served**
61:12
**server**
65:7, 65:10,

65:15, 114:9

**servers**
51:23, 52:3,
64:11, 64:13,
64:14, 64:23,
65:5, 114:15

**service**
89:6

**servicing**
43:6

**set**
53:18, 55:1,
56:9, 58:15,
62:13, 63:1,
65:8, 120:19

**sets**
57:4

**setup**
115:9

**several**
10:1, 27:5,
37:19, 102:19,
125:6

**sexton**
132:22, 133:5

**shall**
43:16, 55:7,
64:19

**share**
126:22

**shared**
22:2

**shareholder**
68:16

**sharing**
39:17

**sharp**
1:25, 2:13,
5:20, 138:2,
138:21

**shoot**
33:21

**short**
44:10, 67:19

**shortly**
133:11, 133:24

**should**
6:5, 26:25,

35:14, 66:1,
114:17, 128:15

**shouldn't**
120:8

**show**
20:21, 21:3,
22:9, 24:5,
24:11, 24:24,
25:7, 26:13,
110:17, 122:3

**showed**
104:15

**showing**
123:20, 136:6

**shows**
22:10, 22:14,
25:1

**shut**
15:15

**side**
11:8, 29:21,
44:10, 124:21

**sides**
7:25

**sight**
18:19

**sign**
47:14, 108:6

**signal**
31:17

**signature**
42:16, 42:20,
42:25

**signature-mig2k**
139:14

**signature-p1kal**
138:19

**signed**
70:11

**significant**
119:24

**signs**
20:6

**simmons**
124:19, 124:20,
129:24

**simply**
75:18, 123:15

**since**
44:17, 61:19,
86:11, 86:15,
86:23, 86:25,
87:12, 87:18,
99:13, 102:2,
123:25, 125:7

**sine**
21:6, 100:18

**single**
79:2, 125:1,
125:2

**sir**
6:8, 40:3,
40:10, 53:13,
55:25, 56:6,
58:18, 66:15,
69:10, 90:15,
93:4

**sit**
109:23

**situations**
71:18

**sizes**
45:13

**skills**
138:11, 139:8

**slang**
116:2

**slid**
134:6

**slight**
44:12

**slightly**
48:20

**slow**
113:25

**small**
13:24, 14:22,
14:23, 18:9,
18:12, 21:20,
22:11, 25:10,
91:24, 121:4

**smaller**
45:13, 115:23,
118:20

**smoothly**
8:3

**soften**
107:12

**softly**
106:23

**solar**
44:15

**sold**
36:22, 37:18,
53:20, 81:1,
85:7, 100:3,
102:3, 119:24

**sole**
15:2, 68:1,
68:23, 95:17

**solely**
61:20

**some**
7:23, 8:2,
8:20, 10:13,
11:8, 16:19,
18:22, 18:23,
21:6, 22:23,
24:7, 27:11,
28:20, 29:1,
34:2, 36:1,
36:23, 36:25,
37:21, 44:13,
45:14, 48:9,
50:12, 52:5,
52:17, 53:6,
53:7, 60:17,
66:4, 75:6,
81:16, 86:3,
87:21, 100:18,
107:4, 111:24,
115:21, 118:19,
120:20, 122:12,
125:22, 134:12,
134:24

**somebody**
28:4, 81:13

**someone**
32:12, 65:21,
73:20, 74:8,
99:10, 109:24,
122:12

**someplace**
102:5

**something**
8:23, 9:13,
9:16, 18:11,
23:25, 24:5,
24:8, 27:25,
29:12, 33:22,
37:8, 37:12,
48:2, 60:24,
61:25, 63:22,
70:25, 76:21,
86:18, 92:3,
92:15, 92:16,
111:21, 113:1,
113:19, 123:17,
127:7, 128:11,
128:13
**sometime**
29:15
**sometimes**
71:16, 124:6
**somewhere**
15:9, 45:24,
47:18, 88:6,
102:5
**soon**
19:16
**sorry**
10:17, 18:3,
30:6, 30:14,
34:3, 50:13,
87:7, 87:9,
97:21, 98:19,
99:6, 104:25,
105:21, 105:22,
106:13, 106:14,
112:19, 113:23,
132:25, 133:1,
133:2, 133:4,
136:13
**sort**
7:23, 24:7,
29:5, 36:25,
116:7, 120:20
**sorts**
32:14
**sought**
113:7
**sounds**
53:13, 91:19,

