

# Transcript of Thomas Yingling

**Date:** July 25, 2025
**Case:** Atchison -v- Hubbell Industrial Controls, Inc.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

**1**

```
1              UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF TENNESSEE
3              Civil Action No. 3:24-cv-922
4
5             TIMOTHY ALLEN ATCHISON,
6                     PLAINTIFF
7
8                        V.
9
10        HUBBELL INDUSTRIAL CONTROLS, INC.,
11                    DEFENDANT
12
13
14
15
16
17
18
19
20
21
22
23  DEPONENT: THOMAS YINGLING
24  DATE:    JULY 25TH, 2025
25  REPORTER: ALLISON WOLFF, RPR
```

**2**

```
1              APPEARANCES OF COUNSEL
2
3  ON BEHALF OF THE PLAINTIFF, TIMOTHY ALLEN ATCHISON:
4  Ken Burger, Esquire
5  Burger Law Firm
6  12 North Public Square
7  Murfreesboro, Tennessee 37130
8  Telephone NO. (615)893-8933
9  E-mail: KenBurger@comcast.net
10  (Appeared via videoconference.)
11
12  ON BEHALF OF THE DEFENDANT, HUBBELL INDUSTRIAL CONTROLS,
13  INC.:
14  William E. Bradley, Esquire
15  Robinson + Cole, LLP
16  1201 Penn Avenue, NW
17  Suite 820
18  Washington, D.C. 20004
19  Telephone No.: (771)213-5602
20  E-mail: wbradley@rc.com
21  Also Present: Timothy Atchison, Plaintiff
22
23
24
25
```

**3**

```
1                      INDEX
2                                            Page
3  PROCEEDINGS                                  5
4  DIRECT EXAMINATION BY MR. BRADLEY            5
5  CROSS-EXAMINATION BY MR. BURGER             62
6  REDIRECT EXAMINATION BY MR. BRADLEY        110
7  RECROSS-EXAMINATION BY MR. BURGER          113
8
9                    EXHIBITS
10  Exhibit                                    Page
11  1 - Subpoena to Testify at a Deposition in a   5
12       Civil Action
13  2 - Complaint                               24
14  3 - Plaintiff's FRCP Rule 26 Initial        38
15       Disclosures
16  4 - 5/31/2025 letter from Mr. Burger        42
17  5 - Plaintiff's Responses to Defendant's    44
18       First Set of Interrogatories 1 - 12
19  6 - 1/16/2024 Disclosure Schedule to Stock  49
20       Purchase Agreement
21  7 - 2012 Sales Incentive Plan               52
22
23
24
25
```

**4**

```
1                    STIPULATIONS
2
3  The deposition of THOMAS YINGLING was taken at TAFT
4  STETTINIUS & HOLLISTER, LLP, 50 EAST RIVER CENTER
5  BOULEVARD, SUITE 850, COVINGTON, KENTUCKY 41011 on
6  Friday the 25th day of JULY, 2025, at approximately
7  10:01 a.m.; said deposition was taken pursuant to
8  FEDERAL Rules of Civil Procedure.
9
10  It is agreed that ALLISON WOLFF, being a Notary Public
11  and Court Reporter for the State of KENTUCKY, may
12  swear the witness.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

```
1              PROCEEDINGS
2
3         COURT REPORTER:  If you raise your right hand,
4    I'll swear you in.
5         Do you solemnly swear or affirm the testimony
6    you're about to give will be the truth, the whole
7    truth, and nothing but the truth?
8         THE WITNESS:  I do.
9         COURT REPORTER:  Thank you.
10              DIRECT EXAMINATION
11   BY MR. BRADLEY:
12        Q.  Please state your name and address for the
13   record.
14        A.   Thomas R. Yingling, 59 Gladiola Way, Amelia,
15   Ohio 45102.
16        Q.  Morning, Mr. Yingling.
17        A.   Good morning.
18        Q.  My name is William Bradley.  I represent
19   Hubbell in the lawsuit brought by Mr. Atchison.  On Zoom
20   today you'll see Mr. Burger and Mr. Atchison.
21   Mr. Burger's representing Mr. Atchison in this lawsuit.
22        A.   Okay.
23        Q.  The court reporter's marked as Exhibit 1 the
24   document you brought with you today.
25        Do you recognize that?
```

6

```
1    A.  Yes.
2    Q.  Mr. Yingling, do you recognize that as a
3    subpoena I issued in connection with this lawsuit?
4    A.  Yes.
5    Q.  Do you understand that you're here today to
6    provide testimony in connection with that lawsuit?
7    A.  Yes.
8    Q.  Have you ever been deposed before?
9    A.  No.
10   Q.  Okay.  I'd like to go over some of the ground
11   rules in depositions.  I want to remind you that you're
12   under oath, just as you are testifying in a court in
13   front of a judge or a jury.  If you do not understand a
14   question during the courts of today's examination,
15   please let me know, and I can rephrase it.  And if you
16   do answer the question, I'll assume you understood it
17   and answered it truthfully; is that fair?
18   A.  Yes.
19   Q.  During the course of the questioning today,
20   there may be objections made for various purposes.  You
21   are still obligated to answer the question unless it
22   would reflect a communication you had with a lawyer
23   regarding the subject matter.  Do you understand that?
24   A.  Yes.
25   Q.  Okay.  We'll take a break at any time today if
```

7

```
1    you need a break for a restroom or to get a drink or
2    anything.  Just let us know.  We'll go off and record,
3    take a break.  Okay?
4    A.  Okay.
5    Q.  As we go through this deposition today, what I
6    need you to do is remember to give a verbal response.
7    The court reporter can't --
8    A.  Okay.
9    Q.  -- record a shake of the head, so please
10   provide a verbal response to my questions.
11   A.  Okay.
12   Q.  I also need you to wait until I finish the
13   questions so we're not talking at the same time, again,
14   so the court reporter can keep an accurate transcription
15   of our conversation.
16   A.  Okay.
17   Q.  I need to ask a -- to establish that you're
18   competent to give testimony today, whether there are any
19   medical conditions or any medications that you're taking
20   that would affect your ability to understand my
21   questions and answer them truthfully.
22   A.  Not taking anything that would affect.
23   Q.  Thank you, Mr. Yingling.  I'd like to get some
24   background information on you first.
25        Did you continue your formal education after
```

8

```
1    high school?
2    A.  Yes.
3    Q.  And can you briefly summarize your
4    post-high-school education.
5    A.  I went to the University of Cincinnati and got
6    an associate degree in electrical engineering.
7    Q.  And do you recall when that was?
8    A.  '74 is when I graduated.
9    Q.  And then, after you graduated from the
10   University of Cincinnati, did you continue your
11   education?
12   A.  No.
13   Q.  Did you enter the workforce?
14   A.  Entered the workforce.
15   Q.  Let's briefly discuss your work history.
16        MR. BRADLEY:  I'm going to have him put
17   himself on mute.
18        COURT REPORTER:  Yeah.
19        MR. BRADLEY:  Mr. Burger, can you put yourself
20   on mute?  We hear rustling papers.
21        MR. BURGER:  I will.  I'm sorry.
22        MR. BRADLEY:  Thank you.
23   BY MR. BRADLEY:
24   Q.  So I would like to explore your work history.
25   A.  Okay.
```

9

1    Q.  What was your first job out of college?

2    **A.  Republic Steel in Canton, Ohio.**

3    Q.  What was the nature of your duties at Republic

4 Steel?

5    **A.  I was hired to be a shift supervisor, so I**

6 **went through -- kind of a get acquainted. I worked in**

7 **all the different departments of the crafts for repairs,**

8 **and then I was given a turn foreman's position in the**

9 **melt shop.**

10    Q.  And how long were you with Republic Steel?

11    **A.  Probably 14 years.**

12    Q.  And what was your next job at Republic Steel?

13    **A.  I was hired into a Post Glover Resisters.**

14    Q.  And do you recall when that was?

15    **A.  No.  Not exactly.**

16    Q.  Understood.  Where was Post Glover Resistors

17 located?

18    **A.  It was here in Kentucky.  They manufacture**

19 **resistors, and I was hired to sell resistor products to**

20 **the steel mill industry on behalf of Post Glover.**

21    Q.  Do you recall how long you were at Post

22 Glover?

23    **A.  Probably not exactly, but more than ten years.**

24    Q.  Thank you.  What was your next job after Post

25 Glover Resistors?

10

1    **A.  Post Glover laid me off, and I went to work**

2 **for Power Ohm Resistors in Katy, Texas.**

3    Q.  Do you recall what year that was?

4    **A.  It was around 2000, but -- yeah.**

5    Q.  Thank you.  What was the nature of your job

6 duties when you took the job at Power Ohm Resistors in

7 2000?

8    **A.  Pretty much the same thing.  I was selling**

9 **resistor products to steel mill customers, and I did**

10 **probably more work in the office, answering phones and**

11 **fielding requests.**

12    Q.  At some point during your tenure at Power Ohm

13 Resistors, did you relocate to the Covington -- or did

14 you relocate to the state of Kentucky?

15    **A.  No.  I've always lived in Ohio.**

16    Q.  Sorry?

17    **A.  To Cincinnati?**

18    Q.  Yeah.  Strike that.

19    When you joined Power Ohm Resistors in 2000,

20 it only had one location.  That was Katy -- Katy, Texas.

21 Correct?

22    **A.  Correct.**

23    Q.  At some point, the company expanded operations

24 into Kentucky; is that correct?

25    **A.  Correct.**

11

1    Q.  Do you recall what year that was?

2    **A.  No.**

3    Q.  And at some point, you joined the Kentucky

4 operations; is that correct?

5    **A.  Yeah.  Me and -- me and a coworker, we were**

6 **both hired from Post Glover at the same time, and**

7 **initially, we worked from our houses.  But then Post --**

8 **Power Ohm got an office in a building complex, just of**

9 **little offices, and we went to the office there.**

10    Q.  Do you recall what year that was?

11    **A.  No.**

12    Q.  Do you recall what city that was?

13    **A.  Kind of Florence, Kentucky.**

14    Q.  Florence, thank you.

15    And do you recall at some point moving into

16 the Covington, Kentucky, facility?

17    **A.  Yeah, I remember when they bought that and**

18 **started rehabbing it, the building.**

19    Q.  Okay.  Do you recall what year that was?

20    **A.  No.**

21    Q.  Okay.  What is your recollection of the move

22 from Florence to Covington?

23    **A.  So we had a little office there.  Joe**

24 **Eschleman had joined us in that office, and we expanded**

25 **the office.  I think we added another employee, so there**

12

1 **were four of us in that office.**

2    **And Power Ohm bought a building in Latonia,**

3 **and of course, there was a lot of remodeling that had to**

4 **be done, and we worked on the remodeling a little bit,**

5 **you know, and continued on our sales job. Then we**

6 **moved into that building in Latonia.**

7    Q.  And do you recall what products were being

8 made or sold out of Latonia?

9    **A.  Resistor products.  We didn't do a lot of**

10 **manufacturing originally.  We had the office, and we**

11 **did, you know, the telephone sales calls, and I would --**

12 **I would be on the road a lot doing traveling sales.**

13    Q.  Do you recall the purchase of a residential

14 property in connection with the move to Covington?

15    **A.  I wasn't really involved with it.  I don't**

16 **know if it happened at the same time or if it happened**

17 **later.  I wasn't involved with it.**

18    Q.  Thank you.

19    During your tenure, Power Ohm Resistors, did

20 your job title change over time?

21    **A.  Yeah.  I was a sales engineer for a long time,**

22 **but, yeah, there came a time when they approached me**

23 **about being the plant manager.**

24    Q.  Do you recall what year that was?

25    **A.  No.**

13

1    Q.   What were the nature of your duties as the
2  plant manager?
3    A.   I just -- everyone was kind of self-motivated,
4  the other sales people, and everyone knew what they
5  needed to and did it.  So I just kind of made sure
6  everything with the building was taken care of properly
7  and approached any problems that we had with, you know,
8  power and light and services and stuff.  I pretty much
9  did my thing.
10    Mike, I think, was still around, and had an
11  office, so -- but, yeah, I was named -- I didn't get
12  into a lot of deep managerial things.  It was kind of
13  similar kind of work as what I was doing before I was
14  named the general manager.  People -- more people would
15  come and ask me questions and stuff, about how they
16  should handle something and stuff like that.
17    Q.   Okay.  And what was your next job after Power
18  Ohm Resistors?
19    A.   I retired.
20    Q.   Were you there when Hubbell Incorporated
21  bought Power Ohm?
22    A.   Yes.
23    Q.   Were you ever an employee of Hubbell
24  Incorporated?
25    A.   Yes.

14

1    Q.   How long were you an employee of Hubbell
2  Incorporated?
3    A.   I knew you were going to ask this.  Six years
4  -- five, six years.
5    Q.   Do you recall what year it was that you
6  retired?
7    A.   2019.
8    Q.   2019, thank you.
9    Do you recall what your job title was at
10  Hubbell?
11    A.   Plant manager.
12    Q.   And --
13    A.   With Hubbell?
14    Q.   Yeah, with Hubbell.
15    A.   I was still a plant manager, but Hubbell did
16  move the manufacturing end of what was at our building
17  to Archdale, North Carolina.
18    Q.   Did you have any role in the Archdale, North
19  Carolina operations?
20    A.   I would frequently go over there and research
21  things and answer questions for them and guide them on -
22  - on things.
23    Q.   When you say they moved the operations to
24  Archdale, what were the operations that got moved there?
25    A.   What --

15

1    Q.   Products?
2    A.   What product did they make?
3    Q.   Yes.
4    A.   So Archdale made several products for Hubbell
5  and different products had different areas of the
6  factory.  So our resistors were kind of made in Texas,
7  so the only thing that went there from us was the -- the
8  brake modules product line.
9    Q.   While you were -- strike that.
10    Did Hubbell maintain any Kentucky operations
11  through 2019?
12    A.   They still had the sales engineers in the
13  building, yeah.
14    Q.   In Covington, Kentucky?
15    A.   Yeah.  And I think they -- part of building
16  was Load Banks Direct, was a different Vance Hinton
17  company, and they used part of our building, too.
18    I guess I was involved with that, as far as UL
19  certification of their products.
20    Q.   Okay.  Thank you.  Where did you first hear
21  the name Tim Atchison?
22    A.   I knew him from trade shows a little bit, and
23  certainly Mike and Vance because of Mike and Vance.  But
24  I knew Tim -- I was acquainted with Tim when he worked
25  at Bonitron.

16

1    Q.   Do you know what Tim did at Bonitron?
2    A.   I think he did the brake module product line,
3  and we sold them resistors.
4    Q.   Were you the salesman in charge of selling
5  products to them, do you know?
6    A.   I don't think I was.  I think a different
7  salesman in the company handled it.
8    Q.   Were you privy to any discussions with Mike
9  Crowe and Vance Hinton in the 2005, 2006 time frame,
10  about trying to start a division in Tennessee?
11    A.   No, I didn't know anything about that.
12    Q.   Do you recall when Tim Atchison was hired at
13  PowerOhm?
14    A.   I recall that he was hired by PowerOhm. Year,
15  no.
16    Q.   You do not know the year.
17    What do you recall regarding circumstances of
18  him being hired?
19    A.   You know, Mike said that he would be, you know
20  -- that we would be bringing in production of the brake
21  modules to the building, and we set up a -- we had a
22  test lab for testing resistors.  And we kind of made
23  some additional modifications to that test equipment to
24  be able to test brake modules.
25    Q.   Do you recall Tim's title when he was hired by

---

17

1  PowerOhm Resistors?

2  **A.  No.  We weren't a title oriented kind of**

3  **workplace.**

4  Q.  Did anybody have the title product design

5  engineer?  Does that sound familiar?

6  **A.  It sounds familiar, yeah.**

7  Q.  Okay.  But you don't know if that was Tim's

8  title when he was hired?

9  **A.  I probably should know, but I don't recall.**

10  Q.  But would -- that would be something more Mike

11  Crowe or Vance Hinton's wheelhouse, in your opinion?

12  **A.  I don't think -- Mike wasn't product**

13  **development either.  He was, you know, just managing**

14  **over everything.  And he had accounts that he called on**

15  **as well, a little bit.**

16  Q.  Did Tim hire, manage, and supervise staff as

17  part of his duties?

18  **A.  He certainly supervised the staff that were**

19  **doing the brake modules, and we did get a manager,**

20  **Michael Simmons, that kind of was in charge of the crew**

21  **at a time.  I can't remember when Michael came in**

22  **compared to when Tim came in, but I think Michael was**

23  **there first.**

24  Q.  And Michael was the manager that --

25  **A.  He was like production manager.**

---

18

1  Q.  Production manager.

2  So who did the staff reviews?

3  **A.  Michael would have done the people in the back**

4  **of the shop, and Mike did them before I was made plant**

5  **manager.  After I was named plant manager, I probably**

6  **did reviews.**

7  Q.  Okay.  Thank you.

8  To the best of your recollection, was Tim

9  Atchison hired to design and build break modules for

10  PowerOhm Resistors?

11  **A.  Yeah.  Yes.**

12  Q.  Do you know how long it took him to -- strike

13  that.

14  Do you know how long it took PowerOhm to bring

15  a brake module to market?

16  **A.  As -- as a thing of time, time is kind of lost**

17  **in my head these days, but...**

18  Q.  Okay.  That's perfectly understandable.  These

19  are events 20 years ago.

20  **A.  My mind doesn't want to --**

21  Q.  So I apologize.  Yeah, please do not guess.

22  Like, what you remember is what you remember.

23  **A.  Right.  Yeah.**

24  Q.  To the best of your recollection, though,

25  Mr. Atchison didn't show up with production-level specs,

---

19

1  ready to go in a shop and start building products; is

2  that correct?

3  **A.  He certainly had a -- knew where he wanted to**

4  **go with it.  He had worked at similar products at**

5  **Bonitron, and I think it was, you know, getting the**

6  **design down and getting people, you know -- staffing up,**

7  **people to make the stuff.  And I can't remember if they**

8  **-- the first things we made were prototypes or if they**

9  **were done to designs and materials were bought according**

10  **to drawings and stuff.  I can't remember.**

11  Q.  Okay.  But the brake product modules that you

12  recall, did they include the BG and LG series?

13  **A.  Yeah.**

14  Q.  So were the BG and LG series designed and

15  built while Tim Atchison was a full-time employee of

16  PowerOhm, to the best of your recollection?

17  **A.  Yeah.**

18  Q.  Were the BG and LG series designed and built

19  as part of his job duties as a full-time employee of

20  PowerOhm, to the best of your knowledge?

21  **A.  Yes.**

22  Q.  Were the BG and LG products designed and built

23  on company time?

24  **A.  Yes.**

25  Q.  Were the BG and LG products designed and built

---

20

1  using company resources?

2  **A.  Yes.**

3  Q.  Were the -- were any other employees of

4  PowerOhm involved in the production, assembly, building

5  of the BG and LG series?

6  **A.  I think it was just the people at Tim's**

7  **direction, and when Michael Simmons was there, you know,**

8  **he would get more heavily involved with that, you know,**

9  **in directing the people what to build and how to allocate**

10  **resources, just in terms of getting it built.**

11  Q.  At any time during Tim Atchison's tenure at

12  PowerOhm, did he ever, in front of you or to you, say

13  that he owned the BG and LG series designs?

14  **A.  No.**

15  Q.  At any time during Mr. Atchison's tenure with

16  you at PowerOhm, did he claim to have any intellectual

17  property rights in BG or LG products?

18  **A.  No.**

19  Q.  At any time during Mr. Atchison's tenure with

20  you at PowerOhm, did he ever say he was promised a

21  licensing fee of 3 percent for the sales of all products

22  by Mr. Hinton and/or Mr. Crowe?

23  **A.  No.**

24  Q.  Have you ever heard the word -- or the words

25  "power electronics"?

21

1     A.  It's from a general term and, probably, I
2  wouldn't pay much attention to them.  It's --
3     Q.  Have you ever heard the word "power tools"?
4     A.  Yeah.
5     Q.  Have you ever heard the word "hand tools"?
6     A.  Yeah.
7     Q.  Are those terms that engineers use to describe
8  a class of products?
9     A.  Yeah.
10    Q.  Is power electronics a word that engineers use
11  to describe a class of products?
12    A.  Yeah.  Yes.
13    Q.  Thank you.  Was the Covington facility ever
14  referred to -- strike that.
15        As plant manager, if there were an entity --
16  separate legal entity called power electronics operating
17  out of your plant, would you have been aware of that?
18    A.  Yes.  I think -- it was going under Mike Crowe
19  being the plant manager before I got involved, but --
20  yeah.
21    Q.  Well, you were aware of Load Banks Direct
22  operating out of your building.  Correct?
23    A.  Yeah.  Correct.
24    Q.  If there was a separate division called power
25  electronics operating out of your building, would you

22

1  have been familiar with that?
2     A.  It's, like, the definition of separate entity.
3  To me, it was people dedicated to a certain product
4  line, but, yeah, I don't know that it's a separate
5  entity, you know, a separate division.
6     Q.  So you have a sales department at PowerOhm.
7  Correct?
8     A.  Right.
9     Q.  So that might be referred to as sales.
10  Correct?
11    A.  Right.
12    Q.  Is that the same with the brake modules being
13  called power electronics, that it's just the noun you're
14  using to describe that product line?
15    A.  Yeah, yeah.
16    Q.  Okay.  Understood.  Thank you.
17        Were you part of any discussions with Mike
18  Crowe or Vance Hinton regarding a potential sale of the
19  company to Hubbell Incorporated?
20    A.  Not until it was announced.
21    Q.  So you had no meetings with Hubbell prior to
22  the announcement?
23    A.  No.
24    Q.  After the company was bought by Hubbell, do
25  you recall any meetings with Hubbell as part of that

23

1  transition?
2     A.  They sent people in and they met with
3  everybody, and then -- then they talked to individual
4  people.  But the sale was done before we met anybody
5  from Hubbell.
6     Q.  When did you learn of the potential move of
7  manufacturing to Archdale, do you recall?
8     A.  I'd say it was pretty quickly after it was
9  announced, you know, not -- certainly not a year.  In a
10  matter of months, it was -- we understood that they were
11  going to relocate us, yeah.
12    Q.  Do you recall -- strike that.
13        You continued on as a Hubbell employee for a
14  number of years after the acquisition.  Correct?
15    A.  Yeah.
16    Q.  Do you recall what happened to the operations
17  that were in Katy, where the resistors were made, after
18  Hubbell bought PowerOhm?
19    A.  I know that they moved them to Mexico, but I
20  thought that was kind of a -- not as fast a process as
21  moving the stuff out of our plant.
22    Q.  Correct.  Understood.
23        But you are aware that they did close the
24  manufacturing facility in Katy --
25    A.  Yeah.

24

1     Q.  -- and moved that --
2     A.  To Mexico, yeah.
3     Q.  And almost immediately after purchasing
4  PowerOhm, plants were made to move manufacturing to
5  Archdale; is that correct?
6     A.  Correct.  I made several trips to Mexico to --
7  to train those people and help those people get started,
8  the same I made several trips to Archdale.
9     Q.  Okay.  Thank you.  We're going to go through
10  some of the documents in this case.  I think it's better
11  to see my questions in context of the lawsuit.  So I
12  would like to mark as Exhibit 2 a copy of the complaint.
13        (Exhibit 2 marked.)
14  BY MR. BRADLEY:
15    Q.  Mr. Yingling, what I have handed to you,
16  marked as Exhibit 2, is a copy of the complaint, Timothy
17  Atchison, filed against Hubbell Industrial Controls,
18  that initiated this lawsuit.  Excuse me.
19        A number of the claims have already been
20  dismissed by the court, but I would like to still go
21  through some of the factual averments to get your
22  recollection of --
23    A.  Okay.
24    Q.  -- what's being claimed in this lawsuit.
25        If you could flip to page 3 of 31, and focus

**25**

1  on paragraph 5.
2  **A.  Okay.**
3  Q.  And I'll give you a moment to read paragraph
4  5.
5  **A.  Okay.  Okay.**
6  Q.  The first sentence in paragraph 5 says that
7  the plaintiff received both one -- strike that.
8  It says the "Plaintiff received both a sales
9  and engineering job and a proposal from PowerOhm
10  Resistors for a separate joint venture proposal in
11  2008."
12  Do you see that?
13  **A.  Yeah.**
14  Q.  To the best of your recollection, was there
15  any separate joint venture or did Tim Atchison have some
16  side job at PowerOhm Resistors?
17  **A.  It was never mentioned to me that it would be**
18  **a separate joint venture.**
19  Q.  Okay.  Thank you.
20  And then the next sentence says, "The proposed
21  focus of Plaintiff's sales and engineering efforts for
22  PowerOhm was to be similar in nature and scope to the
23  work at Bonitron and started with AC generator module
24  project for Omron Oilfield and Marine."  And then it
25  says, "The basic component of the PowerOhm work was

**26**

1  generic in nature and involved routine maintenance,
2  repair, sales, and marketing of components into heavy
3  industry motor-control systems."
4  Do you see that?
5  **A.  Yeah.**
6  Q.  In your recollection, was Mr. Atchison hired
7  to build brake modules?
8  **A.  That's what I assumed, yeah.**
9  Q.  Just asking for your recollection.
10  **A.  Yeah.  Yeah.  That's what I would have**
11  **expected.**
12  Q.  If you could flip to page 4 of 31.  Yeah,
13  strike that.
14  Skip to page 6 of 31.
15  **A.  Page 6?**
16  Q.  Yeah.  I'm sorry, page 7 of 31.  In the first
17  full sentence on that page, it says, "In return for his
18  overseeing and managing the entirety of the technical
19  aspects of the BPM projects, as well as hiring,
20  training, supervising managing, parts personal tech
21  support sales."
22  **A.  Where are you at?**
23  Q.  I'm sorry, page 7 of 31.
24  **A.  The first --**
25  Q.  Yeah, the first full sentence.

**27**

1  **A.  Okay.  So it starts on the previous page?  This**
2  **starts with "discussions as PowerOhm's partner and**
3  **manager."**
4  Q.  Let's see what page you're looking at.  Page --
5  "in return."
6  **A.  Okay.  Got you.  So pose your question again.**
7  Q.  So I wanted you to read that first.
8  **A.  Okay.**
9  Q.  I don't need to read it into the record.
10  **A.  Okay.**
11  Q.  Okay.  You were not aware of any financial
12  arrangement in which Tim Atchison was going to be given
13  3 percent of gross annual global receipts of anything.
14  Correct?
15  **A.  No.  And this was before I was plant manager,**
16  **I --**
17  Q.  Okay.  As plant manager, had there been some
18  arrangement for 3 percent, would you have been aware of
19  that?
20  **A.  No.**
21  Q.  Were you ever involved in the P~&~L
22  statements?
23  **A.  No.**
24  Q.  Were you involved in -- strike that.  We'll
25  look at a document later.

**28**

1  After Hubbell bought PowerOhm, did they
2  continue to make brake modules?
3  **A.  Yes.**
4  Q.  And in the entire time that you were with
5  Hubbell until 2019, were they continuing to make brake
6  modules?
7  **A.  Yes.**
8  Q.  Let's take a five-minute break.
9  **A.  Okay.**
10  Q.  We can we go off the record.
11  (Recess.)
12  BY MR. BRADLEY:
13  Q.  Back on the record.
14  If you could flip to page 10 of 31.  Okay.
15  Paragraph 2, can you read that to yourself.
16  **A.  Okay.**
17  Q.  Okay.  During your tenure at Hubbell, did they
18  continue to sell the BG and LG series products as they
19  existed at the time they bought PowerOhm?
20  **A.  Yes, they continued.  There were some**
21  **challenges with electronic components no longer becoming**
22  **available.  So there was -- I don't know that we ever**
23  **changed anything when I was there, but it was getting**
24  **into a problem to source some of the materials.**
25  Q.  But they continued to pursue the sales of

---

**29**

1 these products?

2     **A. Yes, yes.**

3     Q. And to your knowledge, these products had the

4 same names as they did at PowerOhm?

5     **A. Yes, yes.**

6     Q. Had the same product manuals?

7     **A. Yes.**

8     Q. Same part numbers?

9     **A. Yes.**

10     Q. And were continuously on sale the entire time?

11     **A. Yes.**

12     Q. In this paragraph that you just read, the

13 allegation is that Hubbell shut down the project for a

14 number of years, and then serendipitously snuck it back

15 into products years later.

16     Do you see that?

17     **A. Yeah.**

18     Q. Do you have -- you lived those year at

19 Hubbell. Can you respond to this with your recollection

20 of this.

21     **A. The whole time I was employed, they were**

22 **manufacturing and selling the product line.**

23     Q. Okay. Thank you.

24     If you flip to page 11 of 31, the next page,

25 the paragraph 1, the last sentence. It's about five

---

**30**

1 lines long. At the bottom, it starts with "in educated

2 hindsight."

3     **A. Where's "hindsight"?**

4     Q. "In educated hindsight," about five lines up

5 from the bottom. Six lines. Sorry, seven lines from

6 the bottom.

7     **A. Okay. "In educated hindsight," got it.**

8     Q. Okay. The paragraph reads -- or the sentence,

9 "In educated hindsight, plaintiff now alleges that

10 Hubbell, upon finalizing its purchase of PowerOhm's

11 assets, secretly planned (through contrivance with the

12 above-named PowerOhm officials) to unethically and

13 unlawfully convert plaintiff's intellectual property to

14 the ultimate and exclusive benefit of Hubbell. Hubbell

15 intended to remove plaintiff from any financial

16 entitlement and remove him entirely from its operation."