110:16, 129:18
**source**
26:22, 32:9
**soured**
28:24
**space**
18:13
**speak**
8:24, 126:24
**spearheaded**
78:20
**spearheading**
94:5
**special**
57:13
**specific**
15:8, 36:24,
111:21
**specifically**
24:15, 62:6,
85:10, 86:22
**specifics**
52:5
**specified**
48:15, 49:11,
50:24, 51:24
**specify**
117:3
**speculation**
90:10, 90:17,
109:1, 109:4
**speed**
13:18, 95:19,
115:23, 116:4
**spun**
102:14
**square**
3:6, 12:18,
13:6, 13:9,
18:10
**stage**
67:19
**stages**
16:1
**stalls**
28:20
**stand**
135:25

**standalone**
116:13
**start**
11:9, 17:4,
30:17, 44:24,
46:11, 59:9
**started**
14:8, 15:25,
20:11, 20:15,
36:12, 36:14,
44:12, 46:5
**starting**
12:16, 16:3,
26:6, 28:5,
33:19, 41:7,
41:17, 43:23
**starts**
43:1, 58:14
**state**
2:14, 5:13,
6:17, 15:3,
20:7, 61:10,
69:15, 69:20,
71:10, 72:8,
73:18, 73:20,
74:3, 84:2,
88:16, 88:22,
90:6, 90:7,
90:25, 91:10,
103:20, 138:22
**statement**
53:25, 67:20,
95:25, 102:24,
103:9, 130:20
**statements**
54:2, 102:25,
103:16, 114:5
**states**
1:1, 5:5,
89:10, 89:13,
89:21, 89:22,
90:24, 91:4,
91:11
**status**
108:2
**stay**
13:2, 47:15,
66:3, 66:6,

66:8, 81:14
**stayed**
65:13, 66:5,
128:25
**steaks**
27:11
**step**
12:23, 15:24,
17:18, 31:19,
80:19
**stick**
11:5
**still**
9:9, 10:14,
19:2, 20:6,
35:6, 36:20,
37:9, 37:13,
45:3, 70:15,
79:1, 83:12,
93:19, 114:20,
123:12, 135:15
**stipulate**
6:6
**stipulation**
6:5
**stock**
4:13, 40:7,
42:10, 42:23,
45:14, 50:3,
52:25
**stocked**
45:10
**stole**
108:11, 108:15
**stop**
32:9, 132:14
**storage**
108:18
**stored**
102:5
**story**
105:9
**straight**
29:25, 88:9
**straighten**
96:13, 134:17
**strategic**
75:18, 76:5,

76:22, 77:23,
79:18, 80:1
**street**
20:5, 51:19,
72:24
**strike**
18:3, 24:12,
31:10, 39:7,
44:21, 45:15,
60:20, 68:6,
79:25, 81:1
**strip**
18:9
**stroking**
75:8
**strong**
35:12
**strongly**
29:13, 48:1
**structured**
59:12
**stuart**
132:13, 132:19,
133:7
**stuck**
27:18
**stuff**
37:18, 61:14,
77:21, 80:19,
99:12, 116:7
**stumbling**
113:6
**styles**
20:20
**sub-clause**
57:5, 58:14
**subject**
107:22
**submit**
31:3, 34:21
**subordinates**
123:10, 129:21
**subpoena**
4:10, 7:3, 7:6,
10:13, 10:18
**subsection**
55:1
**subsequent**
134:13

**subsidiaries**
52:22
**subsidiary**
53:7
**successful**
28:9, 31:21,
35:24
**sue**
37:23
**sued**
7:23
**suggesting**
110:13
**suites**
2:7
**sum**
112:21
**superseded**
20:25
**supervise**
129:19
**supervision**
139:6
**supervisors**
124:10
**supplier**
62:21
**suppliers**
62:13
**support**
35:5
**supposed**
35:20
**sure**
10:23, 24:9,
32:11, 34:14,
48:3, 49:1,
67:15, 71:13,
93:12, 97:24,
102:2, 119:12,
123:19, 127:10,
127:15
**surplus**
35:14
**surprise**
80:15
**surprised**
80:17