17     Do you see that?

18     **A. Yeah.**

19     Q. Again, you were at Hubbell during the

20 transition and until 2019.

21     What is your recollection of -- strike that.

22     Were you at Hubbell when Mr. Atchison was

23 terminated?

24     **A. Yes.**

25     Q. Do you recall the circumstances of Mr.

---

**31**

1 Atchison's termination?

2     **A. Yes.**

3     Q. I'm going to ask you some questions, and I

4 just want to remind you you're under oath, and the civil

5 process only works if our citizens show up and testify

6 truthfully.

7     Some of these questions might be difficult

8 because you're going to have to discuss the character of

9 Mr. Atchison in his presence, and I am sorry I'm putting

10 you in this position. But Hubbell's been accused of

11 some untoward conduct, and so I need to address some of

12 these allegations.

13     **A. Okay.**

14     Q. Okay. Can you explain your recollection of

15 why Mr. Atchison was terminated from Hubbell.

16     **A. So to -- I had put Tim out of the house.**

17     Q. Okay. Let's -- can I interrupt for a second?

18 Let's -- okay, let's go back to Mr. Atchison's days at

19 PowerOhm, when you were plant manager.

20     What was your personal assessment of his

21 character as an employee?

22     **A. He was very devoted to his product. He would**

23 **work late into the night, but he would also come into**

24 **the office late. And, of course, he lived in the house**

25 **adjacent to the plant, but he would come in to work**

---

**32**

1 **later, not early in the morning. I have no idea if he**

2 **was working on something in his house intellectually,**

3 **but he would come in late, and he would stay very late**

4 **working in the lab, testing things, and working on his**

5 **product.**

6     **He had personal things that were going on,**

7 **relationships with people in the area of the plant that**

8 **would sometimes cause harm to the house that PowerOhm**

9 **was letting him live in. So it came to a point that I**

10 **forced him to leave the house, and he moved back to**

11 **Tennessee, to his house in Tennessee. And then he was**

12 **working remotely from Tennessee.**

13     Q. Can you give us some examples of the conduct

14 in the house that led you to evict him.

15     **A. I think the thing that -- he would travel from**

16 **work, and he would leave the house for a period of time.**

17 **And the house got broken into -- the plate glass window**

18 **on the front of the house got broken and had to be**

19 **replaced, and so company did not have a good control on**

20 **what was happening at the house.**

21     Q. Were the police ever called to the house for

22 behavior issues?

23     **A. I'd say the police -- there was an occasion**

24 **where the police were called to the house.**

25     Q. Do you recall what your understanding of that

---

**33**

1 situation was?

2    **A. Not completely, you know.**

3    Q. Was Mr. Atchison involved in that situation?

4    **A. I'd say when the damage happened to the house,**

5 **Mr. Atchison was away from the property. When the**

6 **police came, I don't remember an occasion -- it's**

7 **difficult to remember if there was an occasion that the**

8 **police were there when Tim was there. So I can't -- I**

9 **can't say whether -- but I know the police were there**

10 **when he was absent. I can't say if the police were**

11 **there when he was there, but it -- it made me put him**

12 **out of the house.**

13    Q. If something happened while he wasn't there,

14 it wouldn't really be his fault.

15    Why would he be evicted for that?

16    **A. Because it was -- happened because of people**

17 **that he had relationships with, that he gave permission**

18 **for them to enter the house, and they had people they**

19 **knew that were angry about that person being involved**

20 **with Tim and were looking for retribution.**

21    Q. Were these fellow employees or --

22    **A. No.**

23    Q. These were just people from the community?

24    **A. Yeah.**

25    Q. If you could flip to page 12 of 31, paragraph

---

**34**

1 F, "plaintiff's contrived abrupt termination," and read

2 that paragraph to yourself. And it continues on to page

3 14. I'll give you a second to read all of section F.

4    **A. Okay. Okay.**

5    Q. Let's go back to Mr. Atchison's termination.

6 Who -- strike that.

7    Please give me your recollection of the events

8 that led to his termination.

9    **A. Lucien Rainville contacted us, said he was**

10 **going to come over and wanted to talk to Tim, and, of**

11 **course, he talked to other people as well.**

12    **And Tim was living in Nashville, and we -- he**

13 **wanted to talk to Tim. Tim had to be available for that**

14 **meeting. Tim would travel up, and he would stay at a**

15 **hotel in the area when he needed to stay multiple days.**

16 **So they -- my recollection, they planned the meeting for**

17 **around noon so Tim could travel up from Nashville to**

18 **attend the meeting, and I think another supervisor came**

19 **with Lucien for that meeting. It was a more important**

20 **meeting than the typical ones where Lucien would come**

21 **over and visit, and Tim was to be at the meeting. Tim**

22 **assured us he would be at the meeting at noon.**

23    **Noon came and went and Tim didn't show up. I**

24 **think Tim called and said he was running a little late,**

25 **but the time came for the -- to Lucien and the other**

---

**35**

1 **Hubbell employee to go catch their plane after 5:00,**

2 **back to Archdale, and Tim never arrived.**

3    Q. And didn't -- did he call and say, sorry, I

4 can't make it today or I've been in a car accident or

5 anything like that?

6    **A. He called and said he was running late, but**

7 **after that, we never heard from him.**

8    Q. And then, was he terminated because his

9 failure to show up to that meeting?

10    **A. I don't know about a direct link, but that**

11 **certainly contributed to -- he was untrustworthy about**

12 **being there at specific times and dates for appointed**

13 **meetings.**

14    Q. Did anyone at Hubbell mention that his work

15 habits were unacceptable to the company?

16    **A. I think Lucian mentioned that.**

17    Q. So when Mr. Atchison says his firing or his

18 termination was contrived and unexpected and he was a

19 model employee, is it your understanding that Hubbell

20 had a different opinion?

21    **A. Yes.**

22    Q. Thank you. If you could flip to page 15 of

23 31. If you could read paragraph H, sub paragraph 1 to

24 yourself.

25    **A. Okay.**

---

**36**

1    Q. Do you recall Hubbell collecting materials

2 from the Kentucky facilities prior to the move to

3 Archdale?

4    **A. Yeah.**

5    Q. Do you recall Stewart Jang (phonetic) being an

6 individual coming to collect materials?

7    **A. Yes.**

8    Q. Did you speak with Mr. Jang during this

9 process?

10    **A. Yeah, I'm sure I did. He would have asked --**

11 **asked me if I had anything, yeah.**

12    Q. Did he explain to you what he was doing in

13 collecting materials?

14    **A. I'm sure -- well --**

15    Q. Your recollection.

16    **A. My opinion is -- my thought is that he was**

17 **collecting the company's technical information to**

18 **transport it to Archdale because Archdale's where the**

19 **manufacturing was happening, and they were bringing,**

20 **probably, engineers up to speed on the product line over**

21 **there.**

22    Q. It was not a clandestine operation or

23 anything, in your recollection?

24    **A. There would be no reason for us to keep those**

25 **-- that information at our location because we weren't**

---

---

37

1  doing the manufacturing anymore.

2      Q.  Did Mr. Atchison ever say that those designs

3  and materials in Covington were his own personal

4  property?

5      **A.  It's a sketchy thing.  I mean, when he came,**

6  **he brought all that stuff there.  Personal property, you**

7  **know, he -- the company would basically have no interest**

8  **in his personal property, but I don't know how to**

9  **interpret the word "personal" as it applies to this**

10 **stuff.  But the company, I'm sure, felt that they had a**

11 **right to the information that was developed while he was**

12 **there and the testing he did at our place.**

13     Q.  Thank you.

14         When Mr. Atchison was terminated, did he turn

15 in his company laptop?

16     **A.  He did not.**

17     Q.  Do you know what was on his company laptop?

18     **A.  If it was like mine, an engineer with a**

19 **laptop, everything is on there.**

20     Q.  When was the last time you spoke with Tim

21 Atchison, prior to today?

22     **A.  It will be hard to say if it was within the**

23 **last year, but it was probably close to a year ago.**

24     Q.  At anytime post termination, did he indicate

25 he had a grudge against Hubbell?

---

38

1      **A.  He was not happy about how things ended with**

2  **Hubbell, but, yeah, I don't know that he had a grudge.**

3      MR. BRADLEY:  Exhibit 3?

4      COURT REPORTER:  Yes.

5          (Exhibit 3 marked.)

6  BY MR. BRADLEY:

7      Q.  I'm going to hand you what has been marked as

8  Exhibit 3, a copy of plaintiff's initial disclosures in

9  this matter.

10         If you could start on page 2 of 13, and you'll

11 see paragraph 4, plaintiff's case outline may be

12 concisely summarized as follows.

13         Do you see that?

14     **A.  Yes.**

15     Q.  First thing, subsection A, sub paragraph I

16 says -- strike that.

17         Sub paragraph A says, "Atchison's BPM

18 innovations were," subsection I says "not already on

19 market in 2015."

20         Do you see that?

21     **A.  Yeah.**

22     Q.  Were the BG and LG products sold by Hubbell in

23 2015 after the purchase of PowerOhm the same things that

24 were already on the market by PowerOhm before they got

25 bought in 2014?

---

39

1      **A.  Yes.**

2      Q.  Okay.  Then the next sub paragraph 2 says,

3  "Discreetly created as his personal intellectual

4  property at his home, unrelated to paid duties for

5  PowerOhm or Hubbell, Atchison" -- strike that.

6          And earlier, you testified that he was hired

7  to build the BG and LG products for PowerOhm. Correct?

8      **A.  Right.**

9      Q.  If you could flip the page, sub paragraph D

10 says, "Following the initial power electronics

11 development meetings with Hubbell management, Hubbell

12 abruptly terminated, with no stated reason for the model

13 employee, Mr. Atchison." He was only advised -- "he was

14 advised only that there had been no [sic] further review

15 of the power electronics business plan, causing Hubbell

16 to conclude that there was no real marketable value to

17 the Atchison/power electronics innovations.  Atchison

18 meekly departed with routine work commissions unpaid."

19         Do you see that paragraph?

20     **A.  Yeah.**

21     Q.  In your recollection, was he a model employee?

22     **A.  No.**

23     Q.  And in your memory of events, was there a

24 stated reason for his termination?

25     **A.  They didn't provide me a stated reason for his**

---

40

1  **termination.**

2      Q.  Okay.  You were not present when he was

3  terminated?

4      **A.  No.**

5      Q.  Do you know who terminated him?

6      **A.  No.**

7      Q.  Okay.  Thank you.

8          If you could turn to page 8 of 13.

9      **A.  A of 13?**

10     Q.  Eight of 13, yeah.

11     **A.  Okay.**

12     Q.  The paragraph mentions the Ohm motel.  Do you

13 see that?

14     **A.  Yeah.**

15     Q.  Is that a reference to the Kentucky house?

16     **A.  Yes.**

17     Q.  Okay.  Thank you.

18         And in bold it says, "The desktop computer in

19 the house contained all of Mr. Atchison's working

20 files."

21         Do you see that?

22     **A.  Right.**

23     Q.  In bold?

24         And do you understand that to be called the

25 house computer?

---

41

1    A.   Yeah.  It was the house computer.
2    Q.   And was that a PowerOhm computer or is that
3  Mr. Atchison's computer?  Strike that.
4         Do you recall how that computer got there?
5    A.   Yeah, I don't recall if it was provided for
6  him or not.
7    Q.   Okay.  Thank you.
8         And if you could flip to the next page, the
9  indented paragraph says, "Tom Yingling will corroborate
10  Mr. Atchison's house computer claims."
11        Do you see that?
12   A.   Uh-huh.
13   Q.   What is your recollection of the house
14  computer?
15   A.   I know that we provided internet access to the
16  house and a telephone on the company telephone system.
17  I knew he had a laptop.  I'm not surprised he had a
18  desktop computer.  I can't picture it in my mind,
19  recalling it.  I certainly, you know — he didn't, you
20  know — he worked for Mike initially, so the providing
21  of that computer would have been something Mike would
22  have done.  But, yeah, I don't recall the specific
23  computer or that, yeah.
24   Q.   And do you recall if Stewart John came to get
25  the materials off that computer as part of the move to

42

1  Archdale?
2    A.   Yeah.  He would have collected that, yeah.
3    Q.   Okay.  Thank you.
4    A.   Let me add one thing.
5    Q.   Sure.
6    A.   When I put Tim out of the house, I would have
7  thought that if that computer was something he needed to
8  do his work, he would have taken it with him when he
9  moved out of the house.  I know his car was full.  Maybe
10  he didn't have room for it and he was going to come back
11  for it later, but after I put him out of the house, I
12  don't think he would have left anything behind that was
13  relevant to him or important to him.
14   Q.   Understood.  Thank you.
15        Exhibit 4.
16        (Exhibit 4 marked.)
17  BY MR. BRADLEY:
18   Q.   I've handed you a letter I received with some
19  clarification regarding Mr. Atchison's position in this
20  lawsuit.  Just a couple brief questions to get your take
21  on a couple things in here.  If you could flip to page 4
22  of 10, sub paragraph 2.  Strike that.  Lay some
23  foundation.
24        It says, "Finally, Mr. Atchison reaffirms that
25  the below identified potential witnesses will confirm

43

1  the following sequential points in Mr. Atchison's
2  presentation of proof."
3    A.   Okay.
4    Q.   Colon.  Sub paragraph 2 says, "While at
5  PowerOhm, Mr. Atchison's regular duties did not include
6  the brake power module concepts as set forth in the
7  complaint."
8         Do you see that?
9    A.   Yeah.
10   Q.   And you testified earlier, to your
11  recollection, that's the reason he was hired, was to
12  build brake power modules at PowerOhm.  Correct?
13   A.   Right.
14   Q.   And then sub paragraph 3 says, "Those unique
15  (nonroutine) BPM concepts that further evolved at
16  Mr. Atchison's kitchen table between 2008 and 2014 were
17  entirely discreet from his PowerOhm duties.  The scant
18  e-mails confirm that separation."
19        Do you see that paragraph?
20   A.   Yeah.
21   Q.   And is -- I believe you testified your
22  recollection was that there -- he was a full time
23  PowerOhm employee that was building these products for
24  PowerOhm during his entire tenure; is that correct?
25   A.   Yeah.  Yes.

44

1    Q.   If you could flip to page 6 of 10.  You'll see
2  that your name is listed in sub paragraph 11, and I just
3  want to, again, confirm, when we're talking about house
4  computer, we're talking about a desktop computer in the
5  Covington, Kentucky, house called the Ohm motel.
6  Correct?
7    A.   Yes.
8    Q.   And that computer was in the house after Mr.
9  Atchison was put out of the house.  Correct?
10   A.   Yes.
11   Q.   And Mr. Stewart Jang, as part of his
12  collection of the materials that would be needed to move
13  production to Archdale, collected all of the materials
14  from the plant and the house --
15   A.   Everything he thought he would need related to
16  the product line.
17   Q.   Thank you.  Done with that exhibit.
18        Let's take another five-minute break.  Okay.
19  We'll go off the record, use the restroom, whatever.
20        (Recess.)
21        (Exhibit 5 marked.)
22  BY MR. BRADLEY:
23   Q.   Mr. Yingling, I'm handing you what's been
24  marked as Exhibit 5, a copy of plaintiff's response to
25  defendant's first set of interrogatories, 1 through 12.

45

1 Your name appears in this document several times, so I'd
2 like to get your take on what is said in relation to
3 you.
4         If you could start on page 11 of 32. If you
5 could read paragraph B to yourself.
6     A. Okay.
7     Q. Okay. I want to focus on the sentence that
8 says, "When Hubbell acquired PowerOhm Resistors (and its
9 subsidiary, power electronics) PowerOhm, through its
10 subsidiary power electronics, was unequivocally
11 obligated to pay me 3 percent of its gross sales on the
12 power electronics brake power module work. That
13 obligation was fully known to Hubbell, Hubbell's
14 management, Tom Yingling, and Andrew Thexton and perhaps
15 others that I do not presently recall."
16         Do you see that?
17     A. Yeah.
18     Q. I believe earlier you testified you were not
19 aware of any 3 percent obligation to Mr. Atchison?
20     A. No.
21     Q. And I believe you also earlier testified,
22 you're not aware of any -- the existence of any
23 subsidiary called power electronics. Right?
24     A. No.
25     Q. Thank you. Okay. Turn to page paragraph C.

46

1 Your name appears again. Can you read that to yourself.
2     A. Okay.
3     Q. Okay. Again, I'll start with sentence says,
4 "I believe that Tom Yingling will be a truthful source
5 (along with the document evidencing my brief initial
6 payments) for corroborating that the 3 percent
7 arrangement was unique among all employees at PowerOhm
8 or subsequently power electronics."
9         Do you see that?
10     A. Yes.
11     Q. And I believe earlier, you testified you're
12 not aware of any 3 percent arrangement; is that correct?
13     A. Correct.
14     Q. And you were not aware of any entity called
15 "power electronics." Correct?
16     A. Correct.
17     Q. And then it says, "That is an important point
18 I believe directly corroborates my allegations in this
19 matter. The abrupt and inexplicable shutdown of power
20 electronics made absolutely no sense in overall context.
21 If hindsight, it makes perfect sense."
22         My only question is, to the best of your
23 knowledge, the BG and LG products remained on sale
24 throughout the entire time that you were with Hubbell
25 after they bought PowerOhm. Correct?

47

1     A. Correct.
2     Q. Thank you. If you could turn to page 13 of
3 32, paragraph B, your name appears again.
4     A. Okay.
5     Q. And again, it's referencing you as a witness
6 that would corroborate a 3 percent obligation to
7 Mr. Atchison and as, I believe you testified, you were
8 not aware of any such --
9     A. Yeah, I have no knowledge of --
10     Q. Okay. Thank you.
11     A. -- that relationship.
12     Q. Your name appears again on page 16 of 32.
13         Have you finished reading that paragraph, by
14 any chance? Where your name appears?
15     A. Page 15?
16     Q. Page 15 to 16. Yes, your name. Paragraph B,
17 do you see?
18     A. This whole thing about number 6?
19     Q. Yeah. Well, down here at paragraph B, your
20 name appears.
21     A. Okay.
22     Q. And then on the next page, your name appears.
23     A. Okay. Okay.
24     Q. In this paragraph, he talks about an abrupt
25 and unexplained disassembly of power electronics,

48

1 termination of employees, et cetera.
2         My question to you is, was the move of
3 manufacturing to Archdale a secret that the employees
4 weren't aware of?
5     A. I'd say they waited 'til the last possible
6 time to — to let them know that was going to happen.
7     Q. And were you aware, during this time period,
8 that there was going to be a move to Archdale?
9     A. I don't think I had more than 24 hours notice
10 that that was going to happen.
11     Q. And then, did Hubbell explain to you that they
12 were moving operations to Archdale?
13     A. Yes.
14     Q. And then, did that become widely known amongst
15 employees that operations were moving to Archdale?
16     A. Yeah. I don't think I was to say anything
17 until they did — somebody came and did an announcement,
18 yeah.
19     Q. Correct. So it was abrupt and unexplained to
20 the extent it was need to know until it actually
21 happened?
22     A. Right.
23     Q. Okay. Thank you. And did anybody at Hubbell
24 explain to you why they moved to Archdale instead of
25 keeping manufacturing in Kentucky?

---

**49**

1    A.  Consolidation of assets.

2    Q.  And for cost and consolidation reasons?

3    A.  Yeah.

4    Q.  Okay.  Thank you.

5        You can put that aside.  The next exhibit.

6    Exhibit 6.

7        (Exhibit 6 marked.)

8    BY MR. BRADLEY:

9    Q.  Mr. Yingling, I've handed you what's been

10   marked as Exhibit 6, is disclosure schedules to the

11   stock purchase agreement when Hubbell bought PowerOhm

12   Resistors in January of 2014.

13       I would like you to flip to page 25, schedule

14   3.19, titled, Employee Benefit Plans.

15       Do you see that?

16   A.  3.1?

17   Q.  Schedule 3-point -- oops, schedule 3.19.

18   A.  Okay.

19   Q.  Employee benefit plans.

20   A.  Okay.

21   Q.  Can you just take a minute to look down that

22   list briefly.

23   A.  Okay.

24   Q.  Okay.  So as part of the stock purchase

25   agreement, the sellers of PowerOhm, Mr. Crowe,

---

**50**

1    Mr. Hinton, Mr. Jochen, had to provide a list of

2    cash/noncash compensation to the employees of PowerOhm,

3    and they listed a number of plans and agreements here.

4        I want to turn your attention to number 18

5    first.  It says, "Pursuant to a verbal agreement with

6    PowerOhm, Tim Atchison receives a $500 monthly vehicle

7    allowance that is structured as a reimbursed

8    out-of-pocket expense."

9        Do you see that?

10   A.  Yes.

11   Q.  Were you aware that Mr. Atchison had a verbal

12   agreement for a 500-dollar car allowance?

13   A.  No.

14   Q.  Okay.  But you'll see that the sellers of

15   PowerOhm included verbal agreements with their

16   employees, such as Mr. Atchison, in their list of

17   employee -- employee benefit plans?

18   A.  Yeah.

19   Q.  Okay.  Now, you'll see numbers 8 through 12

20   are bonus plans.  It says 2013 bonus plan for Joe

21   Eschleman, then 2013 plan for Randy Wu.

22       Do you see that?

23   A.  Yes.

24   Q.  Were you aware of written bonus plans for

25   various sales employees?

---

**51**

1    A.  I don't know.

2    Q.  Were you -- maybe you did not see them, but

3    were you aware that they existed?

4    A.  I think that's likely, yeah.

5    Q.  Okay.  Let's skip to 13 to 17.  We'll start

6    with 16.  Says, "2013 sales incentive plan, product

7    manager for Thomas Yingling."

8        Do you see that?

9    A.  Yes.

10   Q.  Do you recall having a sales incentive plan?

11   A.  Yes.

12   Q.  And was this a written --

13   A.  Yes.

14   Q.  -- incentive plan?

15   A.  Renewed annually, yeah.

16   Q.  So every year you'd get a sales incentive plan

17   for management?

18   A.  Right.

19   Q.  And do you recall the contents of what the

20   sales incentive plan would include?

21   A.  If you hit certain targets, you would receive

22   a percentage of money.  Yeah.

23   Q.  And you'll see, in number 17, next one says,

24   Sales incentive, 2013 sales incentive plan, product

25   manager for Tim Atchison.

---

**52**

1        Do you see that?

2    A.  Yes.

3    Q.  So were you aware that the various product

4    managers had sales incentive plans?

5    A.  Yes.

6    Q.  Were you aware they were written plans?

7    A.  Yes.

8    Q.  And were you aware they were renewed every

9    year?

10   A.  Yes.

11   Q.  I'm going to hand you what's been marked as

12   the next Exhibit.  What Exhibit is this?

13       COURT REPORTER:  Seven.

14       MR. BRADLEY:  Exhibit 7.

15       (Exhibit 7 marked.)

16   BY MR. BRADLEY:

17   Q.  Mr. Yingling, I've handed to you a document

18   entitled, 2012 Incentive -- Sales Incentive Plan,

19   product manager for Tim Atchison.

20       Do you see that?

21   A.  Yes.

22   Q.  Does this document look, format wise, similar

23   to the sales incentive plans you recall receiving?

24   A.  Yes.

25   Q.  And in the notes -- do you see the notes on

---

53

1 the left-hand side?
2   A. Okay.
3   Q. And note 2 says, "Executive management
4 reserves the right to modify the plan at any time."
5       Do you see that?
6   A. Yeah.
7   Q. And then note 3 says, "This plan is not an
8 employment contract."
9       Do you see that?
10   A. Yes.
11   Q. Okay. And in this document -- strike that.
12       What was Tim Atchison the project manager for?
13   A. Brake modules.
14   Q. And this document, you'll see it lists the
15 actual sales for brake modules for 2011, and then the
16 target for 2012.
17       Do you see that?
18   A. Yes.
19   Q. And it's under PowerOhm sales.
20       Do you see that?
21   A. Right.
22   Q. Okay. So then, if we go over to the box 1, it
23 says, "Sales bonus."
24   A. Correct.
25   Q. You will see that, based on the quarterly

54

1 shipments, there is a quarterly bonus for achieving
2 certain milestones?
3   A. Correct.
4   Q. And did you have a similar plan, where you had
5 various milestones?
6   A. Yes.
7   Q. Okay. Thank you. And also, you'll see box 2,
8 discretionary bonus.
9   A. Yes.
10   Q. Did you have a similar box, discretionary
11 bonus, if you recall?
12   A. I don't know if I did.
13   Q. Okay. Did you, as the plant manager, work
14 with Mike Crowe to come up with Q2 objectives for
15 anybody in the plant?
16   A. No, this -- I remember Vance saying we
17 agonized for months over creating these plans, and I
18 think it was all him.
19   Q. Okay. Thank you.
20       Down in number 5 on Q2 objectives, where it
21 says, "Competitive advantages, LG and BG product
22 features, ratings, and design." And then it says, "Why
23 are we better than Bonitron and others."
24       Do you see that?
25   A. Yes.

55

1   Q. Do you recall what the company's position was,
2 as a part -- to why your products might be superior to
3 Bonitron, if they were?
4   A. I think they had better -- a better
5 electronics system. It could handle things that
6 Bonitron system couldn't handle. I think there was some
7 features in there that were preferred.
8   Q. And were you familiar with what the components
9 were of those features?
10   A. Well, I know that it -- the one thing that was
11 important was that if a short occurred in the brake
12 module, it would sense that and shut off the electronics
13 faster than Bonitron was capable of doing.
14   Q. Do you know if that feature is found in brake
15 module products of other competitors today?
16   A. Do I know?
17   Q. Yeah.
18   A. Rephrase that.
19   Q. Strike that.
20       During your tenure at Hubbell, were similar
21 features incorporated into competitive products of other
22 manufacturers, similar to what you guys were doing?
23   A. Certainly not all of them. Yeah. Some of the
24 features Tim had in this device were better.
25   Q. And do you know what any -- do you know the

56

1 components of any of those features, what they might be?
2 If you don't, I understand.
3   A. Yeah. I don't know if I could reproduce it
4 accurately now.
5   Q. Got it. Okay.
6   A. The speed of response of the electric
7 components was the -- the high-power components was the
8 gist of it, that I recall.
9   Q. But you don't recall -- I guess what I -- I
10 guess I'd have to show you schematic, maybe that would
11 help, if that -- never mind. It's been too long. Okay.
12 I'm just trying to understand what --
13   A. See, I didn't -- I didn't have to understand
14 this.
15   Q. Understood.
16   A. I just -- for UL testing and -- I would work
17 with Tim late in the day. Frequently we would work
18 until 8:00 at night in the lab and -- testing things and
19 fine tuning things. So -- yeah, so I was aware of those
20 things from discussions with him.
21   Q. Okay. I'm just going to go through some
22 questions to make sure I have captured your testimony
23 accurately today.
24       Was Tim Atchison hired as a full-time employee
25 of PowerOhm for the specific purpose to help design and

57

1   build brake power modules for PowerOhm Resistors, Inc.?
2       **A. Yes.**
3       Q. Did Tim Atchison's job duties during his
4   tenure at PowerOhm include designing, building, testing,
5   and working to bring brake power module products to
6   market for PowerOhm Resistors, Incorporated?
7       **A. Yes.**
8       Q. Were the brake power module products sold by
9   PowerOhm Resistors, including the BG/LG series, the end
10  products of the work Tim Atchison did while he was
11  employed for PowerOhm Resistors, Inc.?
12      **A. Yes.**
13      Q. Were the brake power module products sold as
14  products of PowerOhm Resistors incorporated and not some
15  other entity or subsidiary of PowerOhm Resistors called
16  power electronics?
17      **A. Correct.**
18      Q. To the best of your knowledge, did PowerOhm
19  ever have a separate legal entity or division called
20  power electronics with separate books?
21      **A. No.**
22      Q. Did Tim Atchison ever claim ownership of any
23  intellectual property rights in the brake power module
24  products developed and sold by PowerOhm Resistors,
25  Incorporated?

58

1       **A. I have no knowledge of that.**
2       Q. Did Tim Atchison ever claim, in your presence
3   or to you, that he was a licenser of rights to designs,
4   concepts, and end products that were the brake power
5   module products sold by PowerOhm Resistors, Inc.?
6       **A. No.**
7       Q. Did Tim Atchison ever claimed he joined
8   PowerOhm based on an agreement with Mr. Crowe and Mr.
9   Hinton that he would receive 3 percent of all the future
10  sales of a separate power electronics legal entity?
11      **A. No.**
12      Q. Do you know if there were ever any discussions
13  to seek patent protection for any of the brake power
14  module products being made?
15      **A. I don't think so. Not that I was aware.**
16      Q. When PowerOhm Resistors, Incorporated, was
17  bought by Hubbell in 2014, you continued on as a Hubbell
18  employee. Correct?