**surrendered**
124:1
**surrounded**
19:9
**swear**
5:21
**sweetened**
83:15
**switch**
23:9, 23:10,
23:11, 23:12,
26:17
**switches**
24:17, 32:20,
33:6
**sworn**
6:12, 138:5
**system**
17:5
**systems**
43:7

|  T  |
|---|

**ta**
110:18, 111:10,
111:18, 111:22,
112:3
**tab**
20:22, 20:24,
123:14
**table**
41:23, 134:5,
134:7
**take**
8:21, 8:24,
10:2, 11:22,
17:1, 17:18,
25:25, 30:15,
37:25, 40:23,
46:8, 52:4,
66:11, 74:25,
80:19, 87:15,
98:2, 130:20,
132:24, 133:10
**taken**
62:1, 138:4
**taking**
5:11, 8:9

**talk**
25:5, 86:14,
87:2, 87:5,
87:17, 123:5,
126:13, 129:8
**talked**
30:20, 86:11,
86:14, 86:22,
86:25, 126:10
**talking**
9:14, 46:11,
86:16, 92:24,
93:13, 93:22,
103:5, 129:11,
130:22
**tangible**
53:23
**tax**
70:19, 135:5,
135:7, 135:11
**taxes**
136:2
**tb**
111:19, 111:20
**team**
14:24, 27:1,
32:6, 125:22,
126:21, 127:23,
129:8, 129:11,
129:12, 129:16,
129:17
**technically**
115:1
**technology**
64:11
**tell**
102:16, 104:8,
104:11, 132:3
**telling**
86:18
**ten**
9:14, 15:9,
67:10, 76:20,
86:18, 125:21,
125:23
**ten-minute**
66:11
**tennessee**
1:2, 5:7,

| | | | |
|---|---|---|---|
| 69:15, 69:21, 71:11, 72:2, 73:4, 73:24, 74:3, 84:3, 85:24, 88:25, 89:15, 90:7, 91:1, 91:11, 91:22, 93:14, 94:10, 97:1, 123:12 | 91:12, 100:6, 103:22, 103:23, 109:16, 118:16, 124:8, 124:15, 138:22 | **theory** 34:10 | 116:18, 119:6, 124:18, 124:20, 127:4, 127:8, 129:11, 133:8, 135:15 |

**tenure**
90:3, 107:19, 130:19
**term**
77:17, 80:22, 115:25, 116:3
**terminal**
111:20
**terminated**
132:12
**terminology**
23:8
**terms**
76:10, 112:23, 116:5
**territory**
15:1, 15:2
**testified**
6:14, 90:11
**testify**
6:12
**testifying**
8:7
**testimony**
6:7, 7:2, 9:12, 9:19, 9:21, 87:6, 87:12, 90:13, 95:9, 114:3, 134:19
**texas**
1:15, 2:14, 5:12, 6:20, 7:24, 15:3, 20:12, 33:1, 46:22, 72:9, 72:25, 87:23, 88:14, 88:20, 89:17, 91:1,

**text**
30:10
**th**
5:8, 25:22, 40:8, 40:17, 47:7, 51:19, 132:15, 132:18
**thank**
5:22, 7:21, 8:1, 9:6, 10:7, 10:10, 11:7, 11:18, 12:20, 14:1, 15:12, 15:19, 20:9, 21:22, 21:25, 22:3, 24:23, 25:2, 25:15, 26:5, 28:10, 29:18, 31:25, 32:22, 33:17, 34:1, 35:15, 39:7, 39:25, 40:20, 42:22, 44:5, 45:1, 47:10, 47:24, 48:6, 50:16, 53:12, 53:16, 55:23, 56:6, 57:1, 58:11, 61:9, 61:24, 62:7, 64:6, 66:15, 67:8, 69:6, 70:21, 71:3, 71:21, 72:20, 72:23, 74:1, 74:18, 78:17, 79:5, 79:13, 80:11, 80:25, 133:9, 136:13, 136:16, 136:22, 137:4
**themselves**
5:13, 45:8