19      **A. Correct.**
20      Q. You were employee of Hubbell until 2019.
21  Correct?
22      **A. Correct.**
23      Q. Were the brake power module products, the BG
24  and LG, on sale at PowerOhm Resistors prior to them
25  being bought by Hubbell Incorporated?

59

1       **A. Yes.**
2       Q. Were the brake power module products, the BG
3   and LG, sold by Hubbell in 2014 after they bought the
4   company?
5       **A. Yes.**
6       Q. Were the brake module products, the BG and LG,
7   sold by Hubbell after they bought PowerOhm Resistors,
8   Incorporated, the same products that were sold at
9   PowerOhm Resistors, Incorporated, before Hubbell bought
10  them?
11      **A. Yes.**
12      Q. Were the BG and LG products on sale by Hubbell
13  in 2015?
14      **A. Yes.**
15      Q. Were the BG/LG products listed on Hubbell's
16  website in 2015?
17      **A. Yes.**
18      Q. Did Hubbell successfully sell BG and LG
19  products in 2015?
20      **A. Yes.**
21      Q. Were the BG/LG products on sale by Hubbell in
22  2016?
23      **A. Yes.**
24      Q. Were the BG/LG products listed on Hubbell's
25  website in 2016?

60

1       **A. Yes.**
2       Q. Did Hubbell successfully sell BG and LG
3   products in 2016?
4       **A. After I retired?**
5       Q. In 2016, before you retired.
6       **A. Okay. Yes.**
7       Q. Good. And the same would hold true, to the
8   best of your knowledge, all the way through to when you
9   retired?
10      **A. Yes.**
11      Q. After you retired in 2019, are you aware if
12  Hubbell continued to sell the BG and LG products in
13  2020?
14      **A. Yeah. They sold -- continued to sell them.**
15      Q. And in 2021, do you have any knowledge as to
16  whether or not they continued to sell the BG and LG
17  products in 2021?
18      **A. Yeah, I didn't --**
19      Q. Well, you didn't keep up, so --
20      **A. I didn't keep up.**
21      Q. You were retired. Okay. Thank you.
22      **A. I was -- yeah, the stuff I did for Hubbell**
23  **after I retired as a contractor were problem resolution**
24  **with stuff that we did -- I did no new products. I just**
25  **helped them with technology that I did.**

61

1    Q.   So -- let me take a step back.
2         So after you retired in 2019, you did
3    contractor work for Hubbell; is that correct?
4    **A.   Yes.**
5    Q.   Okay.  How long did you do that?
6    **A.   Three years.**
7    Q.   Three years.  2019 to 2022.
8         And what was the nature of your work again?
9    **A.   I would answer questions for them, and I did**
10   **service calls on failures to analyze what went wrong or**
11   **to give them advice on what they needed to do**
12   **differently on the use of the equipment.**
13   Q.   And when you say this equipment, what products
14   are we talking about?
15   **A.   It was all resistor products, high voltage**
16   **products that I had sold, designed and sold.  Yeah.  It**
17   **wasn't brake modules.  I don't think I ever get into the**
18   **brake modules stuff.**
19   Q.   Okay.  Thank you.
20        Are you aware of any period of time from July
21   30th, 2015, when Mr. Atchison departed Hubbell, where
22   Hubbell stopped selling the BG or LG products?
23   **A.   No.**
24   Q.   Are you aware of any time after July 30th,
25   2015, when Mr. Atchison departed Hubbell, that Hubbell

62

1    stopped offering the products on their website?
2    **A.   No.**
3    Q.   Are you aware of any plans, conspiracy,
4    agreement, or otherwise, between members of PowerOhm
5    and/or Hubbell to mislead Tim Atchison in order to cut
6    him out of a 3 percent royalty for brake power module
7    products?
8    **A.   Not aware of it.**
9    Q.   Do you have any idea why Tim Atchison would
10   list you as a witness that would corroborate his story
11   that there is a separate power electronics division and
12   he was entitled to 3 percent of the gross sales?
13   **A.   Only that it was his belief, but it was not**
14   **something I was aware of.**
15   Q.   Okay.  Thank you.  I have no further
16   questions.  Thank you.  I'll pass the witness.
17        COURT REPORTER:  He might ask questions now.
18        CROSS-EXAMINATION
19   BY MR. BURGER:
20   Q.   Mr. Yingling, we spoke earlier.  I'll
21   introduce myself again on the record.  I'm Tim Burger in
22   Tennessee, just outside Nashville, and I represent
23   Mr. Atchison in this matter.
24        I'm going to ask you some questions about
25   these matters that have been addressed by Mr. Bradley.

63

1    If at any time I ask you anything that seems unclear,
2    there's no particular formality to this as far as I'm
3    concerned.  I'm just trying to understand what your
4    knowledge is, your opinions are about these matters.  So
5    you feel free to ask me to restate anything that I put
6    to you in question form that you think needs
7    clarification at any time in the deposition.  Okay?
8    **A.   Okay.**
9    Q.   And may I clarify, again, not in an accusatory
10   way, but I need to understand, do you have any type of
11   financial arrangement, however broad, that can be
12   defined with Hubbell at the present time?
13   **A.   No.**
14   Q.   Do you have any kind of social relationship or
15   social connection with any of the principles at Hubbell
16   at this time?
17   **A.   No.**
18   Q.   You, I thought, made the comment earlier about
19   when you had last talked to Mr. Atchison, and I thought
20   you said a year or so ago.
21        Did I misunderstand that?
22   **A.   Yeah, that's as close as I could get right**
23   **now.**
24   Q.   How and under what circumstances would you
25   have had occasion to speak with him a year or two ago?

64

1    **A.   I think just called to see how he was, you**
2    **know.**
3    Q.   You called him within the last couple of
4    years, but before this lawsuit, to see how he was?
5    **A.   Yeah.**
6    Q.   You didn't call him and talk to him in the
7    context of anything pertaining to hearing about the
8    lawsuit?
9    **A.   No.**
10   Q.   How long had it been -- had it been before
11   that call to that general welfare call, if I may label
12   it as that, how long -- how many years had passed before
13   you called to check on him?
14   **A.   I would say since I -- since I retired, we**
15   **probably only talked twice.**
16   Q.   Okay.  When would the last time have been
17   before the previous incident, a year or so ago, that
18   you're describing.  When would the last checkup have
19   been?
20   **A.   It might have been a year before.  It could be**
21   **that, in my phone, I had Tim's birthday or something in**
22   **there or something happened in my life that reminded me**
23   **of Tim, so I just would have called to see how he was**
24   **doing.**
25   Q.   Okay.  Let me -- on some of these more

65

1  material points, I understood you to say not once, but
2  maybe three or four times -- as the question was put to
3  you maybe three or four times, that the brake power
4  modules that were being marketed by Hubbell when you
5  departed in 2019 were on the market -- on the brake
6  power module market in their basic form as they existed
7  in 2019 when Tim Atchison came to work for PowerOhm in
8  2008.
9      Did I follow that correctly?
10 A.  No.
11 Q.  Okay.  Tell me how I have misstated that,
12 then.  I misunderstood your answer earlier.
13 A.  I think that maybe what I said is, from the
14 time I -- Tim Atchison left, the brake modules were on
15 sale continuously after that period; but, yeah, before
16 Tim and -- joined up with PowerOhm, we didn't -- we
17 didn't sell any brake modules.
18 Q.  That was my understanding.  That was my
19 understanding.
20     Hubbell had tried to get into the brake power
21 module business when it bought CableForm a year or so
22 before PowerOhm, and that didn't work out very well, did
23 it?
24     MR. BRADLEY:  Objection.  Foundation.
25 BY MR. BURGER:

66

1  Q.  Go ahead.
2      MR. BRADLEY:  You can answer if you know.
3  A.  I have no recollection that Cableform would
4  have anything that would use power modules.
5  BY MR. BURGER:
6  Q.  Okay.  Just maybe say this back to make sure I
7  understood your answer as clearly as I can.
8      As far as you know as the plant manager of the
9  place there in Kentucky, Hubbell had not previously,
10 previous to the acquisition of PowerOhm, had not
11 attempted to get into the brake power module business by
12 buying Cableform?
13     MR. BRADLEY:  Objection.  Foundation.  You may
14 answer.
15 BY MR. BURGER:
16 Q.  If you don't know, you can just tell me you
17 don't know.  If you know, I'm trying to understand.
18 A.  Yeah, I don't know.
19 Q.  Okay.  That's all right.
20     How do you know what paperwork Timothy
21 Atchison possessed in the -- with regard to parts lists,
22 test results, and schematic diagrams of brake power
23 modules the day he arrived on the premises of PowerOhm
24 in 2008, how do you know about that one way or the
25 other?

67

1  A.  I would say, before he came, we had none of
2  those materials on our property, and everything that he
3  was doing was his intellect and his efforts, and
4  everything that we got to build those products was
5  material that he provided and oversaw.
6  Q.  Thank you.
7      Do you have any knowledge -- do you know
8  anything about Bonitron's absence of a design, of a
9  brake power module design program, that it purposefully
10 did not pursue design innovations?
11 A.  I knew of Bonitron having brake modules.  I
12 have no knowledge of the technology that was in them or
13 their efforts to improve that product because it was not
14 something we sold.
15 Q.  Have you ever had conversation with a former
16 Bonitron employee who said -- who told you one of
17 reasons Tim Atchison left Bonitron was that he and other
18 employees were frustrated because Bonitron had
19 specifically said, we don't want to put Tim, money, and
20 effort into innovations that would improve the
21 reliability or the power features of brake power
22 modules?
23 A.  That does sound familiar, that I've heard a
24 statement like that.
25 Q.  So if Tim Atchison told you -- if anybody told

68

1  you Tim Atchison didn't do a bit of design work on brake
2  power modules at Bonitron, all he did was production
3  features and technical follow-up work, repairs, that
4  sort of thing, you wouldn't dispute that?
5  A.  Repeat the question.
6  Q.  I'm sorry.  I stumbled through that.  I'm
7  sorry.
8      If Tim Atchison were to tell you or has told
9  you -- if anybody has told you one reason Tim Atchison
10 departed Bonitron is because they would not let him work
11 on designs on their time, he was working on other things
12 pertaining to brake power modules?
13 A.  No, I don't know.  I don't recall that.
14 Q.  Okay.  I'm not sure what your technical
15 training is.  I take it it's somewhat advanced, and I
16 sure don't want to insult you.
17     But you know the difference between a series
18 and parallel electric circuit, don't you?
19 A.  Correct.
20 Q.  Can you tell me a single manufacturer of brake
21 power modules in the year 2008 who had brake power
22 modules on the market that involved increased power
23 capacity and reliability through the paralleling of
24 transistors that accomplished these results that you
25 described to Mr. Bradley earlier? Can you tell me anyone

69

1  else other than -- well, anybody? Anybody who had that
2  product on the market with parallel transistors in 2008?
3  **A. Yeah, I have no knowledge that anyone had**
4  **that.**
5      Q. And the fact is, what helped PowerOhm become
6  successful in the years between 2008 and 2015 was, as
7  you very adeptly described a moment ago, you guys put on
8  the market a product that had increased power ratings
9  and increased reliability, lower maintenance, which is
10 what your customers were looking for. That's what you
11 guys did very successfully between 2008 and 2015, isn't
12 it?
13     MR. BRADLEY: Objection. Argumentative, but
14    you can answer.
15     **A. Yeah, I don't know that people had the stuff**
16 **with the higher power ratings.**
17 **BY MR. BURGER:**
18     Q. I'm sorry. I thought I understood you to say
19 earlier, in answering Mr. Bradley's questions, that the
20 reason Hubbell had done well -- PowerOhm had done well
21 and then later Hubbell had done well with your brake
22 power modules is that, unlike other people marketing
23 brake power modules, your product offered increased
24 reliability, less maintenance, and higher power ratings
25 for a broader range of functions?

70

1      MR. BURGER: Objection.
2  **A. I don't ever remember mentioning reliability.**
3      MR. BRADLEY: Objection, mischaracterizes
4    prior testimony.
5  BY MR. BURGER:
6      Q. All you got to do is -- if I say something
7  that I misunderstood, if you'll just clarify that for
8  me.
9      I believe you said on this record earlier --
10 we'll see what the record says, if you -- that the
11 reason these products sold well for PowerOhm is because
12 an increased reliability, less maintenance.
13     MR. BRADLEY: Objection.
14 **A. I don't remember stating that.**
15 **BY MR. BURGER:**
16     Q. Then let me get at it this way.
17     What, in your opinion, in hindsight, after
18 2008 up through and including the time of your departure
19 in 2019, what was the salient primary positive feature
20 offered by Hubbell brake power modules that other
21 marketers did not produce? What did you have to offer
22 that others did not?
23 **A. I would say it was the higher power ratings**
24 **and the short circuit protection features.**
25     Q. Okay. And you wouldn't describe those short

71

1  circuit protection features as a -- ultimately, a
2  maintenance increased reliability consideration?
3  **A. No. I would say it's separate from that.**
4      Q. Okay. To your knowledge, did Hubbell or --
5  let me strike that question.
6      To your knowledge, when Tim Atchison came to
7  work for Hubbell in 2008, is there -- did either
8  PowerOhm or any other producer of brake power modules
9  have parts out on the market that contained the prefix
10 for those parts, TA, before a number? Anybody?
11 **A. I know that the TA on the terminals was TA for**
12 **Tim Atchison. He told me --**
13     Q. Why is that the case?
14 **A. He told me that early on.**
15     Q. 2008 or so, when he came to work for you?
16 **A. Yeah.**
17     Q. Did he show you his parts lists that he had
18 developed at his kitchen table, not at Bonitron, that
19 had all those parts, that long, long list of parts that
20 had the TA prefix to the part number? Did he show you
21 that list?
22     MR. BRADLEY: Objection to form, but you may
23    answer.
24 **A. Yeah. I certainly was familiar with the list**
25 **of parts. What had TA in front of it, I don't recall;**

72

1  **certainly, the terminals, fiberglass parts that**
2  **supported the terminals. But, yeah, I have no**
3  **recollection of whether that was done on his -- his time**
4  **or when he was on PowerOhm's time.**
5  **BY MR. BURGER:**
6      Q. Well, if he had it when he walked in the door
7  at PowerOhm, it wouldn't have been done on PowerOhm,
8  would it?
9      MR. BRADLEY: Objection. Assumes facts not in
10    evidence.
11    You may answer.
12 **A. I expect that's true.**
13 **BY MR. BURGER:**
14     Q. That's logical, isn't it?
15 **A. Yeah. He certainly brought information to us**
16 **to allow the manufacture these products and supervise**
17 **the people that were assembling it.**
18     Q. And if Bonitron had zero to do with that,
19 would you agree with his statement that he developed it
20 on his own at his kitchen table or would you disagree to
21 that?
22 **A. I would agree that he had the -- the designs**
23 **in his head before he came with us.**
24     Q. Okay. All this business about Stewart Jang, I
25 had to follow up on that, Stewart Jang being asked to

73

1 make a visit to Tim Atchison personally. As I
2 understood, that happened, you correct me if I'm
3 misstating it, to request copies of all of Tim
4 Atchison's personal and schematic parts lists, test
5 results, and -- and other pertinent documents.
6     First of all, if -- in that context, at the
7 time that occurred, around 2014, at the time that
8 occurred, walk me through this. Number one, PowerOhm is
9 up and running and successfully selling on the market
10 their brake power modules. Correct?
**11    A. Correct.**
12    Q. They've got, in various forms throughout their
13 computers, digitally, every scrap of paper they need to
14 manufacture and successfully market brake power modules,
15 don't they; or they wouldn't be doing it? Every scrap
16 of paper they need, they've got?
**17    A. I don't know. People were trained to build
18 those brake modules by Tim, and at that point, it was
19 repetition. I don't know how much documentation they
20 needed to do it.**
21    Q. It's that "repetition" word you used that is
22 curious to me, Mr. Yingling.
23    Why in the world is this large corporation
24 that is marketing their product and they've got it in
25 their computers and they've got every piece of paper

74

1 they need, making money on it year after year, selling
2 brake power modules, why are they dispatching an envoy
3 to Mr. Atchison over here to say we need all your stuff?
4 Why are they doing that?
5     MR. BRADLEY: Objection. Calls for
6     speculation argumentative.
7 BY MR. BURGER:
8    Q. Your opinion, you're the plant manager. Why
9 are they doing that? Makes no sense, does it?
**10    A. Well, sure they were moving manufacturing from
11 one plant to another. Stewart was put in charge of
12 making sure that transfer occurred smoothly and that
13 product was able to be made at the new location.**
14    Q. So they're going to get from employ engineer
15 Timothy Atchison materials that they already have that
16 they're already using to produce what's already on the
17 market?
18     MR. BRADLEY: Objection.
**19    A. Well, if the stuff hadn't been moved to
20 Archdale first, they have nothing over there. They have
21 to build that information, and he needs to be able to
22 explain it to the people in Archdale.**
**23 BY MR. BURGER:**
24    Q. Why do they come to Tim Atchison, engineer
25 employ, rather than the plant manager who's got all the

75

1 records from what's being built in his plan?
**2    A. I had no responsibility for maintaining the
3 records of how the brake modules were built. We had a
4 shop foreman, and he asked questions. He'd come to me.
5 I don't even know that I went to any kind of a drawing
6 file that we possessed that had all that information in
7 one place.**
8    Q. Okay. Who reviewed those -- those documents -
9 - those documents that were retrieved from both -- I
10 assume your main office there at the plant, plus Tim
11 Atchison?
**12    A. I don't know. I don't know who would review
13 that.**
14    Q. Who ended up in -- in getting possession of
15 those things as the plant manager, can you tell me, when
16 he -- when Stewart Jang came and retrieved the digital
17 information that was possessed, apparently solely by Tim
18 Atchison, and the big drawings that Tim Atchison
19 reproduced from his personal kitchen table works that he
20 gave to Stewart Jang, who ended up receiving those
21 things?
**22    A. I don't know. I have no knowledge.**
23    Q. Do you know anybody at Hubbell now who can
24 tell me that?
**25    A. No.**

76

1    Q. Did you know -- let me rephrase that.
2     Would you dispute, as the plant manager,
3 playing whatever role you played in that -- I think you
4 described it as a short notice transition to Archdale,
5 do you know what part of the materials retrieved by
6 Stewart Jang were digital versus copies of -- multiple
7 copies of written papers generated by Tim Atchison? Do
8 you know how much of that was paper versus digital?
**9    A. No. No knowledge of that.**
10    Q. Who made the decision to dispatch Stewart
11 Jang?
**12    A. Didn't come from me.**
13    Q. Do you know who made that decision?
**14    A. No. There's multiple managers at Archdale
15 that it could have been, and I have no knowledge of who
16 directed that.**
17    Q. And as the plan manager in charge of that
18 entire successful -- highly successful BPM facility
19 there in Kentucky, did they consult with you before they
20 dispatched Stewart Jang?
**21    A. No.**
22    Q. Does that seem odd to you?
**23    A. No.**
24    Q. Okay. To your knowledge, as of the day you
25 departed Hubbell in 2019, did Hubbell have on its

77

1  internet web page, if you wanted to order a part from
2  Hubbell, one page after another of parts listings that
3  contained TA as the prefix to those numbers?
4      **A.  I don't think any of their parts listed in**
5  **their internet would have contained a part numbers TA,**
6  **because components of the brake modules were not**
7  **included on the website.**
8      Q.  If we went on the internet, the website right
9  now, we took a break and went to Hubbell's website,
10  would it surprise you to know that TA is all over their
11  parts numbers?
12      **A.  Yes.**
13      Q.  Okay.  Those are internal parts, aren't they,
14  for these brake power modules that are re-orderable,
15  could be ordered by a customer for their brake power
16  modules as an internal component, aren't they?
17      **A.  I can't picture customers replacing parts in a**
18  **brake module.**
19      Q.  Well, at any time while you were at Hubbell,
20  did you have knowledge -- just to make sure I'm clear,
21  and I apologize if I'm repeating this.  It's supportive.
22  I just need to make sure I'm understanding it.
23      The entire time you were at Hubbell, you have
24  not been aware, up through 2019 and really up through
25  the present date that you departed, that Hubbell is

78

1  offering for sale parts on its internet web page that
2  contain the TA parts listings that you have acknowledged
3  is the name Tim Atchison, internal parts?
4      **A.  They are selling brake modules.  They contain**
5  **internal parts that contain a part number TA. Can anyone**
6  **buy those?  No.  Can anyone see those on an -- our -- on**
7  **their website, no.  They are something that if they were**
8  **to buy those, they would probably send the module back**
9  **to us, we would do repairs, and we will give them a**
10  **repair invoice.  We would not sell them the individual**
11  **parts for them to change in the field.**
12      Q.  So excuse me.  Let me say this back to you to
13  make sure I'm following correctly.
14      It is your firm belief here, as you testify,
15  that if we adjourn this deposition -- we're not going
16  to.  If we did and we all went to the Hubbell website
17  and Mr. Atchison got in there and showed to all of us
18  parts lists that are being offered by sale by Hubbell to
19  customers like Rockwell, et cetera, parts listings that
20  contain TA, you would be surprised at that?
21      **A.  Absolutely.**
22      Q.  Okay.  Do you have in your personal
23  possession, Mr. Yingling, any of the old diagrams and
24  drawings and parts lists that Tim gave to you
25  personally, as you said you guys worked together closely

79

1  and late at night sometimes, as you were trying to solve
2  problems for the -- for the PowerOhm group?  Do you have
3  in your possession now, either on a computer or in paper
4  form, copies of any of the things that Tim gave to you?
5      **A.  No.**
6      Q.  Did you ever work with Jeremy Gaupel,
7  G-A-U-P-E-L?
8      **A.  Yeah.**
9      Q.  How did you happen to work with him?
10      **A.  He was an employee that worked out of the**
11  **Kentucky facility.**
12      Q.  Did he work on the brake power module line
13  under Mr. Atchison's supervision?
14      **A.  That's my recollection, yes.**
15      Q.  Did -- to your knowledge, did he have a
16  reputation among fellow employees -- you, fellow
17  employees, of being a truthful, credible person?
18      **A.  We weren't that close, but I never doubted the**
19  **things he said.**
20      Q.  Have you seen Jeremy Gaupel's sworn
21  declaration --
22      **A.  No.**
23      Q.  -- about --
24      **A.  No.**
25      Q.  -- about his dealings with PowerOhm, power

80

1  electronics, Tim Atchison?
2      **A.  No.**
3      Q.  Let me ask you the same question about Andrew
4  Korton.
5      Do you know Andrew Korton?
6      **A.  Yes.**
7      Q.  How do you happen to know Andrew Korton?
8      **A.  He was an employee at the factory.**
9      Q.  Do you have any reason to doubt the
10  credibility or veracity of Andrew Korton?
11      **A.  I would say I don't have total trust, but I**
12  **think, usually, he tries to be upstanding.**
13      Q.  Have you seen Andrew Korton's sworn
14  declaration regarding his knowledge of where these
15  designs came from, Mr. Atchison's entitled to -- claimed
16  entitlement to 3 percent commission on their design, all
17  gross sales, and his interaction with Tim Atchison with
18  Tim Atchison's personal drawings when a problem came up?
19  You've seen that declaration?
20      **A.  No.**
21      Q.  Do you know Mike Roof, R-O-O-F?
22      **A.  Vaguely.**
23      Q.  Do you know anything about Mr. Roof and his
24  interactions with the company and Mr.-- Mr.-- Mr.
25  Atchison?

81

1  A. No.
2  Q. Have you seen Mike Roof's sworn declaration
3 about what he knows about Mr. Crowe, Mr. Hinton, power
4 electronics, and their dealings with Mr. Atchison?
5  A. No.
6  Q. After the sale of power electronics to Hubbell
7 --
8  MR. BRADLEY: Objection.
9 BY MR. BURGER:
10  Q. I'm sorry. The transition from PowerOhm,
11 PowerOhm Resistors to Hubbell. I got that on my mind.
12 Sorry.
13  After that occurred, do you -- am I correct in
14 understanding that all of PowerOhm's records, technical,
15 administrative, everything, were taken over by
16 representatives at Ohm?
17  A. Well, I'm sure that we kept what we needed to
18 do our job. But I'm sure that they -- Hubbell also
19 gathered what they needed to do their job.
20  Q. Where did you continue to work, Mr. Yingling?
21 Did you continue to -- I missed that earlier. Did you
22 go to Archdale to work permanently or did you stay in
23 Kentucky?
24  A. I never -- I would travel to Archdale
25 frequently to inspect things and to answer questions and

82

1 stuff like that, but, yeah, I never relocated there.
2  Q. What was the main product, then, at the
3 Covington, Kentucky, facility after the -- after the
4 transfer to Archdale of the brake power modules?
5  A. We still had a sales force there. The sales
6 engineers were there with all of the documents they
7 needed and the computer system. So does that answer
8 your question?
9  Q. Well, were you manufacturing anything in
10 Covington? Anything?
11  A. No. All the manufacturing people were gone.
12  Q. And they went to Archdale. Correct? Or back
13 to Katy?
14  A. I don't know that anyone went to Katy because
15 they didn't come from Katy, but some people went to
16 Archdale. The plant manager, the production manager,
17 the shop manager, he went to Archdale for a while and
18 then left Hubbell.
19  Q. Who decided -- I'm sorry.
20  Who decided who would go to Archdale and who
21 wouldn't go to Archdale, stayed? Who made that
22 decision? Was that made by you, as the plant manager,
23 with your overall knowledge of the operation; or was it
24 made by somebody at Hubbell?
25  A. It was made by Hubbell with no input from me.

83

1  Q. Do you know why they did not seek input from
2 you on such a, seems to me, material question?
3  A. Hubbell has their own way of doing things, and
4 they're going to do what they want to do.
5  Q. Okay. Okay. Do you have any knowledge at
6 all, Mr. Yingling, about discussions preceding Tim
7 Atchison coming to PowerOhm in 2008, discussions that
8 involved Vance Hinton and Mike Crowe about PowerOhm
9 creating a, quote, new division in Tennessee somewhere
10 under the name power electronics? Do you know anything
11 at all about that?
12  A. No, wasn't consulted at all.
13  Q. And I understood you to say a minute ago,
14 maybe I misunderstood when you were answering one of
15 Mr. Bradley's questions, that you don't really have any
16 idea at all about there being some separate new business
17 entity named power electronics?
18  A. I do not.
19  Q. If your name appears on an e-mail where the
20 new entity power electronics is being discussed, do you
21 have any knowledge of how that came about? Do you
22 remember that?
23  A. I have no knowledge of it, no.
24  Q. Do you have any knowledge at all about
25 multiple visits by PowerOhm people, including

84

1 specifically Mr. Crowe and Mr. Hinton, to Nashville to
2 look at real estate properties for the creation of a new
3 facility for power electronics for the one and only
4 reason of producing brake power modules?
5  A. No knowledge of that.
6  Q. Can you explain, do you know -- let me
7 rephrase that.
8  Do you know why Mike Crowe, Mr. Hinton,
9 PowerOhm, do you know why they would designate one of
10 their employees, an engineer -- an engineer as opposed
11 to an executive, to be the registered agent in Tennessee
12 for PowerOhm Resistors?
13  A. No.
14  Q. Did you know that Vance Hinton and Mike Crowe,
15 through their accountant, whomever, decided at some
16 point that they needed a registered agent in Tennessee?
17 Were you consulted about that, as the plant manager for
18 PowerOhm in Kentucky?
19  A. No.
20  Q. You have no inkling as to -- anybody ever
21 consulted you, Crowe nor Hinton consulted you about, we
22 need to have a registered agent in Tennessee for
23 PowerOhm Resistors and put his name on file in the
24 office of the business division for the Secretary of
25 State as our representative in Tennessee, our formal

85

1  representative; and we're going to pick an engineer, not
2  one of our executives? Nobody ever consulted with you
3  as the power -- I'm sorry, as the head man, the plant
4  manager if Kentucky? You were out of that loop
5  entirely?
6        MR. BRADLEY: Objection to form.
7        **A. I have no knowledge of the laws of Tennessee**
8  **and what they require, plus I was not the plant manager**
9  **until right before Hubbell bought us.**
10 **BY MR. BRADLEY:**
11       Q. You're right. What were you before you were
12 the plant manager there?
13       **A. A sales engineer.**
14       Q. And who was the plant manager before you?
15       **A. Mike Crowe.**
16       Q. Just want to be sure I'm clear. Mike Crowe,
17 Vance Hinton, nobody on their behalf ever came to you
18 and said, Mr. Atchison, Tom, we want to talk to you, we
19 want to inform you here that we are designating Tim
20 Atchison over here, one of our engineers, to be our
21 registered agent for PowerOhm Resistors in the state of
22 Tennessee? Nobody ever consulted you, did they?
23       **A. No.**
24       Q. And they sure never told you that it had
25 anything to do with their plans to start building brake

86

1  power modules in Nashville?
2        MR. BRADLEY: Objection.
3  BY MR. BURGER:
4        Q. In the Nashville area, did they?
5        **A. No.**
6        Q. Were you ever asked in your position there, at
7  that time, as the -- what did you describe it a moment
8  ago before you were plant manager?
9        **A. Product salesman.**
10       Q. Okay. Were you ever asked about what
11 requirements might be needed for a building, a real
12 estate acquisition in Nashville for a new division from
13 power resistors?
14       **A. Never consulted, never asked.**
15       Q. Were there -- let me shift gears here a
16 minute.
17       Were there ever any immediately identified
18 disappointments -- the time frame here I'm talking
19 about, 2008, Mr. Atchison comes on board in 2008, and
20 you guys start working with his designs that you've said
21 earlier, he brought there. And you're getting up and
22 running on your brake power modules, trying to get them
23 ready to market.
24       Anywhere along the line there, was there --
25 were there ever any disappointments by Mr. Crowe,

87

1  Mr. Hinton, did they ever express to you, in the brake
2  power modules, that -- that you -- that you were
3  bringing to the production line and to the market? Did
4  you hear any complaints or problems about that?