**thereabouts**
37:24, 40:18
**thereafter**
138:7
**therefore**
130:19
**thereof**
62:16
**they'd**
82:7
**thing**
7:22, 19:22, 22:15, 26:24, 28:14, 29:6, 46:6, 66:6, 75:12, 77:9, 107:7
**thing's**
65:25
**things**
8:2, 10:4, 10:23, 28:24, 46:15, 63:17, 66:10, 77:7, 78:4, 82:5, 120:7, 122:21, 124:21
**think**
13:24, 18:21, 20:4, 20:8, 23:20, 24:4, 27:11, 28:18, 28:21, 29:15, 30:23, 45:5, 45:13, 52:3, 65:17, 65:23, 67:6, 67:16, 69:19, 78:23, 81:19, 86:13, 86:14, 86:15, 86:17, 86:20, 87:2, 88:8, 94:1, 94:7, 98:13, 100:1, 111:2, 111:4, 111:23, 112:1,

**thinking**
19:20, 47:18, 66:3
**thorough**
18:24
**thoroughness**
71:13, 89:7
**thought**
62:2, 80:15, 92:14, 110:11, 112:13, 120:2
**threatened**
37:22
**three**
13:24, 14:3, 26:25, 27:8, 27:15, 27:16, 30:5, 31:16, 40:24, 41:21, 63:8, 92:7, 94:21, 97:10, 112:17, 112:21, 123:17, 134:25
**through**
17:14, 24:6, 26:12, 30:21, 37:13, 56:4, 59:7, 60:16, 86:5, 94:2, 101:6, 127:1
**thrown**
114:9
**tier**
62:14
**tim**
20:23, 22:4, 22:8, 23:4, 23:19, 26:12, 27:3, 27:4, 29:2, 29:14, 29:17, 29:18, 33:7, 35:15, 36:4, 36:5,

36:7, 37:5,
37:6, 37:16,
38:3, 38:4,
38:14, 38:17,
39:14, 39:18,
39:23, 47:12,
53:7, 55:24,
60:7, 60:9,
61:16, 61:17,
63:25, 64:4,
65:12, 73:8,
73:23, 84:6,
84:11, 84:14,
84:17, 84:21,
84:24, 85:3,
85:12, 88:21,
89:15, 90:7,
93:18, 93:22,
94:3, 94:16,
94:25, 95:4,
95:17, 96:23,
97:13, 97:16,
98:15, 99:1,
99:24, 101:4,
107:19, 107:22,
107:23, 107:25,
108:10, 108:15,
110:13, 110:16,
111:1, 111:21,
112:3, 115:12,
125:7, 126:1,
126:20, 129:13,
129:17, 130:3
**tim's**
33:8, 111:19,
126:1
**time**
5:8, 7:19,
8:21, 11:3,
12:14, 13:18,
15:8, 16:8,
17:10, 18:8,
19:5, 19:23,
20:18, 22:8,
24:3, 24:5,
25:13, 27:6,
27:12, 33:18,
35:6, 35:11,

36:22, 38:8,
38:9, 38:18,
39:8, 40:14,
45:9, 47:3,
47:12, 63:11,
66:4, 66:16,
66:19, 68:19,
70:22, 70:25,
74:16, 75:21,
78:24, 81:19,
83:20, 84:15,
86:2, 87:23,
87:25, 88:3,
88:15, 91:20,
92:6, 92:9,
92:14, 93:13,
94:18, 97:7,
98:15, 98:24,
102:23, 102:25,
103:8, 105:4,
106:4, 107:17,
108:4, 114:25,
115:15, 115:20,
118:13, 121:14,
122:21, 123:1,
124:1, 126:15,
129:5, 129:6,
133:15, 133:18,
134:13, 136:17
**timeline**
20:16
**times**
7:12, 82:9,
116:7
**timothy**
1:4, 3:19,
5:18, 59:11,
110:18, 134:22
**tims**
27:4
**title**
37:2, 41:18,
51:6, 53:16,
53:21, 75:17,
76:14, 106:24,
107:11
**titled**
75:22

**titles**
76:11, 79:20
**tn**
3:7
**today**
5:9, 5:20,
6:24, 7:2, 8:3,
8:7, 8:13, 9:4,
9:14, 9:15,
9:21, 9:25,
11:9, 22:2,
41:25, 66:11,
86:7, 134:20
**today's**
5:7
**together**
17:2, 24:10,
34:7, 97:18,
97:22
**told**
65:25, 106:22,
114:21, 127:25
**tom**
17:11
**took**
9:14, 13:4,
13:6, 16:4,
16:24, 18:19,
19:17, 27:20,
36:14, 45:25,
61:17, 66:2,
77:19, 78:2,
79:12, 82:21,
87:20, 97:24,
135:20
**top**
120:16
**topic**
103:5, 113:8
**toshiba**
13:8, 13:17,
14:2, 14:6,
116:3
**total**
13:25, 87:24,
119:18
**totally**
111:25