5        **A. That's not something they would have discussed**
6  **with me. Plus I think, when we started doing brake**
7  **modules, Tim Atchison was manufacturing all of them**
8  **himself.**
9        Q. But my understanding is as well, and my
10 question about that, you get the line up and running and
11 you start marketing them and selling them. As the -- in
12 the two positions you held, did either Crowe or Hinton
13 ever come to you and say, we are not pleased with the
14 product in any way, either its reliability, its
15 anything? Cost of production? Any complaints
16 whatsoever about the quality of the product?
17       **A. I don't think I would have been selected to**
18 **have those conversations. I had no power there.**
19       Q. I'm sorry. Even after you became plant
20 manager, you had no power?
21       **A. No.**
22       Q. I don't understand the hierarchy. Help me
23 understand that.
24       Why were you not the head guy?
25       **A. I was the head guy because Mike Crowe wanted**

88

1  **to do other things, and I was best suited to take over**
2  **that responsibility.**
3        Q. And apparently did a good job at it, didn't
4  you?
5        **A. I hope so.**
6        Q. And part of that good job was putting out a
7  good product from Tim Atchison's brake power modules
8  line, wasn't it?
9        **A. I'd say it was more problem solving and**
10 **trouble shooting and keeping everything happy in the**
11 **production end.**
12       Q. But the big picture, Mr. Yingling, is over
13 this period of time from 2008 to 2015, up and through
14 the Hubbell acquisition, your plant in Kentucky, Tim
15 Atchison's production line with his ten employees was
16 producing a good quality brake power modules product,
17 weren't you?
18       MR. BRADLEY: Objection to form. Go ahead.
19 BY MR. BURGER:
20       Q. Weren't you?
21       **A. I agree.**
22       Q. And as a result of producing a good quality
23 product, whether it's Tim Atchison's parallel
24 transistors or something less exotic, as a result of
25 that, within a few years of his coming there, the sales

89

1  started and increased incrementally each year, didn't
2  they?
3  **A.  I would say that's true, but I'd say we have**
4  **records of what the sales were.**
5      Q.  And who would have those records of what the
6  incremental increases in sales were from 2008 through
7  2015?
8  **A.  I would imagine Tim kept his performance**
9  **reviews.**
10     Q.  All right.  I'll get to that in a minute.  I'm
11 talking about sales that were bringing money into the
12 pockets of PowerOhm Resistors initially and later
13 Hubbell from solely brake power modules.
14     They were going up every year very steadily,
15 weren't they?
16 **A.  I sold a different product, so I kept no**
17 **numbers, and I did not have any responsibility to judge**
18 **the increase in sales of brake modules.**
19     Q.  Let me just make sure I'm following this
20 correctly.  You're telling me, as the plant manager,
21 during that phase, that part of your job was not to
22 review whether you sold more brake power modules in 2012
23 than you did in 2011, for example?
24 **A.  That is correct.  I was not involved in that**
25 **at all.**

90

1      Q.  Who kept those records and monitored that?
2  **A.  I would imagine Vance and Mike Crowe and their**
3  **accountant.**
4      Q.  And after Hubbell acquired them, who at
5  Hubbell would have had that role, if you know?
6  **A.  I think Hubbell has a whole division of**
7  **business analysis.**
8      Q.  They keep their records, don't they, year to
9  year?  They don't throw them away after a couple years?
10 They keep their records, don't they, at Hubbell?
11 **A.  I think there are legal requirements to keep**
12 **financial records for a certain number of years.**
13     Q.  You're correct.  You're correct.
14     When did you last talk to Mike Crowe or Vance
15 Hinton?
16 **A.  Probably at Mike Crowe's father's funeral.**
17     Q.  How long ago was that?
18 **A.  I don't have an exact date.**
19     Q.  Roughly?
20 **A.  I'd say more than a year ago, less than three**
21 **years ago.**
22     Q.  If -- have you read Mr. Crowe's or Mr.
23 Hinton's depositions?
24 **A.  I have not.**
25     Q.  If they each have characterized Timothy

91

1  Atchison as highly, highly -- was probably the most
2  knowledgeable person on the field of brake power modules
3  in that 2008, 2015 time frame, would you agree with that
4  assessment?  He was the man, wasn't he?
5      MR. BRADLEY:  Objection.  Foundation.
6  **A.  I don't have an answer for that.**
7  **BY MR. BURGER:**
8      Q.  Let me put it this way.
9      Do you know of anybody whose name you could
10 give me who knew more about brake power modules when he
11 came to work for you in 2008 than Timothy Atchison?
12 **A.  I didn't know anyone, but that doesn't mean**
13 **they didn't exist.**
14     Q.  I agree.  I'm just asking if you could give me
15 the name of all of your extensive experience with power
16 resistors, PowerOhm Resistors, and Hubbell all those
17 years?  Can you name a person within the industry that
18 knows more about the intricacies, the technical
19 intricacies, the design intricacies of brake power
20 modules than this man over here behind me, Timothy
21 Atchison?
22 **A.  I can agree that I don't know anyone else, but**
23 **that also is not my field of electrical engineering, and**
24 **I wouldn't necessarily be aware of anyone.**
25     Q.  Okay.  Here's something I had pondered over,

92

1  and if you can help me understand, and I'll acknowledge
2  I think you may have said to me, you don't -- this is
3  maybe outside your range, but I need to ask you just in
4  case you might know.
5      We've got a company, Hubbell, who was not in
6  the brake power module business before it acquired,
7  PowerOhm Resistors, that premise?
8  **A.  Yes, that's correct.**
9      Q.  I'm sorry.  Am I correct about that?
10 **A.  Yes.**
11     Q.  Okay.  Hubbell acquired PowerOhm Resistors in
12 2014.  2014, and they decide that they're going to
13 transfer this successful product line of brake power
14 modules from Kentucky to Archdale, North Carolina.  Am I
15 correct about that?  Somebody at Hubbell decides that?
16 **A.  Yes, correct.**
17     Q.  And the only people under the big umbrella,
18 the big employment operation umbrella at Hubbell who
19 knows anything about brake power modules are Timothy
20 Atchison and his ten -- his ten members who work on his
21 team up there in a house that -- that place you're
22 talking about in Kentucky.  Nobody else at Hubbell knew
23 anything that you knew of about brake power modules when
24 somebody, mystery executive, made the decision to move
25 the operation from Kentucky to North Carolina.  Nobody

93

1　knew anything about brake power modules, did they?
2　　　MR. BRADLEY: Objection, foundation but go
3　ahead.
4　　**A. I don't know what they did or didn't know**
5　**about brake modules.**
6　**BY MR. BURGER:**
7　　Q. Your -- in your role as the plant manager in
8　the Kentucky facility, you were given short notice by
9　Hubbell, we're going to take this successful product
10　that's making us good money, records will show that,
11　this is a successful product that's making us good
12　money, we're going to quit manufacturing that in your
13　facility, this very unique product, we're going to take
14　it to North Carolina, and you don't know the name of a
15　single person who knows anything about brake power
16　modules in Archdale, North Carolina, do you?
17　　**A. I do not.**
18　　Q. So the next, I think, logical question from
19　that -- you tell me if I'm wrong -- why did they fire
20　all of Tim's team right after Stewart Jang gathered up
21　all the records?
22　　　MR. BRADLEY: Objection. Foundation. Go
23　ahead.
24　BY MR. BURGER:
25　　Q. Why did they do that? Seem suspicious to you,

94

1　Mr. Yingling?
2　　**A. They don't confide in me.**
3　　Q. I've gathered that. I've gathered that.
4　You've done an excellent job making that point for me.
5　　Nobody came to you and said, we're going to
6　fire this -- we're going to fire everybody under the
7　Roof here in Kentucky who knows anything about brake
8　power modules that are doing so well for us. We're
9　going to start -- we're going to, I guess, call temps
10　down here in Archdale, North Carolina, bring them in,
11　let them start from beginning on making these things.
12　　Can you give me any clarity on to what
13　happened with that?
14　　　MR. BRADLEY: Objection, foundation.
15　　　Objection, argumentative, go ahead.
16　BY MR. BURGER:
17　　Q. I don't mean to be argumentative. I'm looking
18　for an ounce of logic, Mr. Yingling, if you could help
19　me with this crazy story.
20　　Can you tell me why, as soon as they gathered
21　the records, Stewart Jang gathers up all the written
22　records, why immediately thereafter, they fire this
23　man's team, and then a few months later, fire him? Can
24　you tell me why they did?
25　　　MR. BRADLEY: Objection. Same objection.

95

1　　**A. They're a corporation, and corporations do**
2　**what corporations do. I -- my input was not requested**
3　**or the accepted.**
4　**BY MR. BURGER:**
5　　Q. I understand. But to your knowledge, none of
6　these mystery decisions made by these mystery executives
7　at Hubbell in that -- in that time frame, none of them
8　came to the plant manager of their very successful brake
9　power module line in Kentucky and says, you know what?
10　We're going to bring Andrew Korton, and we're going to
11　bring Mr. Gaupel, and we're going to bring Timothy
12　Atchison, we're going to bring them down to Archdale to
13　continue our successful monthly climb in gross profits.
14　　Nobody came to you and told you that, did
15　they?
16　　**A. No.**
17　　Q. Who at Archdale can tell me why that odd
18　decision was made, if you can help me on that?
19　　**A. I have no idea who.**
20　　Q. But the -- the predicate points, the premises
21　to all of this is -- I'll walk you through this, just as
22　Mr. Bradley did earlier, these primary points, you've
23　got a successful product being successfully manufactured
24　with the profits really going up every year in Kentucky.
25　　　MR. BRADLEY: Objection. Go ahead.

96

1　BY MR. BURGER:
2　　Q. And no complaints about the quality of the
3　product. Overnight, practically, they tell you it's a
4　great job you're doing up there. We're not going to do
5　it here anymore. Not only are we not going to do it
6　anymore, the team that's doing it is gone, and the man
7　who brought the product in is gone, and we're going to
8　do it all in Archdale.
9　　Can you give me any slight insight as to why
10　and how that might have occurred?
11　　　MR. BRADLEY: Objection. Foundation. Go
12　ahead.
13　　**A. No idea.**
14　**BY MR. BURGER:**
15　　Q. It wouldn't have anything to do with Hubbell
16　not want to go take Mr.-- Mr. Atchison's 3 percent on
17　the gross profits, would it, as far as you know?
18　　**A. I have no knowledge of -- that was getting 3**
19　**percent, so I have no idea, never contemplated why it**
20　**would end.**
21　　Q. I want to ask you about that.
22　　Do you remember if -- Mr. Atchison tells me
23　that he had four separate meetings with you, with you
24　personally, where I'll use his words, he raised hell
25　about the fact that after he had gotten some of the

97

1  initial 3 percent commissions, Mr. Hinton was trying to
2  not paying him or cut it down for a while. And that you
3  came to him and you -- he used the words with you, that
4  he was, quote, being exploited, and that he could not
5  uninvent -- that he could not uninvent his brake power
6  modules now that Hubbell had them.
7      Can you -- do you remember him having that
8  conversation with you, and you intervening on his behalf
9  and getting them to pay him what they owed him?
10     **A. I have no recollection of that.**
11     Q. Even if -- in the PowerOhm Resistors phase
12  before Hubbell came in there, you don't remember this
13  man, Mr. Atchison, coming to you and saying Vance is not
14  following through, we're up and running, the product is
15  now making money, it's out on the market, you've seen
16  the figures, I've been paid before, but they're not
17  paying me the full thing this year. Hinton is trying to
18  cut me down? Do you remember anything about that?
19     **A. I have no recollection of that.**
20     Q. Okay. Okay. Do you know whether or not that
21  last year that he had with PowerOhm Resistors, the gross
22  sales for brake power modules were right at a million
23  dollars? Do you know anything about that?
24     **A. I have no knowledge of that.**
25     Q. Do you know that Mr. Atchison received a

98

1  commission -- a payment, let me -- I shouldn't
2  characterize it -- a payment over and above his salary
3  of 3 percent of a million dollars that year? Do you
4  know anything about that?
5      **A. No.**
6      Q. As the plant manager under who's been under
7  your supervision, you had no discussions with Vance
8  Hinton or Mike Crowe about him coincidentally getting 3
9  percent of the million dollars that brake power modules
10  produced the last year he was with PowerOhm before
11  Hubbell came in?
12     **A. I have no knowledge of that.**
13     Q. I was interested in your answers to
14  Mr. Bradley, to me, the odd story about something
15  happening about some vandalism while he was gone. I
16  didn't quite follow that. And I'm not interested enough
17  in it to pursue it; but along that line, he's fired
18  right after Stewart Jang gathers up all of his records
19  and takes them to Hubbell.
20         MR. BRADLEY: Objection.
21  BY MR. BURGER:
22     Q. Of already -- help -- records that Hubbell
23  already has, according to your description, but he
24  duplicates it. He gave them another copy of all of
25  Tim's records, and he's fired.

99

1      To your knowledge, did any mis -- was there
2  some misconduct element to that? I wasn't quite
3  following what you were saying to Mr. Bradley,
4  performance or misconduct problems with him that caused
5  him to be fired by Hubbell?
6      **A. Tim did not follow through to attend meetings**
7  **that his attendance was requested of, and he affirmed**
8  **that he would attend. He did not follow through and**
9  **show up. He was either --**
10     Q. Which is why --
11     **A. He was either tardy or didn't show up at all.**
12     Q. Which is why somebody at Hubbell continued to
13  give him high -- stellar high performance ratings year
14  after year after year until the day he was fired.
15  Correct?
16         MR. BRADLEY: Objection. Assumes facts not in
17      evidence.
18  BY MR. BURGER:
19     Q. Give me the logic on that, Mr. Yingling, if
20  you can.
21     **A. I don't know that anyone would have reviewed**
22  **his performance from Hubbell.**
23     Q. How about Lucien Rainville? How about Lucien?
24     **A. It's possible, but you'd have to talk to**
25  **Lucien because I have no records of any conversation**

100

1  between Lucien and Tim.
2      Q. Do you know anything about Hubbell's
3  progressive discipline paperwork and their employee
4  handbook and anything? Do you know anything about
5  progressive discipline at Hubbell?
6      **A. I'm sure I did at one time, but I can't**
7  **recollect what their policy is now.**
8      Q. In contrast -- in contrast to his stellar
9  performances across the board, personal performance,
10  technical performance, in contrast to his stellar
11  written performance reviews up until the day he was
12  fired, can you cite to me, Mr. Yingling, a scrap of
13  paper in existence, whatever form, written on the back
14  of a napkin, a scrap of paper, in existence issued by
15  any executive at Hubbell ever criticizing one thing that
16  Timothy Atchison did, one thing?
17         MR. BRADLEY: Objection to form; objection,
18      argumentative; objection, assumes facts not in
19      evidence. You may answer.
20  BY MR. BURGER:
21     Q. It doesn't exist, does it, Mr. Yingling?
22         MR. BRADLEY: Objection. Assumes facts not in
23      evidence.
24     **A. I don't know, have no knowledge of it.**
25  **BY MR. BURGER:**

101

1    Q.  Okay.  So you got this employee to put Hubbell
2  -- put PowerOhm Resistors -- put Hubbell in the brake
3  power module business to the tune of millions were
4  year.  You don't dispute that, that general
5  characterization?  He put Hubbell in the million dollar
6  brake power module business.  Whenever he got the stuff,
7  we'll argue about that later.  He and his team of ten,
8  put Hubbell in the multi-million dollar per year brake
9  power module business, didn't they?
10      MR. BRADLEY:  Objection to form.
11   **A.  I have no knowledge of that, and I know that -**
12 **-**
13 **BY MR. BURGER:**
14   Q.  You know what he did for you, don't you,
15 Mr. Yingling, under your supervision?  He was making the
16 only brake power modules that Hubbell and PowerOhm
17 Resistors were selling?  This -- him, right over here,
18 this guy behind me, he was the only that was making
19 them, him and his team.  Korton -- Andrew Korton and
20 Jeremy Gaupel and the other people who are going to
21 testify in his case that, of course it was his personal
22 material, of course it had nothing to do with Bonitron,
23 of course he was entitled to 3 percent.  We haven't
24 heard from them yet, but help me understand, if you can.
25      MR. BRADLEY:  Objection to form; objection,

102

1  argumentative.
2    **A.  I don't know how to help you understand**
3  **products for PowerOhm.**
4  **BY MR. BURGER:**
5    Q.  Okay.  Well, I'm just trying to know -- tell
6  me why this man was abruptly fired right after all his
7  intellectual properties are gathered up by Stewart Jang
8  when he had a stellar performance record and the product
9  that you just told me about four times, he brought to
10 PowerOhm, the brake power modules, the parallel circuits
11 that nobody else had --
12      MR. BRADLEY:  Objection to form.  Objection
13   foundation.
14 BY MR. BURGER:
15   Q.  He put those on the market.  Why was he fired?
16   **A.  He was a difficult employee.**
17   Q.  I'm sorry?
18   **A.  He was a difficult employee to supervise.**
19   Q.  Where is that in any of his performance
20 records, sir?
21   **A.  I don't know.  I didn't do his performance**
22 **records.**
23   Q.  I'll take that answer and move on.  Let me see
24 here.
25      Do you know Martin Glover?

103

1    **A.  I know Martin Glover, yes.**
2    Q.  How do you know Martin Glover?
3    **A.  He was hired to be -- I think a vice president**
4  **or something, at PowerOhm Resistors.**
5    Q.  And about what period of time did your work
6  with PowerOhm Resistors overlap with Martin Glover's
7  PowerOhm work?
8    **A.  The last, I don't know, five years or so.**
9    Q.  All these questions put to you by Mr. Bradley
10 about power electronics, did you ever see a business
11 card with Martin Glover that showed that he was vice
12 president of power electronics, subsidiary of PowerOhm
13 Resistors?  Did you ever see that?
14   **A.  No.**
15   Q.  Did you ever see any letterhead generated by
16 Mr. Glover that indicated power electronics was a -- a
17 formal or informal, leave it at that, subdivision of
18 power electronic, of which he was vice president?
19   **A.  I never saw anything of that nature.**
20   Q.  Do you recall ever being included in any
21 discussions about Martin Glover being the vice president
22 of power electronics?
23   **A.  I don't recall that.**
24   Q.  Were you ever copied on any e-mails at any
25 time where there was elaborate discussions -- elaborate

104

1  discussions of power electronics being a new division of
2  PowerOhm Resistors?
3    **A.  No.**
4    Q.  Okay.  On this concept of paralleling
5  resistors -- I'm sorry? -- of PowerOhm Resistors
6  paralleling resistors -- transistors, I'm sorry,
7  transistors -- paralleling transistors, in order to
8  achieve this increased -- a desired objective of
9  increased reliability and increased power capacity, was
10 there ever any discussion at PowerOhm Resistors about
11 Mr. Crowe, Mr. Hinton individually or PowerOhm Resistors
12 patenting -- patenting that previously not on the market
13 anywhere -- anywhere-anywhere design for brake power
14 modules?  Any discussions with them about patents?
15      MR. BRADLEY:  Objection to form.  Go ahead,
16   you can answer.
17   **A.  I can recall no conversations with me about**
18 **any of that stuff.**
19 **BY MR. BURGER:**
20   Q.  And so, as we sit here today, based on what
21 you knew when you walked out of the door at Hubbell in
22 2019 and in the course of your subsequent consultation
23 work up through the last couple of years, '22, '23,
24 whatever it was, no one at Hubbell has ever told you
25 that they'd gone to any effort -- expended any effort to

105

1  patent or to look into patenting the designs for brake
2  power modules that involve paralleling transistors in a
3  unique formed that not been used by anybody before 2008?
4     **A.  Nobody has mentioned anything about that to**
5  **me.**
6     Q.  You're not still getting any type of
7  commissions or -- excuse me if I asked this before, you
8  may have answered it -- any type of residual commissions
9  or residual sales bonuses from anything marketed by
10 Hubbell, are you?
11    **A.  No.**
12    Q.  Did you ever ask anyone at Hubbell, given your
13 role there as plant manager for the Covington facility
14 for Hubbell Industries, why you were only given 24
15 hours' notice, if I wrote that down correctly, about
16 their decision to uproot the brake power modules
17 production line and start new in Archdale, 24 hours'
18 notice?  Anybody ever explain to you why you weren't
19 told more about that in advance?
20    **A.  No.  Never questioned it.**
21    Q.  Why did you not demand to know an answer to
22 that?  I don't mean that argumentatively, but
23 respectfully, why did you not demand to know an answer?
24 What are you going to down there in Archdale since you
25 fired all the -- only people that know how to make

106

1  these things up here, the guy who designed them and the
2  people who are putting them together?  Are you going to
3  start fresh down there with temps?  You don't think brake
4  power modules in Archdale, why would you not demand an
5  answer?
6     MR. BRADLEY:  Objection to form, objection
7  argumentative.  Go ahead.
8     **A.  I had no authority to demand an answer from**
9  **them about anything.  I worked at their pleasure.**
10 **BY MR. BURGER:**
11    Q.  Were you not indignant?  Agitated?
12    **A.  No.  It's business.**
13    Q.  What do you know -- can you give me any
14 insight into -- they cleaned house in Covington, they
15 fired all of Tim's hirees, his eight to ten people that
16 worked under him.  They fired him after having gathered
17 -- Stewart's gathered up all of his stuff and taken it
18 to Archdale.
19       How did they go about setting up and meeting
20 customer orders for brake power modules in those early
21 months -- those late months, I'm sorry, of 2015 and
22 early months of 2016 and 2017?  How did they manufacture
23 those things down in Archdale, Mississippi [sic], after
24 they none one of the Kentucky employees with them?
25    MR. BRADLEY:  Objection.

107

1     **A.  We build up enough inventory in Covington to**
2  **satisfy a couple of months of sales to get -- allow them**
3  **time to get up to speed.**
4     MR. BRADLEY:  And objection to form and
5     objection foundation.  Objection, argumentative,
6     but you can answer.
7  BY MR. BURGER:
8     Q.  Who did the hiring at Hubbell in Archdale?
9     **A.  I have no knowledge.**
10    Q.  Were you ever consulted in any slight way?
11 Anybody call you from Hubbell, as the plant manager of
12 their very successful brake power modules facility in
13 Kentucky, and say, give me your advice on this or that
14 aspect on who we need to hire to bring our brake power
15 modules line up to the same speed Tim Atchison had it in
16 Kentucky?  Anybody ever call you and ask your advice on
17 that?
18    MR. BRADLEY:  Objection to form.
19    **A.  It's kind of humerus that I would think that**
20 **Hubbell would ask me my opinion about that.**
21 **BY MR. BURGER:**
22    Q.  That seems humerus to me that you would find
23 it humerus.  So let's explore that.  We -- on a very
24 unfunny topic.  Let's -- seriously.  You're the man in
25 Kentucky.  You've done well for them.  I'm trying to

108

1  understand this disconnect in my mind, at least -- maybe
2  it's me.  You get 24 hours' notice.  Nobody ever calls
3  and you says, we've got to get this up to speed down
4  here on this successful, now million dollar a year gross
5  sales on these brake power modules.  We need your advice
6  on this or that.
7        You were just cut out of the picture entirely
8  on that?
9     **A.  Yup.**
10    Q.  Okay.  Okay.  I need five minutes, and I'll be
11 right back in a second.
12       (Recess.)
13 BY MR. BURGER:
14    Q.  Just one or two follow-up points here.
15       When Mr. Rainville, Lucien Rainville, did the
16 performance evaluations for Timothy Atchison, did he
17 supervise Timothy Atchison on a day-to-day basis?
18    MR. BRADLEY:  Objection to foundation.  Go
19    ahead.
20    **A.  Not that I know of.**
21 **BY MR. BURGER:**
22    Q.  Do you know?  Okay.
23       Who supervised Timothy Atchison on a day-to-
24 day basis?
25    **A.  Well, at that point, Tim was in Nashville, so**

109

1  he was managing himself.
2  Q.  I'm talking about the time frame from 2000 --
3  the time frame from 2008 through 2014, in that continuum
4  of time, who supervised Tim Atchison in Kentucky when he
5  was in Kentucky?
6  A.  Mike Crowe.
7  Q.  Okay.  Did you ever supervise him?
8  A.  I would say I was there to help him on stuff,
9  but I don't know that I supervised him.
10  Q.  The point I'm getting to and I maybe should
11  have gotten there five minutes ago.
12      Did Lucien Rainville or Mike Crowe ever seek
13  your input on what should go into this formal process of
14  an employee evaluation for Tim Atchison?  Did they ever
15  seek your input or your opinion on what sort of employee
16  he was, as far as their official records were concerned?
17  A.  I don't recall if I did annual evaluations for
18  -- for Tim.  I know that, really, the big score card was
19  the bonus plan.  I don't even, you know -- like when I
20  worked in the steel mill, we had a structured annual
21  review, but I don't remember PowerOhm having a
22  structured annual review.
23  Q.  Were the employee evaluations for PowerOhm
24  Resistors employees in Kentucky kept on premises at the
25  Kentucky plant?

110

1      MR. BRADLEY:  Objection.  Foundation.  Go
2  ahead.
3  A.  Yeah, I don't record [sic] that there were
4  annual reviews for the employees.  I think that Vance
5  and Mike would talk to people when it was time to award
6  pay increases, but other than that, I don't think there
7  were reviews.
8  BY MR. BURGER:
9  Q.  I believe -- I thought you said earlier in
10  your testimony -- maybe I need to have you clarify that
11  for me -- that the employees at the Kentucky facility
12  were given annual performance evaluations.
13  A.  I don't recall mentioning that.
14  Q.  Okay.  I don't have any further questions.
15  Thank you.
16      REDIRECT EXAMINATION
17  BY MR. BRADLEY:
18  Q.  I just want to follow up on a few things that
19  came up, Mr. Yingling.
20  A.  Okay.
21  Q.  We're almost done here.
22      Jeremy Kapel (phonetic), do you recognize that
23  name?
24  A.  Yeah.
25  Q.  Was he a personal friend of Mr. Atchison's?

111

1  A.  I thought they knew each other.  I'm not sure.
2  Q.  Okay.  Was Mr. Kapel laid off by Hubbell at
3  some point?
4  A.  I know they parted ways.  I don't know if he
5  was leaving to go back to Tennessee, I think, maybe.  I
6  think Tim worked with -- down in Nashville, down at
7  Bonitron, maybe, or something.
8  Q.  Okay.  Andrew Korton, was he a personal friend
9  of Mr. Atchison's?
10  A.  No.
11  Q.  Was Mr. Korton hired by Mr. Atchison?
12  A.  No.
13  Q.  What was Mr. Korton's job at PowerOhm?
14  A.  I think he helped fabricate brake module
15  assemblies.
16  Q.  And was he laid off by Hubbell?
17  A.  Yeah, I don't know if he was laid off.  I
18  don't remember him leaving on his own, so...
19  Q.  And then Mike Roof, was he a personal friend
20  of Tim Atchison's?
21  A.  I think he was.
22  Q.  The brake power modules annual sales has come
23  up a number of times.  The number has been thrown
24  around, like a million dollars a year.
25      Do you know what the total sales for PowerOhm

112

1  Resistors, Incorporated, was in 2012, 2013?
2  A.  When we got into load resistors for solar
3  fields, sales got up to, I think, 40 million.
4  Q.  So we're talking about maybe 1 or 2 percent, 3
5  percent of the company was brake power modules?
6  A.  Right.
7  Q.  So it's been characterized by Mr. Burger as
8  this amazing, successful endeavor, but in reality, it
9  was 2, 3 percent of the company at the time Hubbell
10  purchased them; is that correct?
11  A.  Probably right, yes.
12  Q.  Thank you.
13      And in your time at Hubbell, did you recognize
14  them to be a 4 to 5 billion-dollar company?
15  A.  Hubbell --
16  Q.  Hubbell Incorporated.  No, Hubbell
17  Incorporated, when you worked at Hubbell, did you
18  understand the size of the company?
19  A.  Yeah.  They were huge.
20  Q.  Like four to five billion dollars?
21  A.  (Moved head up and down).
22  Q.  And they had maybe 80 different businesses?
23  A.  Oh, yeah.  A slew of businesses, yes.
24  Q.  And so are you aware at any time that Hubbell
25  would keep a factory open for a million dollar product

113

1  line as opposed to consolidating it with one of their
2  other facilities?
3  **A. They were always looking to combine locations**
4  **and eliminate overhead.**
5  Q. So the move of this Covington, Kentucky,
6  operation to Archdale or one of the other locations was
7  business as usual for Hubbell, in your experience?
8  **A. Yeah. That -- the Archdale facility probably**
9  **had eight different companies in it that had been moved**
10 **there.**
11 Q. Correct. Okay. And the Katy, Texas,
12 division, where much more of the sales of PowerOhm and
13 the products were made, stayed open a while longer.
14 Correct?
15 **A. Yes.**
16 Q. But that eventually got moved as well to
17 Mexico. Correct?
18 **A. Correct.**
19 Q. Okay. Thank you. I have no further
20 questions. Thank you for your time today, sir.
21     MR. BRADLEY: Thank you, Madame Reporter.
22          RECROSS-EXAMINATION
23 BY MR. BURGER:
24 Q. Mr. Yingling, would it surprise you to know
25 that Timothy Atchison fired Jeremy Gaupel?

114

1  **A. I would -- yes, I'd be surprised because I**
2  **didn't know he had that authority.**
3  Q. Have you ever talked with Mike Crowe about the
4  circumstances pertaining to Jeremy Gaupel's being fired?
5  **A. No.**
6  Q. Those are all of my questions. Enjoy your
7  retirement. Sorry to intrude on it.
8      MR. BURGER: Thank you.
9          (DEPOSITION CONCLUDED AT 1:05 P.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

115

1          CERTIFICATE OF REPORTER
2          COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded digitally by me and then reduced to
10 typewritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skill and ability. I certify that I am not a
13 relative or employee of either counsel and that I am in
14 no way interested financially, directly or indirectly,
15 in this action.