**touch**
81:4
**tough**
104:9
**toured**
21:16
**towards**
36:19
**toys**
18:17, 18:18,
18:23
**tracing**
112:3
**track**
28:2, 41:12
**traction**
28:21
**trade**
22:9, 22:10,
22:14, 24:11,
24:24, 26:13
**transaction**
11:2
**transactions**
55:6
**transcriber**
139:1
**transcript**
4:8, 6:1,
63:14, 136:20,
139:3, 139:6
**transcription**
8:9
**transcriptionist**
138:8
**transfer**
51:7
**transferred**
11:24, 81:11,
110:1
**transistors**
33:5, 117:9,
128:17
**transit**
43:9
**transition**
79:8, 107:12,
112:7

transitionary
77:9
transitioned
15:20, 16:10
transitions
75:24, 77:18
transplant
10:2
travel
59:25
traveled
16:17
tray
15:22
tremendous
16:25
tried
7:20, 28:19
trott
61:16
true
57:6, 138:10,
139:6
trust
53:2
trusted
97:2
truth
6:13, 6:14
truthfully
9:25, 10:10
try
23:7, 31:4,
86:4, 106:23,
117:4, 125:14
trying
19:12, 46:16,
103:17, 105:11,
107:4, 109:18,
113:5, 113:24
tuesday
1:16
turn
10:12, 42:22,
70:7, 83:11,
114:11
turned
19:18, 96:9,

114:12
two
17:14, 17:16,
27:4, 30:11,
35:8, 51:11,
55:6, 56:14,
56:15, 63:17,
76:10, 78:1,
78:21, 82:23,
83:10, 88:22,
99:15
tx
2:9
type
20:25, 108:6,
118:21, 122:5,
122:9
types
15:10, 21:15
typewriting
138:7, 139:5
typical
21:11, 23:8
typically
59:24

**U**

uh-huh
42:5, 50:5,
50:10, 79:16
ul
85:1
umbrella
95:1, 122:16,
127:21
under
6:3, 8:4, 8:6,
38:2, 44:25,
58:1, 58:4,
78:10, 94:25,
119:19, 122:15,
125:25, 127:21,
129:24, 134:20,
139:5
underestimated
76:15
understand
5:25, 7:1,

8:11, 8:18, 9:3,
9:7, 9:24,
41:14, 50:17,
53:15, 56:5,
65:10, 90:21,
90:23, 92:6,
93:10, 95:8,
96:12, 103:7,
105:12, 109:16,
109:18, 111:25,
124:24
understanding
39:10, 65:6,
65:12, 65:15,
87:22, 93:13,
107:3, 107:5,
125:20, 129:22
understandings
49:25, 50:8
understood
10:9, 10:22,
30:1, 38:21,
44:19, 53:12,
55:25, 60:13,
63:13, 66:9,
82:4, 82:6,
85:7, 97:17,
102:8, 106:17,
115:4, 119:11
undertaking
49:25
unflip
23:11
unfortunately
19:8, 120:14
unique
68:2, 68:24,
69:1, 116:25
unit
65:16, 91:24,
99:23
united
1:1, 5:5, 90:24
units
99:3, 100:17,
116:14
university
11:25

unless
9:10, 22:20,
22:21, 37:23
unlike
118:7
unrelated
103:5
unseen
18:19
unsupervised
27:21
until
8:13, 9:17,
15:14, 15:22,
16:13, 36:21,
38:9, 46:12,
61:13, 61:14,
78:7, 92:8,
92:9, 99:22,
111:1
unusual
125:5
use
6:6, 8:22,
55:3, 55:4,
57:16, 80:22,
88:4, 105:2,
131:17
uses
6:3, 19:2,
57:18, 125:23
using
33:12, 84:22,
84:25, 107:8,
117:8, 121:16,
135:1
usually
34:11, 115:21,
120:11, 131:1,
131:21
utilized
22:19