16
17
18  *aw wolff*
19
20
21
22 ALLISON WOLFF,
23 COURT REPORTER/NOTARY
24 MY COMMISSION EXPIRES: 06/15/2027
25 SUBMITTED ON: 08/11/2025

## A

**ability**
7:20, 115:12
**able**
16:24, 74:13,
74:21
**about**
5:6, 12:23,
13:15, 16:10,
16:11, 29:25,
30:4, 33:19,
35:10, 35:11,
38:1, 44:3,
44:4, 47:18,
47:24, 61:14,
62:24, 63:4,
63:18, 64:7,
66:24, 67:8,
72:24, 79:23,
79:25, 80:3,
80:23, 81:3,
83:6, 83:8,
83:11, 83:16,
83:21, 83:24,
84:17, 84:21,
86:10, 86:19,
87:4, 87:10,
87:16, 89:11,
91:10, 91:18,
92:9, 92:15,
92:19, 92:22,
92:23, 93:1,
93:5, 93:15,
94:7, 96:2,
96:21, 96:25,
97:18, 97:23,
98:4, 98:8,
98:14, 98:15,
99:23, 100:2,
100:4, 101:7,
102:9, 103:5,
103:10, 103:21,
104:10, 104:14,
104:17, 105:4,
105:15, 105:19,
106:9, 106:19,
107:20, 109:2,

112:4, 114:3
**above**
98:2
**above-named**
30:12
**abrupt**
34:1, 46:19,
47:24, 48:19
**abruptly**
39:12, 102:6
**absence**
67:8
**absent**
33:10
**absolutely**
46:20, 78:21
**ac**
25:23
**accepted**
95:3
**access**
41:15
**accident**
35:4
**accomplished**
68:24
**according**
19:9, 98:23
**accountant**
84:15, 90:3
**accounts**
17:14
**accurate**
7:14
**accurately**
56:4, 56:23
**accusatory**
63:9
**accused**
31:10
**achieve**
104:8
**achieving**
54:1
**acknowledge**
92:1
**acknowledged**
78:2

**acquainted**
9:6, 15:24
**acquired**
45:8, 90:4,
92:6, 92:11
**acquisition**
23:14, 66:10,
86:12, 88:14
**across**
100:9
**action**
1:3, 3:12,
115:15
**actual**
53:15
**actually**
48:20
**add**
42:4
**added**
11:25
**additional**
16:23
**address**
5:12, 31:11
**addressed**
62:25
**adeptly**
69:7
**adjacent**
31:25
**adjourn**
78:15
**administrative**
81:15
**advance**
105:19
**advanced**
68:15
**advantages**
54:21
**advice**
61:11, 107:13,
107:16, 108:5
**advised**
39:13, 39:14
**affect**
7:20, 7:22

**affirm**
5:5
**affirmed**
99:7
**after**
7:25, 8:9,
9:24, 13:17,
18:5, 22:24,
23:8, 23:14,
23:17, 24:3,
28:1, 35:1,
35:7, 38:23,
42:11, 44:8,
46:25, 59:3,
59:7, 60:4,
60:11, 60:23,
61:2, 61:24,
65:15, 70:17,
74:1, 77:2,
81:6, 81:13,
82:3, 87:19,
90:4, 90:9,
93:20, 96:25,
98:18, 99:14,
102:6, 106:16,
106:23, 115:6
**again**
7:13, 27:6,
30:19, 44:3,
46:1, 46:3,
47:3, 47:5,
47:12, 61:8,
62:21, 63:9
**against**
24:17, 37:25
**agent**
84:11, 84:16,
84:22, 85:21
**agitated**
106:11
**ago**
18:19, 37:23,
63:20, 63:25,
64:17, 69:7,
83:13, 86:8,
90:17, 90:20,
90:21, 109:11
**agonized**
54:17

**agree**
72:19, 72:22,
88:21, 91:3,
91:14, 91:22
**agreed**
4:10
**agreement**
3:20, 49:11,
49:25, 50:5,
50:12, 58:8,
62:4
**agreements**
50:3, 50:15
**ahead**
66:1, 88:18,
93:3, 93:23,
94:15, 95:25,
96:12, 104:15,
106:7, 108:19,
110:2
**all**
9:7, 20:21,
34:3, 37:6,
40:19, 44:13,
46:7, 54:18,
55:23, 58:9,
60:8, 61:15,
66:19, 68:2,
70:6, 71:19,
72:24, 73:3,
73:6, 74:3,
74:25, 75:6,
77:10, 78:16,
78:17, 80:16,
81:14, 82:6,
82:11, 83:6,
83:11, 83:12,
83:16, 83:24,
87:7, 89:10,
89:25, 91:15,
91:16, 93:20,
93:21, 94:21,
95:21, 96:8,
98:18, 98:24,
99:11, 102:6,
103:9, 105:25,
106:15, 106:17,
114:6, 115:11

**allegation**
29:13
**allegations**
31:12, 46:18
**alleges**
30:9
**allen**
1:5, 2:3
**allison**
1:25, 4:10,
115:22
**allocate**
20:9
**allow**
72:16, 107:2
**allowance**
50:7, 50:12
**almost**
24:3, 110:21
**along**
46:5, 86:24,
98:17
**already**
24:19, 38:18,
38:24, 74:15,
74:16, 98:22,
98:23
**also**
2:21, 7:12,
31:23, 45:21,
54:7, 81:18,
91:23
**always**
10:15, 113:3
**amazing**
112:8
**amelia**
5:14
**among**
46:7, 79:16
**amongst**
48:14
**analysis**
90:7
**analyze**
61:10
**andrew**
45:14, 80:3,

80:5, 80:7,
80:10, 80:13,
95:10, 101:19,
111:8
**angry**
33:19
**announced**
22:20, 23:9
**announcement**
22:22, 48:17
**annual**
27:13, 109:17,
109:20, 109:22,
110:4, 110:12,
111:22
**annually**
51:15
**another**
11:25, 34:18,
44:18, 74:11,
77:2, 98:24
**answer**
6:16, 6:21,
7:21, 14:21,
61:9, 65:12,
66:2, 66:7,
66:14, 69:14,
71:23, 72:11,
81:25, 82:7,
91:6, 100:19,
102:23, 104:16,
105:21, 105:23,
106:5, 106:8,
107:6
**answered**
6:17, 105:8
**answering**
10:10, 69:19,
83:14
**answers**
98:13
**any**
6:25, 7:18,
7:19, 13:7,
14:18, 15:10,
16:8, 20:3,
20:11, 20:15,
20:16, 20:19,

22:17, 22:25,
25:15, 27:11,
30:15, 45:19,
45:22, 46:12,
46:14, 47:8,
47:14, 53:4,
55:25, 56:1,
57:22, 58:12,
58:13, 60:15,
61:20, 61:24,
62:3, 62:9,
63:1, 63:7,
63:10, 63:14,
63:15, 65:17,
67:7, 71:8,
75:5, 77:4,
77:19, 78:23,
79:4, 80:9,
83:5, 83:15,
83:21, 83:24,
86:17, 86:25,
87:4, 87:14,
87:15, 89:17,
94:12, 96:9,
99:1, 99:25,
100:15, 102:19,
103:15, 103:20,
103:24, 104:10,
104:14, 104:18,
104:25, 105:6,
105:8, 106:13,
107:10, 110:14,
112:24
**anybody**
17:4, 23:4,
48:23, 54:15,
67:25, 68:9,
69:1, 71:10,
75:23, 84:20,
91:9, 105:3,
105:18, 107:11,
107:16
**anymore**
37:1, 96:5,
96:6
**anyone**
35:14, 68:25,
69:3, 78:5,

78:6, 82:14,
91:12, 91:22,
91:24, 99:21,
105:12
**anything**
7:2, 7:22,
16:11, 27:13,
28:23, 35:5,
36:11, 36:23,
42:12, 48:16,
63:1, 63:5,
64:7, 66:4,
67:8, 80:23,
82:9, 82:10,
83:10, 85:25,
87:15, 92:19,
92:23, 93:1,
93:15, 94:7,
96:15, 97:18,
97:23, 98:4,
100:2, 100:4,
103:19, 105:4,
105:9, 106:9
**anytime**
37:24
**anywhere**
86:24, 104:13
**anywhere-anywhere**
104:13
**apologize**
18:21, 77:21
**apparently**
75:17, 88:3
**appearances**
2:1
**appeared**
2:10
**appears**
45:1, 46:1,
47:3, 47:12,
47:14, 47:20,
47:22, 83:19
**applies**
37:9
**appointed**
35:12
**approached**
12:22, 13:7

**approximately**
4:6
**archdale**
14:17, 14:18,
14:24, 15:4,
23:7, 24:5,
24:8, 35:2,
36:3, 36:18,
42:1, 44:13,
48:3, 48:8,
48:12, 48:15,
48:24, 74:20,
74:22, 76:4,
76:14, 81:22,
81:24, 82:4,
82:12, 82:16,
82:17, 82:20,
82:21, 92:14,
93:16, 94:10,
95:12, 95:17,
96:8, 105:17,
105:24, 106:4,
106:18, 106:23,
107:8, 113:6,
113:8
**archdale's**
36:18
**area**
32:7, 34:15,
86:4
**areas**
15:5
**aren't**
77:13, 77:16
**argue**
101:7
**argumentative**
69:13, 74:6,
94:15, 94:17,
100:18, 102:1,
106:7, 107:5
**argumentatively**
105:22
**around**
10:4, 13:10,
34:17, 73:7,
111:24
**arrangement**
27:12, 27:18,

46:7, 46:12,
63:11
**arrived**
35:2, 66:23
**aside**
49:5
**asked**
36:10, 36:11,
72:25, 75:4,
86:6, 86:10,
86:14, 105:7
**asking**
26:9, 91:14
**aspect**
107:14
**aspects**
26:19
**assemblies**
111:15
**assembling**
72:17
**assembly**
20:4
**assessment**
31:20, 91:4
**assets**
30:11, 49:1
**associate**
8:6
**assume**
6:16, 75:10
**assumed**
26:8
**assumes**
72:9, 99:16,
100:18, 100:22
**assured**
34:22
**atchison**
1:5, 2:3, 2:21,
5:19, 5:20,
5:21, 15:21,
16:12, 18:9,
18:25, 19:15,
24:17, 25:15,
26:6, 27:12,
30:22, 31:9,
31:15, 33:3,

33:5, 35:17,
37:2, 37:14,
37:21, 39:5,
39:13, 39:17,
42:24, 44:9,
45:19, 47:7,
50:6, 50:11,
50:16, 51:25,
52:19, 53:12,
56:24, 57:10,
57:22, 58:2,
58:7, 61:21,
61:25, 62:5,
62:9, 62:23,
63:19, 65:7,
65:14, 66:21,
67:17, 67:25,
68:1, 68:8,
68:9, 71:6,
71:12, 73:1,
74:3, 74:15,
74:24, 75:11,
75:18, 76:7,
78:3, 78:17,
80:1, 80:17,
80:25, 81:4,
83:7, 85:18,
85:20, 86:19,
87:7, 91:1,
91:11, 91:21,
92:20, 95:12,
96:22, 97:13,
97:25, 100:16,
107:15, 108:16,
108:17, 108:23,
109:4, 109:14,
111:11, 113:25
**atchison's**
20:11, 20:15,
20:19, 31:1,
31:18, 34:5,
38:17, 40:19,
41:3, 41:10,
42:19, 43:1,
43:5, 43:16,
57:3, 73:4,
79:13, 80:15,
80:18, 88:7,

88:15, 88:23,
96:16, 110:25,
111:9, 111:20
**attempted**
66:11
**attend**
34:18, 99:6,
99:8
**attendance**
99:7
**attention**
21:2, 50:4
**authority**
106:8, 114:2
**available**
28:22, 34:13
**avenue**
2:16
**averments**
24:21
**award**
110:5
**aware**
21:17, 21:21,
23:23, 27:11,
27:18, 45:19,
45:22, 46:12,
46:14, 47:8,
48:4, 48:7,
50:11, 50:24,
51:3, 52:3,
52:6, 52:8,
56:19, 58:15,
60:11, 61:20,
61:24, 62:3,
62:8, 62:14,
77:24, 91:24,
112:24
**away**
33:5, 90:9

**B**

**back**
18:3, 28:13,
29:14, 31:18,
32:10, 34:5,
35:2, 42:10,
61:1, 66:6,

78:8, 78:12,
82:12, 100:13,
108:11, 111:5
**background**
7:24
**banks**
15:16, 21:21
**based**
53:25, 58:8,
104:20
**basic**
25:25, 65:6
**basically**
37:7
**basis**
108:17, 108:24
**became**
87:19
**because**
15:23, 31:8,
33:16, 35:8,
36:18, 36:25,
67:13, 67:18,
68:10, 70:11,
77:6, 82:14,
87:25, 99:25,
114:1
**become**
48:14, 69:5
**becoming**
28:21
**been**
6:8, 21:17,
22:1, 24:19,
27:17, 27:18,
31:10, 35:4,
38:7, 39:14,
41:21, 44:23,
49:9, 52:11,
56:11, 62:25,
64:10, 64:16,
64:19, 64:20,
72:7, 74:19,
76:15, 77:24,
87:17, 97:16,
98:6, 105:3,
111:23, 112:7,
113:9

**before**
6:8, 13:13,
18:4, 21:19,
23:4, 27:15,
38:24, 59:9,
60:5, 64:4,
64:10, 64:12,
64:17, 64:20,
65:15, 65:22,
67:1, 71:10,
72:23, 76:19,
85:9, 85:11,
85:14, 86:8,
92:6, 97:12,
97:16, 98:10,
105:3, 105:7
**beginning**
94:11
**behalf**
2:3, 2:12,
9:20, 85:17,
97:8
**behavior**
32:22
**behind**
42:12, 91:20,
101:18
**being**
4:10, 12:7,
12:23, 16:18,
21:19, 22:12,
24:24, 33:19,
35:12, 36:5,
58:14, 58:25,
65:4, 72:25,
75:1, 78:18,
79:17, 83:16,
83:20, 95:23,
97:4, 103:20,
103:21, 104:1,
114:4, 115:7
**belief**
62:13, 78:14
**believe**
43:21, 45:18,
45:21, 46:4,
46:11, 46:18,
47:7, 70:9,

110:9
**below**
42:25
**benefit**
30:14, 49:14,
49:19, 50:17
**best**
18:8, 18:24,
19:16, 19:20,
25:14, 46:22,
57:18, 60:8,
88:1, 115:11
**better**
24:10, 54:23,
55:4, 55:24
**between**
43:16, 62:4,
68:17, 69:6,
69:11, 100:1
**bg**
19:12, 19:14,
19:18, 19:22,
19:25, 20:5,
20:13, 20:17,
28:18, 38:22,
39:7, 46:23,
54:21, 57:9,
58:23, 59:2,
59:6, 59:12,
59:15, 59:18,
59:21, 59:24,
60:2, 60:12,
60:16, 61:22
**big**
75:18, 88:12,
92:17, 92:18,
109:18
**billion**
112:20
**billion-dollar**
112:14
**birthday**
64:21
**bit**
12:4, 15:22,
17:15, 68:1
**board**
86:19, 100:9

**bold**
40:18, 40:23
**bonitron**
15:25, 16:1,
19:5, 25:23,
54:23, 55:3,
55:6, 55:13,
67:11, 67:16,
67:17, 67:18,
68:2, 68:10,
71:18, 72:18,
101:22, 111:7
**bonitron's**
67:8
**bonus**
50:20, 50:24,
53:23, 54:1,
54:8, 54:11,
109:19
**bonuses**
105:9
**books**
57:20
**both**
11:6, 25:7,
25:8, 75:9
**bottom**
30:1, 30:5,
30:6
**bought**
11:17, 12:2,
13:21, 19:9,
22:24, 23:18,
28:1, 28:19,
38:25, 46:25,
49:11, 58:17,
58:25, 59:3,
59:7, 59:9,
65:21, 85:9
**boulevard**
4:5
**box**
53:22, 54:7,
54:10
**bpm**
26:19, 38:17,
43:15, 76:18
**bradley**
2:14, 3:4, 3:6,

5:11, 5:18,
8:16, 8:19,
8:22, 8:23,
24:14, 28:12,
38:3, 38:6,
42:17, 44:22,
49:8, 52:14,
52:16, 62:25,
65:24, 66:2,
66:13, 68:25,
69:13, 70:3,
70:13, 71:22,
72:9, 74:5,
74:18, 81:8,
85:6, 85:10,
86:2, 88:18,
91:5, 93:2,
93:22, 94:14,
94:25, 95:22,
95:25, 96:11,
98:14, 98:20,
99:3, 99:16,
100:17, 100:22,
101:10, 101:25,
102:12, 103:9,
104:15, 106:6,
106:25, 107:4,
107:18, 108:18,
110:1, 110:17,
113:21
**bradley's**
69:19, 83:15
**break**
6:25, 7:1, 7:3,
18:9, 28:8,
44:18, 77:9
**brief**
42:20, 46:5
**briefly**
8:3, 8:15,
49:22
**bring**
18:14, 57:5,
94:10, 95:10,
95:11, 95:12,
107:14
**bringing**
16:20, 36:19,

87:3, 89:11
**broad**
63:11
**broader**
69:25
**broken**
32:17, 32:18
**brought**
5:19, 5:24,
37:6, 72:15,
86:21, 96:7,
102:9
**build**
18:9, 20:9,
26:7, 39:7,
43:12, 57:1,
67:4, 73:17,
74:21, 107:1
**building**
11:8, 11:18,
12:2, 12:6,
13:6, 14:16,
15:13, 15:15,
15:17, 16:21,
19:1, 20:4,
21:22, 21:25,
43:23, 57:4,
85:25, 86:11
**built**
19:15, 19:18,
19:22, 19:25,
20:10, 75:1,
75:3
**burger**
2:4, 2:5, 3:5,
3:7, 3:16, 5:20,
8:19, 8:21,
62:19, 62:21,
65:25, 66:5,
66:15, 69:17,
70:1, 70:5,
70:15, 72:5,
72:13, 74:7,
74:23, 81:9,
86:3, 88:19,
91:7, 93:6,
93:24, 94:16,
95:4, 96:1,

96:14, 98:21,
99:18, 100:20,
100:25, 101:13,
102:4, 102:14,
104:19, 106:10,
107:7, 107:21,
108:13, 108:21,
110:8, 112:7,
113:23, 114:8
**burger's**
5:21
**business**
39:15, 65:21,
66:11, 72:24,
83:16, 84:24,
90:7, 92:6,
101:3, 101:6,
101:9, 103:10,
106:12, 113:7
**businesses**
112:22, 112:23
**buy**
78:6, 78:8
**buying**
66:12

**C**

**cableform**
65:21, 66:3,
66:12
**call**
35:3, 64:6,
64:11, 94:9,
107:11, 107:16
**called**
17:14, 21:16,
21:24, 22:13,
32:21, 32:24,
34:24, 35:6,
40:24, 44:5,
45:23, 46:14,
57:15, 57:19,
64:1, 64:3,
64:13, 64:23
**calls**
12:11, 61:10,
74:5, 108:2
**came**
12:22, 17:21,

17:22, 32:9,
33:6, 34:18,
34:23, 34:25,
37:5, 41:24,
48:17, 65:7,
67:1, 71:6,
71:15, 72:23,
75:16, 80:15,
80:18, 83:21,
85:17, 91:11,
94:5, 95:8,
95:14, 97:3,
97:12, 98:11,
110:19
**can't**
7:7, 17:21,
19:7, 19:10,
33:8, 33:9,
33:10, 35:4,
41:18, 77:17,
100:6
**canton**
9:2
**capable**
55:13
**capacity**
68:23, 104:9
**captured**
56:22
**car**
35:4, 42:9,
50:12
**card**
103:11, 109:18
**care**
13:6
**carolina**
14:17, 14:19,
92:14, 92:25,
93:14, 93:16,
94:10
**case**
24:10, 38:11,
71:13, 92:4,
101:21
**cash**
50:2
**catch**
35:1

**cause**
32:8
**caused**
99:4
**causing**
39:15
**center**
4:4
**certain**
22:3, 51:21,
54:2, 90:12
**certainly**
15:23, 17:18,
19:3, 23:9,
35:11, 41:19,
55:23, 71:24,
72:1, 72:15
**certificate**
115:1
**certification**
15:19
**certify**
115:4, 115:12
**cetera**
48:1, 78:19
**challenges**
28:21
**chance**
47:14
**change**
12:20, 78:11
**changed**
28:23
**character**
31:8, 31:21
**characterization**
101:5
**characterize**
98:2
**characterized**
90:25, 112:7
**charge**
16:4, 17:20,
74:11, 76:17
**check**
64:13
**checkup**
64:18

**cincinnati**
8:5, 8:10,
10:17
**circuit**
68:18, 70:24,
71:1
**circuits**
102:10
**circumstances**
16:17, 30:25,
63:24, 114:4
**cite**
100:12
**citizens**
31:5
**city**
11:12
**civil**
1:3, 3:12, 4:8,
31:4
**claim**
20:16, 57:22,
58:2
**claimed**
24:24, 58:7,
80:15
**claims**
24:19, 41:10
**clandestine**
36:22
**clarification**
42:19, 63:7
**clarify**
63:9, 70:7,
110:10
**clarity**
94:12
**class**
21:8, 21:11
**cleaned**
106:14
**clear**
77:20, 85:16
**clearly**
66:7
**climb**
95:13
**close**
23:23, 37:23,

**closely**
63:22, 79:18
**closely**
78:25
**coincidentally**
98:8
**cole**
2:15
**collect**
36:6
**collected**
42:2, 44:13
**collecting**
36:1, 36:16,
36:17
**collection**
44:12
**college**
9:1
**colon**
43:4
**com**
2:20
**combine**
113:3
**come**
13:15, 31:23,
31:25, 32:3,
34:10, 34:20,
42:10, 54:14,
74:24, 75:4,
76:12, 82:15,
87:13, 111:22
**comes**
86:19
**coming**
36:6, 83:7,
88:25, 97:13
**comment**
63:18
**commission**
80:16, 98:1,
115:24
**commissions**
39:18, 97:1,
105:7, 105:8
**commonwealth**
115:2
**communication**
6:22

community
33:23
companies
113:9
company
10:23, 15:17,
16:7, 19:23,
20:1, 22:19,
22:24, 32:19,
35:15, 37:7,
37:10, 37:15,
37:17, 41:16,
59:4, 80:24,
92:5, 112:5,
112:9, 112:14,
112:18
company's
36:17, 55:1
compared
17:22
compensation
50:2
competent
7:18
competitive
54:21, 55:21
competitors
55:15
complaint
3:13, 24:12,
24:16, 43:7
complaints
87:4, 87:15,
96:2
completely
33:2
complex
11:8
component
25:25, 77:16
components
26:2, 28:21,
55:8, 56:1,
56:7, 77:6
computer
40:18, 40:25,
41:1, 41:2,
41:3, 41:4,

41:10, 41:14,
41:18, 41:21,
41:23, 41:25,
42:7, 44:4,
44:8, 79:3, 82:7
computers
73:13, 73:25
concept
104:4
concepts
43:6, 43:15,
58:4
concerned
63:3, 109:16
concisely
38:12
conclude
39:16
concluded
114:9
conditions
7:19
conduct
31:11, 32:13
confide
94:2
confirm
42:25, 43:18,
44:3
connection
6:3, 6:6,
12:14, 63:15
consideration
71:2
consolidating
113:1
consolidation
49:1, 49:2
conspiracy
62:3
constitutes
115:10
consult
76:19
consultation
104:22
consulted
83:12, 84:17,

84:21, 85:2,
85:22, 86:14,
107:10
contacted
34:9
contain
78:2, 78:4,
78:5, 78:20
contained
40:19, 71:9,
77:3, 77:5
contemplated
96:19
contents
51:19
context
24:11, 46:20,
64:7, 73:6
continue
7:25, 8:10,
28:2, 28:18,
81:20, 81:21,
95:13
continued
12:5, 23:13,
28:20, 28:25,
58:17, 60:12,
60:14, 60:16,
99:12
continues
34:2
continuing
28:5
continuously
29:10, 65:15
continuum
109:3
contract
53:8
contractor
60:23, 61:3
contrast
100:8, 100:10
contributed
35:11
contrivance
30:11
contrived
34:1, 35:18

control
32:19
controls
1:10, 2:12,
24:17
conversation
7:15, 67:15,
97:8, 99:25
conversations
87:18, 104:17
convert
30:13
copied
103:24
copies
73:3, 76:6,
76:7, 79:4
copy
24:12, 24:16,
38:8, 44:24,
98:24
corporation
73:23, 95:1
corporations
95:1, 95:2
correct
10:21, 10:22,
10:24, 10:25,
11:4, 19:2,
21:22, 21:23,
22:7, 22:10,
23:14, 23:22,
24:5, 24:6,
27:14, 39:7,
43:12, 43:24,
44:6, 44:9,
46:12, 46:13,
46:15, 46:16,
46:25, 47:1,
48:19, 53:24,
54:3, 57:17,
58:18, 58:19,
58:21, 58:22,
61:3, 68:19,
73:2, 73:10,
73:11, 81:13,
82:12, 89:24,
90:13, 92:8,

92:9, 92:15,
92:16, 99:15,
112:10, 113:11,
113:14, 113:17,
113:18
**correctly**
65:9, 78:13,
89:20, 105:15
**corroborate**
41:9, 47:6,
62:10
**corroborates**
46:18
**corroborating**
46:6
**cost**
49:2, 87:15
**could**
24:25, 26:12,
28:14, 33:25,
34:17, 35:22,
35:23, 38:10,
39:9, 40:8,
41:8, 42:21,
44:1, 45:4,
45:5, 47:2,
55:5, 56:3,
63:22, 64:20,
76:15, 77:15,
91:9, 91:14,
94:18, 97:4,
97:5
**couldn't**
55:6
**counsel**
2:1, 115:13
**couple**
42:20, 42:21,
64:3, 90:9,
104:23, 107:2
**course**
6:19, 12:3,
31:24, 34:11,
101:21, 101:22,
101:23, 104:22
**court**
1:1, 4:11, 5:3,
5:9, 5:23, 6:12,

7:7, 7:14, 8:18,
24:20, 38:4,
52:13, 62:17,
115:23
**courts**
6:14
**covington**
4:5, 10:13,
11:16, 11:22,
12:14, 15:14,
21:13, 37:3,
44:5, 82:3,
82:10, 105:13,
106:14, 107:1,
113:5
**coworker**
11:5
**crafts**
9:7
**crazy**
94:19
**created**
39:3
**creating**
54:17, 83:9
**creation**
84:2
**credibility**
80:10
**credible**
79:17
**crew**
17:20
**criticizing**
100:15
**cross-examination**
3:5, 62:18
**crowe**
16:9, 17:11,
20:22, 21:18,
22:18, 49:25,
54:14, 58:8,
81:3, 83:8,
84:1, 84:8,
84:14, 84:21,
85:15, 85:16,
86:25, 87:12,
87:25, 90:2,

90:14, 98:8,
104:11, 109:6,
109:12, 114:3
**crowe's**
90:16, 90:22
**curious**
73:22
**customer**
77:15, 106:20
**customers**
10:9, 69:10,
77:17, 78:19
**cut**
62:5, 97:2,
97:18, 108:7

**D**

**damage**
33:4
**date**
1:24, 77:25,
90:18, 115:5
**dates**
35:12
**day**
4:6, 56:17,
66:23, 76:24,
99:14, 100:11,
108:24
**day-to**
108:23
**day-to-day**
108:17
**days**
18:17, 31:18,
34:15
**dealings**
79:25, 81:4
**decide**
92:12
**decided**
82:19, 82:20,
84:15
**decides**
92:15
**decision**
76:10, 76:13,
82:22, 92:24,

95:18, 105:16
**decisions**
95:6
**declaration**
79:21, 80:14,
80:19, 81:2
**dedicated**
22:3
**deep**
13:12
**defendant**
1:11, 2:12
**defendant's**
3:17, 44:25
**defined**
63:12
**definition**
22:2
**degree**
8:6
**demand**
105:21, 105:23,
106:4, 106:8
**departed**
39:18, 61:21,
61:25, 65:5,
68:10, 76:25,
77:25
**department**
22:6
**departments**
9:7
**departure**
70:18
**deponent**
1:23
**deposed**
6:8
**deposition**
3:11, 4:3, 4:7,
7:5, 63:7,
78:15, 114:9
**depositions**
6:11, 90:23
**describe**
21:7, 21:11,
22:14, 70:25,
86:7

described
68:25, 69:7,
76:4
describing
64:18
description
98:23
design
17:4, 18:9,
19:6, 54:22,
56:25, 67:8,
67:9, 67:10,
68:1, 80:16,
91:19, 104:13
designate
84:9
designating
85:19
designed
19:14, 19:18,
19:22, 19:25,
61:16, 106:1
designing
57:4
designs
19:9, 20:13,
37:2, 58:3,
68:11, 72:22,
80:15, 86:20,
105:1
desired
104:8
desktop
40:18, 41:18,
44:4
developed
37:11, 57:24,
71:18, 72:19
development
17:13, 39:11
device
55:24
devoted
31:22
diagrams
66:22, 78:23
difference
68:17

different
9:7, 15:5,
15:16, 16:6,
35:20, 89:16,
112:22, 113:9
differently
61:12
difficult
31:7, 33:7,
102:16, 102:18
digital
75:16, 76:6,
76:8
digitally
73:13, 115:9