**V**

vagueness
127:15
valid
55:2

value
17:16
vance
1:14, 2:1, 4:2,
5:3, 6:11, 6:19,
42:11, 67:23,
113:12
vantage
6:19
variable
13:17, 22:19,
95:19, 115:23,
116:4
variables
22:19
varied
125:21
various
13:16, 61:24
vehemently
133:25
vehicle
59:11
vehicles
43:9
vendor
41:12
venture
29:22, 47:5,
53:3, 53:6,
67:25, 68:19,
85:13, 92:23,
93:4, 93:18,
93:24, 94:15,
94:24, 96:17,
97:7, 97:9,
97:14, 97:15,
97:20, 103:5,
103:13, 108:3,
121:13, 121:16,
123:6
verbal
8:8, 50:14,
59:10, 60:2,
60:9
version
21:1
versus
21:20, 36:19,

37:19
vice
15:21, 16:15,
61:21, 75:18,
75:22, 77:10,
77:22, 77:23,
79:17, 79:18,
80:1, 80:5,
105:14, 105:20,
105:24, 106:1,
106:2, 106:3,
106:5, 106:18,
107:7, 107:10,
107:16, 122:25,
127:4
video
5:8, 5:10,
137:1
videographer
5:2, 5:9, 5:19,
66:16, 66:19,
133:13, 133:15,
133:18, 136:17,
137:2
videotaped
5:3
view
120:5, 125:14
viewed
18:18
violating
56:12
violation
56:17
virtually
99:11
visiting
18:8, 94:10
voice
5:13
volatile
120:11
vp
38:7, 38:8,
106:24
vps
38:6

**W**

w-2
29:19, 88:9

wage
36:6
wait
8:13, 9:17
waiver
108:6
walked
135:23
wall
23:9
want
8:3, 20:7,
33:22, 36:9,
37:12, 41:25,
46:6, 48:19,
49:17, 52:7,
59:5, 61:10,
66:3, 66:6,
66:8, 69:8,
83:2, 83:9,
109:20, 121:9,
123:19, 127:9,
127:15, 133:10
wanted
7:16, 17:5,
17:6, 27:8,
37:3, 46:3,
48:1, 49:1,
69:4, 71:13,
76:22, 77:3,
78:4, 78:5,
113:17, 118:3
wanting
27:1
warehouse
18:17, 20:1
warm
26:13
washington
3:14
water
8:23
wave
21:6, 100:18
way
8:14, 20:22,
22:12, 30:18,
34:11, 37:14,

76:24, 78:14,
79:7, 82:5,
97:12, 127:24,
130:16, 131:5,
134:23
ways
114:19
we'll
11:9, 19:25,
29:8, 52:11,
52:15, 54:22,
57:14, 57:15
we're
7:21, 8:12,
9:14, 9:17,
10:24, 34:3,
40:12, 41:5,
48:9, 52:10,
54:22, 61:18,
66:17, 66:20,
83:8, 93:13,
93:16, 122:19,
133:16, 133:19,
136:18, 137:3
we've
83:5, 127:20
wedding
81:9
week
13:8, 86:23,
86:24, 87:1,
87:13, 87:18
weekly
16:18
well-known
32:8
wells
102:21, 102:22
went
11:14, 11:23,
17:8, 18:18,
20:14, 25:1,
28:23, 33:20,
66:5, 99:18,
111:13, 126:25
weren't
7:18, 33:24,
35:4, 35:12,

36:23, 82:6,
91:3, 118:7,
125:5
**west**
11:25, 51:19
**westmoreland**
14:9, 14:10
**whatever**
49:6, 90:4,
94:11, 103:24,
108:2, 112:16
**whatsoever**
74:13
**whenever**
65:13, 66:5,
70:25, 73:17,
77:14
**whereas**
21:11, 43:4
**whereupon**
6:10
**wherever**
90:4
**whether**
23:14, 34:2,
37:1, 47:20,
58:21, 74:8,
91:7, 114:21
**whoever**
81:22, 128:14
**whole**
6:13, 19:17,
19:21, 23:20,
26:24, 38:1,
75:7, 75:12,
106:22, 111:19
**william**
3:11, 5:15,
6:21
**willing**
28:8, 31:19,
80:18
**willingly**
108:12
**winter**
13:4
**wire-wound**
118:20