direct
3:4, 5:10,
15:16, 21:21,
35:10
directed
76:16
directing
20:9
direction
20:7, 115:10
directly
46:18, 115:14
disagree
72:20
disappointments
86:18, 86:25
disassembly
47:25
discipline
100:3, 100:5
disclosure
3:19, 49:10
disclosures
3:15, 38:8
disconnect
108:1
discreet
43:17
discreetly
39:3
discretionary
54:8, 54:10
discuss
8:15, 31:8

discussed
83:20, 87:5
discussion
104:10
discussions
16:8, 22:17,
27:2, 56:20,
58:12, 83:6,
83:7, 98:7,
103:21, 103:25,
104:1, 104:14
dismissed
24:20
dispatch
76:10
dispatched
76:20
dispatching
74:2
dispute
68:4, 76:2,
101:4
district
1:1, 1:2
division
16:10, 21:24,
22:5, 57:19,
62:11, 83:9,
84:24, 86:12,
90:6, 104:1,
113:12
document
5:24, 27:25,
45:1, 46:5,
52:17, 52:22,
53:11, 53:14
documentation
73:19
documents
24:10, 73:5,
75:8, 75:9, 82:6
doing
12:12, 13:13,
17:19, 36:12,
37:1, 55:13,
55:22, 64:24,
67:3, 73:15,
74:4, 74:9,

83:3, 87:6,
94:8, 96:4, 96:6
dollar
50:12, 101:5,
101:8, 108:4,
112:25
dollars
97:23, 98:3,
98:9, 111:24,
112:20
done
12:4, 18:3,
19:9, 23:4,
41:22, 44:17,
69:20, 69:21,
72:3, 72:7,
94:4, 107:25,
110:21
door
72:6, 104:21
doubt
80:9
doubted
79:18
down
19:6, 29:13,
47:19, 49:21,
54:20, 94:10,
95:12, 97:2,
97:18, 105:15,
105:24, 106:3,
106:23, 108:3,
111:6, 112:21
drawing
75:5
drawings
19:10, 75:18,
78:24, 80:18
drink
7:1
duly
115:7
duplicates
98:24
during
6:14, 6:19,
10:12, 12:19,
20:11, 20:15,

20:19, 28:17,
30:19, 36:8,
43:24, 48:7,
55:20, 57:3,
89:21
**duties**
9:3, 10:6,
13:1, 17:17,
19:19, 39:4,
43:5, 43:17,
57:3

**E**

**e-mail**
2:9, 2:20,
83:19
**e-mails**
43:18, 103:24
**each**
89:1, 90:25,
111:1
**earlier**
39:6, 43:10,
45:18, 45:21,
46:11, 62:20,
63:18, 65:12,
68:25, 69:19,
70:9, 81:21,
86:21, 95:22,
110:9
**early**
32:1, 71:14,
106:20, 106:22
**east**
4:4
**educated**
30:1, 30:4,
30:7, 30:9
**education**
7:25, 8:4, 8:11
**effort**
67:20, 104:25
**efforts**
25:21, 67:3,
67:13
**eight**
40:10, 106:15,
113:9

**either**
17:13, 71:7,
79:3, 87:12,
87:14, 99:9,
99:11, 115:13
**elaborate**
103:25
**electric**
56:6, 68:18
**electrical**
8:6, 91:23
**electronic**
28:21, 103:18
**electronics**
20:25, 21:10,
21:16, 21:25,
22:13, 39:10,
39:15, 39:17,
45:9, 45:10,
45:12, 45:23,
46:8, 46:15,
46:20, 47:25,
55:5, 55:12,
57:16, 57:20,
58:10, 62:11,
80:1, 81:4,
81:6, 83:10,
83:17, 83:20,
84:3, 103:10,
103:12, 103:16,
103:22, 104:1
**element**
99:2
**eliminate**
113:4
**else**
69:1, 91:22,
92:22, 102:11
**employ**
74:14, 74:25
**employed**
29:21, 57:11
**employee**
11:25, 13:23,
14:1, 19:15,
19:19, 23:13,
31:21, 35:1,
35:19, 39:13,

39:21, 43:23,
49:14, 49:19,
50:17, 56:24,
58:18, 58:20,
67:16, 79:10,
80:8, 100:3,
101:1, 102:16,
102:18, 109:14,
109:15, 109:23,
115:13
**employees**
20:3, 33:21,
46:7, 48:1,
48:3, 48:15,
50:2, 50:16,
50:25, 67:18,
79:16, 79:17,
84:10, 88:15,
106:24, 109:24,
110:4, 110:11
**employment**
53:8, 92:18
**end**
14:16, 57:9,
58:4, 88:11,
96:20
**endeavor**
112:8
**ended**
38:1, 75:14,
75:20
**engineer**
12:21, 17:5,
37:18, 74:14,
74:24, 84:10,
85:1, 85:13
**engineering**
8:6, 25:9,
25:21, 91:23
**engineers**
15:12, 21:7,
21:10, 36:20,
82:6, 85:20
**enjoy**
114:6
**enough**
98:16, 107:1
**enter**
8:13, 33:18

**entered**
8:14
**entire**
28:4, 29:10,
43:24, 46:24,
76:18, 77:23
**entirely**
30:16, 43:17,
85:5, 108:7
**entirety**
26:18
**entitled**
52:18, 62:12,
80:15, 101:23
**entitlement**
30:16, 80:16
**entity**
21:15, 21:16,
22:2, 22:5,
46:14, 57:15,
57:19, 58:10,
83:17, 83:20
**envoy**
74:2
**equipment**
16:23, 61:12,
61:13
**eschleman**
11:24, 50:21
**esquire**
2:4, 2:14
**establish**
7:17
**estate**
84:2, 86:12
**et**
48:1, 78:19
**evaluation**
109:14
**evaluations**
108:16, 109:17,
109:23, 110:12
**even**
75:5, 87:19,
97:11, 109:19
**events**
18:19, 34:7,
39:23

eventually
113:16
ever
6:8, 13:23,
20:12, 20:20,
20:24, 21:3,
21:5, 21:13,
27:21, 28:22,
32:21, 37:2,
57:19, 57:22,
58:2, 58:7,
58:12, 61:17,
67:15, 70:2,
79:6, 84:20,
85:2, 85:17,
85:22, 86:6,
86:10, 86:17,
86:25, 87:1,
87:13, 100:15,
103:10, 103:13,
103:15, 103:20,
103:24, 104:10,
104:24, 105:12,
105:18, 107:10,
107:16, 108:2,
109:7, 109:12,
109:14, 114:3
every
51:16, 52:8,
73:13, 73:15,
73:25, 89:14,
95:24
everybody
23:3, 94:6
everyone
13:3, 13:4
everything
13:6, 17:14,
37:19, 44:15,
67:2, 67:4,
81:15, 88:10
evict
32:14
evicted
33:15
evidence
72:10, 99:17,
100:19, 100:23

evidencing
46:5
evolved
43:15
exact
90:18
exactly
9:15, 9:23
examination
3:4, 3:6, 5:10,
6:14, 110:16
example
89:23
examples
32:13
excellent
94:4
exclusive
30:14
excuse
24:18, 78:12,
105:7
executive
53:3, 84:11,
92:24, 100:15
executives
85:2, 95:6
exhibit
3:10, 5:23,
24:12, 24:13,
24:16, 38:3,
38:5, 38:8,
42:15, 42:16,
44:17, 44:21,
44:24, 49:5,
49:6, 49:7,
49:10, 52:12,
52:14, 52:15
exhibits
3:9
exist
91:13, 100:21
existed
28:19, 51:3,
65:6
existence
45:22, 100:13,
100:14

exotic
88:24
expanded
10:23, 11:24
expect
72:12
expected
26:11
expended
104:25
expense
50:8
experience
91:15, 113:7
expires
115:24
explain
31:14, 36:12,
48:11, 48:24,
74:22, 84:6,
105:18
exploited
97:4
explore
8:24, 107:23
express
87:1
extensive
91:15
extent
48:20

**F**

fabricate
111:14
facilities
36:2, 113:2
facility
11:16, 21:13,
23:24, 76:18,
79:11, 82:3,
84:3, 93:8,
93:13, 105:13,
107:12, 110:11,
113:8
fact
69:5, 96:25
factory
15:6, 80:8,

facts
72:9, 99:16,
100:18, 100:22
factual
24:21
failure
35:9
failures
61:10
fair
6:17
familiar
17:5, 17:6,
22:1, 55:8,
67:23, 71:24
far
15:18, 63:2,
66:8, 96:17,
109:16
fast
23:20
faster
55:13
father's
90:16
fault
33:14
feature
55:14, 70:19
features
54:22, 55:7,
55:9, 55:21,
55:24, 56:1,
67:21, 68:3,
70:24, 71:1
federal
4:8
fee
20:21
feel
63:5
fellow
33:21, 79:16
felt
37:10
few
88:25, 94:23,

110:18
**fiberglass**
72:1
**field**
78:11, 91:2,
91:23
**fielding**
10:11
**fields**
112:3
**figures**
97:16
**file**
75:6, 84:23
**filed**
24:17
**files**
40:20
**finalizing**
30:10
**finally**
42:24
**financial**
27:11, 30:15,
63:11, 90:12
**financially**
115:14
**find**
107:22
**fine**
56:19
**finish**
7:12
**finished**
47:13
**fire**
93:19, 94:6,
94:22, 94:23
**fired**
98:17, 98:25,
99:5, 99:14,
100:12, 102:6,
102:15, 105:25,
106:15, 106:16,
113:25, 114:4
**firing**
35:17
**firm**
2:5, 78:14

**first**
3:18, 7:24,
9:1, 15:20,
17:23, 19:8,
25:6, 26:16,
26:24, 26:25,
27:7, 38:15,
44:25, 50:5,
73:6, 74:20,
115:7
**five**
14:4, 29:25,
30:4, 103:8,
108:10, 109:11,
112:20
**five-minute**
28:8, 44:18
**flip**
24:25, 26:12,
28:14, 29:24,
33:25, 35:22,
39:9, 41:8,
42:21, 44:1,
49:13
**florence**
11:13, 11:14,
11:22
**focus**
24:25, 25:21,
45:7
**follow**
65:9, 72:25,
98:16, 99:6,
99:8, 110:18
**follow-up**
68:3, 108:14
**following**
39:10, 43:1,
78:13, 89:19,
97:14, 99:3
**follows**
38:12
**force**
82:5
**forced**
32:10
**foregoing**
115:4

**foreman**
75:4
**foreman's**
9:8
**form**
63:6, 65:6,
71:22, 79:4,
85:6, 88:18,
100:13, 100:17,
101:10, 101:25,
102:12, 104:15,
106:6, 107:4,
107:18, 115:10
**formal**
7:25, 84:25,
103:17, 109:13
**formality**
63:2
**format**
52:22
**formed**
105:3
**former**
67:15
**forms**
73:12
**forth**
43:6
**found**
55:14
**foundation**
42:23, 65:24,
66:13, 91:5,
93:2, 93:22,
94:14, 96:11,
102:13, 107:5,
108:18, 110:1
**four**
12:1, 65:2,
65:3, 96:23,
102:9, 112:20
**frame**
16:9, 86:18,
91:3, 95:7,
109:2, 109:3
**frcp**
3:14
**free**
63:5

**frequently**
14:20, 56:17,
81:25
**fresh**
106:3
**friday**
4:6
**friend**
110:25, 111:8,
111:19
**front**
6:13, 20:12,
32:18, 71:25
**frustrated**
67:18
**full**
26:17, 26:25,
42:9, 43:22,
97:17
**full-time**
19:15, 19:19,
56:24
**fully**
45:13
**functions**
69:25
**funeral**
90:16
**further**
39:14, 43:15,
62:15, 110:14,
113:19
**future**
58:9

| G |
|---|

**g-a-u-p-e-l**
79:7
**gathered**
81:19, 93:20,
94:3, 94:20,
102:7, 106:16,
106:17
**gathers**
94:21, 98:18
**gaupel**
79:6, 95:11,
101:20, 113:25

gaupel's
79:20, 114:4
gave
33:17, 75:20,
78:24, 79:4,
98:24
gears
86:15
general
13:14, 21:1,
64:11, 101:4
generated
76:7, 103:15
generator
25:23
generic
26:1
getting
19:5, 19:6,
20:10, 28:23,
75:14, 86:21,
96:18, 97:9,
98:8, 105:6,
109:10
gist
56:8
give
5:6, 7:6, 7:18,
25:3, 32:13,
34:3, 34:7,
61:11, 78:9,
91:10, 91:14,
94:12, 96:9,
99:13, 99:19,
106:13, 107:13
given
9:8, 27:12,
93:8, 105:12,
105:14, 110:12
gladiola
5:14
glass
32:17
global
27:13
glover
9:13, 9:16,
9:20, 9:22,

9:25, 10:1,
11:6, 102:25,
103:1, 103:2,
103:11, 103:16,
103:21
glover's
103:6
go
6:10, 7:2, 7:5,
14:20, 19:1,
19:4, 24:9,
24:20, 28:10,
31:18, 34:5,
35:1, 44:19,
53:22, 56:21,
66:1, 81:22,
82:20, 82:21,
88:18, 93:2,
93:22, 94:15,
95:25, 96:11,
96:16, 104:15,
106:7, 106:19,
108:18, 109:13,
110:1, 111:5
going
8:16, 14:3,
21:18, 23:11,
24:9, 27:12,
31:3, 31:8,
32:6, 34:10,
38:7, 42:10,
48:6, 48:8,
48:10, 52:11,
56:21, 62:24,
74:14, 78:15,
83:4, 85:1,
89:14, 92:12,
93:9, 93:12,
93:13, 94:5,
94:6, 94:9,
95:10, 95:11,
95:12, 95:24,
96:4, 96:5,
96:7, 101:20,
105:24, 106:2
gone
82:11, 96:6,
96:7, 98:15,

104:25
good
5:17, 32:19,
60:7, 88:3,
88:6, 88:7,
88:16, 88:22,
93:10, 93:11
gotten
96:25, 109:11
graduated
8:8, 8:9
great
96:4
gross
27:13, 45:11,
62:12, 80:17,
95:13, 96:17,
97:21, 108:4
ground
6:10
group
79:2
grudge
37:25, 38:2
guess
15:18, 18:21,
56:9, 56:10,
94:9
guide
14:21
guy
87:24, 87:25,
101:18, 106:1
guys
55:22, 69:7,
69:11, 78:25,
86:20

**H**

habits
35:15
hand
5:3, 21:5,
38:7, 52:11
handbook
100:4
handed
24:15, 42:18,

49:9, 52:17
handing
44:23
handle
13:16, 55:5,
55:6
handled
16:7
happen
48:6, 48:10,
79:9, 80:7
happened
12:16, 23:16,
33:4, 33:13,
33:16, 48:21,
64:22, 73:2,
94:13
happening
32:20, 36:19,
98:15
happy
38:1, 88:10
hard
37:22
harm
32:8
head
7:9, 18:17,
72:23, 85:3,
87:24, 87:25,
112:21
hear
8:20, 15:20,
87:4
heard
20:24, 21:3,
21:5, 35:7,
67:23, 101:24
hearing
64:7
heavily
20:8
heavy
26:2
held
87:12
hell
96:24

**help**
24:7, 56:11,
56:25, 87:22,
92:1, 94:18,
95:18, 98:22,
101:24, 102:2,
109:8
**helped**
60:25, 69:5,
111:14
**here**
6:5, 9:18,
42:21, 47:19,
50:3, 74:3,
78:14, 85:19,
85:20, 86:15,
86:18, 91:20,
94:7, 94:10,
96:5, 101:17,
102:24, 104:20,
106:1, 108:4,
108:14, 110:21
**here's**
91:25
**hereby**
115:4
**hereof**
115:6
**hierarchy**
87:22
**high**
8:1, 61:15,
99:13
**high-power**
56:7
**higher**
69:16, 69:24,
70:23
**highly**
76:18, 91:1
**himself**
8:17, 87:8,
109:1
**hindsight**
30:2, 30:3,
30:4, 30:7,
30:9, 46:21,
70:17

**hinton**
15:16, 16:9,
20:22, 22:18,
50:1, 58:9,
81:3, 83:8,
84:1, 84:8,
84:14, 84:21,
85:17, 87:1,
87:12, 90:15,
97:1, 97:17,
98:8, 104:11
**hinton's**
17:11, 90:23
**hire**
17:16, 107:14
**hired**
9:5, 9:13,
9:19, 11:6,
16:12, 16:14,
16:18, 16:25,
17:8, 18:9,
26:6, 39:6,
43:11, 56:24,
103:3, 111:11
**hirees**
106:15
**hiring**
26:19, 107:8
**history**
8:15, 8:24
**hit**
51:21
**hold**
60:7
**hollister**
4:4
**home**
39:4
**hope**
88:5
**hotel**
34:15
**hours**
48:9, 105:15,
105:17, 108:2
**house**
31:16, 31:24,
32:2, 32:8,

32:10, 32:11,
32:14, 32:16,
32:17, 32:18,
32:20, 32:21,
32:24, 33:4,
33:12, 33:18,
40:15, 40:19,
40:25, 41:1,
41:10, 41:13,
41:16, 42:6,
42:9, 42:11,
44:3, 44:5,
44:8, 44:9,
44:14, 92:21,
106:14
**houses**
11:7
**however**
63:11
**hubbell's**
31:10, 45:13,
59:15, 59:24,
77:9, 100:2
**huge**
112:19
**humerus**
107:19, 107:22,
107:23

---

**I**

**idea**
32:1, 62:9,
83:16, 95:19,
96:13, 96:19
**identified**
42:25, 86:17
**imagine**
89:8, 90:2
**immediately**
24:3, 86:17,
94:22
**important**
34:19, 42:13,
46:17, 55:11
**improve**
67:13, 67:20
**inc**
1:10, 2:13,

57:1, 57:11,
58:5
**incentive**
3:21, 51:6,
51:10, 51:14,
51:16, 51:20,
51:24, 52:4,
52:18, 52:23
**incident**
64:17
**include**
19:12, 43:5,
51:20, 57:4
**included**
50:15, 77:7,
103:20
**including**
57:9, 70:18,
83:25
**incorporated**
13:20, 13:24,
14:2, 22:19,
55:21, 57:6,
57:14, 57:25,
58:16, 58:25,
59:8, 59:9,
112:1, 112:16,
112:17
**increase**
89:18
**increased**
68:22, 69:8,
69:9, 69:23,
70:12, 71:2,
89:1, 104:8,
104:9
**increases**
89:6, 110:6
**incremental**
89:6
**incrementally**
89:1
**indented**
41:9
**index**
3:1
**indicate**
37:24

| | | | |
|---|---|---|---|
| indicated | insight | invoice | john |
| 103:16 | 96:9, 106:14 | 78:10 | 41:24 |
| indignant | inspect | involve | joined |
| 106:11 | 81:25 | 105:2 | 10:19, 11:3, |
| indirectly | instead | involved | 11:24, 58:7, |
| 115:14 | 48:24 | 12:15, 12:17, | 65:16 |
| individual | insult | 15:18, 20:4, | joint |
| 23:3, 36:6, | 68:16 | 20:8, 21:19, | 25:10, 25:15, |
| 78:10 | intellect | 26:1, 27:21, | 25:18 |
| individually | 67:3 | 27:24, 33:3, | judge |
| 104:11 | intellectual | 33:19, 68:22, | 6:13, 89:17 |
| industrial | 20:16, 30:13, | 83:8, 89:24 | july |
| 1:10, 2:12, | 39:3, 57:23, | issued | 1:24, 4:6, |
| 24:17 | 102:7 | 6:3, 100:14 | 61:20, 61:24 |
| industries | intellectually | issues | jury |
| 105:14 | 32:2 | 32:22 | 6:13 |
| industry | intended | | |

### J

| | | | |
|---|---|---|---|
| 9:20, 26:3, | 30:15 | jang | **K** |
| 91:17 | interaction | 36:5, 36:8, | kapel |
| inexplicable | 80:17 | 44:11, 72:24, | 110:22, 111:2 |
| 46:19 | interactions | 72:25, 75:16, | katy |
| inform | 80:24 | 75:20, 76:6, | 10:2, 10:20, |
| 85:19 | interest | 76:11, 76:20, | 23:17, 23:24, |
| informal | 37:7 | 93:20, 94:21, | 82:13, 82:14, |
| 103:17 | interested | 98:18, 102:7 | 82:15, 113:11 |
| information | 98:13, 98:16, | january | keep |
| 7:24, 36:17, | 115:14 | 49:12 | 7:14, 36:24, |
| 36:25, 37:11, | internal | jeremy | 60:19, 60:20, |
| 72:15, 74:21, | 77:13, 77:16, | 79:6, 79:20, | 90:8, 90:10, |
| 75:6, 75:17 | 78:3, 78:5 | 101:20, 110:22, | 90:11, 112:25 |
| initial | internet | 113:25, 114:4 | keeping |
| 3:14, 38:8, | 41:15, 77:1, | job | 48:25, 88:10 |
| 39:10, 46:5, | 77:5, 77:8, 78:1 | 9:1, 9:12, | ken |
| 97:1 | interpret | 9:24, 10:5, | 2:4 |
| initially | 37:9 | 10:6, 12:5, | kenburger@comcast |
| 11:7, 41:20, | interrogatories | 12:20, 13:17, | 2:9 |
| 89:12 | 3:18, 44:25 | 14:9, 19:19, | kentucky |
| initiated | interrupt | 25:9, 25:16, | 4:5, 4:11, |
| 24:18 | 31:17 | 57:3, 81:18, | 9:18, 10:14, |
| inkling | intervening | 81:19, 88:3, | 10:24, 11:3, |
| 84:20 | 97:8 | 88:6, 89:21, | 11:13, 11:16, |
| innovations | intricacies | 94:4, 96:4, | 15:10, 15:14, |
| 38:18, 39:17, | 91:18, 91:19 | 111:13 | 36:2, 40:15, |
| 67:10, 67:20 | introduce | jochen | 44:5, 48:25, |
| input | 62:21 | 50:1 | 66:9, 76:19, |
| 82:25, 83:1, | intrude | joe | 79:11, 81:23, |
| 95:2, 109:13, | 114:7 | 11:23, 50:20 | 82:3, 84:18, |
| 109:15 | inventory | | 85:4, 88:14, |
| | 107:1 | | |

92:14, 92:22,
92:25, 93:8,
94:7, 95:9,
95:24, 106:24,
107:13, 107:16,
107:25, 109:4,
109:5, 109:24,
109:25, 110:11,
113:5, 115:2

**kept**
81:17, 89:8,
89:16, 90:1,
109:24

**kind**
9:6, 11:13,
13:3, 13:5,
13:12, 13:13,
15:6, 16:22,
17:2, 17:20,
18:16, 23:20,
63:14, 75:5,
107:19

**kitchen**
43:16, 71:18,
72:20, 75:19

**knew**
13:4, 14:3,
15:22, 15:24,
19:3, 33:19,
41:17, 67:11,
91:10, 92:22,
92:23, 93:1,
104:21, 111:1

**knowledge**
19:20, 29:3,
46:23, 47:9,
57:18, 58:1,
60:8, 60:15,
63:4, 67:7,
67:12, 69:3,
71:4, 71:6,
75:22, 76:9,
76:15, 76:24,
77:20, 79:15,
80:14, 82:23,
83:5, 83:21,
83:23, 83:24,
84:5, 85:7,

95:5, 96:18,
97:24, 98:12,
99:1, 100:24,
101:11, 107:9
**knowledgeable**
91:2
**known**
45:13, 48:14
**knows**
81:3, 91:18,
92:19, 93:15,
94:7
**korton**
80:4, 80:5,
80:7, 80:10,
95:10, 101:19,
111:8, 111:11
**korton's**
80:13, 111:13

---

**L**

**lab**
16:22, 32:4,
56:18
**label**
64:11
**laid**
10:1, 111:2,
111:16, 111:17
**laptop**
37:15, 37:17,
37:19, 41:17
**large**
73:23, 115:2
**last**
29:25, 37:20,
37:23, 48:5,
63:19, 64:3,
64:16, 64:18,
90:14, 97:21,
98:10, 103:8,
104:23
**late**
31:23, 31:24,
32:3, 34:24,
35:6, 56:17,
79:1, 106:21
**later**
12:17, 27:25,

29:15, 32:1,
42:11, 69:21,
89:12, 94:23,
101:7
**latonia**
12:2, 12:6,
12:8
**law**
2:5
**laws**
85:7
**lawsuit**
5:19, 5:21,
6:3, 6:6, 24:11,
24:18, 24:24,
42:20, 64:4,
64:8
**lawyer**
6:22
**lay**
42:22
**learn**
23:6
**least**
108:1
**leave**
32:10, 32:16,
103:17
**leaving**
111:5, 111:18
**led**
32:14, 34:8
**left**
42:12, 65:14,
67:17, 82:18
**left-hand**
53:1
**legal**
21:16, 57:19,
58:10, 90:11
**less**
69:24, 70:12,
88:24, 90:20
**let's**
8:15, 27:4,
28:8, 31:17,
31:18, 34:5,
44:18, 51:5,

107:23, 107:24
**letter**
3:16, 42:18
**letterhead**
103:15
**letting**
32:9
**lg**
19:12, 19:14,
19:18, 19:22,
19:25, 20:5,
20:13, 20:17,
28:18, 38:22,
39:7, 46:23,
54:21, 57:9,
58:24, 59:3,
59:6, 59:12,
59:15, 59:18,
59:21, 59:24,
60:2, 60:12,
60:16, 61:22
**licenser**
58:3
**licensing**
20:21
**life**
64:22
**light**
13:8
**likely**
51:4
**line**
15:8, 16:2,
22:4, 22:14,
29:22, 36:20,
44:16, 79:12,
86:24, 87:3,
87:10, 88:8,
88:15, 92:13,
95:9, 98:17,
105:17, 107:15,
113:1
**lines**
30:1, 30:4,
30:5
**link**
35:10
**list**
49:22, 50:1,

50:16, 62:10,
71:19, 71:21,
71:24
**listed**
44:2, 50:3,
59:15, 59:24,
77:4
**listings**
77:2, 78:2,
78:19
**lists**
53:14, 66:21,
71:17, 73:4,
78:18, 78:24
**little**
11:9, 11:23,
12:4, 15:22,
17:15, 34:24
**live**
32:9
**lived**
10:15, 29:18,
31:24
**living**
34:12
**llp**
2:15, 4:4
**load**
15:16, 21:21,
112:2
**located**
9:17
**location**
10:20, 36:25,
74:13
**locations**
113:3, 113:6
**logic**
94:18, 99:19
**logical**
72:14, 93:18
**long**
9:10, 9:21,
12:21, 14:1,
18:12, 18:14,
30:1, 56:11,
61:5, 64:10,
64:12, 71:19,

90:17
**longer**
28:21, 113:13
**look**
27:25, 49:21,
52:22, 84:2,
105:1
**looking**
27:4, 33:20,
69:10, 94:17,
113:3
**loop**
85:4
**lost**
18:16
**lot**
12:3, 12:9,
12:12, 13:12
**lower**
69:9
**lucian**
35:16
**lucien**
34:9, 34:19,
34:20, 34:25,
99:23, 99:25,
100:1, 108:15,
109:12

**M**

**madame**
113:21
**made**
6:20, 12:8,
13:5, 15:4,
15:6, 16:22,
18:4, 19:8,
23:17, 24:4,
24:6, 24:8,
33:11, 46:20,
58:14, 63:18,
74:13, 76:10,
76:13, 82:21,
82:22, 82:24,
82:25, 92:24,
95:6, 95:18,
113:13
**main**
75:10, 82:2

**maintain**
15:10
**maintaining**
75:2
**maintenance**
26:1, 69:9,
69:24, 70:12,
71:2
**make**
15:2, 19:7,
28:2, 28:5,
35:4, 56:22,
66:6, 73:1,
77:20, 77:22,
78:13, 89:19,
105:25
**makes**
46:21, 74:9
**making**
74:1, 74:12,
93:10, 93:11,
94:4, 94:11,
97:15, 101:15,
101:18
**man**
85:3, 91:4,
91:20, 96:6,
97:13, 102:6,
107:24
**man's**
94:23
**manage**
17:16
**management**
39:11, 45:14,
51:17, 53:3
**manager**
12:23, 13:2,
13:14, 14:11,
14:15, 17:19,
17:24, 17:25,
18:1, 18:5,
21:15, 21:19,
27:3, 27:15,
27:17, 31:19,
51:7, 51:25,
52:19, 53:12,
54:13, 66:8,

74:8, 74:25,
75:15, 76:2,
76:17, 82:16,
82:17, 82:22,
84:17, 85:4,
85:8, 85:12,
85:14, 86:8,
87:20, 89:20,
93:7, 95:8,
98:6, 105:13,
107:11
**managerial**
13:12
**managers**
52:4, 76:14
**managing**
17:13, 26:18,
26:20, 109:1
**manuals**
29:6
**manufacture**
9:18, 72:16,
73:14, 106:22
**manufactured**
95:23
**manufacturer**
68:20
**manufacturers**
55:22
**manufacturing**
12:10, 14:16,
23:7, 23:24,
24:4, 29:22,
36:19, 37:1,
48:3, 48:25,
74:10, 82:9,
82:11, 87:7,
93:12
**many**
64:12
**marine**
25:24
**mark**
24:12
**marked**
5:23, 24:13,
24:16, 38:5,
38:7, 42:16,

44:21, 44:24,
49:7, 49:10,
52:11, 52:15