**wiring**
21:10
**within**
13:7, 116:4,
126:21, 127:5
**without**
13:7, 31:19,
31:23, 52:14,
92:13, 122:3
**witness**
5:21, 22:1,
26:2, 43:2,
50:15, 50:17,
52:6, 52:13,
52:16, 66:23,
67:18, 67:20,
68:8, 85:20,
90:10, 108:24,
130:24, 131:20,
133:21, 136:14
**witness(es**
138:4
**woman**
126:7
**word**
18:20, 33:10,
33:12, 125:23,
131:17
**worded**
134:23
**wording**
92:22, 92:23
**words**
106:20, 107:8,
110:8, 135:1
**work**
12:17, 18:20,
19:1, 19:2,
33:24, 46:3,
71:1, 75:6,
75:13, 77:14,
90:4, 92:9,
108:4, 110:5,
112:6, 125:24
**worked**
12:18, 12:21,
13:12, 23:5,
23:19, 24:14,

31:24, 39:3,
39:23, 78:8,
90:3, 116:3,
130:14
**workers**
124:11
**workforce**
12:13
**working**
14:8, 24:16,
88:25, 91:7,
93:19, 99:12,
114:24
**world**
78:16
**would've**
15:18, 24:10,
26:18, 44:9,
45:21, 53:8,
54:17, 55:20,
58:8, 59:17,
60:6, 60:7,
60:11, 60:14,
60:24, 61:3,
62:1, 62:2,
63:22, 64:2,
64:4, 65:22,
83:16, 88:1,
96:20, 101:12,
103:23, 104:3,
117:1, 123:12,
123:13, 123:14,
126:11, 134:24,
135:12
**wouldn't**
31:13, 31:24,
46:12, 47:8,
65:10, 74:5,
88:18, 89:24,
92:2, 119:6,
125:11, 134:23
**wrap**
133:11, 133:23
**writing**
61:2
**written**
21:25, 49:21,
58:22, 60:19,

113:1
**wrong**
67:6, 67:8,
91:18
**wrote**
130:3, 130:8

| X |
| --- |

**x-i-a-n-g**
133:8
**xiang**
132:13, 132:19

| Y |
| --- |

**yard**
19:17
**yeah**
11:18, 20:3,
20:10, 20:16,
27:24, 29:15,
32:21, 34:8,
35:20, 38:13,
40:10, 40:11,
41:19, 41:22,
41:24, 42:25,
44:16, 44:24,
45:2, 52:8,
52:13, 53:10,
56:8, 57:22,
57:25, 58:3,
58:10, 59:1,
62:2, 65:22,
67:7, 70:19,
72:3, 72:16,
74:10, 75:4,
75:20, 82:18,
91:19, 103:22,
104:2, 123:24,
129:25, 136:24
**year**
11:23, 24:24,
25:1, 27:6,
44:11, 44:16,
71:20, 112:14,
113:9, 117:13,
119:14, 125:1,
125:2, 125:11,
125:16, 126:21,

127:11, 128:1,
131:12
**yearly**
114:4
**years**
9:15, 12:20,
14:3, 18:15,
36:13, 56:15,
70:17, 79:12,
83:10, 89:5,
101:16, 103:3,
103:15, 104:6,
104:12, 105:13,
118:14, 124:4,
125:6
**yep**
9:5, 40:19,
40:21, 41:10,
41:16, 45:20,
48:8, 48:17,
55:25, 62:11,
67:11
**yingling**
17:12
**york**
86:19
**young**
130:14
**yourself**
37:10, 48:11,
75:1

**Z**
**zone**
116:10
**zoom**
6:24

**$**
**$10,000**
112:14, 127:12,
131:2
**$30,000**
130:18, 131:17
**$4**
78:9, 78:10
**$5,000**
131:2

**$500**
59:11, 59:23,
60:3
**$500,000**
114:2, 119:15
**$60,000**
37:24

**0**
**00001**
41:8
**0001**
41:17
**00012**
51:12
**00020**
52:19
**000273**
54:10
**000275**
55:13
**000280**
57:24
**00044**
64:8
**0005**
42:8
**0006**
48:7
**00061**
42:17
**00063**
42:17
**0007**
49:18
**002**
56:19
**0031**
58:12
**0034**
62:10
**05**
25:22
**08**
1:17, 5:9,
87:23, 88:15