**market**
18:15, 38:19,
38:24, 57:6,
65:5, 65:6,
68:22, 69:2,
69:8, 71:9,
73:9, 73:14,
74:17, 86:23,
87:3, 97:15,
102:15, 104:12
**marketable**
39:16
**marketed**
65:4, 105:9
**marketers**
70:21
**marketing**
26:2, 69:22,
73:24, 87:11
**martin**
102:25, 103:1,
103:2, 103:6,
103:11, 103:21
**material**
65:1, 67:5,
83:2, 101:22
**materials**
19:9, 28:24,
36:1, 36:6,
36:13, 37:3,
41:25, 44:12,
44:13, 67:2,
74:15, 76:5
**matter**
6:23, 23:10,
38:9, 46:19,
62:23, 115:9
**matters**
62:25, 63:4
**maybe**
42:9, 51:2,
56:10, 65:2,
65:3, 65:13,
66:6, 83:14,
92:3, 108:1,

109:10, 110:10,
111:5, 111:7,
112:4, 112:22
**mean**
37:5, 91:12,
94:17, 105:22
**medical**
7:19
**medications**
7:19
**meekly**
39:18
**meeting**
34:14, 34:16,
34:18, 34:19,
34:20, 34:21,
34:22, 35:9,
106:19
**meetings**
22:21, 22:25,
35:13, 39:11,
96:23, 99:6
**melt**
9:9
**members**
62:4, 92:20
**memory**
39:23
**mention**
35:14
**mentioned**
25:17, 35:16,
105:4
**mentioning**
70:2, 110:13
**mentions**
40:12
**met**
23:2, 23:4
**mexico**
23:19, 24:2,
24:6, 113:17
**michael**
17:20, 17:21,
17:22, 17:24,
18:3, 20:7
**middle**
1:2

**might**
22:9, 31:7,
55:2, 56:1,
62:17, 64:20,
86:11, 92:4,
96:10
**mike**
13:10, 15:23,
16:8, 16:19,
17:10, 17:12,
18:4, 21:18,
22:17, 41:20,
41:21, 54:14,
80:21, 81:2,
83:8, 84:8,
84:14, 85:15,
85:16, 87:25,
90:2, 90:14,
90:16, 98:8,
109:6, 109:12,
110:5, 111:19,
114:3
**milestones**
54:2, 54:5
**mill**
9:20, 10:9,
109:20
**million**
97:22, 98:3,
98:9, 101:5,
108:4, 111:24,
112:3, 112:25
**millions**
101:3
**mind**
18:20, 41:18,
56:11, 81:11,
108:1
**mine**
37:18
**minute**
49:21, 83:13,
86:16, 89:10
**minutes**
108:10, 109:11
**mis**
99:1
**mischaracterizes**
70:3

**misconduct**
99:2, 99:4
**mislead**
62:5
**missed**
81:21
**mississippi**
106:23
**misstated**
65:11
**misstating**
73:3
**misunderstand**
63:21
**misunderstood**
65:12, 70:7,
83:14
**model**
35:19, 39:12,
39:21
**modifications**
16:23
**modify**
53:4
**module**
16:2, 18:15,
25:23, 43:6,
45:12, 55:12,
55:15, 57:5,
57:8, 57:13,
57:23, 58:5,
58:14, 58:23,
59:2, 59:6,
62:6, 65:6,
65:21, 66:11,
67:9, 77:18,
78:8, 79:12,
92:6, 95:9,
101:6, 101:9,
111:14
**modules**
15:8, 16:21,
16:24, 17:19,
18:9, 19:11,
22:12, 26:7,
28:2, 28:6,
43:12, 53:13,
53:15, 57:1,

61:17, 61:18,
65:4, 65:14,
65:17, 66:4,
66:23, 67:11,
67:22, 68:2,
68:12, 68:21,
68:22, 69:22,
69:23, 70:20,
71:8, 73:10,
73:14, 73:18,
74:2, 75:3,
77:6, 77:14,
77:16, 78:4,
82:4, 84:4,
86:1, 86:22,
87:2, 87:7,
88:7, 88:16,
89:13, 89:18,
89:22, 91:2,
91:10, 91:20,
92:14, 92:19,
92:23, 93:1,
93:5, 93:16,
94:8, 97:6,
97:22, 98:9,
101:3, 101:16,
102:10, 104:14,
105:2, 105:16,
106:4, 106:20,
107:12, 107:15,
108:5, 111:22,
112:5

**moment**
25:3, 69:7,
86:7

**money**
51:22, 67:19,
74:1, 89:11,
93:10, 93:12,
97:15

**monitored**
90:1

**monthly**
50:6, 95:13

**months**
23:10, 54:17,
94:23, 106:21,
106:22, 107:2

**more**
9:23, 10:10,
13:14, 17:10,
20:8, 34:19,
48:9, 64:25,
88:9, 89:22,
90:20, 91:10,
91:18, 105:19,
113:12

**morning**
5:16, 5:17,
32:1

**most**
91:1

**motel**
40:12, 44:5

**motor-control**
26:3

**move**
11:21, 12:14,
14:16, 23:6,
24:4, 36:2,
41:25, 44:12,
48:2, 48:8,
92:24, 102:23,
113:5

**moved**
12:6, 14:23,
14:24, 23:19,
24:1, 32:10,
42:9, 48:24,
74:19, 112:21,
113:9, 113:16

**moving**
11:15, 23:21,
48:12, 48:15,
74:10

**much**
10:8, 13:8,
21:2, 73:19,
76:8, 113:12

**multi-million**
101:8

**multiple**
34:15, 76:6,
76:14, 83:25

**murfreesboro**
2:7

**mute**
8:17, 8:20

**myself**
62:21

**mystery**
92:24, 95:6

**N**

**name**
5:12, 5:18,
15:21, 44:2,
45:1, 46:1,
47:3, 47:12,
47:14, 47:16,
47:20, 47:22,
78:3, 83:10,
83:19, 84:23,
91:9, 91:15,
91:17, 93:14,
110:23

**named**
13:11, 13:14,
18:5, 83:17

**names**
29:4

**napkin**
100:14

**nashville**
34:12, 34:17,
62:22, 84:1,
86:1, 86:4,
86:12, 108:25,
111:6

**nature**
9:3, 10:5,
13:1, 25:22,
26:1, 61:8,
103:19

**necessarily**
91:24

**need**
7:1, 7:6, 7:12,
7:17, 27:9,
31:11, 44:15,
48:20, 63:10,
73:13, 73:16,
74:1, 74:3,
77:22, 84:22,

**92:3, 107:14,**
108:5, 108:10,
110:10

**needed**
13:5, 34:15,
42:7, 44:12,
61:11, 73:20,
81:17, 81:19,
82:7, 84:16,
86:11

**needs**
63:6, 74:21

**net**
2:9

**never**
25:17, 35:2,
35:7, 56:11,
79:18, 81:24,
82:1, 85:24,
86:14, 96:19,
103:19, 105:20

**new**
60:24, 74:13,
83:9, 83:16,
83:20, 84:2,
86:12, 104:1,
105:17

**next**
9:12, 9:24,
13:17, 25:20,
29:24, 39:2,
41:8, 47:22,
49:5, 51:23,
52:12, 93:18

**night**
31:23, 56:18,
79:1

**nobody**
85:2, 85:17,
85:22, 92:22,
92:25, 94:5,
95:14, 102:11,
105:4, 108:2

**noncash**
50:2

**none**
67:1, 95:5,
95:7, 106:24

**nonroutine**
43:15
**noon**
34:17, 34:22,
34:23
**north**
2:6, 14:17,
14:18, 92:14,
92:25, 93:14,
93:16, 94:10
**notary**
4:10, 115:23
**note**
53:3, 53:7
**notes**
52:25
**nothing**
5:7, 74:20,
101:22, 115:8
**notice**
48:9, 76:4,
93:8, 105:15,
105:18, 108:2
**noun**
22:13
**number**
23:14, 24:19,
29:14, 47:18,
50:3, 50:4,
51:23, 54:20,
71:10, 71:20,
73:8, 78:5,
90:12, 111:23
**numbers**
29:8, 50:19,
77:3, 77:5,
77:11, 89:17
**nw**
2:16

**O**

**oath**
6:12, 31:4
**objection**
65:24, 66:13,
69:13, 70:1,
70:3, 70:13,
71:22, 72:9,

74:5, 74:18,
81:8, 85:6,
86:2, 88:18,
91:5, 93:2,
93:22, 94:14,
94:15, 94:25,
95:25, 96:11,
98:20, 99:16,
100:17, 100:18,
100:22, 101:10,
101:25, 102:12,
104:15, 106:6,
106:25, 107:4,
107:5, 107:18,
108:18, 110:1
**objections**
6:20
**objective**
104:8
**objectives**
54:14, 54:20
**obligated**
6:21, 45:11
**obligation**
45:13, 45:19,
47:6
**occasion**
32:23, 33:6,
33:7, 63:25
**occurred**
55:11, 73:7,
73:8, 74:12,
81:13, 96:10
**odd**
76:22, 95:17,
98:14
**offer**
70:21
**offered**
69:23, 70:20,
78:18
**offering**
62:1, 78:1
**office**
10:10, 11:8,
11:9, 11:23,
11:24, 11:25,
12:1, 12:10,

13:11, 31:24,
75:10, 84:24
**offices**
11:9
**official**
109:16
**officials**
30:12
**oh**
112:23
**ohio**
5:15, 9:2,
10:15
**ohm**
10:2, 10:6,
10:12, 10:19,
11:8, 12:2,
12:19, 13:18,
13:21, 40:12,
44:5, 81:16
**oilfield**
25:24
**old**
78:23
**omron**
25:24
**once**
65:1
**one**
10:20, 25:7,
42:4, 51:23,
55:10, 66:24,
67:16, 68:9,
73:8, 74:11,
75:7, 77:2,
83:14, 84:3,
84:9, 85:2,
85:20, 100:6,
100:15, 100:16,
104:24, 106:24,
108:14, 113:1,
113:6
**ones**
34:20
**only**
10:20, 15:7,
31:5, 39:13,
39:14, 46:22,

62:13, 64:15,
84:3, 92:17,
96:5, 101:16,
101:18, 105:14,
105:25
**oops**
49:17
**open**
112:25, 113:13
**operating**
21:16, 21:22,
21:25
**operation**
30:16, 36:22,
82:23, 92:18,
92:25, 113:6
**operations**
10:23, 11:4,
14:19, 14:23,
14:24, 15:10,
23:16, 48:12,
48:15
**opinion**
17:11, 35:20,
36:16, 70:17,
74:8, 107:20,
109:15
**opinions**
63:4
**opposed**
84:10, 113:1
**order**
62:5, 77:1,
104:7
**ordered**
77:15
**orders**
106:20
**oriented**
17:2
**originally**
12:10
**other**
13:4, 20:3,
34:11, 34:25,
55:15, 55:21,
57:15, 66:25,
67:17, 68:11,

69:1, 69:22,
70:20, 71:8,
73:5, 88:1,
101:20, 110:6,
111:1, 113:2,
113:6
**others**
45:15, 54:23,
70:22
**otherwise**
62:4
**ounce**
94:18
**out**
9:1, 12:8,
21:17, 21:22,
21:25, 23:21,
31:16, 33:12,
42:6, 42:9,
42:11, 44:9,
62:6, 65:22,
71:9, 79:10,
85:4, 88:6,
97:15, 104:21,
108:7, 115:6
**out-of-pocket**
50:8
**outline**
38:11
**outside**
62:22, 92:3
**over**
6:10, 12:20,
14:20, 17:14,
34:10, 34:21,
36:20, 53:22,
54:17, 74:3,
74:20, 77:10,
81:15, 85:20,
88:1, 88:12,
91:20, 91:25,
98:2, 101:17
**overall**
46:20, 82:23
**overhead**
113:4
**overlap**
103:6

**overnight**
96:3
**oversaw**
67:5
**overseeing**
26:18
**owed**
97:9
**own**
37:3, 72:20,
83:3, 111:18
**owned**
20:13
**ownership**
57:22

**P**

**page**
3:2, 3:10,
24:25, 26:12,
26:14, 26:15,
26:16, 26:17,
26:23, 27:1,
27:4, 28:14,
29:24, 33:25,
34:2, 35:22,
38:10, 39:9,
40:8, 41:8,
42:21, 44:1,
45:4, 45:25,
47:2, 47:12,
47:15, 47:16,
47:22, 49:13,
77:1, 77:2,
78:1, 115:6
**paid**
39:4, 97:16
**paper**
73:13, 73:16,
73:25, 76:8,
79:3, 100:13,
100:14
**papers**
8:20, 76:7
**paperwork**
66:20, 100:3
**paragraph**
25:1, 25:3,

25:6, 28:15,
29:12, 29:25,
30:8, 33:25,
34:2, 35:23,
38:11, 38:15,
38:17, 39:2,
39:9, 39:19,
40:12, 41:9,
42:22, 43:4,
43:14, 43:19,
44:2, 45:5,
45:25, 47:3,
47:13, 47:16,
47:19, 47:24
**parallel**
68:18, 69:2,
88:23, 102:10
**paralleling**
104:6, 104:7,
105:2
**parallelling**
68:23, 104:4
**part**
15:15, 15:17,
17:17, 19:19,
22:17, 22:25,
29:8, 41:25,
44:11, 49:24,
55:2, 71:20,
76:5, 77:1,
77:5, 78:5,
88:6, 89:21
**parted**
111:4
**particular**
63:2
**partner**
27:2
**parts**
26:20, 66:21,
71:9, 71:10,
71:17, 71:19,
71:25, 72:1,
73:4, 77:2,
77:4, 77:11,
77:13, 77:17,
78:1, 78:2,
78:3, 78:5,

78:11, 78:18,
78:19, 78:24
**pass**
62:16
**passed**
64:12
**patent**
58:13, 105:1
**patenting**
104:12, 105:1
**patents**
104:14
**pay**
21:2, 45:11,
97:9, 110:6
**paying**
97:2, 97:17
**payment**
98:1, 98:2
**payments**
46:6
**penn**
2:16
**people**
13:4, 13:14,
18:3, 19:6,
19:7, 20:6,
20:9, 22:3,
23:2, 23:4,
24:7, 32:7,
33:16, 33:18,
33:23, 34:11,
69:15, 69:22,
72:17, 73:17,
74:22, 82:11,
82:15, 83:25,
92:17, 101:20,
105:25, 106:2,
106:15, 110:5
**percent**
20:21, 27:13,
27:18, 45:11,
45:19, 46:6,
46:12, 47:6,
58:9, 62:6,
62:12, 80:16,
96:16, 96:19,
97:1, 98:3,

98:9, 101:23,
112:4, 112:5,
112:9
**percentage**
51:22
**perfect**
46:21
**perfectly**
18:18
**performance**
89:8, 99:4,
99:13, 99:22,
100:9, 100:10,
100:11, 102:8,
102:19, 102:21,
108:16, 110:12
**performances**
100:9
**perhaps**
45:14
**period**
32:16, 48:7,
61:20, 65:15,
88:13, 103:5
**permanently**
81:22
**permission**
33:17
**person**
33:19, 79:17,
91:2, 91:17,
93:15
**personal**
26:20, 31:20,
32:6, 37:3,
37:6, 37:8,
37:9, 39:3,
73:4, 75:19,
78:22, 80:18,
100:9, 101:21,
110:25, 111:8,
111:19
**personally**
73:1, 78:25,
96:24
**pertaining**
64:7, 68:12,
114:4

**pertinent**
73:5
**phase**
89:21, 97:11
**phone**
64:21
**phones**
10:10
**phonetic**
36:5, 110:22
**pick**
85:1
**picture**
41:18, 77:17,
88:12, 108:7
**piece**
73:25
**place**
37:12, 66:9,
75:7, 92:21,
115:6
**plaintiff**
1:6, 2:3, 2:21,
25:7, 25:8,
30:9, 30:15
**plaintiff's**
3:14, 3:17,
25:21, 30:13,
34:1, 38:8,
38:11, 44:24
**plan**
3:21, 39:15,
50:20, 50:21,
51:6, 51:10,
51:14, 51:16,
51:20, 51:24,
52:18, 53:4,
53:7, 54:4,
75:1, 76:17,
109:19
**plane**
35:1
**planned**
30:11, 34:16
**plans**
49:14, 49:19,
50:3, 50:17,
50:20, 50:24,

52:4, 52:6,
52:23, 54:17,
62:3, 85:25
**plant**
12:23, 13:2,
14:11, 14:15,
18:4, 18:5,
21:15, 21:17,
21:19, 23:21,
27:15, 27:17,
31:19, 31:25,
32:7, 44:14,
54:13, 54:15,
66:8, 74:8,
74:11, 74:25,
75:10, 75:15,
76:2, 82:16,
82:22, 84:17,
85:3, 85:8,
85:12, 85:14,
86:8, 87:19,
88:14, 89:20,
93:7, 95:8,
98:6, 105:13,
107:11, 109:25
**plants**
24:4
**plate**
32:17
**played**
76:3
**playing**
76:3
**please**
5:12, 6:15,
7:9, 18:21, 34:7
**pleased**
87:13
**pleasure**
106:9
**plus**
75:10, 85:8,
87:6
**pockets**
89:12
**point**
10:12, 10:23,
11:3, 11:15,

32:9, 46:17,
73:18, 84:16,
94:4, 108:25,
109:10, 111:3
**points**
43:1, 65:1,
95:20, 95:22,
108:14
**police**
32:21, 32:23,
32:24, 33:6,
33:8, 33:9,
33:10
**policy**
100:7
**pondered**
91:25
**pose**
27:6
**position**
9:8, 31:10,
42:19, 55:1,
86:6
**positions**
87:12
**positive**
70:19
**possessed**
66:21, 75:6,
75:17
**possession**
75:14, 78:23,
79:3
**possible**
48:5, 99:24
**post**
9:13, 9:16,
9:20, 9:21,
9:24, 10:1,
11:6, 11:7,
37:24
**post-high-school**
8:4
**potential**
22:18, 23:6,
42:25
**powerohm's**
27:2, 30:10,

72:4, 81:14
**practically**
96:3
**preceding**
83:6
**predicate**
95:20
**preferred**
55:7
**prefix**
71:9, 71:20,
77:3
**premise**
92:7
**premises**
66:23, 95:20,
109:24
**presence**
31:9, 58:2
**present**
2:21, 40:2,
63:12, 77:25
**presentation**
43:2
**presently**
45:15
**president**
103:3, 103:12,
103:18, 103:21
**pretty**
10:8, 13:8,
23:8
**previous**
27:1, 64:17,
66:10
**previously**
66:9, 104:12
**primary**
70:19, 95:22
**principles**
63:15
**prior**
22:21, 36:2,
37:21, 58:24,
70:4
**privy**
16:8
**probably**
9:11, 9:23,

10:10, 17:9,
18:5, 21:1,
36:20, 37:23,
64:15, 78:8,
90:16, 91:1,
112:11, 113:8
**problem**
28:24, 60:23,
80:18, 88:9
**problems**
13:7, 79:2,
87:4, 99:4
**procedure**
4:8
**proceedings**
3:3, 5:1
**process**
23:20, 31:5,
36:9, 109:13
**produce**
70:21, 74:16
**produced**
98:10
**producer**
71:8
**producing**
84:4, 88:16,
88:22
**product**
15:2, 15:8,
16:2, 17:4,
17:12, 19:11,
22:3, 22:14,
29:6, 29:22,
31:22, 32:5,
36:20, 44:16,
51:6, 51:24,
52:3, 52:19,
54:21, 67:13,
69:2, 69:8,
69:23, 73:24,
74:13, 82:2,
86:9, 87:14,
87:16, 88:7,
88:16, 88:23,
89:16, 92:13,
93:9, 93:11,
93:13, 95:23,

96:3, 96:7,
97:14, 102:8,
112:25
**production**
16:20, 17:25,
18:1, 20:4,
44:13, 68:2,
82:16, 87:3,
87:15, 88:11,
88:15, 105:17
**production-level**
18:25
**products**
9:19, 10:9,
12:7, 12:9,
15:1, 15:4,
15:5, 15:19,
16:5, 19:1,
19:4, 19:22,
19:25, 20:17,
20:21, 21:8,
21:11, 28:18,
29:1, 29:3,
29:15, 38:22,
39:7, 43:23,
46:23, 55:2,
55:15, 55:21,
57:5, 57:8,
57:10, 57:13,
57:14, 57:24,
58:4, 58:5,
58:14, 58:23,
59:2, 59:6,
59:8, 59:12,
59:15, 59:19,
59:21, 59:24,
60:3, 60:12,
60:17, 60:24,
61:13, 61:15,
61:16, 61:22,
62:1, 62:7,
67:4, 70:11,
72:16, 102:3,
113:13
**profits**
95:13, 95:24,
96:17
**program**
67:9

**progressive**
100:3, 100:5
**project**
25:24, 29:13,
53:12
**projects**
26:19
**promised**
20:20
**proof**
43:2
**properly**
13:6
**properties**
84:2, 102:7
**property**
12:14, 20:17,
30:13, 33:5,
37:4, 37:6,
37:8, 39:4,
57:23, 67:2
**proposal**
25:9, 25:10
**proposed**
25:20
**protection**
58:13, 70:24,
71:1
**prototypes**
19:8
**provide**
6:6, 7:10,
39:25, 50:1
**provided**
41:5, 41:15,
67:5
**providing**
41:20
**public**
2:6, 4:10
**purchase**
3:20, 12:13,
30:10, 38:23,
49:11, 49:24
**purchased**
112:10
**purchasing**
24:3

purpose
56:25
purposefully
67:9
purposes
6:20
pursuant
4:7, 50:5
pursue
28:25, 67:10,
98:17
put
8:16, 8:19,
31:16, 33:11,
42:6, 42:11,
44:9, 49:5,
63:5, 65:2,
67:19, 69:7,
74:11, 84:23,
91:8, 101:1,
101:2, 101:5,
101:8, 102:15,
103:9
putting
31:9, 88:6,
106:2
p~&~l
27:21

**Q**

q2
54:14, 54:20
quality
87:16, 88:16,
88:22, 96:2
quarterly
53:25, 54:1
question
6:14, 6:16,
6:21, 27:6,
46:22, 48:2,
63:6, 65:2,
68:5, 71:5,
80:3, 82:8,
83:2, 87:10,
93:18
questioned
105:20

questioning
6:19
questions
7:10, 7:13,
7:21, 13:15,
14:21, 24:11,
31:3, 31:7,
42:20, 56:22,
61:9, 62:16,
62:17, 62:24,
69:19, 75:4,
81:25, 83:15,
103:9, 110:14,
113:20, 114:6
quickly
23:8
quit
93:12
quite
98:16, 99:2
quote
83:9, 97:4

**R**

r-o-o-f
80:21
rainville
34:9, 99:23,
108:15, 109:12
raise
5:3
raised
96:24
randy
50:21
range
69:25, 92:3
rather
74:25
ratings
54:22, 69:8,
69:16, 69:24,
70:23, 99:13
re-orderable
77:14
read
25:3, 27:7,
27:9, 28:15,

29:12, 34:1,
34:3, 35:23,
45:5, 46:1,
90:22
reading
47:13
reads
30:8
ready
19:1, 86:23
reaffirms
42:24
real
39:16, 84:2,
86:11
reality
112:8
really
12:15, 33:14,
77:24, 83:15,
95:24, 109:18
reason
36:24, 39:12,
39:24, 39:25,
43:11, 68:9,
69:20, 70:11,
80:9, 84:4
reasons
49:2, 67:17
recall
8:7, 9:14,
9:21, 10:3,
11:1, 11:10,
11:12, 11:15,
11:19, 12:7,
12:13, 12:24,
14:5, 14:9,
16:12, 16:14,
16:17, 16:25,
17:9, 19:12,
22:25, 23:7,
23:12, 23:16,
30:25, 32:25,
36:1, 36:5,
41:4, 41:5,
41:22, 41:24,
45:15, 51:10,
51:19, 52:23,

54:11, 55:1,
56:8, 56:9,
68:13, 71:25,
103:20, 103:23,
104:17, 109:17,
110:13
recalling
41:19
receipts
27:13
receive
51:21, 58:9
received
25:7, 25:8,
42:18, 97:25
receives
50:6
receiving
52:23, 75:20
recess
28:11, 44:20,
108:12
recognize
5:25, 6:2,
110:22, 112:13
recollect
100:7
recollection
11:21, 18:8,
18:24, 19:16,
24:22, 25:14,
26:6, 26:9,
29:19, 30:21,
31:14, 34:7,
34:16, 36:15,
36:23, 39:21,
41:13, 43:11,
43:22, 66:3,
72:3, 79:14,
97:10, 97:19
record
5:13, 7:2, 7:9,
27:9, 28:10,
28:13, 44:19,
62:21, 70:9,
70:10, 102:8,
110:3, 115:11
recorded
115:9

records
75:1, 75:3,
81:14, 89:4,
89:5, 90:1,
90:8, 90:10,
90:12, 93:10,
93:21, 94:21,
94:22, 98:18,
98:22, 98:25,
99:25, 102:20,
102:22, 109:16
recross-examinat-
ion
3:7, 113:22
redirect
3:6, 110:16
reduced
115:9
reference
40:15
referencing
47:5
referred
21:14, 22:9
reflect
6:22
regard
66:21
regarding
6:23, 16:17,
22:18, 42:19,
80:14
registered
84:11, 84:16,
84:22, 85:21
regular
43:5
rehabbing
11:18
reimbursed
50:7
related
44:15
relation
45:2
relationship
47:11, 63:14
relationships
32:7, 33:17

relative
115:13
relevant
42:13
reliability
67:21, 68:23,
69:9, 69:24,
70:2, 70:12,
71:2, 87:14,
104:9
relocate
10:13, 10:14,
23:11
relocated
82:1
remained
46:23
remember
7:6, 11:17,
17:21, 18:22,
19:7, 19:10,
33:6, 33:7,
54:16, 70:2,
70:14, 83:22,
96:22, 97:7,
97:12, 97:18,
109:21, 111:18
remind
6:11, 31:4
reminded
64:22
remodeling
12:3, 12:4
remotely
32:12
remove
30:15, 30:16
renewed
51:15, 52:8
repair
26:2, 78:10
repairs
9:7, 68:3, 78:9
repeat
68:5
repeating
77:21
repetition
73:19, 73:21

rephrase
6:15, 55:18,
76:1, 84:7
replaced
32:19
replacing
77:17
reporter
1:25, 4:11,
5:3, 5:9, 7:7,
7:14, 8:18,
38:4, 52:13,
62:17, 113:21,
115:1, 115:23
reporter's
5:23
represent
5:18, 62:22
representative
84:25, 85:1
representatives
81:16
representing
5:21
reproduce
56:3
reproduced
75:19
republic
9:2, 9:3, 9:10,
9:12
reputation
79:16
request
73:3
requested
95:2, 99:7
requests
10:11
require
85:8
requirements
86:11, 90:11
research
14:20
reserves
53:4
residential
12:13

residual
105:8, 105:9
resisters
9:13
resistor
9:19, 10:9,
12:9, 61:15
resistors
9:16, 9:19,
9:25, 10:2,
10:6, 10:13,
10:19, 12:19,
13:18, 15:6,
16:3, 16:22,
17:1, 18:10,
23:17, 25:10,
25:16, 45:8,
49:12, 57:1,
57:6, 57:9,
57:11, 57:14,
57:15, 57:24,
58:5, 58:16,
58:24, 59:7,
59:9, 81:11,
84:12, 84:23,
85:21, 86:13,
89:12, 91:16,
92:7, 92:11,
97:11, 97:21,
101:2, 101:17,
103:4, 103:6,
103:13, 104:2,
104:5, 104:6,
104:10, 104:11,
109:24, 112:1,
112:2
resolution
60:23
resources
20:1, 20:10
respectfully
105:23
respond
29:19
response
7:6, 7:10,
44:24, 56:6
responses
3:17

**responsibility**
75:2, 88:2,
89:17
**restate**
63:5
**restroom**
7:1, 44:19
**result**
88:22, 88:24
**results**
66:22, 68:24,
73:5
**retired**
13:19, 14:6,
60:4, 60:5,
60:9, 60:11,
60:21, 60:23,
61:2, 64:14
**retirement**
114:7
**retribution**
33:20
**retrieved**
75:9, 75:16,
76:5
**return**
26:17, 27:5
**review**
39:14, 75:12,
89:22, 109:21,
109:22
**reviewed**
75:8, 99:21
**reviews**
18:2, 18:6,
89:9, 100:11,
110:4, 110:7
**right**
5:3, 18:23,
22:8, 22:11,
37:11, 39:8,
40:22, 43:13,
45:23, 48:22,
51:18, 53:4,
53:21, 63:22,
66:19, 77:8,
85:9, 85:11,
89:10, 93:20,

97:22, 98:18,
101:17, 102:6,
108:11, 112:6,
112:11
**rights**
20:17, 57:23,
58:3
**river**
4:4
**road**
12:12
**robinson**
2:15
**rockwell**
78:19
**role**
14:18, 76:3,
90:5, 93:7,
105:13
**roof**
80:21, 80:23,
94:7, 111:19
**roof's**
81:2
**room**
42:10
**roughly**
90:19
**routine**
26:1, 39:18
**royalty**
62:6
**rpr**
1:25
**rule**
3:14
**rules**
4:8, 6:11
**running**
34:24, 35:6,
73:9, 86:22,
87:10, 97:14
**rustling**
8:20

---
**S**
---

**said**
4:7, 16:19,

34:9, 34:24,
35:6, 45:2,
63:20, 65:13,
67:16, 67:19,
70:9, 78:25,
79:19, 85:18,
86:20, 92:2,
94:5, 110:9,
115:8
**salary**
98:2
**sale**
22:18, 23:4,