**1**
**1**
133:15, 133:18,

136:17, 137:6
**1,000**
18:11
**1,500**
18:11
**1-**
69:23, 72:15
**1.2**
32:1
**10**
1:17, 5:9,
67:2, 120:15,
120:16
**100**
81:20, 88:5,
110:11
**109**
51:19
**11**
66:16, 66:19
**110**
88:5
**12**
3:6, 15:9,
60:16
**120**
128:4
**1201**
3:13
**139**
1:24
**14**
87:23, 88:15
**15**
76:21, 103:3,
103:15
**150**
88:13
**16**
40:8, 40:17,
47:7, 132:15,
132:18, 133:15
**17**
70:2
**18**
59:6, 59:7,
59:9, 60:1,
61:6, 96:22,

96:23
**1980**
12:22
**1981**
12:22
**1987**
14:15
**1996**
16:1, 17:19,
20:11
**1999**
15:18, 15:22,
16:10, 16:14

**2**
**20**
9:15, 10:19,
25:22, 104:5,
104:12, 120:12,
120:13
**20004**
3:14
**2003**
15:22, 15:23,
16:16, 17:9,
17:24, 20:14,
36:12
**2005**
25:22, 26:6,
110:24
**2006**
31:11, 91:17,
91:20, 92:24,
92:25, 93:14,
93:25, 96:5,
98:8, 103:12,
103:19, 105:13,
108:3, 108:20,
110:20, 110:24,
111:12, 121:11
**2007**
91:21, 93:14,
108:3, 108:20,
110:20, 111:12,
121:11
**2008**
29:16, 35:15,
69:23, 94:25,

98:16, 98:20,
99:1, 107:19,
108:4, 108:20,
111:1, 111:12,
114:6, 115:6,
115:10, 115:15,
128:8, 129:5,
130:16
**2009**
61:13, 61:14,
61:15, 61:19,
61:20, 69:25,
70:2
**2010**
134:1
**2011**
45:22, 61:23,
74:23, 105:13,
105:14, 122:24
**2013**
44:8, 44:9,
44:13, 46:12,
60:16, 123:21,
125:15, 131:18
**2014**
40:8, 40:17,
47:7, 107:19,
114:6, 115:15,
116:8, 116:11,
117:5, 117:6,
118:14, 128:9,
129:5, 132:16
**2025**
1:16, 5:8,
138:23, 139:19
**213**
3:15
**22**
69:23, 72:15
**23**
56:7
**24**
1:7, 1:16, 5:7,
5:8, 133:18
**25**
4:11, 120:19,
120:22, 120:23,
120:24, 121:3

**26**
66:23
**28**
136:17, 137:6

---
**3**
---

**3**
3:8
**3.10**
57:1, 57:4,
57:6, 57:20,
57:23
**3.19**
50:24, 58:11,
58:15, 59:2
**3.20**
48:16
**3.4**
52:21
**3.7**
53:16, 53:18,
54:4, 54:9,
54:10
**3.9**
54:25, 55:2,
55:12, 55:14,
55:20, 56:7,
56:10, 56:19
**30**
4:12, 44:10,
44:11, 44:16,
70:17, 89:4
**300**
40:9
**320**
49:7, 62:9,
62:14, 63:15,
63:23
**34**
51:19, 66:16
**37130**
3:7
**38**
32:2, 32:3
**3:-cv**
1:7, 5:7
**3rd**
74:23

---
**4**
---

**4**
40:1
**40**
4:13, 88:6
**46**
66:19

---
**5**
---

**50**
47:21, 47:22,
48:3, 101:1
**5439**
111:10
**5650**
3:15
**587559**
1:23

---
**6**
---

**6-3**
69:25
**6.2**
51:24, 64:8,
64:10
**615**
3:8
**620**
2:8, 5:11
**66**
4:14
**69**
4:15

---
**7**
---

**74**
4:16
**771**
3:15
**78130**
2:9, 5:12

---
**8**
---

**8-**
70:2
**80**
120:12

**81**
14:5
**84**
14:5, 14:14
**84,000**
36:9
**85**
4:4
**87**
14:14, 14:16,
15:14
**893**
3:8
**8933**
3:8

---
**9**
---

**90**
46:25, 100:20,
120:15
**922**
1:7, 5:7
**96**
72:15
**99**
16:16