29:10, 46:23,
58:24, 59:12,
59:21, 65:15,
78:1, 78:18,
81:6
**sales**
3:21, 12:5,
12:11, 12:12,
12:21, 13:4,
15:12, 20:21,
22:6, 22:9,
25:8, 25:21,
26:2, 26:21,
28:25, 45:11,
50:25, 51:6,
51:10, 51:16,
51:20, 51:24,
52:4, 52:18,
52:23, 53:15,
53:19, 53:23,
58:10, 62:12,
80:17, 82:5,
85:13, 88:25,
89:4, 89:6,
89:11, 89:18,
97:22, 105:9,
107:2, 108:5,
111:22, 111:25,
112:3, 113:12
**salesman**
16:4, 16:7,
86:9
**salient**
70:19
**same**
7:13, 10:8,

11:6, 12:16,
22:12, 24:8,
29:4, 29:6,
29:8, 38:23,
59:8, 60:7,
80:3, 94:25,
107:15
**satisfy**
107:2
**saw**
103:19
**say**
14:23, 20:12,
20:20, 23:8,
32:23, 33:4,
33:9, 33:10,
35:3, 37:2,
37:22, 48:5,
48:16, 61:13,
64:14, 65:1,
66:6, 67:1,
69:18, 70:6,
70:23, 71:3,
74:3, 78:12,
80:11, 83:13,
87:13, 88:9,
89:3, 90:20,
107:13, 109:8
**saying**
54:16, 97:13,
99:3
**says**
25:6, 25:8,
25:20, 25:25,
26:17, 35:17,
38:16, 38:17,
38:18, 39:2,
39:10, 40:18,
41:9, 42:24,
43:4, 43:14,
45:8, 46:3,
46:17, 50:5,
50:20, 51:6,
51:23, 53:3,
53:7, 53:23,
54:21, 54:22,
70:10, 95:9,
108:3

scant
43:17
schedule
3:19, 49:13,
49:17
schedules
49:10
schematic
56:10, 66:22,
73:4
school
8:1
scope
25:22
score
109:18
scrap
73:13, 73:15,
100:12, 100:14
second
31:17, 34:3,
108:11
secret
48:3
secretary
84:24
secretly
30:11
section
34:3
see
5:20, 24:11,
25:12, 26:4,
27:4, 29:16,
30:17, 38:11,
38:13, 38:20,
39:19, 40:13,
40:21, 41:11,
43:8, 43:19,
44:1, 45:16,
46:9, 47:17,
49:15, 50:9,
50:14, 50:19,
50:22, 51:2,
51:8, 51:23,
52:1, 52:20,
52:25, 53:5,
53:9, 53:14,

53:17, 53:20,
53:25, 54:7,
54:24, 56:13,
64:1, 64:4,
64:23, 70:10,
78:6, 102:23,
103:10, 103:13,
103:15
seek
58:13, 83:1,
109:12, 109:15
seem
76:22, 93:25
seems
63:1, 83:2,
107:22
seen
79:20, 80:13,
80:19, 81:2,
97:15
selected
87:17
self-motivated
13:3
sell
9:19, 28:18,
59:18, 60:2,
60:12, 60:14,
60:16, 65:17,
78:10
sellers
49:25, 50:14
selling
10:8, 16:4,
29:22, 61:22,
73:9, 74:1,
78:4, 87:11,
101:17
send
78:8
sense
46:20, 46:21,
55:12, 74:9
sent
23:2
sentence
25:6, 25:20,
26:17, 26:25,

29:25, 30:8,
45:7, 46:3
separate
21:16, 21:24,
22:2, 22:4,
22:5, 25:10,
25:15, 25:18,
57:19, 57:20,
58:10, 62:11,
71:3, 83:16,
96:23
separation
43:18
sequential
43:1
serendipitously
29:14
series
19:12, 19:14,
19:18, 20:5,
20:13, 28:18,
57:9, 68:17
seriously
107:24
service
61:10
services
13:8
set
3:18, 16:21,
43:6, 44:25,
115:6
setting
106:19
seven
30:5, 52:13
several
15:4, 24:6,
24:8, 45:1
shake
7:9
shift
9:5, 86:15
shipments
54:1
shooting
88:10
shop
9:9, 18:4,

19:1, 75:4,
82:17
short
55:11, 70:24,
70:25, 76:4,
93:8
should
13:16, 17:9,
109:10, 109:13
shouldn't
98:1
show
18:25, 31:5,
34:23, 35:9,
56:10, 71:17,
71:20, 93:10,
99:9, 99:11
showed
78:17, 103:11
shows
15:22
shut
29:13, 55:12
shutdown
46:19
sic
39:14, 106:23,
110:3
side
25:16, 53:1
signature-bi6ds
115:18
similar
13:13, 19:4,
25:22, 52:22,
54:4, 54:10,
55:20, 55:22
simmons
17:20, 20:7
since
64:14, 105:24
single
68:20, 93:15
sir
102:20, 113:20
sit
104:20
situation
33:1, 33:3

six
14:3, 14:4,
30:5
size
112:18
sketchy
37:5
skill
115:12
skip
26:14, 51:5
slew
112:23
slight
96:9, 107:10
smoothly
74:12
snuck
29:14
social
63:14, 63:15
solar
112:2
sold
12:8, 16:3,
38:22, 57:8,
57:13, 57:24,
58:5, 59:3,
59:7, 59:8,
60:14, 61:16,
67:14, 70:11,
89:16, 89:22
solely
75:17, 89:13
solemnly
5:5
solve
79:1
solving
88:9
some
6:10, 7:23,
10:12, 10:23,
11:3, 11:15,
16:23, 24:10,
24:21, 25:15,
27:17, 28:20,
28:24, 31:3,

31:7, 31:11,
32:13, 42:18,
42:22, 55:6,
55:23, 56:21,
57:14, 62:24,
64:25, 82:15,
83:16, 84:15,
96:25, 98:15,
99:2, 111:3
somebody
48:17, 82:24,
92:15, 92:24,
99:12
something
13:16, 17:10,
32:2, 33:13,
41:21, 42:7,
62:14, 64:21,
64:22, 67:14,
70:6, 78:7,
87:5, 88:24,
91:25, 98:14,
103:4, 111:7
sometimes
32:8, 79:1
somewhat
68:15
somewhere
83:9
soon
94:20
sorry
8:21, 10:16,
26:16, 26:23,
30:5, 31:9,
35:3, 68:6,
68:7, 69:18,
81:10, 81:12,
82:19, 85:3,
87:19, 92:9,
102:17, 104:5,
104:6, 106:21,
114:7
sort
68:4, 109:15
sound
17:5, 67:23
sounds
17:6

source
28:24, 46:4
speak
36:8, 63:25
specific
35:12, 41:22,
56:25
specifically
67:19, 84:1
specs
18:25
speculation
74:6
speed
36:20, 56:6,
107:3, 107:15,
108:3
spoke
37:20, 62:20
square
2:6
staff
17:16, 17:18,
18:2
staffing
19:6
start
16:10, 19:1,
38:10, 45:4,
46:3, 51:5,
85:25, 86:20,
87:11, 94:9,
94:11, 105:17,
106:3
started
11:18, 24:7,
25:23, 87:6,
89:1
starts
27:1, 27:2,
30:1
state
4:11, 5:12,
10:14, 84:25,
85:21
stated
39:12, 39:24,
39:25

statement
67:24, 72:19
statements
27:22
states
1:1
stating
70:14
stay
32:3, 34:14,
34:15, 81:22
stayed
82:21, 113:13
steadily
89:14
steel
9:2, 9:4, 9:10,
9:12, 9:20,
10:9, 109:20
stellar
99:13, 100:8,
100:10, 102:8
step
61:1
stettinius
4:4
stewart
36:5, 41:24,
44:11, 72:24,
72:25, 74:11,
75:16, 75:20,
76:6, 76:10,
76:20, 93:20,
94:21, 98:18,
102:7
stewart's
106:17
still
6:21, 13:10,
14:15, 15:12,
24:20, 82:5,
105:6
stipulations
4:1
stock
3:19, 49:11,
49:24
stopped
61:22, 62:1

story
62:10, 94:19,
98:14
strike
10:18, 15:9,
18:12, 21:14,
23:12, 25:7,
26:13, 27:24,
30:21, 34:6,
38:16, 39:5,
41:3, 42:22,
53:11, 55:19,
71:5
structured
50:7, 109:20,
109:22
stuff
13:8, 13:15,
13:16, 19:7,
19:10, 23:21,
37:6, 37:10,
60:22, 60:24,
61:18, 69:15,
74:3, 74:19,
82:1, 101:6,
104:18, 106:17,
109:8
stumbled
68:6
sub
35:23, 38:15,
38:17, 39:2,
39:9, 42:22,
43:4, 43:14,
44:2
subdivision
103:17
subject
6:23
submitted
115:25
subpoena
3:11, 6:3
subsection
38:15, 38:18
subsequent
104:22
subsequently
46:8

subsidiary
45:9, 45:10,
45:23, 57:15,
103:12
successful
69:6, 76:18,
92:13, 93:9,
93:11, 95:8,
95:13, 95:23,
107:12, 108:4,
112:8
successfully
59:18, 60:2,
69:11, 73:9,
73:14, 95:23
suite
2:17, 4:5
suited
88:1
summarize
8:3
summarized
38:12
superior
55:2
supervise
17:16, 72:16,
102:18, 108:17,
109:7
supervised
17:18, 108:23,
109:4, 109:9
supervising
26:20
supervision
79:13, 98:7,
101:15
supervisor
9:5, 34:18
support
26:21
supported
72:2
supportive
77:21
sure
13:5, 36:10,
36:14, 37:10,

42:5, 56:22,
66:6, 68:14,
68:16, 74:10,
74:12, 77:20,
77:22, 78:13,
81:17, 81:18,
85:16, 85:24,
89:19, 100:6,
111:1
surprise
77:10, 113:24
surprised
41:17, 78:20,
114:1
suspicious
93:25
swear
4:12, 5:4, 5:5
sworn
79:20, 80:13,
81:2, 115:7
system
41:16, 55:5,
55:6, 82:7
systems
26:3

**T**

ta
71:10, 71:11,
71:20, 71:25,
77:3, 77:5,
77:10, 78:2,
78:5, 78:20
table
43:16, 71:18,
72:20, 75:19
taft
4:3
take
6:25, 7:3,
28:8, 42:20,
44:18, 45:2,
49:21, 61:1,
68:15, 88:1,
93:9, 93:13,
96:16, 102:23
taken
4:3, 4:7, 13:6,

42:8, 81:15,
106:17, 115:5,
115:11
takes
98:19
taking
7:19, 7:22
talk
34:10, 34:13,
64:6, 85:18,
90:14, 99:24,
110:5
talked
23:3, 34:11,
63:19, 64:15,
114:3
talking
7:13, 44:3,
44:4, 61:14,
86:18, 89:11,
92:22, 109:2,
112:4
talks
47:24
tardy
99:11
target
53:16
targets
51:21
team
92:21, 93:20,
94:23, 96:6,
101:7, 101:19
tech
26:20
technical
26:18, 36:17,
68:3, 68:14,
81:14, 91:18,
100:10
technology
60:25, 67:12
telephone
2:8, 2:19,
12:11, 41:16
tell
65:11, 66:16,

68:8, 68:20,
68:25, 75:15,
75:24, 93:19,
94:20, 94:24,
95:17, 96:3,
102:5
**telling**
89:20
**tells**
96:22
**temps**
94:9, 106:3
**ten**
9:23, 88:15,
92:20, 101:7,
106:15
**tennessee**
1:2, 2:7,
16:10, 32:11,
32:12, 62:22,
83:9, 84:11,
84:16, 84:22,
84:25, 85:7,
85:22, 111:5
**tenure**
10:12, 12:19,
20:11, 20:15,
20:19, 28:17,
43:24, 55:20,
57:4
**term**
21:1
**terminals**
71:11, 72:1,
72:2
**terminated**
30:23, 31:15,
35:8, 37:14,
39:12, 40:3,
40:5
**termination**
31:1, 34:1,
34:5, 34:8,
35:18, 37:24,
39:24, 40:1,
48:1
**terms**
20:10, 21:7

**test**
16:22, 16:23,
16:24, 66:22,
73:4
**testified**
39:6, 43:10,
43:21, 45:18,
45:21, 46:11,
47:7
**testify**
3:11, 31:5,
78:14, 101:21,
115:7
**testifying**
6:12
**testimony**
5:5, 6:6, 7:18,
56:22, 70:4,
110:10
**testing**
16:22, 32:4,
37:12, 56:16,
56:18, 57:4
**texas**
10:2, 10:20,
15:6, 113:11
**th**
1:24, 4:6,
61:21, 61:24
**thank**
5:9, 7:23,
8:22, 9:24,
10:5, 11:14,
12:18, 14:8,
15:20, 18:7,
21:13, 22:16,
24:9, 25:19,
29:23, 35:22,
37:13, 40:7,
40:17, 41:7,
42:3, 42:14,
44:17, 45:25,
47:2, 47:10,
48:23, 49:4,
54:7, 54:19,
60:21, 61:19,
62:15, 62:16,
67:6, 110:15,

112:12, 113:19,
113:20, 113:21,
114:8
**thereafter**
94:22
**thexton**
45:14
**they'd**
104:25
**thing**
10:8, 13:9,
15:7, 18:16,
32:15, 37:5,
38:15, 42:4,
47:18, 55:10,
68:4, 97:17,
100:15, 100:16
**things**
13:12, 14:21,
14:22, 19:8,
32:4, 32:6,
38:1, 38:23,
42:21, 55:5,
56:18, 56:19,
56:20, 68:11,
75:15, 75:21,
79:4, 79:19,
81:25, 83:3,
88:1, 94:11,
106:1, 106:23,
110:18
**think**
11:25, 13:10,
15:15, 16:2,
16:6, 17:12,
17:22, 19:5,
20:6, 21:18,
24:10, 32:15,
34:18, 34:24,
35:16, 42:12,
48:9, 48:16,
51:4, 54:18,
55:4, 55:6,
58:15, 61:17,
63:6, 64:1,
65:13, 76:3,
77:4, 80:12,
87:6, 87:17,

90:6, 90:11,
92:2, 93:18,
103:3, 106:3,
107:19, 110:4,
110:6, 111:5,
111:6, 111:14,
111:21, 112:3
**thomas**
1:23, 4:3,
5:14, 51:7
**thought**
23:20, 36:16,
42:7, 44:15,
63:18, 63:19,
69:18, 110:9,
111:1
**three**
61:6, 61:7,
65:2, 65:3,
90:20
**through**
7:5, 9:6,
15:11, 24:9,
24:21, 30:11,
44:25, 45:9,
50:19, 56:21,
60:8, 68:6,
68:23, 70:18,
73:8, 77:24,
84:15, 88:13,
89:6, 95:21,
97:14, 99:6,
99:8, 104:23,
109:3
**throughout**
46:24, 73:12
**throw**
90:9
**thrown**
111:23
**tim**
15:21, 15:24,
16:1, 16:12,
17:16, 17:22,
18:8, 19:15,
20:11, 25:15,
27:12, 31:16,
33:8, 33:20,

34:10, 34:12,
34:13, 34:14,
34:17, 34:21,
34:23, 34:24,
35:2, 37:20,
42:6, 50:6,
51:25, 52:19,
53:12, 55:24,
56:17, 56:24,
57:3, 57:10,
57:22, 58:2,
58:7, 62:5,
62:9, 62:21,
64:23, 65:7,
65:14, 65:16,
67:17, 67:19,
67:25, 68:1,
68:8, 68:9,
71:6, 71:12,
73:1, 73:3,
73:18, 74:24,
75:10, 75:17,
75:18, 76:7,
78:3, 78:24,
79:4, 80:1,
80:17, 80:18,
83:6, 85:19,
87:7, 88:7,
88:14, 88:23,
89:8, 99:6,
100:1, 107:15,
108:25, 109:4,
109:14, 109:18,
111:6, 111:20

**tim's**
16:25, 17:7,
20:6, 64:21,
93:20, 98:25,
106:15

**time**
6:25, 7:13,
11:6, 12:16,
12:20, 12:21,
12:22, 16:9,
17:21, 18:16,
19:23, 20:11,
20:15, 20:19,
28:4, 28:19,

29:10, 29:21,
32:16, 34:25,
37:20, 43:22,
46:24, 48:6,
48:7, 53:4,
61:20, 61:24,
63:1, 63:7,
63:12, 63:16,
64:16, 65:14,
68:11, 70:18,
72:3, 72:4,
73:7, 77:19,
77:23, 86:7,
86:18, 88:13,
91:3, 95:7,
100:6, 103:5,
103:25, 107:3,
109:2, 109:3,
109:4, 110:5,
112:9, 112:13,
112:24, 113:20,
115:5

**times**
35:12, 45:1,
65:2, 65:3,
102:9, 111:23

**timothy**
1:5, 2:3, 2:21,
24:16, 66:20,
74:15, 90:25,
91:11, 91:20,
92:19, 95:11,
100:16, 108:16,
108:17, 108:23,
113:25

**title**
12:20, 14:9,
16:25, 17:2,
17:4, 17:8,
115:6

**titled**
49:14

**today**
5:20, 5:24,
6:5, 6:19, 6:25,
7:5, 7:18, 35:4,
37:21, 55:15,
56:23, 104:20,

113:20

**today's**
6:14

**together**
78:25, 106:2

**told**
67:16, 67:25,
68:8, 68:9,
71:12, 71:14,
85:24, 95:14,
102:9, 104:24,
105:19

**tom**
41:9, 45:14,
46:4, 85:18

**took**
10:6, 18:12,
18:14, 77:9

**tools**
21:3, 21:5

**topic**
107:24

**total**
80:11, 111:25

**trade**
15:22

**train**
24:7

**trained**
73:17

**training**
26:20, 68:15

**transcript**
115:5, 115:11

**transcription**
7:14

**transfer**
74:12, 82:4,
92:13

**transistors**
68:24, 69:2,
88:24, 104:6,
104:7, 105:2

**transition**
23:1, 30:20,
76:4, 81:10

**transport**
36:18

**travel**
32:15, 34:14,
34:17, 81:24

**traveling**
12:12

**tried**
65:20

**tries**
80:12

**trips**
24:6, 24:8

**trouble**
88:10

**true**
60:7, 72:12,
89:3, 115:11

**trust**
80:11

**truth**
5:6, 5:7,
115:7, 115:8

**truthful**
46:4, 79:17

**truthfully**
6:17, 7:21,
31:6

**trying**
16:10, 56:12,
63:3, 66:17,
79:1, 86:22,
97:1, 97:17,
102:5, 107:25

**tune**
101:3

**tuning**
56:19

**turn**
9:8, 37:14,
40:8, 45:25,
47:2, 50:4

**twice**
64:15

**two**
63:25, 87:12,
108:14

**type**
63:10, 105:6,
105:8

typewritten
115:10
typical
34:20

## U

uh-huh
41:12
ul
15:18, 56:16
ultimate
30:14
ultimately
71:1
umbrella
92:17, 92:18
unacceptable
35:15
unclear
63:1
under
6:12, 21:18,
31:4, 53:19,
63:24, 79:13,
83:10, 92:17,
94:6, 98:6,
101:15, 106:16,
115:10
understand
6:5, 6:13,
6:23, 7:20,
40:24, 56:2,
56:12, 56:13,
63:3, 63:10,
66:17, 87:22,
87:23, 92:1,
95:5, 101:24,
102:2, 108:1,
112:18
understandable
18:18
understanding
32:25, 35:19,
65:18, 65:19,
77:22, 81:14,
87:9
understood
6:16, 9:16,

22:16, 23:10,
23:22, 42:14,
56:15, 65:1,
66:7, 69:18,
73:2, 83:13
unequivocally
45:10
unethically
30:12
unexpected
35:18
unexplained
47:25, 48:19
unfunny
107:24
uninvent
97:5
unique
43:14, 46:7,
93:13, 105:3
united
1:1
university
8:5, 8:10
unlawfully
30:13
unless
6:21
unlike
69:22
unpaid
39:18
unrelated
39:4
until
7:12, 22:20,
28:5, 30:20,
48:17, 48:20,
56:18, 58:20,
85:9, 99:14,
100:11
untoward
31:11
untrustworthy
35:11
uproot
105:16
upstanding
80:12

use
21:7, 21:10,
44:19, 61:12,
66:4, 96:24
using
20:1, 22:14,
74:16
usual
113:7
usually
80:12

## V

vaguely
80:22
value
39:16
vance
15:16, 15:23,
16:9, 17:11,
22:18, 54:16,
83:8, 84:14,
85:17, 90:2,
90:14, 97:13,
98:7, 110:4
vandalism
98:15
various
6:20, 50:25,
52:3, 54:5,
73:12
vehicle
50:6
venture
25:10, 25:15,
25:18
veracity
80:10
verbal
7:6, 7:10,
50:5, 50:11,
50:15
versus
76:6, 76:8
via
2:10
vice
103:3, 103:11,

103:18, 103:21
videoconference
2:10
visit
34:21, 73:1
visits
83:25
voltage
61:15

## W

wait
7:12
waited
48:5
walk
73:8, 95:21
walked
72:6, 104:21
want
6:11, 18:20,
31:4, 44:3,
45:7, 50:4,
67:19, 68:16,
72:25, 83:4,
85:16, 85:18,
85:19, 96:16,
96:21, 110:18
wanted
19:3, 27:7,
34:10, 34:13,
77:1, 87:25
washington
2:18
way
5:14, 60:8,
63:10, 66:24,
70:16, 83:3,
87:14, 91:8,
107:10, 115:14
ways
111:4
wbradley@rc
2:20
we'll
6:25, 7:2,
27:24, 44:19,
51:5, 70:10,

| | | | |
|---|---|---|---|
| 101:7 | 60:16, 72:3, | 68:1, 68:3, | 10:18, 11:5, |
| **we're** | 88:23, 89:22, | 68:10, 71:7, | 11:17, 12:21, |
| 7:13, 24:9, | 97:20 | 71:15, 79:6, | 12:22, 13:11, |
| 44:3, 44:4, | **whole** | 79:9, 79:12, | 14:14, 15:13, |
| 78:15, 85:1, | 5:6, 29:21, | 81:20, 81:22, | 15:15, 17:6, |
| 93:9, 93:12, | 47:18, 90:6, | 91:11, 92:20, | 18:11, 18:21, |
| 93:13, 94:5, | 115:7 | 103:5, 103:7, | 18:23, 19:13, |
| 94:6, 94:8, | **whomever** | 104:23 | 19:17, 21:4, |
| 94:9, 95:10, | 84:15 | **worked** | 21:6, 21:9, |
| 95:11, 95:12, | **widely** | 9:6, 11:7, | 21:12, 21:20, |
| 96:4, 96:7, | 48:14 | 12:4, 15:24, | 21:23, 22:4, |
| 97:14, 110:21, | **william** | 19:4, 41:20, | 22:15, 23:11, |
| 112:4 | 2:14, 5:18 | 78:25, 79:10, | 23:15, 23:25, |
| **we've** | **window** | 106:9, 106:16, | 24:2, 25:13, |
| 92:5, 108:3 | 32:17 | 109:20, 111:6, | 26:5, 26:8, |
| **web** | **wise** | 112:17 | 26:10, 26:12, |
| 77:1, 78:1 | 52:22 | **workforce** | 26:16, 26:25, |
| **website** | **within** | 8:13, 8:14 | 29:17, 30:18, |
| 59:16, 59:25, | 37:22, 64:3, | **working** | 33:24, 36:4, |
| 62:1, 77:7, | 88:25, 91:17 | 32:2, 32:4, | 36:10, 36:11, |
| 77:8, 77:9, | **witness** | 32:12, 40:19, | 38:2, 38:21, |
| 78:7, 78:16 | 4:12, 5:8, | 57:5, 68:11, | 39:20, 40:10, |
| **welfare** | 47:5, 62:10, | 86:20 | 40:14, 41:1, |
| 64:11 | 62:16, 115:4 | **workplace** | 41:5, 41:22, |
| **went** | **witnesses** | 17:3 | 41:23, 42:2, |
| 8:5, 9:6, 10:1, | 42:25 | **works** | 43:9, 43:20, |
| 11:9, 15:7, | **wolff** | 31:5, 75:19 | 43:25, 45:17, |
| 34:23, 61:10, | 1:25, 4:10, | **world** | 47:9, 47:19, |
| 75:5, 77:8, | 115:22 | 73:23 | 48:16, 48:18, |
| 77:9, 78:16, | **word** | **wouldn't** | 49:3, 50:18, |
| 82:12, 82:14, | 20:24, 21:3, | 21:2, 33:14, | 51:4, 51:15, |
| 82:15, 82:17 | 21:5, 21:10, | 68:4, 70:25, | 51:22, 53:6, |
| **weren't** | 37:9, 73:21 | 72:7, 73:15, | 55:17, 55:23, |
| 17:2, 36:25, | **words** | 82:21, 91:24, | 56:3, 56:19, |
| 48:4, 79:18, | 20:24, 96:24, | 96:15 | 60:14, 60:18, |
| 88:17, 88:20, | 97:3 | **written** | 60:22, 61:16, |
| 89:15, 105:18 | **work** | 50:24, 51:12, | 63:22, 64:5, |
| **whatever** | 8:15, 8:24, | 52:6, 76:7, | 65:15, 66:18, |
| 44:19, 76:3, | 10:1, 10:10, | 94:21, 100:11, | 69:3, 69:15, |
| 100:13, 104:24 | 13:13, 25:23, | 100:13 | 71:16, 71:24, |
| **whatsoever** | 25:25, 31:23, | **wrong** | 72:2, 72:15, |
| 87:16 | 31:25, 32:16, | 61:10, 93:19 | 79:8, 82:1, |
| **wheelhouse** | 35:14, 39:18, | **wrote** | 110:3, 110:24, |
| 17:11 | 42:8, 45:12, | 105:15 | 111:17, 112:19, |
| **whenever** | 54:13, 56:16, | **wu** | 112:23, 113:8 |
| 101:6 | 56:17, 57:10, | 50:21 | **year** |
| **whether** | 61:3, 61:8, | | 10:3, 11:1, |
| 7:18, 33:9, | 65:7, 65:22, | **Y** | 11:10, 11:19, |
| | | **yeah** | |
| | | 8:18, 10:4, | |

12:24, 14:5,
16:14, 16:16,
23:9, 29:18,
37:23, 51:16,
52:9, 63:20,
63:25, 64:17,
64:20, 65:21,
68:21, 74:1,
89:1, 89:14,
90:8, 90:9,
90:20, 95:24,
97:17, 97:21,
98:3, 98:10,
99:13, 99:14,
101:4, 101:8,
108:4, 111:24

**years**
9:11, 9:23,
14:3, 14:4,
18:19, 23:14,
29:14, 29:15,
61:6, 61:7,
64:4, 64:12,
69:6, 88:25,
90:9, 90:12,
90:21, 91:17,
103:8, 104:23

**yingling**
1:23, 4:3,
5:14, 5:16, 6:2,
7:23, 24:15,
41:9, 44:23,
45:14, 46:4,
49:9, 51:7,
52:17, 62:20,
73:22, 78:23,
81:20, 83:6,
88:12, 94:1,
94:18, 99:19,
100:12, 100:21,
101:15, 110:19,
113:24

**yourself**
8:19, 28:15,
34:2, 35:24,
45:5, 46:1

**yup**
108:9

---
**Z**
---
**zero**
72:18
**zoom**
5:19

---
**$**
---
**$500**
50:6

---
**0**
---
**00**
35:1, 56:18
**01**
4:7
**05**
114:9
**06**
115:24
**08**
115:25

---
**1**
---
**1**
114:9
**10**
4:7, 28:14,
42:22, 44:1
**11**
29:24, 44:2,
45:4, 115:25
**110**
3:6
**113**
3:7
**12**
2:6, 3:18,
33:25, 44:25,
50:19
**1201**
2:16
**13**
38:10, 40:8,
40:9, 40:10,
47:2, 51:5
**14**
9:11, 34:3

**15**
35:22, 47:15,
47:16, 115:24
**16**
3:19, 47:12,
47:16, 51:6
**17**
51:5, 51:23
**18**
50:4

---
**2**
---
**20**
1:24, 4:6,
18:19
**2000**
10:4, 10:7,
10:19, 109:2
**20004**
2:18
**2005**
16:9
**2006**
16:9
**2008**
25:11, 43:16,
65:8, 66:24,
68:21, 69:2,
69:6, 69:11,
70:18, 71:7,
71:15, 83:7,
86:19, 88:13,
89:6, 91:3,
91:11, 105:3,
109:3
**2011**
53:15, 89:23
**2012**
3:21, 52:18,
53:16, 89:22,
112:1
**2013**
50:20, 50:21,
51:6, 51:24,
112:1
**2014**
38:25, 43:16,
49:12, 58:17,

59:3, 73:7,
92:12, 109:3
**2015**
38:19, 38:23,
59:13, 59:16,
59:19, 61:21,
61:25, 69:6,
69:11, 88:13,
89:7, 91:3,
106:21
**2016**
59:22, 59:25,
60:3, 60:5,
106:22
**2017**
106:22
**2019**
14:7, 14:8,
15:11, 28:5,
30:20, 58:20,
60:11, 61:2,
61:7, 65:5,
65:7, 70:19,
76:25, 77:24,
104:22
**2020**
60:13
**2021**
60:15, 60:17
**2022**
61:7
**2024**
3:19
**2025**
1:24, 3:16,
4:6, 115:25
**2027**
115:24
**213**
2:19
**22**
104:23
**23**
104:23
**24**
1:3, 3:13,
48:9, 105:14,
105:17, 108:2

**25**
1:24, 4:6,
49:13
**26**
3:14

### 3

**3**
2:8
**3-point**
49:17
**3.1**
49:16
**3.19**
49:14, 49:17
**30**
61:21, 61:24
**31**
3:16, 24:25,
26:12, 26:14,
26:16, 26:23,
28:14, 29:24,
33:25, 35:23
**32**
45:4, 47:3,
47:12
**37130**
2:7
**38**
3:14
**3:-cv**
1:3

### 4

**40**
112:3
**41011**
4:5
**42**
3:16
**44**
3:17
**45102**
5:15
**49**
3:19

### 5

**5**
35:1

**50**
4:4
**500**
50:12
**52**
3:21
**5602**
2:19
**59**
5:14

### 6

**615**
2:8
**62**
3:5

### 7

**74**
8:8
**771**
2:19

### 8

**8**
56:18
**80**
112:22
**820**
2:17
**850**
4:5
**893**
2:8
**8933**
2:8

### 9

**922**
1:3